IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 20 CR 352 |
| | ) | |
| v. | ) | |
| | ) | |
| ANTHONY EMEKA IBEKIE, | ) | Chicago, Illinois |
| | ) | June 17, 2024 |
| Defendant. | ) | 8:59 a.m. |

VOLUME 1
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. PAIGE NUTINI
MS. MEGAN DeMARCO
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For the Defendant: KENT R. CARLSON & ASSOCIATES, P.C.
BY: MR. KENT R. CARLSON
53 W. Jackson Boulevard, Suite 1523
Chicago, Illinois 60604

Also Present: MS. AMY MANSKER, Special Agent
IRS Criminal Investigations

MR. CHRISTOPHER KADONSKY, Special Agent
IRS Criminal Investigations

Court Reporter: AMY M. KLEYNHANS, CSR, RPR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 2318A
Chicago, Illinois 60604
Telephone: (312) 818-6531
amy_kleynhans@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: 20 CR 352, USA versus Defendant No. 2, USA versus Ibekie.

THE COURT: Good morning, folks.

Let's get everyone's appearances on the record, if you would, please.

Start with counsel for the government.

MS. NUTINI: Good morning, Your Honor.

Paige Nutini and Megan DeMarco on behalf of the United States.

THE COURT: All right. Good morning, Ms. Nutini.

Good morning, Ms. DeMarco.

MS. DeMARCO: Good morning, Judge.

THE COURT: And it looks like you have some guests with you today; is that right?

MS. NUTINI: Yes, Your Honor. I apologize.

THE COURT: That's fine.

MS. NUTINI: This is Special Agent Amy Mansker and Special Agent Christopher Kadonsky, both with IRS Criminal Investigations.

THE COURT: All right. Ms. Mansker and -- Kadonsky?

All right. I don't think I know either one of you. Welcome to my courtroom. I'm Judge Seeger. Pleasure to meet you.

MS. MANSKER: Good morning, Judge.

THE COURT: Welcome.

You folks are the party representatives for the trial; is that right?

MS. NUTINI: Yes, Judge.

THE COURT: They're going to be here the whole trial? You're not going to swap people?

MS. NUTINI: Yes, Your Honor.

THE COURT: Are they testifying?

MS. NUTINI: Yes.

THE COURT: Okay. So you've got two party representatives, both of whom are testifying?

MS. NUTINI: Yes.

THE COURT: All right. Any objection to that?

MR. CARLSON: No, Judge.

THE COURT: All right. Very good.

All right. So welcome to both of you.

All right. Defense table, go ahead, please.

MR. CARLSON: Good morning, Your Honor.

Kent Carlson on behalf of Mr. Ibekie.

THE COURT: All right. Good morning, Mr. Carlson.

Thank you, everybody, for being here.

Let me start by saying this: Are you folks ready for trial?

MS. NUTINI: Yes, Your Honor, we are.

MR. CARLSON: Yes, Your Honor.

THE COURT: All right. Very good.

So it is 9:00 o'clock. We had talked about convening at 8:30. I have been ready to go. You folks have been ready to go. Thank you for being here.

I've been reluctant to come out here in the meantime because the defendant is not yet here, and I have a strong preference for proceeding with the defendant here because it's a criminal case and it's the trial.

I do have some housekeeping matters to cover with you. I am perfectly fine with just delaying that for ten minutes or so until he arrives just so he can have the benefit of hearing it. I don't think it will take real long on my end.

I also could ask if the defendant wants to waive his appearance for the preliminary material.

I will say this: There is zero pressure from me to waive his appearance. If you want him to be here for every minute of the trial, I think that's perfectly appropriate.

So, Mr. Carlson, I'm more than happy to wait. I don't love proceeding without the defendant unless you tell me that that's what you'd like to do to get the ball rolling.

MR. CARLSON: Judge, I don't have any problem waiving his presence, but if Your Honor would prefer to have him here, I understand that as well. I -- however Your Honor wishes to proceed is fine by me.

THE COURT: Okay. Do we have an update about how soon

he'll be here, by chance?

THE MARSHAL: (Shaking head side to side.)

THE COURT: Is he in the building?

THE MARSHAL: Not that I know of yet, Judge. I haven't heard back.

THE COURT: Okay. Well, let me just say this: I think we should wait, if that's okay. I think we should wait.

Let me just say a couple things real briefly.

I've given you the judge's list.

Does everybody have that? For the questionnaires, right?

MS. NUTINI: Yes, Judge.

MR. CARLSON: Yes.

THE COURT: Everybody's got that?

And I gave you the redline of the preliminary jury instructions.

Did everybody get that?

MR. CARLSON: Yes, Your Honor.

MS. NUTINI: Yes.

THE COURT: Okay. I have a couple updates on a couple jurors that we can cover. It has to do with Jurors 41, 47, and 32. I think my courtroom deputy gave you a hard copy of Juror 32's issues.

I don't know if we gave them the e-mail for 47 and 41 as well.

Okay. Let me . . .

We can cover this when Mr. Ibekie is here. The issue is Juror 47 was having trouble with a cab. She is probably here.

And Juror 41 announced he's not coming today, apparently.

So -- so why don't we do this, folks: Why don't we hang loose for another ten or 15 minutes. And if it's really getting behind the schedule, maybe we can cover the preliminary things.

I don't really have a lot. I think I can do it in five or ten minutes. And I know you folks are anxious to go, but given that it's the first day of trial, I'd like the defendant to be here, even if we cover small things.

Is that good?

Okay. So I'm going to go back to chambers. Does that sound good, everybody? We'll hang loose.

MR. CARLSON: That's fine.

THE COURT: I understand there were some issues with the audio this morning. I don't know if that's been smoothed out.

I'm seeing nodding heads, so that looks like it's going to go well.

MS. NUTINI: Yes, Your Honor. We tested it on Friday. It wasn't working. And then this morning, it wasn't working,

but Kevin from the IT department came back in and said that there was some functionality that even the courtroom deputy couldn't override --

THE COURT: Yeah.

MS. NUTINI: -- that he had to take care of, and he did. He said that it's very possible it will happen again, but -- so we should have him on speed dial, and he can adjust it remotely. But we'll make sure to test the equipment every morning.

THE COURT: All right. Very good. Thank you for saying all of that.

I think it goes to show the value of doing the test in advance. So thank you for doing that. Thank you for testing.

If anybody has any issues in front of the jury when the jury is watching, I'll try to smooth it over. I like my lawyers to look good, all of you as my lawyers. The lawyers for the defense, the lawyers for the government, I want you to present your cases well. So if there's a technology issue, I'll probably try to smooth it over with the jury.

But thank you in advance to both sides for doing everything you can to be ready. Okay?

So we'll hang loose for ten minutes or so. As soon as the -- 20?

THE MARSHAL: About 20, Your Honor.

I did hear back, and there's just a lot of traffic in

and out of MCC.

THE COURT: Yep.

THE MARSHAL: Unfortunately, U.S. marshals pull second in priority to the BOP in general.

THE COURT: Yep. Okay.

Given that this is the first day of trial, I don't want to create anxiety for the defendant by starting. So we're going to start when he's here. Okay? I don't have a lot. I think relatively shortly once he's going, we'll be able to cover my preliminary matters, we can cover your preliminary matters, and then we'll get the jury in here. Okay?

Maybe the delay will solve the cab issue that one of the jurors was having. Okay?

So as soon as I hear the defendant is here, I'm going to roll right back out. Okay?

Thank you, folks.

THE CLERK: All rise.

(Recess at 9:10 a.m., until 9:31 a.m.)

THE CLERK: 20 CR 352, USA versus Anthony Ibekie.

THE COURT: All right. Good morning, everybody.

Pleased to see the defendant here.

Let's go ahead and get everyone's appearances so that the defendant can have the benefit of hearing everyone's names.

Go ahead, please.

MS. NUTINI: Good morning, Your Honor.

Paige Nutini and Megan DeMarco on behalf of the United States.

I also have at our table Special Agent Amy Mansker and Special Agent Christopher Kadonsky, both of whom are with IRS Criminal Investigations.

THE COURT: All right. Very good.

Good morning, Ms. Nutini.

Good morning, Ms. DeMarco.

And the rest of you, good morning.

Defense team, go ahead, please.

MR. CARLSON: Good morning, Your Honor.

Kent Carlson on behalf of Mr. Ibekie.

THE COURT: All right. Very good.

Mr. Ibekie, good morning, sir.

THE DEFENDANT: Good morning, Your Honor.

Anthony Ibekie.

THE COURT: Mr. Ibekie, are you ready for trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you had enough time to prepare for trial?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you need to talk to your lawyer privately before we get going today?

THE DEFENDANT: No, I think we are good, sir.

THE COURT: Okay. Very good.

I want to say a special thank-you to the deputy marshals who are here with us and will be with us throughout the trial.

Thank you, folks, for your service to the public. I really appreciate you all, and I hope you feel that in the courtroom. We can't do anything without you folks. I appreciate everything that you do for your country. So thank you.

All right, folks. I just have a few preliminary things that I'd like to cover.

Let me say this again, which I said before, but I want to hear it in -- I want Mr. Ibekie to say it -- hear it.

Is the government ready for trial?

MS. NUTINI: Yes, Your Honor.

THE COURT: Is the defense ready for trial?

MR. CARLSON: Yes, Your Honor.

THE COURT: All right. Very good.

So let's go through the list of the jurors.

I gave everyone the judge's list. That is the list I don't normally distribute, but I wanted to distribute this time for your benefit because it will help you figure out who is who from the jury in terms of this name and this number. So we should try to use that.

Does everybody have that?

MS. NUTINI: Yes, Judge. Thank you.

THE COURT: Does that help?

MR. CARLSON: Yes.

MS. NUTINI: Yes.

THE COURT: Okay. Very good.

You all went through the questionnaires. You got them on Friday.

Is that right, everybody?

MR. CARLSON: Yes, Your Honor.

MS. NUTINI: Yes, Your Honor.

THE COURT: Were they helpful?

MS. NUTINI: Yes.

MR. CARLSON: Very much so.

THE COURT: Any reactions to anything?

I have a reaction.

Do you want me to go first?

I'll go first.

MR. CARLSON: Sure, go ahead.

THE COURT: My reaction is I've got a lot of questions today. I have a lot of questions.

Can I say on a personal note, my throat always hurts at the end of jury selection. It really does. Every time I do it, I say I'm going to make the lawyers do it next time.

Here's the thing: There are a lot of people that have answers that elicited a reaction from me or made me think that I should follow up.

I expect today that there's going to be a need to bring a lot of people to the witness stand. If people have certain views of things, I'd like them to express it, but I would prefer to have them express it outside the presence of everyone else. I don't have perfect control over that. Sometimes people blurt things out. But if people have issues that I don't necessarily want broadcast to the whole jury room, I'll put them in the witness box and just have a conversation.

I think I'm going to do that a lot today. All right?

What I will typically do, at the end of each person, when they come to the witness stand, I will say, "Does anyone have any follow-up questions for this person?" Okay? So just be mindful of that.

In general, for jury selection, I do want to give you folks the information you need to make the best decision for your respective clients about who you want on the jury and who you don't. So I will do what I can to just try to vacuum up information from them.

If you think that there is something that is important that I should follow up on, you can suggest it to me. Usually what we'll do is I'll go through all 14, and then I'll ask you, "Does anybody have any follow-ups for any of these people?" In other words, we'll do that in a sidebar.

We're not going to do that after each individual person because it gets a little chaotic. Okay?

I would say this: Please be judicious in your requests for follow-up. If you think it's important, I'll be pretty strongly inclined to ask it. But everything is finite, including time in the courtroom. And you've got to really think to yourself, do you want me to spend five minutes drilling down on this, because when we have 40-some people, it does add up pretty quickly.

Okay. So it's a long way of saying, if you think it's important, raise it, and if I think it's important, I'll ask it. But just be mindful of the cost of doing so. It does slow jury selection down.

Okay. Do you all have the same reaction to the questionnaires, that there is a fair amount of follow-up needed on some of these?

MS. NUTINI: It does, Your Honor.

THE COURT: Okay.

MR. CARLSON: Absolutely, Judge. There's quite a few.

THE COURT: Yeah, quite a few. That was my reaction, too.

I will say this: In previous jury selections, I have asked people some standard questions at the end, and it has varied. But my last couple trials, I've done things like this: "So, you know, the defendant is entitled to the presumption of innocence. Do you believe that? Do you think you can follow the rule that he's entitled to the presumption of innocence?

"The government has the burden. They have to prove their case beyond a reasonable doubt. Can you return a verdict for the government if they prove their case? And if they don't prove their case, can you return a verdict in favor of the defense."

Those sorts of things.

I don't know if I need to do that here. I'm a little concerned about the time that we're facing given that we've only got seven days before we have to break with the testimony.

Do you all have a reaction on whether you want me to ask those standard questions?

MR. CARLSON: Judge, I would ask that you do that. I think the stakes are so high, and the responses to some of these questions are -- are fraught with uncertainties. I would think that erring on the side of caution is the way to proceed.

THE COURT: And what would you propose that I do? Just cover what I just covered or --

MR. CARLSON: Yes, Judge.

THE COURT: Okay. What does the government think?

MS. NUTINI: Your Honor, that's fine. I believe most of these questions were already addressed in the questionnaire, but if you want to briefly address the panel as a whole, maybe that would save a little time.

THE COURT: Okay. We'll see how it goes when we get going. I will go out and print the standard questions I asked

in my last couple trials when we get going here. I'll float it to you before I do it. Okay?

I want to cover some specifics with some of the jurors.

Last week, we excused Juror 5, Juror 42, and Juror 48.

Juror 48 was the juror who no longer lives here. I know that one juror had an issue with taking her mom to the doctor for a cancer appointment today. I think that was Juror 5. I may have it the other way around.

Juror 42 was the dental exam person.

Again, maybe I've got those inverted, but that's the concept.

So we've already excused Jurors 5, 42, and 48.

Is that what you folks got?

MS. NUTINI: Yes --

MR. CARLSON: Yes.

MS. NUTINI: -- Judge.

THE COURT: All right. Very good.

All right. So we had a couple issues that we have flagged. One has been resolved. Juror 47, who was not here yet, but she's here, so that's good.

Juror 41 is the person who said that they have a work emergency. And apparently, there was a voicemail that was left. And I asked Ms. Ramos to play the voicemail for you.

Did you all hear that voicemail?

MS. NUTINI: We did, Your Honor.

MR. CARLSON: Yes, Judge.

THE COURT: All right. So that was -- I didn't -- I haven't personally heard it, but that was the person who said they have some kind of a work emergency. So we will deal with that separately.

Juror 32 is another person I wanted to flag. This is a person who says that she has anxiety issues. She attached a letter from her therapist saying that she's got anxiety issues.

Did everyone get that?

MS. NUTINI: We did, Your Honor.

MR. CARLSON: Yes, Judge.

THE COURT: Okay. Any reaction to that, anybody?

MR. CARLSON: Judge, my reaction is that when there is a medical professional saying they don't believe that her health is such that she should be able to serve on a jury without causing her further harm, I think that is as strong a cause as we're going to come up with. And I would ask that she be excused for cause.

THE COURT: Okay. What does the government think?

MS. NUTINI: Your Honor, we agree. We have no objection to that.

THE COURT: Okay. So there is a joint proposal to excuse Juror 32; is that right?

MR. CARLSON: Yes, Judge.

THE COURT: Government?

MS. NUTINI: Yes, Your Honor.

THE COURT: All right. So I'll strike her for cause given that we've got a note from her doctor saying she's got anxiety issues.

I will ask Ms. Ramos to excuse her so she doesn't even have to sit through the day.

Does that sound good, everybody?

It will save us time.

MR. CARLSON: Yes, Judge.

MS. NUTINI: Yes, Your Honor.

THE COURT: And that will hopefully that dampen her anxiety.

Okay. So the other thing I wanted to tell you is we apparently have four jurors who are not here. Fortunately, they're in the back half of the collection. It's Jurors 29, 34, 44, and 55.

So 29, 34, 44, and 55.

What we will do is, in a minute, we are going to take a five-minute break. Ms. Ramos is going to place a very quick phone call to each of them and just say, "You're supposed to be here for jury duty," okay, just to let them know right away that they're supposed to be here.

Everybody get those numbers?

29, 34, 44, and 55.

Okay. Everybody got them?

We are going to have 12 jurors and three alternates today.

All right. So, you know, I've never done three alternates before. I think you still get just one strike, don't you? The number of strikes doesn't increase, I think.

MS. NUTINI: That's our understanding, Your Honor.

MR. CARLSON: That's --

THE COURT: All right.

MR. CARLSON: -- correct.

THE COURT: So we will do that.

Do you all have any final comments, suggestions, objections, or otherwise on jury selection? Any questions about the procedure?

MS. NUTINI: No questions, Your Honor. I think our numbers are looking a little tighter than we feel comfortable with, but it is what it is.

THE COURT: Yeah, you and me both. I think that's -- all right. Mr. Carlson, what do you think?

MR. CARLSON: Judge, I agree we're a little tighter, but quite honestly, I didn't expect it to really go as smoothly as we had hoped.

THE COURT: Yeah. Well, I agree with you. I'm concerned about how many people we've got. You know, I think my last jury in a criminal case, I had 14 people questioned.

And in the first batch, I had one person serve on the jury out of that first 14. It was one for 14. So hopefully, we can do better than that today.

Okay. Anything else on jury selection?

I think we've covered everything.

MR. CARLSON: No.

THE COURT: I want this to be a cooperative enterprise with you folks. If you need info, you feel like you're not getting it, anything like that, I want you to speak up and let me know. Okay? I want to make sure that you folks get the info you need because it's important for your clients. Okay? I'm receptive to comments.

Let's talk about preliminary jury instructions. I know that's not the top of the mountain here in terms of priority. But I did give you a hard copy of the preliminary jury instructions. The government suggested a tweak or two, and I think they're fine, so I adopted them.

Any issue with those, folks?

MR. CARLSON: Fine.

MS. NUTINI: No, Judge.

THE COURT: Okay. And as part of jury selection, I'm going to be reading the statement of the case. That was Docket No. 272.

Is that still agreed, everybody?

MR. CARLSON: It is. And we had discussed -- before

Your Honor had suggested maybe taking out the one paragraph. I ask that that second paragraph remain in there, and with that, I agree.

THE COURT: Yeah, that's the bit about "the indictment is simply the formal way of telling" --

MR. CARLSON: Yes, Judge.

THE COURT: I'll include that. Yeah, they'll hear it a couple times. That's fine.

Any objection to any of this?

MS. NUTINI: No, Your Honor.

THE COURT: Okay. I think we're good there.

I think that's about all I've got, frankly. I don't have a lot. I'm anxious to get going, as you folks are. I do think Ms. Ramos needs to make these calls like now, I think, just to make sure that nobody has forgotten about jury duty and -- or maybe we can just get them here someway, somehow.

MR. CARLSON: Judge, in light of the fact that we're concerned about the numbers, it might be beneficial, even if some of these people are going to arrive a little bit late, to know that they're coming.

THE COURT: That's right.

And we've also notified the jury department that we may need more bodies. So we're going to have the jury department ask them to complete more questionnaires.

I'm hopeful that what we've got is going to be enough,

because if we have to get more questionnaires from more people, they've got to be scanned and collated, and we've got to go through them, and it does lead to some delay.

Here's the bottom line: The most important thing is not to do -- do it fast. The most important thing is to do it well. The most important thing is to have a fair and impartial jury. And it's going to take as long as it takes, right? It's going to take as long as it takes. I mean, it's important.

You know, I would like to get it done, but I want to get it done well. So we're going to take what it takes today.

Anybody have an issue with that?

MR. CARLSON: Not at all, Judge.

MS. NUTINI: No, Your Honor.

THE COURT: Okay. All right. So let's, folks, take a five-minute break.

So here's the plan: Ms. Ramos is going to make the phone calls. In five minutes or so, as soon as she's done, I'm going to roll back out here. I'm going to see if you have any final things to raise, and then we're going to bring the jury in. I'm going to give an inspirational speech to them about jury service.

Ms. DeMarco, how did it go last time?

MS. DeMARCO: Great, Your Honor.

THE COURT: I hope it's okay. I do try to make people feel good about being here. I would not want to live in a

country where the government just put people in jail without the people and the community having a say about it. Think about that, right? So it's just really important that we understand why we're here. Because the jury is a protection for we, the people.

I'd ask the intern back there -- Stephanie, good morning to you. We're going to put the jury on the left of the courtroom. So if you'd be kind enough to go on the right side, I'd appreciate that. Okay?

Everybody understand the plan?

We'll get going in five minutes.

All right. Thank you, folks.

THE CLERK: All rise.

(Recess at 9:47 a.m., until 10:10 a.m.)

THE COURT: All right. Welcome back, everyone.

Thank you to Ms. Ramos for making those calls.

She heard back from one of the jurors, and I wanted to fill you in on that.

Remember there were four jurors who were missing, right? 29, 34, 44, and 55. I can give you the names, if you want.

She left a voicemail for Juror 29. Has not heard back.

She left a voicemail for Juror 34. Left a voicemail. She did hear back from him. Charles something something is his

name. He apparently injured his back this weekend and cannot get out of bed.

Ms. Ramos, do you want to provide any more details on that.

THE CLERK: Yes.

It's Juror 34, Charles Gosel. He said he pulled his back over the weekend, and he can barely get out of bed, which means he can barely drive over.

THE COURT: And was that -- that was a voicemail back?

THE CLERK: Yes.

THE COURT: Does anybody want to hear the voicemail?

MS. NUTINI: No, Your Honor.

MR. CARLSON: No, Judge.

THE COURT: All right. Any reaction to that? Do we want to excuse him for cause?

MR. CARLSON: Judge, having back problems myself and knowing exactly where he is and what he's going through, I would move that he be excused for cause.

THE COURT: Okay. Any objection to that? Government?

MS. NUTINI: No objection.

THE COURT: All right. So he'll be excused for cause.

Okay. Juror No. 30 -- excuse me -- 34 is excused for cause.

Juror 44 has arrived.

Ms. Ramos tried to leave a juror -- Juror No. 55 a

voicemail. It got some sort of weird fax-sounding something on the other end.

Ms. Ramos, do you want to be kind enough to tell us what you heard when you tried to leave a voicemail.

THE CLERK: Yeah, it didn't go to any kind of voicemail. It was more of a beep, kind of like the faxing -- I don't know if anyone has ever tried dialing a fax number, but it just goes straight to a dial tone. And that's the only number that the jury department has. That's it.

THE COURT: All right. Anything else on that, everybody?

We'll just see. I don't know what else to do. We've got kind of a dud number for a nonshowing juror. Okay?

Let me give you the proposed preliminary questions that I'll ask each member of the jury at the end. There are four of them.

Here it goes.

"Number 1: At the end of the trial, I'll instruct the jury on the law.

"Will you be able to follow my instructions about the law even if you disagree with them?

"Number 2: The government has the burden to prove its case beyond a reasonable doubt.

"Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

"On the flip side, can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

"Question 3: A defendant has the presumption of innocence.

"Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

"Number 4: Is there anything else about you that we should know that would affect your ability to be fair and impartial?"

So topic one is, "Can you follow the law?" Topic two is burden of proof. Topic three is presumption of innocence. Topic four is fairness and impartiality.

Any reaction? Any thoughts?

MR. CARLSON: I think that covers it, Judge.

MS. NUTINI: Agreed.

THE COURT: Okay. So they do have a reinforcing effect. You know, I'll phrase it differently for each individual juror, kind of, purpose, frankly, so they hear it a couple of different ways. That way, they can get the message over and over again. I think it will help.

That's all I have. It is 10:14. I'm anxious to get going with jury selection, as I know you folks are, too.

Anything else from the government?

MS. NUTINI: No, Your Honor.

THE COURT: All right. Anything else from the defense?

MR. CARLSON: No, Your Honor.

THE COURT: All right. Let's go ahead and get the jury.

Good luck, everyone, in the trial.

Ms. Ramos was just confirming there that she can tell the juror who had the therapist issue that she can be excused for the day and she doesn't have to come in.

Let me cover one last thing, folks.

When I talk to them about the schedule, I'm going to tell them that we think this trial will probably last less than two weeks. I'm going to tell them that we're going to start jury selection today, that we are going to pick a jury. We are not going to be here on Wednesday. We are not going to be here on Monday and Tuesday of next week. The parties are hopeful that they will be able to complete the presentation of evidence by Friday of next week, but that's not a guarantee, it's not a promise; it's just a hope.

If the parties have completed their presentation of the evidence and the jury deliberates, jury deliberations will start -- will continue through the first week of July. So they can start deliberating if everything is done.

If everything is not done, then we're going to take a

two-week break and we're going to start on July 15th.

Is that good, everybody?

MS. NUTINI: That sounds good to the government with the only caveat of, I think it would be, the parties are hopeful that we will complete the presentation of evidence before Friday, the -- whatever date that is, instead of by Friday because I think it's possible we will complete it by Wednesday or Thursday --

THE COURT: Yeah, yeah.

MS. NUTINI: -- of next week.

THE COURT: I may not stick the landing on my exact phraseology with the jury here, but I'll try to convey that, that we're going to try to do it before the end of next week.

Mr. Carlson, are you comfortable with that?

MR. CARLSON: That's fine, Judge.

THE COURT: Okay. I appreciate how cooperative everyone has been leading up to trial. It's been really smooth with you all. So thank you for everything you've done to make this smooth, as far as I see it. So you all are very easy to deal with.

MS. NUTINI: Your Honor, while we're waiting on the jury, one final matter, we have received signed revised stipulations, and mostly that is reordering some of the government's exhibits that have changed. And so we will be filing those on the docket later today.

THE COURT: Great. Perfect. Thank you for that.

(Venire in at 10:19 a.m.)

THE CLERK: All rise.

THE COURT: Have a seat, everyone.

Well, good morning. Good morning, everybody. Good morning. Good morning.

I am Judge Seeger.

Welcome to the federal courthouse.

Let me say this right off the bat: First things first, thank you for being here. Thank you for being here, folks. I know all of you made an effort to be here. None of you live across the street. All of you made a special effort to be here. We appreciate the fact that you folks took the time to be here today. Thank you for doing that.

As I said, I'm Judge Seeger.

Let me introduce you to my staff.

You've already met Ms. Ramos. She's the best courtroom deputy in the building.

To my left is my court reporter, Amy Spee. She has the fastest fingers in the tri-state area. She takes down each and every word that is spoken in the courtroom. Think about that. She takes a record not for the jurors, but for me.

So I'm really lucky to have Ms. Ramos and Ms. Spee here today.

Thank you, folks, for your service to your country.

Today we will be picking a jury to serve in a criminal case. The name of the case is United States versus Anthony Ibekie.

Let me talk to you briefly about the schedule.

It is hard to predict how long a trial will last. That's true in any trial. You never know how long a trial is going to last because you can't say for certainty on the front end.

I try to be straight with people. So I'm going to be straight with you folks. I'm going to give you the best estimate that I've got. Okay?

I think this trial likely will last less than two weeks. That is not a promise. That is not a guarantee. That is not set in stone. I'm just being as straight with you as I can. I think it's probably going to last through some part of next week.

Let me also talk to you about a few quirks with the schedule. Wednesday of this week is Juneteenth. It's a federal holiday. We will not be having trial on Wednesday, June 19th.

Next week, we will not be having trial on Monday, June 24th, or on Tuesday, June 25th.

So those of you who are going to be serving on the jury, you should know that you're not going to be here on Wednesday of this week. You will not be here on Monday of next

week. You will not be here on Tuesday of next week.

We are hopeful that we will make good progress, and there is a decent chance that we will finish the trial at some point next week. It might be toward the front of the week. It might be toward the back of the week, starting on Wednesday.

So there is some likelihood that we're going to be able to finish by the end of next week.

If the parties have presented all of their evidence and if I've instructed the jury and there are jury deliberations, then the jury deliberations will continue through the first week of July until the jury returns a verdict.

If the presentation of the evidence is not done by the end of next week, then we are going to take a two-week break, and we will resume on Monday, July 15th.

So I know I've hit you with a lot of dates, folks, but let me just tell you the concept again.

There is no trial on Wednesday of this week. There is no trial on Monday or Tuesday of next week. I think there is a reasonably good chance that the parties will complete the presentation of the evidence at some point next week, but that remains to be seen. Okay?

Did you all get the calendar as part of the jury selection process?

I hope that was helpful to you. I'll tell you, I'm a

visual person. It's just easier for me to see than hear it. If I hear it, it kind of goes in one ear and out the other. But hopefully, this was helpful for you.

No trial on Wednesday. No trial on Monday or Tuesday. We'll see how it goes. Maybe we'll be done by the end of next week.

Let me say one other thing, too, before we get going here. I know that there are some people who have back issues and hip issues and it's just hard to sit still. I especially feel sorry for those of you in the back who are sitting on those hard benches.

Parenthetically, at some point, I'm going to personally spring for cushions for you all so you aren't sitting on those hard benches.

If you all feel uncomfortable, you folks in the gallery, and you have any issues, you just need to stand up, you need to stretch, I want you to go ahead and feel free to do that. Just please don't cause a commotion, obviously, which you obviously wouldn't. But I don't want anybody back there feeling uncomfortable. So if you need to stand up and stretch, if you've got a back issue or anything like that, please go ahead and do that.

Let me also say this right off the bat: We appreciate your willingness to serve on a jury. I'm going to go out on a limb and guess that maybe, just maybe someone in this room

wasn't entirely thrilled to get a jury summons in the mail. I am aware of that phenomenon. Maybe somebody didn't love having to go to jury duty.

Well, let me say this: I get it. I get it. I understand. I really do.

Let me just say this by way of perspective: Please keep an open mind. Jury service is one of the most important duties we have as an American citizen. Our legal system, our entire system of justice is the envy of the world. A big part of that is our jury system. People from the community give each other a fair trial.

Let me say that again.

People from the community give each other a fair trial. That's how we resolve differences in this country, fairly and impartially. And we need your help to do it.

You know, a jury system is critically important to our democracy. You know, in the vast majority of countries around the world, there is no jury duty -- jury system. A judge like me decides guilt or innocence. A judge like me decides who wins and who loses.

And let me tell you, you don't want that. You don't want that.

That's not how it works in this country. We, the people, are in charge. It's the first three words of the Constitution for a reason. We, the people, are in charge.

That's true in a lawsuit. That's true in a courtroom.

A jury decides who wins and who loses. A jury decides who is right and who is wrong. A jury decides guilty or not guilty. Members of the community, the people, control the outcome of the case.

The right to a jury trial is one of the most important rights we have as American citizens. We've had that right in this country from day one. In fact, the Declaration of Independence mentions the right to a jury trial not once, not twice, three times. It brings it up three times. That's one of the reasons we broke off from England.

All of you have a right to a jury trial. Now, think about that for a second. If you're ever charged with a crime, if a loved one is ever charged with a crime, if you're ever in a civil lawsuit, you've got a right to call members of the community to serve fairly and impartially. You have that right, and so do other people of the community as well.

And that's why you're here today. You have the right to a jury trial, and the right to a jury trial creates responsibilities.

It might be the highest form of public service you do in your life.

Let me say that again.

Today, meaning this jury service, might be the highest and best service to your country that you ever do in your

lifetime, other than maybe serving in the military or the intelligence community.

So let me say this: If any of you weren't entirely 100 percent thrilled with getting a jury summons, I get it. I really do. I get it. But I want you to know this: Serving on a jury is a noble thing. Serving on a jury is public service. Serving on a jury is the right thing to do.

Here's the bottom line, folks: We need you. Your country needs you. Your country needs you to serve on a jury.

Thank you for service to your country.

Here's the other thing I'll say: You may be surprised, for those of you who serve on a jury, how uplifting the process is once you go through it. It's very common for me to have jurors that are a little bit apprehensive on the front end. But on the back end, they feel pretty good about the legal system that we've got in this country. So please keep an open mind in the meantime.

Let me say this by way of an anecdote: In the mail the other day, my son got a jury summons to this federal courthouse. And I said, "Oh, you're going. You're going." I meant to bring it up here today.

So I know what it feels like, folks. Thank you genuinely. Thank you, genuinely, for being here.

Let me give you a couple preliminary instructions.

You must not communicate about the case or do any

research about the case from this moment forward, period. It's very important, it is very important that you not look at any outside information. It may be incomplete. It may be inaccurate. It may be legally irrelevant. It's not fair to the people who have worked so hard to have their day in court if the process gets compromised by outside information.

So thank you, folks, for resisting any temptation you may have to talk to each other about the case or look on your phones about the case.

I know that each of you came in here Friday to complete the questionnaires. Thank you for doing that. So for all of you, this is your second visit to the courthouse in your jury service. Thanks for taking the time to come down. That was very helpful. You all gave us really helpful information. It's going to speed things along today as we do jury selection. So thank you for doing that.

Let me just tell you a little bit about how we're going to be picking a jury today. The way we pick a fair and impartial jury is by telling you a little bit about the case and then asking you a series of questions.

I don't know how long that process will take. I expect it to take several hours today. It is possible that the process will stretch into tomorrow. In a criminal case, it's possible that it's going to extend into tomorrow.

I may ask you some follow-up questions in response to

your questionnaire. Part of the goal there is for me to figure out if you have any extraordinary hardship that would keep you from serving on the jury.

Notice that phrase: "extraordinary hardship." That's a high standard. Examples include you're leaving the country this week or you're having surgery this week or you're having a baby this week or you're the only person who can care for someone in hospice or someone who is -- an infant or something like that.

What I'm going to do is I'm going to go through each -- down the line. I'm going to ask you questions in a moment one by one. I also have some questions that I'm going to ask everybody. And the goal of that process is to get a fair and impartial jury.

Let me say this, too: I know that some people don't love public speaking. I'm aware of this phenomenon. I remember when I was in eighth grade having to give a speech, you know, in English class, just terrified going up there. I didn't like it.

Please don't feel that way at all. You're just going to be talking to me. We're just going to be hearing a little biographical information just for a couple minutes. It's not going to be an onerous process at all.

It is very common when I do jury selection that a topic will come up where we're not going to have a conversation

in front of everyone in the whole room. Like, let's say there is a topic that you don't want to discuss. Let's imagine if you're going to be unavailable for a personal reason or you've got experience in your life that you think you might want to share but don't want to share with everyone. That's not a problem at all.

Here's how we do it: We have members of the jury come up to the witness box. We turn on a white noise machine. We put on these old-school headphones so I can talk to you privately. Nobody else can hear you except the parties and the lawyers and me. Okay? So we're going to do it that way.

It's going to be very common today for people to come on up. I'll say, "Come on up to the witness stand. Let me just ask you a couple questions." It's very routine.

What we're going to do today is we're going to march through 14 of you. We're going to go through and ask you questions. And then when you 14 are done, we're going to go with the next 14.

So those of you who are here in the 14, you've got the squishy chairs up there. That does not mean you're going to be serving on the jury. We just had to start with somebody, and you're the first 14 people we started with. Okay? We had to start somewhere.

Before I do any -- so that's an overarching explanation of the day: why we're here and what we're going to

do.

Before I do anything else, I'm going to ask my courtroom deputy to administer the oath. She is going to ask you to promise that you told the truth throughout the -- and you will continue to tell the truth throughout the process.

So, Ms. Ramos, if you'd be kind enough to please administer the oath to the members of the panel.

THE CLERK: Everyone, please raise your right hand.

THE COURT: That's all of you. All of you.

THE CLERK: Everyone.

(Venire sworn.)

THE COURT: All right. Let me ask this first question to everybody, including the 14 of you and everybody in the gallery: Do each of you swear or affirm that your answers to the questionnaires were truthful, accurate, and complete? If so, please say "yes."

THE VENIRE: Yes.

PROSPECTIVE JUROR MICHAELS: I didn't understand a lot of the questions.

THE COURT: Okay. Thank you for saying that.

Do you want to tell me your name, sir, and we'll be sure to follow up with you.

PROSPECTIVE JUROR MICHAELS: Thomas Michaels.

THE COURT: Thomas Michaelson [*sic*]. Okay. Thank you, Mr. Michaelson. I appreciate you flagging that. We'll be

sure to follow up with you on that.

Okay. Is your answer that you did give, Mr. Michaelson -- when you understood the questions, were the answers accurate and complete?

PROSPECTIVE JUROR MICHAELS: No, because there was one question that asked me if I would have an open mind to any illegal immigrant being tried in our system, who would I pick, the police or --

THE COURT: Okay. All right. So --

(Unreportable crosstalk.)

PROSPECTIVE JUROR MICHAELS: I would pick the police for sure.

THE COURT: All right. So we'll cover that. So thank you for sharing that.

So let me just say this: We will cover that with you during a sidebar. So thank you for sharing that.

The next thing I'm going to do is make some introductions. I'm going to ask the counsel for the government to introduce themselves. And I'll ask the defense team to introduce themselves.

I'm going to ask you all, members of the jury, if you know any of these people. So you've got to listen to the names, look at the faces. Please make sure that you take a good look and listen and see if you know them.

So I'll ask counsel for the government to please

introduce yourself.

MS. NUTINI: Thank you, Your Honor.

Good morning.

My name is Paige Nutini, and I'm an Assistant United States Attorney with the government.

MS. DeMARCO: Good morning.

My name is Megan DeMarco. I'm also an Assistant United States Attorney.

MS. MANSKER: Good morning.

I'm Amy Mansker. I'm a special agent with IRS Criminal Investigations.

MR. KADONSKY: Good morning.

I'm Chris Kadonsky. I'm a special agent with IRS Criminal Investigations.

THE COURT: All right. Could everyone hear that? Could everybody hear the last two names?

Folks, do you want to speak into the microphone.

Bear with me, please.

MS. MANSKER: Good morning.

I'm Amy Mansker. I'm a special agent with IRS Criminal Investigation.

MR. KADONSKY: And I'm Chris Kadonsky, a special agent with IRS Criminal Investigation.

THE COURT: All right. Thank you, folks. That's the government team.

Does anybody know them? Anybody in the gallery?

(No response.)

THE COURT: All right. So that's a bunch of nos.

All right. Thank you, Counsel.

Thank you, everybody.

And now we're going to introduce the defense attorney -- go ahead, please -- and the defendant.

MR. CARLSON: Good morning, ladies and gentlemen.

My name is Kent Carlson, and I represent this gentleman, Anthony Ibekie.

THE COURT: All right. Good morning, Mr. Carlson.

Good morning, Mr. Ibekie.

Does anyone know Mr. Carlson or Mr. Ibekie? Anyone?

(No response.)

THE COURT: Very good. So the answer to that is no.

The next thing we're going to do, everyone, is I'm going to read a statement of the case. It's two paragraphs long. It's an overarching summary of what the case is about. It's just kind of a teaser to give you a sense of what you're going to hear during the trial.

It's important that you listen carefully because I want to make sure that nobody in the courtroom knows anything about the case. Okay?

So here it goes.

The indictment in this case charges that Defendant

Anthony Emeka Ibekie committed the crimes of wire fraud, mail fraud, money laundering, making a false statement to a financial institution, and false use of a passport. The defendant has pled not guilty to the charges.

The indictment is simply the formal way of telling the defendant what crimes he's accused of committing. It is not evidence that the defendant is guilty. It does not even raise a suspicion of guilt.

So that's the statement of the case.

Does anyone think that they know anything about the case? Heard anything about it? Any familiarity? Anyone?

(No response.)

THE COURT: All right. So the answer to that from everyone is no.

All right. So without further ado, what we're going to do is we're going to start questioning the members of the prospective jury pool.

Does everyone have their questionnaire handy? Everyone got it?

Here's what we're going to do: When it's your turn, you stand up, you introduce yourselves, you just say a little bit about yourself for like a minute or two, and then I have a couple follow-up questions for you.

When I am done, I'm also going to ask everyone the same four or five questions. So when you listen to those

questions, you may want to think about how you would answer them. Okay?

So the goal of this exercise is for us to learn a little bit more about you. I'd like you to give me some raw biographical information.

If I was doing it, I would do it like this: I'd say, "Good morning. My name is Steve Seeger. I'm 53 years old. I live in such and such town."

I'm not going to tell you where I live.

"I live in such and such town. I work in the legal field. I've been doing that for a couple decades now. Here is where I get my news," *et cetera*, *et cetera*. Just a minute or two, nice and easy.

If there are answers in here that you think are important for us to know and elaborate on, I want you to go ahead and touch on it.

I think for a lot of these where you gave an answer, you're going to probably come up and do a sidebar, I think.

Okay? Does everybody understand?

All right. So without further ado, we're going to have our leadoff hitter this morning.

Our first prospective juror is James Lyman.

Do you want to stand up and turn the microphone on, if it's not on already.

PROSPECTIVE JUROR LYMAN: Hello.

THE COURT: Good morning.

PROSPECTIVE JUROR LYMAN: Good morning.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR LYMAN: Thank you.

THE COURT: Thank you for being the leadoff hitter this morning.

Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR LYMAN: Yeah. I'm James Lyman. I'm 22. I'm from the northern suburbs of Chicago. And I'm an incoming medical student at Northwestern Medicine. And that's a very important aspect, I think, because I have a lot going on in terms of preparation. And I'll also be moving from Michigan back to Illinois, to my home in the suburbs, this -- tomorrow, hopefully. I have a receipt of the moving truck that I've booked and some movers, too, as well. And that's tomorrow, Wednesday. And Thursday I was planning to move.

And then I'll be back. And then two weeks from now, I'll have to move again into my apartment downtown to begin medical school.

So that's the first thing about me.

And then besides that, I -- unfortunately, I think I have some ideological differences with the judicial system, and I'm not sure how impartial I could be. So I think I'd like to discuss that as well.

THE COURT: Okay. So tell me why you want to study

medicine.

PROSPECTIVE JUROR LYMAN: It's just -- I really enjoy the science, and it's a nice way to work with the science and work with people and do a lot of good on the one-on-one interactions.

THE COURT: Okay. You went where for undergrad?

PROSPECTIVE JUROR LYMAN: University of Michigan.

THE COURT: Okay. Your stuff is in Ann Arbor right now?

PROSPECTIVE JUROR LYMAN: Yeah, my lease is ending.

THE COURT: Okay. When does it end?

PROSPECTIVE JUROR LYMAN: July, July 1st.

THE COURT: Okay. So you were planning to go there tomorrow?

PROSPECTIVE JUROR LYMAN: Yeah.

THE COURT: Okay.

PROSPECTIVE JUROR LYMAN: And I have a receipt --

THE COURT: Okay.

PROSPECTIVE JUROR LYMAN: -- for the truck that I have.

THE COURT: Okay. So -- but you don't have to be out of your lease until when?

PROSPECTIVE JUROR LYMAN: I guess, technically, July 1st.

THE COURT: Okay. So you've got a couple weeks yet.

PROSPECTIVE JUROR LYMAN: Yeah.
THE COURT: Okay. When do you start medical school?
PROSPECTIVE JUROR LYMAN: July 29th --
THE COURT: So it wouldn't --
PROSPECTIVE JUROR LYMAN: -- but there are two events before that.
THE COURT: It wouldn't interfere with the trial, though, it doesn't sound like.
PROSPECTIVE JUROR LYMAN: Yeah.
THE COURT: You've got until the end of July. Okay.
PROSPECTIVE JUROR LYMAN: It's mainly the moving.
THE COURT: Okay. You were planning to move tomorrow?
PROSPECTIVE JUROR LYMAN: Yeah, I was going to drive tomorrow, and then --
THE COURT: Can you move this weekend?
PROSPECTIVE JUROR LYMAN: I could, but I have, like, movers scheduled to help me move some big items.
THE COURT: How much stuff do you have in your place in Ann Arbor?
PROSPECTIVE JUROR LYMAN: I've got like a couch, a bed. So, like, pretty big things that I need an extra hand with.
THE COURT: Okay.
All right. Why don't you come on up.
We're going to put the headphones on, everybody.

We're going to have a brief sidebar, everyone.

So if you'd be kind enough to leave the microphone on your chair.

Put the headset on. Have a seat.

(At sidebar with Prospective Juror Lyman:)

THE COURT: All right. Let's make sure the system is working.

Can all the parties hear me? Thumbs-up if you can.

All right. Can any members of the jury hear me?

(No response.)

THE COURT: All right. Nobody reacted.

Mr. Lyman, can you hear me okay?

PROSPECTIVE JUROR LYMAN: Yeah.

THE COURT: You went to New Trier.

PROSPECTIVE JUROR LYMAN: Yeah.

THE COURT: When did you graduate?

PROSPECTIVE JUROR LYMAN: 2020.

THE COURT: Do you think jury service is important?

PROSPECTIVE JUROR LYMAN: I do.

THE COURT: How would you like to be treated?

PROSPECTIVE JUROR LYMAN: Fairly and --

THE COURT: Yeah.

PROSPECTIVE JUROR LYMAN: -- impartial.

THE COURT: Why can't you move this weekend?

PROSPECTIVE JUROR LYMAN: I need movers to help. I

mean, I could maybe, but --

THE COURT: Yeah.

PROSPECTIVE JUROR LYMAN: -- I'd have to scramble to find someone else.

THE COURT: Yeah. But a couch, come on.

PROSPECTIVE JUROR LYMAN: Yeah.

THE COURT: I mean, you look --

PROSPECTIVE JUROR LYMAN: School is out, so --

THE COURT: -- like -- you look like you could pick up a couch by yourself, if you don't mind me saying so. Don't you think?

PROSPECTIVE JUROR LYMAN: I --

THE COURT: You're a big brawny guy.

Go ahead.

PROSPECTIVE JUROR LYMAN: I appreciate the compliment, maybe, but I think that's pretty hard for anyone to do on their own with a full-size couch.

THE COURT: Yeah. What do you -- I was sort of kidding, but sort of not.

Do you have friends in Ann Arbor right now?

PROSPECTIVE JUROR LYMAN: I don't.

THE COURT: So you hired people in Ann Arbor?

PROSPECTIVE JUROR LYMAN: Yeah.

THE COURT: Like, who did you hire?

PROSPECTIVE JUROR LYMAN: It's just one of the, like,

College -- I think it's called College Hunks. It's like a --
THE COURT: Okay.
PROSPECTIVE JUROR LYMAN: -- student moving --
THE COURT: All right. So --
PROSPECTIVE JUROR LYMAN: -- company.
THE COURT: -- you've got -- you got, what, a U-Haul? Or what have you got?
PROSPECTIVE JUROR LYMAN: Yeah, I have a U-Haul truck.
THE COURT: You've got a U-Haul. That's easy to move.
Can you please speak into the microphone so they can hear you okay.
PROSPECTIVE JUROR LYMAN: Yeah, yeah.
THE COURT: So you've just got like -- you've got like -- you've got two weeks to move, it sounds to me.
PROSPECTIVE JUROR LYMAN: Yeah.
THE COURT: I mean, it seems like you could work that out. We don't have jury duty Monday or Tuesday next week.
Couldn't you move it a week?
PROSPECTIVE JUROR LYMAN: I --
THE COURT: Don't you think?
PROSPECTIVE JUROR LYMAN: I could maybe, yes.
THE COURT: I mean, I will say I'm familiar with the concept of having college kids move.
PROSPECTIVE JUROR LYMAN: Yeah.
THE COURT: It's pretty easy. Don't you --

PROSPECTIVE JUROR LYMAN: Okay.

THE COURT: -- think? Don't you think?

PROSPECTIVE JUROR LYMAN: I don't know if it's easy, but sure.

THE COURT: I mean, how much stuff do you have?

PROSPECTIVE JUROR LYMAN: I have like a full apartment's worth, a one-bedroom apartment.

THE COURT: Yeah.

Okay. Tell me about your ideological concerns.

PROSPECTIVE JUROR LYMAN: Where --

THE COURT: And you're under oath here, so you've got to be straight with me.

What ideological concerns do you have?

PROSPECTIVE JUROR LYMAN: I mean, I just -- where would you like me to start?

THE COURT: Go ahead. Whatever you've got.

PROSPECTIVE JUROR LYMAN: With a lot of law enforcement, to start, I'm not sure how much I trust everyone's motives and their integrity. I'm not saying that everyone is a bad apple, but I believe there are a lot of bad apples, and especially at a system level I have a lot of concerns.

So I'm not -- I don't mean to suggest anyone in this room per se is -- has any mal intent or anything. I would never like to suggest that. But I do worry about the system as a whole, which I think might make me a little less impartial.

THE COURT: All right. So the case involves fraud allegations and tax-related allegations.

Is there any reason you can't be fair to both sides?

PROSPECTIVE JUROR LYMAN: I'm not sure.

THE COURT: You're really not sure?

PROSPECTIVE JUROR LYMAN: No, I'm not sure. I mean, I'd like to hear a lot more about the case, which I'm sure would happen in the --

THE COURT: Okay.

PROSPECTIVE JUROR LYMAN: -- trial, but --

THE COURT: You are a college graduate, right?

PROSPECTIVE JUROR LYMAN: Yeah.

THE COURT: Why can't you be fair to people?

PROSPECTIVE JUROR LYMAN: I mean, I think I can. I'd just like to hear more about the case.

THE COURT: Okay. Tell me what other ideological concerns you have.

PROSPECTIVE JUROR LYMAN: I mean, I think the major one is with law enforcement, and a little bit with the judicial system. I know it's not the majority, but there are many that are wrongly sentenced and wrongly incarcerated, and I think the system as a whole doesn't favor rehabilitation, from my perspective and from what I've read.

I imagine you might disagree, and I'm open to those opinions, of course. That's just my opinion.

THE COURT: Okay. Your grandmother was a victim of an e-mail scam.

PROSPECTIVE JUROR LYMAN: Yeah.

THE COURT: Tell me about that.

PROSPECTIVE JUROR LYMAN: I don't really know much details. I just know she lost a lot of money -- I think around $800 -- to a scam.

Yeah, I don't really know all the details. My mom and my uncles kind of handled it.

THE COURT: Okay. Would that affect your ability to be fair to the defendant here?

PROSPECTIVE JUROR LYMAN: Again, I think it might depend on the nature of the crime. And --

THE COURT: But you don't know if there is a crime.

PROSPECTIVE JUROR LYMAN: Oh, yeah. Sorry. Yeah.

THE COURT: It's an accusation.

PROSPECTIVE JUROR LYMAN: The nature of the accusation, yes, and the story that goes with it.

THE COURT: Okay. Can I ask you a question?

PROSPECTIVE JUROR LYMAN: Mm-hmm.

THE COURT: Who would you want to sit in your case if you were a juror [*sic*]? What would you want that person to be like? Do you think you'd want somebody there that was trying to get out of jury duty?

PROSPECTIVE JUROR LYMAN: No, I don't think so.

THE COURT: Okay. Would you want people to be fair and impartial?

PROSPECTIVE JUROR LYMAN: Yes.

THE COURT: Do you think you can do that for other people?

PROSPECTIVE JUROR LYMAN: I'd hope so.

THE COURT: Well, do you want that for you? If you're the defendant, do you want to be treated fairly?

PROSPECTIVE JUROR LYMAN: Yes.

THE COURT: Can't you do that for other people?

PROSPECTIVE JUROR LYMAN: I hope so, but I just don't know how much faith I have in the system. But I'll be as impartial as I can be, yes.

THE COURT: Okay. Does the government have any follow-up questions for Mr. Lyman?

MS. NUTINI: No, Your Honor.

THE COURT: Okay. Mr. Carlson?

MR. CARLSON: Judge --

THE COURT: You can go ahead and ask directly.

MR. CARLSON: Mr. Lyman, you said that --

THE COURT: You've got to speak into the microphone, Mr. Carlson, so we can hear you.

MR. CARLSON: Mr. Lyman, you indicated that when you were asked about immigration status, whether that would prevent you from being fair and impartial, and you said, "Not really."

Can you expound on that a little bit.

PROSPECTIVE JUROR LYMAN: Yeah, I think I said that because I didn't know his immigration status, and I'd like to know kind of more details about that.

MR. CARLSON: If he was a -- as it says in here, a citizen of Nigeria, would that affect your ability to be fair and impartial?

PROSPECTIVE JUROR LYMAN: No.

MR. CARLSON: Thank you.

THE COURT: Does anybody have any other follow-up questions?

MS. NUTINI: No, Judge.

THE COURT: All right. Mr. Carlson, you might want to control the headset and turn up your sound just a little bit more so we can hear you. Okay?

All right. Mr. Lyman, why don't you go ahead and take your seat back in the gallery.

Okay. Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Mr. Lyman. I appreciate you answering my questions.

I'm going to now ask you -- you've got to sit down.

Stand up, please.

I'm now going to ask you a series of questions.

Here it goes.

Number 1: At the end of the trial, I'll instruct the jury on the law.

Will you be able to follow my instructions about the law even if you disagree with them?

PROSPECTIVE JUROR LYMAN: Yes.

THE COURT: All right. Question 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR LYMAN: If it reaches a high bar of reasonable doubt, then yes.

THE COURT: Okay. Let me say the question again.

The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR LYMAN: Yes.

THE COURT: All right. Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR LYMAN: Yes.

THE COURT: All right. Question 3: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent

throughout the trial?

PROSPECTIVE JUROR LYMAN: No.

THE COURT: All right. Question No. 4: Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR LYMAN: No.

THE COURT: All right. Thank you, Mr. Lyman. I appreciate that.

Have a seat, please.

All right. Juror No. 2, we have Ms. Slovak.

Good morning.

PROSPECTIVE JUROR SLOVAK: Good morning.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR SLOVAK: Yeah.

THE COURT: Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR SLOVAK: Yes.

I'm Cara Slovak. I'm 34 years old. I'm from Ohio, but I've been in Illinois for the last ten years. I'm a buying manager from Aldi. Something to note, though, is that with Aldi, we are a German-based company. And I actually am doing an expat program, and I'm moving to Germany for the next three years. We leave July 1st. So for the next two weeks, we have a visa appointment. I have an ex- -- or a meeting with the tax company over there, as well as we have to do virtual viewings

of apartments because, German law, I have to actually physically or virtually view an apartment before we can put an offer for a lease.

THE COURT: Hmm-mm. Go ahead.

PROSPECTIVE JUROR SLOVAK: That was it.

THE COURT: You leave for Germany when exactly?

PROSPECTIVE JUROR SLOVAK: July 1st.

THE COURT: July 1st. Okay. So that's a week from Saturday, I think? Or, no, two weeks from --

PROSPECTIVE JUROR SLOVAK: Just over two weeks, yeah.

THE COURT: Two weeks from today, I think.

PROSPECTIVE JUROR SLOVAK: Yeah.

THE COURT: Do you speak German?

PROSPECTIVE JUROR SLOVAK: No. And we did a look-and-see trip, and that language barrier is stuff.

THE COURT: Yeah. And you're going to be over there how long?

PROSPECTIVE JUROR SLOVAK: Three years.

THE COURT: Three years.

PROSPECTIVE JUROR SLOVAK: Three to five.

THE COURT: And where in Germany are you going?

PROSPECTIVE JUROR SLOVAK: Dusseldorf.

THE COURT: I have just a couple questions for you.

Do you mind coming up to the podium, if you would, please.

(At sidebar with Prospective Juror Slovak:)

THE COURT: All right. So, Ms. Slovak, can you hear me?

PROSPECTIVE JUROR SLOVAK: Yes.

THE COURT: All right. Thank you for -- Ms. Slovak, can you hear me?

PROSPECTIVE JUROR SLOVAK: Yes.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR SLOVAK: Yeah.

THE COURT: I looked at your form. I'm not going to ask you follow-up questions on all of them. Thank you for being candid on the form.

PROSPECTIVE JUROR SLOVAK: Yeah.

THE COURT: I just wanted to see, does anybody have any follow-up questions about the Germany trip?

MS. NUTINI: Not from the government.

MR. CARLSON: Not from -- not from the defense.

THE COURT: All right. Does anybody have any follow-up questions for this juror of any kind, large or small?

MS. DeMARCO: Yes, Your Honor. Questions 14 and 15.

THE COURT: Okay. Go ahead.

MS. DeMARCO: Ms. Slovak, you put on your questionnaire that you -- your husband had an experience with the criminal justice system and it gave you a negative view of the judicial system.

Could you tell us a little bit about that.

PROSPECTIVE JUROR SLOVAK: Yeah, I thought it was one of those unfair circumstances.

So my husband, unfortunately, had a mother who was addicted to alcohol and had an abusive boyfriend. So there was an incident where he found out that the boyfriend was beating his mom. So he showed up, punched the boyfriend in defense of his mom, but then that man was able to charge my husband, and it was called a domestic abuse charge, even though my husband was not living there and was not related to that man.

MS. DeMARCO: Do you think you'd be able to put that experience aside and kind of have an open mind about this case and --

PROSPECTIVE JUROR SLOVAK: Yes.

MS. DeMARCO: -- be fair and impartial?

PROSPECTIVE JUROR SLOVAK: Yes.

MS. DeMARCO: Okay.

PROSPECTIVE JUROR SLOVAK: Mm-hmm.

THE COURT: Anything else from the government?

MS. DeMARCO: No, Your Honor.

THE COURT: Mr. Carlson, any questions for this juror?

MR. CARLSON: Yes, Judge.

Question 35, you said -- the question was, "Do you have any prejudices or biases of any kind that would make it difficult for you to be fair to a criminal defendant?"

Your response was "Yes."

Could you expound upon that.

PROSPECTIVE JUROR SLOVAK: My bad. I think that was a mistake. I don't. It would be no.

MR. CARLSON: And you also, in several places, indicated that you were against scamming innocent people.

PROSPECTIVE JUROR SLOVAK: Mm-hmm.

MR. CARLSON: Can you expound upon that.

PROSPECTIVE JUROR SLOVAK: Yeah, I have had a close friend who had skimmers on a gas station pump, and she, unfortunately, used a debit card instead of a credit card. So there was a lot of issues going back and forth with getting her money back from the bank.

MR. CARLSON: Would you be able to put that experience aside and judge the defendant in this case solely on the evidence here in the courtroom despite your not having sympathy for scamming innocent people?

PROSPECTIVE JUROR SLOVAK: Yes.

MR. CARLSON: Nothing further.

THE COURT: Okay. Anything else from the government?

MS. DeMARCO: No, Your Honor.

THE COURT: All right. Ms. Slovak, you made it look easy up here. Thank you for answering my questions.

PROSPECTIVE JUROR SLOVAK: Of course.

THE COURT: I'm just going to ask you a couple

follow-up questions. The same one you heard Mr. Lyman answer.

Thank you for taking the time to come down for jury duty.

PROSPECTIVE JUROR SLOVAK: Yeah.

THE COURT: I meant it when I said the thanks before, and I hope that came across. I mean it.

So thank you.

PROSPECTIVE JUROR SLOVAK: Of course. Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Ms. Slovak.

I'm going to ask you the same couple questions that you heard Mr. Lyman answer a moment ago.

So here it goes.

Question No. 1: At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions about the law even if you disagree with it?

PROSPECTIVE JUROR SLOVAK: Yes.

THE COURT: All right. Number 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR SLOVAK: Yes.

THE COURT: Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable

doubt?

PROSPECTIVE JUROR SLOVAK: Yes.

THE COURT: Question 3: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed innocent throughout the trial?

PROSPECTIVE JUROR SLOVAK: No.

THE COURT: Question 4: Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR SLOVAK: No.

THE COURT: Okay. Thank you, Ms. Slovak. I appreciate that.

PROSPECTIVE JUROR SLOVAK: Yep.

THE COURT: All right. Next up, we've got Ms. Roth.

PROSPECTIVE JUROR ROTH: Hello.

THE COURT: Good morning.

PROSPECTIVE JUROR ROTH: Good morning.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR ROTH: Thank you for --

THE COURT: Go ahead --

PROSPECTIVE JUROR ROTH: -- having me.

THE COURT: Go ahead and introduce yourself.

PROSPECTIVE JUROR ROTH: I'm Alexia Roth. I'm 23. I

live in North Aurora -- or have been living in Peoria. I am currently a student at Bradley University in Peoria and currently home for the summer just trying to make some money for the next semester.

THE COURT: I grew up in Bloomington-Normal and Bradley was our archenemy for the local --

PROSPECTIVE JUROR ROTH: I know.

THE COURT: -- school team. Illinois State, yeah.

So tell me again what you -- you're studying to get a degree right now?

PROSPECTIVE JUROR ROTH: I'm currently studying to do art.

THE COURT: To do art. What kind of art do you want to do?

PROSPECTIVE JUROR ROTH: 3D art, 3D art particularly for video games.

THE COURT: Oh. So let me ask you a couple questions.

Your mother is a police officer.

PROSPECTIVE JUROR ROTH: Yes.

THE COURT: Does she talk to you about her job?

PROSPECTIVE JUROR ROTH: I mean, yeah, a lot of the time. Usually, she'll come home and be like, "Oh, guess what happened today."

THE COURT: Yeah.

PROSPECTIVE JUROR ROTH: And I'm like, "Awesome."

THE COURT: Does she deal with any tax issues?
PROSPECTIVE JUROR ROTH: No.
THE COURT: Has she ever worked on a tax case?
PROSPECTIVE JUROR ROTH: Not that I'm aware of.
THE COURT: How about fraud; does she ever work on any fraud case or --
PROSPECTIVE JUROR ROTH: Personally, I haven't heard of that, no.
THE COURT: Okay. What kind of cases does she work on?
PROSPECTIVE JUROR ROTH: Your typical police officer ones, you know, like burglary, domestic violence, stuff like that.
THE COURT: Okay.
PROSPECTIVE JUROR ROTH: She's currently doing backgrounds now. So she's not on the streets anymore --
THE COURT: Okay.
PROSPECTIVE JUROR ROTH: -- due to injury.
THE COURT: So let me ask you this: Your mom is a police officer.
PROSPECTIVE JUROR ROTH: Yes.
THE COURT: We need people on the jury that can be fair to both sides.
PROSPECTIVE JUROR ROTH: Yes.
THE COURT: And just kind of completely play it

straight.

Can you be fair to the defendant here even though your mom is a --

PROSPECTIVE JUROR ROTH: Of course.

THE COURT: -- a police officer?

PROSPECTIVE JUROR ROTH: Yes. Of course.

THE COURT: In other words, are you going to put your thumb on the scale and favor the government over the defendant just because your mom is a police officer?

PROSPECTIVE JUROR ROTH: No.

THE COURT: Do you think that would be the right thing to do, to favor one side or the other?

PROSPECTIVE JUROR ROTH: Absolutely not.

THE COURT: All right. Do you have any concerns about that?

PROSPECTIVE JUROR ROTH: No.

THE COURT: Okay. And I saw that your grandmother had a bad experience.

PROSPECTIVE JUROR ROTH: Yes.

THE COURT: I'm happy to talk with you about that privately, if you'd like. But the main thing I want to know is whether there's anything about that experience that would affect your ability to be fair and impartial to both sides.

PROSPECTIVE JUROR ROTH: No, not at all.

THE COURT: Did that involve e-mails or in person or

what?

PROSPECTIVE JUROR ROTH: I believe it was like over the phone and like the Internet since she wasn't very educated about that stuff.

THE COURT: Okay. Any desire to follow up with that, folks, on a sidebar?

MS. NUTINI: No, Your Honor.

MR. CARLSON: No, Your Honor.

THE COURT: The main thing we want to get at is your grandmother had an experience.

PROSPECTIVE JUROR ROTH: Yes.

THE COURT: And all of us bring our life experiences into the courtroom. And the question is whether anything about that experience would impact your ability to be fair to both sides. Because we need people who could be fair to everybody.

Can you do that?

PROSPECTIVE JUROR ROTH: I'm a fair person. I'm not going to judge.

THE COURT: Okay. And then I saw that there's a -- somebody in your life that's having a birthday, but other than the birthday celebration --

PROSPECTIVE JUROR ROTH: I'm free.

THE COURT: You're free. Okay.

So let me ask you our standard questions.

PROSPECTIVE JUROR ROTH: Yes.

THE COURT: Here it goes.

At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions about the law even if you disagree with them?

PROSPECTIVE JUROR ROTH: Yes.

THE COURT: Number 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR ROTH: Yes.

THE COURT: On the flip side, can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR ROTH: Yes.

THE COURT: Number 3: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR ROTH: No.

THE COURT: Finally, 4: Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR ROTH: No.

THE COURT: All right. Thank you for answering my questions.

PROSPECTIVE JUROR ROTH: Thank you.

THE COURT: All right. Next up, we've got Mr. Berkowicz.

PROSPECTIVE JUROR BERKOWICZ: Good morning.

THE COURT: Good morning.

PROSPECTIVE JUROR BERKOWICZ: My name is --

THE COURT: Thank you for being here.

PROSPECTIVE JUROR BERKOWICZ: Well, thank you very much.

THE COURT: Go ahead and introduce yourself.

PROSPECTIVE JUROR BERKOWICZ: My name is Matthew Berkowicz. I'm 45. I live in the southern -- southern suburbs of Cook County. And I work with Sherwin-Williams. I've been there for 20 years.

THE COURT: Great.

Lansing, Illinois, where is that exactly?

PROSPECTIVE JUROR BERKOWICZ: It's right near the border of Indiana and Illinois.

THE COURT: Okay.

PROSPECTIVE JUROR BERKOWICZ: Torrence Avenue, 90 -- 80-94.

THE COURT: Okay.

PROSPECTIVE JUROR BERKOWICZ: Right there.

THE COURT: How long did it take you to get here this morning and how did you get here?

PROSPECTIVE JUROR BERKOWICZ: Actually, I drove. And actually, I got spun around in traffic, so it took a little longer than it probably should have, but -- but yeah. About an hour, 50 minutes to an hour.

THE COURT: Yeah. Construction probably doesn't help.

PROSPECTIVE JUROR BERKOWICZ: Yeah, and I'm not too familiar with the city. So, like I said, the first shock getting here on Friday was smooth, and then this time, I got kind of turned around. So . . .

THE COURT: Got it.

PROSPECTIVE JUROR BERKOWICZ: But I got here.

THE COURT: Well, thank you for being here. Thank you four doing that.

I have just a couple follow-up questions for you.

Do you mind coming up to the sidebar for me.

PROSPECTIVE JUROR BERKOWICZ: That's fine.

THE COURT: Okay. Thank you.

(At sidebar with Prospective Juror Berkowicz:)

THE COURT: All right. Can you hear me okay?

PROSPECTIVE JUROR BERKOWICZ: Yes, sir.

THE COURT: Do you remember the old-school Walkmans? We used to have these headsets --

PROSPECTIVE JUROR BERKOWICZ: Mm-hmm.

THE COURT: -- back in the day.

All right. So I just wanted to follow up with you.

Thank you for being here.

So Question 17 was about whether you had any strong feelings about the defense attorneys and prosecutors in the criminal justice system, and you wrote "Trump trials."

PROSPECTIVE JUROR BERKOWICZ: Yes, sir.

THE COURT: And why don't we just have a little conversation about that. So go ahead.

Tell me whatever you meant by that.

PROSPECTIVE JUROR BERKOWICZ: It's very -- like, we have the New York trials that went on, convicted 34 counts. As far as I see, they just kind of fabricated the whole thing, railed him, stacked the jury, guilty, and that's it.

THE COURT: Okay.

PROSPECTIVE JUROR BERKOWICZ: And then plus they're doing the RICO in Atlanta, trying to do all that.

THE COURT: Okay.

PROSPECTIVE JUROR BERKOWICZ: It seems like it's a whole lot of stacking the -- stacking the table, I think.

THE COURT: Okay. Well, thank you for sharing that.

What -- how should we think about that when we think about you as a prospective juror? I mean, does that affect your ability to be fair?

PROSPECTIVE JUROR BERKOWICZ: No, I wouldn't say that.

THE COURT: Yeah. Let me put it this way: I think I heard you say you were concerned about the stacked jury in New York, I think, if I heard you right.

PROSPECTIVE JUROR BERKOWICZ: Correct.

THE COURT: So do you view yourself as impartial?

In other words, if you sit on the jury, are we stacking the deck for or against anybody?

PROSPECTIVE JUROR BERKOWICZ: I would hope not.

THE COURT: Yeah. Do you want a juror like you on the jury, is a way I'd put it?

PROSPECTIVE JUROR BERKOWICZ: I don't know.

THE COURT: Yeah. Well, what do you mean?

PROSPECTIVE JUROR BERKOWICZ: Like I said, I'd rather be at work right now.

THE COURT: I understand. I understand.

PROSPECTIVE JUROR BERKOWICZ: I'm sure a lot of people were, but I don't have all the excuses like everybody else had. So . . .

THE COURT: I guess here's what I'm getting at: Do you have any views of the legal system that would prevent you from being a fair and impartial juror in this case?

That's what we're getting at. You had some concerns about the Trump cases. I'm familiar with that phenomenon. There is a lot of discussion going on in the public right now about those trials.

I will tell you, we're going to have a trial here, and we want a fair and impartial jury to sit on the jur- -- you know, to do the legal system proud with a fair and impartial jury here.

What's your reaction to that?

PROSPECTIVE JUROR BERKOWICZ: I'm kind of, yeah, just -- the whole legal system in general, yeah, it seems -- it seems like it could be used for different things. I don't know. It seems like we're going after maybe the wrong people sometimes. I don't know.

THE COURT: Okay. Well, let me put it this way: Is there any reason you couldn't be fair to the government here?

PROSPECTIVE JUROR BERKOWICZ: No, they haven't done anything to me --

THE COURT: I mean --

PROSPECTIVE JUROR BERKOWICZ: -- per se.

THE COURT: I mean, you know, you didn't like the fact that former President Trump was charged in New York. It seems like you had some concerns about that, if that's fair.

Is that a fair way of putting it?

PROSPECTIVE JUROR BERKOWICZ: That's correct, sir.

THE COURT: Would you hold that against the government?

Do you think, "Boy, you know, the government charges people for political reasons or improper reasons," or anything

like that? Would you hold it against the government?

PROSPECTIVE JUROR BERKOWICZ: No.

THE COURT: And how about the defense team; would you be more sympathetic or less sympathetic to Mr. Ibekie just because he's been charged with a crime? Would you be swayed one way or the other just before you heard any evidence?

PROSPECTIVE JUROR BERKOWICZ: I think I could be fair.

THE COURT: Okay. Here's what -- I know I'm asking you some questions the same -- the same way, but you also had little confidence in Homeland Security and the IRS here.

PROSPECTIVE JUROR BERKOWICZ: Yeah, the -- yeah, that -- that's a mess with Secretary Mayorkas and the human trafficking that's happening.

THE COURT: Okay. Well, I'll tell you, I don't expect Secretary Mayorkas to testify here. And, you know, this case doesn't involve the border. You know, we do have a case against a defendant, and he's entitled to a fair trial. And we're just trying to get a fair and impartial jury.

Do you think you can do that?

PROSPECTIVE JUROR BERKOWICZ: Yes, sir.

THE COURT: Okay. Any follow-up questions for this juror?

PROSPECTIVE JUROR BERKOWICZ: Well, I also have GameStop going on. I don't know if you've been following that.

THE COURT: GameStop, the stock?

PROSPECTIVE JUROR BERKOWICZ: You've got it.

THE COURT: Tell me about that.

PROSPECTIVE JUROR BERKOWICZ: Yeah, we're -- I'm in it. So it would be a little difficult to, you know -- you know, you've got your head going in all kinds of different ways.

THE COURT: Okay.

PROSPECTIVE JUROR BERKOWICZ: So that's also a distraction, I would say.

THE COURT: You're distracted by the stock movement of Game stock?

PROSPECTIVE JUROR BERKOWICZ: Yeah, wait and see.

THE COURT: All right. Well, I don't know much about that stock. I've read some of the news. Good luck. I'll just say --- I say to everyone good luck.

PROSPECTIVE JUROR BERKOWICZ: Thank you, sir.

THE COURT: Any follow-up by the government for this particular juror?

MS. NUTINI: No, Your Honor.

THE COURT: How about Mr. Carlson; anything from the defense?

MR. CARLSON: No, Your Honor.

THE COURT: Mr. Berkowicz, you answered my questions. I appreciate you coming on up here.

PROSPECTIVE JUROR BERKOWICZ: Thank you, sir.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Mr. Berkowicz.

If you'd be kind enough to take the microphone. We're going to ask you the standard questions.

Question 1: At the end of the trial, I will instruct the jury on the law.

Will you be able to follow my instructions on the law even if you disagree with them?

PROSPECTIVE JUROR BERKOWICZ: Yes, sir.

THE COURT: Number 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR BERKOWICZ: Yes, Your Honor.

THE COURT: On the flip side, can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR BERKOWICZ: Yes, sir.

THE COURT: Question 3: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR BERKOWICZ: No, sir.

THE COURT: All right. Question 4: Is there anything

else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR BERKOWICZ: No, sir.

THE COURT: All right. Very good.

Thank you, Mr. Berkowicz. I appreciate you answering my questions.

PROSPECTIVE JUROR BERKOWICZ: Thank you.

THE COURT: All right. Next up, we have Ms. Perkins.

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: Good morning.

PROSPECTIVE JUROR PERKINS: Good morning.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR PERKINS: Thank you.

THE COURT: Do you want to go ahead and introduce yourself for us.

PROSPECTIVE JUROR PERKINS: Hi. I'm Crystal Perkins. I am 55 years old. I've lived on the West Side of Chicago my entire life. I currently work as a clerk at the Secretary of State that is issuing driver's license and state IDs.

THE COURT: Oh. Which branch do you work at?

PROSPECTIVE JUROR PERKINS: Diversey Express.

THE COURT: I need to go over there.

PROSPECTIVE JUROR PERKINS: We'll take care of you.

THE COURT: All right. Well, I appreciate that.

Okay. How long have you worked for the Secretary of

State?

PROSPECTIVE JUROR PERKINS: I just started in December of last year.

THE COURT: Okay. How do you like it?

PROSPECTIVE JUROR PERKINS: I enjoy it.

THE COURT: Yeah. I think it's improved a lot. I think -- the last time I went, it was pretty user-friendly.

PROSPECTIVE JUROR PERKINS: Yeah. And with the appointments as well --

THE COURT: Yeah.

PROSPECTIVE JUROR PERKINS: -- it goes smoothly most of the time.

THE COURT: Yeah. Okay.

What did you do before working for the Secretary of State?

PROSPECTIVE JUROR PERKINS: I worked for the State, like, a contract, a family resource, processing applications for babysitting.

THE COURT: Okay. Great.

Well, thank you for your public service.

PROSPECTIVE JUROR PERKINS: You're welcome.

THE COURT: I just have a couple follow-up questions for you, Ms. Perkins.

Do you mind coming up just for --

PROSPECTIVE JUROR PERKINS: Sure.

THE COURT: -- 30 seconds. Is that okay?

Come on up, please.

PROSPECTIVE JUROR PERKINS: That's fine.

(At sidebar with Prospective Juror Perkins:)

THE COURT: Good morning, Ms. Perkins.

PROSPECTIVE JUROR PERKINS: Good morning.

THE COURT: Do you remember these old-school headphones, like Sony Walkmans? Do you remember that --

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: -- back in the day?

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: I just had a couple questions for you.

I saw that you were a victim of burglary. I was sorry that happened.

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: Is there anything about that experience that would affect your ability to be fair and impartial --

PROSPECTIVE JUROR PERKINS: No.

THE COURT: -- here?

I mean, you know, we want somebody who can be fair to the government. We want somebody who can be fair to Mr. Ibekie.

Can you do that?

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: Okay. And then I wanted to ask you just

briefly -- it said your husband had an incident with an officer, and it said "unsupervised probation." I didn't know exactly what that meant. I was hoping you could fill it in for me.

PROSPECTIVE JUROR PERKINS: The "unsupervised probation"?

THE COURT: Yeah, I just was -- I wasn't sure what the whole situation was. Just tell me what you -- what we ought to know.

PROSPECTIVE JUROR PERKINS: I think he was driving from a doctor's appointment, going back to work, and I guess he wasn't in uniform -- so they call them a peace officer -- walked across the street --

THE COURT: Can you -- a little --

PROSPECTIVE JUROR PERKINS: Oh.

Walked across the street.

THE COURT: The officer or your husband?

PROSPECTIVE JUROR PERKINS: The officer.

THE COURT: Okay.

PROSPECTIVE JUROR PERKINS: And my husband was driving.

THE COURT: Okay.

PROSPECTIVE JUROR PERKINS: And maybe he yelled out the window like, "You're gonna get ran over." And so the offi- -- but he was in plain clothes. The officer pulled a gun and

was trying to open my husband's door.

THE COURT: Oh.

PROSPECTIVE JUROR PERKINS: But to him, he thought it was just someone on the street. So -- and it was like two or three years after that we found out that there was an alert on his license. And so he had to go to court behind that.

THE COURT: I see.

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: I see.

Was your husband okay?

PROSPECTIVE JUROR PERKINS: He was, yes.

THE COURT: And when was this?

PROSPECTIVE JUROR PERKINS: This occurred maybe 2013 or '14, but we didn't learn about the alert until we got pulled over for tags, which they couldn't see because it was a temporary tag --

THE COURT: Yeah.

PROSPECTIVE JUROR PERKINS: -- in 2016.

THE COURT: Okay. Is your husband okay?

PROSPECTIVE JUROR PERKINS: He is, yes.

THE COURT: Okay. So I'm sorry that you went through that. I'm sure that was difficult.

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: Is there anything about that experience that would affect your ability to be fair to both sides here?

PROSPECTIVE JUROR PERKINS: No.

THE COURT: In other words, can you be fair to the government?

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: Did you feel like the government treated you unfairly in connection with that at all?

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: Okay. And tell me about that.

PROSPECTIVE JUROR PERKINS: Because it's like the car my husband was driving was in my name. And so I don't know what they did. They just assumed he was the driver.

THE COURT: Mm-hmm.

PROSPECTIVE JUROR PERKINS: And so with them putting that alert on him -- my husband has never been in any trouble. So by them -- I thought they just misused their power.

THE COURT: Mm-hmm.

PROSPECTIVE JUROR PERKINS: The officer.

THE COURT: Okay. So the government is hearing this now.

Is there any reason you can't be fair to the government in this case?

PROSPECTIVE JUROR PERKINS: No.

THE COURT: I mean, this case involves allegations of, you know, fraud and tax issues and whatnot.

Is there anything about your life experience that

would affect your ability to be fair and impartial to both sides?

PROSPECTIVE JUROR PERKINS: Right now, I'm currently seeking a lawyer because of fraud on my dad and my grandmother.

THE COURT: Okay.

PROSPECTIVE JUROR PERKINS: And my dad just passed in May.

THE COURT: Oh, I'm sorry to hear that.

PROSPECTIVE JUROR PERKINS: Someone scammed them both out of a total of 54,000 --

THE COURT: Wow.

PROSPECTIVE JUROR PERKINS: -- in two months for construction work.

THE COURT: Okay. I'm sorry that happened.

PROSPECTIVE JUROR PERKINS: Yeah.

THE COURT: Was it by e-mail? Was it by --

PROSPECTIVE JUROR PERKINS: No --

THE COURT: -- phone? Was it --

PROSPECTIVE JUROR PERKINS: -- person to person.

THE COURT: So, like, somebody came up and said they'd do construction in the house and took the money and didn't do the work? Or what --

PROSPECTIVE JUROR PERKINS: Right. Someone referred him -- they started out, they did the work and like overcharged, but then for the next month and a half they did

nothing but collect money.

THE COURT: I see.

PROSPECTIVE JUROR PERKINS: And because my mom had just passed, my dad was grieving, and he was in a proc- -- he had a brain bleed. So we believe he was in the process of a stroke. So that affected it, his judgment.

THE COURT: Okay. Well, I'm sorry you're going through that, and I'm sorry about your dad.

PROSPECTIVE JUROR PERKINS: Thank you.

THE COURT: And both of your parents.

So everybody brings life experiences in the courtroom. I do, too.

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: And what we're really getting at here, you know, Ms. Perkins, is we want somebody who can be fair.

You've got experience in your life where you believe that somebody in your family was defrauded, and I've got a criminal defendant here in my courtroom who is going to be defending charges brought by the government, that you're going to hear some allegations of fraud.

Can you be fair and impartial to both sides in this case?

PROSPECTIVE JUROR PERKINS: I can.

THE COURT: In other words, is there any reason you can't be fair to the government?

PROSPECTIVE JUROR PERKINS: No.

THE COURT: And how about Mr. Ibekie? You know, he's charged with certain crimes, as I've summarized them. Can you be fair to Mr. Ibekie, truly?

PROSPECTIVE JUROR PERKINS: I can.

THE COURT: Okay. Folks, do you have any follow-up questions for Ms. Perkins?

MS. NUTINI: Not from the government. Thank you.

MR. CARLSON: No, Your Honor.

THE COURT: Okay. That wasn't so bad, Ms. Perkins. What do you think?

PROSPECTIVE JUROR PERKINS: No, it was not.

THE COURT: I'm enjoying talking to you.

PROSPECTIVE JUROR PERKINS: Thank you.

THE COURT: All right. So I'm just going to ask you a couple follow-up questions when you get back, the same questions you've heard before.

PROSPECTIVE JUROR PERKINS: Okay.

THE COURT: Okay?

All right.

PROSPECTIVE JUROR PERKINS: Okay.

THE COURT: Thank you for coming up. Watch your step. Okay?

PROSPECTIVE JUROR PERKINS: Okay. Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Ms. Perkins. I appreciate you taking the time to chat with me there.

I have just four follow-up questions for you.

PROSPECTIVE JUROR PERKINS: Okay. Okay.

THE COURT: Here it goes.

Question 1: At the end of the trial, I'll instruct the jury on the law.

Will you be able to follow my instructions on the law even if you disagree with them?

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: Question 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR PERKINS: Yes.

THE COURT: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow that rule and make sure that the defendant is presumed innocent throughout the trial?

PROSPECTIVE JUROR PERKINS: No.

THE COURT: All right. Last question for you, Ms. Perkins.

Number 4: Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR PERKINS: No.

THE COURT: All right. Thank you, Ms. Perkins, for answering my questions.

PROSPECTIVE JUROR PERKINS: Thank you.

THE COURT: All right. Next up, we've got Ms. Rich.

PROSPECTIVE JUROR RICH: Hi.

THE COURT: Good morning.

PROSPECTIVE JUROR RICH: Good morning.

THE COURT: Thank you for taking the time to be here.

PROSPECTIVE JUROR RICH: Oh, you're welcome.

THE COURT: Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR RICH: My name is Karen Rich. I am 66, and I work for Medline Industries. I'm a distribution service manager. In a nutshell, I just make sure you get your stuff.

THE COURT: You "make sure you get your stuff," so --

PROSPECTIVE JUROR RICH: So I have 20 -- I have 20 hospitals --

THE COURT: Yeah.

PROSPECTIVE JUROR RICH: -- and I just work with them and make sure, yeah, that they get what they're ordering.

THE COURT: And what kind of products are we talking about? What sort of medical --

PROSPECTIVE JUROR RICH: Medical supplies.

THE COURT: Like all sorts of things?

PROSPECTIVE JUROR RICH: Oh, yeah. It could be anything from mop heads to bandages to scalpels to the gowns that you wear in the --

THE COURT: Okay.

PROSPECTIVE JUROR RICH: -- hospital.

THE COURT: And how long have you been doing that?

PROSPECTIVE JUROR RICH: Three years.

THE COURT: Three years.

And what did you do before that?

PROSPECTIVE JUROR RICH: I worked for a packaging company for a year. And before that, I worked for Aon selling medical -- Medicare supplement coverage.

THE COURT: Okay. Where do you like to get your news?

PROSPECTIVE JUROR RICH: I don't.

THE COURT: You don't?

What do you like doing for fun? What's fun for you?

PROSPECTIVE JUROR RICH: I have 11 grandchildren.

THE COURT: Oh. You have 11 grandchildren?

PROSPECTIVE JUROR RICH: Yeah.

THE COURT: Wow. That's a lot of activity.

PROSPECTIVE JUROR RICH: Yeah.

THE COURT: Do they live close?

PROSPECTIVE JUROR RICH: Most of them.

THE COURT: Yeah. Good. Good. Good. Good.

I have just a couple follow-up questions for you, Ms. Rich.

Do you mind coming up and just talking to me for a minute.

(At sidebar with Prospective Juror Rich:)

THE COURT: All right. Hi, Ms. Rich.

Can you hear me okay?

PROSPECTIVE JUROR RICH: I can.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR RICH: Well, you're welcome.

THE COURT: So I had a couple questions.

The first question I wanted to ask you about was the answer to Question 13. It was whether someone in your family or a close friend was ever a victim of a crime, and you answered "Yes," and you said, "I can be impartial."

Can you fill that out a little bit more, what happened.

PROSPECTIVE JUROR RICH: Well, I was a victim of the crime, but it was --

THE COURT: Let's go into the microphone.

PROSPECTIVE JUROR RICH: Oh, sorry.

THE COURT: You're fine. Go ahead.

PROSPECTIVE JUROR RICH: My son had stole my ATM card and cleared out my account.

THE COURT: Oh, I'm sorry to hear that.

Okay. Would that affect your ability to be fair to both sides here?

PROSPECTIVE JUROR RICH: Oh, absolutely not.

THE COURT: Okay. And then I saw that your sons went through the criminal justice system, and they -- it looks like they did time served for drug offenses; is that right?

PROSPECTIVE JUROR RICH: That's true.

THE COURT: Is there anything about that experience that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR RICH: No.

THE COURT: In other words, is there anything about the legal system or the judicial system that would affect your --

PROSPECTIVE JUROR RICH: The legal system saved my children's lives.

THE COURT: Oh, interesting.

PROSPECTIVE JUROR RICH: So . . .

THE COURT: Yeah, tell me about that.

PROSPECTIVE JUROR RICH: Well, they're sober and living great lives today, and if they had not been held

accountable for, you know, their wrongdoing, they might not be here anymore.

THE COURT: Yeah. Well --

PROSPECTIVE JUROR RICH: So I'm thankful for it.

THE COURT: Okay. Well, thank you for sharing that. I'm glad to hear your sons are sober.

PROSPECTIVE JUROR RICH: Thank you.

THE COURT: And then it says you spoke with your -- you spoke with an Attorney General's Office.

PROSPECTIVE JUROR RICH: Yeah, when -- when --

THE COURT: Is it for -- with your sons?

PROSPECTIVE JUROR RICH: Yes.

THE COURT: Okay. That was the state authorities, not the federal authorities; is that right?

PROSPECTIVE JUROR RICH: That's right.

THE COURT: Okay. And that was, it sounds like, a good experience? Or a bad experience?

PROSPECTIVE JUROR RICH: Yeah, no --

THE COURT: Or a good experience?

PROSPECTIVE JUROR RICH: -- a great experience.

THE COURT: A great experience.

PROSPECTIVE JUROR RICH: Yeah, he really cared about my son. So --

THE COURT: Okay. And then there was a question about Homeland Security and Internal Revenue Service and the postal

inspectors and --

PROSPECTIVE JUROR RICH: Oh, I might have misread that.

THE COURT: The question was a little long. It's on me.

PROSPECTIVE JUROR RICH: Sorry.

THE COURT: The question is long.

The concept is this: Can you -- is there anything about those agencies that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR RICH: No.

THE COURT: In other words, do you have positive or negative views about the Homeland Security Department or the IRS?

PROSPECTIVE JUROR RICH: I don't honestly have any view.

THE COURT: Okay. And then it's -- there was a question about whether you've been a victim of a fraud or someone close to you has, and you wrote, "Just a shopping site fraud."

PROSPECTIVE JUROR RICH: Yeah.

THE COURT: Tell me about that.

PROSPECTIVE JUROR RICH: Well, it was like an advertisement, and -- I don't know -- I got a message from my bank saying that there was a charge that wasn't a usual charge,

you know. And it came out after their investigation that it was like some shopping site, someone had got my information and had used it.

THE COURT: Okay. Is there anything about that experience that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR RICH: No.

THE COURT: Okay. Does anybody have any follow-up?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. Very good.

Ms. Roth -- or -- excuse me -- Ms. Rich. We had a Roth and then a Rich.

PROSPECTIVE JUROR RICH: Yeah.

THE COURT: Thank you for coming up. I hope it's not -- you don't feel like you're being put on the spot by coming up here.

PROSPECTIVE JUROR RICH: No. Actually, I'm thankful that I could come up here and just explain it without --

THE COURT: Yeah.

PROSPECTIVE JUROR RICH: You know, I mean, what happened with my boys, that's a matter of --

THE COURT: Yeah.

PROSPECTIVE JUROR RICH: -- public record. And it's all good, you know.

THE COURT: Yeah.

PROSPECTIVE JUROR RICH: But I'm glad that it's not news for everybody.

THE COURT: Yeah. Well --

PROSPECTIVE JUROR RICH: You know what I mean?

THE COURT: I've got you.

Well, good luck with your sons, ma'am. I appreciate it.

I'm going to ask you the standard questions in a minute. Okay?

PROSPECTIVE JUROR RICH: Okay.

(Proceedings heard in open court:)

THE COURT: All right. Ms. Rich, thank you for answering my questions.

I'm going to ask you the follow-up questions that we've asked everyone else in the panel.

Question 1: At the end of the trial, I'll instruct the jury on the law.

Will you be able to follow my instructions on the law even if you disagree with it?

PROSPECTIVE JUROR RICH: Yes.

THE COURT: Number 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR RICH: Yes.

THE COURT: Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR RICH: Yes.

THE COURT: Number 3: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR RICH: Do I have any concern?

THE COURT: Do you have any concerns about your --

PROSPECTIVE JUROR RICH: No.

THE COURT: -- ability to do that?

PROSPECTIVE JUROR RICH: No.

THE COURT: All right. Question 4: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR RICH: No.

THE COURT: All right. Thank you for answering my questions.

Next up, we've got Mclamore.

PROSPECTIVE JUROR MCLAMORE: Hello.

THE COURT: Good morning.

PROSPECTIVE JUROR MCLAMORE: Good morning.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR MCLAMORE: Thank you.

THE COURT: Do you want to go ahead and introduce yourself for us.

PROSPECTIVE JUROR MCLAMORE: Of course.

I'm Ryan Mclamore. I'm 19 years old. I'm a college student right now. I just finished up my freshman year. And I'm back at my hometown to make some money for next year.

THE COURT: Mm-hmm. What are you doing?

PROSPECTIVE JUROR MCLAMORE: I'm a camp counselor.

THE COURT: Okay. Where?

PROSPECTIVE JUROR MCLAMORE: Winnetka Park District.

THE COURT: Okay. What do you do for that?

PROSPECTIVE JUROR MCLAMORE: I look after kids.

THE COURT: Yeah. Are you the kickball coordinator? Or what do you do?

PROSPECTIVE JUROR MCLAMORE: I just chaperone them to activities, like field trips or just local activities, get them started, handle anything that happens, like, just -- yeah.

THE COURT: Okay. You two don't know each other, do you, Mr. Lyman and you?

You live in neighboring suburbs. Maybe you went to the same high school.

Where did you go to high school?

PROSPECTIVE JUROR MCLAMORE: New Trier.

THE COURT: Did you go to New Trier? Yes?
PROSPECTIVE JUROR LYMAN: (Nodding head up and down.)
THE COURT: Mr. Lyman, you've got to say "yes."
PROSPECTIVE JUROR LYMAN: Yes.
THE COURT: You guys don't know each other?
PROSPECTIVE JUROR MCLAMORE: No.
PROSPECTIVE JUROR LYMAN: I don't believe so.
THE COURT: All right. And tell me where you're in school and what you're studying.
PROSPECTIVE JUROR MCLAMORE: I'm in the University of Denver, and I just selected economics as my major.
THE COURT: Okay. Great. Terrific.
I have a couple follow-up questions for you, Mr. Mclamore, if you could come on up, please.
PROSPECTIVE JUROR MCLAMORE: Of course.
(At sidebar with Prospective Juror Mclamore:)
THE COURT: Hi. Good morning.
PROSPECTIVE JUROR MCLAMORE: Good morning.
THE COURT: So you went to New Trier?
PROSPECTIVE JUROR MCLAMORE: Yes, I did.
THE COURT: You graduated a year ago?
PROSPECTIVE JUROR MCLAMORE: Yeah.
THE COURT: Okay. I want to ask you about your grandparents. It says your grandparents were scammed out of some money and the experience made it difficult for you to

render a fair verdict.

What happened to your grandparents?

PROSPECTIVE JUROR MCLAMORE: So my grandpa was e-mailed and then scammed, also called, and he sent -- the amount was wrong. It was 10,000; it was actually 70,000.

THE COURT: Okay. So --

PROSPECTIVE JUROR MCLAMORE: And --

THE COURT: -- your -- your grandfather lost $70,000?

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: Okay.

PROSPECTIVE JUROR MCLAMORE: And just my mom and my aunt, all of them went on calls trying to figure out what they could do. It was really tough. It was like a year ago. So, like, right in the middle, it was like weeks on end because we were just trying to figure out how much he actually did lose because we didn't know the amount until near the end. So, like, talking, like -- and it just put an emotional toll with my grandparents. They had -- sold a couple of their assets because they didn't have that much money.

And my -- and it just affected my mom and my family a little bit around just -- and I was roped into it because I was hearing all the conversations. And it just affected everyone badly.

THE COURT: Was it over e-mail, the fraud over e-mail?

PROSPECTIVE JUROR MCLAMORE: I -- I do not know that,

but --

THE COURT: Okay.

PROSPECTIVE JUROR MCLAMORE: -- it was a scam -- fraud scam-related, like some -- it's fraud scam related. I wish I could go in further.

THE COURT: Do you know what happened? Do you know how they were defrauded? What they were told, what the fraud was about, anything like that?

PROSPECTIVE JUROR MCLAMORE: My mom just told me the amount. She didn't go into specific detail --

THE COURT: Yeah.

PROSPECTIVE JUROR MCLAMORE: -- because she just didn't want to keep talking about it.

THE COURT: So the concept is your grandparents lost $70,000 through a fraud, but you don't know how it happened or what they told your grandparents or anything like that; is that fair?

PROSPECTIVE JUROR MCLAMORE: I know they were on the phones with banks and different, like, things to try to figure out, like, what they could do.

THE COURT: Okay.

PROSPECTIVE JUROR MCLAMORE: I heard -- I heard those phone calls, but I never really actively listened in. It wasn't --

THE COURT: Okay. Does that experience affect your

ability to be fair and impartial?

PROSPECTIVE JUROR MCLAMORE: In this case, yes.

THE COURT: Tell me about that.

PROSPECTIVE JUROR MCLAMORE: For me, it's for my family and for us and for also a friend of mine, don't -- and I know he was also -- it's just really hard for me to -- because of the experiences, some of my family had to go with, and friends of mine. And I recently lost a couple things due to scamming that's unrelated, but it really affects my judge- -- like, view of this kind of case and what it's related to about.

Because I know, like, the effects it can go through -- and how can I say it? -- like the emotional issues like someone can do for, like, losing money, or something like that.

THE COURT: I mean, you haven't heard any evidence in this case yet.

PROSPECTIVE JUROR MCLAMORE: Well, no, but --

THE COURT: You don't know anything about the case except what it's about --

PROSPECTIVE JUROR MCLAMORE: That's true. Well --

THE COURT: -- except at a high level, right?

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: Can you be fair to Mr. Ibekie?

PROSPECTIVE JUROR MCLAMORE: That is -- I don't know.

THE COURT: Do you think he's entitled to a fair trial?

PROSPECTIVE JUROR MCLAMORE: I think everyone is entitled to a fair trial.

THE COURT: Including Mr. Ibekie?

PROSPECTIVE JUROR MCLAMORE: Everyone is entitled to a fair trial.

THE COURT: Would you want a fair trial if it was you?

PROSPECTIVE JUROR MCLAMORE: Of course.

THE COURT: Do you think you're entitled to that?

PROSPECTIVE JUROR MCLAMORE: Everyone is entitled to a fair trial.

THE COURT: How about Mr. Ibekie; do you think Mr. Ibekie is entitled to a fair trial?

PROSPECTIVE JUROR MCLAMORE: I do believe everyone is entitled to a fair trial.

THE COURT: Including Mr. Ibekie?

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: I mean, is there any reason why you can't be fair to him?

PROSPECTIVE JUROR MCLAMORE: At the moment, no.

THE COURT: Are you sure about that? Are you sure about that?

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: I mean, we've got Mr. Ibekie here accused of fraud. He's got the presumption of innocence. The government hasn't proved anything yet. You haven't heard any

evidence yet. You know, he walks in, presumption of innocence in his corner.

Can you be fair to him throughout the trial?

PROSPECTIVE JUROR MCLAMORE: Well, if the evidence proves in the way that I thought it could, then I don't know.

THE COURT: What do you mean "if the evidence proves in the way I thought it could"?

PROSPECTIVE JUROR MCLAMORE: You've got to -- I've got to focus up here.

No, I'm just going to say yes.

THE COURT: Well, I want you to tell me the truth here. Don't just say yes --

PROSPECTIVE JUROR MCLAMORE: Well, the --

THE COURT: -- to answer my question. You've got to --

PROSPECTIVE JUROR MCLAMORE: Yeah, of course. Of course.

THE COURT: -- you've got to be straight with me --

PROSPECTIVE JUROR MCLAMORE: Of course.

THE COURT: -- and you've got to --

PROSPECTIVE JUROR MCLAMORE: Of course.

THE COURT: -- tell me what you're thinking.

Go ahead.

PROSPECTIVE JUROR MCLAMORE: Well -- let's see -- if it's anything related to what my family went through or what

I've heard from close friends, family friends, then I probably could lean to the guilty verdict.

THE COURT: Okay. But --

PROSPECTIVE JUROR MCLAMORE: But I do believe everyone still is entitled to a fair verdict.

THE COURT: Okay. You didn't complete part of the form.

PROSPECTIVE JUROR MCLAMORE: Yeah. Well --

THE COURT: What happened there?

PROSPECTIVE JUROR MCLAMORE: So I was going to head back to that, but I just kind of got hyperfocused on a few questions. I do have ADHD, as I did write on there, and I just kind of forgot about those questions. So when I handed it in, I just didn't remember I had to do those.

THE COURT: Okay.

PROSPECTIVE JUROR MCLAMORE: Or follow up.

THE COURT: Okay. Let's just do it orally.

PROSPECTIVE JUROR MCLAMORE: Okay.

THE COURT: Have you or any member of your family or any close friend ever been arrested or charged with a crime?

That's Question 14.

PROSPECTIVE JUROR MCLAMORE: At the moment, no.

THE COURT: All right. Question 15 we will skip because it's covered by 14.

Question 16 is, anybody in your family who is a lawyer

or in the criminal justice system?

PROSPECTIVE JUROR MCLAMORE: No.

THE COURT: Question 17: Do you have any strong feelings about defense attorneys or prosecutors or the criminal justice system?

PROSPECTIVE JUROR MCLAMORE: No.

THE COURT: Question 18: Do you have any feelings about law enforcement that could affect your ability to be fair and impartial?

PROSPECTIVE JUROR MCLAMORE: No.

THE COURT: Question 19: Do you have any friend or relative that's worked in law enforcement?

PROSPECTIVE JUROR MCLAMORE: No.

THE COURT: Number 20: Would you have any difficulty giving the testimony of law enforcement officers the same weight that you give other witnesses?

PROSPECTIVE JUROR MCLAMORE: Can you please explain that question?

THE COURT: Yeah.

So do you think that a witness is more believable just because it's a law enforcement officer?

PROSPECTIVE JUROR MCLAMORE: Oh, no, I believe every witness is, like -- I believe both police and just general people statements are both the same, in my opinion.

THE COURT: Equally?

PROSPECTIVE JUROR MCLAMORE: Equally, yes.

THE COURT: You're not going to put a thumb on the scale of either side?

PROSPECTIVE JUROR MCLAMORE: No.

THE COURT: Okay. Question 27 asked about the fact that the defendant is not a United States citizen.

And the question was whether there's anything about his immigration status that would affect you from being fair and impartial, and you said, "Yes, I" --

PROSPECTIVE JUROR MCLAMORE: Yeah, I didn't answer that question.

THE COURT: You wrote, "Yes, I feel like American citizens."

What does that mean?

PROSPECTIVE JUROR MCLAMORE: I'm so sorry. I was -- meant to come back to that question as well.

For me -- yes, for me I do believe American citizens -- like, for this federal court, I don't -- is he a dual citizen or, like, is he just Nigerian? Like, that's --

THE COURT: Does it matter?

PROSPECTIVE JUROR MCLAMORE: At this point, no.

THE COURT: No, honestly, does it matter?

PROSPECTIVE JUROR MCLAMORE: To me, no.

THE COURT: Suppose he's not a United States citizen. Do you think he's entitled to a fair trial?

PROSPECTIVE JUROR MCLAMORE: I think everyone is entitled to a fair trial.

THE COURT: Even if he's not a citizen?

PROSPECTIVE JUROR MCLAMORE: Well, he is a citizen of a country, but that's not ours.

THE COURT: Okay. If he is not an American citizen, do you think he's entitled to a fair trial in an American courtroom?

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: Okay. Are you sure about that?

PROSPECTIVE JUROR MCLAMORE: Yeah.

THE COURT: If he's from Nigeria, would you hold that against him?

PROSPECTIVE JUROR MCLAMORE: No, I have nothing against Nigeria.

THE COURT: Okay. Do you have any prejudices or biases of any kind that we ought to know about?

PROSPECTIVE JUROR MCLAMORE: No.

THE COURT: Are you sure? You paused there.

PROSPECTIVE JUROR MCLAMORE: I don't really know how to answer that question. Like, can you explain further?

THE COURT: Just -- it's just an open-ended question.

Do you have any prejudices or biases that we ought to know about?

PROSPECTIVE JUROR MCLAMORE: I -- I don't think so. I

can't think of any right now, so I'm just going to say no.

THE COURT: Okay. And then you talked about ADHD.

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: Tell me about that.

PROSPECTIVE JUROR MCLAMORE: So I do actually have something from my school in case you do want to know if I have it or not.

For me, it's -- I have trouble sitting. Like, I do constantly move. And for me, for long periods of time, I will lose concentration, like, get, like, uninterested. I'll start zoning out.

THE COURT: Okay.

PROSPECTIVE JUROR MCLAMORE: That's stuff that affects me.

THE COURT: And you said you don't want to sit on a jury.

PROSPECTIVE JUROR MCLAMORE: Well, I found out about this Thursday. I wasn't -- I was still at school when this -- when the letter was sent out, so I had no idea that I had to do this until my mom told me on Thursday when she got a voicemail that I was summoned. So I didn't really have any time to, like, think about anything. I was just still at school just working on finals. So I just had no idea that --

THE COURT: Let me ask you a question.

PROSPECTIVE JUROR MCLAMORE: Of course.

THE COURT: If you or a loved one were charged with a crime, what kind of jurors would you want?

PROSPECTIVE JUROR MCLAMORE: Fair.

THE COURT: Okay. Do you think you can do that?

PROSPECTIVE JUROR MCLAMORE: If I am selected, I will try the best of my ability to help, but I -- I can't say if I will get un- -- just distracted at times. That will happen eventually no matter how much I do promise. That is something I do deal with, and it's been a process.

THE COURT: Okay. Any follow-up questions from the government?

MS. NUTINI: Your Honor, just very briefly.

Good morning.

I wanted to just follow up briefly about your ADHD.

PROSPECTIVE JUROR MCLAMORE: Of course.

MS. NUTINI: Understanding that we will have a morning break, a lunch break, and an afternoon break that would allow you to move about and take some breaks, do -- does that change your opinion at all about your ability to sit for periods of time knowing that they won't be very extended periods of time?

PROSPECTIVE JUROR MCLAMORE: Well, I -- I do understand breaks are important, but -- like the breaks you give, yes. Anyway, still, it just happens. I don't control how I just get distracted or just start looking around. It just happens on its own. Even with -- the breaks help, but I

just -- I still -- I still can't confirm for certain that I can sit and just listen and process the information because I could be thinking of something else, completely zone out. It's just stuff that happens.

MS. NUTINI: Thank you.

PROSPECTIVE JUROR MCLAMORE: You're welcome.

THE COURT: Mr. Carlson.

MR. CARLSON: I just have one question.

In light of everything that you've told us, if you were a defendant on trial in this courtroom, would you want a person like you with everything that you've told us to be on your jury?

PROSPECTIVE JUROR MCLAMORE: See, for me, just dealing with my ADHD, I would want someone who would listen, because as for me, I could miss out on some information, zone out. I could forget some things. And I feel like for me, I do not want myself, like, to be on a jury with someone who has the same thing because I don't know if they know the full information and I don't know if they would just choose to choose the sides of everyone else on the jury, just decide to choose instead of trying to -- yeah, just -- just go with the rest of the jury. I just want -- I want someone who will listen and make the assumption on their own and not have to have other people to help make that assumption for them.

MR. CARLSON: Thank you.

PROSPECTIVE JUROR MCLAMORE: You're welcome.

THE COURT: Anything else from the parties?

MS. NUTINI: No. Thank you.

MR. CARLSON: No. Thank you.

THE COURT: Okay. Mr. McElroy --

PROSPECTIVE JUROR MCLAMORE: Mclamore.

THE COURT: I beg your pardon.

You can go ahead and take your seat. I'm going to ask you your follow-up questions.

PROSPECTIVE JUROR MCLAMORE: Okay. Thank you so much.

(Proceedings heard in open court:)

THE COURT: Thank you, Mr. Mclamore. I'm going to ask you the follow-up questions.

Question No. 1: At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions on the law even if you disagree with it?

PROSPECTIVE JUROR MCLAMORE: Yes, sir.

THE COURT: All right. Number 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: On the flip side, can you return a verdict for the defendant if the government doesn't prove its case

beyond a reasonable doubt?

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: All right. Question 3: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR MCLAMORE: No.

THE COURT: Is --

PROSPECTIVE JUROR MCLAMORE: I'm sorry. Yeah, I didn't hear that question.

THE COURT: Let me ask you. It's important.

A defendant has the presumption of innocence.

Do you understand that?

PROSPECTIVE JUROR MCLAMORE: (Nodding head up and down.)

THE COURT: Do you understand that?

PROSPECTIVE JUROR MCLAMORE: Yes, I do.

THE COURT: Do you think that's important?

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: Do you think people in our country ought to be presumed innocent?

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: Do you think that's a good thing?

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: All right. Do you have any concern about your ability to follow the rule that the defendant is presumed innocent throughout the trial?

PROSPECTIVE JUROR MCLAMORE: Yes.

THE COURT: Okay. Anything else above and beyond what we've talked about at sidebar?

PROSPECTIVE JUROR MCLAMORE: No.

THE COURT: Okay. Question No. 4: Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR MCLAMORE: No, I think we covered everything.

THE COURT: Okay. Thank you for answering my questions.

PROSPECTIVE JUROR MCLAMORE: Thank you.

THE COURT: All right. We're going to go to the back row now, folks. We're going to go to the back, all the way to the left. If you would be kind enough to pass it along.

It looks like we've got Mr. Montana.

PROSPECTIVE JUROR MONTANA: Good morning.

THE COURT: Good morning. Thank you for being here.

PROSPECTIVE JUROR MONTANA: You're welcome.

THE COURT: Do you want to go ahead and introduce yourself, please.

PROSPECTIVE JUROR MONTANA: Sure.

My name is Bill Montana. I'm 64 years old. Excuse me. I live in Western Springs.

THE COURT: Okay.

PROSPECTIVE JUROR MONTANA: I'm an investment real estate broker as an independent contractor. I work for GREA, and I specialize in selling large apartment buildings.

What I like to do: soccer, cooking, gardening. I do some things for non-for-profits, things like that, volunteer work.

THE COURT: Yeah. How's the real estate market these days?

PROSPECTIVE JUROR MONTANA: Challenging.

THE COURT: I would think. Is it all apartment buildings, like residential buildings, that you do?

PROSPECTIVE JUROR MONTANA: Yeah, that's it. Yeah.

THE COURT: All right. So I appreciate all that.

I have a couple follow-up questions for you, if you don't mind coming on up.

PROSPECTIVE JUROR MONTANA: Sure, not at all.

THE COURT: Watch your step, please. Come on up, please.

(At sidebar with Prospective Juror Montana:)

THE COURT: All right. Good morning, Mr. Montana.

PROSPECTIVE JUROR MONTANA: Good morning.

THE COURT: Thanks for being here.

PROSPECTIVE JUROR MONTANA: Sure.

THE COURT: All right. Let's go through the questions.

One question was, "Do you have any strong feelings about defense attorneys and prosecutors in the criminal justice system?" And you wrote, "There should be consequences that fit the crime."

PROSPECTIVE JUROR MONTANA: Correct.

THE COURT: Talk to me.

PROSPECTIVE JUROR MONTANA: Well, I think sometimes the rhetoric that you read regarding the state's attorney, you know, letting off people for crimes that maybe they should be incarcerated, that gives me some concerns just because I think that smaller crimes do lead to larger crimes.

THE COURT: Okay. So when you say "the state's attorney," you mean Kim Foxx?

PROSPECTIVE JUROR MONTANA: Correct.

THE COURT: Cook County?

PROSPECTIVE JUROR MONTANA: Correct.

THE COURT: Okay. What else?

PROSPECTIVE JUROR MONTANA: That's it.

THE COURT: Okay. And the next question was related. It said, "Do you have any feelings about law enforcement that could affect your ability to be fair and impartial?"

And it looks like it says, "Bad rap over the last

several years."

PROSPECTIVE JUROR MONTANA: Correct.

THE COURT: Tell me about that.

PROSPECTIVE JUROR MONTANA: Well, I think that sometimes because of the rhetoric, they just point out the bad police, and I think sometimes they forget about the good police. And the number of bad police and the number of incidents regarding, you know, death to people that maybe shouldn't be, you know, presumed -- you know, killed and things like that is minuscule when you compare it to how many people get killed by drunk drivers.

THE COURT: Okay. So how should we think about you as a prospective juror as we think about the last couple questions about your views of the criminal justice system?

PROSPECTIVE JUROR MONTANA: No, I'm open-minded, but I would just like to see facts that are substantiated.

THE COURT: Okay. Well, you know, on that note, the government has the burden to prove its case beyond a reasonable doubt, and the government is the only party here that's got the burden to do anything. The defendant doesn't have an obligation to do anything.

Do you understand that?

PROSPECTIVE JUROR MONTANA: Oh, absolutely.

THE COURT: Are you leaning in favor of one side or the other as you sit here right now?

PROSPECTIVE JUROR MONTANA: No.

THE COURT: Can you be fair to both sides?

PROSPECTIVE JUROR MONTANA: Of course.

THE COURT: Can you be fair to the government?

PROSPECTIVE JUROR MONTANA: Of course.

THE COURT: And Mr. Ibekie is looking at you wondering if you could be a fair juror.

Can you be fair to Mr. Ibekie?

PROSPECTIVE JUROR MONTANA: Sure.

THE COURT: All right. And then it looks like you're talking to a friend of yours who is a Willowbrook detective.

PROSPECTIVE JUROR MONTANA: Yes.

THE COURT: Anything about that that would affect your ability to be fair?

PROSPECTIVE JUROR MONTANA: Not really. It just gets colorful from time to time.

THE COURT: Do you talk about tax cases or fraud cases, anything like that?

PROSPECTIVE JUROR MONTANA: No.

THE COURT: All right. And there was a question about Homeland Security and the IRS. Tell me what you think of those organizations.

PROSPECTIVE JUROR MONTANA: Well, I think they're both good. I mean, the IRS sometimes gives me a little angst just because I think they make mistakes and put the onuses back on

me. And so it just involves a little bit more work, a little bit more stress.

THE COURT: Okay. You wrote, "Not too fond of the lack of competency." Tell me what you meant by that.

PROSPECTIVE JUROR MONTANA: Well, it just -- it's very recent to where I was going back and forth with the IRS, and they said one thing. And I said, "Okay. Do you have notes of that?" I said, "Is this being recorded?" And then all of a sudden I got this letter. I'm like, "Well, that's just not what you said." "Oh, it got reallocated somewhere else."

I'm like, one hand didn't seem like the other hand -- what the other hand was doing.

THE COURT: Okay. Is this a personal tax issue you've got or is it a business tax issue or both?

PROSPECTIVE JUROR MONTANA: Well, I'm an independent contractor, so --

THE COURT: Right.

PROSPECTIVE JUROR MONTANA: -- it's probably --

THE COURT: Okay.

PROSPECTIVE JUROR MONTANA: -- a little bit of both.

THE COURT: Do you have an axe to grind with respect to the IRS right now?

PROSPECTIVE JUROR MONTANA: Oh, no.

THE COURT: Do you think they're treating you fairly?

PROSPECTIVE JUROR MONTANA: Oh, it just was -- again,

it just created a lot more paperwork and a lot more work on my end just because, like I said, one hand didn't seem to know what the other hand was doing.

THE COURT: Do you have positive or negative views of the IRS? Or neutral? Or how would you describe it?

PROSPECTIVE JUROR MONTANA: I would say just because, you know, there is a little bit of an open sore of late, probably, you know, I would say maybe a little bit skewed towards dislike.

THE COURT: Okay. Would that affect your ability to be fair here?

PROSPECTIVE JUROR MONTANA: No --

THE COURT: I mean --

PROSPECTIVE JUROR MONTANA: -- just because it's not related to me.

THE COURT: Okay. So you've got a couple people at the table here who said they were from the IRS.

Did you respond positively or negatively from that?

PROSPECTIVE JUROR MONTANA: No, it was innocuous.

THE COURT: Okay. Did you have any concerns when you heard what the case was about, about your ability to be fair and impartial?

PROSPECTIVE JUROR MONTANA: No.

THE COURT: Okay. And then there was a question about whether anybody was a victim of a crime, and you wrote, "Yes,

ID Social Security number."

And tell me about that and whether anybody lost money. You've got to understand what we're trying to get at.

PROSPECTIVE JUROR MONTANA: I understand.

THE COURT: We want people who can be fair.

PROSPECTIVE JUROR MONTANA: Yeah, you don't want me to be impartial. I totally understand.

Oh, no. So I just answered the questions truthfully, you know, just be- -- the basis of my questions doesn't mean that I am going to be impartial in any way.

But I think -- oh. So it was a friend, identity got stolen, somebody bought a house in California, and I just felt bad just because -- I don't think she was -- lost any monetary gains, but she says maybe thousands of -- but I felt bad because, God, what a pain in the butt.

THE COURT: Okay. There was a question about your views of the government and whether you could be fair and impartial, and you wrote, "Not a lot of faith in the government."

So tell me about that.

PROSPECTIVE JUROR MONTANA: Yeah. Well, like, again, living in Cook County, I kind of use that as a baseline. And so that is basically kind of how I judge sometimes about, you know -- again, what you read.

I had a philosophy teacher many, many years ago that

told me to believe nothing that you see and half of what you read. So I kind of take that to heart nowadays.

And I used to do something different, and so I know statistics very, very well. And so I look at, you know, how big is the sample size and all of that other stuff before I try to -- I do a little bit more reading than just reading the headlines and making a conclusion from that.

THE COURT: Okay. Can you be fair to the government here?

I mean, you wrote that you've not -- you've got "not a lot of faith in the government." And the government is listening to you as a juror. What should they think about you as a prospective juror?

PROSPECTIVE JUROR MONTANA: Just prove your case.

THE COURT: Okay. Can you be fair to the government?

PROSPECTIVE JUROR MONTANA: Sure.

THE COURT: Okay. Any reason you can't?

PROSPECTIVE JUROR MONTANA: No.

THE COURT: How about Mr. Ibekie; can you be fair to Mr. Ibekie?

PROSPECTIVE JUROR MONTANA: Sure.

THE COURT: Any reason you can't?

PROSPECTIVE JUROR MONTANA: None.

THE COURT: And then -- so you're self-employed, so there is work stress.

This is not the world's longest trial. This is going to be a couple of weeks. Sometimes trials here last months, months. This is a relatively short trial.

PROSPECTIVE JUROR MONTANA: Right.

THE COURT: Can you do that?

PROSPECTIVE JUROR MONTANA: Yeah, I talked to my business partner. He can handle it.

THE COURT: Okay. And then -- so it says, "How do you feel about the possibility of serving on a jury?" You wrote, "Not good." Tell me about that.

PROSPECTIVE JUROR MONTANA: Just time. That's all.

THE COURT: Okay. Here's the bottom line, Mr. Montana: We need fair and impartial people.

PROSPECTIVE JUROR MONTANA: Sure.

THE COURT: Can you do that?

PROSPECTIVE JUROR MONTANA: Yeah.

THE COURT: Okay. Any concerns?

PROSPECTIVE JUROR MONTANA: No.

THE COURT: All right. Any follow-up, anybody?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. Very good.

You can step down, sir.

I need to talk with the lawyers for a moment.

So, everybody, leave your headset on.

But you can step down. We're going to leave the white noise machine on, but you can go ahead and take your seat.

Okay. Thank you, Mr. Montana.

PROSPECTIVE JUROR MONTANA: Thank you.

(Prospective Juror Montana exits the sidebar.)

THE COURT: All right. So I wanted to say to the government, you've got your colleagues there from the IRS. They don't have headsets on. They're entitled to listen. I don't know if they have headsets. They should have them.

MS. NUTINI: Your Honor, it looks like they are sharing a pair of headsets.

THE COURT: Okay.

MS. NUTINI: I believe we only have three.

THE COURT: Okay. We will get you, at a break, another headset. Okay? Because you're entitled to have your party representative hear what's happening. Okay?

MS. NUTINI: Thank you, Judge.

THE COURT: And, Mr. Carlson, your microphone is a little low, I think.

Can we do a test on that.

MR. CARLSON: Test. Test.

THE COURT: Ms. Ramos will help you here.

Ms. Ramos, any tips?

THE CLERK: It depends on every person. Because on your -- the little gadget on the side, it has a volume. So you

can raise it up to hear him louder or you could raise it down. So it's kind of every individual.

MR. CARLSON: Is this any better, Judge?

THE COURT: Maybe. We can maybe test it during a break. I don't know. I've been able to hear you. It's just a little faint.

One observation: This is the chattiest group of prospective jurors I've ever seen. I just -- it's like a little party breaking out over in the jury box over there.

Do you guys hear that?

MS. NUTINI: Yes.

THE COURT: I'm thinking up here, "Can you guys pipe down? I'm trying to ask questions to these jurors."

Quick feedback: Does anybody have any feedback for me? Are you getting the info you want? Are you getting as much as you need?

MS. NUTINI: Yes, Your Honor. I think it's going very well.

I think just a brief point of feedback from the government is understanding that IRS Criminal Investigations is involved in this case. This is not a tax case.

THE COURT: Yeah. Oh, that's a good point. Yeah. Okay.

MS. NUTINI: There is no tax charges.

THE COURT: Okay. Fair enough. Yeah.

MS. NUTINI: And so I just don't want to confuse the jury about that.

THE COURT: Okay. Do I need to clean up on that? I'm sorry if I misspoke there.

MS. NUTINI: I don't think so.

THE COURT: Mr. Carlson, do you think I need to clean up anything on that?

MR. CARLSON: No, Your Honor.

THE COURT: All right. So I'm speaking extemporaneously, and every now and again, I make a mistake like that. So I'm sorry. If anybody thinks I need to clear that up, let me know.

Mr. Carlson, are you getting the kind of info you want?

MR. CARLSON: Yes.

THE COURT: All right. So here's what we're going to do: I'm going to try to go through the next six people quickly, hopefully, and then break for lunch. We'll see how it goes. I'm not going to keep them longer than 12:30 or they're going to get grumpy. But we'll see where we are.

Okay, everybody?

MR. CARLSON: Fine, Judge.

THE COURT: All right. Very good.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Mr. Montana.

Let me just ask a couple follow-up questions.

Number 1: At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions about the law even if you disagree about them?

PROSPECTIVE JUROR MONTANA: Yes.

THE COURT: Number 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR MONTANA: Yes.

THE COURT: On the flip side, can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR MONTANA: Yes.

THE COURT: Number 3: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR MONTANA: No.

THE COURT: Finally, is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR MONTANA: No.

THE COURT: All right. Thank you for answering my questions, Mr. Montana.

Next up, we have Ms. Gramer.

Good morning.

PROSPECTIVE JUROR GRAMER: That is correct.

THE COURT: Did I get the pronunciation right?

PROSPECTIVE JUROR GRAMER: Yeah.

THE COURT: All right. Very good. Well --

PROSPECTIVE JUROR GRAMER: Most people don't pronounce it correct.

THE COURT: Well, I took a flier on it.

So good morning.

PROSPECTIVE JUROR GRAMER: So I am Diane Lee Gramer. I'll be 60 August 1st. And I live in the LaSalle-Peru area. It's near Starved Rock State Park, if anyone is familiar with that.

I work --

THE COURT: You came -- you came a long way this morning.

PROSPECTIVE JUROR GRAMER: Yeah, thanks to the Metra train in Joliet there. I hopped on there this morning. A lot easier than driving Friday morning.

THE COURT: Yeah. Thank you for -- thank you for doing that. I know that's a haul.

You know, we sit in the Northern District of Illinois,

folks, and that's a big area, so a lot of you came from really far.

So thank you for doing that.

PROSPECTIVE JUROR GRAMER: Welcome.

I work for CarParts.com -- or it's known as JC Whitney Everything Automotive Company -- for 21 years. The last four years, I've been working remote, which I absolutely love, since the pandemic.

I will advise, I do wear hearing aids. And even with the hearing aids, I do miss a lot of tones, a lot of lines, especially my right ear.

Other than that, any questions for me?

THE COURT: Sure. Well, I don't want to put you on the spot with your hearing.

Have you been able to hear me okay today?

PROSPECTIVE JUROR GRAMER: Yes. It was nice when you asked for them two to repeat their names.

I kind of -- I don't get all of it, and I'm afraid that I might miss some important factors in this case.

THE COURT: What if we got you a headset like this to listen, would that help you?

PROSPECTIVE JUROR GRAMER: It might.

THE COURT: Okay. All right.

So thank you for that.

I have just a couple follow-up questions for you.

PROSPECTIVE JUROR GRAMER: Sure.

THE COURT: So speaking of headsets, you're about to try a pair on.

PROSPECTIVE JUROR GRAMER: I'll try.

THE COURT: Okay. Come on up, please.

(At sidebar with Prospective Juror Gramer:)

THE COURT: All right. Ms. Gramer, good morning.

PROSPECTIVE JUROR GRAMER: I hear you.

THE COURT: Thank you for being here.

I've got you fine.

Can you hear me okay?

PROSPECTIVE JUROR GRAMER: Yeah.

THE COURT: Do you want to speak into the microphone.

PROSPECTIVE JUROR GRAMER: Sure.

THE COURT: There you go.

So one of the -- thank you for being here.

PROSPECTIVE JUROR GRAMER: Sure.

THE COURT: One of the questions was about the fact that the defendant is not a United States citizen, he is a citizen of Nigeria, and whether there was anything about his status that would prohibit you -- or keep you from being fair to him.

Can you talk to me about that.

PROSPECTIVE JUROR GRAMER: Well, I think if you're going to be here, there should be no -- no crime, follow our

rules.

THE COURT: Okay. Now, the defendant here has the presumption of innocence. And it doesn't matter where he's from. Everybody in the American court system is entitled to the presumption of innocence.

Do you believe that?

PROSPECTIVE JUROR GRAMER: Yes.

THE COURT: Even noncitizens. Do you believe noncitizens are entitled to the presumption of innocence?

PROSPECTIVE JUROR GRAMER: Yes.

THE COURT: Do you think it should be easier to convict a noncitizen than a citizen?

PROSPECTIVE JUROR GRAMER: No.

THE COURT: Do you think noncitizens are entitled to a fair trial?

PROSPECTIVE JUROR GRAMER: Yes.

THE COURT: For example -- so if we've got a citizen of the United States in one courtroom, and we've got a citizen of Nigeria in the courtroom next door, do you think one person should get a fair trial but the other person not get the same kind of trial?

PROSPECTIVE JUROR GRAMER: The same kind of trial.

THE COURT: Okay.

PROSPECTIVE JUROR GRAMER: I'm just saying, if you're -- if you're here to begin with, something was not

right, something was done.

THE COURT: How do you know that?

PROSPECTIVE JUROR GRAMER: Well, that's why we're here.

THE COURT: Well --

PROSPECTIVE JUROR GRAMER: We've got to go through trial.

THE COURT: Here's all you know: He's been charged with something, but the government hasn't proven anything yet.

PROSPECTIVE JUROR GRAMER: Right.

THE COURT: You know, do you think he's entitled to the presumption of innocence?

PROSPECTIVE JUROR GRAMER: Yes.

THE COURT: Would you think to yourself, "Boy, Mr. Ibekie has been charged with a crime, so, therefore, he must be guilty"? Would you think that?

PROSPECTIVE JUROR GRAMER: No.

THE COURT: Honestly, would you think just because he's here, he must have done something wrong?

PROSPECTIVE JUROR GRAMER: No, we have to -- that's why we're here; we have to --

THE COURT: Yeah.

PROSPECTIVE JUROR GRAMER: -- hear it out, go through trial.

THE COURT: Yeah. I mean, Mr. Ibekie is trying to

figure out who can be fair to him.

PROSPECTIVE JUROR GRAMER: Mm-hmm.

THE COURT: You know he's a citizen of Nigeria.

Is there any reason you can't be fair to him?

PROSPECTIVE JUROR GRAMER: I would be fair.

THE COURT: Yeah. Would you hold it against him, the fact that he's from Nigeria?

PROSPECTIVE JUROR GRAMER: No.

THE COURT: Would you say, "Boy, it's going to be easier to convict him because he's not an American"?

PROSPECTIVE JUROR GRAMER: No.

THE COURT: Would you say, "Boy, he probably broke the law because he's been accused of something, because he's not from here," anything like that?

PROSPECTIVE JUROR GRAMER: No.

THE COURT: Okay. Do you see what I'm getting at?

PROSPECTIVE JUROR GRAMER: Yes, but --

THE COURT: Yeah.

PROSPECTIVE JUROR GRAMER: -- did you see my questionnaire? I watch 90-dayer, and that's all about --

THE COURT: 90-dayer, that, I missed.

So go ahead.

PROSPECTIVE JUROR GRAMER: That's one of my favorite shows, and they're from, like, Nigeria and all over the place.

THE COURT: I see. 90-dayer, I see it in Question 10.

I will tell you this: I don't watch a lot of television. That's how I became a federal judge, you know. So I don't know.

What is that show about?

PROSPECTIVE JUROR GRAMER: Oh, it's online dating --

THE COURT: Oh.

PROSPECTIVE JUROR GRAMER: -- out of the country and how they have to come in legally.

THE COURT: I see. Okay. That, I'm not aware of.

So does that affect your ability to be fair to him or anything like that?

PROSPECTIVE JUROR GRAMER: No, no.

THE COURT: Okay.

PROSPECTIVE JUROR GRAMER: It's a learning experience, if anything.

THE COURT: Okay. I'm learning something here, too, today.

All right. So let's talk about how -- you know, you live not close.

PROSPECTIVE JUROR GRAMER: Not close.

THE COURT: Can you do it?

PROSPECTIVE JUROR GRAMER: I have to depend on someone because, like I say, I work remote. I hardly go out. I just go to the grocery store or go see my elderly parents. So this driving in the heavy horrific traffic, it's not for me. It's

very stressful.

My spouse was able to help me this morning and Friday.

THE COURT: Okay.

PROSPECTIVE JUROR GRAMER: He's not too happy.

THE COURT: So you got -- you got here today by taking a ride? Getting a ride or taking the train today?

PROSPECTIVE JUROR GRAMER: We drove to Joliet and hopped the train.

THE COURT: Got it.

PROSPECTIVE JUROR GRAMER: It was a lot easier.

THE COURT: I've got it.

I mean, here's the bottom line, Ms. Gramer: We need people who can be fair. You know, we just need people.

PROSPECTIVE JUROR GRAMER: Mm-hmm.

THE COURT: You know, and it's going to be inconvenient, but this is kind of a short trial. A lot of trials in this building go for months. Here, we're talking, you know, give or take, a couple of weeks, maybe. We don't know how long it will be, but --

PROSPECTIVE JUROR GRAMER: I know.

THE COURT: Can you do that for a couple of weeks? Can you make it happen?

PROSPECTIVE JUROR GRAMER: Yeah, we can make it happen.

THE COURT: Okay. Any follow-up questions for

Ms. Gramer, anybody?

MS. NUTINI: Not from the government. Thank you.

PROSPECTIVE JUROR GRAMER: Okay.

MR. CARLSON: No, Your Honor.

THE COURT: All right. Very good.

PROSPECTIVE JUROR GRAMER: All right.

THE COURT: We'll go back and ask you the four questions. Thank you.

PROSPECTIVE JUROR GRAMER: Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Ms. Gramer.

I'm going to ask you the standard four questions.

Question No. 1: At the end of the trial, I'll instruct the jury on the law.

Will you be able to follow my instructions even if you disagree with them?

PROSPECTIVE JUROR GRAMER: Yes, sir.

THE COURT: All right. Number 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR GRAMER: Yes.

THE COURT: And on the flip side, can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR GRAMER: Yes, sir.

THE COURT: Question 3: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR GRAMER: Uhm-uhm. No.

THE COURT: Question 4: Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR GRAMER: Nothing.

THE COURT: Okay. Thank you. I appreciate you answering my questions.

PROSPECTIVE JUROR GRAMER: Thank you.

THE COURT: All right. Next up -- I'm going to put my hot streak for pronunciation at risk here.

Here it goes.

Ms. Feijoo?

PROSPECTIVE JUROR FEIJOO: Almost.

THE COURT: Okay.

PROSPECTIVE JUROR FEIJOO: My name is Tina Feijoo.

THE COURT: Feijoo? Oh, I wasn't even close.

Good morning. Thank you for being here.

PROSPECTIVE JUROR FEIJOO: I was trying to make you feel good.

THE COURT: I appreciate that.

Do you want to go ahead and introduce yourself, Ms. Feijoo.

PROSPECTIVE JUROR FEIJOO: Yes.

My name is Tina Feijoo. I live in Plainfield, and I work as an accounts payable specialist for a company called Henricksen. We work with office furniture.

THE COURT: Mm-hmm.

How long have you been doing that?

PROSPECTIVE JUROR FEIJOO: Only about three months.

THE COURT: And what did you do before that?

PROSPECTIVE JUROR FEIJOO: Before that, I was an order coordinator for another office furniture company. And then before that, I was a courtroom clerk for Will County Courthouse.

THE COURT: Oh. How long did you work at the courthouse?

PROSPECTIVE JUROR FEIJOO: Just about five months.

THE COURT: Okay. How did you like that?

PROSPECTIVE JUROR FEIJOO: It was very busy. I worked in small claims. So --

THE COURT: Okay.

PROSPECTIVE JUROR FEIJOO: -- 200 cases or so --

THE COURT: Yeah.

PROSPECTIVE JUROR FEIJOO: -- every morning. So,

yeah, it was busy.

THE COURT: And did you spend time in a courtroom?

PROSPECTIVE JUROR FEIJOO: Oh, yes.

THE COURT: Yeah. And that was for five months?

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: Okay. Does that experience have a positive or negative -- give you -- was that a positive or a negative experience, working in the courtroom?

PROSPECTIVE JUROR FEIJOO: I would say it was a positive.

THE COURT: Okay.

PROSPECTIVE JUROR FEIJOO: I didn't mind it.

THE COURT: You're not just saying that because I'm here, are you?

PROSPECTIVE JUROR FEIJOO: No.

THE COURT: A little joke there.

Okay. I have a couple follow-up questions for you, Ms. Feijoo, if you wouldn't mind coming on up. All right?

PROSPECTIVE JUROR FEIJOO: Thank you.

(At sidebar with Prospective Juror Feijoo:)

THE COURT: Hi, Ms. Feijoo. Can you hear me?

PROSPECTIVE JUROR FEIJOO: Yes, I can.

THE COURT: All right. Very good.

I have a question about the phone scam involving your father-in-law, Question 13.

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: Can you tell me about that.

PROSPECTIVE JUROR FEIJOO: I know the information that he gave us, he was embarrassed about it, to say the least.

My son with autism was away at college at the time, and he, I guess, was -- my father-in-law was given a call saying that he had been involved in a car accident and had killed a woman who was pregnant.

And I guess after that, over the next two days, they were calling him about this and that. He sent money, I believe, a couple of times. He was very worried just because of, you know, it being his grandson. And my son has autism, so that worried him even more.

We found out about it because he had called my husband. My husband was bringing our son home for a weekend because he had a doctor's appointment. And he had called him, and my husband said that he sounded off and asked me to give him a call. And he's like, you know, "So what is going on? Is he okay?" And I'm like, "Yeah, he's okay. He is just coming home for a doctor's appointment."

And then in talking, he discovered that he had been scammed. And he's just -- he has a very strong personality. You know, he's been in the Marines. He, you know, served in wars. And I think he just felt embarrassed that he was so taken advantage of.

THE COURT: Okay. So thank you for sharing that. I'm sorry you went through that.

In light of that, does that affect your ability to be a fair and impartial juror to both sides here?

PROSPECTIVE JUROR FEIJOO: You know, I was thinking about my answers on this, and I'm a very honest person, and I think I overthought a lot of my answers on this on Friday. But it doesn't. I do have very strong opinions towards people who are convicted of scams against the elderly --

THE COURT: Okay.

PROSPECTIVE JUROR FEIJOO: -- but that would be people who are convicted.

THE COURT: Yeah. Do you understand that Mr. Ibekie is here and he hasn't been convicted of anything?

PROSPECTIVE JUROR FEIJOO: Absolutely.

THE COURT: Do you understand that?

PROSPECTIVE JUROR FEIJOO: Yes, I do.

THE COURT: Do you think the presumption of innocence is important?

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: And Mr. Ibekie is entitled to that. Don't you think?

PROSPECTIVE JUROR FEIJOO: Yes. Yes.

THE COURT: You know, the fact that you've got a family member who is defrauded has nothing to do with

Mr. Ibekie, does it?

PROSPECTIVE JUROR FEIJOO: No.

THE COURT: All right. So given that experience, is there any reason you can't be fair and impartial to Mr. Ibekie?

PROSPECTIVE JUROR FEIJOO: No, there isn't any reason.

THE COURT: In other words, he is sitting there and his lawyer is sitting there thinking about you and listening about the experience.

Should they have any concerns about your ability to be fair and impartial?

PROSPECTIVE JUROR FEIJOO: No.

THE COURT: Okay. And then you wrote in here that you support the police strongly.

PROSPECTIVE JUROR FEIJOO: Yes. Yes.

THE COURT: And your husband is a Will County deputy.

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: Does he ever work with fraud -- on fraud cases, anything like that?

PROSPECTIVE JUROR FEIJOO: He works with evidence in CSI.

THE COURT: Okay.

PROSPECTIVE JUROR FEIJOO: He hasn't directly worked with any type of computer fraud or phone fraud, but he does know of --

THE COURT: Okay.

PROSPECTIVE JUROR FEIJOO: -- different things, different scams that are going on --

THE COURT: Okay.

PROSPECTIVE JUROR FEIJOO: -- just through work.

THE COURT: Well, you wrote that you strongly support the police.

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: This case is going to involve allegations, and you're going to hear things about Homeland Security, and you may hear people from the IRS testify. We'll see.

But can you be fair to both sides?

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: In other words, can you be fair to Mr. Ibekie?

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: If the government doesn't prove its case beyond a reasonable doubt, what are you going to do?

PROSPECTIVE JUROR FEIJOO: Well, if they don't prove their case, then he's innocent.

THE COURT: Yeah. Well, he is innocent before they do anything.

PROSPECTIVE JUROR FEIJOO: Well, yes.

THE COURT: Right? So --

PROSPECTIVE JUROR FEIJOO: Yes. I mean, then he is not found -- you know, then he's not convicted.

THE COURT: Yeah.

PROSPECTIVE JUROR FEIJOO: I'm sorry.

THE COURT: No need to apologize.

Here's what I'm getting at: Do you have a finger on the scale going into this case before you hear anything else?

PROSPECTIVE JUROR FEIJOO: No.

THE COURT: Okay. And then, one of the questions was, "Do you have any religious, moral, or ethical views?" And you wrote that you are a Christian and it depends on what they do.

PROSPECTIVE JUROR FEIJOO: Yeah. Well, yeah, there's -- I'm actually fairly open-minded on people. I don't like any beliefs where people are hurting other people.

THE COURT: Okay. Would that affect your ability to be fair and impartial here?

PROSPECTIVE JUROR FEIJOO: He's not convicted, so no.

THE COURT: Okay. In other words, we want to make sure he's got the presumption of innocence.

Can you --

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: -- do that?

Okay. And then one of the questions was whether you have any prejudices or bias of any kind that would make you -- make it difficult for you to be fair and impartial, and you wrote, "Not sure."

PROSPECTIVE JUROR FEIJOO: Yeah.

THE COURT: Tell me about that.

PROSPECTIVE JUROR FEIJOO: No, I'm -- like I said, I did some thinking over the weekend. And, no, I know right from wrong on this. And I did some thinking, and -- yeah. No.

THE COURT: What did you think about?

PROSPECTIVE JUROR FEIJOO: Just thinking it over with my husband, and I was telling him my answers. And I'm like, I think I'm overthinking this because I'm like, could there be something in the back of my mind that would make me -- you know? And I don't think there -- there isn't.

THE COURT: You don't think there isn't or you don't think there is?

PROSPECTIVE JUROR FEIJOO: No, I don't think there is.

THE COURT: You don't think there is.

PROSPECTIVE JUROR FEIJOO: I'm sorry.

THE COURT: Okay. You're fine. You're fine.

What did you mean by "not sure"? Tell me what you meant by that.

PROSPECTIVE JUROR FEIJOO: Because at the time, you know, you don't -- you don't know what you hear. You know, you don't know what you're going to hear or how you might look at something, but thinking back to being at the courthouse -- and my husband is like, you know what -- and I know -- everybody is innocent until found guilty.

THE COURT: Okay. And that same follow-up on the next

question was --

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: -- whether you could be fair and impartial. The same answer or --

PROSPECTIVE JUROR FEIJOO: Yes, I think I was just overthinking everything.

THE COURT: Okay. And then I wanted to ask you about you starting your job. You've got a loss of pay if you aren't there.

Can you manage?

PROSPECTIVE JUROR FEIJOO: You know, I thought I was going to -- after Friday, I spoke with my manager, and between her and I, we were looking through the handbook. And she said that there appears to be some changes in how they have it. How they word it isn't real clear-cut, but she says that it should be compensated --

THE COURT: Okay. Is there --

PROSPECTIVE JUROR FEIJOO: -- any loss of pay.

THE COURT: Is there any reason you can't serve on a jury from an availability or financial standpoint?

PROSPECTIVE JUROR FEIJOO: No.

THE COURT: Okay. Folks, do you have any follow-up questions?

MS. NUTINI: No, Your Honor. Thank you.

MR. CARLSON: No, Your Honor.

THE COURT: All right. Very good. Thank you for coming on up.

PROSPECTIVE JUROR FEIJOO: Thank you.

THE COURT: I appreciate it.

(Proceedings heard in open court:)

THE COURT: All right. Ms. Feijoo, thank you for answering my questions.

I'm going to ask you the same follow-up questions I asked them.

Number 1: At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions even if you disagree with the law?

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: Number 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR FEIJOO: Yes.

THE COURT: Question 3: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR FEIJOO: No.

THE COURT: Finally, 4: Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR FEIJOO: No.

THE COURT: All right. Thank you for answering my questions. I appreciate that.

All right. Next up, we have -- I'm struggling with the handwriting a little. Banters?

PROSPECTIVE JUROR BAUTERS: Bauters.

THE COURT: Bauters?

PROSPECTIVE JUROR BAUTERS: Bauters.

THE COURT: Bauters?

PROSPECTIVE JUROR BAUTERS: Yes.

THE COURT: All right. Good morning.

PROSPECTIVE JUROR BAUTERS: Good afternoon.

THE COURT: Good afternoon, I should say. Thank you for being here.

Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR BAUTERS: Sure.

My name is Joe Bauters. I'm 32 years old. Originally from Michigan, moved here to Chicago ten years ago. I'm a CPA.

I specialize in tax. Worked in the same firm for the last ten years. So . . .

THE COURT: What kind of tax work do you do?

PROSPECTIVE JUROR BAUTERS: All kinds. Mostly represent large building companies, you know, practice in front of the IRS on a daily basis.

THE COURT: Mm-hmm. How has that experience been?

PROSPECTIVE JUROR BAUTERS: Good.

THE COURT: Yeah. Do you have positive or negative views of the IRS?

PROSPECTIVE JUROR BAUTERS: Indifferent.

THE COURT: Yeah.

PROSPECTIVE JUROR BAUTERS: It could be positive and negative at certain times.

THE COURT: Okay. All right.

PROSPECTIVE JUROR BAUTERS: Depending on the status of their outcome.

THE COURT: Got it. Okay.

I have a couple follow-up questions for you.

Do you mind coming on up for me.

PROSPECTIVE JUROR BAUTERS: Sure.

THE COURT: Thank you.

(At sidebar with Prospective Juror Bauters:)

THE COURT: All right. Thank you for being here.

Give me your pronunciation one more time.

PROSPECTIVE JUROR BAUTERS: Bauters.

THE COURT: Bauters with a "D"?

PROSPECTIVE JUROR BAUTERS: Yeah, it's pronounced, like, with a "D." It's a "T." It's B-a-u-t-e-r-s.

THE COURT: Got it. I ask in the spirit of trying to get your name right. So --

PROSPECTIVE JUROR BAUTERS: Thank you.

THE COURT: Thank you.

So you've got some experience with the IRS.

Is that going to affect your ability to be fair and impartial?

PROSPECTIVE JUROR BAUTERS: No, but I do work with them every day.

THE COURT: Yeah.

PROSPECTIVE JUROR BAUTERS: So I deal with the IRS every day, but I do not think it would be an impact.

THE COURT: How have they treated you?

PROSPECTIVE JUROR BAUTERS: For the most part, pretty well.

THE COURT: Okay. Do you think that they are more believable or less believable than anybody else?

PROSPECTIVE JUROR BAUTERS: No, I do not.

THE COURT: We don't know what the evidence is going to be. It's possible that we're going to have people associated with the government testifying at trial. It is

possible that there could be an IRS person testifying.

Will you have any positive or negative reaction from the fact that somebody from the IRS may testify?

PROSPECTIVE JUROR BAUTERS: No.

THE COURT: In other words, would you think, "Boy, I like this person," or, "Boy, I don't like that person" --

PROSPECTIVE JUROR BAUTERS: No.

THE COURT: -- because they're from the IRS? Anything like that?

PROSPECTIVE JUROR BAUTERS: No.

THE COURT: Tell me about the Internet scam that your friend had.

PROSPECTIVE JUROR BAUTERS: Just a -- right, they got called and -- right, $60,000 in Apple gift cards, just was a part of a scam. Right. They went in and said, "Hey, you know, my" -- "your someone was in jail." And so they gave them $60,000 in Apple gift cards to get them out of jail.

THE COURT: Okay. Is there anything about that experience that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR BAUTERS: No.

THE COURT: And then there was a question about, "How do you feel about serving on a jury?" And you said, "Not very excited." And I didn't take that personally, but I want you to tell me about that.

PROSPECTIVE JUROR BAUTERS: No, it's my civic duty to serve on the jury, but, you know, I do work 60-plus hours a week. So I would be making up that. I'll be having to take time off.

THE COURT: Yeah.

PROSPECTIVE JUROR BAUTERS: The firm does not -- you know, it's going to be PTO, so I'll be making up the time outside of this courthouse. So --

THE COURT: Yeah.

PROSPECTIVE JUROR BAUTERS: So I'm not looking forward to that aspect of serving.

THE COURT: Can you show up for jury duty and be fair and impartial and attentive the whole time?

PROSPECTIVE JUROR BAUTERS: Yes.

THE COURT: All right. What kind of jury would you want? If it was your case, what kind of jurors would you want?

PROSPECTIVE JUROR BAUTERS: Just more intelligent, thoughtful, and, you're right, impartial.

THE COURT: Can you be that kind of juror?

PROSPECTIVE JUROR BAUTERS: Yes.

THE COURT: Okay. Any questions for him, folks?

MS. NUTINI: Your Honor, just briefly, if we can inquire.

What is the name of the CPA firm that you work for?

PROSPECTIVE JUROR BAUTERS: It's called Crowe,

C-r-o-w-e, LLP.

MS. NUTINI: Thank you.

PROSPECTIVE JUROR BAUTERS: Yep.

THE COURT: Anything else from the government?

MS. NUTINI: No. Thank you.

THE COURT: Defense counsel?

MR. CARLSON: No, Your Honor.

THE COURT: All right. Very good.

Thank you for answering my questions. I appreciate that.

PROSPECTIVE JUROR BAUTERS: Thanks.

(Proceedings heard in open court:)

THE COURT: All right, Mr. Bauters. Thank you for answering my questions.

Let me ask you the follow-up.

Number 1: At the end of the trial, I'll instruct the jury on the law.

Will you be able to follow my instructions about the law even if you disagree?

PROSPECTIVE JUROR BAUTERS: Yes.

THE COURT: Number 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR BAUTERS: Yes.

THE COURT: On the flip side, can you return a verdict for the defense if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR BAUTERS: Yes.

THE COURT: Number 3: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR BAUTERS: No.

THE COURT: Number 4: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR BAUTERS: No.

THE COURT: All right. Very good.

Do you want to pass the microphone down.

Thank you.

Folks, we are going to go three more people, and then we're going to take our lunch break. Okay?

Next up, we have Ms. Hess.

PROSPECTIVE JUROR HESS: Yes.

THE COURT: Good morning.

PROSPECTIVE JUROR HESS: Good morning.

THE COURT: Thank you for being here.

Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR HESS: I'm Amber Hess. I'm 45. And I've been -- for the last five years, I've -- well, actually, say where I came from. I live an hour and a half, I guess, south. I live in Wilmington, Illinois, which is --

THE COURT: I've been to Wilmington --

PROSPECTIVE JUROR HESS: By Kankakee, yes.

THE COURT: I've been to -- I've been to an antique shop in Wilmington. I know exactly where that is.

Go ahead.

I'm going to guess it's Exit 227 -- how's that? -- on 55.

PROSPECTIVE JUROR HESS: I don't know. I paid somebody to drive me here today.

THE COURT: Okay.

PROSPECTIVE JUROR HESS: I'm terrified of the train. I'm terrified to drive down here by myself. So I'm very anxious, very nervous.

THE COURT: Why are you anxious and nervous?

PROSPECTIVE JUROR HESS: Just in general.

THE COURT: Okay.

PROSPECTIVE JUROR HESS: Just my demeanor, I guess.

THE COURT: Okay. Don't be nervous.

Go ahead.

PROSPECTIVE JUROR HESS: For the last five years, I've worked with special ed for an autism program in Joliet School

District.

And before that, I worked with a special ed co-op four or five years, traveling to different school districts.

And that's it.

THE COURT: Okay. We've got a couple follow-up questions for you, Ms. Hess. If you'd come on up, please.

(At sidebar with Prospective Juror Hess:)

THE COURT: All right. Ms. Hess, good afternoon.

PROSPECTIVE JUROR HESS: Mm-hmm.

THE COURT: Thank you for being here.

Are you going to be able to come to trial every day and be here on time and be --

PROSPECTIVE JUROR HESS: I --

THE COURT: Let's go into the microphone.

Is that an issue for you? Wilmington is not close.

PROSPECTIVE JUROR HESS: No. It's hard to get -- I mean, my husband is disabled, so he does --

THE COURT: Oh.

PROSPECTIVE JUROR HESS: -- have some appointments that I would like to go to because he's supposed to be having another back surgery, like his fifth one.

THE COURT: I'm sorry to hear that.

PROSPECTIVE JUROR HESS: Yes.

And my father, he had just passed away in January.

THE COURT: Oh, I'm sorry to hear that, too.

PROSPECTIVE JUROR HESS: So I'm still handling some of his ordeals. And his service is actually in July because we have family from out of state and -- yeah.

THE COURT: I'm sorry you're going -- you've got a lot going on right now.

PROSPECTIVE JUROR HESS: Yes.

THE COURT: All right. So let me ask you this: You said you don't agree with the SAFETY Act. Tell me what you meant by that.

PROSPECTIVE JUROR HESS: I guess taking criminals in and then just letting them go back.

THE COURT: Okay. That's a state law?

PROSPECTIVE JUROR HESS: Okay.

THE COURT: I think.

Does that have anything to do with your view of this particular case?

PROSPECTIVE JUROR HESS: No.

THE COURT: Okay. Would it affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR HESS: No.

THE COURT: And then you wrote, "I don't think we should pay taxes."

Tell me about that.

PROSPECTIVE JUROR HESS: I -- I mean, I believe in some sense we should, like at the store and, like, things like

that, but -- I don't know. I just -- it just seems like our system is corrupt. I don't know.

THE COURT: Okay. Any follow-up on that?

PROSPECTIVE JUROR HESS: No.

THE COURT: Okay. And then there was a question about him being a citizen of Nigeria. We've got a defendant here who is not from this country.

What's your thinking about that?

PROSPECTIVE JUROR HESS: I -- I don't know. I just -- I feel like if he's not a citizen of the United States -- like -- I don't know. I'm just nervous about they're letting people in -- in the borders and they're letting them in and they're giving them money and they're giving them everything.

And we've, actually, in Wilmington, had a case where there was an immigrant walking around the town, and a little boy saw him and ran and told his mom, and the mom went back to the backyard. And he said, "I can take whatever I want. The government doesn't give me anything."

So I'm just scared about -- just in general.

THE COURT: Okay. Can you be fair to Mr. Ibekie?

PROSPECTIVE JUROR HESS: Yes.

THE COURT: Do you think he's entitled to a fair trial?

PROSPECTIVE JUROR HESS: Yes.

THE COURT: Do you think that he's entitled to the

presumption of innocence?

PROSPECTIVE JUROR HESS: Yes.

THE COURT: Do you think it should be easier to convict a noncitizen than a citizen?

PROSPECTIVE JUROR HESS: No.

THE COURT: Do you think the same rules should apply to everybody?

PROSPECTIVE JUROR HESS: Yes.

THE COURT: Do you think you're entitled to a fairer trial than Mr. Ibekie?

PROSPECTIVE JUROR HESS: No.

THE COURT: Or should it be the same?

PROSPECTIVE JUROR HESS: No, it should be the same.

THE COURT: Okay. And then you wrote in here, "It's not fair to get money you haven't earned."

Tell me about that.

PROSPECTIVE JUROR HESS: Well, like, it said that he was convicted of fraud and -- so that's basically what I meant.

THE COURT: Yeah. Okay. Well, thank you for that.

He hasn't been convicted of anything. That's the point of the trial. He's been --

PROSPECTIVE JUROR HESS: Okay.

THE COURT: -- accused of some crimes, but he is entitled to the --

PROSPECTIVE JUROR HESS: Right.

THE COURT: -- presumption of innocence.
Do you understand that?
PROSPECTIVE JUROR HESS: Yes.
THE COURT: Do you think he's guilty just because he's been charged with a crime?
PROSPECTIVE JUROR HESS: No.
THE COURT: No, really, do you?
PROSPECTIVE JUROR HESS: Uhm-uhm.
THE COURT: I mean, do you view him as an innocent person?
PROSPECTIVE JUROR HESS: Mm-hmm.
THE COURT: Truly?
PROSPECTIVE JUROR HESS: Mm-hmm.
THE COURT: Any concerns about that?
PROSPECTIVE JUROR HESS: No.
THE COURT: And you wrote here -- it says you're prejudiced against those who come to the United States illegally and use our tax dollars.
You don't know anything about his immigration status other than the fact that he is not a United States citizen.
Can you be fair to him?
PROSPECTIVE JUROR HESS: Yes.
THE COURT: Do you have any reason to think that he's done anything illegal just because he is here?
PROSPECTIVE JUROR HESS: No.

THE COURT: And then you've got a couple appointments on June 20th and 21st.

PROSPECTIVE JUROR HESS: Right.

THE COURT: Can you -- I don't know what that is, and I'm not trying to pry into your business here, but is that a medical appointment --

PROSPECTIVE JUROR HESS: Yes.

THE COURT: -- or what is it?

PROSPECTIVE JUROR HESS: Medical.

THE COURT: Okay. How -- how -- without getting too detailed -- I don't want to invade your privacy, but I need to know how important they are and how difficult it would be to reschedule them.

PROSPECTIVE JUROR HESS: They -- I mean, I'd probably have to wait another two months or three months to get in.

THE COURT: And how -- how important are they, the appointments? Without getting into the details, just is that --

PROSPECTIVE JUROR HESS: It's --

THE COURT: Just tell me --

PROSPECTIVE JUROR HESS: Just female.

THE COURT: And I'm just -- and I'm trying to respect your privacy.

PROSPECTIVE JUROR HESS: Right.

THE COURT: I just don't know -- all right. So I

think I've got that.

Do we have any follow-up questions for this prospective juror?

MS. NUTINI: Not from the government.

MR. CARLSON: Ms. Hess, in light of the things that you have told us and are in your questionnaire, if you were sitting in Mr. Ibekie's shoes, do you want to have a person like you serving on the jury?

PROSPECTIVE JUROR HESS: I -- I don't -- probably not, I guess.

MR. CARLSON: Thank you.

PROSPECTIVE JUROR HESS: Mm-hmm.

THE COURT: Can you elaborate on that? Tell me why.

PROSPECTIVE JUROR HESS: Just because I feel -- I guess I feel indifferent. I'm not a hundred percent sure.

THE COURT: Okay. Mr. Carlson, any follow-up?

MR. CARLSON: No, Your Honor.

THE COURT: Okay. Thank you, Ms. Hess. I appreciate you answering my questions.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Ms. Hess.

We've got a couple follow-up questions that will ring familiar to you at this point.

Question No. 1: At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions even if you disagree with them?

PROSPECTIVE JUROR HESS: Yes.

THE COURT: Question 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR HESS: Yes.

THE COURT: Can you return a verdict for the defense if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR HESS: Yes.

THE COURT: Number 3: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR HESS: No.

THE COURT: Question 4: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR HESS: No.

THE COURT: All right. Thank you, Ms. Hess, for answering my questions.

All right. Next up, we've got -- Bermudez?

Ms. Bermudez?

PROSPECTIVE JUROR BERMUDEZ: Yep. That's right.

THE COURT: Good afternoon.

PROSPECTIVE JUROR BERMUDEZ: Good afternoon.

THE COURT: Thanks for being here.

PROSPECTIVE JUROR BERMUDEZ: Yep. You're welcome.

So I'm Amanda Bermudez. I'm 39 years old. Originally from Iowa. I've been in Chicago for 17 years. I live on the Near West Side. I work for Bank of America. I've been there for three years. I'm in global market operations.

Before that, I was at a trust company for about 13 years that was a startup that I kind of helped build and scale where they did self-directed IRAs, so people that would buy private assets within their retirement plan.

So that's -- I'm happy to answer any questions --

THE COURT: Great.

PROSPECTIVE JUROR BERMUDEZ: -- that you have for me.

THE COURT: Yeah, I appreciate that.

Do you mind coming on up.

PROSPECTIVE JUROR BERMUDEZ: Yep.

(At sidebar with Prospective Juror Bermudez:)

THE COURT: Can you hear me?

PROSPECTIVE JUROR BERMUDEZ: Yes, I can.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR BERMUDEZ: Yes.

THE COURT: I hope this isn't too hard of a slog to sit through all of this. I appreciate you answering my questions.

PROSPECTIVE JUROR BERMUDEZ: No problem. I actually think it's very nice that you pull people up to ask sensitive stuff. So I appreciate that. This is my first time doing this, so --

THE COURT: Okay. Good. So -- and I'm glad you said that. I know there are some sensitive things in your responses.

PROSPECTIVE JUROR BERMUDEZ: Yeah.

THE COURT: You know, so here's the goal: We're trying to figure out who can be fair and impartial --

PROSPECTIVE JUROR BERMUDEZ: Mm-hmm.

THE COURT: -- right?

And so I saw that your husband was held at gunpoint when you first moved here. I was sorry to read that.

The question that I have is whether that is going to negatively affect your ability to be fair to both sides here.

Is there anything about that experience that would affect your ability to be fair to the government or fair to Mr. Ibekie?

PROSPECTIVE JUROR BERMUDEZ: No.

THE COURT: And then I saw that your mom had a negative experience with the criminal justice system. I was

sorry to read that. I'm sure that was hard on you.

And, you know, I read your answer about you feeling like she was overly prosecuted, *et cetera*.

Can you just talk to me a little bit about that just orally. Just tell me about that.

PROSPECTIVE JUROR BERMUDEZ: I'm going to try to do it without crying.

THE COURT: Okay.

PROSPECTIVE JUROR BERMUDEZ: So I'm not trying to be -- just -- yeah, so it was maybe 15 years ago, and it just kind of, like, had an upheaval on our life. And I happened to be pregnant with my child, and it was just a very traumatic time.

THE COURT: Yeah. Well, I will say again, I'm sorry that you went through that. I'm sorry that this is --

PROSPECTIVE JUROR BERMUDEZ: Oh.

THE COURT: -- hard for you.

PROSPECTIVE JUROR BERMUDEZ: No, it's okay. I just -- I wanted to be honest and at least write what happened, but also kind of, like, humiliating to say it to people.

THE COURT: Well, I understand. I understand that. You know -- I understand.

So here's what we're trying to figure out: We need people who can be fair and impartial. And we've got the government here bringing a case that -- the government is

entitled to a fair trial. We've got Mr. Ibekie here. He's entitled to a fair trial.

PROSPECTIVE JUROR BERMUDEZ: Yeah.

THE COURT: And is there anything about that experience that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR BERMUDEZ: I don't -- I mean, I don't think so. I think I'm someone who looks at the facts of things. I mean, I've had experiences professionally dealing with being deposed for fraud cases and things like that. So I think my family thing is more emotional for me. But, you know, I work in banking, and so I have to be very objective for -- you know, for my role.

THE COURT: Yeah.

PROSPECTIVE JUROR BERMUDEZ: I think for me the concern is more that -- like, just the time commitment, like anybody. But if I would get selected, I just -- it would be one of those things where I'd have to work at night. And I know people make a lot of sacrifices. So . . .

THE COURT: You know, you wrote in here that your mom was overly prosecuted.

Should the government be concerned about your ability to be fair --

PROSPECTIVE JUROR BERMUDEZ: I don't --

THE COURT: -- to them?

PROSPECTIVE JUROR BERMUDEZ: I don't think so. I mean, I know on my answers, I was vague, but I truly do feel like you have to look at every situation, all the facts in every situation.

So I think with her particular situation, you know, I have a level of emotion with it that I, you know, don't have otherwise.

THE COURT: Okay. And let me ask you this: Can you just decide this case based on the facts and the law that you hear in this courtroom?

PROSPECTIVE JUROR BERMUDEZ: Yes.

THE COURT: All right. And your mom was a victim of a fraud and somebody stole thousands of dollars from her. Tell me about that.

PROSPECTIVE JUROR BERMUDEZ: I know. I cannot believe that all of this is focused on my mom. So, yeah --

THE COURT: Okay. I'm not trying to pick on your mom, either, but --

PROSPECTIVE JUROR BERMUDEZ: No, it's funny. Yeah, she had something where, like, she was sent an e-mail, and she clicked on the e-mail and did all of the scam thing. And I don't know how much -- I know it was under a hundred thousand, but it was just one of those scam-type things. And then they get in your computer.

I don't know all the full details. That's about the

extent of which I know.

THE COURT: Okay. So in light of that, do you think you can be fair to both sides in this case?

PROSPECTIVE JUROR BERMUDEZ: I will try my best, yeah. I mean, like I said, I think I'll just look at the facts of what happened and --

THE COURT: Yeah.

PROSPECTIVE JUROR BERMUDEZ: -- and then, you know, decide that from there.

THE COURT: So should Mr. Ibekie be concerned about your ability to be fair to him?

I mean, he's accused of some crimes here. The government hasn't proven anything yet. He's entitled to the presumption of innocence.

Should he be concerned about your ability to be fair to him?

PROSPECTIVE JUROR BERMUDEZ: No.

THE COURT: Let's talk about your son's trip to Iowa.

PROSPECTIVE JUROR BERMUDEZ: Yeah.

THE COURT: So your son is at camp in Iowa?

PROSPECTIVE JUROR BERMUDEZ: Yeah. So he's going to Snow Valley Basketball Camp, which we do every year. And, basically, after that, we've got a family reunion. So we've got my sister-in-law flying in from Spain to come. She's coming in on the 27th. And then we need to get him from camp

and then go to Marshalltown, which is like Central Iowa.

THE COURT: Okay. When is that?

PROSPECTIVE JUROR BERMUDEZ: The 20 -- so the 27th is the date he actually has to be picked up. He is dropped off on the weekend.

THE COURT: If you can't be there because you've got jury duty, who is going to pick him up?

PROSPECTIVE JUROR BERMUDEZ: So I would try to have my husband pick him up, but -- I'm not trying to continue to bring my mom into this, but she just had surgery where -- she had knee surgery, and then they had to cut the back of her thigh --

THE COURT: Yeah.

PROSPECTIVE JUROR BERMUDEZ: -- because it didn't heal.

THE COURT: Yeah.

PROSPECTIVE JUROR BERMUDEZ: And then my dad subsequently had back surgery two weeks ago.

THE COURT: Okay.

PROSPECTIVE JUROR BERMUDEZ: So my husband works remotely, and he's been going to -- they live in Freeport, Illinois. And so he's been kind of going there, checking on them a couple of times a week.

So as long as I can make sure my parents are fine, then my husband can do it. But if something comes up with my parents, then he's the one that has to do it. Because for

work, I go into the office three days a week, but he is fully remote --

THE COURT: Right.

PROSPECTIVE JUROR BERMUDEZ: -- so he's got more flexibility than I do.

THE COURT: All right. So assuming that your parents are okay --

PROSPECTIVE JUROR BERMUDEZ: Yes.

THE COURT: -- he could pick up your kid from camp?

PROSPECTIVE JUROR BERMUDEZ: Yes.

THE COURT: Okay. And when is the reunion with your sister -- sister or sister-in-law?

PROSPECTIVE JUROR BERMUDEZ: So -- well, we're getting my son on that Thursday.

THE COURT: Yeah.

PROSPECTIVE JUROR BERMUDEZ: Or potentially that Thursday, and then that weekend.

THE COURT: The weekend. So the 29th and 30th?

PROSPECTIVE JUROR BERMUDEZ: Mm-hmm.

THE COURT: Okay. But not on the 28th?

PROSPECTIVE JUROR BERMUDEZ: No.

THE COURT: All right. Okay. Any follow-up questions for her?

MS. NUTINI: Not from the government.

MR. CARLSON: No, Your Honor.

THE COURT: All right. So we've got a couple follow-up questions, and then one more person, and then we've got lunchtime.

PROSPECTIVE JUROR BERMUDEZ: Okay.

THE COURT: Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Ms. Bermudez, thank you for answering my questions.

A couple follow-up questions for you.

Question No. 1: At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions even if you disagree?

PROSPECTIVE JUROR BERMUDEZ: Yes.

THE COURT: Question 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR BERMUDEZ: Yes.

THE COURT: On the flip side, can you return a verdict for the defense if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR BERMUDEZ: Yes.

THE COURT: Number 3: The defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR BERMUDEZ: No.

THE COURT: Number 4: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR BERMUDEZ: No.

THE COURT: Okay. Thank you, Ms. Bermudez. I appreciate that.

And last but not least this morning, we've got Ms. Landree.

PROSPECTIVE JUROR LANDREE: Hi.

THE COURT: Hi. Good morning -- good afternoon, I should say.

PROSPECTIVE JUROR LANDREE: Yeah, afternoon.

THE COURT: Thank you for being here and patiently listening to those questions.

PROSPECTIVE JUROR LANDREE: Thank you. Of course.

My name is Jenna Landree. I'm 21. 22 in a week and a half, I guess. But technically -- I'm a senior at Illinois State University, but I'll be doing my student teaching in the fall in the suburbs.

I'm from Waukegan, Illinois, I have been my whole life.

Yeah, my mom's job, she is a corrections officer at Lake County, but that's my only concern, I guess.

THE COURT: Great. So you're currently an ISU student.

PROSPECTIVE JUROR LANDREE: Currently, yes.

THE COURT: Yeah. Did you say you're remotely? I didn't hear that.

PROSPECTIVE JUROR LANDREE: No. So I'm student teaching --

THE COURT: Yeah.

PROSPECTIVE JUROR LANDREE: -- in the fall, so I'll be here the whole time. I won't go back to school down in Normal.

THE COURT: Got it. I'm from Normal.

PROSPECTIVE JUROR LANDREE: Oh, okay. So --

THE COURT: My birth certificate says Normal, Illinois.

PROSPECTIVE JUROR LANDREE: A funny name.

THE COURT: A little bit of irony.

PROSPECTIVE JUROR LANDREE: A little bit.

THE COURT: Yeah, it may or may not fit.

So let me ask you, your mom is a correctional officer?

PROSPECTIVE JUROR LANDREE: Yes.

THE COURT: Is there anything about that experience that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR LANDREE: No, I don't think so.

THE COURT: Okay. In other words, should anybody be concerned that you're going to favor the government or favor the defense or anything like that?

PROSPECTIVE JUROR LANDREE: No.

THE COURT: Okay. And then I read about the dog sitting on June 28th.

PROSPECTIVE JUROR LANDREE: Yeah.

THE COURT: Is that --

PROSPECTIVE JUROR LANDREE: I mean --

THE COURT: -- something we can work around maybe?

PROSPECTIVE JUROR LANDREE: Yeah, I'm flexible. I get it. I have to --

THE COURT: We can --

PROSPECTIVE JUROR LANDREE: -- do what I have to do.

THE COURT: -- find another friend for the pooch for a day?

PROSPECTIVE JUROR LANDREE: Probably.

THE COURT: Okay. All right.

All right. So let me just ask you a couple follow-up questions --

PROSPECTIVE JUROR LANDREE: Yes.

THE COURT: -- Ms. Landree.

At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow the instructions even if

you disagree with them?

PROSPECTIVE JUROR LANDREE: Yes.

THE COURT: Number 2: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR LANDREE: Yes.

THE COURT: Can you return a verdict for the defense if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR LANDREE: Yes.

THE COURT: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR LANDREE: No.

THE COURT: Finally, No. 4: Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR LANDREE: No.

THE COURT: All right. I need to speak privately with the lawyers.

One moment, folks. Bear with us.

Sidebar.

(Proceedings heard at sidebar:)

THE COURT: All right, everybody. We've gone through and asked questions to 14 people.

Does anyone have any need for any follow-up information for any of these 14 people before I ask you for-cause challenges, which we'll do after a break?

MS. NUTINI: Not from the government.

MR. CARLSON: No, Your Honor.

THE COURT: Do you all feel like you've gotten the info you need to make your decisions?

MS. NUTINI: Yes, Judge.

MR. CARLSON: Yes, Judge.

THE COURT: Okay. So here's what we're going to do: I'm going to excuse them. I think at this point given that it's a little later, I'm going to let them go until 1:45. Okay? I'm going to let them go until 1:45.

I will talk with you after they've left.

Ms. Ramos, where should I tell them to go?

THE CLERK: Courtroom 2303, Judge Tharp's.

THE COURT: Judge Tharp, 2303.

Okay. Everybody got the plan here?

MR. CARLSON: Yes, Judge.

THE COURT: Okay. I will have them take the elevator to the right, so you folks should take the elevator to the left as you leave the courtroom. Okay?

All right. Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, everybody.

It is now time for the much-promised lunch break. We're going to take our break.

It is 12:37. I'm going to give you a lunch break until 1:45. You've got until 1:45.

You may leave the building. I'll allow you to leave the building. If you would like to stay in the building, you can. There is a cafeteria on the second floor.

You may not know this, but this is actually the largest federal courthouse in the entire country. We have a cafeteria. Most of them don't.

The food actually is -- you know, it's reasonably pretty good. So if you'd like to go to the second floor, you can. They have all kinds of sandwiches and things down there.

If you would like to leave the building and walk around, like I said, you certainly can. There's lots and lots of places here in downtown Chicago.

Here's what I do need you to do: I need you to come back and be ready to go right at 1:45. I mean, like, we're going to have --- we're going to bring you in here at 1:45.

You are not going to come into this courtroom. You're going to go in the courtroom down the hall, to Judge Tharp, 2303. 2303.

This is the easiest floor to remember. It's Michael Jordan's number, folks, 23. Come to the 23rd to Judge Tharp, 2303.

So think of three-peat with Michael Jordan. That's 2303. That's where you go.

PROSPECTIVE JUROR BERKOWICZ: Is there anyplace to go smoke --

THE COURT: Is there any --

PROSPECTIVE JUROR BERKOWICZ: -- out of the building anywhere?

THE COURT: Yes. I think that the CSOs -- the court security officers downstairs can tell you where you can smoke.

I don't know if they allow you to smoke on the federal property itself, but there are plenty of places for a long leisurely walk.

PROSPECTIVE JUROR BERKOWICZ: Okay.

THE COURT: So you can have a good smoke walk, wherever you'd like to go.

PROSPECTIVE JUROR BERKOWICZ: Thank you, sir.

THE COURT: Does everybody understand the plan?

We need you here, everybody, ready and raring to go.

When we come back, we're going to have new 14 people, and then we'll go from there. All right? We'll see you promptly at 1:45.

Thank you, folks.

(Venire out at 12:39 p.m.)

THE COURT: All right. Have a seat, everyone.

Any thoughts? Feedback? Suggestions? Comments? Objections? Anything?

Anything, folks?

MS. NUTINI: Nothing from the government.

MR. CARLSON: No.

THE COURT: I actually mean it when I say I'm receptive to comments. I'm trying to give you folks -- Ms. Nutini, are you getting the info that you need to get a sense of people?

MS. NUTINI: Yes, Your Honor.

THE COURT: Do you see I'm just trying to get people talking?

MS. NUTINI: Yes.

THE COURT: Mr. Carlson, any feedback?

MR. CARLSON: Judge, I thought it all went relatively smooth.

THE COURT: Okay. As you can tell, sometimes I come at questions -- kind of the same kind of question but a couple different ways. I'm doing that very intentionally because every now and again there will be like a pause or I'll detect a little something. Sometimes if I just keep at it, I'll keep shaking the tree and something will fall out. Okay?

You know, it's like a live wire act up here doing this

extemporaneously. I just try getting them talking and thinking, you know, "If I was in the government's shoes, what would I want to know? If I was in defense counsel's shoes, what would I want to know?"

I'm trying to emphasize themes about presumption of innocence, and I really have them like -- "Okay. Look at Mr. Ibekie. Can you be fair to him?"

Is that okay with you, Mr. Carlson, the way it's going?

MR. CARLSON: Absolutely, Judge.

THE COURT: Yeah. I mean, that's what we want, right?

MR. CARLSON: Right.

THE COURT: I actually think some -- some of these people, I had kind of a different feel about them after they kept talking. So . . .

I want to give you folks a chance to take a break and maybe eat something.

We need to reconvene. I want to give you a chance to talk with your respective teams about whether we do for-cause challenges.

Let's remember the procedure. We're going to -- when we come back, before we reconvene, we're going to see if you have any for-cause challenges for this 14 group of -- this group of 14 people. Okay? We want to sort that out first. That way, we'll know how many eligible people we have before we

get the next 14 in. Okay?

Do people expect that they have some for-cause challenges?

MR. CARLSON: Yes, Judge.

THE COURT: Okay. Without telling me how many right now, is it more than a couple? Do you -- the only reason I ask -- and you don't have to tell me now, but we need to figure out when we're resuming.

Do you think we'll need more than 15 or 20 minutes to talk it through?

MR. CARLSON: Judge, I can tell you, I believe I have four or five.

THE COURT: Four or five. Okay.

MS. NUTINI: We have one or -- yeah --

THE COURT: A couple?

MS. NUTINI: -- only --

THE COURT: Maybe a couple.

MS. NUTINI: -- one.

THE COURT: Okay. So why don't we give ourselves 20 minutes to talk it through. I think if we come back at 12:25, you folks will have, you know, about 40 minutes to eat some lunch and talk it over.

MR. CARLSON: You mean 1:25.

THE COURT: 1:25. Excuse me. Yeah, 1:25. Thank you.

Does that sound good, everybody?

MS. NUTINI: Yes, Judge.

MR. CARLSON: Fine.

THE COURT: There was a lot there this morning with some people. There was a lot there.

So here's the plan: We'll come back at 1:25. We'll -- I will rule on any for-cause challenges. We will reconvene, and we'll get rolling, and we'll go from there.

Okay? Anybody else have anything you want to raise?

MR. CARLSON: No, Your Honor.

THE COURT: We'll see you at 1:25. Thank you.

THE CLERK: All rise.

(Recess at 12:43 p.m., until 1:32 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 20 CR 352 |
| | ) | |
| v. | ) | |
| | ) | |
| ANTHONY EMEKA IBEKIE, | ) | Chicago, Illinois |
| | ) | June 17, 2024 |
| Defendant. | ) | 1:32 p.m. |

TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. PAIGE NUTINI
MS. MEGAN DeMARCO
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For the Defendant: KENT R. CARLSON & ASSOCIATES, P.C.
BY: MR. KENT R. CARLSON
53 W. Jackson Boulevard, Suite 1523
Chicago, Illinois 60604

Also Present: SPECIAL AGENT AMY MANSKER, IRS

SPECIAL AGENT CHRISTOPHER KADONSKY, IRS

Court Reporter: AMY M. KLEYNHANS, CSR, RPR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 2318A
Chicago, Illinois 60604
Telephone: (312) 818-6531
amy_kleynhans@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; venire out; defendant present:)

THE COURT: All right, everyone. Have you had a chance to confer with your teams on any for-cause challenges?

MS. NUTINI: We have, your Honor.

THE COURT: All right.

MR. CARLSON: Yes, Judge.

THE COURT: And have you all talked about it? Are there any agreed challenges? Sometimes there are. I didn't tell you to do that, but I should have.

MS. NUTINI: Your Honor, we have discussed at least one agreed challenge, and that would be Juror No. 1, James Lyman, I believe. And Mr. Carlson can confirm that, but I believe both parties are in agreement that he should be struck for cause.

THE COURT: Okay. And what do you think, Mr. Carlson?

MR. CARLSON: I agree, Judge.

THE COURT: And do you want to make a proffer why that is?

MR. CARLSON: Sure, Judge. He is the student who was moving from Michigan to Chicago and then to his apartment to go to med school. And, quite honestly, that's a lot on somebody's plate to ask him to put that all aside and sit here and judge a trial, especially when he has got a moving truck lined up, and things like that.

Additionally, some of his responses, and this is more for the government's position, but he seemed to have a bias against the government.

MS. NUTINI: Yes, your Honor. I agree with the first statement. I think the main reason for our for-cause challenge was relating to the statements about not trusting law enforcement. And your Honor asked the potential juror in many different ways whether he could put aside his views and be fair and impartial. He equivocated on numerous occasions that he would have a hard time doing so. And I believe he ended by saying: I'd hope so. And for those reasons, we don't believe that he would be a fair and impartial juror.

THE COURT: Okay. As a graduate of the University of Michigan, should I feel embarrassed? I don't know. I thought he was squirrely and un-serious. I'm going to strike him for cause. I just didn't care for his -- he didn't have a tone that I thought was serious.

I also think that the availability is a significant issue for him. And he is going to be -- that's the primary driving force of why I'm excusing him for cause. He is moving tomorrow. He brought in the receipt. I just didn't care how he conducted himself. I was disappointed about how he comported himself in my courtroom.

And, Mr. Ibekie, you should be glad he's not on your jury because I want the jury full of serious people. You know

what I mean?

THE DEFENDANT: Yes, your Honor.

THE COURT: And he was un-serious.

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. Everybody agree we want serious people?

MR. CARLSON: Yep.

MS. NUTINI: Yes, your Honor.

THE COURT: We need grown-ups on this jury because Mr. Ibekie is entitled to that. So Juror No. 1 is going to be stricken for cause.

Are there any other agreed challenges for cause?

MS. NUTINI: No, your Honor.

THE COURT: Okay. And we had already stricken No. 5, obviously; right? So we've got that person stricken for cause.

MR. CARLSON: Correct.

THE COURT: Does the government have any strikes -- proposed strikes for cause maybe that's not agreed to?

MS. NUTINI: No, your Honor.

THE COURT: Okay. And Mr. Carlson, do you have any for-cause challenges you want to make?

MR. CARLSON: I do, Judge. I would move to strike No. 8, Mr. McLamore for cause. He is the young man who had ADHD. I think he had some rather significant problems understanding some of your, I thought, very simple questions.

Additionally, some of his responses were not responsive to that. And, additionally, he said he goes through periods where he just drifts off, and he doesn't -- isn't able to concentrate and listen to what's going on.

Additionally, when I asked him if he were in Mr. Ibekie's shoes whether he would want him to serve on his jury, he said he wouldn't. So for those reasons, I would move to strike him for cause.

THE COURT: All right. So this is the 19-year-old who is a recent graduate of New Trier High School. What's the government's position?

MS. NUTINI: Your Honor, the government objects to the for-cause challenge here. I believe that obviously when we're asking jurors questions, or potential jurors, we have to take what they're saying at face value. I do think that your Honor's questions -- I did not have trouble tracking the question and answer sessions between your Honor and this potential juror. I thought he was answering your questions. I do think some potential jurors, like all of them, have follow-up questions sometimes.

I think that last question Mr. Carlson is referring to is, would you want yourself on a jury, is a bit of a confusing question for a juror. I was confused the first time it was posed. And so I do think that there is some -- if there's hesitation or confusion, I think that that was not -- he was

not the only potential juror to have that.

I think with respect to the ADHD issue, again, we can only take what he says at face value here. He is an economics major at the University of Denver. And that is a demanding major, and he is somehow able to cope with his ADHD to where he can sit through classes, presumably, and is able to retain those classes. I know sometimes classes are around an hour and 15 minutes to an hour and a half in college. And so I don't believe that the sessions we're sitting for during this trial are going to be much longer, given the breaks that we're going to take in both the morning and the afternoon.

So for those reasons, based on his ADHD diagnosis, the government objects to the for-cause challenge.

THE COURT: Okay. So I'm going to strike No. 8 for cause. This juror gave me the heebie-jeebies. I try to be straight with you people. I'm just going to speak directly. He gave me the heebie-jeebies when I asked him: Can you be fair? So much that happens in a courtroom is never transcribed because it just gets the words down, it doesn't convey the emotion, or the context, or the body language.

Do you remember his hesitations and his pause and just the awkwardness? I was trying to figure out, is this just an awkward guy? Is he nervous? Am I intimidating him? Does he have ADHD? I don't know what was going on. But I felt like I couldn't get a straight answer out of him when I asked him can

you be fair to the defendant. And I didn't know exactly what was going on. The more he spoke, the more uncomfortable I got that he could give Mr. Ibekie a fair trial, candidly.

I want impartial people on the jury. And for whatever reason, that was just hard for him. That was a big ask. Our two New Trier grads are having a hard time being fair to people, apparently. I feel like calling somebody over there. That's another topic. I don't know if they have to take civics at that high school, but maybe they ought to start. I was disappointed at the performance of the New Trier grads today.

So I'm striking No. 8 for cause. Here's the reason. I didn't think he could be fair. Okay. So No. 8 is stricken for cause.

Mr. Carlson, any other for-cause challenges?

MR. CARLSON: Yeah. No 2, Ms. Slovak. She's the one who is moving to Germany. She leaves --

THE COURT: I thought that was funny, the Slovak going to Germany.

MR. CARLSON: Yeah.

THE COURT: The German Slovak. Go ahead.

MR. CARLSON: She said she was leaving on the 1st. She's getting ready, she has got -- and I was looking for it here. She has got appointments, visa appointments, and movers scheduled for the 26th, 28th and 31st. She is leaving for three years. It's not like she's going on a vacation. I think

she has got far other things on her mind than she would have being able to concentrate on this case. I would love to have her on the jury, Judge, but I just -- in light of everything that she has on her plate right now, I think she should be excused for cause.

THE COURT: What does the government think?

MS. DEMARCO: We would oppose a for-cause challenge here. She seemed like she would make a great juror, and I do think we're fairly confident we will be done by the end of next week. If we're not, I mean, I think this is why we have three alternates. But given our tight numbers and given that she was otherwise totally unproblematic, I think we would oppose the for-cause challenge.

THE COURT: So can I ask you a question? She's leaving the country for three years. Do you think she's going to be focused for the next two weeks? Do you honestly think that?

MS. DEMARCO: I mean, I thought her demeanor was -- seemed very receptive to being on the jury.

THE COURT: Can I ask another question? There's a lot of wisdom in the phrase don't borrow trouble. I don't know how long this jury is going to want to deliberate. Let's imagine a world where you folks get done with evidence on Thursday next week. We close and we do final instructions on Friday, and we're done by noon. Are people 100 percent sure we're going to

get a jury verdict Friday afternoon? I mean, I wouldn't bank on that. I mean, you've got 16 counts?

MS. DEMARCO: Uh-huh.

THE COURT: They're going to have a few things to talk about, I think. I think we're borrowing trouble by putting her on the jury from an availability standpoint. I mean, I think we're asking for trouble. I think the odds of this jury deliberating into July are not insignificant.

So I'm going to strike her for cause. I think she would be a terrific juror but for the availability issues. I also think, too, even if we could get her done with the trial, it's a big ask for her to be on this jury for the final two weeks before she leaves the country for three years. You know what I mean? You're asking for somebody who's potentially not going to be available at the end of the day and is going to be mentally distracted along the way.

So I'm going to strike Juror No. 2 for cause.

Mr. Carlson, anything else?

MR. CARLSON: Judge, yeah. Juror No. 13, Ms. Hess. She was the one woman who indicated she had travel issues, that her husband had health issues. And, again, she's another one that said she probably would not want her serving as a juror on her -- on a case if she were on trial. In light of the fact that the travel from Wilmington is a long way. I would just think that we're inviting trouble by having her on the jury

because of the travel issues alone, but then the husband issue. And I'm not sure that she -- if she doesn't believe she could be fair and impartial and wouldn't want her sitting on her own jury, I think we ought to excuse her for cause.

THE COURT: By way of context, Wilmington is probably 15 miles from the Central District of Illinois. And she's not that far away from going to Peoria for jury duty. Anybody here been to Wilmington? Anybody? Mr. Carlson has.

What does the government think?

MS. NUTINI: Your Honor, the government opposes this request I think on a few grounds. The first with respect to whether she could be fair and impartial. During your Honor's questioning with her, you asked very explicitly: Can you be fair to the defendant? She answered: Yes. Does the defendant deserve a fair trial? Yes. Is the defendant entitled to a presumption of innocence? Yes. Is it easier to convict a non-citizen -- should it be easier to convict a non-citizen than a citizen? No. So I think that this potential juror was asked those questions in very different ways numerous times, and she was unequivocal that she could be fair and impartial.

At the end, when Mr. Carlson asked the question about, would you want to be -- would you want yourself to be on this jury, again, the same question was asked to that other potential juror earlier that caused a bit of confusion. She said something to the effect of "no," and then you did some

follow-up and said: Why? And my understanding eventually, or how she left it, was: I feel indifferent about it. I'm indifferent about whether I would be -- be on a jury or not. And, your Honor, I don't think indifference is necessarily a bad thing. She's not equivocating one way or the other.

So for those reasons on that first point, I don't believe that the for-cause challenge is necessary in this case.

Also, with respect to the medical appointments, she did indicate she had appointments on June 20th and June 21st. She said she would probably need to wait two to three months to reschedule those. That's obviously not an ideal situation to be in. However, I do know, just from personal experience in all of us, you know, you can sometimes get on a wait list for medical appointments and are able to get off of that wait list sooner. If she's doing jury duty, maybe they're able to accommodate her for an earlier slot than having to wait two to three months. Again, that's not an ideal situation to be in, but I don't believe it rises to the level of being excused as a juror.

THE COURT: Okay. Thank you. So I'm going to excuse her for cause for primarily availability issues. Her husband is disabled. Her husband just had back surgery. She lives really far away. Wilmington is not close. You either have to take a train or you have to have a long drive on Interstate 55. I have done that drive. It's undoable, I think, during rush

hour, unless you want to spend an hour and a half each way. All of us are blessed to live in an urban area where there is --

(Prospective juror entered then exited the room.)

THE COURT: All right. I stopped there because a juror walked in. I stopped speaking as soon as Ms. Ramos said something there.

But I think many of us are living in an area where there is easy access to public transportation. I would invite any of us to go to Wilmington, Illinois and then contemplate getting to the Dirksen Federal Building every day. That's a big heavy ask, I think, for this person.

She was also very anxious and nervous. And I think part of that had to do with the fact that she had these medical appointments coming up. I want people in the courtroom that have their head in their game and can be serious and impartial and feel like they can devote their best selves to this process. I think from a variety of perspectives, she's not able to provide that.

So I'm going to strike Ms. Hess for cause, Juror No. 13.

Mr. Carlson, anything else?

MR. CARLSON: Judge, the last one I have, and I'm not as sure about this one, is Ms. Gramer, No. 10. She is the woman who had hearing aids and said she has problems hearing.

And your Honor questioned her about whether she would be able to hear everything, and she said she's afraid she would miss stuff, was her words.

Additionally, she has -- another person with long travel. She's in LaSalle. And she indicated she had a hard time trying to -- trying to get here.

I worry about having somebody on the jury who isn't going to be able to hear everything that's said in the courtroom. We've all spent a lot of time, and we're doing everything we can to make this trial as streamlined and as to the point as possible. To have a juror miss a point because they can't hear, I just think for that, when coupled with her travel issues, I think out of an abundance of caution we would be better off striking her for cause.

THE COURT: All right. So thank you for that. So what about the headset idea? I mean, she said that she could hear with the headsets. When I had the sidebar with her, it seemed to me that she could hear me just fine. If she has trouble hearing, we would be more than happy to set up headsets over there. It seems to me she can -- she could do that.

MR. CARLSON: Judge, if there's a way to be able to do that, where she is still able to concentrate on what's going on in the courtroom. I myself have a hard time concentrating while listening to what goes on in the headsets.

THE COURT: Let me ask Ms. Ramos, can we get a headset

for the juror if they need one? I assume we can wire something up, I think. The good folks here at the Dirksen Federal Building could wire up something for her, I think.

I agree with you in concept that I don't want a juror on the panel who couldn't hear. I think we can probably work it out with her, is my reaction on that. But what does the government think?

MS. NUTINI: Your Honor, we agree with that. I believe she had no issues hearing you during the sidebar, and a headset is a good idea.

THE COURT: Okay. So I'm going to deny that request to strike her for cause. I thought her hearing issues were real but overcome-able. I didn't think they were severe. They were moderate, at most. I think we could make the headsets available to her, and she can use them if she feels like she needs them.

I think her availability issues are not di minimus but not so serious that we should strike her for cause. Wilmington, Illinois is not situated the same place as LaSalle/Peru. I don't know how many streetlights are in Wilmington, but having spent time there, I don't think I count very many. It's a pretty small little town. There's no easy access to the train. I think she can get here from LaSalle/Peru. So I'm not going to grant that objection, but you're welcome to preemptory her, if you'd like. Okay?

MR. CARLSON: Thank you.

THE COURT: Anything else on --

MR. CARLSON: No, your Honor.

THE COURT: -- for-cause challenges?

So let's review the bidding, everybody. I want you to check my calculation here. We have stricken for cause Jurors 1, 2, 5, 8 and 13. Everybody agree with that?

MR. CARLSON: Yes, Judge.

MS. NUTINI: Yes, your Honor.

MS. DEMARCO: Yes, your Honor.

THE COURT: So we've got Jurors 3, 4, 6, 7, 9, 10, 11, 12, 14, and 15. Is that right, everybody?

MS. NUTINI: Yes, Judge.

MR. CARLSON: Yes, Judge.

THE COURT: So we've got 10 people, and we need, what, 32, 33, somewhere in there, I think, give or take; right? So we made some progress. Do you all want to take a five-minute break and we will get going? Do you need a break?

MS. NUTINI: I think we're ready to go.

THE COURT: Mr. Carlson, do you need a break?

MR. CARLSON: I'm fine, Judge.

THE COURT: Does anybody have anything else they want to raise before getting the jury?

MS. NUTINI: Not from the government.

THE COURT: Let's get the jury.

(Venire in at 1:52 p.m.)

THE COURT: Thank you, Ms. Ramos. Have a seat, everyone. Good afternoon. Good afternoon, everybody. Thank you for being here. I appreciate everybody in the second group here. You all spent the morning sitting there listening to complete strangers talk about themselves and then had to sit in a hard bench the whole time. So thank you for doing that. I don't know if it's better or worse to sit and listen to other people talk about themselves or to talk about yourself a little bit in front of people. But I think you folks got a really good example this morning of the kind of things we're trying to get at.

I'm going to ask you folks to do the exact same thing that we did before. Just stand up. Just kind of talk about yourself a little bit. Like, talk about where you live and your educational background, what you do for a living. Anything biographical is helpful, just to kind of get to know you a little bit. And as before, I'm sure I'm going to ask a lot of you folks to come up to the podium here. I want everyone to know, I do that to make everybody feel at ease and respect your privacy. There are a lot of, you know, experiences walking into the courtroom, and I want to make sure people feel comfortable talking to me. Not everybody has everything that they want to say in front of everybody. So it's really, really common to come on up here. All right? So

thank you for doing that.

So our lead-off hitter for the second batch. So I'm putting my handwriting deciphering skills to the test here. It looks like Minexus? What is your --

PROSPECTIVE JUROR MIULLI: Narbi Miulli.

THE COURT: I will take your word for it. I do see Narbi. So what's your last name? What is your last name?

PROSPECTIVE JUROR MIULLI: Miulli.

THE COURT: Miulli. Okay. Good afternoon, Ms. Miulli.

PROSPECTIVE JUROR MIULLI: Good afternoon.

THE COURT: Thank you for being here. Do you want to go ahead and introduce yourself, tell us about yourself.

PROSPECTIVE JUROR MIULLI: Sure. Again, I'm Narbi Miulli. 55 years old. I live in DuPage County. I'm actually a Postmaster at the United States Postal Service.

THE COURT: Oh, how long have you been doing that?

PROSPECTIVE JUROR MIULLI: I've been there 26 years.

THE COURT: Oh, thank you for doing that.

PROSPECTIVE JUROR MIULLI: You're welcome.

THE COURT: Keep going. You're doing great. You know, do you garden? What do you do for fun?

PROSPECTIVE JUROR MIULLI: I actually rescue animals.

THE COURT: What do you rescue?

PROSPECTIVE JUROR MIULLI: I volunteer at Starfish

Animal Rescue.

THE COURT: Good for you. How long have you been doing that?

PROSPECTIVE JUROR MIULLI: Six years. So I've fostered about 114 dogs in five years and found them homes.

THE COURT: Wow, that's great. That's great.

Okay. So I think I've got a pretty good handle on your questions and answers. There was a question about whether you hold any views that make it difficult for you to sit as a juror and judge the conduct of other people. And you wrote "yes" to that. I want to just see what you meant by that.

The question was: Do you hold any religious, moral, or ethical or other beliefs or principles that make it difficult for you to judge the conduct of other people? In other words, you know, can you be --

PROSPECTIVE JUROR MIULLI: I'm just Roman Catholic. So just my beliefs --

THE COURT: Okay.

PROSPECTIVE JUROR MIULLI: -- is all. But that wouldn't hold me --

THE COURT: What's that?

PROSPECTIVE JUROR MIULLI: That wouldn't hold me to be judgemental.

THE COURT: Yeah, everybody is entitled to have whatever religious beliefs they want --

PROSPECTIVE JUROR MIULLI: That's just not myself.

THE COURT: -- that's perfectly fine.

Is there anything about your religious beliefs or your philosophical beliefs, or anything like that, where you say, you know, I just couldn't be a juror? Anything like that?

PROSPECTIVE JUROR MIULLI: No, not at all.

THE COURT: In other words, is there anything about your Catholic beliefs that would make it difficult for you to be fair to the government?

PROSPECTIVE JUROR MIULLI: No, not at all.

THE COURT: How about Mr. Ibekie? Is there anything about your Catholic beliefs that would make it difficult for you to be fair to Mr. Ibekie --

PROSPECTIVE JUROR MIULLI: No.

THE COURT: -- anything like that?

Okay. I think I understand all your answers. Let me just ask you the follow-up the questions. All right?

PROSPECTIVE JUROR MIULLI: Okay.

THE COURT: So here it goes. At the end of the trial, I am going to instruct you on the law. Will you be able to follow my instructions and follow the law, even if you disagree with the law?

PROSPECTIVE JUROR MIULLI: Yes, sir.

THE COURT: No. 2. The government has the burden to prove its case beyond a reasonable doubt. Can you return a

verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR MIULLI: Yes, I can.

THE COURT: On the flip side, can you return a verdict for the defendant if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR MIULLI: Yes, I can.

THE COURT: Very good. No. 3. The defendant has the presumption of innocence. Do you have any concerns about your ability to follow the rule the defendant is presumed innocent throughout the trial?

PROSPECTIVE JUROR MIULLI: No, not at all.

THE COURT: No. 4. Is there anything else about you that we should know that affects your ability to be fair and impartial?

PROSPECTIVE JUROR MIULLI: No. Not at all.

THE COURT: Are you taking a vacation this summer?

PROSPECTIVE JUROR MIULLI: Yes.

THE COURT: Where are you going?

PROSPECTIVE JUROR MIULLI: Normally I go to Costa Rica.

THE COURT: Oh, good for you.

PROSPECTIVE JUROR MIULLI: I work hard, so.

THE COURT: What do you do there?

PROSPECTIVE JUROR MIULLI: Just relax. The ocean, the

rain forest.

THE COURT: That sounds pretty good.

PROSPECTIVE JUROR MIULLI: Help with the sloths, yeah.

THE COURT: Help with the sloths?

PROSPECTIVE JUROR: Yes. I'm really the animal person.

THE COURT: It's a surprising thing that that species survived, by the way. You wouldn't think being incredibly slow is a good survival technique. I wouldn't think anyway.

All right. Well, pleasure to meet you. Thank you for being here. Appreciate that.

All right. Next up we have Mr. Provan. All right. Mr. Provan.

PROSPECTIVE JUROR PROVAN: Hi, I'm Max Provan.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR PROVAN: Thank you for having me. I am Max Provan. I'm 27, about to turn 28. I'm a teacher in CUSD 200. So that's Wheaton/Warrenville School District.

THE COURT: Thank you for doing that.

PROSPECTIVE JUROR PROVAN: I obviously went to Ohio State, worked over in Columbus, Ohio for four years. Just moved back two years ago. And I've been here teaching ever since. Teach English to high schoolers.

THE COURT: How long has it been since they beat Michigan?

(Laughter.)

THE COURT: I strike my own question. Sorry.

PROSPECTIVE JUROR PROVAN: Thank you. Thank you.

THE COURT: Strike my own question.

PROSPECTIVE JUROR PROVAN: We could go over the record, if we need to.

(Laughter.)

THE COURT: I know, we can go -- yeah, hats off to Ohio State. I felt triggered there for a moment.

(Laughter.)

THE COURT: All right. So a more serious note. There was a question here about any feelings you have toward law enforcement. And, you know, we've got a case here where, you know, the government is bringing a case against someone. He is entitled to, you know, a fair trial and all the important things that come with that. Do you have any views about law enforcement one way or the other that would affect your ability to be fair to both sides?

PROSPECTIVE JUROR PROVAN: No.

THE COURT: In Question 18, you had some questions about law enforcement, and I just wanted to just tease out a little bit what you meant by that.

PROSPECTIVE JUROR PROVAN: Yeah, I think I just kind of put that I had some anxiety with regards to uniformed law enforcement, if that was correct. Is that the question you're

referring to?

THE COURT: Yeah.

PROSPECTIVE JUROR PROVAN: Yeah. That's all, just --

THE COURT: Okay. So during trial, we may have testimony from a government agent, you know, we'll see how it goes, but it's possible that we'll have somebody from Homeland Security or IRS, or who knows what. Is that going to affect you one way or the other, positively or negatively?

PROSPECTIVE JUROR PROVAN: No.

THE COURT: Do you think that somebody who testifies on behalf of the government is more credible just because they're with the government?

PROSPECTIVE JUROR PROVAN: No.

THE COURT: And how about the flip side? Do you think they're less credible? You think, they're the government, I probably won't believe them?

PROSPECTIVE JUROR PROVAN: No.

THE COURT: Okay. I wanted to ask you about your experience with your grandmother.

PROSPECTIVE JUROR PROVAN: Yeah.

THE COURT: And I'm happy to do that with sidebar. But the thing I'm getting at, the concept is, is there anything about that experience that would affect your ability to be fair? Because we need people who can be fair to everybody here. So, go ahead.

PROSPECTIVE JUROR PROVAN: No, I believe that, you know, being a fair juror is the most important piece of it. So I just wanted to be -- you know, make you guys aware of that potential issue, that's all.

THE COURT: Okay. Do you know the details about what happened to your grandmother in terms of whether it was oral or in person or --

PROSPECTIVE JUROR PROVAN: Yeah. It was one of the phone scams where they were trying to impersonate, you know, one of, like, the grand kids, or whatever.

THE COURT: Okay.

PROSPECTIVE JUROR PROVAN: Someone call and ask for money, say that they were in trouble and needed them to send money.

THE COURT: I see. Is there any -- and when did that happen?

PROSPECTIVE JUROR PROVAN: That was four years ago.

THE COURT: All right. Is there anything about that experience that would affect your ability to be fair?

PROSPECTIVE JUROR PROVAN: No, I don't think so. I think I would still require a sufficient level of evidence in order to prove any significant amount of guilt.

THE COURT: Okay. Can you be fair to Mr. Ibekie?

PROSPECTIVE JUROR PROVAN: Yeah.

THE COURT: In other words, should he have any concern

about your ability to be fair because your grandmother had a bad experience? Are you going to hold that against anybody in the courtroom?

PROSPECTIVE JUROR PROVAN: No.

THE COURT: Okay. And then you start your summer school on July 2nd; is that right?

PROSPECTIVE JUROR PROVAN: Yes, summer school, unfortunately. July 1st is the planning meeting, and then, yeah, all of July, yeah.

THE COURT: Okay. And what is that exactly?

PROSPECTIVE JUROR PROVAN: So that's a summer school program for middle schoolers in Yorkville. I'm teaching 7th grade English. It's kind of like an extended school year for the month of July, just so that they don't lose some of those important skills; right. A little reading, doing a little writing for that month. So, as long as we can get it done before then, I'd love to serve, but.

THE COURT: How does your average 7th grader respond to summer school in English class?

PROSPECTIVE JUROR PROVAN: Great. Just like you would expect. Just like you would expect.

THE COURT: You know, it's mainly a -- you know, there's hero potential for you if you can turn them around.

PROSPECTIVE JUROR PROVAN: Some of the squirrely adults in this courtroom are about my 7th graders English

class in summer school.

THE COURT: Yeah, I understand that. I understand that.

PROSPECTIVE JUROR PROVAN: Yeah.

THE COURT: So let me ask you my follow-up questions. At the end of the trial, I am going to instruct you on the law. Will you be able to follow my instructions in the law, even if you disagree with it?

PROSPECTIVE JUROR PROVAN: Yes, sir.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt. Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR PROVAN: Yes, sir.

THE COURT: How about the flip side? Can you return a verdict for the defense if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR PROVAN: Absolutely.

THE COURT: All right. Very good. A defendant has the presumption of innocence. Do you have any concern about your ability to follow the rule the defendant is presumed innocent throughout the trial?

PROSPECTIVE JUROR PROVAN: No, sir.

THE COURT: All right. Is there anything else about you that we should know that affects your ability to be fair and impartial juror?

PROSPECTIVE JUROR PROVAN: I do not believe so.

THE COURT: You were genuinely a good sport with my Ohio State jokes, so thank you for that. Thank you for being a good sport.

PROSPECTIVE JUROR PROVAN: I do what I can. Thank you, sir.

THE COURT: Thank you.

All right. Mr. Alfonso. Good afternoon. Thank you for being here.

PROSPECTIVE JUROR ALFONSO: No problem.

THE COURT: You want to go ahead and introduce yourself for us.

PROSPECTIVE JUROR ALFONSO: I am Timothy Alfonso. I am 24 years old. I'm going to be a 3L at Chicago Kent this year. I am currently a law clerk at --

THE COURT: You're doing great. 3L means he's a law student. It's his third year of law school.

PROSPECTIVE JUROR ALFONSO: Yeah, my final year. I am a law clerk at Taxman, Pollock, Murray & Bekkerman, which is a plaintiff's personal injury firm. I am from the northwest suburbs. I live in Hawthorn Woods. And, yeah, any questions?

THE COURT: How do you feel about serving on the jury as a law student?

PROSPECTIVE JUROR ALFONSO: I don't think it's a good idea.

THE COURT: And why would you say that?

PROSPECTIVE JUROR ALFONSO: Bringing in outside knowledge is something, like, I'm bound to do just from my school and studies and my work. And so I am afraid that that will impact my decisions.

THE COURT: Yeah. Can I tell you something? I sat on a jury, me personally, when I was a lawyer, and it was the best day I ever had in the law.

PROSPECTIVE JUROR ALFONSO: Interesting.

THE COURT: Honestly. I learned more by being a jury -- on a jury than I had at any other -- any other day in the law because you get a different perspective on things, you know, so. What do you want to do when you get out of law school?

PROSPECTIVE JUROR ALFONSO: I went into law school thinking I wanted to be a defense attorney, and that is definitely still an option. But I am really enjoying my work at Taxman. So personal injury could be an option.

THE COURT: Okay. I've just got a couple follow-up questions for you. Do you mind coming on up, we'll ask you a couple questions?

PROSPECTIVE JUROR ALFONSO: Of course.

(At sidebar with Prospective Juror Alfonso:)

THE COURT: All right. Looks like we've got four headsets for the government now; is that right? Very good.

All right. Mr. Alfonso, hi there.

PROSPECTIVE JUROR ALFONSO: Hi there.

THE COURT: So I wanted to ask you, I saw that you've been robbed before, and you said it would make things difficult?

PROSPECTIVE JUROR ALFONSO: Uh-huh.

THE COURT: This isn't a robbery case. But tell me about that experience and why you think it would affect you.

PROSPECTIVE JUROR ALFONSO: I was in Wrigleyville hanging out with friends, and I was outside a bar, and I started having conversation with, like, two strangers. And then all of a sudden I was taken, like, down an alleyway by another, like, group of three people, and all of my possessions were taken.

THE COURT: I'm sorry about that.

PROSPECTIVE JUROR ALFONSO: That's all right.

THE COURT: When was that?

PROSPECTIVE JUROR ALFONSO: A year ago, year and a half ago, something like that.

THE COURT: Okay. So this case doesn't involve robbery.

PROSPECTIVE JUROR ALFONSO: Yeah.

THE COURT: You know. And is there anything about that experience that would keep you from being fair?

PROSPECTIVE JUROR ALFONSO: No, it's just something I

wanted to make aware. I understand that theft and robbery are two very different things. I just wanted any indication of something that's similar that has happened to me to be known.

THE COURT: Yep, fair enough. So did I read you to say that you want to be a defense attorney?

PROSPECTIVE JUROR ALFONSO: It is definitely what I went into law school thinking, and it is still an option. But my horizons have broadened since I've been in school.

THE COURT: Okay. Do you think it's important for criminal defendants to get a fair trial?

PROSPECTIVE JUROR ALFONSO: Of course.

THE COURT: Do you think they're entitled to a presumption of innocence?

PROSPECTIVE JUROR ALFONSO: Of course.

THE COURT: Can you do that?

PROSPECTIVE JUROR ALFONSO: Yes.

THE COURT: Is there any reason you can't be fair to Mr. Ibekie?

PROSPECTIVE JUROR ALFONSO: Not that I know of.

THE COURT: Okay. And then question 20 said: Can you give the testimony of the law enforcement officers the same weight? And you said: "No. Unless their testimony is in defense of another officer, then I'd judge harsher."

PROSPECTIVE JUROR ALFONSO: Yeah.

THE COURT: So I paraphrased that. I may not have

paraphrased it exactly, but I think I know what you meant. Why don't you just tell me in your own words what you meant by that.

PROSPECTIVE JUROR ALFONSO: That if a law enforcement officer is testifying in the defense of another law enforcement officer, I will grade that much harsher than if they were testifying in any other degree.

THE COURT: Why is that?

PROSPECTIVE JUROR ALFONSO: I think that there is a longstanding history of protecting your own, and I believe that that should be taken into account.

THE COURT: Okay. The jury in this case might hear testimony about facts, they come from an agent. Can you give that testimony the same weight as any other testimony?

PROSPECTIVE JUROR ALFONSO: I can.

THE COURT: In other words, would you think, oh, but this is an agent, this person is more believable or less believable? Or what would you think?

PROSPECTIVE JUROR ALFONSO: No, their position does not give my thoughts any stand-in.

THE COURT: Okay. And then one of the questions was about allegations of fraud or financial crimes. You said it wouldn't affect your ability to be fair, but you hate theft. Question 28. Tell me about that.

PROSPECTIVE JUROR ALFONSO: That kind of tied into my

happenings of, like, what my experience was. I obviously am not going to have a good experience being stolen from. So I think it was just, like, a general, any kind of stealing is bad. Not theft, the crime itself.

THE COURT: And do you understand Mr. Ibekie hasn't been --

PROSPECTIVE JUROR ALFONSO: He's just accused.

THE COURT: He's just accused. You understand that; right?

PROSPECTIVE JUROR ALFONSO: Sure.

THE COURT: You of all people as a law student understand that; right?

PROSPECTIVE JUROR ALFONSO: Yeah. He has no culpability until the very end.

THE COURT: Well, and -- and even after.

PROSPECTIVE JUROR ALFONSO: If -- if that happens, yeah.

THE COURT: I mean, you don't know how the jury is going to decide. I mean --

PROSPECTIVE JUROR ALFONSO: Yep.

THE COURT: -- and he doesn't have to do anything except --

PROSPECTIVE JUROR ALFONSO: Be here.

THE COURT: -- be here. And the government has got all the burden, and he's got the presumption of innocence. Do

you understand all that?

PROSPECTIVE JUROR ALFONSO: 100 percent.

THE COURT: Can you follow those rules?

PROSPECTIVE JUROR ALFONSO: Of course.

THE COURT: And then question 31 said you can follow the law, but if circumstances arise where you believe the law is so wrong, then jury nullification may be at issue?

PROSPECTIVE JUROR ALFONSO: Yeah.

THE COURT: Tell me about that.

PROSPECTIVE JUROR ALFONSO: Well, if I thought that even if someone has committed a crime under extraordinary circumstances, I might not agree with the punishment for said crime.

THE COURT: Uh-huh. Okay. Do you understand you've got to follow the law?

PROSPECTIVE JUROR ALFONSO: 100 percent.

THE COURT: I mean, you're a law student. Right?

PROSPECTIVE JUROR ALFONSO: Yep.

THE COURT: You got this. Meaning, you understand how it works; right?

PROSPECTIVE JUROR ALFONSO: 100 percent.

THE COURT: A jury has got to follow the law.

PROSPECTIVE JUROR ALFONSO: 100 percent.

THE COURT: You can do that?

PROSPECTIVE JUROR ALFONSO: 100 percent.

THE COURT: No issue?

PROSPECTIVE JUROR ALFONSO: None.

THE COURT: Is there anything about the case, meaning nature of the case you think, boy, you may want to nullify the law?

PROSPECTIVE JUROR ALFONSO: Uh-uh. I just thought it was necessary to make it known that I am okay with going against the punishment if there are certain circumstances that make me feel that way.

THE COURT: Well, let me stop you. Punishment -- the jury doesn't decide punishment. You understand that; right?

PROSPECTIVE JUROR ALFONSO: Uh-huh.

THE COURT: It's up to the judge; right?

PROSPECTIVE JUROR ALFONSO: Of course.

THE COURT: And the judge doesn't even decide that unless there's a guilty verdict; right?

PROSPECTIVE JUROR ALFONSO: Yes.

THE COURT: And that's up to the jury; right?

PROSPECTIVE JUROR ALFONSO: Yep.

THE COURT: Based on what you know about the case, do you think there's any scenario where you would be inclined to nullify the law --

PROSPECTIVE JUROR ALFONSO: Not that I can think of at the moment.

THE COURT: -- and do your own thing?

Okay. You said your eyesight isn't the best.

PROSPECTIVE JUROR ALFONSO: Yeah, if it's going to be, like, a board or something I have to view from far away, I would need it on a screen up close.

THE COURT: Okay. You can see me okay, though?

PROSPECTIVE JUROR ALFONSO: Yeah, I can see you. It's just, like, words on a screen far away, they are quite blurry.

THE COURT: Okay. Folks, do you have any follow-up questions for him?

MS. NUTINI: Not from the government.

MR. CARLSON: Just -- you indicated that you didn't think it was a good idea for someone in your position to serve on a jury, and one of the reasons was that you might bring in --

PROSPECTIVE JUROR ALFONSO: Outside knowledge.

MR. CARLSON: -- outside knowledge. Can you expound upon that a little bit?

PROSPECTIVE JUROR ALFONSO: I'm just afraid that the way that I'm viewing facts or information, I will make unnecessary draws to my outside knowledge, when I'm supposed to only be taking the facts and information from this trial. I'm afraid that I will make connections, make assumptions, because of my prior knowledge.

MR. CARLSON: And if Judge Seeger instructed you you couldn't do that, you had to rely solely on the evidence that

comes from this courtroom, can you follow his commands?

PROSPECTIVE JUROR ALFONSO: I will follow all instructions given to me by the Court, yes.

MR. CARLSON: Thank you.

THE COURT: Anything else for anybody?

All right. Thank you, Mr. Alfonso.

(Proceedings heard in open court:)

THE COURT: Thank you, Mr. Alfonso. Let me ask you the four questions. No. 1. At the end of the trial, I'm going to instruct the jury on the law. Will you be able to follow my instruction, even if you disagree?

PROSPECTIVE JUROR ALFONSO: Yes.

THE COURT: No. 2. The government has the burden to prove its case beyond a reasonable doubt. Can you return a verdict for the government, if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR ALFONSO: Yes.

THE COURT: Can you return a verdict for the defense if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR ALFONSO: Yes.

THE COURT: Question 3. A defendant has the presumption of innocence. Do you have any concern about your ability to follow the rule that the defendant is presumed innocent throughout the trial?

PROSPECTIVE JUROR ALFONSO: No.

THE COURT: No. 4. Is there anything else about you that we should know that affects your ability to be a fair and impartial juror?

PROSPECTIVE JUROR ALFONSO: I don't.

THE COURT: All right. Very good. Thank you, Mr. Alfonso.

All right. Next up we have Ms. Weygand?

PROSPECTIVE JUROR WEYGAND: Susan Weygand.

THE COURT: Weygand. Good afternoon.

PROSPECTIVE JUROR WEYGAND: Good afternoon.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR WEYGAND: Thanks.

THE COURT: Do you want to go ahead and introduce yourself to us, please.

PROSPECTIVE JUROR WEYGAND: My name is Susan Weygand. I am 61 years old. I work for United States Postal Service as a mail carrier.

THE COURT: Look at that. Two-for-four. How many years?

PROSPECTIVE JUROR WEYGAND: 26.

THE COURT: Weren't you 26 years, too?

PROSPECTIVE JUROR MIULLI: Yeah.

THE COURT: Look at that. I'm paying attention up here.

PROSPECTIVE JUROR WEYGAND: I'm retiring at the end of December.

THE COURT: Are you really? Congratulations.

PROSPECTIVE JUROR MIULLI: I've got three more years.

THE COURT: Three more years? Wow.

Thank you for doing that. We have a lot of good people in the postal service that work really hard and everyone else benefits from it. So thank you for doing that.

PROSPECTIVE JUROR WEYGAND: Yeah, it's hard work.

THE COURT: Well, that's -- boy, I won't work this job 26 years. I mean, that's a long time.

PROSPECTIVE JUROR WEYGAND: Even more. I mean, I worked as a sub for a long time, too, before I became regular. So, yeah.

THE COURT: Well, thank you for doing that. So keep going. You're doing great. Go ahead. What else?

PROSPECTIVE JUROR WEYGAND: I'm blessed to have three sons. You know, raised three sons. Like to garden. Like to travel. That's about it.

THE COURT: Are you going anywhere this summer?

PROSPECTIVE JUROR WEYGAND: No, not this summer. No.

THE COURT: Have you ever been to Costa Rica?

(Laughter.)

PROSPECTIVE JUROR WEYGAND: No, I have not. I wouldn't mind going either.

THE COURT: All right. Well, all right. So thank you, Ms. Weygand. I have a -- just a couple follow-up questions for you. Do you mind coming up? Is that okay? Do you mind?

(At sidebar with Prospective Juror Weygan:)

THE COURT: Can you hear me okay?

PROSPECTIVE JUROR WEYGAND: Yeah.

THE COURT: Very good. So there was an answer to a question about whether somebody from your family has been through the criminal justice system. And I don't want to press upon it in a way that makes you uncomfortable at all, but I just want to make sure if there's any -- anything about your family's interaction with the law enforcement --

PROSPECTIVE JUROR WEYGAND: No.

THE COURT: -- or judicial system that affects your ability to be fair and impartial?

PROSPECTIVE JUROR WEYGAND: No, I don't think so.

THE COURT: Okay. Do you feel like your son, for example, was treated fairly?

PROSPECTIVE JUROR WEYGAND: Yes, very much so.

THE COURT: Do you mind going to the microphone? I want to hear you.

PROSPECTIVE JUROR WEYGAND: Very much so.

THE COURT: Okay.

PROSPECTIVE JUROR WEYGAND: I mean, you know, you do

the crime, you do the time, and that kind of thing, but.

THE COURT: Did you think your son was guilty just because he was charged?

PROSPECTIVE JUROR WEYGAND: Um, I think he was guilty, yeah.

THE COURT: You thought he was guilty?

PROSPECTIVE JUROR WEYGAND: I mean, he's got probation, but he's --

THE COURT: Okay.

PROSPECTIVE JUROR WEYGAND: He's doing well today.

THE COURT: Good. I'm glad to hear that.

PROSPECTIVE JUROR WEYGAND: Yes.

THE COURT: So Mr. Ibekie is charged. He has got the presumption of innocence. Can you give him the presumption of innocence?

PROSPECTIVE JUROR WEYGAND: Yeah.

THE COURT: Okay.

PROSPECTIVE JUROR WEYGAND: Yeah.

THE COURT: So there was a question about how do you feel about serving on a jury, and you said: "Would rather not. I just want to work my job." So you were very -- you get the award for candor there.

PROSPECTIVE JUROR WEYGAND: Well --

THE COURT: Go ahead.

PROSPECTIVE JUROR WEYGAND: Yeah, the 90 miles. I

drive 90 miles a day just on my route. And then driving up here from Ottawa.

THE COURT: You're from Ottawa?

PROSPECTIVE JUROR WEYGAND: Yeah.

THE COURT: Okay. So that's kind of by Starved Rock, obviously.

PROSPECTIVE JUROR WEYGAND: Yeah.

THE COURT: That's pretty far.

PROSPECTIVE JUROR WEYGAND: Yeah, yeah.

THE COURT: So how did you get here today, you drove?

PROSPECTIVE JUROR WEYGAND: Yeah, I -- well, and I actually drove last night and stayed in a hotel. Kind of made a holiday for myself.

THE COURT: Okay. Thank you for doing that.

PROSPECTIVE JUROR WEYGAND: Yeah.

THE COURT: So I know where Ottawa is very clearly. I know where Ottawa is. It's not close. How are you going to get here if you've got to be here for two weeks? You can't stay in a hotel.

PROSPECTIVE JUROR WEYGAND: I know.

THE COURT: Unless money grows on trees, you're probably not going to be able to stay in --

PROSPECTIVE JUROR WEYGAND: Well, that's the whole thing. And I got a 100-pound -- a 100-pound German Shepherd that I've been boarding, so. So, yeah, it's going to be tough.

And even at work, I mean, there is just not that many substitute mail carriers that can fill in for you, so.

THE COURT: Yeah. Well, how are you going to get here every day?

PROSPECTIVE JUROR WEYGAND: Drive, probably.

THE COURT: Okay. How long is that going to take you with rush hour?

PROSPECTIVE JUROR WEYGAND: I'd probably leave at 5:00. I mean, I'd have to. It just depends on when court is.

THE COURT: Well, if we start, you know, get going with testimony at 9:00, what time are you going to have to be here? Or what time are you going to have to leave your house to be here by 9:00 -- be here before 9:00?

PROSPECTIVE JUROR WEYGAND: I don't know. The way I drive, I'm a big chicken. So I'd probably try to set out at 5:30.

THE COURT: Okay.

PROSPECTIVE JUROR WEYGAND: 6:30, 7:30, get here by 8:00. I don't know how long it -- it takes about an hour and 90 minutes, I think.

THE COURT: Okay. Any follow-up for her, folks?

MS. NUTINI: Not from the government. Thank you.

MR. CARLSON: No, your Honor.

THE COURT: Okay. Ms. Weygand, thank you for answering my questions.

PROSPECTIVE JUROR WEYGAND: Yep.

(Proceedings heard in open court:)

THE COURT: All right. Ms. Weygand, thank you for answering my questions. Let me ask you the follow-up questions that we've asked other people. At the end of the trial, I'll instruct the jury on the law. Will you be able to follow my instructions about the law, even if you disagree with them?

PROSPECTIVE JUROR WEYGAND: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt. Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR WEYGAND: Yes.

THE COURT: And on the flip side, can you return a verdict for the defendant if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR WEYGAND: Yes.

THE COURT: A defendant has the presumption of innocence. Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR WEYGAND: No.

THE COURT: Finally, is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR WEYGAND: No.

THE COURT: All right. Thank you for answering my questions.

All right. Ms. Rivers. Good afternoon.

PROSPECTIVE JUROR RIVERS: Good afternoon.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR RIVERS: Thank you.

THE COURT: You want to go ahead and introduce yourself for us.

PROSPECTIVE JUROR RIVERS: Sure. I am Dominique Rivers. I'm an executive assistant for Rothschild, as well as a project manager for a celebrity gossip site as well.

THE COURT: Can you unpack that for me? What does that mean? Everybody in the room wants some sweet gossip right now. So what does that mean?

PROSPECTIVE JUROR RIVERS: I am actually under an NDA, so I --

THE COURT: All right. Sorry.

PROSPECTIVE JUROR RIVERS: -- can't really talk about that.

THE COURT: What is the concept? Just tell me what that -- I don't -- I was sort of kidding about the gossip, but, like, what does that mean? Just unpack what you -- what do you do for a living?

PROSPECTIVE JUROR RIVERS: Okay. So for Rothschild, I schedule meetings, book travel. Anything that a typical

executive assistant would do. But also I have a part-time job as a project manager for a celebrity gossip site. So we get a bunch of e-mails about different things, and like if it's something of interest, then I'm kind of the person to check to make sure the facts are correct.

On top of that, I am -- I have a degree in paralegal studies. Didn't too much like that, so I kept within the clerical arena of being an executive assistant.

THE COURT: Great. Okay. I have a few follow-up questions for you, if you don't mind coming up. Is that okay?

PROSPECTIVE JUROR RIVERS: Sure.

(At sidebar with Prospective Juror Rivers:)

THE COURT: All right. Hi, Ms. Rivers. Can you hear me okay?

PROSPECTIVE JUROR RIVERS: Yes.

THE COURT: Thank you for coming on up.

PROSPECTIVE JUROR RIVERS: No worries.

THE COURT: So I read your answers about your brother, that he was a victim of a shooting and a robbery?

PROSPECTIVE JUROR RIVERS: Yes.

THE COURT: I was sorry to read that. I'm sorry to read that.

PROSPECTIVE JUROR RIVERS: He's alive.

THE COURT: I'm glad to hear that. And then I also read that your brother -- I don't know if it's the same

brother, but there is a brother that was charged with possession with the intent to sell?

PROSPECTIVE JUROR RIVERS: It's a different brother.

THE COURT: Different brother. Okay. Can you just talk about those two experiences for me? And I think what we are trying to get at, Ms. Rivers, is we're trying to see if there is anything about those experiences that would affect your ability to be fair. Because, you know, the government here needs a fair trial; right?

PROSPECTIVE JUROR RIVERS: Right.

THE COURT: Right? The government just needs people who can listen to the evidence and call it straight.

PROSPECTIVE JUROR RIVERS: Right.

THE COURT: Mr. Ibekie needs that, too. Mr. Ibekie needs people who can be unbiased, and impartial, and fair, and listen to the evidence and just render the best verdict they can based on the facts and the evidence in the courtroom.

Can you just talk about that for me?

PROSPECTIVE JUROR RIVERS: Sure. So we all have some sort of bias that we have. It won't hinder me from making a conscious decision on behalf. Those two situations were -- did make me kind of afraid of the police from how they handled both situations. Although, one of my brothers was the actual victim. But it wouldn't hinder me from making a fair judgment.

THE COURT: Okay. So thank you for sharing all that.

So we've got a case here where the government is bringing charges against Mr. Ibekie. Is there any reason you couldn't be fair to the government?

PROSPECTIVE JUROR RIVERS: No.

THE COURT: How about Mr. Ibekie? Any reason you couldn't be fair to Mr. Ibekie?

PROSPECTIVE JUROR RIVERS: No.

THE COURT: You've heard a little bit about the case. You just heard a little. You know, but as you've heard a little about this, is there any part of it that makes you think, boy, I'm going to have just a hard time playing it straight here?

PROSPECTIVE JUROR RIVERS: No.

THE COURT: Okay. And then I wanted to ask you about your father who was scammed. It says your father was 89 years old, was scammed by a person by e-mail.

PROSPECTIVE JUROR RIVERS: Uh-huh. E-mail and phone.

THE COURT: E-mail and phone. Can you tell me about that and --

PROSPECTIVE JUROR RIVERS: Sure. So my father is going through dementia.

THE COURT: Sorry to hear that.

PROSPECTIVE JUROR RIVERS: And he has Medicare. And so this actually happened twice, where they'll call him and say that, hey, your insurance is no longer valid. We do have this

new insurance, but you need to pay. And so with him not knowing too much about the internet and phone calls, and things like that, he gave up his credit card information. That was the first set of identity theft that he went through. They got his credit card number. They somehow -- he said he didn't give it, but somehow they got his Social Security number as well. We were able to get that straightened out after a year and a half.

And the other time it just happened with his -- his credit card -- his debit card.

THE COURT: Okay. I'm sorry that happened to your father. Is there anything about that experience that would make it hard for you to be fair?

PROSPECTIVE JUROR RIVERS: Um, it would (sic) make it hard for me to be fair, but --

THE COURT RIVERS: It would or would not?

PROSPECTIVE JUROR: It wouldn't. It is a softer spot for me, but it wouldn't hinder me from making a conscious decision, a judgment.

THE COURT: Okay. Is there any reason you couldn't be fair to Mr. Ibekie?

PROSPECTIVE JUROR RIVERS: No.

THE COURT: I mean, he has been charged with various crimes, including fraud-related crimes, but he's got the presumption of innocence.

PROSPECTIVE JUROR RIVERS: Right.

THE COURT: You know, he walks in the courtroom with all sorts of presumptions in his favor. Can you give those -- the presumption of innocence to him?

PROSPECTIVE JUROR RIVERS: Absolutely.

THE COURT: Okay. And then there was a question in here about whether you hold any beliefs, you know, religious or moral or ethical, that would affect your ability to be fair and affect your ability to judge the conduct of another person. And I think the answer was blank here, and I just wanted to double check.

PROSPECTIVE JUROR RIVERS: Oh.

THE COURT: Do you have any religious or personal or moral or ethical views that would make it difficult for you to serve as a juror?

PROSPECTIVE JUROR RIVERS: No. I don't have a religion.

THE COURT: Okay. And then you wrote here that you don't agree with people scamming people.

PROSPECTIVE JUROR RIVERS: Uh-huh.

THE COURT: And we've got a defendant here who's not -- nothing has been proven against him yet.

PROSPECTIVE JUROR RIVERS: Exactly.

THE COURT: So can you keep an open mind and give him the presumption of innocence?

PROSPECTIVE JUROR RIVERS: Absolutely.

THE COURT: Okay. And then it looks like you've got a job interview lined up. I'm sorry, you had a job interview that you had to miss already. Sorry about that.

PROSPECTIVE JUROR RIVERS: Uh-huh.

THE COURT: But you're on vacation July 7th.

PROSPECTIVE JUROR RIVERS: Yes.

THE COURT: So I will tell you, I don't know how long the jury is going to deliberate. But once the jury deliberates, the jury deliberates, and just -- they just go until they're done.

PROSPECTIVE JUROR RIVERS: Right.

THE COURT: Do you have any other conflicts between now and July 7th?

PROSPECTIVE JUROR RIVERS: I have been on LinkedIn a lot with recruiters, so I do have recruiters calling me. My job actually at Rothschild will be coming to an end at the end of this year. So they have job placement trying to assist us with finding jobs because the Chicago office will be closing. So that does pose an issue for me because I have two children in college that I am the sole provider for. So I really need to find another job.

THE COURT: I get that. Well, good luck with your job search.

PROSPECTIVE JUROR RIVERS: Thank you.

THE COURT: I'm sympathetic. I'm sure you're going to do great.

PROSPECTIVE JUROR RIVERS: Thank you.

THE COURT: It sounds like you're going to do great.

Any follow-up questions for anybody -- from anybody?

MS. NUTINI: Just briefly, your Honor.

THE COURT: Go ahead.

MS. NUTINI: Good afternoon, Ms. Rivers.

PROSPECTIVE JUROR RIVERS: Hello. How are you?

MS. NUTINI: Hi. I wanted to follow-up about the two experiences that you -- that both your brothers went through and ask you specifically, what law enforcement agency did you have -- you or your brothers have interactions with?

PROSPECTIVE JUROR RIVERS: They -- one of them with Chicago Police Department, and one in Iowa. The one from Chicago is the one where my brother was robbed at gunpoint.

MS. NUTINI: Okay. Thank you. And this kind of dovetails into your answers to Questions 15 and 18, getting at the judicial system. And I believe your answer was it's not designed for black and brown people.

PROSPECTIVE JUROR RIVERS: Yes.

MS. NUTINI: And then about law enforcement, "I don't believe they're trained well. They see most black-brown people as criminals."

PROSPECTIVE JUROR RIVERS: Yes.

MS. NUTINI: You will hear testimony in this case from law enforcement agents, not specifically from the ones that you interacted with. But my question is, would you be able to hear that testimony from law enforcement agents and give it the same weight that you would give any other witness you're listening to?

PROSPECTIVE JUROR RIVERS: Absolutely.

MS. NUTINI: And would your experiences that -- your negative experiences that you and your family have had, do you think that would impact the way in which you assessed what a law enforcement agent is saying when they're on the witness stand?

PROSPECTIVE JUROR RIVERS: No.

MS. NUTINI: Thank you.

PROSPECTIVE JUROR RIVERS: You're welcome.

THE COURT: Mr. Carlson, any follow-up?

MR. CARLSON: No, your Honor.

THE COURT: All right. That wasn't so bad up here. What do you think?

PROSPECTIVE JUROR RIVERS: Um, no. I do suffer from extreme anxiety, so.

THE COURT: You don't seem like it. You seemed chillax up here in a good way. It's not that hard to talk to me.

PROSPECTIVE JUROR RIVERS: No, it's not. It's not.

THE COURT: All right. I like talking to you.

All right. Ms. Rivers, I appreciate you coming up. I am going to ask you the same questions you've heard everybody else answer. Okay. Thank you. I appreciate that.

PROSPECTIVE JUROR RIVERS: Okay. Sure thing.

(Proceedings heard in open court:)

THE COURT: Thank you, Ms. Rivers.

PROSPECTIVE JUROR RIVERS: All right. You're welcome.

THE COURT: Let me ask you the same questions you heard other people asked. No 1. At the end of the trial, I'll instruct the jury on the law. Will you be able to follow my instruction about the law, even if you disagree with the law?

PROSPECTIVE JUROR RIVERS: Yes.

THE COURT: No. 2. The government has the burden to prove its case beyond a reasonable doubt. Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR RIVERS: Yes.

THE COURT: On the flip side, can you return a verdict for the defendant if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR RIVERS: Yes.

THE COURT: No. 3. A defendant has the presumption of innocence. Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent

throughout the trial?

PROSPECTIVE JUROR RIVERS: No.

THE COURT: No. 4. Is there any other reason for anyone to think that you would be anything less than fair and impartial? In other words -- I didn't stick the landing on that question. Let me say it again.

Is there anything else about you that we should know when we try to figure out if you can be fair and impartial? Is there anything else about you?

PROSPECTIVE JUROR RIVERS: No.

THE COURT: Okay. Thank you, Ms. Rivers. I appreciate that.

All right. Next up we've got Ms. Cesario.

PROSPECTIVE JUROR CESARIO: Yes.

THE COURT: Good afternoon.

PROSPECTIVE JUROR CESARIO: Good afternoon.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR CESARIO: You're quite welcome.

THE COURT: Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR CESARIO: My name is Barbara Cesario. I'm 62 years old. I'm from Burbank, which is just outside of the city on the southwest side. I'm retired. I retired a year and a half ago. The previous 22 years before I retired I was a receptionist at an animal hospital. In my

spare time, I like to garden and spend time with my husband.

THE COURT: That sounds pretty good. What kind of gardening do you do?

PROSPECTIVE JUROR CESARIO: You know, just regular upkeep on my landscaping, perennials. I also like house plants. I'm getting better, I'm not killing things as much as I used to. So I'm getting a little bit better at that. But that's about it.

THE COURT: Good. It's hard not to kill plants. They seem to do really great outside, and put them inside and they just -- apparently they don't like living inside, as it turns out.

PROSPECTIVE JUROR CESARIO: I know. I used to over water.

THE COURT: Yeah.

PROSPECTIVE JUROR CESARIO: That was my biggest problem. But I'm getting a little better at that.

THE COURT: Yeah. I have a lot of thoughts on this topic.

All right. So let me ask you this: There was a question about your husband's work van that was stolen many years ago.

PROSPECTIVE JUROR CESARIO: Yes. That was many years ago. Probably about 35 years ago. And all his tools were in there.

THE COURT: Okay.

PROSPECTIVE JUROR CESARIO: That was many years ago.

THE COURT: Is there anything about that experience that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR CESARIO: No.

THE COURT: Okay. I've got a couple follow-up questions for you, if you don't mind coming up. Do you mind?

PROSPECTIVE JUROR CESARIO: No, that's fine.

THE COURT: Come on up, please.

(At sidebar with Prospective Juror Cesario:)

THE COURT: Can you hear me okay?

PROSPECTIVE JUROR CESARIO: Yes.

THE COURT: Do you remember the old-school Sony Walkman? It's just like these.

PROSPECTIVE JUROR CESARIO: I know. I have a pair, actually.

THE COURT: All right. So I have a couple follow-up questions. Thanks for coming on up here.

PROSPECTIVE JUROR CESARIO: Okay.

THE COURT: So one of the questions was a Question 17, of any strong feelings. And you wrote "generally more favorable to prosecutors than defense attorneys."

PROSPECTIVE JUROR CESARIO: Correct.

THE COURT: And I just want to just talk that through with you.

PROSPECTIVE JUROR CESARIO: Uh-huh.

THE COURT: Tell me what you think.

PROSPECTIVE JUROR CESARIO: Just in general, I just --

THE COURT: Go into the microphone so we can hear you.

PROSPECTIVE JUROR CESARIO: Oh, I'm sorry.

THE COURT: You're doing great. No need to apologize. Go ahead.

PROSPECTIVE JUROR CESARIO: I just -- I don't know if I overthought this too much because I was the last person to return my questionnaire that day. So I don't know if I overthought every question too much. It's just in general. I have a more favorable opinion of law and order and prosecutors.

THE COURT: Okay. Well, do you believe that all of us are innocent until proven guilty?

PROSPECTIVE JUROR CESARIO: And this was another question. And that's one of your follow-up questions that I think, if I'm going to be totally honest, I may have a problem with.

THE COURT: Okay.

PROSPECTIVE JUROR CESARIO: Because you stated could I believe that somebody was totally innocent, like, throughout the trial. I don't think I could guarantee that because I may think somebody is guilty after hearing some testimony.

THE COURT: Okay. Well, thank you for that. And no need to apologize for anything. I want you to just -- just

give it to me straight, just like you're doing. I appreciate your candor.

PROSPECTIVE JUROR CESARIO: Okay.

THE COURT: You know, in our system of justice, a criminal defendant walks into the courtroom an innocent person. All of us; right?

PROSPECTIVE JUROR CESARIO: Right. Right.

THE COURT: And Mr. Ibekie is, too. Do you believe that?

PROSPECTIVE JUROR CESARIO: I believe at the start of the trial I could certainly believe that. But it's just that during the testimony part, if I may -- if I'm being honest --

THE COURT: Yeah, I want you to be honest.

PROSPECTIVE JUROR CESARIO: If I hear something, I may think otherwise --

THE COURT: Okay.

PROSPECTIVE JUROR CESARIO: -- before the end of the trial.

THE COURT: Okay. What if I tell you -- what if I instruct you as the judge that you've got to keep an open mind. Because you haven't heard anything.

PROSPECTIVE JUROR CESARIO: Right. I know. I know.

THE COURT: You're doing fine.

PROSPECTIVE JUROR CESARIO: I'm just, like -- you know, I was just trying to be totally honest. I'm not perfect.

THE COURT: Yeah, none of us are. None of us are.

PROSPECTIVE JUROR CESARIO: You know, and it just -- if I was going to be totally honest, I just would have to say that. I mean, I can -- I could say I could do my best.

THE COURT: Okay. Is there any reason why you think you couldn't do your best to keep an open mind?

PROSPECTIVE JUROR CESARIO: No, not really. Not really.

THE COURT: Okay. You know, I'm trying to think of a metaphor here. You know, the basketball game, you don't want to call the game after the second quarter; right? I mean, you've got to play the whole game, don't you think?

PROSPECTIVE JUROR CESARIO: Right. Yes.

THE COURT: You've got to play the whole game.

PROSPECTIVE JUROR CESARIO: True.

THE COURT: Because you don't know how it's going to go.

PROSPECTIVE JUROR CESARIO: Right.

THE COURT: And in a courtroom, you know, it's not over until it's over. You've got to keep an open mind. Do you think you can do that?

PROSPECTIVE JUROR CESARIO: I can.

THE COURT: Okay. And then there was a question here about him being from Nigeria. And I want to talk to you about that.

PROSPECTIVE JUROR CESARIO: You know, I -- okay. I answered that because, you know, when I was working, I would get, like, fax -- like, faxes two or three times a week, and it would -- was an obvious scam, you know, to me. And that's where they seemed to originate from. So I somehow got that in my mind, that that's where a lot of these scams originate in that part of the world. I mean, I don't know if I'm correct or not. But that's where that answer came from.

THE COURT: Okay. So Mr. Ibekie is a citizen of Nigeria. Would you hold it against him that he's from Nigeria and not the United States?

PROSPECTIVE JUROR CESARIO: No.

THE COURT: Do you think he is more likely to be guilty if he is from Nigeria?

PROSPECTIVE JUROR CESARIO: I guess I would listen to the testimony and do as you instructed me --

THE COURT: Okay.

PROSPECTIVE JUROR CESARIO: -- to wait until the end of, you know, the trial.

THE COURT: Do you think he is entitled to a fair trial?

PROSPECTIVE JUROR CESARIO: Yes.

THE COURT: Do you think he's entitled to the presumption of innocence?

PROSPECTIVE JUROR CESARIO: Yes.

THE COURT: So, you know, Mr. Ibekie is over there listening to you. Should he have any concerns about your ability to be a fair juror for him?

PROSPECTIVE JUROR CESARIO: No.

THE COURT: Are you sure about that answer?

PROSPECTIVE JUROR CESARIO: You know what, I can't -- I'm not.

THE COURT: Okay. Can I tell you something, I just want you to be straight with me, and you're being straight with me. I appreciate that.

PROSPECTIVE JUROR CESARIO: Okay.

THE COURT: And there is some other questions along these lines about him testifying. And you said: "I understand the principle, but I would think less of the defendant for not testifying." Can you talk to me about that?

PROSPECTIVE JUROR CESARIO: That's another thing, too, where I was just being honest. I was on another jury before, many years ago, at this courthouse, and the defendant did not take the stand. And, in fact, they did not have any type of defense at all. After the prosecution had their whole case finished, the defense didn't even put on any type of, you know, testimony or anything like that. And I have to admit, it did kind of affect my thinking a little bit.

THE COURT: All right. So in our system, the government has the burden of proof. They got to prove their

case beyond a reasonable doubt. A criminal defendant doesn't have to do anything except show up.

PROSPECTIVE JUROR CESARIO: Yeah, I understand that.

THE COURT: You know what I mean?

PROSPECTIVE JUROR CESARIO: Yeah.

THE COURT: The defendant doesn't have to testify. He doesn't have to call witnesses. He doesn't have to present evidence.

PROSPECTIVE JUROR CESARIO: Right.

THE COURT: The defendant has to be here, and that's it.

PROSPECTIVE JUROR CESARIO: Right.

THE COURT: And you can't hold it against him. You can't draw any inference from the fact that a defendant doesn't, you know -- does that all ring true with you? Do you agree with all those points?

PROSPECTIVE JUROR CESARIO: I mean, I understand that that's the principle. I just can't guarantee that I would do it.

THE COURT: Okay. I got you.

And then you wrote here you'd have a bias against the defendant in this type of a case. Was there anything else that we haven't already touched on?

PROSPECTIVE JUROR CESARIO: Well, that was because of I had said about those faxes, and that's where they seemed to

originate from. That's where that came from.

THE COURT: Okay. Got it.

Any follow-up questions from the government?

MS. NUTINI: No, your Honor. Thank you.

THE COURT: Okay. Mr. Carlson, I invite you to ask any follow-up questions you'd like.

MR. CARLSON: No questions, your Honor.

THE COURT: Okay. Ms. Cesario, it was kind of you to answer my questions.

PROSPECTIVE JUROR CESARIO: Okay. Now, you're going to ask me those follow-up questions, and that one question is probably going to be an issue.

THE COURT: The presumption of innocence?

PROSPECTIVE JUROR CESARIO: Correct.

THE COURT: I'll say apart from what we've already talked about.

PROSPECTIVE JUROR CESARIO: Okay.

THE COURT: So I'll say: Apart from what we've already talked about, do you have any concern?

PROSPECTIVE JUROR CESARIO: Okay.

THE COURT: Is it -- let me just put it to you: Do you have any other concern -- actually, let me just ask you these and not in the front of everybody.

PROSPECTIVE JUROR CESARIO: Okay.

THE COURT: At the end of the trial, I'll instruct the

jury on the law. Will you be able to follow my instructions even if you disagree with them?

PROSPECTIVE JUROR CESARIO: Yes.

THE COURT: The government has the burden to prove the case beyond a reasonable doubt. Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR CESARIO: Yes.

THE COURT: Can you return a verdict for the defendant if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR CESARIO: Yes.

THE COURT: A defendant has the presumption of innocence. Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent --

PROSPECTIVE JUROR CESARIO: Yes.

THE COURT: -- throughout the trial?

PROSPECTIVE JUROR CESARIO: Yes, I do have a concern.

THE COURT: Is there anything else that we haven't already touched on?

PROSPECTIVE JUROR CESARIO: No.

THE COURT: All right. Anything else about you that we should know about your ability to be fair and impartial?

PROSPECTIVE JUROR CESARIO: No.

THE COURT: Okay. Folks, any -- any follow-up

questions for anybody?

MS. NUTINI: No. Thank you.

MR. CARLSON: No, Judge.

THE COURT: All right. Ms. Cesario, you were very candid. I appreciate you talking to me.

PROSPECTIVE JUROR CESARIO: Thank you.

THE COURT: All right. Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Ms. Cesario. I appreciate that. We went ahead, while we were talking, we just pounded out the list of four questions. We just did it there so you all don't have to listen to that.

So we will go to the next. So Mr. Knezovich?

PROSPECTIVE JUROR KNEZOVICH: Knezovich.

THE COURT: Knezovich. All right. Good afternoon.

PROSPECTIVE JUROR KNEZOVICH: Good afternoon.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR KNEZOVICH: Yep. Thanks for having me.

THE COURT: You want to go ahead and introduce yourself.

PROSPECTIVE JUROR KNEZOVICH: My name is Ross Knezovich. I'm 30 years old. I grew up in Naperville, Illinois. I went to school at Illinois Wesleyan University in Bloomington, Illinois.

THE COURT: Yeah, Bloomington/Normal. That's my hometown.

PROSPECTIVE JUROR KNEZOVICH: Uh-huh, right there. After school -- or my concentration was in graphic design for school there. After school I went to Chicago. I've been living here. I work at the same company that I interned at, so I've been there for eight-and-a-half years, which is TMS. And I am an associate creative director currently where I work on apparel design, packaging design, merchandise. A whole bunch of other things. Promotions and activations. And my biggest client is probably McDonald's, but I also work with Starbucks, T-Mobile, and some other clients as well.

THE COURT: Uh-huh. So what do you actually design for them, like?

PROSPECTIVE JUROR KNEZOVICH: So for packaging, like the cup that you get every day at McDonald's, the holiday cups.

THE COURT: Yeah. You're the Starbucks holiday cup guy?

PROSPECTIVE JUROR KNEZOVICH: Well, I'm not Starbucks. I am actually the McCafe. We don't work on that.

THE COURT: I see. All right. A lot of thought goes into that. Probably way more than it looks.

PROSPECTIVE JUROR KNEZOVICH: Yes. We're currently doing it right now, so I'm trying to multi-task.

THE COURT: You're working now for the holiday cups?

PROSPECTIVE JUROR KNEZOVICH: Yes.

THE COURT: Wow. Okay. All right. So let me ask you a couple follow-up questions. One of the questions was do you have any views about law enforcement that affects your ability to be fair and impartial here? And you made some comments about the Chicago Police Department?

PROSPECTIVE JUROR KNEZOVICH: Yes. Just in general the history I feel like of police have been kind of skewed towards minorities and have been affected in different ways that I kind of have seen the different side of it and don't appreciate. So that's kind of my viewpoint on it. But that wouldn't affect my decision to give someone a fair trial.

THE COURT: Yeah. So we've -- thank you for that. So we've got the government bringing some charges here that I think it is possible that we're going to have people from the government testify. You could have somebody from the IRS testify or somebody from Homeland Security testify. Will you be able to listen to that testimony and give it the same weight that you give anybody else?

PROSPECTIVE JUROR KNEZOVICH: Yes.

THE COURT: In other words, will you be pro-government or anti-government, or somewhere -- anything like that before they even testify?

PROSPECTIVE JUROR KNEZOVICH: No, I'll be fair for both sides.

THE COURT: In other words, would you say, boy, this is a government person, I'm not going to like that person because they're with the government --

PROSPECTIVE JUROR KNEZOVICH: No. Will not be skewed.

THE COURT: -- or the flip side? Yeah, okay, you won't be skewed either way? Okay.

That's what you'd want if it was your case; right?

PROSPECTIVE JUROR KNEZOVICH: Yes.

THE COURT: Okay. I think I -- I think I answered -- I think I've got an understanding of all of your questions and answers. So let me ask you this: At the end of the trial I'm going to instruct the jury on the law. Will you be able to follow my instructions even if you disagree with them?

PROSPECTIVE JUROR KNEZOVICH: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt. Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR KNEZOVICH: Yes.

THE COURT: And what about the flip side? If the government doesn't prove its case beyond a reasonable doubt, can you return a verdict in favor of the defendant?

PROSPECTIVE JUROR KNEZOVICH: Yes.

THE COURT: A defendant has the presumption of innocence. Do you have any concern about your ability to follow the rule that the defendant is presumed innocent

throughout the trial?

PROSPECTIVE JUROR KNEZOVICH: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR KNEZOVICH: No.

THE COURT: Okay. Appreciate you answering my questions.

PROSPECTIVE JUROR KNEZOVICH: Thank you.

THE COURT: Good luck with the cups.

All right. So next up, it looks like we have Ms. McCaster?

PROSPECTIVE JUROR McCASTER: Yes.

THE COURT: Good afternoon.

PROSPECTIVE JUROR McCASTER: Good afternoon.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR McCASTER: Thank you.

THE COURT: You want to go ahead and introduce yourself for us.

PROSPECTIVE JUROR McCASTER: Yes. I'm Tawanda McCaster. I'm 41 years old. I used to work for Amazon, but I stopped working for Amazon for six years to become an Uber driver because it gave me more time so I could be able to be a mom to my kids.

I live on the west side of Chicago in the Austin area.

I like to cook. I like to do nothing when I don't have nothing to do.

THE COURT: There you go. That sounds pretty good.

PROSPECTIVE JUROR McCASTER: And that's about it.

THE COURT: Are you an Uber driver now?

PROSPECTIVE JUROR McCASTER: Yes.

THE COURT: How do people behave in Ubers, would you say, from the Uber-driver perspective? How do people behave?

PROSPECTIVE JUROR McCASTER: When I started doing Uber, I found out that the adults is the biggest kids that it is.

THE COURT: Wait, say -- wait. Say that again. What?

PROSPECTIVE JUROR McCASTER: Adults are the bigger kids that are --

THE COURT: Oh, the adults. I got you. Okay.

PROSPECTIVE JUROR McCASTER: Adults are the big kids right now.

THE COURT: What do you mean by that?

PROSPECTIVE JUROR McCASTER: Like, simple things. Like, can you turn the air up? Like, all you got to do is ask. And they'll get out and leave a bad review.

THE COURT: Oh, okay.

PROSPECTIVE JUROR McCASTER: Instead of just asking me to do it that. I'm very apt to anything.

THE COURT: I am a very undemanding passenger. I

don't put any demands on people.

What did you do for Amazon? Were you a driver for them, or what did you --

PROSPECTIVE JUROR McCASTER: I was a delivery driver.

THE COURT: Okay. How long have you been driving for a living? You have been driving people and driving things. How long have you been doing that?

PROSPECTIVE JUROR McCASTER: People and things, I've been driving all my life. Since about 17.

THE COURT: Okay. And what do you like to do for fun? You said nothing, but you've got to be doing something. What do you like to do for fun?

PROSPECTIVE JUROR McCASTER: Basically I just -- I don't have no adult life, just it's about my kids. So, like, I take them swimming.

THE COURT: You're a driver for them, too, it sounds like.

PROSPECTIVE JUROR McCASTER: Yes, basically.

THE COURT: Swimming, what -- I cut you off. Go ahead.

PROSPECTIVE JUROR McCASTER: Excuse me?

THE COURT: I cut you off. You said swimming and --

PROSPECTIVE JUROR McCASTER: Swimming, game rooms. That's it.

THE COURT: Okay. All right. I think I understand

all your answers on the questionnaire. So let me just ask you the straight-up questions here.

At the end of the trial, I'm going to instruct the jury on the law. Will you be able to follow my instructions, even if you disagree with them?

PROSPECTIVE JUROR McCASTER: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt.

PROSPECTIVE JUROR McCASTER: Yes.

THE COURT: Can you return a verdict for the government if the government proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR McCASTER: Yes.

THE COURT: And how about the flip side. Can you return a verdict for the defendant --

PROSPECTIVE JUROR McCASTER: Yes.

THE COURT: -- if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR McCASTER: Yes.

THE COURT: Do you understand the government has got the burden here and the defendant doesn't have to do anything except show up. Do you understand that?

PROSPECTIVE JUROR McCASTER: Yes.

THE COURT: In other words, the defendant doesn't have to present any evidence at all. Do you understand that?

PROSPECTIVE JUROR McCASTER: Yes.

THE COURT: A defendant has the presumption of innocence. Do you have any concern about your ability to follow the rule that the defendant is presumed innocent throughout the trial?

PROSPECTIVE JUROR McCASTER: No.

THE COURT: All right. Last question for you. Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR McCASTER: Not at all.

THE COURT: All right. Thank you, Ms. McCaster. Appreciate it.

PROSPECTIVE JUROR McCASTER: You're welcome.

THE COURT: All right. Next up, we've got Mr. Jones.

PROSPECTIVE JUROR JONES: No. Michael Lehet Jones, yes.

THE COURT: Lehet Jones. I beg your pardon. Good afternoon.

PROSPECTIVE JUROR JONES: Good afternoon.

THE COURT: Thanks for being here.

PROSPECTIVE JUROR JONES: You're welcome.

THE COURT: You want to go ahead and introduce yourself to everybody.

PROSPECTIVE JUROR JONES: I'm Michael Lehet Jones. I'm 55. I grew up in Pennsylvania. I've lived in Chicago for

24 years. Recently my husband and I bought a home in Des Plaines. So I've been doing a lot of landscaping and learning how to be a homeowner. I work for an electronics distribution company as a software tester. And I've been with them for 23 years.

THE COURT: What do you do exactly? Break that down for me.

PROSPECTIVE JUROR JONES: We have a website, and my responsibility is when we roll out new features, we'll have documents that we have to read. We write up test scripts, make sure that when you push a button it actually does what it's supposed to do. And we test that all internally before we deploy that out to a production, where then it's visible to the public.

THE COURT: Got it. What do you like doing for fun?

PROSPECTIVE JUROR JONES: I have two dogs, so I like spending time with them. Landscaping. I've been doing a lot of that this year. And just learning about being a homeowner.

THE COURT: How are the cicadas?

PROSPECTIVE JUROR JONES: They're not too bad out in Des Plaines.

THE COURT: Yeah? Are they?

PROSPECTIVE JUROR JONES: No, not too bad.

THE COURT: I pooh-poohed the cicadas thing until I went outside, and it was louder than I expected, actually. I

thought it was going to be overblown, but it -- it was -- it delivered, I thought.

PROSPECTIVE JUROR JONES: Oh, no, it has been -- its not been too bad. My dog loves them, so he's going to be very upset when they're gone because he likes to eat them.

THE COURT: All right. Well, there's more than I want to follow-up on, but.

So I read that somebody stole your identity once?

PROSPECTIVE JUROR JONES: Yes.

THE COURT: And I guess I am happy to hear about that, but the thing that I really want to hear about is, does that affect your ability to be fair to everybody in this courtroom?

PROSPECTIVE JUROR JONES: No.

THE COURT: Just sort of talk about what happened in detail.

PROSPECTIVE JUROR JONES: Someone used my identity to buy a phone. And the only way I found out about it was they had it delivered to my home address, and I got a notification from UPS that there was a package coming, and I didn't know there was a package coming. And -- so that was about the extent of it. I was not out any money, or anything.

THE COURT: Okay. Is there anything about that experience that would affect your ability to be fair to both sides here?

PROSPECTIVE JUROR JONES: No, sir.

THE COURT: In other words, is there any reason you couldn't be fair to Mr. Ibekie based on that experience?

PROSPECTIVE JUROR JONES: No, there's no reason.

THE COURT: Okay. And then can you talk to me a little bit about your availability. I read your answer there, but I want to make sure I understand.

PROSPECTIVE JUROR JONES: Yeah. So I have a doctor's appointment this Thursday that I made about three months ago.

THE COURT: Okay.

PROSPECTIVE JUROR JONES: I can try to change that. I have some vacation planned, but now you said that that's not going to be during that time because we're going to be closed. And I think my dog has a dental appointment during that period as well. And --

THE COURT: A dog dental appointment. Never heard that one before. All right. So let me follow-up with you on that. So you've got a doctor's appointment but it sounds like --

PROSPECTIVE JUROR JONES: I can try to change it. I made it about three months ago. You know, I've been waiting for this, so.

THE COURT: I got it. Okay.

PROSPECTIVE JUROR JONES: I can try to change, if necessary.

THE COURT: Got it. And then you've got a -- you've

got a vacation starting June 29th?

PROSPECTIVE JUROR JONES: Yeah, the 29th through the 5th. But you said court is going to be in recess that time.

THE COURT: So we will not be presenting evidence then.

PROSPECTIVE JUROR JONES: Okay.

THE COURT: If the jury is deliberating, the jury is deliberating. Are you -- do you have tickets planned somewhere?

PROSPECTIVE JUROR JONES: I'm driving to Pennsylvania to visit my family.

THE COURT: Got it. Okay. Got it. And -- okay.

Let me ask you the follow-up questions. At the end of the trial, I am going to instruct the jury on the law. Will you be able to follow my instructions about the law even if you disagree with it?

PROSPECTIVE JUROR JONES: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt. Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR JONES: Yes.

THE COURT: Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR JONES: Yes.

THE COURT: A defendant has the presumption of innocence. Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR JONES: No.

THE COURT: Last question. Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR JONES: No, sir.

THE COURT: Okay. I appreciate you answering my questions.

PROSPECTIVE JUROR JONES: Thank you.

THE COURT: All right. So next we've got Teresinski?

PROSPECTIVE JUROR TERESINSKI: Yes, sir.

THE COURT: How was that?

PROSPECTIVE JUROR TERESINSKI: Perfect.

THE COURT: Good afternoon.

PROSPECTIVE JUROR TERESINSKI: Good afternoon.

THE COURT: Thanks for being here.

PROSPECTIVE JUROR TERESINSKI: Thank you.

THE COURT: Do you want to go ahead and introduce yourself to us?

PROSPECTIVE JUROR TERESINSKI: Yeah. My name is Brian Teresinski. I'm 54 years old. I live in Elgin, Illinois. I was born there and I still reside there. I have a wife, two

daughters. Oldest is in Louisville. Youngest is a senior in high school. My undergrad was at Illinois State University.

THE COURT: Look at that, this is a Bloomington/Normal heavy courtroom today.

PROSPECTIVE JUROR TERESINSKI: That's right. I got my graduate degree at Aurora University. Let's see, what else? I've been teaching for the past 30 years at St. Charles East High School.

THE COURT: Oh, thanks for doing that.

PROSPECTIVE JUROR TERESINSKI: Sure.

THE COURT: What do you teach?

PROSPECTIVE JUROR TERESINSKI: I teach European and U.S. History.

THE COURT: Oh, good for you. That's great.

PROSPECTIVE JUROR TERESINSKI: And I've been coaching just as long. So, coaching football, and assistant athletic director as well, so.

THE COURT: Do you view coaching football as just another form of teaching?

PROSPECTIVE JUROR TERESINSKI: Same thing. That's why I love it so much.

THE COURT: Yeah, tell me, what's it like to coach football?

PROSPECTIVE JUROR TERESINSKI: Well, I certainly get a little bit more fired up on the football field than I do in the

classroom. I'm pretty passionate in the classroom as well. But, you know, it's -- it's a very passionate game, so it's -- I played it, and I went to St. Charles myself, so it's fun teaching there and coaching there as well, so.

THE COURT: Yeah. Well, I tell you, I think you can have a real impact on young people coaching them, I would think. I mean, thank you for doing that.

PROSPECTIVE JUROR TERESINSKI: Sure.

THE COURT: I have just a couple follow-up questions for you. Do you mind coming up? Is that okay?

(At sidebar with Prospective Juror Teresinski:)

THE COURT: All right. Can you hear me okay?

PROSPECTIVE JUROR TERESINSKI: Yep.

THE COURT: It's like the old-school headphones.

PROSPECTIVE JUROR TERESINSKI: Yes.

THE COURT: The Sony Walkmans. Thank you for being here. I always feel for you all. You know, you have to sit all day, and we have all these sidebars, and you don't know what we are talking about here.

PROSPECTIVE JUROR TERESINSKI: I understand the process.

THE COURT: Appreciate your patience.

PROSPECTIVE JUROR TERESINSKI: Sure.

THE COURT: So you had some -- there was some questions about, you know, what do you think about the criminal

justice system. And you were candid. I appreciate your candor.

PROSPECTIVE JUROR TERESINSKI: Yeah, I wanted to be as honest as possible.

THE COURT: You totally were. I get that. Just tell me what you think here.

PROSPECTIVE JUROR TERESINSKI: Well, let me just preface what I'm going to say by saying for much of my life I've been a very proud American. That's the way I was raised.

THE COURT: Yep.

PROSPECTIVE JUROR TERESINSKI: Over the past five or 10 years, I think that my love for this country has certainly diminished. I thought we used to live in the greatest country with the greatest criminal justice system and best government we could ever have. And to be honest, at times, I am very embarrassed to be living in this country, with things that have been done. I believe the criminal justice system is politicized. The DOJ, IRS, CIA, FBI. I think it's all a -- a -- they're all part of politics and -- which I don't think should be. To be honest, I don't have very much respect -- well, maybe not respect, but I don't very much -- what's the word -- trust in the criminal justice system. And, again, all due respect in judges, in lawyers. I just -- I don't anymore. And it pains me to say that because how much I love this country. But I really don't honestly think I can be fair.

And immigration is another topic that I am very -- feel very passionate about. And this is -- this case has something to do with that. To be honest, and I'll be honest with you here, I don't think any non-citizens should -- should have -- should be afforded what our Constitution gives citizens. I think it should stop right there. So, no. And so dealing with -- with this case, with the non-citizen case, I just -- I don't -- I don't -- I can't be -- I can't be partial. I just -- that's just how I feel. And, again, I don't want to waste anyone's time. I'm not saying this to get out of jury duty because this is a very important part of us being citizens in this country. But that's -- that's how I feel about that.

THE COURT: Just out of curiosity, what's your reaction to the day you've had so far? You've been -- you come down to federal court here. You know, you've been in my courtroom. I've, you know, liked having you here. And you've gotten to know me a little bit, and you got to know the federal courthouse. I mean, does it affect your view? Honestly, like how -- how has your experience been today?

PROSPECTIVE JUROR TERESINSKI: It has been fine. You know, I just -- I just think to me little things matter.

THE COURT: Yeah.

PROSPECTIVE JUROR TERESINSKI: And then when we were told to be here at 8:45, we don't start until, what, after 10:00 o'clock. You're supposed to start back at 1:45 sharp, we

didn't start until 1:55. That little stuff to me matters. If I was late to my classes 10 minutes, I'd be fired. If I was late to going to practice, I'd be fired.

THE COURT: Uh-huh.

PROSPECTIVE JUROR TERESINSKI: And so those things matter to me. Maybe they don't matter to people in the court system, but that's just the way it is --

THE COURT: Yeah.

PROSPECTIVE JUROR TERESINSKI: -- to me. It's my opinion.

THE COURT: Yeah, I gotcha. Okay. Any follow-up from the government?

MS. NUTINI: No, your Honor.

THE COURT: Mr. Carlson, any follow-up?

MR. CARLSON: No, your Honor.

THE COURT: Okay. You've been candid talking to me. Can I tell you, I speak for just myself. I come to work every day. I try to make Americans proud.

PROSPECTIVE JUROR TERESINSKI: Yeah. And, listen, I'm not -- I'm not trying to disrespect you --

THE COURT: No, no, no.

PROSPECTIVE JUROR TERESINSKI: -- and your position. And I said I wanted to be as -- as honest as possible about this, you know. And I know you have a difficult job. I know the prosecutors and the defendant, they have a difficult job as

well.

THE COURT: Yeah. I'll put it this way, I didn't take anything you said -- anything you said as directed at me unless you tell me I should.

PROSPECTIVE JUROR TERESINSKI: No, I hope not.

THE COURT: I didn't take it. I was kidding a little. I didn't take it that way at all.

PROSPECTIVE JUROR TERESINSKI: Okay.

THE COURT: Here's the thing. A lot of people have views about the legal system, the justice system, how people are treated. You're entitled to have those views. The thing I wanted is for you to be candid with me, and you were really candid, so I appreciate you doing that. I will say this: There are a lot of us that are trying really hard to make you proud, just -- just, for what it's worth from today, there are a lot of us here trying really hard to have a good system of justice.

PROSPECTIVE JUROR TERESINSKI: And believe me, I want to feel that pride again --

THE COURT: Yeah.

PROSPECTIVE JUROR TERESINSKI: -- in this country, in our systems. I -- I do.

THE COURT: Yeah.

PROSPECTIVE JUROR TERESINSKI: It's just because that's the way I've always been. That's the way I was raised.

THE COURT: Yeah. You can spend as much time as you want in my courtroom and see if it makes you feel better about the system.

PROSPECTIVE JUROR TERESINSKI: Okay.

THE COURT: We're doing the best we can.

PROSPECTIVE JUROR TERESINSKI: Yeah.

THE COURT: We appreciate you.

PROSPECTIVE JUROR TERESINSKI: I understand.

THE COURT: And thank you for the feedback actually on the time thing. I'm -- I am very sensitive to that. It is hard when we've got a big group of people. Like, there will be a time when we can't start for a reason or I can't tell the jurors why we can't start right away. There's a good reason. I do appreciate you being here today.

PROSPECTIVE JUROR TERESINSKI: Sure. Yeah.

THE COURT: Appreciate that. Any follow-up, anybody?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. Thanks for coming up.

(Proceedings heard in open court:)

THE COURT: All right. Very good. Thank you for answering my questions. Let me just ask you the follow-up questions. At the end of the trial, I'm going to instruct the jury on the law. Will you be able to follow my instructions even if you disagree with them?

PROSPECTIVE JUROR TERESINSKI: Yes.

THE COURT: All right. The government has the burden to prove its case beyond a reasonable doubt. Can you return a verdict for the government if it proves its case beyond a reasonable doubt? Apart from what we've already talked about.

PROSPECTIVE JUROR TERESINSKI: Yes.

THE COURT: All right. Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR TERESINSKI: Yes.

THE COURT: A defendant has the presumption of innocence. Apart from anything that we've already talked about, do you have any concern about your ability to follow the rule that the defendant is presumed innocent throughout the case?

PROSPECTIVE JUROR TERESINSKI: No.

THE COURT: Is there anything else that we should know about you, above and beyond what we talked about already --

PROSPECTIVE JUROR TERESINSKI: No, sir.

THE COURT: -- that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR TERESINSKI: No, sir.

THE COURT: Appreciate you answering my questions. Okay.

All right. Next up we have Ms. Bell?

PROSPECTIVE JUROR BELL: Yes.

THE COURT: Good afternoon.

PROSPECTIVE JUROR BELL: Good afternoon.

THE COURT: Thank you for taking the time to be here today.

PROSPECTIVE JUROR BELL: Thank you.

THE COURT: Do you want to go ahead, introduce yourself for us?

PROSPECTIVE JUROR BELL: Yes. My name is Debra Bell. And I am 63 years old. I am retired as of August of 2016, from the Social Security Administration branch.

THE COURT: Thank you for doing that.

PROSPECTIVE JUROR BELL: Thank you. I was --

THE COURT: They help a lot of people, you know.

PROSPECTIVE JUROR BELL: They do.

THE COURT: Yeah, thank you.

PROSPECTIVE JUROR BELL: They do. We do. We did. I was a bid authorizer there, which -- which what I did was I corrected people's checks. I made sure that money was right going out, change their address, bank information, and talked on the 1-800 number.

THE COURT: That's great. There's a real person in every one of those checks you issued. Glad that you did that.

PROSPECTIVE JUROR BELL: Yes.

THE COURT: And how many years did you do that?

PROSPECTIVE JUROR BELL: 37.

THE COURT: Wow. Congratulations on doing that. Hard-earned retirement.

PROSPECTIVE JUROR BELL: Yes.

THE COURT: And tell me again, Ms. Bell, when did you retire?

PROSPECTIVE JUROR BELL: In 2016.

THE COURT: 2016. And what have you been doing since then?

PROSPECTIVE JUROR BELL: A lot of stuff. I've been gardening, traveling.

THE COURT: We have a lot of gardeners in here today.

PROSPECTIVE JUROR BELL: Yeah. Traveling. And I make jewelry. And I sew.

THE COURT: I'm sorry, you make jewelry?

PROSPECTIVE JUROR BELL: Yes.

THE COURT: What kind of jewelry do you make?

PROSPECTIVE JUROR BELL: Just small jewelry, like bracelets and necklaces.

THE COURT: Okay. One of the questions was whether you have anybody that's been employed by the federal government in your family or any close friends. Do you have anybody in your family?

PROSPECTIVE JUROR BELL: No, not now. I misunderstood. I worked there.

THE COURT: You worked there. I got you. Okay. And let me ask you, actually. Do you mind coming on up, Ms. Bell. Can I ask you a follow-up question?

PROSPECTIVE JUROR BELL: Sure.

THE COURT: Come on up.

(At sidebar with Prospective Juror Bell:)

THE COURT: Can you hear me, Ms. Bell?

PROSPECTIVE JUROR BELL: Yes.

THE COURT: All right. Very good. So thank you for coming on up here. The only reason I wanted you to come up was there was a question about members of your family, have you ever been arrested or been involved in the criminal justice system, and you wrote that your son got probation for guns in a vehicle, or something. And I didn't want to put that out, just to respect your privacy. So do you mind speaking into the microphone and telling me about that?

PROSPECTIVE JUROR BELL: Yes. My son was arrested -- this must have been --

THE COURT: I'm having a little -- you're doing great. I'm having a little hard time hearing you. Come a little closer. There you go. You're doing great, Ms. Bell.

PROSPECTIVE JUROR BELL: Can I pull this closer?

THE COURT: Pull the mike. There you go.

PROSPECTIVE JUROR BELL: All right. My son was arrested maybe about 20 years ago for some guns. And he did

some time, but then he ended up getting probation.

THE COURT: Okay.

PROSPECTIVE JUROR BELL: And I only found out about that when I went to court, you know, that he had the guns in his car.

THE COURT: Is there anything about that experience that would make it hard for you to be fair and impartial here?

PROSPECTIVE JUROR BELL: No.

THE COURT: How did the government treat you and your family?

PROSPECTIVE JUROR BELL: Well.

THE COURT: Okay. How do you feel about possibly serving on a jury? You left it blank, so I wanted to see. How do you -- how do feel about it, Ms. Bell?

PROSPECTIVE JUROR BELL: Oh, I can do it.

THE COURT: You can do it?

PROSPECTIVE JUROR BELL: I can do it, yeah.

THE COURT: Yeah. Can you be fair?

PROSPECTIVE JUROR BELL: Yes.

THE COURT: Can you be impartial?

PROSPECTIVE JUROR BELL: Yes.

THE COURT: Do you think Mr. Ibekie is entitled to that?

PROSPECTIVE JUROR BELL: Yes.

THE COURT: Do you think Ms. Nutini and Ms. DeMarco,

the government, are entitled to have a fair trial? What do you think?

PROSPECTIVE JUROR BELL: Yes.

THE COURT: Can you be fair to both sides?

PROSPECTIVE JUROR BELL: Yes.

THE COURT: Any reason you can't just follow the evidence and follow the law and render a verdict that's consistent with the evidence?

PROSPECTIVE JUROR BELL: No.

THE COURT: Anybody got any follow-up questions for her?

MS. NUTINI: Not from the government.

MR. CARLSON: No, your Honor.

THE COURT: Okay. Appreciate you. We will ask you the four follow-up questions. Okay?

PROSPECTIVE JUROR BELL: Okay. Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Ms. Bell. Let me ask you the standard questions.

At the end of the trial, I'm going to instruct the jury on the law. Will you be able to follow my instructions, even if you disagree with them?

PROSPECTIVE JUROR BELL: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt. Can you return a verdict for

the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR BELL: Yes.

THE COURT: Can you return a verdict for the defense if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR BELL: Yes.

THE COURT: A defendant has the presumption of innocence. Do you have any concerns about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR BELL: No.

THE COURT: Finally, is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR BELL: No.

THE COURT: Okay. Ms. Bell, thank you for answering my questions.

PROSPECTIVE JUROR BELL: Thank you.

THE COURT: Okay. Next up today, we've got Ms. Tran.

PROSPECTIVE JUROR TRAN: Yeah.

THE COURT: Good afternoon.

PROSPECTIVE JUROR TRAN: Good afternoon.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR TRAN: Yeah, of course.

THE COURT: You want to go ahead and introduce

yourself?

PROSPECTIVE JUROR TRAN: Yeah. My name is Kaitlyn Tran. I'm 21 years old. And I'm from the northwest suburbs of Chicago. This fall I'll be an upcoming senior at the University of Illinois at Urbana/Champaign. I major in information sciences and minor in business.

THE COURT: What do you want to do long-term?

PROSPECTIVE JUROR TRAN: I'm planning to do either product design or a UX design after graduation.

THE COURT: Like, what kind of product design?

PROSPECTIVE JUROR TRAN: Hopefully in, like, technology, like, interfaces at, like, one of the big companies, like Google or Apple.

THE COURT: So when you say technology-like interfaces, like -- like, what?

PROSPECTIVE JUROR TRAN: Like, mobile apps, or, like, website design.

THE COURT: Uh-huh. Okay. What do you like doing for fun?

PROSPECTIVE JUROR TRAN: I like fashion. I like to go shopping. I really love animals, so I like to play with dogs and hang out with friends. And typical things like that.

THE COURT: A lot of dog lovers in the room today, apparently. All right. So you have a relative who works as an attorney?

PROSPECTIVE JUROR TRAN: Yes.

THE COURT: Do you ever talk to that person? Who is it? How is it related to you, the person?

PROSPECTIVE JUROR TRAN: Yeah, so he is my uncle.

THE COURT: Okay.

PROSPECTIVE JUROR TRAN: And he -- it does work in, like, foreclosure attorney, but then sometimes we did talk about like other cases related to his relatives. And that's the extent to what our conversations have.

THE COURT: So nothing involving fraud or the criminal justice system or anything like that?

PROSPECTIVE JUROR TRAN: No.

THE COURT: Is there anything about that that would make you impartial?

PROSPECTIVE JUROR TRAN: No.

THE COURT: Or, I'm sorry. Sorry, I said that wrong. Is there anything about that that would affect your ability to be impartial and fair?

PROSPECTIVE JUROR TRAN: No.

THE COURT: All right. And then you had a civil case that you were involved in?

PROSPECTIVE JUROR TRAN: Yes.

THE COURT: What was that about, if you're willing to say?

PROSPECTIVE JUROR TRAN: It was a family matter.

THE COURT: Okay. Do you want to talk to me about it privately? Do you want to come on up?

PROSPECTIVE JUROR TRAN: Sure.

THE COURT: Why don't you come on up here.

(At sidebar with Prospective Juror Tran.)

THE COURT: All right. Ms. Tran, thank you for being here. You want to go ahead -- I want to say, I'm not trying to evade your privacy, so just give me a little bit, and I'll follow-up from there. What we're trying to figure out is if there's anything about that experience that would affect your ability to be fair. Okay? We're not just trying to plumb into into your business here. So just -- you start with being a little more general, and I'll follow-up as need be.

PROSPECTIVE JUROR TRAN: Yeah. So it was a civil case that took place last summer, and it was my older brother -- or my brothers against my parents. It didn't have anything, like, related, I would say, like, to how this case is. It was just more of, like, my older brothers wanting to adopt my younger brother from my parents.

THE COURT: Okay. Is there anything about that that would affect your ability to be fair to the parties here?

PROSPECTIVE JUROR TRAN: No.

THE COURT: I mean, there was nothing involved -- it was not a criminal case, obviously; right?

PROSPECTIVE JUROR TRAN: No.

THE COURT: Right. All right. Okay. And then you start work June 17th? That's today?

PROSPECTIVE JUROR TRAN: I was supposed to, yeah, but I had to reschedule to -- I -- it's postponed. I'm not sure when.

THE COURT: And is that okay?

PROSPECTIVE JUROR TRAN: Yeah, it's okay. It's just, if possible, I would like to work as much because I'm having some, like, financial difficulties regarding my payment for tuition for the upcoming school year. And I was planning to use that payment towards my tuition and housing.

THE COURT: Got it. Okay. So you want to earn money for college. And what job were you missing out on that you were supposed to start today?

PROSPECTIVE JUROR TRAN: It was a sales position at Victoria Secret. Yeah.

THE COURT: Okay. All right.

Folks, do you have any follow-up questions for her?

MS. NUTINI: Not from the government.

MR. CARLSON: No, your Honor.

THE COURT: Okay. Ms. Tran, I appreciate you answering my questions. Thank you.

PROSPECTIVE JUROR TRAN: Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Ms. Tran, thank you for

answering my questions. Let me ask you the follow-up questions.

At the end of the trial, I'm going to instruct the jury on the law. Will you be able to follow my instructions, even if you disagree with them?

PROSPECTIVE JUROR TRAN: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt. Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR TRAN: Yes.

THE COURT: And can you return a verdict for the defendant if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR TRAN: Yes.

THE COURT: A defendant has the presumption of innocence. Do you have any concern about your ability to follow the rule that the defendant is presumed innocent throughout the trial?

PROSPECTIVE JUROR TRAN: No.

THE COURT: Finally, is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR TRAN: No.

THE COURT: All right. Thank you for answering my questions.

All right. Mr. Schieber?

PROSPECTIVE JUROR SCHIEBER: Schieber.

THE COURT: Schieber. Sorry about the pronunciation.

PROSPECTIVE JUROR SCHIEBER: Everyone does it, so.

THE COURT: Welcome. Thank you for being here.

PROSPECTIVE JUROR SCHIEBER: Thank you.

THE COURT: You want to go ahead and introduce yourself.

PROSPECTIVE JUROR SCHIEBER: Sam Schieber. I'm 34. I live in Western Springs. I grew up in Kansas City, Missouri, went to college in St. Louis, St. Louis University. My wife is a nurse at Rush. I work in the insurance industry. I am a National -- director for national accounts for automotive business. No kids. I'm hoping to have some soon. I don't know. That's about it.

THE COURT: What do you like doing for fun?

PROSPECTIVE JUROR SCHIEBER: Golf, gardening, cooking.

THE COURT: All right. Pretty common things. All right. Come on up. I've got a couple questions for you.

(At sidebar with Prospective Juror Schieber:)

THE COURT: All right. Can you hear me?

PROSPECTIVE JUROR SCHIEBER: Yes.

THE COURT: All right. Thank you for being here.

PROSPECTIVE JUROR SCHIEBER: Yep.

THE COURT: Everybody hear me okay? I can't hear

my -- okay.

I've got a couple questions for you. One of them had to do with your cousin from 1998. I was so sorry to read that.

PROSPECTIVE JUROR SCHIEBER: Yeah, thank you.

THE COURT: I'm sorry, I'm having a microphone -- there we go. I was so sorry to read that.

PROSPECTIVE JUROR SCHIEBER: Yep.

THE COURT: Is there anything about that experience that would affect your ability to be fair and impartial here to both sides?

PROSPECTIVE JUROR SCHIEBER: The case -- it was a difficult case, and, I, you know, honestly think they arrived at the wrong verdict, so I don't know. That kind of paints my system -- my view of the justice system a little negatively, to be honest.

THE COURT: Okay. So this case is a criminal case, but there's not going to be evidence of a violent crime. Do you understand that?

PROSPECTIVE JUROR SCHIEBER: Yep.

THE COURT: So in light of that, do you think you can be fair to both sides here?

PROSPECTIVE JUROR SCHIEBER: Yes.

THE COURT: Is there any reason you can't be fair to the government in this case?

PROSPECTIVE JUROR SCHIEBER: I don't think so, no.

THE COURT: And how about Mr. Ibekie? He has been charged with some crimes. He is entitled to the presumption of innocence. Any reason you can't be fair to him?

PROSPECTIVE JUROR SCHIEBER: No, I think I can be fair.

THE COURT: All right. And I was sorry to read about your wife's cousin.

PROSPECTIVE JUROR SCHIEBER: Yep.

THE COURT: And I just want to ask you about that. You know, there's a lot there. I just want to see what you're bringing into the courtroom with that. So, go ahead, please.

PROSPECTIVE JUROR SCHIEBER: Yeah. So, he had, you know, suffered from mental issues, they had gone undiagnosed for a while. Things kind of deteriorated over time. There were issues where he had a gun, and, you know, had a minor altercation, had his gun taken away. His condition kind of worsened. I think, you know, before he -- he shot the four people, he had really kind of gone off the deep end. I think it was undiagnosed schizophrenia. You know, delusions. He had -- I think he tried to go to the FBI to an office to tell them that he's talking to aliens and that the government is spying on him, and all that. And he was -- they kind of said, okay, sure, sure, you know, run along.

We had heard the news that he had killed four people. We were driving up to my inlaw's lake house in Wisconsin. And

they were very close. You know, the lake house we were going to had pictures of him and us kind of all over the walls, so it was kind of an eerie experience. But he was on the run for a day. No one knew where he was going. So all of us, the -- my -- my wife's family and her brothers and sisters, we all had to go into hiding because we didn't know where he was. You know, it was very plausible -- very plausible that he would have showed up to that lake house where we were at because he had been there a bunch. You know, one of his favorite places.

The evening after he had been on the run for a few hours, he had essentially set up a -- you know, a video that he had filmed a few days before essentially saying what he was going to do. And had sent out like a 40-page, you know, manifesto, if you want to call it that, that had been scheduled to send after he knew he would be on the run to go out to, you know, just kind of a random group of people, people that he knows. So I saw that. Got that, saw that, and, you know, kind of learned more about his situation that way than I had known before.

But eventually he was, you know, apprehended in Topeka, Kansas. And he has since, you know, been standing trial. There has been an effort to kind of restore him to competency via medication, get him treatment. It sounds like he hasn't been responding well to treatment, but I think the state has decided that he's back to competency, so I believe

the case is going to be retried again, now that he's, you know, deemed competent.

THE COURT: And you wrote that it caused you to question the capabilities of the legal system. Tell me about that.

PROSPECTIVE JUROR SCHIEBER: Yeah. You know, it was kind of obvious from the first incident before he had shot people that there was going to be an issue. And, you know, they took his guns, which was good. The fact that -- you know, the thing that kind of riles me up was, you know, if he really did go to that FBI office, which, you know, I think he did, he said -- he mentioned it in his manifesto, you know, saying that he's talking to aliens, and all this. And, you know, just at that time the government seemed to really want to go after gun violence, and things like this. And having someone come to you on a silver platter and kind of brush it off, that made me, you know, kind of question -- question things.

THE COURT: Okay. Can you be fair to the government in this case?

PROSPECTIVE JUROR SCHIEBER: Yes, I think I can.

THE COURT: Do you have any doubt about that?

PROSPECTIVE JUROR SCHIEBER: No, I don't think so.

THE COURT: How about Mr. Ibekie? Can you be fair to Mr. Ibekie?

PROSPECTIVE JUROR SCHIEBER: Yes, I can.

THE COURT: Any doubts?

PROSPECTIVE JUROR SCHIEBER: No.

THE COURT: So you've had more than your fair share here of interactions with the criminal justice system.

PROSPECTIVE JUROR SCHIEBER: Yep.

THE COURT: But we've got parties here that are involved in a case where there are a lot of different charges. They are fraud-based charges.

PROSPECTIVE JUROR SCHIEBER: Yep.

THE COURT: The government is bringing them. And Mr. Ibekie is entitled to the presumption of innocence. Is there any reason you can't be a fair and impartial juror?

PROSPECTIVE JUROR SCHIEBER: No.

THE COURT: I mean, you've got these experiences with your cousin and your wife's cousin. You know, those are clearly difficult circumstances. I'm sorry that you've gone through that.

PROSPECTIVE JUROR SCHIEBER: Yep.

THE COURT: All of us bring life experiences into the courtroom. And what the parties are trying to figure out is whether you've got life experiences that would just prohibit you from being unfair.

PROSPECTIVE JUROR SCHIEBER: Yep.

THE COURT: Or, I'm sorry, prohibit you from being fair. Is there anything about your life experience for those

cases that would make it difficult for you to be a fair and impartial juror?

PROSPECTIVE JUROR SCHIEBER: I don't think so, no.

THE COURT: Okay. And then one of the questions was whether you'd be -- it would be difficult for you to give law enforcement officers the same weight. And you said: "Yes, they have different incentive than other witnesses." And tell me what you mean by that.

PROSPECTIVE JUROR SCHIEBER: Yeah, so I think the government's kind of in the business of winning cases. And I think any, you know, law enforcement officer, whether it be police officer or government official, you know, they're there to make sure the government can win a case more so necessarily than a, you know, civilian witness, if you want to refer to it that way.

THE COURT: Okay. So I don't want to paraphrase you, but you tell me if I have this right. Are you more skeptical of a government witness than an ordinary witness?

PROSPECTIVE JUROR SCHIEBER: Yes.

THE COURT: Okay. If I told you that a government witness is not entitled to more credibility or less credibility than any other testimony from any other witness, in other words, you have to treat each individual person like an ordinary person, not better, not worse, but, you know, the same, can you -- can you do that?

PROSPECTIVE JUROR SCHIEBER: Yes, I can.

THE COURT: In other words, if you had somebody from the government testify on behalf of the IRS or the Department of Homeland Security, are you going to be more skeptical of them?

PROSPECTIVE JUROR SCHIEBER: No.

THE COURT: Okay. Are you sure about that?

PROSPECTIVE JUROR SCHIEBER: Yes.

THE COURT: Okay. And you had a consulting project with the United States Postal Service, and you didn't have a good experience with them?

PROSPECTIVE JUROR SCHIEBER: Yeah. It was for implementing, you know, chip credit card readers acceptance so as a way to fight fraud. Very long-term project. And just, you know, anything with a big governmental organization is going to be slow. But this was especially trying on my patience and nerves and sanity.

THE COURT: Got it. You've got a work trip later this week?

PROSPECTIVE JUROR SCHIEBER: Yeah. On the 24th and 25th. I'm supposed to come back the 25th.

THE COURT: I'm sorry, next week, I should say.

PROSPECTIVE JUROR SCHIEBER: Correct, yep. And just given, you know, this time of year, with storms and travel, I just want to make sure I'm not stuck in Raleigh.

THE COURT: Right. So 24th and 25th, we're not going to be having court then anyway.

PROSPECTIVE JUROR SCHIEBER: Yep. Yeah, but if -- if -- I'm supposed to come back late that night. So if there's any kind of delay, then I don't want to get held up.

THE COURT: But absent storms, you're going to be available?

PROSPECTIVE JUROR SCHIEBER: Yes.

THE COURT: All right. Any follow-up from anybody?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. Thank you for answering my questions. I have don't mean to bring up difficult topics with your family, I hope you know that.

PROSPECTIVE JUROR SCHIEBER: Understood. Yep.

THE COURT: So, thank you.

PROSPECTIVE JUROR SCHIEBER: Thank you.

(Proceedings heard in open court:)

THE COURT: I will ask you the standard questions. No 1, at the end of the trial, I'm going to instruct the jury on the law. Will you be able to follow my instructions in the law, even if you disagree with the instructions?

PROSPECTIVE JUROR SCHIEBER: Yes.

THE COURT: All right. No 2. The government has the burden to prove its case beyond a reasonable doubt.

PROSPECTIVE JUROR SCHIEBER: Yes.

THE COURT: Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR SCHIEBER: Yes.

THE COURT: Can you return a verdict for the defendant if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR SCHIEBER: Yes.

THE COURT: A defendant has the presumption of innocence. Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR SCHIEBER: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR SCHIEBER: No.

(Microphone malfunction.)

PROSPECTIVE JUROR SCHIEBER: It says dead battery.

THE COURT: Dead battery. All right. Just shout out your answer.

PROSPECTIVE JUROR SCHIEBER: No.

THE COURT: All right. Got you. Thank you for answering my question.

All right. While she switches the battery, why don't

I just have you come on up to the witness stand. Is that okay? Or can we turn on that mike? Why don't you go to that microphone right there, sir.

Good afternoon, Mr. Madanat?

THE CLERK: No.

THE COURT: No? Oh, I'm sorry. Mr. Zambrano.

PROSPECTIVE JUROR ZAMBRANO: Correct.

THE COURT: Good afternoon, Mr. Zambrano. I'm sorry I got your name wrong.

PROSPECTIVE JUROR ZAMBRANO: That's all right.

THE COURT: Do you want to go and introduce yourself for us?

PROSPECTIVE JUROR ZAMBRANO: Yes. My name is Cesar Zambrano. I am 37 years old. Born and raised in the south suburbs of Cook County, currently living in Tinley Park. I have a wife and three kids and a dog. I work in the healthcare solutions division for Jones Lang LaSalle as an architectural drafter. I've been doing that for 11 years now.

For fun I like to golf. I grew up playing soccer, my kids play soccer now. So more or less driving them to and from games. Other than that --

THE COURT: Terrific. What does that mean? You said architectural drafter for Jones LaSalle? What does that mean?

PROSPECTIVE JUROR ZAMBRANO: Yeah, so we're in the healthcare solutions division, so we provide maintenance for

architectural drawings for hospitals, mainly so they can meet compliance for joint commission, stuff like that. So we have over 300 clients nationwide. So near major hospital systems. Rush is one of our biggest clients. Novant in North Carolina. So we -- what we do is maintain their architectural drawings. Anytime there's an update, an addition, they renovate a floor, we take care of that for them.

On top of the architectural drawings, we do -- we implement life safety information, space information that they all use to present for joint commissions and credentialing, and stuff like that.

THE COURT: Very good. Come on up, I have a couple follow-up questions for you.

(At sidebar with Prospective Juror Zambrano:)

THE COURT: All right. Mr. Zambrano, can you hear me?

PROSPECTIVE JUROR ZAMBRANO: Yes, I can.

THE COURT: All right. Thanks for answering my questions.

PROSPECTIVE JUROR ZAMBRANO: No problem.

THE COURT: So one of the questions was about fraud and financial crimes. I'm looking at Question 28. And you said you believe that fraud is a very bad crime.

PROSPECTIVE JUROR ZAMBRANO: Yeah.

THE COURT: Tell me about that.

PROSPECTIVE JUROR ZAMBRANO: I just think it's -- the

more and more we rely on technology, it's getting worse. You know, you can't -- I'm pretty sure we all know somebody who has been the victim of any -- some sort of technological fraud or identity fraud.

THE COURT: Uh-huh. Do you believe in the presumption of innocence?

PROSPECTIVE JUROR ZAMBRANO: Yes.

THE COURT: Strongly?

PROSPECTIVE JUROR ZAMBRANO: Yes.

THE COURT: All right. So, you know, the government has accused Mr. Ibekie of a number of crimes, but the government hasn't proven anything.

PROSPECTIVE JUROR ZAMBRANO: Right.

THE COURT: And in the meantime, Mr. Ibekie is entitled to the presumption of innocence. He's innocent unless and until proven guilty beyond a reasonable doubt. Do you understand all that?

PROSPECTIVE JUROR ZAMBRANO: I do.

THE COURT: Do you agree with all those principles?

PROSPECTIVE JUROR ZAMBRANO: Yes.

THE COURT: Is there any reason you can't apply those principles here?

PROSPECTIVE JUROR ZAMBRANO: No.

THE COURT: And I read about your experience with your family. Several people have had credit cards.

PROSPECTIVE JUROR ZAMBRANO: Yeah, yeah. My brother and sister-in-law were defrauded several years ago. And I can't remember how long, but, you know, someone from out of state somehow got ahold of their credit card information and, you know, ran up the bill.

THE COURT: Okay. In light of that experience, is there any reason you can't be fair to Mr. Ibekie?

PROSPECTIVE JUROR ZAMBRANO: No, I don't think so. I think I can be fair.

THE COURT: Should he be concerned at all about your ability to be fair?

PROSPECTIVE JUROR ZAMBRANO: I don't think so.

THE COURT: And you said you think fraud is getting worse?

PROSPECTIVE JUROR ZAMBRANO: Yeah, kind of as to what I said earlier. I think just the more we go more on -- our life is more or less involved in the internet, and stuff like that. You know, you can't go home without a phone, or, you know, not -- I just think it leads us more susceptible to cases of that, you know.

THE COURT: Yeah. So when you hear that Mr. Ibekie has been charged with fraud-related cases, I'm sorry, crimes, what's your reaction to that? Do you have any reaction?

PROSPECTIVE JUROR ZAMBRANO: I think it's a serious accusation, but I -- like I said, I think I can be fair.

THE COURT: Okay. Any reason you'd be stacking the deck for him, against him, anything like that, either way?

PROSPECTIVE JUROR ZAMBRANO: No, I don't -- I don't see myself, no.

THE COURT: Okay. I want to talk about your availability, including your childcare.

PROSPECTIVE JUROR ZAMBRANO: Yes.

THE COURT: So did you say you work from home?

PROSPECTIVE JUROR ZAMBRANO: I work from home. And because of that, it has just been easiest for me to care for my kids. I've been remote since 2020, since pandemic hit.

THE COURT: Yeah.

PROSPECTIVE JUROR ZAMBRANO: So my wife's parents are the ones that mainly help, but they both work, so they're not always available. My parents live in Indiana, so getting them to come and help is not the easiest thing, you know, in the world. So we've had to pull some favors for me to come today and Friday, last week Friday, but --

THE COURT: All right. Thank you for doing that.

PROSPECTIVE JUROR ZAMBRANO: Yeah, no problem.

THE COURT: You may have said this. I'm sorry if I didn't --

PROSPECTIVE JUROR ZAMBRANO: That's okay.

THE COURT: Are you married, or do you have a partner?

PROSPECTIVE JUROR ZAMBRANO: Yeah, yeah. My wife

works full-time as a nurse manager.

THE COURT: At Rush?

PROSPECTIVE JUROR ZAMBRANO: No, she's --

THE COURT: Different person with Rush. Go ahead.

PROSPECTIVE JUROR ZAMBRANO: Franciscan Alliance in Olympia Fields is her hospital.

THE COURT: Got it. All right. And how old are your children?

PROSPECTIVE JUROR ZAMBRANO: Nine, six, and four.

THE COURT: Okay. If you have to be on jury duty for the next week-and-a-half, or two weeks, how is that going to roll with your kids?

PROSPECTIVE JUROR ZAMBRANO: It would be -- like I said, it would be a little difficult to find childcare. I think I could manage, but, you know, pull some favors, you know, make some phone calls. Hopefully we can get some help, but, you know, it would be --

THE COURT: Okay. You know, I understand all that. I really truly do. You know, one of the challenges with jury duty is I've got a room full of people and everybody has got jobs and volunteer work --

PROSPECTIVE JUROR ZAMBRANO: Right. Right.

THE COURT: -- kids, and things.

Any follow-up for him?

MS. NUTINI: Not from the government.

MR. CARLSON: No, your Honor.

THE COURT: I saw Messi play once in Paris.

PROSPECTIVE JUROR ZAMBRANO: You're very lucky. I wish I could.

THE COURT: Yeah. I saw one of his last games over there.

PROSPECTIVE JUROR ZAMBRANO: That's amazing.

THE COURT: I was in the second row.

PROSPECTIVE JUROR ZAMBRANO: He was here not too long ago.

THE COURT: He's quite good.

PROSPECTIVE JUROR ZAMBRANO: He's amazing.

THE COURT: All right. So we're going to ask the follow-up questions. I'd like the lawyers to stay on the line for a second. You can go ahead, take your seat. Thank you.

PROSPECTIVE JUROR ZAMBRANO: Okay.

THE COURT: Sure.

(Prospective Juror exits the sidebar:)

THE COURT: All right, everybody. As the juror is resuming his seat, do you all have follow-up questions for any of these 14 people? Because, after this person, we're going to take a break, and during the break, I'm going to ask you if you have any for-cause challenges. So I'm not going to ask you now if you have any for-cause challenges, but I'd like to know if you need anymore info. Does the government need anymore info

about these 14 people?

MS. NUTINI: No, your Honor.

THE COURT: Okay. Mr. Carlson, is there anything else you'd like to know from these 14 people?

MR. CARLSON: No, your Honor.

THE COURT: All right. Very good. We're going to go off the sidebar, I'm going to wrap up with him, then we're going to take a break. Okay? All right. Very good.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Mr. Zambrano. Let me ask you the follow-up questions. At the end of the trial, I'm going to instruct the jury on the law. Will you be able to follow my instructions about the law even if you disagree with them?

PROSPECTIVE JUROR ZAMBRANO: Yes.

THE COURT: All right. The government has the burden to prove its case beyond a reasonable doubt. Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR ZAMBRANO: Yes.

THE COURT: Can you return a verdict for the defendant if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR ZAMBRANO: Yes.

THE COURT: A defendant has the presumption of

innocence. Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR ZAMBRANO: No.

THE COURT: All right. Last question for you, Mr. Zambrano. Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR ZAMBRANO: No.

THE COURT: All right. Folks, we are now going to take our break. It is 3:32. We're going to take 15 minutes, or so. We're going to give everybody a chance to use the restroom. As soon as everybody is ready, we're going to get rolling. They should go down to Judge Tharp's chambers -- excuse me, Judge Tharp's courtroom at 2303. So we'll take, you know, 15 minutes, or so. As soon as everyone is ready, we'll get rolling. We'll see you shortly. Thank you, folks.

THE CLERK: All rise.

(Venire exits the courtroom.)

THE COURT: All right. Have a seat, everyone. I want to give you folks a chance to talk with your teams about any for-cause challenges and then use the restroom. I would ask, folks, that you kindly use a restroom on a different floor, if you don't mind. Maybe go down to 21 or 19 so you don't bump into -- bump into anyone. I'd like you to use the south

elevators. Go out the courtroom and take a left. That way you're less likely to bump into them.

Do you all want a couple minutes to talk through for-cause challenges? Maybe you don't need more time.

MS. NUTINI: We can do them now, your Honor, or we can defer to your Honor.

THE COURT: I'm easy. Whatever. The government is ready. Is that right? Okay.

Mr. Carlson, I'm happy to give you time if you want to talk with your client. If you don't need it, we can just pound it out.

MR. CARLSON: We can just proceed, Judge.

THE COURT: Okay. Does anyone have any for-cause challenges to the second batch of jurors? We'll start with the government.

MS. DEMARCO: Yes, your Honor. We have two. Juror No 21, Ms. Cesario, and Juror No 25, Mr. Teresinski.

MR. CARLSON: And, Judge, I think I can make those easy because those were also on my list. So they would be agreed, I think.

THE COURT: All right. So there's a joint motion to excuse Juror No 21, Ms. Cesario, and Juror No 25, Mr. Teresinski. Joint motion from both?

MR. CARLSON: Yes, Judge.

MS. DeMARCO: Correct, your Honor.

THE COURT: So you're going to make a proffer, Ms. DeMarco?

MS. DeMARCO: Yes, Judge. Regarding Juror 21, Ms. Cesario. I think she was fairly candid that she couldn't be fair. She said she would make a judgment about somebody's guilt at the beginning of trial or after just hearing a little bit of the testimony. I think your Honor kind of tried to rehabilitate her, and she was resisting.

And then, you know, she didn't want to even answer in front of the other jurors the four follow-up questions. So she was clearly uncomfortable with the presumption of innocence.

THE COURT: Mr. Carlson, do you want to add anything to that?

MR. CARLSON: Judge, no, that's -- that's fine. I agree with that.

THE COURT: You know, so I agree with you, I'm going to strike her for cause. When I'm doing this, I want to press people, but I don't want to press them so much they don't give me the truth; right? So I did ask the same question to her a couple different ways, and it seemed pretty clear to me that she just wasn't comfortable. You know, I mean, she was looking at Mr. Ibekie, and she was pretty candid in saying: I'm not sure I could be fair to him. So my reaction was: Thank you for telling me, you won't be on this jury. You know, that was my reaction. So I'll excuse Juror 21 for cause.

Ms. DeMarco, do you want to make a proffer for Juror No 25?

MS. DEMARCO: Yes, your Honor. Similarly, I think he was very adamant about the fact that he couldn't be fair in the other direction for the government. He said I really don't think I could be fair. Actually, he was kind of biased towards both sides. He made comments about non-citizens shouldn't have Constitutional rights. He doesn't believe in the criminal justice system. He thinks DOJ and IRS are politicized. Again, I think your Honor tried to rehabilitate him, and he was not willing to be led down that path.

THE COURT: Mr. Carlson, anything to add?

MR. CARLSON: Judge, he actually said that he was embarrassed to live in this country. I think that says all you really need to decide.

THE COURT: I don't think he's the best fit for the jury deliberation room. I don't think. He has a lot going on there. Most of my comments I'm going to keep to myself.

I thought he brought a lot of energy to the room. Energy is good. But he clearly has an arsenal of axes to grind, put it that way. Fill a small armory. So I'm going to excuse him for cause. He clearly has too many issues with the legal system, the judicial system. He has -- contemptuous is maybe a bit strong, but not strong by much. He does not think much of this process. He's going to I think be unable to

deliberate with other members of the jury. So he'll be stricken for cause, Juror 25.

Does the government have any other for-cause challenges --

MS. DEMARCO: No, your Honor.

THE COURT: -- to the second batch?

Mr. Carlson, did you?

MR. CARLSON: Judge, I have Juror No 19, Ms. Weygand. She is the woman who lived in Ottawa, Illinois and actually paid to stay in a hotel last night so she could be here. She said she would have to leave at 5:30 or 6:00 in the morning in order to be here. And that, by my calculations, would get her home at 8:00 o'clock at night, having to turn around to come back. I would move that she be stricken for cause.

THE COURT: Okay. What does the government think?

MS. NUTINI: Your Honor, the government objects to the for-cause challenge. I believe that -- understanding that that is a commute and the government is sympathetic to that, surely. I believe Ms. Weygand said that she would -- I think her quote was, sort of, I'd have to leave at 5:30, 6:00, 7:00, something like that. Based on, like, she said: I'm kind of a scared driver. Or something to that effect. I think it was more about a comfortability for her and making sure that she had enough time to arrive, which is in every juror's purview if they want to arrive early, they are surely welcome to do so. I

don't think that's a basis to strike her for cause.

THE COURT: All right. So I'm going to deny that challenge. I agree with most of what Mr. Carlson said, but I don't think it rises to the level of a for-cause challenge. If I struck her for cause, I don't know why I wouldn't strike everybody from Ottawa for cause, candidly. I get it. I mean, I know exactly where Ottawa is. As you folks can undoubtedly tell, I grew up in downstate Illinois. I'm familiar with the geography down there. That is not close. That's really hard to get downtown Chicago. I don't know if you folks live in the city or the burbs, or somewhere, but this is past the burbs, and then some. I don't know how I can strike her without striking basically everybody in Ottawa. That's the challenge we've got. I think it's very burdensome for her to be here. I'm concerned about her ability to be here. I don't think it's at the level where it rises to the level of a for-cause challenge for her, even though I'm very sympathetic to everything Mr. Carlson just said.

Mr. Carlson, do you have any other for-cause challenges?

MR. CARLSON: No, your Honor.

THE COURT: Okay. So that means in the second batch we struck Juror 21 and 25. Do I have that right, everybody?

MS. NUTINI: Yes, Judge.

MR. CARLSON: Yes, Judge.

THE COURT: And then we've got these people who made it through: 16, 17, 18, 19, 20. 22, 23, 24. 26, 27, 28, 29, 30. Those are the jurors I've got. Oh, not 29. 29 was the no-show; right? Beg your pardon.

MS. NUTINI: Correct.

THE COURT: So let me say that again. We've got 16, 17, 18, 19, 20. 22, 23, 24. 26, 27, 28, and 30. Do I have that right, everybody?

MR. CARLSON: Yes, Judge.

MS. NUTINI: Yes.

THE COURT: That means we have -- we have 22 people so far.

MS. NUTINI: That's what we have, too.

THE COURT: Mr. Carlson, is that what you've got?

MR. CARLSON: I believe so, Judge. Hold on.

THE COURT: Let me just read you the jurors that I've got, and you folks can correct me. I think these are who we've got. Jurors 3, 4. 6, 7. 9, 10, 11, 12. 14, 15, 16, 17, 18, 19, 20. 22, 23, 24. 26, 27, 28, and 30.

MS. NUTINI: That's what the government has.

MR. CARLSON: That's what I have as well, Judge.

THE COURT: So that's, what, 22 people? And the magic number here is?

MS. NUTINI: 33.

THE COURT: 33. So, you know, we're two-thirds of the

way there, literally; right?

So why don't we take a couple-minute break. As soon as you folks are ready, I'll have Ms. Ramos bring us out, and we'll just keep rolling along as quickly as we can. Does that sound good? Mr. Carlson?

MR. CARLSON: Judge, does 33 include the alternates?

THE COURT: So we need 12 jurors.

MR. CARLSON: Twelve.

THE COURT: And then we need six peremptories for the government. We've got 10 peremptories for the defense. So that's 12, plus six, plus 10. That's 28, I think. And then if you have three alternates, that brings us to 31, and then two strikes.

MR. CARLSON: Okay.

THE COURT: That's 33, I think. Right?

MR. CARLSON: Right.

THE COURT: If we had 33 people. And let me just say this again. The first 12 people who make it through the gauntlet are the jurors. All right? So let's imagine a world in which each side exercised one preemptory. And that's not suggestive, it's just for easy math; right? If each side did one preemptory and we had a pool of, you know, 18 people, well, the first 12 of those are going to be the jury. Everybody with me? It's the first 12 who make it through.

I will not tell people who the alternates are going to

be. Meaning, I won't tell them because I want them to stay focused. So you all know the last three people who are seated are going to be the three alternates. Okay? It's the last three people. We're going to pick 15 people. The last three, so, 13, 14, 15 are the alternates, but they won't know that. Does that sound good?

We'll come back in, like, five minutes. As soon as Ms. Ramos tells me that you're ready, I'll come back out. Okay? Thanks.

MR. CARLSON: Thank you, Judge.

(Recess at 3:45 p.m., until 3:58 p.m.)

(Proceedings heard in open court; venire out.)

(Change of reporter.)

THE COURT: All right. Welcome back, everyone.

So it is almost 4:00 o'clock. We've got 22 people. We need 11 more people.

It is potentially within the field of play that I could get through all 14 in an hour. Potentially. It depends a lot on how they do. I am not going to rush this. I'm not going to probably be as talkative with them as in the last batch, but I'm going to try to move things along as well, because that's where my head is right now.

If you feel like you are not getting the information that you need, I want you to tell me. The appropriate thing is for this to be done well, not for this to be fast.

I think in an ideal world, it would be nice if we could pick a jury today, because otherwise, I'm going to bring back all 50 people tomorrow. If I have to bring back all 50 people tomorrow, then I've got to bring back all 50 people tomorrow. You know, we'll see how it goes. Okay? That's my reaction.

Anybody have a reaction to that? Anybody?

MS. NUTINI: Nothing further, Your Honor.

THE COURT: Okay. Mr. Carlson.

MR. CARLSON: Judge, it is what it is, in my opinion. We need to do what we need to do. And we need to do it the

right way.

THE COURT: Totally right. I think that's right. I agree with you.

So we'll see where we are. If we get a jury, we do. If we don't, we don't. Those are the options.

Reminder, everyone, we have already stricken some of these people, right? We have stricken Juror 32 and 34, right, and 42 and 48?

MS. NUTINI: Yes, Judge, that's what we have.

THE COURT: Okay. Everybody ready to get the jury?

MS. NUTINI: Yes.

THE COURT: And we'll start with Juror 31.

Everybody with me?

Okay. Here we go.

Is everyone still satisfied with the amount of info you're getting from the process?

MS. NUTINI: Yes.

MR. CARLSON: Yes, Judge.

THE COURT: All right.

MS. NUTINI: And, Your Honor, I know you'll put 14 in the box, but is it correct that we only need to get through 11 to have the 33 number?

THE COURT: We need 11 people who have survived the for-cause challenge.

MS. NUTINI: Right.

THE COURT: So if I --

MS. NUTINI: Right.

THE COURT: -- get through 11 people, and I personally see no reason to go any further, I may do a sidebar.

MS. NUTINI: I forgot about for-cause challenges, yeah.

THE COURT: Yeah. But we'll see how it goes.

Parenthetically, I have often thought that there should be a tool in the district toolbox for me to make a finding that a prospective juror is intentionally trying to get out of jury duty and for me to penalize that person by keeping them off the jury but forcing them to watch the entire jury trial or something like that, watch other people do their civic duty while they aren't.

Doesn't that seem like a good idea?

MR. CARLSON: Judge, there are judges in this building who do that.

THE COURT: Is that right?

MR. CARLSON: That is correct.

THE COURT: They force people to watch jury duty?

MR. CARLSON: They said we're going to excuse this person for cause, but I'm going to make him sit here through the entire jury selection process.

THE COURT: Through the jury trial or the jury selection?

MR. CARLSON: Just the jury selection process, but -- instead of excusing them right away.

THE COURT: I was thinking about having them attended the entire trial. Why couldn't I do that? They're not released until I release them.

MS. NUTINI: Do they not go back into the pool, though, to be potentially called for another jury trial?

THE COURT: Well, technically, yes, they do.

MS. NUTINI: Which could be months long.

THE COURT: It could be. It could be.

I will say in general, I do not respond well to people who I think are trying to get out of jury duty, because all of us should be a little bit more civic-minded, I think. I think we've collectively done a good job of weeding those people out today, hopefully.

(Venire in at 4:04 p.m.)

THE CLERK: All rise.

THE COURT: Have a seat, everyone.

All right. Welcome back, everyone. We're making good progress. I'd like to continue with our third batch.

Thank you, everybody, for being here. Thank you for taking the time to be here today.

We have put new batteries into the microphone, and we are ready to go.

Welcome to all of you in the third batch. Thank you

for sitting here. You've sat through introductions to 28 complete strangers today, and your time has now come.

So our leadoff hitter for batch three is Ms. Cardiff. Is that right?

PROSPECTIVE JUROR CARDIFF: Yes.

THE COURT: Good afternoon to you.

PROSPECTIVE JUROR CARDIFF: Good afternoon.

THE COURT: Do you want to go ahead and introduce yourself, please.

PROSPECTIVE JUROR CARDIFF: My name is Kaitlyn Cardiff. I am an upcoming junior at Illinois State University.

THE COURT: I saw that. This is not supposed to be about my hometown, but I've never seen that before. And we've got four people from Bloomington-Normal here today. So welcome.

PROSPECTIVE JUROR CARDIFF: I plan to be an elementary education teacher. My mother was one, and I went to the same school that she taught at, so I always looked up to her.

I'm 20 years old. I am from the North Side of Chicago. I was born and raised there. My dad is a city worker as well. My mom is a CPS teacher.

Yeah, I think that's it.

THE COURT: Great.

For the form -- sorry. For the answers in the form, you put "N/A" for a lot of them. I can construe that to be a

no. Is that --

PROSPECTIVE JUROR CARDIFF: Yeah.

THE COURT: Like, it just didn't apply because you had -- the answer was no?

PROSPECTIVE JUROR CARDIFF: Yeah.

THE COURT: Okay. That's how I read it, too.

You are working now? What are you doing this summer?

PROSPECTIVE JUROR CARDIFF: Yes, I work at -- I have a part-time job at Goodwill. And I am a sales associate and a cashier. So I basically just help the customers out whenever they need.

THE COURT: Okay. Let me ask you my follow-up questions.

At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions about the law even if you disagree with them?

PROSPECTIVE JUROR CARDIFF: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR CARDIFF: Yes.

THE COURT: On the flip side, can you return a verdict for the defendant if the government does not prove its case

beyond a reasonable doubt?

PROSPECTIVE JUROR CARDIFF: Yes.

THE COURT: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR CARDIFF: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR CARDIFF: No.

THE COURT: Okay. Thank you, Ms. Cardiff. I appreciate that.

All right. Mr. Fuller -- no. No, that's clearly wrong. Let's see.

PROSPECTIVE JUROR KRAMER: Kramer.

THE COURT: I'm sorry?

PROSPECTIVE JUROR KRAMER: Kramer.

THE COURT: Yep.

Mr. Kramer, good afternoon to you.

PROSPECTIVE JUROR KRAMER: Good afternoon.

THE COURT: Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR KRAMER: Sure.

So my name is Maor Kramer. I'm 28 years old. I'm originally from the north suburbs. I currently live in Lincoln Park. Did my undergraduate in psychology, master's in counseling and sport human performance. I currently work as a licensed therapist in Wicker Park in a private practice. I've been doing that for a couple years now.

THE COURT: Great.

How do you enjoy that?

PROSPECTIVE JUROR KRAMER: I like it. It's really fulfilling work.

THE COURT: Okay. So you were candid in your responses about views of law enforcement.

Thank you for doing that.

You know, now you know a little bit more about this case, what it's about. You know, there's a -- some charges about fraud, and the defendant is entitled to the presumption of innocence. And you're going to be hearing evidence -- I expect you may hear testimony from certain officers.

Is there anything about the nature of the case that would make you -- make it difficult for you to be fair and impartial to both sides?

PROSPECTIVE JUROR KRAMER: No, sir.

THE COURT: In other words, when you hear that it's brought by the government and there are Homeland Security people who might testify or IRS people, is there anything about

that where you think, "Boy, this would be a hard case for me to be fair to each side"?

PROSPECTIVE JUROR KRAMER: No, sir.

THE COURT: Okay. And I actually do need you to come up and let me ask a follow-up question.

PROSPECTIVE JUROR KRAMER: Sure.

THE COURT: Okay. Very good.

(At sidebar with Prospective Juror Kramer:)

THE COURT: All right. Thank you, Mr. Kramer. I'm sorry --

PROSPECTIVE JUROR KRAMER: Sure.

THE COURT: -- I called you the wrong name.

PROSPECTIVE JUROR KRAMER: No worries.

THE COURT: I did want to ask you about your answer to 26. I didn't want to put you on the spot. But you said you were "struggling financially, not sure if this is a bias against the IRS." And I didn't want to put you on the spot.

PROSPECTIVE JUROR KRAMER: Yeah, I mean, I -- in full disclosure, I'm essentially living close to paycheck to paycheck. Obviously, I take this responsibility incredibly seriously. But, you know, when I learned yesterday that it was going to be, you know, a three-week case, that was just something that popped into my mind --

THE COURT: Right.

PROSPECTIVE JUROR KRAMER: -- is the longer it goes,

the more challenging it will be --

THE COURT: Right.

PROSPECTIVE JUROR KRAMER: -- you know, financially.

THE COURT: I don't know how long this trial is going to last. I really don't. And once a jury deliberates, they get to deliberate as long as they want.

PROSPECTIVE JUROR KRAMER: Sure.

THE COURT: I think there is a decent chance that the evidence will close next week --

PROSPECTIVE JUROR KRAMER: Okay.

THE COURT: -- but that's not a guarantee.

PROSPECTIVE JUROR KRAMER: I understand that.

THE COURT: Yeah.

PROSPECTIVE JUROR KRAMER: I understand.

THE COURT: In light of that, do you think you can serve on the jury?

PROSPECTIVE JUROR KRAMER: So when you say "next week," are you talking about, quite literally, like, this upcoming week?

THE COURT: So that would be Wednesday, Thursday, and Friday of next week.

PROSPECTIVE JUROR KRAMER: Okay. I understand.

I mean, like I said, it would put a significant financial strain onto me, but at the same time, I understand that I have a responsibility.

THE COURT: Okay.

PROSPECTIVE JUROR KRAMER: So I want to be, you know, honest in that answer.

THE COURT: And then you said you're out of town June 26th, 27th, and 28th.

PROSPECTIVE JUROR KRAMER: Correct.

THE COURT: And what are you out of town for?

PROSPECTIVE JUROR KRAMER: I'll be in Milwaukee.

THE COURT: And what are you doing up there?

PROSPECTIVE JUROR KRAMER: My best friend lives there.

THE COURT: Can that be postponed?

PROSPECTIVE JUROR KRAMER: I mean, it can be. He's a doctor. He has limited time off.

Like I said, I understand my responsibility of this. It likely can't be, but at the same time --

THE COURT: I will --

PROSPECTIVE JUROR KRAMER: -- I understand this responsibility.

THE COURT: -- tell you, in my last trial, somebody said he had to fly to Columbia, South America. He served on the jury.

PROSPECTIVE JUROR KRAMER: I understand, sir.

THE COURT: You know, so I appreciate your attitude and good spirit. I can tell you're civic-minded, which is nice to see.

PROSPECTIVE JUROR KRAMER: Thank you. I appreciate it.

THE COURT: Any follow-up for this gentleman, anybody?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. I'll ask you the follow-up questions.

Thank you, Mr. Kramer.

PROSPECTIVE JUROR KRAMER: Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Mr. Kramer, at the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions even if you disagree with them?

PROSPECTIVE JUROR KRAMER: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR KRAMER: Yes.

THE COURT: Can you return a verdict for the defendant if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR KRAMER: Yes.

THE COURT: A defendant has a presumption of

innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed innocent throughout the trial?

PROSPECTIVE JUROR KRAMER: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR KRAMER: No, sir.

THE COURT: All right. Very good. Thank you for answering my questions.

PROSPECTIVE JUROR KRAMER: Thank you.

THE COURT: Next up, we have Ms. Moore.

PROSPECTIVE JUROR MOORE: Yes.

THE COURT: Good afternoon.

PROSPECTIVE JUROR MOORE: Good afternoon.

THE COURT: Thank you for your patience today.

Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR MOORE: Yes.

My name is Janice Moore. I am 66 years old. I live in Rogers Park. I like reading and listening to live jazz music, love football, and watching documentaries on TV.

I have a six-year-old adorable rescue dog, who I hope is not home destroying my house. It's hard to find someone to stay with her. She goes to work with me every day. I work a

hybrid schedule, and she goes to the office and goes to meetings and she is a part of the staff.

THE COURT: What do you do for a living?

PROSPECTIVE JUROR MOORE: I work at Hadley. It -- we offer practical and social/emotional help for seniors experiencing vision loss. The big three: MAC D, diabetic retinopathy.

We teach them things through workshops and discussion groups and podcasts, how to navigate a table setting when you go out to eat and you can't see because you have the big MAC D dot in your eye.

And we provide also social and emotional help to them. It's very daunting when people start to lose their sight and they can't live their lives the way they used to. So we have peer-to-peer mentoring groups to help them navigate that.

THE COURT: Got it.

I have a couple follow-up questions for you, if you don't mind coming on up.

PROSPECTIVE JUROR MOORE: Sure.

THE COURT: All right. Thank you.

(At sidebar with Prospective Juror Moore:)

THE COURT: Can you hear me, Ms. Moore?

PROSPECTIVE JUROR MOORE: Yes.

THE COURT: Thank you for being here.

One of the questions was about whether you've been the

victim of a crime, and you know people -- loved ones who have. I was sorry to read that.

I want to know if there's anything about those experiences that would make it difficult for you to be a fair and impartial juror in this case.

PROSPECTIVE JUROR MOORE: No.

THE COURT: Okay. And you wrote in here that your cousin was convicted and he was a troubled youth.

Is there anything about that experience that would make it difficult for you to be a juror?

PROSPECTIVE JUROR MOORE: No.

THE COURT: And it looks like your uncle was a judge and president of the bar, and your cousin was a state's attorney.

Does that affect your ability to be fair and impartial to both sides?

PROSPECTIVE JUROR MOORE: No.

THE COURT: All right. And it says your son has -- has been "profiled in certain areas. I'm not sure about my feelings."

PROSPECTIVE JUROR MOORE: You know, as a parent, it's very difficult. He went to Loyola Academy, and in a couple of the far northern suburbs, he had a really bad incident where he was -- two white friends in the front seat of the car, and they were pulled over for speeding. The driver was speeding. And

he -- the police officers told the two white -- his two white friends to get out of the car, stand over here. And he was in the back. And he was pulled out by his neck, his sweatshirt, and thrown on the ground and harassed at the police station.

THE COURT: Got it.

PROSPECTIVE JUROR MOORE: They weren't charged with anything.

THE COURT: Got it.

PROSPECTIVE JUROR MOORE: But -- yeah.

THE COURT: Well, I'm sorry that that happened.

Is there anything about that experience that would make it difficult for you to be fair in this case?

PROSPECTIVE JUROR MOORE: I don't think so, no.

THE COURT: In other words, this is a case against Mr. Ibekie.

Do you have any hard feelings against the government?

PROSPECTIVE JUROR MOORE: No.

THE COURT: How about Mr. Ibekie; would you be more favorable or less favorable toward Mr. Ibekie in light of that experience?

PROSPECTIVE JUROR MOORE: No.

THE COURT: Have you ever been questioned by law enforcement?

PROSPECTIVE JUROR MOORE: Yes. Well, questioned for . . . ?

THE COURT: Anything.

Question 23 was, "Have you ever been questioned as part of a criminal investigation," and it was blank, so --

PROSPECTIVE JUROR MOORE: No -- well, yeah, just theft at the church. There were a couple when I worked at the church. I mean, questioned in terms of giving a statement about something that had occurred --

THE COURT: Okay.

PROSPECTIVE JUROR MOORE: -- at the church.

THE COURT: It wasn't about your conduct?

PROSPECTIVE JUROR MOORE: No, no.

THE COURT: Got it.

And then it looked like your elderly aunt lost --

PROSPECTIVE JUROR MOORE: 3,000.

THE COURT: -- $3,000 in an e-mail scam.

Sorry about that.

PROSPECTIVE JUROR MOORE: Yeah.

THE COURT: Could you still be impartial?

PROSPECTIVE JUROR MOORE: Yes.

THE COURT: Are you sure about that?

PROSPECTIVE JUROR MOORE: Yeah, you know, it's not so much her. I've been targeted but realized they were scams, and it's -- it kind of makes me mad. It's a little bit like attempted robbery.

THE COURT: Okay.

PROSPECTIVE JUROR MOORE: You know, mad and insulted --

THE COURT: Yeah.

PROSPECTIVE JUROR MOORE: -- because, you know, it's obvious, at least it was to me the times when I received e-mails.

THE COURT: Do you feel mad at Mr. Ibekie right now?

PROSPECTIVE JUROR MOORE: No, because he's not, you know, as far as I know -- you know, innocent until proven guilty, you know.

THE COURT: You haven't heard any evidence about Mr. Ibekie.

PROSPECTIVE JUROR MOORE: No. No.

THE COURT: And so can you give him that presumption of innocence?

PROSPECTIVE JUROR MOORE: Yeah. Absolutely.

THE COURT: Any concerns about that?

PROSPECTIVE JUROR MOORE: No.

THE COURT: Okay. And then you said you've got -- you work for a nonprofit, and you had a handwritten --

PROSPECTIVE JUROR MOORE: Yeah, on the back.

THE COURT: I guess what I want to say is, you know, everybody here works or volunteers or has little people.

I always say, is there any reason why you in particular have reasons that are above and beyond what everyone

else has?

PROSPECTIVE JUROR MOORE: You know, I guess -- and I can't really say that because I don't know theirs, but it is -- we're in the midst of a CEO search, and I have a lot of responsibility as a board liaison. It's a small company. There is really no one else to fill in my role. They don't have the knowledge that I have this far.

So we have meetings. We're preparing for a transition from the old president to the new president. And I just -- there's a lot I have scheduled.

THE COURT: Got it.

PROSPECTIVE JUROR MOORE: And so it's going to affect other people's schedules --

THE COURT: Got it.

PROSPECTIVE JUROR MOORE: -- because there are -- probably 70 percent of the things that are scheduled, I need to be there.

THE COURT: Got it.

Anything else from the parties?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: Very good.

Thank you, Ms. Moore. I'll ask you the follow-up questions.

PROSPECTIVE JUROR MOORE: Okay.

(Proceedings heard in open court:)

THE COURT: Thank you, Ms. Moore.

Let me ask you the follow-up questions.

At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions about the law even if you disagree with them?

PROSPECTIVE JUROR MOORE: Yes, Your Honor.

THE COURT: Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR MOORE: Yes.

THE COURT: Can you return a verdict for the government -- excuse me. Can you -- let me say that again.

The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR MOORE: Yes.

THE COURT: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR MOORE: No.

THE COURT: Is there anything else about you that we

should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR MOORE: No.

THE COURT: All right. Very good. Thank you.

Do you want to pass the microphone down.

This looks like Mr. Livingston.

PROSPECTIVE JUROR LIVINGSTON: Yes.

THE COURT: Good afternoon.

PROSPECTIVE JUROR LIVINGSTON: Good afternoon.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR LIVINGSTON: Thank you.

THE COURT: Do you want to go ahead and introduce yourself to us.

PROSPECTIVE JUROR LIVINGSTON: My name a Harris Livingston. I live in Westchester, Illinois, in the Chicago western suburbs. I'm 25 years old. I currently work as a custodian at Rush Oak Park Hospital in environmental services.

THE COURT: How long have you been doing that?

PROSPECTIVE JUROR LIVINGSTON: Six years.

THE COURT: Okay. Great.

What do you like doing for fun?

PROSPECTIVE JUROR LIVINGSTON: Health and fitness, traveling, and sports health fitness.

THE COURT: Okay.

PROSPECTIVE JUROR LIVINGSTON: Sports, yeah.

THE COURT: Good.

All right. So I think I understand the questions that you filled out. I appreciate you coming in.

Let me say this to everybody, too: You all came in on Friday. Thank you for doing that. That wasn't small. Did I say that already today? If I didn't say that already, thank you for doing that. You know, you guys have been down here a couple days. I know that was burdensome for you. It made today go more quickly. So thank you for doing that.

Let me ask just you the follow-up questions.

PROSPECTIVE JUROR LIVINGSTON: Okay.

THE COURT: At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions about the law even if you disagree with them?

PROSPECTIVE JUROR LIVINGSTON: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR LIVINGSTON: Yes.

THE COURT: Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR LIVINGSTON: Yes.

THE COURT: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR LIVINGSTON: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR LIVINGSTON: No.

THE COURT: Okay. Thank you for answering my questions.

PROSPECTIVE JUROR LIVINGSTON: Thank you.

THE COURT: All right. Next up, we have Mr. Michaels.

PROSPECTIVE JUROR MICHAELS: Hi.

THE COURT: Good afternoon.

PROSPECTIVE JUROR MICHAELS: Good afternoon.

THE COURT: Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR MICHAELS: Yeah.

I'm Tom Michaels. I'm 58 years old. I live on the South Side, do heating/air-conditioning, and I'm here because you summoned me.

THE COURT: Yes, I did.

(Laughter.)

THE COURT: Well, thank you for coming. I like it when people follow my summons.

So how long have you been doing air conditioning?

PROSPECTIVE JUROR MICHAELS: 30 years.

THE COURT: Okay. How do you like that?

PROSPECTIVE JUROR MICHAELS: Good.

THE COURT: All right. Why don't you come on up. I've got a couple follow-up questions for you.

(At sidebar with Prospective Juror Michaels:)

THE COURT: All right. Mr. Michaels, can you hear me?

PROSPECTIVE JUROR MICHAELS: Yes.

THE COURT: All right. So just talk to me here. You said something at the outset of the trial this morning. You raised your hand. You're the only one who raised your hand. You wanted to say something.

And why don't you just follow up on that.

And speak into the microphone, if you would, please.

PROSPECTIVE JUROR MICHAELS: This one right here?

THE COURT: Yeah.

PROSPECTIVE JUROR MICHAELS: Okay.

Yeah, I'm -- when I read those questions, I didn't really understand them. I tried to get them done. At the same time, I tried to be socially correct instead of just answering them honestly.

Right now, I'm going through credit card fraud three

times already from them hacking me. And right now, it's -- one of the cases is still going on. I've spent so much time and aggravation from these people hacking me and stealing my stuff that I don't think -- you know, I think it should be a start, lock them up until he gives the names of the people who actually are doing it.

THE COURT: Mm-hmm. Well, thank you for that.

So you pointed at the defendant there a couple times.

Why did you do that?

PROSPECTIVE JUROR MICHAELS: Because he's the one you're charging him with it.

THE COURT: Well, I'm not charging him with anything, number one. I'm the Court. And number two, this case doesn't involve your credit card situation. This is a totally different set of facts here.

PROSPECTIVE JUROR MICHAELS: Yeah, but they're still stealing from us. He's not even a United States citizen, and he's stealing from United States citizens. How does that make me feel? Not good.

THE COURT: Okay. All right. Does anybody have any follow-up questions for this juror?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: Okay. Mr. Michaels, I appreciate you answering my questions.

Let me just cut through the *voir dire* questions.

Do you think you can give the defendant the presumption of innocence?

PROSPECTIVE JUROR MICHAELS: No.

THE COURT: Okay. Do you think you can follow my instructions?

PROSPECTIVE JUROR MICHAELS: I want to say yes, but I don't know until the end because I know I've seen stuff where you say, oh, disregard this and disregard that, but how could you disregard something you hear?

THE COURT: Got it.

And can you be a fair and impartial juror? Do you really think?

PROSPECTIVE JUROR MICHAELS: No.

THE COURT: Okay. Thank you for answering my questions.

PROSPECTIVE JUROR MICHAELS: Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Mr. Michaels.

We went ahead, folks, and covered the *voir dire* questions to speed things along, the additional four questions.

So next up to bat, we've got Ms. -- Ajkic?

PROSPECTIVE JUROR AJKIC: Ajkic.

THE COURT: Ajkic. All right. Good afternoon.

PROSPECTIVE JUROR AJKIC: Good afternoon.

THE COURT: Thank you for being here.

PROSPECTIVE JUROR AJKIC: Thank you.

THE COURT: Do you want to introduce yourself for us.

PROSPECTIVE JUROR AJKIC: My name is Ervina Ajkic. I'm 26 years old. I work at a manufacturing company as a machinist. I got my bachelor's degree at Lake Forest College for psychology. I gave that up during COVID, so I became a machinist.

THE COURT: What do you make as a machinist? What do you personally --

PROSPECTIVE JUROR AJKIC: Hydraulic manifolds, valves, anything that involves oil and water.

THE COURT: And what company do you work for?

PROSPECTIVE JUROR AJKIC: HydraForce.

THE COURT: Okay. Do you mind if you come on up? Do you mind?

Come on up.

(At sidebar with Prospective Juror Ajkic:)

THE COURT: All right. Can you hear me?

PROSPECTIVE JUROR AJKIC: Yes.

THE COURT: All right. Thanks for coming on up.

PROSPECTIVE JUROR AJKIC: Thank you.

THE COURT: One of the questions was whether anybody has been a crime victim, and you mentioned your parents.

PROSPECTIVE JUROR AJKIC: Correct.

THE COURT: So I'm sorry you went through that.

PROSPECTIVE JUROR AJKIC: Thank you.

THE COURT: And let me be a hundred percent clear, I'm not trying to bring up any hard experiences for you. Okay?

PROSPECTIVE JUROR AJKIC: Thank you. Thank you.

THE COURT: I'm not trying to do that. But we've got a case here where we've got the government charging a defendant with an assortment of crimes. It's 16 crimes. It's not a violent crime. It's not domestic crimes. It's -- I'll call it loosely -- financial crimes is the allegation. He is entitled to the presumption of innocence.

Is there anything about your life experience with your parents that would make it difficult for you to be fair to the government and fair to Mr. Ibekie here?

PROSPECTIVE JUROR AJKIC: No. And I think the only thing -- it's not physical, so I should be okay.

THE COURT: Yeah. So there's no allegation here, right, Mr. Carlson, of any physical contact or anything like that?

MR. CARLSON: There is not, Judge.

THE COURT: Right. So you're not going to hear any of that here.

PROSPECTIVE JUROR AJKIC: Okay.

THE COURT: It's a financial-related set of allegations, and the defendant is entitled to the presumption

of innocence.

Now that you know that -- you didn't know it when you submitted the form, but now --

PROSPECTIVE JUROR AJKIC: Correct.

THE COURT: -- you know that.

Do you think you could serve on the jury and be fair and impartial to both sides?

PROSPECTIVE JUROR AJKIC: I believe so --

THE COURT: Do you have --

PROSPECTIVE JUROR AJKIC: -- yes.

THE COURT: -- any concerns about that?

PROSPECTIVE JUROR AJKIC: No.

THE COURT: Okay. And there was a case your family is involved in with workers' compensation.

Is that going to affect your ability to be fair and impartial here?

PROSPECTIVE JUROR AJKIC: No, it shouldn't affect it.

THE COURT: And you're available for jury service?

PROSPECTIVE JUROR AJKIC: Yes.

THE COURT: Okay. Any follow-up questions for her, anybody?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. We'll ask you the follow-up questions. Thank you.

PROSPECTIVE JUROR AJKIC: Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Thank you for answering my questions.

Let me ask you the follow-up questions.

At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions about the law even if you disagree with them?

PROSPECTIVE JUROR AJKIC: Yes.

THE COURT: All right. The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR AJKIC: Yes.

THE COURT: Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR AJKIC: Yes.

THE COURT: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR AJKIC: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR AJKIC: No.

THE COURT: Thanks for answering my questions.

All right. Next up, we have Ms. Mackoff.

PROSPECTIVE JUROR MACKOFF: Yeah, Mackoff.

THE COURT: Mackoff. Thanks for being here.

PROSPECTIVE JUROR MACKOFF: My name is Helena Mackoff. I'm 20. I'm from the Gold Coast of Chicago. I'm an incoming junior at the University of Illinois Urbana-Champaign studying psychology. And, yeah, this summer I'm working retail at Walgreens, and I'm studying abroad in London, starting in July.

THE COURT: Terrific. You've been there before?

PROSPECTIVE JUROR MACKOFF: Yeah.

THE COURT: You're going on July 6th?

PROSPECTIVE JUROR MACKOFF: Mm-hmm.

THE COURT: Between now and July 6th, any reason why you couldn't serve on the jury?

PROSPECTIVE JUROR MACKOFF: No.

THE COURT: All right. What do you like doing for fun?

PROSPECTIVE JUROR MACKOFF: I like playing with my dog, watching TV, shopping.

THE COURT: All right. All-American activities.

All right. So let me ask you the follow-up questions.

At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions even if you disagree with them?

PROSPECTIVE JUROR MACKOFF: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR MACKOFF: Yes.

THE COURT: Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR MACKOFF: Yes.

THE COURT: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR MACKOFF: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR MACKOFF: No.

THE COURT: Okay. Very good. Thanks for answering my questions.

Next up, we've got Ms. Shah.

Good afternoon.

PROSPECTIVE JUROR SHAH: Good afternoon.

THE COURT: Thanks for being here.

Do you want to introduce yourself for us.

PROSPECTIVE JUROR SHAH: Yeah.

My name is Sonia Shah. I'm 52. I live in Gurnee. And I've been a pediatrician for 23 years with Advocate Aurora.

And for fun -- I love summers. I love being outside and being active, and I love reading.

THE COURT: Great. Thank you for being a pediatrician. That's tough stuff.

PROSPECTIVE JUROR SHAH: That's fine.

THE COURT: I want to talk to you about one of your answers, and maybe you'd be kind enough to come up.

Do you mind?

Thank you, Ms. Shah.

(At sidebar with Prospective Juror Shah:)

THE COURT: Can you hear me?

PROSPECTIVE JUROR SHAH: Yes.

THE COURT: All right. Very good.

So thank you for your answers.

One of your answers was about Trump supporters.

PROSPECTIVE JUROR SHAH: Yes.

THE COURT: And you were candid. Thank you for that.

I'm looking at Question No. 35.

One of the questions was whether you have prejudices or biases of any kind, and you wrote, "I'm not sure if this counts, feel Trump supporters are not logical or capable of good judgment. And do not believe in civilians owning guns."

Does that mean you don't believe in civilians owning guns?

PROSPECTIVE JUROR SHAH: Yes.

THE COURT: Okay. So, in other words, you think Trump supporters are not logical, you think they are not able of exercising good judgment, and you believe that people should not be able to own guns.

Do I --

PROSPECTIVE JUROR SHAH: Yes.

THE COURT: -- have that right?

Okay. So this is a judicial arena, legal arena. It's not a political arena. So we're not going to be deciding political questions here.

PROSPECTIVE JUROR SHAH: Okay.

THE COURT: So the former president is not on the -- going to be taking the witness stand. You know, we're not going to be political here.

It's a case involving allegations of fraud.

PROSPECTIVE JUROR SHAH: Okay.

THE COURT: 16 crimes that are charged. And the defendant is entitled to the presumption of innocence.

Knowing that, knowing that this is not a political arena, this is a judicial arena where we decide things based on the facts and the law, do you think you can do that?

PROSPECTIVE JUROR SHAH: Yes.

THE COURT: Can you be fair and impartial?

PROSPECTIVE JUROR SHAH: Yes.

THE COURT: I mean, if somebody is in the jury room and says something that you politically disagree with, are you going to be able to work together cooperatively with the jury and talk things through and listen to each other?

PROSPECTIVE JUROR SHAH: Yes.

THE COURT: Any reason you can't do that?

PROSPECTIVE JUROR SHAH: No.

THE COURT: I mean, all of us live with people and get to know people we disagree with, and you just talk it through as, you know, reasonable, logical people.

Any reason you can't do that?

PROSPECTIVE JUROR SHAH: No.

THE COURT: Okay. So you're a pediatrician. You wrote that it's going to be difficult to see patients for two weeks. I get that. I want you to talk to me about that. I will tell you I don't have any special exception for doctors.

PROSPECTIVE JUROR SHAH: Right.

THE COURT: So --

PROSPECTIVE JUROR SHAH: That's the only thing I can think of it. It is kind of a burden to, like, figure out what to do with the patients for two weeks.

THE COURT: Yeah.

PROSPECTIVE JUROR SHAH: But I have to say, this is summer, so it's our less busy season --

THE COURT: Okay.

PROSPECTIVE JUROR SHAH: -- rather than winter when there is so much sickness.

THE COURT: Yeah.

PROSPECTIVE JUROR SHAH: So if there is a time, this would work for me.

THE COURT: Got it. Okay.

Any follow-up questions for her, folks?

MS. NUTINI: No, Judge.

THE COURT: Mr. Carlson?

MR. CARLSON: No, Judge.

THE COURT: Okay. How do you think the day is going so far?

PROSPECTIVE JUROR SHAH: Oh, fine.

THE COURT: Okay.

PROSPECTIVE JUROR SHAH: It's very interesting.

THE COURT: All right. I'll ask you the follow-up

questions.

All right. Thank you.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Ms. Shah.

Let me ask you the follow-up questions.

At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions even if you disagree with them?

PROSPECTIVE JUROR SHAH: Yes.

THE COURT: All right. The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR SHAH: Yes.

THE COURT: And on the flip side, can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR SHAH: Yes.

THE COURT: A defendant has the presumption of innocence.

Do you believe that -- do you have any -- let me say that again.

Do you have any concern about your ability to follow the rule that the defendant is presumed innocent throughout the

trial?

PROSPECTIVE JUROR SHAH: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR SHAH: No.

THE COURT: All right. Dr. Shah, thank you for answering my questions.

All right. Next, we've got Mr. Clark -- or Ms. -- oh, that's wrong.

I had Christopher Clark. But tell me your name.

PROSPECTIVE JUROR JOSHI: Heta Joshi.

THE COURT: So Juror, what, 43?

PROSPECTIVE JUROR JOSHI: (Nodding head up and down.)

THE COURT: All right. Very good.

Good afternoon. Thank you for being here.

Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR JOSHI: Yeah.

My name is Heta Joshi. I'm 31. I work as a cancer registry coordinator at Advent Health in Hinsdale.

THE COURT: And how long have you been doing that?

PROSPECTIVE JUROR JOSHI: Five years.

THE COURT: Okay. What does that entail exactly?

PROSPECTIVE JUROR JOSHI: So every cancer patient that comes to any hospital, basically, we have to keep data on them.

And basically, if you read any, like, articles or journals that say, oh, there's an increase in, you know, women with breast cancer in Chicago, they get those statistics from hospitals, from someone like me.

THE COURT: Okay. Let me ask you, one of the questions was whether you know anyone who was involved in a crime, and you have described larceny involving gold jewelry. I'm sorry that happened to your grandmother.

Is there anything about that experience that would affect your ability to be fair to both sides here?

PROSPECTIVE JUROR JOSHI: No.

THE COURT: Okay. As you know a little about the case -- you don't know a lot, but you know a little -- when you hear about the nature of the case, is there anything about it that makes you wonder if you can be fair to both sides?

PROSPECTIVE JUROR JOSHI: No.

THE COURT: And is there anything about your experience that your uncle had that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR JOSHI: No.

THE COURT: And you've got appointments on Thursdays.

Is that something you could work around?

PROSPECTIVE JUROR JOSHI: Mm-hmm.

THE COURT: No issue with your availability?

PROSPECTIVE JUROR JOSHI: No.

THE COURT: All right. Very good.

So let me ask you the follow-up questions.

At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions about the law even if you disagree with them?

PROSPECTIVE JUROR JOSHI: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR JOSHI: Yes.

THE COURT: Can you return a verdict for the defendant if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR JOSHI: Yes.

THE COURT: A defendant has a presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed innocent throughout the trial?

PROSPECTIVE JUROR JOSHI: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR JOSHI: No.

THE COURT: Thank you for answering my questions.

All right. Next up, we have Izquierdo.

PROSPECTIVE JUROR IZQUIERDO: Yes, sir.

THE COURT: Good afternoon.

PROSPECTIVE JUROR IZQUIERDO: Good afternoon.

THE COURT: Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR IZQUIERDO: Yeah.

My name is Nick Izquierdo. I'm 35. I currently live in Humboldt Park where my father is from. I'm originally from Waukegan, Illinois. I went to school for criminal justice, focus in social justice, but I currently work as an IT analyst, and I have for the last three years.

THE COURT: And what do you do as an IT analyst?

PROSPECTIVE JUROR IZQUIERDO: A number of things. I'm, like, the assistant to the assistant's administrator. I work with network issues, cybersecurity, hardware, software, troubleshooting, all of those types of things.

THE COURT: And for what company?

PROSPECTIVE JUROR IZQUIERDO: Avlon Industries. It's a hair care manufacturer and distributor.

THE COURT: Got it.

And you said you went to school for criminal justice.

PROSPECTIVE JUROR IZQUIERDO: Yes, sir.

THE COURT: Tell me about that.

PROSPECTIVE JUROR IZQUIERDO: Well, my father, uncle, grandfather -- I've had family members in the criminal justice system growing up, so my intention was to go to help people stay out of jail.

THE COURT: Yeah. Okay.

I've got a couple follow-up questions for you, if you don't mind coming on up.

(At sidebar with Prospective Juror Izquierdo:)

THE COURT: Can you hear me?

PROSPECTIVE JUROR IZQUIERDO: Yes, sir.

THE COURT: Thanks for coming on up.

PROSPECTIVE JUROR IZQUIERDO: Sure.

THE COURT: So I saw you've been arrested for reckless endangerment, and then your father and your stepfather and your uncle and your grandfather have been arrested.

PROSPECTIVE JUROR IZQUIERDO: Yes, sir.

THE COURT: And you had impressions about degrading tones and whatnot.

Thank you for sharing all of that.

PROSPECTIVE JUROR IZQUIERDO: Yeah, yeah. Sure.

THE COURT: You know, this case involves allegations of financial-based crimes. That's just a loose description.

Is there anything about the nature of the case that makes you think you couldn't be fair and impartial?

PROSPECTIVE JUROR IZQUIERDO: No.

THE COURT: In other words, it doesn't involve, you know, dealing with somebody on the street, a police officer or anything; it involves just dealing, you know, like financial-based allegations.

PROSPECTIVE JUROR IZQUIERDO: Yeah.

THE COURT: Is there anything about that that makes you think you can't be fair?

PROSPECTIVE JUROR IZQUIERDO: No, I don't think so.

THE COURT: And you've got an aunt who works for the Department of Homeland Security?

PROSPECTIVE JUROR IZQUIERDO: Yeah, she works in human resources.

THE COURT: And you've studied criminal justice and, you said, social activism or social justice?

PROSPECTIVE JUROR IZQUIERDO: Yeah, social justice.

THE COURT: All right. Do you come into this courtroom with a thumb on the scale of either side?

PROSPECTIVE JUROR IZQUIERDO: No, not necessarily.

THE COURT: I mean, are you favoring the government or favoring the defendant before you heard any evidence?

PROSPECTIVE JUROR IZQUIERDO: I mean, with, you know, being educated, it's hard for me to pick a side, one or the other.

THE COURT: Yeah.

PROSPECTIVE JUROR IZQUIERDO: I'm able to be objective, if need be.

THE COURT: Okay. And then you've been questioned as part of a criminal justice -- I'm sorry -- a criminal investigation.

What was that about.

PROSPECTIVE JUROR IZQUIERDO: Questioned? I'm sorry?

THE COURT: Sorry. I didn't say that right.

Have you ever been questioned as part of a criminal investigation?

PROSPECTIVE JUROR IZQUIERDO: Oh, I mean, there's stuff from like middle school, high school with like fights -- and so things of that nature, but nothing -- never that serious.

THE COURT: Yeah. Anything we ought to know about that would affect your ability to be a fair and impartial juror?

PROSPECTIVE JUROR IZQUIERDO: I don't think so.

THE COURT: All right. And then somebody was a victim of a phishing operation via social media with a $400 payout.

PROSPECTIVE JUROR IZQUIERDO: Yeah. That was actually me. I was kind of in a bad place. I was with that reckless endangerment charge during COVID. During litigation, I had to leave my job. So I just -- someone was impersonating someone I knew, and I ended up paying out for something silly. So I kind

of take fault for that on my own. It was just -- more or less, just not being in a good place.

THE COURT: In light of that, is there any problem with you being fair to Mr. Ibekie?

PROSPECTIVE JUROR IZQUIERDO: Not at all.

THE COURT: Is there any axe to grind or hard feelings or anything like that?

PROSPECTIVE JUROR IZQUIERDO: No. I mean, there's always context, so it's hard for me to hold anything against someone that I don't know, especially if I don't have any facts.

THE COURT: Yeah. And you wrote here that you've been -- you're apprehensive about missing work.

You know, it's a pretty short trial in the grand scheme of things. Can you do it for --

PROSPECTIVE JUROR IZQUIERDO: Yeah, so the only issue is I'm on a two-person team, and ironically, my boss is going on vacation on Thursday this week.

THE COURT: Okay.

PROSPECTIVE JUROR IZQUIERDO: So he'll be out until next Tuesday. So that's the only issue that I have, where I'm the only person for coverage as far as my responsibilities.

THE COURT: Yeah, well, the good news is we don't sit Wednesday or Monday or Tuesday.

PROSPECTIVE JUROR IZQUIERDO: Right. Right.

THE COURT: So we just have a couple of days here.

PROSPECTIVE JUROR IZQUIERDO: Yeah. So I wanted to make sure I was clear on that.

THE COURT: Okay. But if you have to come in for jury duty on Thursday and Friday this week, you can do that?

PROSPECTIVE JUROR IZQUIERDO: Yeah, if I need to. I'll just have to communicate and figure out something.

THE COURT: I appreciate your good attitude on that.

PROSPECTIVE JUROR IZQUIERDO: For sure.

THE COURT: Any follow-up questions, anybody?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. I appreciate you. Thank you.

PROSPECTIVE JUROR IZQUIERDO: Thank you.

(Proceedings heard in open court:)

THE COURT: Let me ask you the standard questions.

At the end of the trial, I'm going to instruct the jury on the law.

Can you follow my instructions?

PROSPECTIVE JUROR IZQUIERDO: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR IZQUIERDO: Yes.

THE COURT: Can you return a verdict for the defendant if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR IZQUIERDO: Yes.

THE COURT: A defendant has a presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed innocent?

PROSPECTIVE JUROR IZQUIERDO: No.

THE COURT: Is there anything else about you that you should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR IZQUIERDO: No, sir.

THE COURT: Thanks for answering my questions.

All right. Next up, we have Ms. Lopez.

Good afternoon.

PROSPECTIVE JUROR LOPEZ: Good afternoon.

THE COURT: Thanks for being here.

PROSPECTIVE JUROR LOPEZ: Thank you.

THE COURT: Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR LOPEZ: My name is Lorena Lopez. I grew up in the northern side of the city. Currently, I live in the west suburbs, where I have three kids, five grandkids. I'm currently -- well, I haven't -- I stopped working about 29,

30 years ago to take care of my kids. And now after that, now it's my grandkids.

THE COURT: Your kids probably appreciate that.

PROSPECTIVE JUROR LOPEZ: Yes.

So for fun, I really -- right now, I don't have any time, but if I did, I like gardening.

Pretty much it.

THE COURT: Great. I have a couple follow-up questions for you.

Do you mind coming on up, please.

PROSPECTIVE JUROR LOPEZ: Sure.

(At sidebar with Prospective Juror Lopez:)

THE COURT: All right. Thank you for being here.

Let me ask you some follow-up questions.

Question 21 is, "Do you have anybody that you know or love that's working for the federal government?"

PROSPECTIVE JUROR LOPEZ: No, no.

THE COURT: Okay. And then your daughters were involved in a case involving theft.

PROSPECTIVE JUROR LOPEZ: When they were teenagers, yeah.

THE COURT: Okay. Is there anything about that experience that would make it difficult for you to be a fair and impartial juror?

PROSPECTIVE JUROR LOPEZ: No.

THE COURT: All right. Can you return a verdict based on the facts and the evidence that you hear?

PROSPECTIVE JUROR LOPEZ: Yes.

THE COURT: Okay. One of the questions was whether you have any biases or prejudices.

Do you have any biases or prejudices of any kind?

PROSPECTIVE JUROR LOPEZ: No.

THE COURT: All right. Do you understand English?

PROSPECTIVE JUROR LOPEZ: Some words I have a hard time.

THE COURT: Okay. Have you had -- understand -- have had a hard time understanding me today?

PROSPECTIVE JUROR LOPEZ: No. I mean, just barely hearing from far away, but close, I don't have a problem.

THE COURT: When you say "hearing," you mean like you can't hear well enough?

PROSPECTIVE JUROR LOPEZ: From my left ear, yeah.

THE COURT: From your left ear. Okay.

PROSPECTIVE JUROR LOPEZ: Mm-hmm.

THE COURT: If we got you headsets, would that help you?

PROSPECTIVE JUROR LOPEZ: Yes.

THE COURT: Okay. And how is your eyesight?

PROSPECTIVE JUROR LOPEZ: Just barely for reading I have a problem. I need glasses to read.

THE COURT: Okay. And then you've got transportation issues.

Can you be here for trial every day?

PROSPECTIVE JUROR LOPEZ: Right now, we only have one vehicle, me and my husband. So I would have to figure something out.

THE COURT: And do you think that's doable?

PROSPECTIVE JUROR LOPEZ: Probably.

THE COURT: Okay. Any follow-up questions for her, anybody?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. Thank you.

You can step down, and let me keep the lawyers on the line here.

(Prospective Juror Lopez exits the sidebar.)

THE COURT: All right, everybody. That's -- two, four, six, seven -- we've done 11 people. I'm going to do one more and then stop.

Does that sound good, everybody?

MS. NUTINI: Yes.

THE COURT: All right.

MR. CARLSON: Fine.

(Proceedings heard in open court:)

THE COURT: All right. So let me ask you the

follow-up questions.

At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions?

PROSPECTIVE JUROR LOPEZ: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR LOPEZ: Yes.

THE COURT: Can you return a verdict for the defendant if the government does not prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR LOPEZ: Yes.

THE COURT: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed to be innocent throughout the trial?

PROSPECTIVE JUROR LOPEZ: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR LOPEZ: No.

THE COURT: All right. Very good.

Thank you for answering my questions.

And then we've got -- that was Ms. Lopez. Now we've got Ms. Vazquez.

Good afternoon.

PROSPECTIVE JUROR VAZQUEZ: Good afternoon.

THE COURT: Thanks for being here.

PROSPECTIVE JUROR VAZQUEZ: Thank you.

THE COURT: Can you go ahead and introduce yourself.

PROSPECTIVE JUROR VAZQUEZ: My name is Sandy Vazquez. I'm 42 years old, and I'm a cashier and a server in a restaurant.

THE COURT: You're doing good. Yeah, I couldn't hear you. Go ahead.

You're a cashier and a server at a restaurant?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: Okay. How long have you been doing that?

PROSPECTIVE JUROR VAZQUEZ: Over 20 years.

THE COURT: Great. All right. Very good.

Do you mind coming up -- come on up, and I'll ask you some follow-up questions.

(At sidebar with Prospective Juror Vazquez:)

THE COURT: Thanks for being here, Ms. Vazquez.

I have some questions about your availability. I saw that your husband had a stroke. I was so sorry to read that.

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: You're a single -- you became a single mom with that.

Who is going to take care of your -- how many kids do you have? And what's going to happen if they're -- if you're at jury duty?

PROSPECTIVE JUROR VAZQUEZ: I have two kids: a 16-year-old and a five-year-old.

THE COURT: Okay.

PROSPECTIVE JUROR VAZQUEZ: And right now, they taking care of -- her -- my mother-in-law is taking care of them right now.

THE COURT: Okay. And can you do that for, you know, two weeks or so, give or take?

PROSPECTIVE JUROR VAZQUEZ: Probably, I could --

THE COURT: Yeah.

PROSPECTIVE JUROR VAZQUEZ: -- but financially -- I'm the only one provider.

THE COURT: Okay. Got it.

Okay. And you work as a cashier at an Eggspresso Cafe?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: So if you don't work, you don't get paid?

PROSPECTIVE JUROR VAZQUEZ: No.

THE COURT: Okay. And would you give law enforcement the same weight as other testimony, a law enforcement

officer --

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: -- the same weight?

Okay. Can you follow my instructions?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: One of the questions was, "Do you understand that the defendant is presumed innocent?"

Do you believe the defendant is presumed innocent?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: All right. Will you follow the rule that a defendant doesn't have to testify?

Do you understand that a defendant does not have to testify? Do you understand that?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: Can you follow that rule here?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: Will you hold it against the defendant if he does not testify?

PROSPECTIVE JUROR VAZQUEZ: I don't understand.

THE COURT: Yeah.

If he doesn't testify, will you think, "Oh, it's bad that he didn't testify" or --

PROSPECTIVE JUROR VAZQUEZ: No.

THE COURT: Okay. If you believe that the government has proven its case, can you return a verdict for the

government?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: And if it doesn't prove its case, can you return a verdict for the defense?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: Is it difficult for you to understand English?

PROSPECTIVE JUROR VAZQUEZ: English is my second language. So my first language is Spanish. So when I'm nervous, I'm thinking about it more.

THE COURT: In Spanish?

PROSPECTIVE JUROR VAZQUEZ: Yeah.

THE COURT: Okay. Do you have any trouble understanding me today?

PROSPECTIVE JUROR VAZQUEZ: No.

THE COURT: All right. So there was a list of names attached.

Did you look at the list?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: Did you know any of those people?

PROSPECTIVE JUROR VAZQUEZ: No.

THE COURT: Any follow-up, anybody?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. How big of a financial burden

is it going to be if you miss work for two weeks because of trial?

PROSPECTIVE JUROR VAZQUEZ: Well, I'm the only one paying rent, bills, all expenses.

THE COURT: Okay. Any follow-up on that, folks?

MS. NUTINI: No, Your Honor.

MR. CARLSON: No, Your Honor.

THE COURT: All right. We're going to ask one more person. Okay?

Thank you. I appreciate it.

(Proceedings heard in open court:)

THE COURT: All right. Thank you.

Let me ask you the follow-up questions.

At the end of the trial, I'll instruct the jury on the law.

Will you be able to follow my instructions even if you disagree with them?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: The government has to prove its case beyond a reasonable doubt.

Can you follow that rule?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: If the government does not prove its case beyond a reasonable doubt, can you return a verdict for the defendant?

PROSPECTIVE JUROR VAZQUEZ: Yes.

THE COURT: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed innocent?

PROSPECTIVE JUROR VAZQUEZ: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR VAZQUEZ: No.

THE COURT: All right. Very good. Thank you very much.

Next up, we have Ms. Galloway.

Good afternoon.

PROSPECTIVE JUROR GALLOWAY: Good afternoon.

THE COURT: Thank you for being here.

Do you want to go ahead and introduce yourself.

PROSPECTIVE JUROR GALLOWAY: I beg your pardon?

THE COURT: Can you introduce yourself.

PROSPECTIVE JUROR GALLOWAY: Oh, sure.

My name is Peggy Galloway. I'm 68 years old. I work for Advocate Trinity Hospital as a guest service part time.

My hobbies are cooking, singing, and helping people.

THE COURT: All right. Those are good things. Thank you for that.

Do you have any strong feelings about prosecutors or defense attorneys or the criminal justice system that would affect your ability to be fair?

PROSPECTIVE JUROR GALLOWAY: No.

THE COURT: Okay. You've learned about this case a little bit.

As you hear about the case, is there any reason you couldn't be fair to one side or the other?

PROSPECTIVE JUROR GALLOWAY: No.

THE COURT: All right. And do you have any personal experience with the criminal justice system or any loved one who had experience with the criminal justice system that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR GALLOWAY: I've had some, but I don't know if it would affect --

THE COURT: Okay.

PROSPECTIVE JUROR GALLOWAY: -- my decision.

THE COURT: If you think it might affect you, I would like you to come up for sidebar.

Is there any experience that you've got in your background that would affect your ability to be fair?

PROSPECTIVE JUROR GALLOWAY: Maybe.

THE COURT: Okay. Why don't you come on up. Come on up.

(At sidebar with Prospective Juror Galloway:)

THE COURT: All right. Thank you, Ms. Galloway, for being here. You've been very patient today.

PROSPECTIVE JUROR GALLOWAY: Mm-hmm.

THE COURT: So do you want to follow up with me on that. Tell me what you had in mind.

PROSPECTIVE JUROR GALLOWAY: I was raped at one time.

THE COURT: I'm sorry to hear that.

PROSPECTIVE JUROR GALLOWAY: So -- and then I don't know about being fair sometimes, because if someone is guilty and they're trying to get off, I have an issue with that.

THE COURT: Okay.

PROSPECTIVE JUROR GALLOWAY: And I'm not going to sit in and say, yes, they're innocent when I don't feel they are.

THE COURT: Okay. I'm sorry about all of that. I hope this wasn't difficult for you. I didn't mean to put you in a difficult spot here.

PROSPECTIVE JUROR GALLOWAY: It's okay.

THE COURT: Knowing what you know about this case, is there any reason you can't be fair to both sides?

PROSPECTIVE JUROR GALLOWAY: Yes, I could be fair, but my issue is I have disabilities.

THE COURT: Okay. Tell me about that.

PROSPECTIVE JUROR GALLOWAY: I have herniated disks in my back. I'm still recuperating from a knee surgery, knee replacement, and the other knee is going out.

THE COURT: Okay.

PROSPECTIVE JUROR GALLOWAY: So it's difficult for me to sit long periods of time. You know, I have to at least walk around, get up. That's just my life now.

THE COURT: Okay. Was it hard for you to come down here today?

PROSPECTIVE JUROR GALLOWAY: Yeah.

THE COURT: Okay.

PROSPECTIVE JUROR GALLOWAY: I mean, as a matter of fact, I thought I was going to be later than I was.

THE COURT: Yeah. You called in, I think.

PROSPECTIVE JUROR GALLOWAY: I did.

THE COURT: That was kind of you to do that. I wanted to say thank you for that, by the way.

And you're going to be leaving the state to visit an ill sister.

PROSPECTIVE JUROR GALLOWAY: Yes.

THE COURT: Okay.

PROSPECTIVE JUROR GALLOWAY: I have a sister in Florida that's ill.

THE COURT: Okay. And did you recognize any of the names on the list, ma'am? There is a list of names. Do you --

PROSPECTIVE JUROR GALLOWAY: Uhm-uhm.

THE COURT: -- recognize anybody?

PROSPECTIVE JUROR GALLOWAY: No.

THE COURT: Okay. Any follow-up, anybody?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: One of the questions was whether you have any biases or prejudices, and you said, "Not sure."

What did you mean by that?

PROSPECTIVE JUROR GALLOWAY: Because I wasn't sure --

THE COURT: Okay.

PROSPECTIVE JUROR GALLOWAY: -- of the questions.

THE COURT: Got it.

PROSPECTIVE JUROR GALLOWAY: So --

THE COURT: I mean, as you look at Mr. Ibekie and think about the charges against Mr. Ibekie, is there any reason you can't be fair and impartial?

PROSPECTIVE JUROR GALLOWAY: I guess not. I don't know.

THE COURT: Okay. All right. Any follow-up, anybody?

MR. CARLSON: No, Judge.

MS. NUTINI: No, Your Honor.

THE COURT: Okay. Very good.

You can step down, Ms. Galloway. Please be careful when you step down. Okay.

(Proceedings heard in open court:)

THE COURT: Please watch your step, Ms. Galloway.

All right. Let me ask you the standard questions.

At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions even if you disagree?

PROSPECTIVE JUROR GALLOWAY: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR GALLOWAY: Yes.

THE COURT: And if the government doesn't prove its case beyond a reasonable doubt, can you return a verdict for the defendant?

PROSPECTIVE JUROR GALLOWAY: Yes.

THE COURT: The defendant has a presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed innocent throughout the trial?

PROSPECTIVE JUROR GALLOWAY: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR GALLOWAY: No, only what I -- we discussed.

THE COURT: Okay. Very good. Thank you. I appreciate that.

And then last but not least, we've got Ms. Oliver.

PROSPECTIVE JUROR OLIVER: Hi.

THE COURT: Good afternoon.

Do you want to introduce yourself, please.

PROSPECTIVE JUROR OLIVER: I'm Raegan Oliver. I am going into my second year of law school at the University of Massachusetts. I'm currently interning at Homeland Security as a legal intern this summer.

THE COURT: Okay. Very good.

And let me ask you the follow-up questions.

At the end of the trial, I'm going to instruct the jury on the law.

Will you be able to follow my instructions even if you disagree with them?

PROSPECTIVE JUROR OLIVER: Yes.

THE COURT: The government has the burden to prove its case beyond a reasonable doubt.

Can you return a verdict for the government if it proves its case beyond a reasonable doubt?

PROSPECTIVE JUROR OLIVER: Yes.

THE COURT: Can you return a verdict for the defendant if the government doesn't prove its case beyond a reasonable doubt?

PROSPECTIVE JUROR OLIVER: Yes.

THE COURT: A defendant has the presumption of innocence.

Do you have any concern about your ability to follow the rule that the defendant is presumed innocent?

PROSPECTIVE JUROR OLIVER: No.

THE COURT: Is there anything else about you that we should know that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR OLIVER: No.

THE COURT: All right. Very good. Thank you for answering my questions.

I'd like the lawyers to get on with a sidebar with me, please.

(Proceedings heard at sidebar:)

THE COURT: All right. Does anybody need any additional information before we do for-cause challenges?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. Does the government have any?

MS. NUTINI: Yes, Your Honor. We have three.

THE COURT: Okay. Does the defendant have any?

MR. CARLSON: Judge, I also have three.

THE COURT: All right. Who are they?

For the government. Go ahead.

MS. NUTINI: 37, 46, and 47.

MR. CARLSON: All agreed, Judge.

THE COURT: Okay. Let's make a very quick proffer. Go ahead.

37 is the AC guy.

MS. NUTINI: Yes, Your Honor. I apologize. I was looking for my notes on that.

THE COURT: Thomas Michaels.

MS. NUTINI: Yes.

Mr. Michaels, I believe at the -- just from the outside, was unable to follow Your Honor's instructions about being fair and impartial in this case. He also expressed concerns with the --

THE COURT: It's like the Kelly Clarkson song, he's already gone.

MS. NUTINI: Yes.

THE COURT: He's been removed.

That's a reasonably good joke on the spur of the movement. He's stricken for cause.

46.

MS. NUTINI: Your Honor, 46, her husband had a stroke. She's the -- financially the only provider. She has a 16-year-old and a five-year-old, who her mother-in-law is taking care of currently, but she expressed major concerns about financially being able to make ends meet if she were

selected for this jury.

THE COURT: All right. And any objection to her?

MR. CARLSON: No, Judge. I agree.

THE COURT: Let me ask you this: Is there -- you have an objection to 47 as well, and that's Peggy Galloway, the disabled woman who was just up?

MS. NUTINI: Yes, Your Honor.

THE COURT: And does the government -- I'm sorry. Does the defense agree with that?

MR. CARLSON: Yes, Judge.

THE COURT: What are you -- what's the view on this last person, this Raegan Oliver? She is interning at Homeland Security.

MS. NUTINI: Your Honor, I don't believe that any of the questions asked would qualify her as a for-cause challenge. She didn't raise any concerns with respect to being fair and impartial given that internship. So I don't believe it's appropriate for a for-cause challenge.

MR. CARLSON: Judge, my only comment is that that is an agency that is involved in this case.

THE COURT: Yeah.

MR. CARLSON: And --

THE COURT: Let's go into the microphone.

MR. CARLSON: It's an agency that's involved in this case. It's going to be made reference to time and time and

time again.

She is an intern there. I think it is -- at least appears inappropriate to have somebody sitting on the jury who is connected with an agency that is in charge of investigating, putting on this case.

THE COURT: Okay. Here's what we're going to do: I'm going to reserve judgment on those two people. I'm going to let the jury go into Judge Tharp's courtroom. We're going to call the next three people.

Ms. Ramos, we've got -- we have more people here? We've got Juror No. 50, 51, and 52, right?

THE CLERK: Yes.

THE COURT: You've got those names, everybody?

Everybody understand the plan?

MS. NUTINI: Your Honor, I do believe we have enough --

THE COURT: I don't know how many peremptories you've got, though. I haven't ruled on those yet. Because we've got -- he's got an objection to a fourth person, potentially, and then we don't have enough people. So I need more people.

MS. NUTINI: Understood.

THE COURT: Do you see what I mean?

MS. NUTINI: Yes.

THE COURT: I mean, I need 11, and if he objects to four, I have to either reject one of them or I need more

people.

So here's what we're going to do: We're going to go off. They're going to go to Judge Tharp's courtroom. We're going to interview three more people, and then we're going to stop. Okay? And we're going to call them in. All right, everybody?

(Proceedings heard in open court:)

THE COURT: All right, folks. Here's what we're going to do. We are making good progress. We're not quite done.

Here's what we're going to do: I'm going to need you folks to go down to Judge Tharp's courtroom. Three of you will stay. I'm going to ask questions to three more people. The rest of you need to stay put in Judge Tharp's courtroom. We are going to see if we can impanel a jury today. If we do not impanel a jury today, then all of you have to come back tomorrow.

Okay. So we're going to see if we can impanel a jury today. See what I'm thinking?

So stick with me. I'm going to talk to three more people. We're going to see how we do, and we're going to keep you posted. Okay? Everybody understand the plan?

So Ms. Ramos is going to take you down to Judge Tharp's courtroom. I need the following three people to stay.

Ms. Ramos please call it out.

THE CLERK: Alanna Ping, Dawn Ramey, Andrea Shimp.

THE COURT: Could those three people stand up.

Okay. So you three people, I'd like you to stay put in the room. I'd like everyone else to go down to Judge Tharp's courtroom. Okay?

Stay posted.

THE CLERK: All rise.

(Venire out at 5:01 p.m.)

THE COURT: All right. Have a seat.

I need Alanna Ping first, and then I need Ms. Ramey, and Ms. Shimp. In order. Yep.

(Prospective Juror Ping, Prospective Juror Ramey, and Prospective Juror Shimp enter the courtroom.)

THE COURT: All right. Good afternoon, everybody. Good afternoon. Thank you for being here.

We're going to start with Ms. Ding.

Good afternoon.

PROSPECTIVE JUROR PING: My name is Alanna Ping.

THE COURT: Ping. I'm sorry. It looked like "Ding." I beg your pardon.

Go ahead.

PROSPECTIVE JUROR PING: I'm 19 years old. I just finished my freshman year at University of Illinois Urbana-Champaign.

THE COURT: What are you studying?

PROSPECTIVE JUROR PING: I'm studying mechanical engineering.

THE COURT: Okay. Good. That's a great engineering school down there.

PROSPECTIVE JUROR PING: Thank you.

THE COURT: All right. So I think I understand most of your questions.

I mean this in the nicest possible way. I had a hard time with some of the handwriting.

PROSPECTIVE JUROR PING: It's okay. People tell me that.

THE COURT: It looks like it says, "My mom has lost money from an Internet scam," and it gave you a bad impression, something like that.

PROSPECTIVE JUROR PING: Yeah, so it was maybe a few years ago. But my mom was getting her citizenship here, and around that time, some person -- I think it was a phone scam, but they got a lot of her personal information by pretending to be a government agency. And then they tried to, like, get her to pay them for that information.

THE COURT: Can you speak into the microphone so I can hear you.

PROSPECTIVE JUROR PING: Sorry.

They tried to get her to pay them for that information, or something of the sort. So she lost some

personal information and some money. So that's --

THE COURT: Okay. Is there anything about that experience that would affect your ability to be fair and impartial?

PROSPECTIVE JUROR PING: I don't think it should.

THE COURT: All right. Can you be fair to Mr. Ibekie?

PROSPECTIVE JUROR PING: Yeah.

THE COURT: Are you sure about that?

PROSPECTIVE JUROR PING: I think so.

THE COURT: Yeah. And one of the questions was whether you hold any moral or religious views that would make it difficult for you to serve on a jury.

Can you talk about that.

PROSPECTIVE JUROR PING: Oh, I just -- I feel, like, morally I'm not in a place to judge anyone, but I feel -- but, like, in terms of a court and given, like, I guess, the guidelines, I think that's a different issue. So it should be fine.

THE COURT: When you say "the guidelines," what do you mean?

PROSPECTIVE JUROR PING: Like, I think if it's up to me personally to make, like, a moral judgment of someone else, I don't think I'm -- I am, like -- like -- I don't think that's, like, my call.

THE COURT: Well, you're right on that.

Let me say this: We don't decide good people and bad people here. That's not what you do in a courtroom. You don't decide good person/bad person. That's not the issue.

The issue is guilty or not guilty. That's the choice. It's not good person/bad person.

Are you with me? Do you understand that?

PROSPECTIVE JUROR PING: Yeah.

THE COURT: Can you do that?

PROSPECTIVE JUROR PING: Yeah. I think I misunderstood the --

THE COURT: Yeah.

PROSPECTIVE JUROR PING: -- question, then.

THE COURT: I've got it.

So, in other words, the government is going to present evidence. The jury is going to hear evidence throughout the trial.

Can you decide the evidence based on the facts and the law and return a verdict based on what you hear?

PROSPECTIVE JUROR PING: Yes.

THE COURT: Is there any reason why you can't do that?

PROSPECTIVE JUROR PING: No.

THE COURT: And then there was a question about your availability. And I'm sorry, I have a hard time telling -- you have an online class?

PROSPECTIVE JUROR PING: Yeah, right now I'm taking an

online class, and I have, like, my first internship starting, like, next week. And I'm helping out at, like, a stay-away camp currently. So --

THE COURT: Okay. Is --

PROSPECTIVE JUROR PING: -- it's a little busy.

THE COURT: Is there any reason you can't put those things on hold for a couple days?

PROSPECTIVE JUROR PING: The stay-away camp should be fine. And I can try and figure out the internship stuff, although, I think it might be a little difficult. So --

THE COURT: For an internship?

PROSPECTIVE JUROR PING: Uhm --

THE COURT: What if I wrote them a letter and say, "Hey, the star intern needs to stay away for a couple days to decide something in federal court," do you think that would help?

PROSPECTIVE JUROR PING: I feel like it could help, yeah.

THE COURT: Yeah. Okay.

PROSPECTIVE JUROR PING: I'm just a little worried.

THE COURT: All right. Any follow-up questions for Ms. Ping, anybody?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. Thank you, Ms. Ping.

I need to have a sidebar with the lawyers, if you could excuse me.

Thank you.

(Proceedings heard at sidebar:)

THE COURT: Okay. So let's go back to the for-cause challenges.

I excused No. 37, right?

MS. NUTINI: Yes, Judge.

THE COURT: And then 46 was the woman who was the primary caretaker; her husband had a stroke; she worked at a restaurant, the Eggspresso Cafe, or something like that. She was clearly experiencing some financial concerns on that.

Was there a joint request to excuse her for cause?

MS. NUTINI: There was.

MR. CARLSON: Yes.

THE COURT: All right. So I will agree with you. I'll excuse her.

That's 46, right?

MR. CARLSON: Yes, Judge.

MS. NUTINI: Yes.

THE COURT: Okay. And then Juror 47 was the woman who was disabled, Peggy Galloway, and she's got the sick sister.

Was there a joint request to excuse her?

MS. NUTINI: There was, Your Honor.

MR. CARLSON: Yes, Judge.

THE COURT: Do you want to very briefly make a proffer.

MS. NUTINI: Yes, Your Honor.

The government's basis was, given Ms. Galloway's disabilities, including a herniated disk in her back, knee surgery that she had on one knee, anticipated knee surgery she was going to have to have on another knee, she said it was very difficult for her to arrive here today, and she arrived here late. She expressed concern about coming on a routine basis.

THE COURT: Okay. Any objection to that?

MR. CARLSON: No, there's not, Judge, but I would just add that I watched her specifically trying to get out of the jury box --

THE COURT: Yeah.

MR. CARLSON: -- and she needed the assistance of other jurors to be able to step down. I think we really need to excuse her.

THE COURT: Yeah, I agree with that. I felt sorry for her personally. You know, I liked her.

So I'll excuse No. 49 for cause.

MS. NUTINI: Your Honor, that's 47.

THE COURT: I beg your pardon. I'm sorry. 47. Thank you.

So we've excused 46 and 47 and 37 for cause, right?

MR. CARLSON: Right.

MS. NUTINI: Yes.

THE COURT: So always correct a judge when he screws up. It's a good principle. So thank you for that.

All right. So we've just excused 37, 46, and 47.

Juror 48 was not with us, right? That's the New Yorker.

MR. CARLSON: Yes, Judge.

MS. NUTINI: Correct.

THE COURT: Juror 49 was the intern at Homeland Security.

Is there a motion to exclude her for cause?

MR. CARLSON: There is, Judge, for the reasons I've previously stated. I just think there's too much Homeland Security involved in this case --

THE COURT: Any --

MR. CARLSON: -- when she's working there.

THE COURT: Any objection to that?

MS. NUTINI: No objection.

THE COURT: I agree with you, Mr. Carlson. I thought that -- do you notice how quickly I stopped there?

MR. CARLSON: I did.

THE COURT: I don't want that swirling in her head, and I don't want Mr. Ibekie to think, "Boy, somebody is on the jury that is an intern at one of the agencies." I didn't think that would be appropriate.

Is there any objection to Juror No. 50 for cause, Ms. Ping?

MR. CARLSON: I don't -- I don't see any basis, Judge.

MS. NUTINI: I agree, Your Honor.

THE COURT: All right. Very good. I agree with that.

All right. So I think we've hit our magic number.

Tell me, everybody -- I count Jurors 3, 4, 6, 7, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 22, 23, 24, 26, 27, 28 -- sorry -- 28, 30, 31, 33, 35, 36, 38, 39, 40, 41, 43, 44, 45, and 50.

MR. CARLSON: Did you say 41, Judge?

THE COURT: I thought I did.

MR. CARLSON: I don't think 41 is one of the -- I think he was a no-show.

THE COURT: Was he a no-show?

MS. NUTINI: That's correct.

THE COURT: Okay. I'm sorry. I beg your pardon.

Was the rest of it correct?

MR. CARLSON: So far, yes, Judge.

MS. NUTINI: Yes, Judge.

THE COURT: All right. So that's -- one, two, three, four, five, six, seven, eight, nine, ten, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32 -- we're at 33.

Everybody got me on the math?

We've now hit our magic number.

MR. CARLSON: Yes, Judge.

THE COURT: All right.

MS. NUTINI: Yes, Your Honor.

THE COURT: All right. So here's what we're going to do: I'm going to let these jurors go to the room. You've got a couple minutes at the most to tell me your peremptories. You should know who it is by now. Write it on a piece of paper by the jury number and the name.

As soon as you're ready, we're going to bring them back in, and we're going to get rolling.

Sound good, everybody?

MR. CARLSON: Yes, Judge.

MS. NUTINI: Yes, Your Honor.

(Proceedings heard in open court:)

THE COURT: All right. Folks, I need to speak privately with the lawyers just for a couple minutes.

If you'd be kind enough to walk down to Judge Tharp's courtroom. We'll come get you when the time comes. Okay?

Thank you, everybody.

THE CLERK: All rise.

(Prospective Juror Ping, Prospective Juror Ramey, and Prospective Juror Shimp exit the courtroom.)

THE COURT: All right, everybody. Write down on a piece of paper the names of the peremptories by juror number

and the juror name.

When the time comes, I will read them.

Again, the government gets six. The defense team gets ten.

We're going to pick the jury, and then we'll do the alternates. We're going to do two batches.

Everybody understand?

MR. CARLSON: Yes, Judge.

THE COURT: Okay.

MR. CARLSON: I am going to need a minute with Mr. Ibekie.

THE COURT: Go ahead. Yeah.

And don't take what I've said to rush you. You should take the time you need.

MR. CARLSON: Thank you.

(Counsel and defendant conferring.)

THE COURT: It looks like the defense team is ready.

Is the government ready?

MS. NUTINI: Yes, Your Honor.

THE COURT: Let me be clear on this, folks. You've each handed the note to my courtroom deputy.

Have you folks had enough time to consult on peremptories? I don't want to rush anybody.

MR. CARLSON: No, we're fine, Judge.

THE COURT: Is everybody -- the government team, I'm

not rushing you.

Have you all had enough time?

MS. DeMARCO: Yes, Your Honor.

THE COURT: Honestly, everybody ready?

Did everybody -- before you exercise your peremptories, did you all get enough information on all of the prospective jurors? Do you feel satisfied with the information you got?

MS. NUTINI: Yes, Judge.

MR. CARLSON: Judge, I think we have more than we normally do. I was very happy.

THE COURT: Okay. Well -- all right. Thank you.

All right. So I've got a note from each of you.

Everybody remember the protocol?

I'm going to read the government's peremptories, then I'm going to read the defense peremptories. If you both strike the same juror, it counts for both of you. The person is out.

And the first 12 bodies that survive are the jurors. The next three people that survive are going to be the alternates.

Everybody got it?

MS. NUTINI: Yes, Your Honor.

THE COURT: Any questions about the procedure, anybody?

MR. CARLSON: No.

THE COURT: All right. So the government has four peremptories. The government exercises a peremptory on No. 4, Matthew Berkowicz; No. 18, Timothy Alfonso; No. 28, Samuel Schieber; and it looks like No. 20, Dominique Rivers.

Do I have that right, Counsel for the government?

MS. NUTINI: Yes, Your Honor.

THE COURT: So you've got six peremptories. You're exercising four of them. I'm not commenting on that. Don't take it that way. I want to make sure you know you've got six and you exercised four, which is perfectly fine.

MS. NUTINI: Yes, Judge.

THE COURT: Okay. Bear with me.

That's not suggestive, by the way. Don't take it as suggestive. I often think it is a good sign when people don't exercise all of their peremptories, because often, there is no need. So don't take that as a suggestion that you should have done anything differently.

All right. So the defense team has -- I think -- you exercised ten peremptories, Mr. Carlson; is that right?

MR. CARLSON: Yes, Judge.

THE COURT: All right. So you exercised a peremptory on No. 7 -- that's Ms. Rich -- 11, Tina Feijoo; No. 12, Mr. Bauters; No. 14, Amanda Bermudez; and No. 16, Narbi Muilli; No. 19, Susan Weygand; and No. 22, Ross Knezovich; No. 27, Ms. Tran; No. 40, Dr. Shah; and No. 43, Heta Joshi.

Did I get that right?

MR. CARLSON: Yes, Judge.

THE COURT: All right. So I'm going to tell you my math, everybody. And I want you to tell me if I have this correct.

It looks to me like the jurors are -- the first juror is No. 3, Alexia Roth. The next is -- the second juror is No. 6, Crystal Perkins. The third juror is going to be No. 9, William Montana. The fourth juror is going to be No. 10, Diane Gramer. The fifth juror is going to be Jenna Landree. The sixth juror is going to be Maxwell Provan, No. 17. The eighth juror is going to be Tawanda McCaster.

MS. NUTINI: Your Honor, is that the seventh juror?

THE COURT: That could be.

One, two, three, four, five, six, seven.

Exactly right. Good job.

So Tawanda McCaster is the seventh. Excuse me.

The eighth juror is Michael Lehet.

The ninth juror is -- I'm sorry. That was 24.

The ninth juror is Debra Bell, 26.

The tenth juror is Cesar Zambrano, No. 30.

The 11th juror is Kaitlyn Cardiff.

And the 12th and final juror is going to be Maor Kramer, No. 33.

One, two, three, four, five, six, seven, eight, nine,

ten, 11, 12.

So let me give those numbers again.

Juror 3, 6, 9, 10, 15, 17, 23, 24, 26, 30, 31, and 33.

That's one, two, three, four, five, six, seven, eight, nine, ten, 11, 12.

That's what I've got.

MS. NUTINI: That's what we have as well.

MR. CARLSON: That's what I have as well, Judge.

THE COURT: All right. Very good.

All right. So now you've got to pick the alternates. We're going to have three alternates.

The next lineup is 35, 36, 38, 39, and 44, right?

We don't need to go all the way to the end because you don't have enough strikes anyway, right?

So, again, the first two people named are going to be your alternates. So take a moment, folks. And if you have any peremptories, hand up a piece of paper and let me know.

(Brief pause.)

THE COURT: All right. I've got two pieces of paper.

So remember the procedure. The first three people that survive are going to be the alternates.

The government has no strikes.

The defendant strikes No. 35.

So the alternates are going to be 36, 38, and 39.

Do I have that right, everybody?

MS. NUTINI: Yes, Judge.

THE COURT: Okay. So does anybody want to see the notes?

You're happy to see it, if you want. I've got it here.

I'll hand that back to my courtroom deputy.

Does everybody agree that we got a jury? We've got alternates? We followed the procedure.

MS. NUTINI: Yes, Your Honor.

MR. CARLSON: Yes, Judge.

THE COURT: Okay. Do you want me to give the numbers one last time?

Let's just do it one last final check.

The jury consists of Juror No. 3, Ms. Roth; Juror No. 6, Ms. Perkins; Juror No. 9, Mr. Montana; Juror No. 10, Ms. Gramer; Juror No. 15, Landree; Juror 17, 27 -- I'm sorry -- Juror 17, Provan; Juror No. 23, McCaster; Juror No. 24, Lehet; Juror No. 26, Bell; Juror 30, Zambrano; Juror 31, Cardiff; and Juror 31, Kramer.

Is that 12, everybody? Did I get 12?

MS. NUTINI: Yes, Judge.

THE COURT: And the alternates are 36, Livingston; 38, Ajkic; and 39, Mackoff. Is that right?

MS. NUTINI: Yes.

MR. CARLSON: Yes.

THE COURT: Here's what we're going to do: We're going to get everybody in the room. I'm going to apologize to them for keeping them late, but I'm going to tell them the other option would be coming in Tuesday morning, and that will create good spirits in the room.

We're going to announce the jury. I'm going to seat 15 people. I'm not going to tell them who the alternates are. I'm going to impanel them, swear them in. I'm going to excuse everyone else today.

They're going to be escorted out. They're going to see the jury room. And Ms. Ramos will show them that and show them the buzzer system. And we're going to start bright and early tomorrow morning at 9:00 o'clock.

Does that sound good, everybody?

MR. CARLSON: It sounds like a plan.

MS. NUTINI: Yes, Judge.

THE COURT: Okay. Let's go ahead and get the jury.

(Venire in at 5:32 p.m.)

THE COURT: Have a seat, everyone.

Thank you, everyone, for your patience. I know it is 5:30. It's later in the day than we normally go. We did that for good reason.

We have completed the jury selection process. We've completed the jury selection process. I know who is going to be on the jury, and I'll announce it in a moment.

I had a decision to make about 40 minutes ago. I said I could keep them a little bit later today, just a little bit later, or I could make all 50 of them come back tomorrow morning for half an hour.

I decided to let most of you go about your business tomorrow and not come in. All right. So you've got to think of what your day would be like tomorrow. I didn't want to make so many of you come in for no reason other than to announce that you're not going to be on the jury.

So, thank you, everyone. I know it's later in the day, but I did it for good reason. I'm trying to show a little compassion and empathy for those of you who aren't going to be on the jury. Okay? So thank you for sticking around.

Before I announce the members of the jury, let me say this: I really appreciate everyone's patience. You all were on call for jury duty last week. You had to call in to see if you had to come down, right? And all of you trekked down to the Dirksen Federal Building last Friday, and you completed the questionnaire. And all of you sat through jury selection today hearing more about complete strangers than you ever wanted to know, and you had to share a little bit about yourself as well.

And for most of you, after going through all of that, you're not going to be serving on the jury. I hope none of you feel like your time was wasted. If you went through the jury process and you didn't get picked on a jury, you shouldn't feel

that way at all. Actually, you should feel the opposite. All of your time was invaluable.

Here's the simple reality: We can't pick a jury unless we have members of the community that are willing to come down and serve, and we can't pick a jury unless we call in more people than we actually need to serve on a jury.

The way it always goes is you question lots and lots of people, and only some of them are going to be able and willing to serve on a jury.

So for those of you who came down and you sat through the courthouse process on Friday and sat through it again today and you didn't serve on a jury, don't feel like your time was wasted. You, actually, frankly, folks, should feel a little bit -- more than a little bit proud because you are serving your country by -- just by being here today. And that's true for those of you who are going to be on the jury, and it's true of you for those who aren't going to be on the jury.

So on behalf the court system, thank you for serving on the jury, and thank you for being willing to serve on the jury pool.

Here's what we're going to do: In a moment, I'm going to ask my courtroom deputy to call out the names of the jurors. There are going to be 12 jurors and three alternates. I will not tell you who is who. You should not make any assumptions about who is who. There's going to be 15 of you. Fifteen of

you will listen to the evidence in the case. At the end of the case, 12 of the 15 will deliberate as a jury. We always, in a case like this, have a few alternates.

So there is going to be 15 names called. Of the 15, you are going to be sitting through the jury trial, and 12 of you will deliberate at the end.

Okay. Without further ado, I'd ask the courtroom deputy to call out the 15 names who are going to be serving as a jury plus the three alternates.

THE CLERK: Alexia Roth.

THE COURT: And when you hear your name, folks, I'd like you to stand up, come into the front row, take the first seat in order, please.

THE CLERK: Crystal Perkins.

William Montana.

Diane Gramer.

Jenna Landree.

Maxwell Provan.

THE COURT: Hang on. Let's get them in order here.

I think that's Ms. Gramer in the green. I think.

You're not Ms. Gramer, right?

JUROR PERKINS: No.

THE COURT: So you have to switch.

THE CLERK: Tawanda McCaster.

Michael Lehet.

Debra Bell.

THE COURT: Sir, if you'd be kind enough to take the seat all the way down with the special monitor in front of it.

THE CLERK: Cesar Zambrano.

Kaitlyn Cardiff.

Maor Kramer.

Harris Livingston.

Ervina Ajkic.

Helena Mackoff.

That's it.

THE COURT: We've got all 15 people, it looks like.

I'd now ask the courtroom deputy to please swear in the members of the jury.

(Jury sworn.)

THE COURT: All right. We have now officially impaneled the jury.

Members of the jury, thank you for your service to your country on the jury.

Let me tell you the plan.

In a moment, I'm going to excuse you for the day. Ms. Ramos is going to direct you out the back door. You're going to go out the back door. She is going to show you the jury room. That's where you'll go in the morning. She was going to show you the room. There is a bathroom and a whole facility there where you're going to be coming in every

morning.

Once she shows you the room, she is going to escort you down the hall. She is going to take you out the back door. She is going to show you where to go in the morning.

Here's the concept: When you get here tomorrow morning, you should not go to the jury department on the second floor. You should not go to Judge Tharp's courtroom, either. And you should not come to my courtroom, either.

Here's all you've got to do: Come up the elevator. Go to the 23rd floor, Michael Jordan's number. Nice and easy to remember. Go to the 23rd floor. And when you get off the elevator bank, you're going to see some glass doors that are kind of fogged out, like secure doors. There is a little box there, a security door. There is a button on it that says "Seeger." You just push -- push the "Seeger" button.

Ms. Ramos will show you exactly where it is when she walks out.

So just come up to the 23rd floor, look for my name, push the button, and we'll buzz you in the secured door. Okay?

And when you get through, come on back, and you could walk down to the jury room where she'll show you. Okay?

So when you come in tomorrow, come up to the 23rd floor, buzz "Seeger," we'll let you in. Walk in the jury room, and you can wait there. Okay?

There is a light breakfast in the morning, right,

every day?

There is a light breakfast. Ms. Ramos takes care of that, does a great job.

We need you here at a dead drop time of 8:45 because we are going to be here ready to roll at 9:00 o'clock tomorrow morning. Okay? Every day we're going to start trial at 9:00 o'clock, so we need you back there ready to go at 8:45.

When you come in in the morning, you should leave all of your belongings in the back. It's a secure room. It will be locked. So you've got to leave your phone in there, leave all that.

I will give you more instructions when we get going tomorrow morning.

So what will happen tomorrow morning is I'm going to give you preliminary jury instructions. We're going to do opening statements, and then we're going to get rolling with the evidence.

Okay. Does everybody understand that?

So, again, come to the 23rd floor, push the "Seeger" button, come on back. We'll let you into the jury room, and then we can go from there.

Let me give you a few final instructions.

You cannot talk to anyone about the case, period, not even each other. Not even each other. You can tell people that you're on jury duty. That's fine. You can tell people

that you're in the federal courthouse in downtown. No problem. You can do that. You can tell people that you expect it to go, you know, about a couple of weeks, give or take. That's fine.

So you can let people know physically where you are, what you're doing, and you can let them know about how long you're going to be here. You can't tell them anything about the case. You can't tell them if it's a civil case or a criminal case. You can't say anything about the case at all to anyone. You've got to keep it to yourself.

And that's equally true back in the jury room. You can't talk about the case. You can't talk about the lawyers. You can't talk about the evidence. You can't talk about anything. That will come, but that doesn't come until the very end of the case.

Everybody with me?

So I always say you can talk about the Cubs. You can talk about the Bears. You can't talk about the Packers, and you can't talk about anything else that happens in the courtroom. Okay. That's the instruction. All right? So you've just got to wait until the very end of the case. Okay?

All right. So anything else we need to cover with the jury before we dismiss them for the day?

MR. CARLSON: Elevators, Judge.

THE COURT: Yes. So elevators. Thank you.

When you come in in the morning, you should take the

north elevator. Now, I will tell you, I worked in this building six months before I knew north from south. That's a true story.

Here's all you've got to do: Go through security, take a left. North is left. Left is north. Okay. Just go through security.

If you take the wrong elevator bank, it is not the end of the world. You may ask yourself, why are we doing that? Well, I have the lawyers and the parties take the other elevator bank. That way, you don't get in an elevator with somebody. You keep each other separate. Right? You avoid any awkward interactions.

You won't see them, I don't think, but if you do see them, they aren't being rude to you. I've just told them not to talk to you. They're not supposed to talk to you, and you're not supposed to talk to them. Don't even say "hi." Just kind of ignore them if you do see them.

All right. So just nice and simple. Just come through the lobby, go through security, take a left.

If you completely forget everything I just told you, just remember Seeger. Go to Seeger on 23, and we'll find you. We will find you.

Anything else from the parties this morning -- or this afternoon?

MR. CARLSON: No, Judge.

MS. NUTINI: No, Your Honor.

THE COURT: All right. Very good.

So in a moment, I'm going to excuse the jury.

Those of you who did not serve on a jury -- did not get picked for the jury, thank you again for your jury service.

Ms. Ramos, I don't expect they have to go to the jury department, right?

THE CLERK: No.

THE COURT: So in a moment, you are officially dismissed from the jury service.

Thank you, everyone, for coming down, for spending a couple of days with us. Your time was not wasted. It was very valuable.

So thank you, folks, for your service to your country.

Members of the jury, we will see you bright and early at 8:45 in the morning.

We will see you then.

Have a safe trip home, everyone.

Thank you.

THE CLERK: All rise.

(Jury out at 5:44 p.m.)

THE COURT: Have a seat, everyone.

All right. We've got a jury.

Any thoughts, comments, observations, objections, anything, to jury selection, anybody?

MS. NUTINI: No, Your Honor.
THE COURT: Anything?
MR. CARLSON: No, Judge.
THE COURT: Did you think it went smoothly, honestly?
MR. CARLSON: Yes.
MS. NUTINI: Yes.
THE COURT: I mean, I always say this to people: I accept feedback on jury selection. I try to get info to you folks. Hopefully, I got you the information you needed to pick a jury.
Okay. Let's talk just for a few minutes. I know you're anxious to turn the page and start thinking about tomorrow. I get that. I understand that.
Let's just talk about jury instructions and then openings and then the rest of the day.
I gave you the preliminary jury instructions. We just had a couple edits.
Did they look okay, everybody?
MR. CARLSON: Yes, Judge.
MS. NUTINI: Yes.
THE COURT: Let's talk about openings.
Does any party expect to have any demonstratives or use any exhibits?
MS. NUTINI: Yes, Your Honor. We have a PowerPoint that's about six slides. Right when we get out of court, we'll

send that to defense counsel.

THE COURT: Okay.

MS. NUTINI: An iteration of it he's seen before, but we'll make sure that the final version is seen.

THE COURT: Okay. Very good.

And how about you, Mr. Carlson; do you have any?

MR. CARLSON: No.

THE COURT: Okay. Perfectly fine.

If you have any objection to it, Mr. Carlson, I'd like you to file something tonight that just says, "We have an objection." That way, we may need -- I'll need the government to file it if there is an objection.

See what I mean? Are you with me?

So I don't expect an objection. That's not suggestive. But, you know, usually how it goes, it's not objectionable.

If there is an objection, I need the government to file it on the docket tonight, your demonstratives, so I can see it and be ready to go tomorrow morning. Okay?

Any updated estimate on how long openings are going to go tomorrow?

MS. NUTINI: Still about 15 minutes from the government.

THE COURT: Okay. And Mr. Carlson?

MR. CARLSON: Ten minutes, Judge.

THE COURT: Okay. So nice and short. And we'll get rolling right away.

Do you want to remind me of what your lineup is tomorrow, Ms. Nutini.

MS. NUTINI: Yes, Your Honor. And I will pull it up right now.

First is Dale Helms, second is Special Agent Amy Mansker, third is Special Agent Jay Luciano, fourth to fifth is David Petroselli and John Gorski.

So we have five witnesses lined up right now, Your Honor. We may be able to make a sixth available if needed.

THE COURT: Okay. Thank you for that.

Any reaction to any of that, Mr. Carlson? Is that --

MR. CARLSON: That's what they had given me previously, Judge.

THE COURT: Yeah, the names ring a bell. So I thought that, too.

Do you think there's any chance you're going to run out of bodies tomorrow -- I assume not -- in terms of witnesses?

MS. NUTINI: We will do our best to make sure that does not happen, Your Honor.

THE COURT: Yeah, I strongly encourage that. We've only got so much time in a courtroom. All of the time needs to

be spent, right? So I don't want to be in a situation where it's 3:45, and we run out of witnesses. So it's the government's responsibility to make sure you've got more than enough bodies here. Okay?

MS. NUTINI: Yes, Your Honor.

THE COURT: I'll flip the podium so you've got the podium for openings.

If I can go back to that.

You're welcome to wear a lapel mic if you want. You don't have to. Most of the time, there's not a problem with the audio. I will tell you, sometimes people move around, and they get a little further back from the microphone, and I don't think that's helpful to them because it's harder to hear. And if the jury can't hear you, the rhetorically powerful sentences that you're saying may not land well, right, because they can't hear you. So I'd encourage you to be close to the microphone.

I don't think there are any rulings you need.

I think we're good to go, right, everybody?

MS. NUTINI: Yes, Your Honor.

MR. CARLSON: Yes.

THE COURT: What do you need from me other than to adjourn you for the day? What do you -- other than just getting going --

MS. NUTINI: Nothing from --

THE COURT: -- anything --

MS. NUTINI: -- the government.

THE COURT: -- from the government?

Okay.

MR. CARLSON: Nothing, Judge.

THE COURT: Okay. Well, Mr. Ibekie, we've got your trial, sir. We'll hit it hard tomorrow morning at 9:00 a.m.

Every trial, I have these conflicting instincts where I say I want to be nice to the lawyers on the start time, and I always regret it later because -- invariably regret it because we end up talking, we get late.

I thought that comment from the jury -- the member of the jury about starting late was a little bit hot but also pretty instructive about having time wasted. Right? He doesn't want us starting late. Remember that? The guy with the blue shirt. That was actually kind of an important feedback thing for him. I'm sure I need to do a better job of keeping the trains running on time.

So I think we ought to start at 8:30 tomorrow. I don't think there's any likelihood that we'll have more than 20 minutes or so of things to talk about. It might be more like five minutes.

So -- good, everybody?

MR. CARLSON: That's fine, Judge.

THE COURT: Here's what I would also say: If there is ever a time where you think there are a bunch of issues that

all of a sudden we need to talk about, I really need you to let me know by e-mailing Ms. Ramos or putting something on the docket.

What I don't want to do is roll out here at 8:30 and have an hour of things to talk about. Right? So if you have a bunch of stuff to talk about, evidentiary objections or whatnot, no problem. I guarantee you I'll be here. Trust me. I get in pretty early, so I'll be here.

But I do need to know if you've got more than, you know, a little bit of time that you think you're going to need from me before we get rolling.

Okay? Everybody good?

MS. NUTINI: Yes, Your Honor.

MR. CARLSON: Yes.

MS. NUTINI: The defendant -- Mr. Ibekie was a little late arriving this morning.

THE COURT: Yeah.

MS. NUTINI: And I know we spoke with the marshals just anecdotally off the record.

THE COURT: Yeah.

MS. NUTINI: I know that they were doing everything they could on their end.

Is there anything Your Honor would like the government to do to coordinate with the marshals just to ensure we're not running into that tomorrow?

THE COURT: Yes.

MS. NUTINI: I know it's out of their control --

THE COURT: Yeah.

MS. NUTINI: -- a lot of the times.

THE COURT: So thank you for saying that.

Let me say again how much I appreciate everything that the marshals do. I always really appreciate that. I hope you all know that.

They have such an important job, and it's a very delicate thing moving people from the MCC over here. I want to make sure that the defendant is present when we talk about anything that's substantive. I guess that does limit our ability.

If we start at 8:30, and Mr. Ibekie isn't here yet, I guess it would depend on whether there's anything substantive to talk about.

Mr. Carlson, what's your perspective on that?

MR. CARLSON: Judge, it's going to be different potentially day to day as to what we're going to do. If it is just scheduling matters, I don't have any problem on dealing with Mr. Ibekie not being here. But if it's any matter of substance, I would want him to be here, Judge.

THE COURT: Okay. Why don't we play it by ear.

So thank you, Ms. Nutini, for raising that.

If it's a ministerial thing and the defendant wants to

waive his appearance, I'll take it up at the time. I have a preference for him being here if we can get him here. I think it's difficult for the marshals to get him here by 8:30. I think it's pretty difficult.

MR. CARLSON: And, Judge, it's my understanding that it's not even the marshals service getting him here. The problem is, at the MCC, their priority is BOP movement first, not marshals movement first. So each day depends on what movement BOP has --

THE COURT: Yeah.

MR. CARLSON: -- before they can even get there. So there's -- it's almost impossible to tell.

THE COURT: Yeah. Okay. I think what we'll probably do is we will try to err on the side of covering substantive things at the end of the day when the defendant is here instead of at the beginning of the day. I think this is going to work itself out in the wash. I think this will be fine, you know.

Okay. So everybody good?

We'll see you tomorrow morning at 8:30.

Thank you, everybody, for working together cooperatively. I thought it was a smooth day. I'm glad that we've got a jury. You know, we're at a nice logical stopping point. Each of you can give an opening tomorrow that will start with a nice clean slate in the day. They'll be here and fresh and ready and attentive, and they'll be happy to listen

to you. And we'll hit the ball rolling. Sorry we can't -- well, hit the ball, and we'll get it rolling as hard as we can, and we'll take it from there. Okay?

So have a good evening, folks. Get some rest. We'll see you tomorrow morning at 8:30.

Thank you, folks.

THE CLERK: All rise.

(Adjourned at 5:55 p.m., until 6/19/2024, 8:44 a.m.)

* * * * *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Amy M. Kleynhans* — *5/27/2025*
Amy M. Kleynhans — Date
Official Court Reporter

*/s/ Sandra M. Tennis* — *5/27/2025*
Sandra M. Tennis — Date
Official Court Reporter