IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 20 CR 352 |
| | ) | |
| v. | ) | |
| | ) | |
| ANTHONY EMEKA IBEKIE, | ) | Chicago, Illinois |
| | ) | June 18, 2024 |
| Defendant. | ) | 8:44 a.m. |

VOLUME 2
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

| | |
|---|---|
| For the Government: | MR. MORRIS O. PASQUAL<br>ACTING UNITED STATES ATTORNEY<br>BY: MS. PAIGE NUTINI<br>MS. MEGAN DeMARCO<br>Assistant United States Attorney<br>219 S. Dearborn Street, 5th Floor<br>Chicago, Illinois 60604 |
| For the Defendant: | KENT R. CARLSON & ASSOCIATES, P.C.<br>BY: MR. KENT R. CARLSON<br>53 W. Jackson Boulevard, Suite 1523<br>Chicago, Illinois 60604 |
| Also Present: | MS. AMY MANSKER, Special Agent IRS Criminal Investigations<br><br>MR. CHRISTOPHER KADONSKY, Special Agent IRS Criminal Investigations |
| Court Reporter: | AMY M. KLEYNHANS, CSR, RPR, CRR<br>Official Court Reporter<br>219 S. Dearborn Street, Room 2318A<br>Chicago, Illinois 60604<br>Telephone: (312) 818-6531<br>amy_kleynhans@ilnd.uscourts.gov |

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE CLERK: 20 CR 352, USA versus Defendant No. 2, Anthony Ibekie.

THE COURT: Good morning, folks.

Let's get everyone's appearances on the record, if you would, please.

Start with counsel for the government.

MS. NUTINI: Good morning, Your Honor.

Paige Nutini and Megan DeMarco on behalf of the United States. Also is Amy Mansker and Chris Kadonsky from IRS --

THE COURT: All right.

MS. NUTINI: -- Criminal Investigations.

THE COURT: All right. Very good.

Good morning, Ms. Nutini.

Good morning, Ms. DeMarco.

MS. DeMARCO: Good morning, Judge.

THE COURT: And good morning to IRS crew. I'll commit your names to memory at some point during this trial. I'm not there yet. So, in the meantime, good morning to you.

And the defense team.

MR. CARLSON: Good morning, Your Honor.

Kent Carlson on behalf of Mr. Ibekie.

THE COURT: Good morning, Mr. Carlson.

Mr. Ibekie is not here yet. I understand he's somewhere en route, which is perfectly fine.

THE MARSHAL: He's here. I'm just waiting for my partner.

THE COURT: Oh, perfect.

Okay. So he's here. Thank you for doing that.

Let me say how much I appreciate everything the marshals do. I'll say that when your partner is here. But I mean that. You know, so . . .

I don't want to make too much progress here, folks, when the defendant isn't here. I will simply say I got the revised stipulations filed yesterday, Docket No. 306. So thank you for that.

And were you on board with all of those, Mr. Carlson, I assume, obviously?

MR. CARLSON: Yes, Judge.

THE COURT: Okay. Very good.

So I will have it up here. It would help me if the government would give me a little bit of a heads-up about when you want me to read it.

Do you expect me to read it at some point today?

MS. NUTINI: Yes, Judge. We plan on starting trial with Stipulation No. 1.

THE COURT: Okay.

MS. NUTINI: And so before we call our first witness, we'll ask you to read that stipulation.

THE COURT: Okay.

MS. NUTINI: We also have at least, I believe, five or six others throughout the day.

THE COURT: Okay. Very good.

You know, I should have said this, Mr. Carlson: Do you have any objection to me covering these couple preliminary matters without the defendant here?

MR. CARLSON: No, Your Honor.

THE COURT: Do you waive his appearance, in other words?

MR. CARLSON: Yes.

THE COURT: And I'm happy to repeat all of this when he's here, you know.

MR. CARLSON: With these things, Judge, I don't think that's necessary.

THE COURT: Okay. Needless to say, I feel very strongly that a defendant should be here for anything substantive because I don't want him to feel excluded and I don't want him to be excluded. So if at any point along the way during any point in the trial, Mr. Carlson, you say, "Let's wait for the defendant to be here," I'm going to do that. Okay?

MR. CARLSON: Fine.

THE COURT: Just out of fairness to him.

Okay. All right. So I will read the stipulations.

All you have to do, Ms. Nutini or Ms. DeMarco, is just

say, "Your Honor, we would now ask you to read Stipulation Number" such and such, and I'll explain to the jury what it is.

Would you like it to be published to the jury?

The reason I ask, I noticed Stipulation No. 1 has certain government exhibit numbers. I think it's going to be hard for them to digest if they don't see it. So just as a general matter, the way I like doing things in trial -- I want the jury to understand. Just in general, I want the jury to understand and feel engaged. If they feel like they can't understand, they lose interest, they get frustrated, and that's not good.

So what I would propose for these stipulations, folks, so they can absorb it is have Ms. Ramos have it be ready so that she can push a button, just publish on the screen the stipulation as it's read and only the stipulation that's read.

Any issue with that, anybody?

MR. CARLSON: No, that's fine.

MS. NUTINI: I think that makes sense.

THE COURT: Okay. So, Ms. Ramos, if you'd be kind enough to pull up Exhibit -- excuse me -- the stipulations, which are at Docket No. 306. Maybe save a PDF file. And when the time comes, we'll pull the stipulation and publish it to the jury so they can see it. I think, otherwise, this chart is just going to be too difficult for people to digest.

Okay. So that's something I wanted to cover.

I got the government's third revised exhibit list yesterday, Docket No. 309.

Anything I should know in that?

MS. NUTINI: No, Your Honor, just further convincing and streamlining the exhibits. We wanted to just have the most revised version filed since Your Honor has asked us to file --

THE COURT: Yep.

MS. NUTINI: -- something every evening.

THE COURT: Yep.

MS. NUTINI: We also have an updated binder for Your Honor -- and we can pass that up whenever you'd like it --

THE COURT: Okay.

MS. NUTINI: -- of the printed exhibits.

THE COURT: Thank you.

Was there anything added to the third revised exhibit list? Any new exhibits?

MS. NUTINI: No, there was not.

THE COURT: Okay. Any objection to anything in here, Mr. Carlson?

MR. CARLSON: No, Judge.

THE COURT: Okay. Very good. So I will be ready with that.

You all have the preliminary jury instructions, obviously. Any final objections, thoughts, corrections, or otherwise to that, anybody?

MR. CARLSON: No, Your Honor.

MS. NUTINI: No, Your Honor.

THE COURT: Okay. Do you all have anything that you wanted to cover with me?

Let me just tell you how this is going to roll this morning. We're going to bring them in. I'm going to try to warm them up, thank them for being here, make them feel comfortable.

I'm going to give them the preliminary jury instructions. It usually takes, you know, 15 or 20 minutes or so. And then I will go right to openings. And I think if your openings are going to be as short as I expect them to be, I think we're going to go right to the witness without taking a break.

So is the first witness here and ready to go?

MS. NUTINI: Yes, Your Honor.

THE COURT: So I think this should go pretty smoothly.

I will tell you, I try to make this a lawyer-friendly courtroom. So if you need something from me, please speak up. If you need a break, speak up. If you're at a logical stopping point for your exam and you're looking at the clock and you're thinking, "Boy, it's 12:15. I'm at a nice clean breaking point before I turn to the another topic," you can just tell me, "Judge, this might be a good time for a break," and I'll give it to you.

You know, I try to make the lawyers on both sides look good in front of the jury, make it be smooth and whatnot. So that's how I like to do things. Okay? So I want you to be comfortable, and you can do the best you can for your clients.

I don't really have anything else. You know, it's 8:50. I want to give you folks a chance to collect your thoughts.

Is there anything else you need from me? Anybody?

MS. NUTINI: Your Honor, just while we have a minute, we may just go ahead and raise the question of expert witnesses. We have one we anticipate will go later on today.

I've seen two practices done before judges and just want to make sure we're doing it properly before you.

Would you prefer that we say -- once we ask the qualifying questions, pause and say, "Your Honor, at this point, the government seeks to admit John Gorski as a fingerprint expert pursuant to Rule 702"?

THE COURT: Okay.

MS. NUTINI: Or would Your Honor prefer us to not refer to them as an expert witness?

THE COURT: Yeah. Is there any objection to the qualifications?

MR. CARLSON: No, Your Honor.

THE COURT: All right. So you should lay the foundation but then not ask me to bless that person in front of

the jury.

This is what Judge Durkin had in his standing order, and I adopted it in my standing order. I don't want the jury to think I'm sprinkling judicial holy water on this person and making them look good in front of the jury.

As long as you lay the foundation and as long as the defendant doesn't object and as long as I think that the foundation has been laid independently, then the person can just go ahead and testify as an expert without me blessing that person overtly.

See what I mean?

I think that's better, because, otherwise, it could lend a certain amount of credibility from the Court, like I've -- you know, the judiciary, in front of the jury, has blessed this person as being somebody who knows what they're talking about. That's really up to the jury.

I -- as the -- another way of saying it is I'm the gatekeeper. If you lay the foundation, the gate is open and you don't need me to call out to the gallery, "Hey, everybody, I opened the gate because this is a good person."

Does that make sense?

MS. NUTINI: It does. Thank you, Your Honor.

THE COURT: All right. So just go ahead and do that. I think that's about it.

Anything else from the government?

MS. DeMARCO: Just a heads-up, Judge, our second witness has four stipulations, and they're out of order, so I can just give them to you now in case there is no break in between.

THE COURT: Okay. So the second witness --

MS. DeMARCO: Is going to be Special Agent Mansker.

THE COURT: Okay.

MS. DeMARCO: And during -- kind of weaved throughout her testimony, we'd ask you to read Stipulations 10, 2, 5, and 4.

THE COURT: Okay. I will be ready for that. Just let me know what you want me to read, and I'll read it.

MS. DeMARCO: Perfect.

THE COURT: Okay.

MS. DeMARCO: Thank you.

THE COURT: The other thing I would say, too, you know, no witnesses can be in the room and hear other people testify except the party representatives.

The party representatives are here, and they are welcome to listen, but they cannot talk to each other about the substance of their testimony, and you also can't talk to anyone else about the substance of the testimony that's taken place.

So, you know, if you've got Larry who testified yesterday and Bob testifying tomorrow, you can't tell Bob before he testifies tomorrow what Larry said today.

See what I mean?

So you're here, you're welcome to hear, but you can't work as a team and coordinate and put your heads together. Once trial is going, everybody is in a bubble. Okay? Does that make sense, everybody?

MS. NUTINI: It does.

THE COURT: So just don't tell anybody what anybody else has said. Don't summarize it.

Are we ready to go with the defendant?

THE MARSHAL: We are.

THE COURT: All right. Very good.

Do you want to bring the defendant in?

The defendant is here.

MR. CARLSON: And, Judge, he is going to need a minute to put his tie on.

THE COURT: Totally fine. Totally fine. I'm just going to welcome him and -- you know . . .

(Defendant enters the courtroom.)

THE DEFENDANT: Good morning, Your Honor.

THE COURT: Good morning, Mr. Ibekie. Nice to see you. Good morning, sir.

THE DEFENDANT: Thanks for having me.

THE COURT: All right. So the defendant has arrived.

Mr. Ibekie, we have -- good morning to you.

We've only covered a couple of housekeeping items

while you were en route. Let me just summarize them for you.

Here's the punch line: You haven't missed anything substantive. I'm not going to cover anything substantive when you're not here. But we basically talked about the fact that the government has some stipulations that they want to present, and I'll read them at the appropriate time.

We talked about the fact that the government had filed a revised exhibit list. We talked about openings a little bit. We talked about the fact that the government doesn't have to ask me to bless the expert before the person testifies as an expert and gives expert opinion testimony. And we talked about some scheduling things, that sort of thing.

Anything else that we should summarize for Mr. Ibekie, folks? Anything else?

MS. NUTINI: No, Your Honor.

THE COURT: I was just in the process of telling the government witnesses that they can't tell each other what other witnesses have said. So when somebody testifies, they can't say, "Hey, Bob, this is what Larry testified to yesterday," that kind of thing. Okay?

Mr. Carlson, do you want to add anything else?

MR. CARLSON: No, Your Honor.

THE COURT: Okay. Why don't we do this -- unless Mr. Carlson had anything that you wanted to raise.

MR. CARLSON: Not at this point, Judge.

THE COURT: Let's take five or ten minutes. I want to let Mr. Carlson talk to Mr. Ibekie and make sure he's ready to go because he's arrived, and I want to make sure he's had an opportunity to consult with his client one more time.

As soon as you folks are ready, we're going to get started. I know that we're sensitive to the clock, so as close to 9:00 o'clock as we can, we're going to get going, but I want to give you a chance to talk and use the restroom and be ready to go. Okay?

So I'll be ready when you're ready. See you in a couple minutes.

MR. CARLSON: Thank you, Judge.

THE DEFENDANT: Thank you, Your Honor.

THE CLERK: All rise.

(Recess taken from 8:56 a.m. until 9:11 a.m.)

THE COURT: Welcome back, everyone.

We were using that time to get a headset for the one juror who may need one.

Ms. Ramos will hand it to the juror in the hallway and show her how to adjust the volume.

A couple things. Apparently, it is very sensitive. So if there's something going on at the microphone and you're talking to your client, it may pick up your mic. So be mindful of that. If you want to have a private conversation, think about turning your mic off because I don't want any juror to

hear what you're talking about. All right?

The other thing is, if she does use it, we have to all remember to ask her to take it off during a sidebar or she will hear the sidebar. Okay? So it's going to require some collective diligence by us to remember to encourage her to take it off. Okay? Does that make sense, everybody?

So when we get the jury in a minute, I'll ask Ms. Ramos to give it to the juror, make sure that it works, show her how to use it, and have her let us know if there's any issues. Okay? Does that make sense, everybody?

Does anybody have anything you want to raise before we get the jury?

MS. NUTINI: Not from the government.

MR. CARLSON: No, Your Honor.

THE COURT: Everybody ready for trial?

MS. NUTINI: Yes, Your Honor.

THE COURT: Let's get the jury.

MR. CARLSON: Yes.

(Jury in at 9:16 a.m.)

THE COURT SECURITY OFFICER: All rise.

THE COURT: Have a seat, everyone.

Well, good morning.

THE JURY: (In unison) Good morning.

THE COURT: Nice to see you again today.

I'm going to start today like I started yesterday.

Thank you for being here. Thank you for being here.

You know, I went through jury selection with you all yesterday. I got to know each of you a little bit. I am mindful of the fact that none of you live across the street, and some of you live the opposite of across the street. Some of you live pretty far away, actually. Right? A lot of you took trains to be here or buses or you got through traffic. It's not easy being in downtown Chicago this time of the morning. But you guys went 15 for 15 today. Everybody was here. I just wanted to start by saying we appreciate that. We appreciate you doing that.

You know, it's a wonderful thing to have a jury system in our country. It's one of our great freedoms, is we give each other a fair trial. And it's only because of people like you we can do that in this country. So thank you for doing that.

All right. We're going to start trial in earnest today.

Let me give you an overview of what's going to happen.

In a moment, I'm going to read some preliminary jury instructions. You're going to hear the final jury instructions at the end of the case. The preliminary jury instructions just give you kind of a preview of what -- some ground rules for the trial, how to think about the case. It's not going to be overly substantive, but it gives you like a framework for what

you're going to hear during the trial. It takes, again, 15 or 20 minutes or so. Not real long.

As soon as that's done, we're going to hear opening statements. An opening statement is just a preview. It's like a sneak peek of the evidence about what you're going to hear. Each side gets to stand up and tell you a little bit about what they think you're going to hear during the trial. And usually, they, you know, take 15 or 20 minutes, each side, maybe more, maybe less, but that's kind of a rough ballpark.

And as soon as the opening statements are done, we're going to launch right into testimony. So we're going to start hearing witnesses. And they're going to come up, take the witness stand seat that many of you are comfortable with from yesterday.

We're going to hear testimony, and we're going to go until the testimony is done. So I expect you're going to hear from a number of different witnesses today. And we're going to get going.

Let me say one housekeeping matter before I start. I know a couple of you expressed some concerns yesterday about your ability to see or your ability to hear. I want everyone to be able to see everything, and I want everyone to be able to hear everything throughout the whole trial. Okay?

We've given at least one of you a headset. You are welcome to use that. I hope it works. Maybe the technology

gods will smile upon us.

If it doesn't work or you have any trouble for any reason, I want you to tell me, and I'll fix it. Okay? We'll fix it. We'll make sure you can hear.

If at any point today any of the rest of you just can't hear -- maybe somebody speaks and they don't speak into the microphone, you know -- just raise your hand or pull on your ear, and I'll figure out that that's what you mean. Okay?

You see the video screens are in front of you, everybody? When you start hearing evidence, the evidence is going to pop up on there so you can see it.

I always encourage the lawyers to zoom in when they can just to make sure you see it.

If anybody can't see anything today, I want you to just raise your hand and, you know, point at the screen. We'll make sure you can see it. Okay?

So that's a long way of saying we want you to be comfortable, we want you to see everything, we want you to hear everything. And if you're not getting what you need, I want you to let me know, because we'll take care of you. Okay?

So without further ado, folks, I'm going to read you the preliminary jury instructions.

When I give you the final jury instructions at the end of the case, I'm going to give everybody a hard copy. For this morning, I'm just going to read it to you. It's not overly

long. It's about, you know, seven pages single-spaced.

Okay? Everybody ready?

Oh, by the way, you got -- everybody has got notebooks, right?

I'll tell you this in a minute, but I'll repeat it now: You're welcome to take notes or you're welcome to not take notes. It's up to you. You're not required, but you can if you want to. Okay?

Everybody ready to do the preliminary jury instructions?

Okay. Here it goes.

Members of the jury, you are now the jury in this case, and I'll take a few minutes to tell you about your duties as jurors and to give you some instructions.

At the end of the trial, I'll give you more detailed instructions. Those instructions will control your deliberations.

You have two duties as jurors.

Your first duty is to decide the facts from the evidence that you see and hear in court.

Your second duty is to take the law as I give it to you, apply it to the facts, and decide if the government has proved the defendant guilty beyond a reasonable doubt.

You must perform those duties fairly and impartially. Do not let sympathy, prejudice, fear, or public opinion

influence you.

In addition, do not let any person's race, color, religion, national ancestry, or gender influence you.

By your verdict, you will decide the questions of fact that arise during the trial based on my instructions of law at the close of the trial.

It's important that you give careful attention to the testimony and evidence as it is received and presented for your consideration.

You should keep an open mind throughout the trial. You should not form or express any opinion about the case one way or the other until you've heard all of the evidence, the attorneys' closing arguments, and my instructions to you on the applicable law.

If you see the lawyers or any of the parties in the courthouse, in the hallways or in the cafeteria, they will not speak to you. They're not being rude. They are following my order not to have any contact with you.

Please do not talk to any of the lawyers or any of the parties or any of the witnesses.

One of my duties is to decide all questions of law and procedure.

From time to time during the trial and at the end of the trial, I will instruct you on the rules of law that you must follow in making your decision. You should not take

anything that I say or anything that I do during the trial as indicating what I think the evidence or what your verdict should -- excuse me. Let me say that again.

You should not take anything that I may say or anything that I may do as indicating what I think of the evidence or what I think your verdict should be.

In other words, it's up to you; it's not up to me.

The trial will proceed in the following manner: First, the government's attorney will make an opening statement. Next, defendant's lawyer will make an opening statement.

An opening statement is not evidence but is simply a summary of what the attorney expects the evidence to be.

After the opening statements, the government will call witnesses and present evidence. Then, defendant will have an opportunity to call witnesses and present evidence.

However, the defendant has an absolute right not to testify or to present evidence.

After the parties' main cases are completed, the government may present rebuttal evidence.

After the evidence has been presented, I will instruct you on the law that applies to the case, and the attorneys will make closing arguments.

After that, you will go to the jury room to deliberate on your verdict.

The charges against the defendant are in a document called an indictment. You will have a copy of the indictment during your deliberations.

The indictment in this case charges that Defendant Anthony Emeka Ibekie committed the crimes of wire fraud, mail fraud, money laundering, making a false statement to a financial institution, and false use of a passport.

The defendant has pled not guilty to the charges.

The indictment is simply the formal way of telling the defendant what crimes he is accused of committing. It is not evidence that the defendant is guilty. It does not even raise a suspicion of guilt.

The defendant is presumed innocent of the charges. This presumption continues throughout the case, including during your deliberations. It is not overcome unless, from all the evidence in the case, you are convinced beyond a reasonable doubt that the defendant is guilty as charged.

The evidence includes only the testimony of the witnesses, the exhibits admitted in evidence, and any facts that I may instruct you to find or that the parties may agree or stipulate to.

A stipulation is simply an agreement between both sides that certain facts are true.

A defendant has an absolute right not to testify or present evidence. You may not consider in any way the fact

that the defendant did not testify or present evidence. You should not even discuss it during your deliberations.

Part of your job as jurors will be to decide how believable each witness was and how much weight to give to each witness's testimony. I'll give you additional instructions about this at the end of the trial.

A language other than English may be used during the trial. When that happens, you should consider only the evidence provided through the official interpreter. Although some of you may know Vietnamese, it's important for all jurors to consider the same evidence. For this reason, you must base your decision on the evidence presented in the English translation.

Do not make any decisions by simply counting the number of witnesses who testified about a certain point. What is important is how believable the witnesses are and how much weight you think their testimony deserves.

Give the evidence whatever weight you believe it deserves. Use your common sense in weighing the evidence, and consider the evidence in light of your own everyday experience.

People sometimes look at one fact and conclude from it that another fact exists. This is called an inference. You are allowed to make reasonable inferences so long as they're based on the evidence.

You may have heard the phrases "direct evidence" and

"circumstantial evidence."

Direct evidence is proof that doesn't require an inference, such as the testimony of someone who claims to have personal knowledge of a fact.

Circumstantial evidence is proof of a fact or a series of facts that tends to show that some other fact is true.

Let me give you an example.

Direct evidence that it's raining is testimony from a witness who says, "I was just outside, and I saw it raining."

That's direct evidence.

Circumstantial evidence that it's raining is seeing somebody walk into the courtroom holding a wet umbrella.

That's circumstantial evidence.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence.

When the time comes to deliberate on your verdict, you should consider all the evidence in the case, including circumstantial evidence.

The following things are not evidence, and you must not consider them as evidence in deciding the facts of the case.

Here it goes. These are not evidence.

Number one, opening statements.

Number two, closing arguments.

Number three, questions.

Number four, objections by the lawyers.

Number five, any testimony that I instruct you to disregard.

And number six, anything you may see or hear when the Court is not in session, even if what you see or hear is done or said by one of the parties or one of the witnesses. None of that is evidence.

During the course of the trial, you may be shown documents that contain redactions, meaning that some words in the documents are hidden from view.

Documents are redacted for a number of reasons that have nothing to do with the merits of the case. You should not draw any inference or conclusion from the fact that a document contains redactions.

Let me just give you an example.

If there's a bank statement and it has a Social Security number, we might redact that, or it might contain other material that's just totally irrelevant or not admissible for some other reason. We would redact it. You shouldn't draw any inference from the fact that something is redacted.

From time to time during the trial, I may be called upon to make rulings of law on objections or on motions by the lawyers. You should not infer or conclude from any ruling or any other comment that I may make that I have any opinion how you should decide the case.

And if I should sustain an objection to a question that goes unanswered by a witness, you should not guess or speculate what the answer might have been. And you should not draw any inference or conclusions from the question itself.

When an objection is sustained, that means you are not to consider the question or the answer.

When an objection is overruled, that means you may consider the evidence.

So let me go over the lingo with you.

Let's imagine there is a question and there's an objection. If I say "sustained," that means I agree with the objection, and you shouldn't consider the testimony even if they blurt something out. So if it's "Objection," "Sustained," that means it's a bad question.

If there's an objection and it's overruled, that means I'm rejecting the objection, and you can consider the testimony that follows.

So "sustained" means I agree with the objection. "Overruled" means I don't.

At times during the trial, it may be necessary for me to talk with the lawyers out of your hearing or by calling a recess. Often during a trial, something comes up that doesn't involve the jury.

We will do what we can to keep the number and the lengths of these conferences to a minimum, but you should

remember the importance of the matter you're here to determine, and you should please be patient even though the case at times may appear to go smoothly.

It's another way of saying, every now and again, I have to talk to the lawyers. Bear with us.

You have been given jury notebooks. You may use them to take notes during the trial.

Any notes that you take during a trial are only aids for your memory. The notes are not evidence. If you don't take notes, you should rely on your own independent recollection of the evidence and not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollections or impressions of each juror about the testimony.

When you leave the courthouse during a trial, your notes should be left in the jury room. So please don't take them home. Leave them in the jury room.

When you leave at night, your notes will be secured and will not be read by anyone. It's a secure room. We'll lock it.

At the end of the trial, your notes will be destroyed. No one will be allowed to read the notes before they are destroyed.

Please pay close attention to the testimony as it is given. At the end of the trial, you must make your decision

based on what you recall of the evidence. You will not have a written transcript of the testimony to consult.

Let me say that twice. I always say it twice.

You will not have a written transcript of the testimony to consult.

You all can see that my court reporter is here taking it down. The court reporter makes a record for the Court. The court reporter does not make a record for the jury. You will not have a transcript from the court reporter at the end of the trial.

As jurors, you will not receive a transcript, so please listen carefully to the testimony as it's given.

I do not permit jurors to ask questions of witnesses or the lawyers. Please don't interrupt the lawyers during the exam of their witnesses. The exception would be, folks, if you can't hear or you can't see. Just raise your hand or tug at your ear or something like, and we'll make sure you can see and hear it.

If you are -- if you have a question about something, it's, frankly, their job to give you the information. If they don't, they don't. All right? So -- but you can't just ask a question.

If you are unable to hear a witness or a lawyer, please raise your hand, and I'll make sure it's corrected.

All jurors must follow certain rules of conduct, and

you must follow them, too.

Let me go over them with you.

First, you should keep an open mind throughout the trial. Don't make up your mind about what the verdict should be until the trial is over. Do not make up your mind until you've received my final instructions on the law and you your fellow jurors have discussed the evidence.

Number two, your verdict in this case must be based exclusively on the law as I give it to you and the evidence that's presented in court during the trial.

For this reason, and to ensure fairness to both sides in this case, you must obey the following rules. These rules apply both when you are here in court and when you are not in court. They apply until after you have returned your verdict in the case.

So I'm now going to read you seven rules.

Number one, you must not discuss the case or the issues in the case or anyone who is involved in the case amongst yourselves until you go to the jury room to deliberate after the trial is completed, not before. After the trial is completed.

Number two, you must not communicate with anyone about the case or the issues in the case or anyone who is involved in the case until after you have returned your verdict.

Number three, you must not read any news stories or

articles or listen to any radio or television reports about the case or anyone who has anything to do with the case.

Number four, you must not do any research of any kind about the case. You must not search the Internet or consult dictionaries or do any investigation about the case or about the evidence that you may hear.

You may not perform any investigation of any kind on your own, period. For example, you may not look up anything, anything on your phones.

Number five, when you are not in the courtroom, you must not allow anyone to communicate with you or give you any information about the case or the issues in the case or about anyone who is involved in the case.

If someone tries to communicate with you about the case or the issues in the case or about someone who is involved in the case, or if you overhear or learn any information about the case or the issues in the case or someone involved in the case when you're not in the courtroom, you must report it to me immediately.

Number six, you may tell your family and your loved ones and your employer that you're serving on a jury. That's perfectly fine. You may do that.

You can explain to them that you have to be in court. You can tell them where you are. Totally fine. You can tell them you're at the Dirksen Federal Building in downtown

Chicago, at the federal courthouse. Totally fine. You can tell them what hours you're going to be here. You could tell them where you're going to be. You can tell them how long the trial is expected to last. That's all fine. You can tell your loved ones where you are and why you're here.

However, you must not communicate with them about the case or the issues in the case or anyone who is involved in the case until after you've returned your verdict. So you can't tell anybody what the case is about or who the parties are. You can't tell them if it's a criminal case or a civil case.

You can't have any conversations with anyone about the case except to say where you physically are and how long you're going to be here and what the hours are. Okay? So people can know where you are and why you're here, but that's it.

Number seven, all the information that you'll need to decide the case will be presented here in court. You must not look up or obtain or consider any information from any outside source.

There are a few reasons for all of these rules.

First, it wouldn't be fair to the parties in the case for you to consider outside information or communicate information about the case with others.

Second, outside information may be incorrect or misleading.

Third, if you talk or communicate about the case, you

may organize your thoughts in a way that may lead you to form conclusions before you've heard anything.

When I say that you may not obtain or consider any information from outside sources and may not communicate with anyone about the case or the issues in the case or those involved in the case, I'm referring to every way that people communicate or obtain information. This includes, for example, face-to-face communications or looking things up or doing research or reading or watching or listening to reports in the news media or communications using any electronic device, such as your phone or a telephone or the computer or the Internet or text messaging or social media or Facebook or Twitter or Instagram or TikTok or anything else or any other form of communication, period. Nothing. You can't do anything to look things up.

If you hear or see or receive -- excuse me. If you hear or see or receive any information about the case by these or any other means, you must report it to me immediately.

It's a long way of saying this: Everything you learn about the case must come from inside this courtroom. That's it. No looking up anything on your phone, period.

I just want to cover a couple logistical points.

First, please continue to use the elevators on the north side of the building.

Thank you all for doing that this morning. It looked

like from our end things went smoothly. I hope it went smoothly on your end.

So remember, when you go through the security in the building, take a left. And if you get lost, which you won't -- but if you do get lost, just tell them you're here with Judge Seeger, 23rd floor. You'll find your way.

If you're not sure where to go, the court security officers will help you.

Second, please leave your phones in the jury room. Please don't take them into the courtroom. It will help you avoid distractions. The last thing you want is your phone to be going off in the jury trial. They'll be secure in the jury room. The court security officer will lock the room. They'll be secure. All of your belongings will be safe back there. The court security officer will make sure of that.

Let me give you some final instructions.

Do not allow sympathy, prejudice, fear, or public opinion to influence you. You should not be influenced by any person's race, color, religion, national ancestry, or sex.

I will now give you an overview of the burden of proof.

The government has the burden of proving the defendant's guilt beyond a reasonable doubt. This burden of proof stays with the government throughout the case. The defendant is never required to prove his innocence. He is not

required to produce any evidence at all.

If you need to communicate with me, you must give a signed note to a member of the court staff to give to me.

You must not make up your mind about what the verdict should be until after you've gone to the jury room to decide the case and you and your fellow jurors have discussed the evidence.

You are obliged to keep an open mind until then.

Again, after you retire to deliberate, you -- excuse me. Let me say that again.

Again, until you retire to deliberate, you may not discuss the case with anyone, even your fellow jurors. Even your fellow jurors.

After you retire to deliberate, you may begin discussing the case with your fellow jurors at the end of the trial. But you cannot discuss the case with anyone else until you've returned a verdict and the case is at an end.

Now we will begin with opening statements. Again, opening statements are not evidence, folks. The statements are intended to help you understand the issues and the evidence, as well as the positions taken by the parties.

All right. Folks, those are my preliminary jury instructions.

What we are going to do next is hear opening statements. What always happen is the government speaks first,

defense attorney speaks second. And after that's done, we'll hear -- start hearing evidence from the witnesses. Okay? That's the plan for the day.

I'll now invite counsel for the government to give an opening statement.

MS. NUTINI: Thank you, Your Honor.

May I have a moment to set up?

THE COURT: Absolutely.

Members of the jury, it's pretty common when each side gets the baton, so to speak, they need a moment to set up and get things going. Sometimes we have to switch the computer system. That's very common.

OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

MS. NUTINI: In 2020, 72-year-old Dale Helms received a letter in the mail about an inheritance, millions of dollars were in a Canadian bank account belonging to a relative of his who had died. All he had to do was respond to an e-mail address in the letter. It was simple. So he did.

Over the next several weeks, Mr. Helms began communicating back and forth with the individuals that purportedly worked for a bank.

Mr. Helms, after communicating with them, however, would learn that there was no inheritance, these individuals did not work for a bank, and that the almost $30,000 that he had sent to these individuals was gone. All because of this

man, the defendant, Anthony Ibekie.

For three years, the defendant tricked individuals like Dale Helms, most of them elderly, out of hundreds of thousands of dollars.

He ripped off these individuals, some of them from their life savings. $27,000 from Dale Helms. $58,000 from another victim. Over $200,000 from a third victim. The list goes on.

So how did he do it?

You'll learn that the defendant and his fellow scammers devised a fraud scheme in which they followed five steps to trick innocent victims.

First, they mailed unsolicited letters to potential victims. We're not talking about 20 letters. We're talking about thousands of letters written, printed, folded, stuffed into envelopes and mailed around the clock. These letters purported to be from employees of foreign banks. These letters told the victims that a long lost family member in Canada had died without a will leaving behind millions of dollars in a bank account. The letter was signed by a fake name pretending to work at one of those banks, providing an e-mail for the victim, like, Dale Helms, to respond to if they wanted to proceed with claiming the inheritance.

That's step one, the first lie.

Step two is the victim follows the instructions in the

letter and responds via e-mail to that fake bank employee by an alias name, usually Peter Pfizer or John Delon.

Remember, these are individuals who allegedly worked for these banks trying to help the victims claim the inheritance.

Who are these people in reality?

They're the defendant. The defendant is Peter Pfizer. The defendant is John Delon.

These are the alias names the defendant came up with to further the scheme. More lies.

That's step two.

Once the victim is on the hook, so to speak, step three involves the victim communicating back and forth with the defendant posing as these alias names about this fake inheritance.

To further trick these victims, the defendant also directs them to contact various departments within the bank, all operated by the defendant and his fellow scammers.

Additional alias identities are used during this step. More fake names. More fake bank employees who continue to communicate with the victim and rope them in.

That's step three.

Step four is the victim is told he will need to retain a Canadian attorney to help him with claiming the inheritance. This attorney will help smooth the process with the bank, the

victim is told. But the attorney isn't real. This is all part of the scam. The victim is directed to send money for a retainer agreement with that attorney.

After that is done, though, the victim is told they need to pay additional fees for various other things, like certificates and liens and charges associated with claiming their inheritance.

Again, more lies.

Each of these fees escalates in the amount. The victim gradually buys more and more into the fraud.

That's step four.

So where does all of this money go?

That's step five.

The money is sent to bank accounts in various business names all controlled or connected to the defendant.

Because, you see, the defendant registered various fake businesses with the Illinois Secretary of State and then opened bank accounts in those business names. Why? For the sole purpose of receiving fraudulent money from victims like Dale Helms.

But the defendant was tricky. He didn't register most of these businesses or bank accounts in his own name. Why? Well, the businesses were not legitimate, as we've discussed. Their purpose was to receive fraud proceeds. So the defendant used fake Nigerian passports containing his photograph and an

alias name and date of birth. Or the defendant used other people to register these businesses and open bank accounts: His son. His ex-wife. His fellow scammers. All people connected to the defendant.

After step five, the fraud is complete. There is no inheritance. The victim loses his money, and the defendant gets richer. He takes the money, and he funnels some of it to bank accounts in his name in Nigeria.

Make no mistake, ladies and gentlemen, the defendant is the man behind the lies and these alias names. You'll learn about some of the ways that law enforcement figured this out.

For example, federal agents conducted an investigatory trash pool at the defendant's house and found ripped up template fraud letters and envelopes. They also found a handwritten note containing the e-mail address and password for one of the alias names the defendant used to communicate with the victims, all inside of his trash.

A search warrant was also conducted at the defendant's house, where agents found a home office with two large printers, stacks of envelopes, and a typed list containing the accounts, passwords, and phone numbers for some of the alias identities the defendant used, almost like an answer key to commit his fraud.

And they found this Nigerian passport with the defendant's photograph on it. What's the name on here? Toni

Ibe Emeka. Not the defendant's name.

Yet again another alias name the defendant used, in this case, to open fake accounts under fake business names that received fraudulent victim funds.

Numerous phones, computers, and flash drives in the defendant's house also contained a mountain of evidence linking the defendant to this inheritance fraud.

For example, copies of fake driver's licenses using the alias names the defendant sent to victims: Peter Pfizer, John Delon; copies of the e-mails and attachments that victims received from these foreign bank accounts during the fraud; and hundreds of spreadsheets containing potential victim names and addresses to mail these letters to.

So what is the defendant charged with in this case?

As the judge instructed you, for his actions, the defendant has been charged in an indictment with wire fraud, mail fraud, money laundering, making false statements to banks, and passport fraud.

As the judge has told you, it is the government's burden to prove the defendant's guilt beyond a reasonable doubt. And that's what we're going to do during this trial.

So I'd like to spend a few final minutes with you telling you how the government is going to prove its burden during this case.

You're going to hear testimony from the victims of the

defendant's crimes, the individuals who were tricked into engaging in this inheritance fraud and who lost big, victims like Dale Helms.

Many of these victims are elderly, and that makes sense, because the defendant's scheme, it preyed on the vulnerable. For the fraud to be successful, the defendant couldn't ask too many questions. They couldn't become suspicious too early.

You'll see some of the e-mails the victims exchanged with the defendant and his fellow scammers, the five steps that roped them into the fraud.

You're also going to hear testimony from the defendant's son, Ebuka Egbunam. Mr. Egbunam was charged in a separate fraud case and is cooperating with the government in exchange for a benefit in that case.

Mr. Egbunam will tell you about his relationship with his father and how he, too, got roped into helping the defendant commit this fraud.

You see, Mr. Egbunam, who you will hear from, is a tech-savvy guy, and the defendant used that to his advantage. He had Mr. Egbunam do things, like create fake websites, in furtherance of the fraud, register a fake business, and open a bank account for that business.

Mr. Egbunam is going to give you an inside look into how the defendant operated.

You're also going to hear testimony from the federal agents who were involved in this investigation. You'll learn about an undercover operation in which an agent posed as a victim. And the defendant and his co-scammers took the agent through those five steps we've talked about.

And the defendant, while he was posing as one of his alias identities, directly communicated with that agent believing he was a victim, directing that agent where to send money. Some of these communications are recorded. And you'll hear the defendant's own voice directing the agent what to say to the banks, for example, so they don't flag anything as fraudulent.

The agents who will testify during trial will also walk you through some of the investigative steps that led to uncovering the defendant's crimes, like that trash pool and the search warrant at the defendant's house.

You'll also hear from the fingerprint witness who will explain that the defendant's fingerprints were recovered from a fraudulent letter addressed to a potential victim that law enforcement intercepted out of the mail before it made it to that victim.

And a witness in document reconstruction will explain to you how he reconstructed the documents that were found inside of the defendant's house during that search warrant inside of a shredder bin. He will show you these documents

reconstructed. And many of them appear to be those same fraudulent letter templates the defendant used to mail to victims in the hundreds.

And you'll hear more details about all of those phones and computers and flash drives that were seized at the defendant's house, each of them containing evidence of the defendant's crimes. His alias identities, his template scam letters, the victim addresses, his fake businesses, his foreign bank accounts, his fraudulent bank accounts. All of it is there on those devices.

Members of the jury, once you have seen and heard all of the evidence in the case, the government will ask you to return the only verdict that is consistent with the evidence in this case, and that is guilty beyond a reasonable doubt on all counts.

Thank you.

THE COURT: Thank you, Counsel.

So that was the government's opening statement.

I'll now invite defense counsel to deliver an opening statement.

MR. CARLSON: Thank you, Judge.

OPENING STATEMENT ON BEHALF OF DEFENDANT

MR. CARLSON: Ladies and gentlemen of the jury, my name is Kent Carlson, and I represent Anthony Ibekie.

We are here today because the people at this table

charged Mr. Ibekie with participating in a mail and wire fraud scheme with money laundering, making false statements to banks, and false use of a passport.

Having made those charges, the government must prove beyond a reasonable doubt, amongst other elements, that Anthony Ibekie knowingly became a member of the charged scheme to defraud with the intent and attempt to make it succeed.

They must prove beyond a reasonable doubt that he knowingly laundered money. They must prove beyond a reasonable doubt that he knowingly made false statements to banks to influence the actions of the banks. And they must prove beyond a reasonable doubt that he knowingly used a passport that was false.

Anthony Ibekie entered a plea of not guilty. What that plea of not guilty means is, "I didn't do it. I didn't become a member of the charged fraud scheme with the intent to make it succeed."

He has denied he laundered money. He has denied that he knowingly made false statements to banks. And he has denied that he knowingly used a false passport.

He has said to the people at this table, "Take all the power and resources of the United States of America and try and prove my guilt beyond a reasonable doubt, because I didn't do it."

As Judge Seeger told you, under our system of justice,

Anthony Ibekie does not need to prove his innocence. He is presumed innocent. As he sits here right now, he is innocent. That presumption remains with him through these opening statements, through all the evidence that's presented in this case, throughout Judge Seeger's instructions to you on the law, and throughout your entire jury deliberations unless and until each and every one of you individually and collectively are convinced of Anthony Ibekie's guilt beyond a reasonable doubt.

Folks, I'm not standing here to tell you Anthony Ibekie is perfect. He's not. And you're probably going to hear some things that he's not very proud of. But you're not here to decide whether Anthony Ibekie or his actions are perfect. You're not here to decide whether you approve of his actions. You are not here to decide if you would have acted differently if you were in his shoes.

You are here solely to determine if the government can prove beyond a reasonable doubt that Anthony Ibekie knowingly became a member of the charged fraud scheme, that he knowingly laundered money, that he knowingly made false statements to banks, and that he knowingly used a false passport.

I'm sure you're not surprised, but I'm going to tell you right now I don't think they can prove those things. I don't believe they're going to be able to prove each and every allegation of each and every crime charged.

Now, I watched and listened when Assistant U.S.

Attorney Nutini a few minutes ago told you what she thought the evidence was going to show.

And I ask you to remember each and every thing that she told you. Each and every thing that she promised you. And I ask you to hold them to those promises. And if they don't, it will be your duties to find Mr. Ibekie not guilty.

As Judge Seeger said in his preliminary instructions, what she said to you, just like what I'm saying now, it's not evidence. Merely what she believed the evidence in this case may show, I don't believe the evidence is going to support that.

I believe that the evidence that you're going to hear and, just as importantly, the evidence that you won't hear is not going to convince you of Anthony Ibekie's guilt.

And I'm not going to sit here and catalog all of my disagreements with Ms. Nutini as to what the evidence will show, but I'll remind you there's two sides to every story. And I'm just going to give you one example.

In her opening, she told you a minute ago that Anthony Ibekie's fingerprints was found on a letter. I submit to you you're not going to hear any evidence that his fingerprint is found on any letter. What you may hear is that there was a fingerprint on the outside of an envelope. And you are going to hear how that fingerprint got on the outside of that envelope.

You're going to hear from a witness who has got an axe to grind against Anthony. He is a witness who has something to gain by making things up. And I believe you'll want to hear -- some of it is because of animosity. Some of it is due to anger. More importantly, some of it's to receive the ultimate benefit that a court can give, and that ultimate benefit is absolute freedom from your own criminal acts.

I believe you're going to hear from some of the witnesses, some victims in this case. You're going to hear they never dealt with Anthony Ibekie. They never saw him. They never even heard of him. They dealt and saw a whole slew of other people whose names you're going to hear, but not Anthony Ibekie.

The government wants you to believe that Anthony Ibekie is all of those other people. I don't believe there's going to be any evidence that shows Anthony Ibekie is those other people.

I believe the evidence is going to show that Anthony Ibekie did not knowingly join any scheme to defraud anybody, that he didn't intend to defraud anybody, he didn't launder money, he didn't make false statements to banks or use a false passport.

During this trial, ladies and gentlemen, I ask you only as follows, and only as consistent with the oath that you took, that you be fair and impartial, that you presume Anthony

Ibekie innocent of the charges against him, that you listen carefully and consider all of the evidence, that you assess the believability of the evidence, and most importantly, that you apply your common sense. Because that's why you're here, that you follow the law that Judge Seeger gives you at the end of the trial, and that you hold the government to their duty, their obligation, not just to prove guilt, but to prove beyond a reasonable doubt.

And I'm not suggesting to you that it's going to be easy. The easy thing would be to say, "Hey, Anthony Ibekie, based upon what I've heard so far, he's a bad guy. He's been labeled as a fraudster and a cheat. He got all of this money from innocent people, and he told lie after lie after lie to do it. He's on trial here in federal court. It doesn't just happen unless you did something wrong."

You folks promised that you wouldn't do that. And when you made that promise, I believed you, and Anthony believed you.

We believe you're up to that task. You're up to do the hard work, the dirty work, what the Constitution of this great land demands.

One thing I'm going to say to you, I'm a music fan. And when all is said and done, I believe that you're going to find the words of a 1960s band, Buffalo Springfield, said. "There's something happening here, but what it is ain't exactly

clear."

And I submit to you, folks, if it ain't exactly clear, you need to find Anthony Ibekie not guilty. And I believe when all the evidence is in and when you go back to deliberate, you'll return to this courtroom finding it ain't exactly clear and finding him not guilty.

Thank you very much.

THE COURT: Thank you, Counsel.

So, members of the jury, that was the opening statement from each side. I'll just repeat what I said to you before. Opening statements are just a preview. They're not evidence. It's like a sneak peek of what the parties reasonably expect you'll hear at the trial. Okay?

You have not heard any evidence yet. That's about to change.

I'd invite the government to call your first witness.

MS. NUTINI: Thank you, Your Honor.

We'd like to begin by publishing -- having Your Honor read the parties' Stipulation No. 1 for the record.

THE COURT: Very good.

Okay. So, folks, you just heard that from the government. The government said that they would like me to read a stipulation into the record.

You remember during my preliminary instructions, I told you that you're going to hear certain kinds of evidence?

You're going to hear people take the witness stand to my left, you're going to see certain exhibits presented, and you're also going to hear some stipulations during the trial.

A stipulation is just what it sounds like. It's an agreement between the parties that certain facts are true. You may consider the stipulations when you consider your verdict at the end of the trial.

Okay. So I'm now going to read for you the stipulation.

It's going to be Stipulation No. 1?

MS. NUTINI: Yes, Your Honor.

THE COURT: So I'm now going to read into the record Stipulation No. 1.

It should be up on the screen.

Can everybody see that okay?

Maybe we could make that a little bit bigger for the jury.

Is that better, everybody?

Okay. So I'm going to read Stipulation No. 1. It's about two pages long.

Here it goes.

Stipulation No. 1, if the custodian of records for the entities listed below were called to testify in this case, each of them would testify that:

Number one, as custodian of records, his or her

responsibilities include maintaining and retrieving records of the entity for which he or she works.

Number two, that the records compromising the government exhibits listed below were made by a person with knowledge of, or made with information transmitted by a person with knowledge of, the acts or events appearing on the records; that the records were made at or near the time of the acts or events appearing on the records; that it was the regular practice of the entities listed below to make such records; and that the records were kept in the ordinary course of the regularly conducted activities of the entities listed below.

Number three, the parties agree that Government Exhibits 301 through 309, 311, and 312, which are described more fully below, are admissible in evidence.

I'll turn the page.

Everybody see that chart there?

So let me just describe what you're seeing. There is a chart. There is a header with two columns. The column on the left says "Government Exhibit Number." And to the right, it says "Description."

So let me just read that into the record.

Government Exhibit No. 301, TCF Bank account for Jenant, spelled J-e-n-a-n-t, ending in 9392.

Government Exhibit 302, TCF Bank account for Setraco, S-e-t-r-a-c-o, ending in 7097.

Government Exhibit No. 303, TCF Bank account for Samcord, ending in 5398.

Government Exhibit 304, BMO Harris Bank account for Berger, ending in 5874.

Government Exhibit No. 305, Chase Bank account for Emetech, ending in 6830.

Government Exhibit No. 306, Chase Bank account for Godmeks, spelled G-o-d-m-e-k-s, Incorporated, ending in 2012.

Government Exhibit 307, Chase Bank account for Esijemine, spelled E-s-i-j-e-m-i-n-e, Lucky Nengite, spelled N-e-n-g-i-t-e, Incorporated, ending in 2296.

Government Exhibit No. 308, U.S. Bank account for Setraco, again, spelled S-e-t-r-a-c-o, ending in 1606.

Government Exhibit No. 309, Citibank account for Globayo, spelled G-o- -- excuse me -- G-l-o-b-a-y-o, ending in 2818.

Government Exhibit No. 311, Bank of America account for Samcord, ending in 5622.

Government Exhibit No. 312, Federal Reserve wire transfer records.

It says "So stipulated." There is a signature by an Assistant United States Attorney, a stipulation for defense counsel, and a stipulation from Defendant Anthony Ibekie.

So stipulated?

MS. NUTINI: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: All right. Very good.

So that's Stipulation No. 1, folks. You can consider that stipulation when you return your verdict at the end of the case and deliberate.

Counsel, you may proceed.

MS. NUTINI: Thank you, Your Honor.

The government moves to admit into evidence Government's Exhibits 301 through 309, 311, and 312 to be published with a later witness.

THE COURT: All right. Any objection?

MR. CARLSON: No objection.

THE COURT: All right. Very good.

(Government's Exhibit Nos. 301 through 309, 311, and 312 were received in evidence.)

THE COURT: Those are admitted.

Folks, let me tell you what just happened. You heard the government there move to admit certain documents into evidence. The Court is the gatekeeper for what is admissible and what is an exhibit that you can consider. The government has laid the foundation for the exhibits. We just -- those are the same exhibit numbers that you saw a minute ago.

I have admitted them into evidence. That means that the documents that she just moved into evidence can be considered as part of the evidentiary record.

At the end of the trial, you will have a copy of all of the exhibits that are admitted into evidence. So you don't have to commit those to memory.

So if there's a document -- let's say it's one of these records that you just saw there -- if it's presented in court and it's admitted into evidence and you see it on your screen, you'll have access to it on the big screen in the back of the courtroom. You know that big Jumbotron back there in the jury deliberation room? You can use that. You can pull up any exhibit you'd like.

So if it's been admitted into evidence, you can consider it as part of rendering your verdict, and you'll have access to it at the end of the trial if you'd like to see it. Okay? So those documents are admitted into evidence.

Counsel for the government, you may proceed.

MS. NUTINI: Thank you, Your Honor. The government calls Dale Helms.

THE COURT: Okay. Let's bring Mr. Helms up.

Do you want to help Ms. Nutini?

The court security officer can help her move the . . .

(Dale Helms enters the courtroom.)

THE COURT: Come on, Mr. Helms. Good morning.

THE WITNESS: Good morning.

THE COURT: Please raise your right hand.

(Witness sworn.)

THE COURT: Very good. Have a seat, Mr. Helms. Watch your step there.

All right. Good morning.

Thank you for being here.

I'd like you to speak into the microphone. I want to make sure all the men and women of the jury can hear you today. So please be mindful of that.

There is a pitcher of water next to you. If you need something to drink, just help yourself. Okay?

THE WITNESS: Okay.

THE COURT: All right. Very good.

Counsel, you may proceed.

MS. NUTINI: Thank you, Your Honor.

DALE HELMS, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. NUTINI:

Q. Good morning, sir.

A. Good morning.

Q. Can you please state and spell your name for the record.

A. Dale Helms, D-a-l-e H-e-l-m-s.

Q. Mr. Helms, how old are you?

A. 71.

Q. And where do you live?

A. East Grand Forks, Minnesota.

Q. Are you currently employed?

A. Yes, I am.
Q. And what do you do for work?
A. I'm self-employed. I own a charter bus company.
Q. And how long have you owned a charter bus company?
A. 13-plus years.
Q. What did you do prior to owning a charter bus company?
A. I used to work in the East Grand Forks School District bus garage.
Q. And what was your position in the East Grand Forks School District?
A. I was a mechanic and a driver.
Q. And how long did you hold that position?
A. 14 years I believe I was there.
Q. Mr. Helms, I'd like to direct your attention to 2019.
In 2019, did you receive a letter in the mail regarding an alleged inheritance from a relative of yours?
A. I did.
Q. And do you remember who the letter was from?
A. Peter Pfeiffer [*sic*].
Q. And do you remember who this Peter said he worked for?
A. I think it was the Standard Chartered Bank.
Q. And in summary, what did this letter from Peter from the Standard Chartered Bank say to you?
A. Basically said that there was an inheritance from a relative that had passed away that I could collect.

Q. Do you remember what kind of inheritance we're talking about? How much money?
A. It was somewhere in the area of like $11 million or something.
Q. And did you respond to this initial letter in 2019?
A. I did not right away.
Q. And why is that?
A. I just didn't think that -- I didn't know the relative, and I just thought it was probably not up to standard, I guess.
Q. I'd now like to direct your attention to April of 2020.
Did you receive any more letters in the mail about an inheritance?
A. Yes, I did.
Q. And do you remember who the second letter was from?
A. Again, from Peter.
Q. And, again, what did the letter, in summary, say?
A. Basically, it said the same thing about the inheritance and wanted to know if I was ready to proceed or not.
Q. Mr. Helms, I'd like to show you a disk that has been marked as Government's Exhibit 103.
MS. NUTINI: Your Honor, permission to approach?
THE COURT: You may.
BY MS. NUTINI:
Q. Do you recognize this disk, Mr. Helms?
A. Yes, I do.

Q. And what is it?
A. It's a disk with all the correspondence I had on -- for the inheritance.
Q. And when you say "correspondence," are you referring primarily to e-mails?
A. On -- e-mails, yes.
Q. And how do you know what's on that disk?
A. I seen it this morning.
Q. And do you see your initials on that disk?
A. Yes, I do.
Q. And you said you saw the disk this morning?
A. I did.
Q. And did you review all of the contents of the disk?
A. I did.
Q. And are those contents fair and accurate copies of the documents and communications you exchanged between April of 2020 and June of 2020?
A. Yes, they are.

MS. NUTINI: Your Honor, the government moves to admit the following exhibits into evidence: 103-1, 103-2, 103-5, 103-6, 103-7, 103-9, 103-11, 103-12, 103-13, 103-14, 103-15, and 103-16.

THE COURT: All right. Any objection?

MR. CARLSON: No objection, Judge. I just -- did she say 103-2?

MS. NUTINI: Yes, Judge.
MR. CARLSON: Okay. I just missed that one.
No objection, Judge.
THE COURT: All right. So they're admitted.
(Government's Exhibit Nos. 103-1, 103-2, 103-5, 103-6, 103-7, 103-9, 103-11, 103-12, 103-13, 103-14, 103-15, and 103-16 were received in evidence.)
THE COURT: They're all on the disk, obviously?
MS. NUTINI: They are, Your Honor.
THE COURT: They're all admitted. You can publish to the jury.
MS. NUTINI: Thank you, Your Honor.
BY MS. NUTINI:
Q. Mr. Helms, I'm showing you Government's Exhibit 103-1. And this is a several-page document.
I'm going to scroll through the pages so we can see them all, and then we'll talk about them.
This is Page 1.
This is Page 2.
This is Page 3.
And this is Page 4.
Mr. Helms, what is Government's Exhibit 103-1?
A. 103-1 is a letter addressed to me, to my address.
Q. And are there actually two letters in this exhibit?
A. Yes, there is.

Q. And so starting with the first that's dated April 19th of 2020, do you see that?
A. Yes.
Q. And then the second letter that's dated April 20th of 2020, do you see that?
A. Yes.
Q. And so is it fair to say you actually received three letters in the mail?
A. Yes.
Q. So one in 2019, and then you received two in 2020?
A. Yes. Correct.
Q. And besides the date of these two letters, are they basically the same letter?
A. Basically say the same thing.
Q. So I'd like to just focus on the April 20th, 2020, letter.
I'm going to direct your attention first to the second full paragraph of the letter.
And who does this letter say that it's from?
A. It says it's from Peter Pfeiffer.
Q. And this Peter Pfizer, is that what you were referring to earlier?
A. Peter Pfizer is the same one I was referring to earlier, yes.
Q. And then directing your attention to a van Helms.
Mr. Helms, do you know anyone by the name of van

Helms?
A. I can't say that I honestly do.
Q. And, again, what -- what did this letter say, in summary?
A. In summary, it's just saying that -- that a deceased customer of the bank, Mr. Van Helms, had passed away and that I was in line for an inheritance and could collect an inheritance.
Q. And what was the amount of that inheritance?
A. 11.6 million.
Q. Mr. Helms, directing your attention to the bottom portion of the document, who is the letter signed from?
A. It's signed Peter Pfizer.
Q. And does Mr. Pfizer direct you to an e-mail address to respond to if you would like to proceed with claiming the inheritance?
A. Yes, he does.
Q. And what is that e-mail address?
A. Peterpfizer456@aol.com.
Q. And is it "pppfizer"?
A. "Pppfizer," yes. I'm sorry.
Q. And did you reach out to Mr. Pfizer to that e-mail address that was in the letter?
A. Yes.
Q. And did you reach out by e-mail?
A. Yes.

Q. And did Pfizer respond to you?
A. Yes.
Q. I'd like to show you what's been admitted as Government's Exhibit 103-2.
Just before we get into the substance, what type of document are we looking at here?
A. This is an e-mail document from Peter to me.
Q. And when an e-mail document is printed, is it fair to say you have to start from the bottom up to read the e-mail?
A. Yes.
Q. Okay. So let's start from the bottom, which is Page 2 of the document. And I'm first going to direct your attention to the bottom portion.
Who is this e-mail from, and who is it to?
A. It's from me to "ppfizer."
Q. And do you appear to be -- do there appear to be some attachments?
A. Yes.
Q. And, Mr. Helms, do you and Mr. Pfizer appear to communicate back and forth in the course of this e-mail chain?
A. Yes, we do.
Q. And does Mr. Pfizer direct you that he has attached an NDA?
A. Yes.
Q. Do you know what an NDA is?
A. I'm not sure.

Q. And do you then provide some answers to some questions?
A. Yes.
Q. I'd like to direct your attention to -- excuse me -- to this portion of the e-mail address, but before you provide the answers to the questions, is this an e-mail from Peter Pfizer within this e-mail chain?
A. Yes.
Q. And does it read in substance, "Hey, Dale. I got it. I know you scared. I am just as scared, but I believe this because I know this customer in person while he is alive, and I also understand the bank process . . ."?
A. Yes.
Q. And what was your understanding of what you and Mr. Pfizer were discussing during this e-mail communication?
A. It was my understanding he knew the person and he knew the process of how to get -- get the inheritance.
Q. And by "the person," are you referring to van Helms?
A. Van Helms, mm-hmm. Yes.
Q. And does Mr. Pfizer provide you a phone number that you can contact him at?
A. He did.
Q. And does that phone number begin with 44 and end in 0817?
A. Yes.
Q. Did you contact that phone number?
A. I tried to, but it didn't work from my phone.

Q. And why is that?
A. It doesn't look like a normal phone number, I guess. And I tried to punch it in several times. I don't know.
Q. And when you say "It doesn't look like a normal phone number," does it appear to be a phone number for a different country?
A. Yes.
Q. And did Mr. Pfizer also provide you the documents that are attached to this e-mail?
I'd like to go through those with you. But did he also provide you a license?
A. Yes, he did.
Q. And I'd like to show you that. It's the first attachment.
Do you know why he provided you a license?
A. I don't know why. Just to prove that it was him, I guess.
Q. And then the second page, is this the back of the license?
A. The back of the license, yes.
Q. So did you begin communicating with Mr. Pfizer by e-mail?
A. Yes.
Q. Did you ever meet Pfizer in person?
A. No.
Q. And after you were communicating with Pfizer, did you eventually complete an application to claim what you thought was your inheritance?
A. Yes.

Q. Did Pfizer provide you an e-mail address to send the application to?
A. Yes, he did.
MS. NUTINI: I'd like to publish what's been admitted as Government's Exhibit 103-5.
BY MS. NUTINI:
Q. Mr. Helms, what type of document are we looking at here?
A. That's the application where they -- they received the application at -- it was from Standard Group Services, Wyashika Sellar, and she had said that had she received the -- in receipt of the application.
Q. And is this -- the Standard Group Services e-mail address, is this the e-mail address that Peter Pfizer told you to contact?
A. Yes.
Q. And you mentioned a name. Who is this e-mail -- excuse me. Who is this e-mail signed by?
A. Wyashika Sellar, the manager of operations at the unclaimed estate department of Standard Chartered Financial Group.
Q. Did you ever talk to Wyashika Sellar on the phone?
A. No.
Q. Did you ever meet Wyashika Sellar in person?
A. No.
Q. And there are two attachments to this document. I'd like to go through both of them with you.

The first appears to be a letter that, again, says, essentially, the same, "We're in receipt of your application."

And it's signed by Wyashika Sellar; is that correct?

A. Correct.

Q. The second document appears to be a questionnaire.

Did you receive both of these documents?

A. I did.

Q. And did you complete this questionnaire?

A. I did.

Q. And did anyone help you complete the questionnaire or fill in these answers?

A. Yes, Peter gave me all ans- -- or everything on every question, what to answer, with the exception of my name, of course. I knew that.

Q. So as you're communicating with Wyashika Sellar, you're also still communicating with Peter?

A. Yes.

Q. And Peter is telling you what to put in this form?

A. Yes.

Q. So after you completed this questionnaire, did you send it back to Wyashika Sellar?

A. Yes.

MS. NUTINI: I'm now publishing Government's Exhibit 103-6, which has been admitted into evidence.

BY MS. NUTINI:
Q. Again, Mr. Helms, does this appear to be an e-mail?
A. Yes.
Q. And is it from that same StandardGroupServices.com e-mail address?
A. Yes.
Q. And who is the e-mail from?
A. It's from Wyashika Sellar again, congratulating on my successful completion of the questionnaire.
Q. And scrolling to the attached documents, does Ms. Sellar advise you that the next step in claiming your inheritance is to contact a different bank?
A. Yes.
Q. And what was the name of that bank?
A. It was the TD Canada Trust Bank Financial Group in Toronto, Ontario.
Q. Did she provide the contact information to reach out to that bank?
A. Yes.
Q. And what was that contact information?
A. It was an e-mail at ued@tdcanadagroup.com.
Q. And did you contact that TD Canada e-mail address?
A. Yes.
Q. And did you correspond with that e-mail address?
A. Yes.

Q. Do you remember the name of the person you corresponded with?
A. No, I don't.
Q. And when you corresponded with TD Canada Trust, did the bank inform you that you would need to hire someone to help you move forward with claiming the inheritance?
A. Yes, they informed me that I'd have to hire an attorney.
Q. Do you remember the name of that attorney?
A. Pierre Delouis.

MS. NUTINI: I'd like to publish Government Exhibit 103-7.

BY MS. NUTINI:
Q. So, Mr. Helms, before we talk a bit further about Pierre Delouis, I'd like to direct your attention to this e-mail.

In the midst of these communications back and forth, did you receive the -- this e-mail from Peter Pfizer?
A. Yes, I did.
Q. And what does this e-mail say?
A. It was a new contact, a new e-mail for Peter to use to keep in touch with Peter.
Q. So Peter sends you another e-mail address and says, "Hey, correspond with me now through this e-mail address"?
A. Yes.
Q. Did you think anything of it at the time?
A. No.

Q. I'm now publishing Government's Exhibit No. 103-9.

Again, Mr. Helms, does this appear to be an e-mail chain?

A. Yes, it does.

Q. I'd like to start from the bottom.

Mr. Helms, who are you e-mailing here?

A. I'm -- to Hall & Hall Chambers. That's Pierre Delouis.

Q. So was this the e-mail address that Pierre Delouis used?

A. Yes.

Q. And does Pierre Delouis respond to you and let you know that he's attached a retainer agreement?

A. Yes, he does.

Q. I'm now scrolling to page 3 of the document.

What are we looking at here?

A. That's a retainer, attorney retainer agreement from Hall & Hall Chambers.

THE COURT: Counsel, we might be at a good logical breaking point for a midmorning break --

MS. NUTINI: Sure.

THE COURT: -- if it's okay.

Members of the jury, we try to take a midmorning break. We usually do it at 10:30, 10:45, somewhere in there. So we're going to go ahead and have our first break of the day.

Take your jury notebooks with you. You're going to be in the jury deliberation room. There are a couple bathrooms

back there. We usually take, you know, 15 minutes or so. Let everybody stretch their legs, use the restroom or whatnot.

As soon as you folks are ready, we're going to come back out and get rolling.

You started to hear the evidence. You heard just a little bit, but there is a lot more to come. You can't talk to each other about it, even other members of the jury. You've got to keep an open mind until the very end of the trial. Okay?

So we'll see you when we see you.

Thank you, folks.

THE CLERK: All rise.

(Jury out at 10:39 a.m.)

THE COURT: All right, sir. You can step down. Please don't talk to anyone about the substance of your testimony. And please watch your step.

We'll come back in about ten or 15 or so.

Watch your step.

All right. Have a seat, everyone.

The -- so, sir, if you want to go into the hallway, if you would. We can just -- I've got to talk to the lawyers for just a minute. You can be free to mill around and stretch your legs, take a drink, take a walk, whatever you'd like.

Thank you, sir.

(Dale Helms exits the courtroom.)

THE COURT: All right, folks.

Ms. Nutini, bear with me for interrupting your presentation there. I was going to take a break around 10:45 or so, give or take, 10:30, 10:35 -- excuse me -- 10:30 or 10:45. The court security officer flagged me down saying one of the jurors had mouthed to him that he had to go to the bathroom. That's the juror in the middle of the back row with the brown shirt. Whenever anyone in my courtroom says they have to use the bathroom, I never stand in the way.

So that was the reason for interrupting. So -- it was right around schedule anyway.

MS. NUTINI: Yeah, not a problem.

THE COURT: I don't have anything to cover.

We're going to go for about ten minutes or so. I want to make sure that Mr. Ibekie can talk to his lawyer and use the restroom and all of that.

So why don't we check in in about ten or 15 minutes.

My rule is basically, as soon as the jury is ready, I'm ready, and we'll get going.

But we've got two bathrooms back there for 15 people, so, you know, it usually takes about at least 15 minutes.

All right? Anything else you all want to cover?

MR. CARLSON: No.

THE COURT: As soon as we're ready, we'll roll. All right?

Thank you, folks.

THE CLERK: All rise.

(Recess taken from 10:41 a.m. until 11:02 a.m.)

THE COURT: All right, folks. Welcome back.

Is there anything that anyone wants to cover?

MS. NUTINI: No, Your Honor.

MS. DeMARCO: No, Your Honor.

MR. CARLSON: That's the only thing I wanted -- what time do you break for lunch?

THE COURT: You know, that's a good question. I usually do it kind of organically as the spirit moves. Usually no later than 12:30 unless you're really about to wrap up an exam and you need a little bit longer. But I think if we start at 11:00 here, we'll roll until about 12:30, give or take.

I mean, if you finish with a witness at 12:15, I'm not going to make you put a new witness on. You know, it's just somewhere in that a range.

I think if you go past 12:30, people start getting distracted.

I will tell you, I'm not hardwired to eat lunch, so you may need to nudge me. You know, but 12:30, give or take.

Is that good?

(Dale Helms enters the courtroom.)

THE COURT: Welcome back, sir.

Everybody ready for the jury?

MS. NUTINI: Yes, Judge.

THE COURT: All right. Very good.

Go ahead and get the jury.

(Jury in at 11:03 a.m.)

THE COURT SECURITY OFFICER: All rise.

THE COURT: All right. Have a seat, everyone.

Welcome back, everyone.

I'll tell you folks the same thing that I tell everybody on every jury. If you ever need to use the bathroom, not a big deal, just raise your hand and I'll know you need a break. Not a big deal at all.

It happens in every trial. Frankly, I had a trial a month ago where we came back from a break, and five minutes later, somebody raised their hand and said, "I've got to go the bathroom." I said, "Not a big deal. If you've got to go, you've got to go."

So if anybody needs a break for any reason -- I would rather have you tell me and take a quick break than for any of you to be uncomfortable. I don't want you to be uncomfortable for any reason throughout the trial. Okay?

With that, I'll invite the government to proceed with your examination.

MS. NUTINI: Thank you, Judge.

BY MS. NUTINI:

Q. Mr. Helms, before the break, we were talking about

Government's Exhibit 103-9, and specifically, this retainer agreement that you were sent by Pierre Delouis; is that correct?
A. Yes.
Q. I'd like to direct your attention to the bottom of the retainer agreement outlining some of the fees.
Do you see that?
A. Yes.
Q. And what were you told that you owed for this retainer agreement?
A. $6400.
Q. And is that the 3900 plus --
A. The 3900 prorate registry processing fee and -- for 3900, and a change of ownership processing fee for 2500.
Q. And that's $6400 total?
A. Yes.
MS. NUTINI: I'd like to publish Government's Exhibit 103-11, which has been admitted.
BY MS. NUTINI:
Q. And, again, Mr. Helms, does this appear to be an e-mail chain?
A. Yes.
Q. And who is this e-mail chain -- well, let me scroll down.
Who is this e-mail chain between?
A. From me to Hall & Hall, to Pierre Delouis.

Q. And directing your attention to the response from Pierre Delouis, does he appear to thank you for sending the retainer agreement signed?
A. Yes.
Q. And does he also discuss with you the account to make the payment to?
A. Yes.
Q. And what was your understanding of his explanation of this -- the reason he directed you to make the account -- make the payment to this specific account?
A. He wanted the funds available -- or wanted the retainer funds -- or the funds for the fees, he wanted them before he would proceed.
Q. And let's look at the actual account he directed you to.
So I'm scrolling to the third page of the document.
Is this the information that Pierre Delouis provided to you to send the $6400 to?
A. Yes.
Q. I'm going to direct your attention to the beneficiary name.
Are you familiar with the company Emetech Solutions?
A. Not at all.
Q. I'm also going to direct you to the beneficiary address.
Are you familiar with 797 Oxbow Avenue in Oswego, Illinois?
A. No.

Q. And what was your understanding of why Pierre Delouis was directing you to make a payment to a bank account in Oswego, Illinois?
A. The reasoning for it was -- the way I understood it was that because of the exchange rate, or whatever you want to call it, that there would be a fee that they would have to take. And they go through this company to bypass the other fees.
Q. So is it correct -- Pierre Delouis told you he's in Canada; is that right?
A. Yes.
Q. And so you're saying he told you there would be some sort of fee with sending a payment to another country?
A. Yes.
Q. Mr. Helms, did you wire $6400 to Emetech Solutions?
A. Yes, I did.
Q. I'd like to direct your attention to Government's Exhibit 305. And we're going to look specifically at 305-B. This is one of the bank records. It's been admitted into evidence.
Mr. Helms, I'm directing you to a payment that was made on June 2nd. And before I blow that up, I'll direct your attention to this portion of the bank statement.
What year are we looking at?
A. 2020, May 30th of 2020.
Q. So directing your attention to this deposit on June 2nd, is

that June 2nd of 2020?
A. Yes.
Q. And what is the amount of the deposit?
A. 6,400.
Q. Do you see your name here listed in the description?
A. Yes.
Q. And I've highlighted your name; is that correct?
A. Yes.
Q. Mr. Helms, from what bank did you send the $6400 payment?
A. Area Community Credit Union in Grand Forks, North Dakota, which is the bank that I bank at.
Q. And to what bank did you send the $6400 payment to?
A. Chase.
Q. And specifically, what company?
A. Emetech Solutions, Inc.
Q. Mr. Helms, did you receive an inheritance after wiring this $6400?
A. No.
Q. Were you told there were more fees that you had to pay?
A. Yes.
MS. NUTINI: I'd like to publish Government's Exhibit 103-12.
BY MS. NUTINI:
Q. Mr. Helms, can you explain for the jury what we're looking at here.

A. This is the extra fees that was -- had to be paid. It was like for a certificate of trustee and a probate charge and things like that, for a total of $30,925.
Q. So, Mr. Helms, this appears to be from Hall & Hall Chamber -- or at least on Hall & Hall Chamber letterhead; is that correct?
A. Correct.
Q. And who worked at Hall & Hall Chamber?
A. Pierre Delouis.
Q. So fair to say Pierre told you these are the additional fees that you're going to have to owe?
A. Correct.
Q. And after you received this invoice from Pierre, did you communicate with anyone else about it?
A. Yeah, I contacted Peter again to let him know that there was more fees involved and I wasn't so sure I wanted to pay them. I wasn't going to pay at all.
Q. So you're talking with Pierre Delouis, the attorney, through e-mail, correct?
A. Right.
Q. And then at the same time, you're still talking to Peter Pfizer, who told you he worked for the bank, right?
A. Right.
Q. And so you said you expressed some sort of reservations about moving forward?

A. Yep.
Q. And what, if anything, did Peter Pfizer tell you?
A. Peter said that he was willing to pitch in some of it. He was going to pay like -- I don't remember the exact numbers -- 40 percent, and I'd pay 60 percent.
Q. So -- sorry. I didn't mean to cut you off.
A. No, that's fine.
And so whatever that would have come out to be. Like, he was going to pay 10,000; I'd pay 20,000.
Q. So what was your understanding of why Peter Pfizer would help you pay the fees owed to Pierre Delouis, the attorney?
A. Because he wanted to keep it moving along because he stood to collect part of the inheritance also.
MS. NUTINI: Publishing Government's Exhibit 103-13, which has been admitted into evidence.
BY MS. NUTINI:
Q. Mr. Helms, does this appear to be an e-mail exchange between you and peterp968@yahoo.com?
A. It does.
Q. I'd like to direct your attention to the portion I've highlighted. If you can read it for the jury.
A. It says, "Hey, Dale. I wired 10,000 to the lawyer. I have attached the confirmation receipt so you can send it to them."
Q. So Peter is letting you know in this e-mail he sent $10,000 to Pierre Delouis?

A. Correct.
Q. I'm directing your attention to the second page of the document, which is the attachment he provided to you.
What are we looking at here?
A. It's a Barclay Bank. It's a notice that $10,000 had been transferred out of an account there.
Q. So this is the attachment that Peter Pfizer provided to you?
A. Yes. Yes. It said the sender was Peter Pfizer, and then it was going -- the recipient was Emetech Solutions, Inc.
Q. And so is it fair to say this was sort of the proof that Peter Pfizer was providing to you that he sent the $10,000?
A. Correct.
Q. Do you see a circle around the confirmation code?
A. Yes.
Q. And do you also see a scribbled-out account number.
A. Yes.
Q. And this is the way in which you received the document?
A. Yes.
Q. In other words, you did not make these markings, did you, Mr. Helms?
A. I did not, no.
MS. NUTINI: Now publishing Government's Exhibit 103-14, which has been admitted into evidence.
Again, this appears to be an e-mail chain. I'm going

to start from the bottom on page 3.
BY MS. NUTINI:
Q. Mr. Helms, who is this e-mail chain between?
A. It's from me to Hall & Hall regarding the signed document.
Q. And what are you all discussing -- you and Pierre Delouis discussing in these -- in this e-mail chain?
A. We're discussing the rest of the money to be sent and when I was going to be able to do it.
Q. And do you write "I am still working on the money. Do I still have time? That's a lot of money to come up with"?
A. Yes.
Q. How does Pierre Delouis respond to you?
A. He says, "Yes, you still have time. Please, before making the payment, let me know."
Q. And what do you say back to Pierre Delouis?
A. I said, "My partner has already sent 10,000 to the same account today. I'm sending the rest after while when banks open up. Do you want it to go where else?"
Q. Mr. Helms, when you reference "My partner has already sent $10,000," what are you referring to?
A. I'm referring to Peter.
Q. Now directing your attention to page 2 of the document. And this is the response from Pierre Delouis.
Does Pierre Delouis acknowledge that your partner, Peter Pfizer, sent $10,000?

A. Yes. He says, "Your partner has already sent the 10,000 to that account. Not a problem. But the balance should be a cashier's check payable to Globayo, LLC. The address is 2726 Alyssa Drive, Naperville, Illinois."
Q. So, Mr. Helms, is Pierre Delouis directing you where to send the remainder of the payment?
A. The remainder of what I was paying, yes.
Q. Are you familiar with the company Globayo, LLC?
A. Not at all.
Q. And are you familiar with an address of 2726 Alyssa Drive in Naperville, Illinois?
A. No.
Q. Again, do you know why Pierre Delouis was directing you to send money to a business in Illinois?
A. Again, to bypass the fees. It was to send it there so you wouldn't have to pay all the extra fees for international.
Q. That's what you were told?
A. That's what I was under the impression, that that's what they said, yes.
Q. Mr. Helms, how did you respond to Pierre Delouis?
A. "I have a check in hand for $20,925."
Q. And did you have a check for that amount when you sent this e-mail?
A. I did.
Q. Mr. Helms, did Pierre Delouis then e-mail you back and tell

you to send the check to a different address than the Alyssa Drive address?
A. Yes. He said, "Please send it by UPS to 1419 North Harlem Avenue, Suite B, Oak Park, Illinois."
Q. Are you familiar with this address on North Harlem Avenue in Oak Park, Illinois?
A. No.
Q. Did Pierre Delouis provide any explanation as to why you were sending money now to an address in Oak Park, Illinois?
A. There was just a communication error that I was to send it there, and one of his associates would pick it up there.
Q. And, Mr. Helms, was it at all odd to you that the address changed within this e-mail correspondence?
A. Kind of, but at that point, I was -- it was -- it didn't really matter, I guess.
Q. And why do you say it didn't really matter?
A. Well, because I was already into it, and I was like, okay, we've just got to continue finishing it. So I just did whatever they asked me to do.
MS. NUTINI: I'm now going to publish Government's Exhibit 309-A, which is a portion of Government's Exhibit 309, which has been admitted into evidence.
BY MS. NUTINI:
Q. Scrolling to page 3 of the document, Mr. Helms -- and I'm going to blow up a cashier's check -- do you see that in front

of you?
A. Yes.
Q. Do you recognize this cashier's check?
A. Yes.
Q. And what is it?
A. It's a cashier's check made out to Globayo, LLC, for $20,925.
Q. Is this the cashier's check that you got to provide to Globayo?
A. Yes.
Q. And it looks like it's a different bank than the last one; is that correct?
A. Yes.
Q. And why is that?
A. I couldn't get it at my bank, so I went to another bank, and I had -- I had a friend that would help me through his bank to get it.
Q. And why couldn't you get it at your bank?
A. They wouldn't do it. They wasn't so sure that it was --
MR. CARLSON: Objection, Judge.
BY THE WITNESS:
A. -- kosher and up front. So they wouldn't --
THE COURT: I'm sorry. There is an objection pending. Do you want a sidebar?
MR. CARLSON: Yes.

THE COURT: Let's have a sidebar. Go ahead.

Bear with us, folks. We've got a sidebar. That means I've got to talk to the lawyers for a moment. We'll just use these headphones.

There is going to be a white noise machine, so excuse us.

(Proceedings heard at sidebar on the record:)

THE COURT: All right. So I wanted to hear the question again.

And it says, "So why couldn't you get it at your bank?"

Was that the question?

MR. CARLSON: It was, Judge.

THE COURT: What's the objection?

MR. CARLSON: Judge, he is repeating -- it's hearsay what the bank told him -- or what the bank believed is irrelevant and it's hearsay.

THE COURT: All right. Overruled.

(End of sidebar.)

THE COURT: The objection is overruled.

You may proceed.

MS. NUTINI: Thank you, Your Honor.

BY MS. NUTINI:

Q. Mr. Helms, I'll repeat my question.

Why couldn't you get the $20,925 cashier's check from

your bank?
A. Because they believed it was probably fraud, and they wouldn't do it.
Q. And so to be clear, when you got this check from another bank, was this your money?
A. Yes, it was.
Q. And there's a remitter that's referenced.
Do you know this individual?
A. Yes. It was the friend that helped me get -- that's where he banks at, is Choice Bank, and he helped me get the cashier's check. I just gave him a check for the same amount, and he deposited it right in his account there.
Q. Mr. Helms, once you got this $20,000 cashier's check, did you mail it?
A. Yes.
Q. Where did you mail it?
A. I mailed it to that Naperville -- Globayo, LLC, in Naperville -- in Naperville, Illinois.
Q. And so is this the first address that Pierre Delouis directed you to send the payment to?
A. For this payment, yes.
Q. If you recall, the last e-mail, he first directed you to Alyssa Drive, and then he changed the address, correct?
A. Yeah.
Q. So at some point, does it appear he changed it back to the

original address?
A. Yeah.
Q. Mr. Helms, did you retain a copy of the receipt and delivery-related documents for mailing the cashier's check?
A. Yes, I did.
MS. NUTINI: I'd like to publish Government's Exhibit 103-15, which has been admitted into evidence.
BY MS. NUTINI:
Q. What are we looking at here, Mr. Helms?
A. It's a receipt from the UPS store in Grand Forks, North Dakota where I mailed it -- the check. I put it in an envelope -- a package and mailed it to that address from Grand Forks, North Dakota, from the UPS store. And that's the fee it cost me to send it.
Q. And what's the date on this receipt?
A. 6/11 of '20.
Q. Mr. Helms, did you receive your inheritance after mailing this over $20,000 cashier's check?
A. No.
Q. Were you told that you in fact owed more fees?
A. Yes.
Q. At some point, after you made this $6400 payment and this over $20,000 payment, did you begin to question whether this inheritance was real?
A. Yes.

Q. And why is that?
A. Because I wasn't -- every time I made a payment, I was told I'd be getting it, and it never ever come through, so . . .
Q. So what did you do?
A. I -- if I'm not mistaken, I think I got ahold of Peter and told him I was done, I was out.
Q. So at some point, Mr. Helms, did you stop communicating with these individuals?
A. For the most part, except for Peter. He kept -- we kept conversation a little bit and wanting me to stay in. So . . .
Q. Mr. Helms, did you ever get that $6400 back?
A. No.
Q. Did you ever get that $20,925 back?
A. No.
Q. What impact did losing that money have on your life?
MR. CARLSON: Objection.
THE COURT: Overruled.
Go ahead.
BY THE WITNESS:
A. What was the question?
BY MS. NUTINI:
Q. What impact did losing that money have on your life?
A. Oh, it was everything I had. It was my total -- total savings that I had at that point in time.
Q. Mr. Helms, do you know anyone by the name of Anthony

Ibekie?
A. No.
Q. And you testified that you never met Peter Pfizer, correct?
A. Correct.
Q. And you never met Pierre Delouis, did you?
A. No.
Q. Did you ever meet Wyashika Sellar?
A. No.
Q. Did you ever meet any of the individuals that you were e-mailing back and forth with?
A. No.
MS. NUTINI: Thank you. I have no further questions.
THE COURT: Okay. Thank you, Counsel.
Defense Counsel, you may proceed.
MR. CARLSON: Thank you, Judge.

CROSS-EXAMINATION

BY MR. CARLSON:
Q. Mr. Helms --
A. Yes.
Q. -- you didn't know Mr. Ibekie, did you?
A. Pardon?
Q. You didn't know Mr. Ibekie, did you?
A. No.
Q. And you've never talked to him?
A. No.

Q. Never dealt with him?
A. No.
Q. You -- the government showed you all of the documents in Government Exhibit No. 103, and she went through them with you.
You didn't see Mr. Ibekie's name in there anywhere, did you?
A. I don't believe so.
Q. You didn't see his photograph anywhere in there, did you?
A. That gentleman there? No.
Q. You were shown a photograph --
A. Yep.
Q. -- of Mr. -- someone who purported to be Mr. Pfizer, correct?
A. Correct.
Q. That's not Mr. Ibekie's photograph, was it?
A. No.
Q. Would it be fair to say, Mr. Helms, that you didn't even know that Mr. Ibekie existed?
A. Correct.
MR. CARLSON: I have nothing further.
THE COURT: Yeah. Thank you, Mr. Carlson.
Any redirect?
MS. NUTINI: Your Honor, just very briefly.
THE COURT: Okay. Come on up.

REDIRECT EXAMINATION

BY MS. NUTINI:
Q. I'm publishing Government's Exhibit 309-A, Mr. Helms. This is a document we reviewed during your direct examination.
And I'd like to direct you to the address of the entity Globayo, LLC.
Do you see that there?
A. Yes.
Q. And on direct examination, I -- and this is my mistake. I asked you if this is where the check was mailed.
Was I incorrect when I said that the check -- you actually mailed the check to this Alyssa Drive address?
A. Yeah, that's -- the check was made out to that Globekie (phonetic), LLC.
Q. But did you actually mail the check to a different address?
A. Yes, I think I did.
Q. And that was the address that we -- we reviewed previously on Harlem Avenue in Oak Park, Illinois?
A. Oak Park, yep.
Q. And I apologize for that mistake.
MS. NUTINI: Thank you. I have nothing further.
THE COURT: Okay. Very good.
Sir, you may step down.
Thank you for coming.
Please watch your step.
Okay. Thank you, sir. Have a safe trip home.

(Witness excused.)

THE COURT: Members of the jury, what you saw is typically how it works. Someone will call a witness. The other side gets to do cross-examination. And then the party that called the witness gets to do a redirect exam to respond to what happened in cross. All right. So that's a very typical examination.

Counsel may call your next witness.

MS. DeMARCO: Your Honor, the government calls David Petroselli.

THE COURT: Okay.

The court security officer has the disk. I'll have the officer tender it back to the prosecutor.

Thank you.

Let me explain one other thing, folks.

Witnesses don't get to hear other witnesses testify. They have to wait in the hallway. And that means we have to send somebody out into the hallway to go get them. They wait down the hall. So that's why there's a bit of a lag. You don't want witnesses to hear what other people testify except the parties and the party representatives. That's why there is a minute or two of delay, we've got to get the witness.

Come on up, please.

Come up, sir.

Come on up here, please, sir. Come on up here,

please.

You're doing fine.

There you go. Come on up, please, sir.

Good morning.

THE WITNESS: Good morning.

THE COURT: Take a couple steps here.

All right. Sir, I'm going to actually have you have a seat here. Okay?

THE WITNESS: All right.

THE COURT: Good morning to you. Welcome.

All right. Sir, I'm going to need you to raise your right hand, if you would, please.

(Witness sworn.)

THE COURT: All right. Very good, sir.

You can go ahead and spin your chair around, if you could, please.

And there's a microphone right in front of you. Right here (indicating). If you want to take your right hand and feel it right there.

Have you got that, sir?

THE WITNESS: Oh, there we go.

THE COURT: And there is a pitcher of water here, sir, if you'd like something to drink.

Would you like something to drink?

THE WITNESS: No, I don't.

THE COURT: Okay. If you want something to drink, let me know, and I'll get it for you.

THE WITNESS: Okay.

THE COURT: Okay. So the microphone is right in front of you. The prosecutor is right in front of you, and the jury is to your left. There is a court security officer to your left as well, sir.

THE WITNESS: Okay.

THE COURT: Okay? Are you ready to proceed?

THE WITNESS: Yes.

THE COURT: Okay. Very good.

MS. DeMARCO: Okay. Thank you, Your Honor.

DAVID PETROSELLI, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. DeMARCO:

Q. Good morning.

A. Good morning.

Q. Can you please state and spell your name.

A. David Petroselli. David, D-a-v-i-d; Petroselli, P-e-t-r-o-s-e-l-l-i.

Q. How old are you?

A. 78 years old.

Q. And where do you currently live?

A. Glen Ellyn, Illinois.

Q. Are you currently employed?

A. No.
Q. Were you employed before?
A. Yeah. Yes.
Q. What did you do for work?
A. Well, I was a general dentist.
Q. And when did you retire from being a general dentist?
A. Basically, it's -- it's -- it's been around four months.
Q. Okay. Dr. Petroselli, I want to draw your attention to March of 2018.
Were you working at that time?
A. Yes, I was.
Q. Okay. Where were you working?
A. 2018, I was working -- I was working in Carol Stream, Illinois.
Q. Okay. As a dentist?
A. As a dentist.
Q. Okay. Around that time, did you receive a letter in the mail at your job regarding a relative?
A. Yes.
Q. What did the letter say, in summary?
A. The letter -- the letter said in summary that I was -- the relative passed away, and he left money. And I was to -- and I was going to get it if I -- I could get the information.
Q. Okay. Do you remember how much money it was, approximately?

A. Well, it was something like 8 or $9 million, something like that.
Q. Okay. And was the letter from a particular institution or an individual?
A. It was from an individual.
Q. Do you remember that person's name?
A. Not really. I don't remember his name anymore. But he was in charge of getting information.
Q. Did he work for any particular organization or institution?
A. He -- he -- I believe he worked for -- I think he worked for the -- a bank in -- he said in Canada that was holding the money.
Q. Okay. And did you know the relative that you were supposedly related to?
A. No, I didn't know who -- I didn't know him at all.
Q. And what did the letter say you had to do to receive this 8 or $9 million?
A. Well, basically, I had -- I had to -- I had to get some information available and get it to this person, and then he was going to hook me up with a lawyer -- evidently, it was supposed to be in Canada -- that was going to help me obtain this inheritance.
Q. Okay. So just zooming out a bit, did you have to contact this person?
A. Yes. I had to contact him. I -- he gave me -- I believe

he gave me his phone number and the -- and then I contacted him.
Q. Did you contact him by e-mail as well?
A. Yes, I think I did contact him by e-mail as well. There was a phone number to call, and I contacted him by phone and possibly -- and through e-mail when we started communicating.
Q. Okay. And, Dr. Petroselli, just shifting gears for a second, as you sit here today, are you able to read e-mails?
A. Read them? Yes, I can read them with my glasses on and --
Q. Is it difficult for you to read e-mails?
A. Well, it is a little difficult.
Q. Why is that?
A. Well, because I -- my eyesight is -- is not what it used to be, and I have glaucoma. So -- and my eyesight has changed quite a bit.
Q. Okay. Back in March of 2018, were you able to communicate via e-mail?
A. Yes.
Q. Okay.
A. My eyesight was better than it is now.
Q. Okay. So after you responded to this initial letter, did you receive a response back?
A. Yes, I did. And I had to come up with some money to go ahead and -- because I -- I started working with this -- supposedly this lawyer from Canada, and he -- he said I had to

come up with a certain amount of money to pay for -- pay for things that needed to be started to -- to continue this arrangement of getting the -- the inheritance.

Q. Okay. And where did you get the name of the lawyer from that you hired?

A. I got the name from the first person that contacted me. And -- and I can't remember his name right now, but he was the one who -- who sent me the first -- first communication letter.

Q. Okay. And do you remember the lawyer's name?

A. The lawyer's name was Pierre Delouis.

Q. Okay. And once you got the lawyer's name from the initial person who contacted you, it sounds like you contacted the lawyer?

A. Right.

Q. And did you contact him via phone and e-mail or just e-mail?

A. It was through e-mail, and then we -- we did start -- start to communicate through a phone -- phone also.

Q. Okay. Did the lawyer send you any sort of agreement, like a formal agreement to enter into?

A. Yes, and -- and I believe I -- you know, I -- I signed it, and I -- I -- I believe I sent it -- I sent it back to him.

Q. Okay. And was there a discussion of fees in that agreement?

A. Fees?

Q. Yes.
A. No, I'm not -- I -- well, in that agreement, there were certain -- there were -- there were initial fees to -- to get this rolling, to get it going.
Q. Okay. And did you in fact pay a fee?
A. Yes.
Q. Do you remember the amount?
A. Well, the -- the amounts varied, but I think the first amount was something like $12,000.
Q. Okay. And where did you send that fee to?
A. I sent it to -- I believe I sent it to his -- his office, I believe. It was his office address that he had.
Q. Okay. Do you remember where that was?
A. It was in Canada. It was supposedly in Canada.
Q. Okay. Are you -- are you sure you sent it to Canada?
A. Well, I'm now --
Q. Are you having trouble remembering where you sent it?
A. Yeah, I'm not sure where I sent it. I know that there were -- there were other fees that I sent to different places. Some -- some of them were -- were in Canada and some were in the United States.
Q. Okay. Is there anything that would refresh your memory about where exactly you sent that first fee?
A. Well, I know I -- I -- I'm not sure if it was the first fee or not, but I know I sent one to a place called Godmeks in

Lisle, Illinois.
Q. Okay. So you sent one of the payments to Godmeks in Lisle, Illinois?
A. Right.
Q. Okay. Were you familiar with the company Godmeks?
A. No.
Q. Okay.
A. No, I wasn't.
Q. And what was your understanding of why you were making a payment in Illinois when your lawyer was supposedly in Canada?
A. Well, I was just -- you know, I was just following what he wanted me to do. I didn't know why he -- he had me sending money to a couple other places, too. So I just assumed that's what -- what -- how he did his business.
Q. Did you make other payments in Illinois?
A. I think I sent one to Rockford, Illinois, and -- and -- and I'm not sure if I sent one to some other place in Illinois besides Lisle. There were other places that I sent money to. It wasn't -- just some different states.
Q. Okay. So after that initial retainer agreement, did you make another payment?
A. Yeah. So I did -- I did make some more payments, and I -- I -- I made a payment to -- I forget who -- who -- actually who it was, but it turned out that the -- the person who was -- it was in -- it was the person that had the -- the money was

transporting it to someplace in Virginia, and he got arrested.
Q. Okay.
A. And so -- and so that's when I found out that this whole thing was really a scam.
Q. And, Dr. Petroselli, are you familiar with a company called Samcord?
A. I -- I believe that was -- that might have been the place that I sent some money to.
That's -- that's in Chicago somewhere or local?
Q. Do you remember sending money to Chicago?
A. I believe I sent something to that -- to that company, Samcord.
Q. Okay.
A. Yes.
Q. Okay. And, Dr. Petroselli, did you ever receive this inheritance?
A. No. No. I never received any inheritance.
Q. Did you eventually learn that there was no inheritance?
A. Yes.
MS. DeMARCO: Can I have one moment, Your Honor?
THE COURT: You may.
MS. DeMARCO: No further questions.
THE COURT: All right. Very good.
Counsel for the defense.

CROSS-EXAMINATION

BY MR. CARLSON:
Q. Dr. Petroselli, is it fair to say that you never met an individual named Anthony Ibekie?
A. Say that name again, please.
Q. Anthony Ibekie.
A. No, I have never met him, that person.
Q. Would it be fair to say that you've never even interacted with Anthony Ibekie?
A. No, I've never interacted with -- with -- well, I -- I'm not sure if he was one of the people that was in -- in the -- Godmeks, but I -- that's the only interaction I've had with -- with him if he was in -- within Godmeks.
Q. Dr. Petroselli, do you remember testifying before the grand jury?
A. Do I remember testifying?
Q. Yes. Back in October of 2020 in this building.
A. 2020? I -- was it regarding -- regarding this -- this inheritance? Was it regarding this --
Q. Yes --
A. -- inheritance?
Q. -- regarding this.
A. In 2020? Actually, I do not remember that occasion.
Was that a one-time that I was here?
Q. The government served you with a subpoena to testify before the federal grand jury.

Do you remember that?
A. Yeah, I think so. Yeah, I think I remember that now in 2020.
Q. And when you testified before the federal grand jury, do you recall telling the grand -- and when you were before that grand jury, you were sworn to tell the truth; isn't that correct?
A. Correct.
Q. And you did tell the truth, correct?
A. Yes, I did.
Q. And do you recall being -- do you recall saying, "I do not know nor have I ever knowingly interacted with any individual named Anthony Emeka Ibekie"?
A. Well, I -- I guess I -- I -- I'm not sure I know who he's connected with, but I guess I didn't interact with him because I don't -- I never -- I never met the man. So, no, I didn't -- I didn't interact with him.
MR. CARLSON: I have no further questions.
THE COURT: Thank you, Mr. Carlson.
Does the government have any redirect?
MS. DeMARCO: No, Your Honor.
THE COURT: All right. Very good.
Mr. Petroselli, you may step down, sir. Thank you for coming.
Before you go down, I'll say this: In light of your

glaucoma, I want to make sure you walk out safely. The court security officer is going to help you off the stand and help you out of the courtroom. There are a lot of wires and things in here, and we don't want anybody to trip. Okay, sir?

THE WITNESS: Okay.

THE COURT: All right. Thank you.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: All right. The government may call its next witness.

MS. DeMARCO: Thank you, Your Honor.

The government calls Amy Mansker.

THE COURT: Okay. Ms. Mansker, come on up.

(Witness sworn.)

THE COURT: Very good. Have a seat, please.

Good morning.

THE WITNESS: Good morning.

THE COURT: You know the drill. Please speak into the microphone so that all the men and women of the jury can hear you. And help yourself to a water if you need it.

THE WITNESS: Yes, Your Honor.

THE COURT: Very good.

Counsel, you may proceed.

MS. DeMARCO: Thank you, Judge.

AMY MANSKER, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. DeMARCO:

Q. Can you please state and spell your name for the record.

A. Yes.

Amy Mansker, A-m-y M-a-n-s-k-e-r.

Q. Are you currently employed?

A. Yes, I am.

Q. Where do you work?

A. I work at Internal Revenue Service Criminal Investigation.

Q. What's your position?

A. I'm a special agent.

Q. Okay. And do you commonly refer to IRS Criminal Investigations as IRSCI?

A. Yes.

Q. How long have you been an agent with IRSCI?

A. A little over seven years, since approximately 2016.

Q. Can you summarize your job responsibilities.

A. I investigate potential criminal violations of the tax code and other related financial crime, such as money laundering.

Q. Is there a difference between IRS special agent and a revenue agent?

A. Yes, there is.

Q. What's the differential?

A. So a special agent is on the criminal investigation side of the Internal Revenue Service. And a revenue agent is on what

we commonly refer to as the civil side of the Internal Revenue Service.

So a special agent is a law enforcement agent, and we investigate criminal violations. A revenue agent is on the civil side, and they are involved in more of the public-facing type of responsibilities that you typically think of with the IRS. So they'll perform audits, assess, you know, any kind of tax due and owing, correct any kind of mistakes on filings, or just help the general public with filing their taxes.

That is not something that we do on the criminal investigation side. In fact, like, the majority of the time, you're going to -- if you're the general public, you'll be dealing with the civil side, which would be the revenue agents. The general public, in most circumstances, are not going to come into contact with the criminal investigation side unless we are actually looking at some sort of intentional criminal act.

Q. Before joining the IRS, did you work in law enforcement?
A. Yes, I did.
Q. What did you do?
A. I was a police officer.
Q. How long were you a police officer?
A. Approximately two years.
Q. Okay. I want to draw your attention now to May of 2019.
Were you assigned to an investigation at that time?

A. Yes, I was.
Q. What was the nature of the investigation?
A. We were investigating a fraudulent inheritance scheme.
Q. What were your job responsibilities vis-à-vis that investigation?
A. So just trying to identify individuals that were a focus of the investigation. I was reviewing bank records, speaking with potential victims or witnesses, and just conducting analysis and following leads.
Q. Did you eventually become a case agent on the investigation?
A. Yes, I did.
Q. What does it mean to be a case agent?
A. A case agent is -- is essentially just the primary agent on the investigation. So it's one of the main agents for the case.
So in our investigations, a lot of times they're collaborative efforts, and we'll have other agents assist or help. You know, they might help with interviews or things like that.
But a case agent is really the one that is investigating the -- the crime, identifying leads, and trying to determine, you know, next steps in the case.
Q. Were there eventually other case agents on this particular investigation?

A. Yes, there were.
Q. Who were they?
A. Christopher Kadonsky, also with IS Criminal Investigation, and Sixto Luciano with Homeland Security Investigations.
Q. Generally speaking, what kinds of investigative tools do agents use in investigations?
A. We use a variety of different investigative techniques. It can be an investigative trash pool, subpoenas, looking at publicly available open source information, using law enforcement databases. We conduct undercover operations, search warrants, a variety of different tools.
Q. And at the time that you joined this investigation, had some of those tools already been employed?
A. Yes.
Q. Okay. Which ones?
A. Trash pool.
Q. Okay. Okay. And you mentioned that it was an inheritance fraud investigation?
A. That's correct.
Q. Can you give an overview of what an inheritance fraud scheme is.
A. Yeah, an inheritance fraud scheme is essentially when a victim is contacted, they're told that somebody has passed away without a beneficiary. They're looking for next of kin to claim a large sum of money. And essentially, that victim is

that next of kin that they're trying to help claim that inheritance.

The entire thing is a ruse designed specifically to defraud victims out of money. There is no inheritance. There never was an inheritance. The entire thing is a lie.

Q. And in the course of investigating this particular scheme, did you come to learn that there were several steps that played out with several victims?

A. Yes.

Q. Okay. So let's take them kind of one by one.

What's step one of this scheme?

A. Step one is that a victim or a potential victim receives an unsolicited letter in the mail. And so that letter provides some information to that victim. It tells the victim that there's this inheritance that is left behind, somebody that happens to share the same last name as the victim has passed away, and they do not have next of kin and there's no beneficiary on a bank account that contains a substantial amount of money, in the millions.

And so this letter purports to be from someone at the bank that -- where that account is being held. And the letter offers to help the victim claim this money that does not have a beneficiary.

The letter also provides contact information for this individual posing as the bank representative and instructs the

victim to contact them through e-mail.
Q. Okay. And then what's step two once the initial letter has been sent and received?
A. So step two is when the victim then in fact responds to the letter via e-mail. And they respond to the e-mail address that is in the letter, indicating that they want to move forward with claiming the inheritance.
Q. Okay. And in this scheme, were there certain names used in the initial letter?
A. Yes.
Q. What were those names, some of them?
A. We frequently saw Peter Pfizer associated with Standard Chartered Bank and John Delon associated with TD Canada Trust Bank.
Q. Okay. And are Standard Charter and TD Canada Trust actual banks?
A. Yes, they are.
Q. Okay. And in the course of your investigation, did you ever learn whether a Peter Pfizer ever worked at either of these banks?
A. We did.
Q. Did he?
A. No, he did not.
Q. Okay. So what's the next step in the process? What's step three?

A. After the victim responds to the letter, then the scammers start corresponding with the victim through phone or e-mail or both, and they continue to provide additional instructions. And some of those instructions include filling out bank questionnaires, filling out applications, filling out nondisclosure agreements, essentially documentation that is intended to sort of legitimize this inheritance claim.
Q. Okay. And so by step three, has any money been demanded?
A. No.
Q. Okay. So what's the next step after the back-and-forth with the documentation?
A. Eventually, in step four, the victim is then instructed to retain an attorney. And the individuals that are posing as bank representatives provide a name to the individual, Pierre Delouis, as an attorney that they should use and retain for these services. They instruct the victim to then contact the attorney and retain their services.
Q. Did you ever learn in the course of the investigation whether Pierre Delouis is actually a licensed attorney in Canada?
A. We did.
Q. Is he?
A. He is not.
Q. Okay. And what's the final step?
A. The final step is then the victim is instructed to send

money. Usually, it's through a wire transfer to a bank account in the name of a fictitious business or sending the money through a cashier's check, in which the scammers provide the victim an address of where to send that cashier's check to.

And ultimately, those funds get deposited into various different bank accounts under different fictitious business names.

Once the victim sends money, the scammers then come back and provide additional information, requests that they need to send money for other things. There's additional fees, there's liens against the inheritance, just other variations of different ruses to get them to send more money.

Each time they ask for more money, the amount increases each time. And this essentially continues in sort of this cycle until the victim just stops sending money. And ultimately, they never receive an inheritance.

Q. Okay. I want to switch gears slightly now.

Once you joined the investigation, did you become familiar with people and places that were involved in the investigation?

A. Yes, I did.

Q. Okay.

MS. DeMARCO: Okay. And this is not published to the jury, correct?

Okay. So I'm showing the witness just a series of

photos.

BY MS. DeMARCO:

Q. I'm showing you Government Exhibit 701, 702, 703, 704, 705, 723, 713, 714, 715, 716, and 717.

Special Agent, did you recognize the photos I just showed you?

A. Yes.

Q. What do you recognize them to be?

A. These are photos of either people or places that were focuses of our investigation.

Q. Have you reviewed them before trial?

A. Yes.

Q. Do they all contain fair and accurate photos of people and places that you're going to testify about today?

A. Yes.

MS. DeMARCO: The government moves to admit Exhibits 701 through 705, 713 through 717, and 723.

THE COURT: Any objection?

MR. CARLSON: No objection.

THE COURT: All right. They're admitted.

(Aforementioned exhibits received in evidence.),

THE COURT: You can publish to the jury.

MS. DeMARCO: Thank you, Your Honor.

THE COURT: Folks, "publish to the jury" is a fancy way of saying the jury can see it. That's all it means. I

don't know why the lingo is the way it is, but that's what it is, "publish to the jury."

They can see it.

Go ahead.

MS. DeMARCO: Thank you, Judge.

BY MS. DeMARCO:

Q. Special Agent, I'm showing you what's been marked as Government Exhibit 701.

Do you recognize this photo?

A. Yes, I do.

Q. Who is it?

A. This is the defendant, Anthony Ibekie.

Q. Okay. And if you saw Anthony Ibekie in person, would you recognize him?

A. Yes.

Q. Do you see him in the courtroom?

MR. CARLSON: Judge, we'd stipulate that Ms. Mansker could identify Mr. Ibekie.

THE COURT: Okay. Well, she can go ahead and do that.

Go ahead.

BY THE WITNESS:

A. Yes, Anthony Ibekie is the individual sitting at the defense counsel table wearing the blue shirt and the gold tie.

MS. DeMARCO: So let the record, please, reflect that the witness has identified the defendant.

THE COURT: Yes.
BY MS. DeMARCO:
Q. Okay. I'm now showing you Government Exhibit 702.
Do you recognize this individual?
A. Yes, I do.
Q. Who is this?
A. This is Samuel Aniukwu.
Q. And who is Samuel Aniukwu as it relates to this investigation?
A. This is an individual that was another focus of our investigation and also resided with the defendant.
Q. Okay. I'm showing you Government Exhibit 703.
Do you recognize this person?
A. Yes, I do.
Q. Who is this?
A. Jennifer Gosha.
Q. Who is Jennifer Gosha as it relates to the investigation?
A. This is another individual that was a focus of our investigation.
Q. I'm showing you Government Exhibit 704.
Do you recognize this person?
A. Yes.
Q. Who is this?
A. Ebuka Egbunam.
Q. Who is Ebuka Egbunam?

A. Ebuka Egbunam is the defendant's son.
Q. And what is his relation to the investigation?
A. He was also an individual that was the focus of the investigation.
Q. I'm showing you Government Exhibit 705.
Do you recognize this person?
A. Yes, I do.
Q. Who is this?
A. This is Tonyanika Fogle.
Q. Who is Tonyanika Fogle?
A. This is the defendant's ex-wife and also an individual that opened one of the bank accounts that was the focus of the investigation.
Q. Okay. And we'll talk about that a bit more in a bit.
I'm showing you Government Exhibit 723.
Do you recognize this person?
A. Yes.
Q. Who is this?
A. Vincent Izuegbu.
Q. And who is Vincent Izuegbu?
A. This is an individual that is an associate of Anthony Ibekie and another individual that opened a bank account related to the investigation.
Q. Okay.
MS. DeMARCO: At this time, Your Honor, I would ask

you to read Stipulation 10.

THE COURT: Okay.

All right. Members of the jury, earlier we heard Stipulation No. 1. I read it into the record. We are now going to read another stipulation. It's Stipulation No. 10.

And we'll pull it up on the screen, and we'll blow it up so everyone can see it.

Okay. Can everybody see that on the screen?

All right. I'm now going to read Stipulation No. 10 into the record.

Stipulation No. 10:

From at least 2016 to April 2019, Anthony Ibekie lived at 5206 Lincoln Avenue, Lisle, Illinois. Samuel Aniukwu lived in this house with Ibekie. Ebuka Egbunam also lived in this house at various times.

Beginning in spring of 2019, Anthony Ibekie lived at 2726 Alyssa Drive, Naperville, Illinois. Ibekie rented the house. Aniukwu lived in this house with Ibekie. Egbunam also lived in this house at various times.

In November 2019, Aniukwu left the Alyssa Drive house in Naperville and moved into 716 South Weber Road, Unit 512, Romeoville, Illinois, where he lived alone through July of 2020.

At the end of December 2019 or early January 2020, Anthony Ibekie moved from the Alyssa Drive house in Naperville

to 797 Oxbow Avenue, Unit 110, Oswego, Illinois. He lived in this apartment through July of 2020. Egbunam lived in the apartment with Ibekie at various times.

From at least 2016 to July of 2020, Jennifer Gosha resided at 1419 North Harlem Avenue, Apartment B, Oak Park, Illinois.

And we'll turn to the page.

It says "So stipulated." There are signatures there from a representative of the United States government, from Kent Carlson, defense counsel, and from defendant, Anthony Ibekie.

So stipulated?

MS. NUTINI: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: Okay. Thank you.

MS. DeMARCO: Thank you, Judge.

And can I publish to the jury again?

THE COURT: You may.

MS. DeMARCO: Thank you.

BY MS. DeMARCO:

Q. Okay. Special Agent Mansker, I'm showing you Government Exhibit 713.

Let me blow this up a little.

Do you recognize this photo?

A. Yes, I do.

Q. What is it?
A. This is a residence located at 5206 Lincoln Avenue in Lisle, Illinois.
Q. Okay. And I know we just heard this in the stipulation, but who lived there?
A. Anthony Ibekie lived there, as well as Samuel Aniukwu and, at times, Ebuka Egbunam.
Q. Okay. And showing you Government Exhibit 714.
Do you recognize this exhibit?
A. Yes, I do.
Q. What is it?
A. This is a residence located at 2726 Alyssa Drive in Naperville, Illinois.
Q. Okay. And who lived there?
A. Again, Anthony Ibekie resided there with Samuel Aniukwu and Ebuka Egbunam at times.
Q. And showing you Government Exhibit 715.
Do you recognize these photos?
A. Yes, I do.
Q. What are they?
A. This is the residence at 797 Oxbow Avenue, Unit 110, in Oswego, Illinois.
Q. Okay. And who lived there?
A. Anthony Ibekie and Ebuka Egbunam.
Q. Okay. So in Lisle and Naperville, Aniukwu, the defendant,

and Mr. Egbunam all lived. And then at this point, they split residences. Mr. Egbunam and the defendant moved to Oswego, and Mr. Aniukwu does not move with them?
A. That's correct.
Q. Okay. Showing you Government Exhibit 716.
What are these photos?
A. This is a residence located at 716 South Weber Road, Unit 512, in Romeoville, Illinois.
Q. And who lived in Romeoville?
A. Samuel Aniukwu.
Q. I'm showing you 717.
Do you recognize this photo?
A. Yes, I do.
Q. What is this?
A. This is a residence located at 1419 North Harlem Avenue, Apartment B, in Oak Park, Illinois.
Q. And who lived there?
A. Jennifer Gosha.
Q. Okay.
MS. DeMARCO: Judge, I'm at a logical stopping point if now is a good time. I could also keep going.
THE COURT: No, this is perfect.
Folks, we're now going to take our lunch break. I've encouraged the lawyers for all the parties to tell me when they're at a logical stopping point for lunch. We usually take

a break, frankly, probably like 12:15, 12:30, somewhere in there.

So thank you, Counsel, for flagging that you're at a logical stopping point.

It is 12:13. We're going to take a break for an hour. We're going to come back -- and I'll ask you to be in the jury room by 1:15, and we'll get rolling right away.

Please take your jury notebooks with you and leave them in the jury room. You folks are on your own for lunch. We provide the morning breakfast, but we don't provide lunch for people. I wish we could, but we can't. I'm sorry. You're on your own.

There is a cafeteria on the second floor. There is lots of places around and about the area. If you'd like to go for a walk, you can. If you want to experience temperatures that are at least 25 degrees hotter than what it is in this courtroom, you can go for a walk outside. But we will need you back in an hour.

Enjoy your lunch break, folks.

A couple quick reminders. You know this already. You can't talk to anyone about the case, even each other. Do please keep an open mind. Enjoy your lunch. We'll talk to you in about an hour.

Thank you, folks.

THE CLERK: All rise.

(Jury out at 12:14 p.m.)

THE COURT: You can step down.

Don't talk to anyone about the substance of your testimony.

THE WITNESS: Yes.

THE COURT: All right. Step down.

(Witness exits the witness stand.)

THE COURT: Have a seat, everyone.

Thank you, Ms. DeMarco. That was the right thing to do. I appreciate you flagging the logical stopping point.

MS. DeMARCO: No problem, Judge. We were about to get into bank records. So I --

THE COURT: Yeah. No, I think --

MS. DeMARCO: -- didn't --

THE COURT: -- that's perfect.

MS. DeMARCO: -- want them on an empty stomach.

THE COURT: I want both sides to do that.

Mr. Carlson, you do the exact same thing. Whenever you're at a good spot, you know, in any of your exams, you know, feel free to speak up.

You know, candidly, anytime you get much beyond 12:15, jurors start looking at the clock and start getting hungry.

So I'm glad you spoke up.

I only have a couple quick things, and then we'll let you folks take a lunch break.

For demonstratives, I would like you to file them on the docket. So, for example, the government had some demonstratives in their openings. Perfectly fine. I'd like you to file it on the docket. It's a way of making a public record of what the jury saw. And you never know when it's going to be helpful someday to have it, either because of this case or some future case.

But I sometimes, frankly -- when I am going through a trial, I like to go back and look at demonstratives that anybody has. So if you'd be kind enough to do that. I'd like you to do it the day of the demonstration -- the day of the use of the demonstratives.

And then just a quick reminder before I forget, at the end of every day, I require the parties to file an agreed list of admitted exhibits.

Let me just summarize again what I need.

It should just have the case caption on it, and then it should be called something like "The Agreed List of Admitted Exhibits." And it should just have a simple table. It should have -- first column, it should have the exhibit number, and then the next column should be the date of admission, and the next column should be a short description. It doesn't have to be fancy; it just has to be a clean record of what's admitted, when it was admitted, and what it is.

And the protocol is the party that is in the process

of calling the witnesses has the obligation to prepare it and send it to the other side and file it.

So, for example, at the end of the day today, either Ms. Nutini or Ms. DeMarco will need to send the agreed list to Mr. Carlson. Make sure he's on board with it.

Mr. Carlson, I'm going to ask you to double-check and make sure it's complete. We want to make sure it doesn't have anything that it doesn't have. So that's going to be my way of double-checking that we've got a list of what's admitted.

And as soon as Mr. Carlson gives you any feedback or gives you the green light, I'd like you to go ahead and file it on the docket.

I promise you, at the end of the trial, you will be glad we've done this every day. That way, you're not scrambling around wondering what's in, what's out, whether you put something in the record or not. It will be a nice clean record of what was presented at trial, when it was presented.

The last thing you want to think about before closings is what was admitted. Right? So it will be helpful to you, I think. It's a little bit of a pain as trial rolls along, but you'll be glad when the trial is over that you've got it.

Does that sound okay, everybody?

MR. CARLSON: It's fine, Judge.

MS. NUTINI: It does, Your Honor.

THE COURT: All right. Anything anyone wants to

raise?

MS. NUTINI: Nothing from the government.

MR. CARLSON: No.

THE COURT: I enjoyed the Buffalo Springfield reference. I'll tell you, Stevie Nicks has an outstanding version of that song, you know --

MR. CARLSON: I'll have to look at it.

THE COURT: -- that I heard her sing at Ravinia last year. She was outstanding.

So we'll, folks, see you in about an hour. I'll plan to roll out here at about 1:10.

If you need me anytime before then, let me know, but otherwise, we'll see you at about 1:10, give or take. Okay?

Thank you, folks.

THE CLERK: All rise.

(Recess at 12:18 p.m., until 12:18 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ) Case No. 20 CR 352
)
v. )
)
ANTHONY EMEKA IBEKIE, ) Chicago, Illinois
) June 18, 2024
Defendant. ) 1:25 p.m.

TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. PAIGE NUTINI
MS. MEGAN DeMARCO
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For the Defendant: KENT R. CARLSON & ASSOCIATES, P.C.
BY: MR. KENT R. CARLSON
53 W. Jackson Boulevard, Suite 1523
Chicago, Illinois 60604

Also Present: MS. AMY MANSKER, Special Agent
IRS Criminal Investigations

MR. CHRISTOPHER KADONSKY, Special Agent
IRS Criminal Investigations

Court Reporter: AMY M. KLEYNHANS, CSR, RPR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 2318A
Chicago, Illinois 60604
Telephone: (312) 818-6531
amy_kleynhans@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out; defendant present:)

THE COURT: Everybody ready for the jury?

MS. NUTINI: Yes, your Honor.

THE COURT: Let's get the jury.

(Jury in at 1:27 p.m.)

THE COURT: All right. Have a seat, everyone. Welcome back from lunch.

Counsel, you may continue with your examination.

MS. DeMARCO: Thank you, Judge.

Can I publish to the jury, please? Thank you.

AMY MANSKER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,

DIRECT EXAMINATION (Resumed)

BY MS. DeMARCO:

Q. Special Agent, I'm showing you Government Exhibit 309A, which we've seen already today. Before the lunch you were testifying about some addresses?

A. That's correct.

Q. What is the significance of this address here?

A. This is 2726 Alyssa Drive, Naperville, Illinois. That is the residence where the defendant resided.

Q. Okay. And I should ask you, too, do you recognize this check?

A. Yes, I do.

Q. What is it?

A. This is a check that was obtained on behalf of Dale Helms that was later deposited into the Globayo LLC bank account.
Q. Where was this check mailed?
A. It was mailed to 1419 North Harlem Avenue, Apartment B, in Oak Park, Illinois.
Q. And then you testified about that address earlier as well?
A. Yes.
Q. Who lived there?
A. Jennifer Gosha.
Q. Okay. I want to switch gears a bit now and talk to you about some of the records that you gathered in the course of your investigation.
Did you come to learn that there were certain business entities that were connected to the inheritance fraud scheme that you were investigating?
A. Yes, I did.
Q. What was the role of the business entities?
A. The business entities were created essentially for the purpose of being able to open bank accounts so that the bank accounts could receive money from the victims.
Q. And did each of these businesses have to incorporate with the Illinois Secretary of State?
A. Yes, they did.
Q. Can you tell the jury, what does it mean to incorporate with the Secretary of State?

A. Basically it just means to register the business name with the state. That's pretty much it.

Q. Is there certain information that's provided?

A. Yes.

Q. What is the example of that information?

A. Some of the information would be like the business name, the registered agent that is registering the business, potentially the incorporator of the business. They might also list board of directors or officers that are involved with the business, and then also like the business address.

Q. And in the course of the investigation, did you subpoena those Secretary of State records for certain entities?

A. Yes, I did.

Q. Why did you do that?

A. We were just -- we -- we believed that those businesses were associated with the inheritance fraud scheme. And obtaining those records, we were wanting to obtain more information about who may be involved with those businesses or where some of those businesses may be purportedly to be located.

MS. DeMARCO: Okay. And, your Honor, could I ask you to please read Stipulation No. 2.

THE COURT: Okay. Folks, you've heard a couple stipulations already. We're going to read another stipulation as well. This is going to be Stipulation No. 2. Ms. Ramos

will put it on the screen. It's page 4 of 22.

Can everybody see that okay? No, not yet?

Very good. Here we go. Stipulation No. 2.

If called to testify, a records custodian from the Illinois Secretary of State, ILSOS, would testify that, as a custodian of records, his or her responsibilities include maintaining and retrieving records of the ILSOS, including business incorporation records.

The records custodian would further testify that:

No. 1, the business incorporation records comprising the government exhibits listed below were made by a person with knowledge of, or made with information transmitted by a person with knowledge of, the acts or events appearing on the records.

No. 2. The records were made at or near the time of the acts or events appearing on the records.

No. 3. It was the regular practice of the entities listed below to make such records, and;

No. 4. The records were kept in the ordinary course of the regularly conducted activities of the entities listed below.

The parties agree that Government Exhibits 401 through 409, which are described more fully below, are admissible in evidence.

And you will see there, folks, there's a chart there that has two columns. The left column says "government exhibit

number." The right column says "descriptions." Let me just read it.

Government Exhibit 401 is for Berger Services, Incorporated. Government Exhibit 402 is for Emetecon Solutions, Inc. Government Exhibit 403 is for Esijemine Lucky Nengite, Incorporated. Government Exhibit No. 404 is for Globayo LLC. Government Exhibit 405 is for Godmeks, Inc. That's G-o-d-m-e-k-s. Government Exhibit 406 is for Jenant, Incorporated. Government Exhibit 406 is for Samcord, Incorporated. 407, I'm sorry.

Let me say that again, folks. Excuse me if I said that wrong, everybody.

Government Exhibit 406 is for Jenant, Incorporated. That's J-e-n-a-n-t, Inc. Government Exhibit 407 is for Samcord, Incorporated, spelled S-a-m-c-o-r-d. Government Exhibit 408 is for Setraco Services, Inc. Setraco is spelled S-e-t-r-a-c-o. Government Exhibit 409 is for Samtoni Medical Equipment, Incorporated. Samtoni is spelled S-a-m-t-o-n-i.

Let me go through a couple other spellings.

Emetech was spelled E-m-e-t-e-c-h. That's for Government Exhibit 402. For Government Exhibit 403, Esijemine was spelled E-s-i-j-e-m-i-n-e. And one other spelling for the sake of the record, Government Exhibit 404 for Globayo. Globayo is spelled G-l-o-b-a-y-o.

If you go to the next page it says "so stipulated."

There are signatures for the U.S. Attorney's office, for defendant Ibekie's counsel, and for defendant Anthony Ibekie.

So stipulated?

MS. DeMARCO: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: All right. You made proceed, Counsel.

MS. DeMARCO: Thank you, your Honor. At this time the government moves to admit Exhibits 401 through 409 into evidence.

THE COURT: Any objection?

MR. CARLSON: No objection.

THE COURT: All right. It's admitted. You can publish to the jury.

Folks, that's another way of saying they've been admitted into evidence. The exhibits that you just heard about, the foundation for them, they're now admitted into evidence, and you can consider them as part of your verdict.

Go ahead.

MS. DeMARCO: Thank you, Judge.

BY MS. DeMARCO:

Q. Special Agent, I'm going to just publish the first page of each of these, and if you could just briefly describe what we're looking at. I'm showing you Government Exhibit 401.

A. Yes. This is Articles of Incorporation for Berger Services, Incorporated.

Q. And Government Exhibit 402?
A. Articles of Incorporation for Emetech Solutions, Incorporated.
Q. Okay. And we'll talk about these in more detail in a moment.
Government Exhibit 403?
A. Certificate of Dissolution of Domestic Corporation for Esijemine Lucky Nengite, Incorporated.
Q. And is the Articles of Incorporation also there?
A. Yes.
Q. That's the third page of Government Exhibit 403.
Government Exhibit 404?
A. Articles of Incorporation for Esijemine Lucky Nengite, Incorporated.
Q. Government Exhibit 405?
A. Articles of Organization for a limited liability company for Globayo, LLC.
Q. I'm sorry, this is Government Exhibit 404. Now showing you Government Exhibit 405.
A. Certificate of Dissolution of Domestic Corporation for Godmeks, Incorporated.
Q. Okay. And scrolling down to the third page of this exhibit?
A. This would be the Articles of Incorporation also for Godmeks, Incorporated.

Q. Okay. Government Exhibit -- that's still 405.
Showing you Government Exhibit 406.
A. Articles of Incorporation for Jenant, Incorporated.
Q. 407?
A. Certificate of Dissolution for Domestic Corporation for Samcord, Incorporated.
Q. And this is the third page of Exhibit 407?
A. This would be the Articles of Incorporation for Samcord, Incorporated.
Q. Government Exhibit 408?
A. Articles of Incorporation for Setraco Services, Incorporated.
Q. And Government Exhibit 409?
A. The Certificate of Dissolution of Domestic Corporation for Samtoni Medical Equipment, Incorporated.
Q. And the third page of Government Exhibit 409?
A. This is the Articles of Incorporation for Samtoni Medical Equipment, Incorporated.
Q. Okay. In preparation for trial, were you asked to review all of these records and prepare a chart summarizing their contents?
A. Yes.
Q. How did you do that?
A. I obtained the records from the Illinois Secretary of State. I reviewed those records for any relevant information

and then summarized that information into a chart.
Q. Can I publish just to the witness, please?
Special Agent, I'm showing you what's been marked as Government Exhibit 1101. Do you recognize this exhibit?
A. Yes, I do.
Q. What do you recognize it to be?
A. This is the summary chart of the Illinois Secretary of State information.
Q. Does this summary chart contain fair and accurate information that you gleaned from the Secretary of State records?
A. Yes, it does.
MS. DeMARCO: The government moves to admit Exhibit 1101 into evidence.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: It's admitted. You can publish to the jury.
MS. DeMARCO: Thank you, Judge.
(Government's Exhibit No. 1101 was received in evidence.)
BY MS. DeMARCO:
Q. Okay. Can you tell us what we're looking at here? What are each of these columns?
A. Sure. So the first column is just the government exhibit number. The second column is the name of the entity, the

business entity. The third column is the date that business entity was registered with Illinois Secretary of State. The fourth column is the registered agent and the incorporator that was listed on the Illinois Secretary of State records. And the last column is the address associated with that business entity.
Q. Okay. And then I'd ask you to please go through each line of this for the jury. So starting with the first line, which correlates to Government Exhibit 404.
A. Government Exhibit 404, the entity name is Globayo LLC. It was registered on June 1st of 2017. The registered agent and the incorporator for the business was Vincent Izuegbu. And the address associated with the business was 3258 West 85th Place in Chicago, Illinois.
Q. Okay. So we looked at a reference to Globayo LLC earlier; is that right?
A. That's correct.
Q. Where did we see that?
A. That is a business entity that Dale Helms sent money to.
Q. Okay. And who is Vincent Izuegbu?
A. Vincent Izuegbu is an associate of the defendant.
Q. Okay. And is there any significance to the 85th Place in Chicago address?
A. Not that I'm aware of.
Q. Okay. Okay. And then can you please read the second line

correlating to Government Exhibit 409?
A. Government Exhibit 409 for Samtoni Medical Equipment, Incorporated. It was registered on November 1st of 2017. The registered agent and incorporator were both Samuel Aniukwu. And the address is 5206 Lincoln Avenue in Lisle, Illinois.
Q. What's the significance of 5206 Lincoln Avenue, Lisle, Illinois?
A. That is the residence that the defendant resided at with Samuel Aniukwu.
Q. Okay. Can you remind the jury who Samuel Aniukwu is again?
A. Yes. Samuel Aniukwu is just another individual that was a focus of the investigation. An associate of the defendant.
Q. Is there anything significant to you about the name Samtoni?
A. Yes. The Samtoni name appears to be sort of a merging of the first names, shortening and merging of the first names of Samuel Aniukwu and Anthony Ibekie. So Samuel, Sam. Anthony, Toni. Samtoni.
Q. Okay. Can you please go to the third line correlating to Government Exhibit 405.
A. Government Exhibit 450, GodMEKS, Incorporated, registered on April 13, 2018. The registered agent and incorporator were Uchenna Ani Samuel. And the address was 5206 Lincoln Avenue, Unit 1A in Lisle, Illinois.
Q. Who is Uchenna Ani Samuel?

A. This is an alias that is used by Samuel Aniukwu.
Q. And is there anything significant to you about the name Godmeks?
A. The Godmeks appears to be a merging of a portion of the defendant's father's name, as well as a portion of the defendant's middle name. So Godfrey is Anthony Ibekie's father. And then the defendant's middle name is Meka. So Godfrey, God. And Meka, meks. Godmeks.
Q. Okay. And then I think we're at 407.
A. Government Exhibit 407, Samcord, Incorporated was registered on June 5, 2018. The registered agent and incorporator, Emeka Toni Ibe. And then that was the registered agent. The incorporator just appears to be a reordering of those names: Emeka Ibe Toni. And then the address was 4935 Washington Boulevard, Unit 2 in Chicago, Illinois.
Q. What is Emeka Toni Ibe?
A. That is an alias of the defendant.
Q. How do you know that?
A. We seized a passport from the defendant's residence during a search warrant, and that passport contained the name Toni Ibe Emeka. And there was a photograph of the defendant on that passport.
Q. We'll talk more about the search warrant later.
Okay. Line 403.
A. 403. Esijemine Lucky Nengite, Incorporated, registered on

July 9, 2018. The registered agent was Emeka Ibekie. And the incorporated was Sulaiman Adedotun. The address was 5206 Lincoln Avenue in Lisle, Illinois.
Q. Who is Sulaiman Adedotun?
A. This is an alias of Samuel Aniukwu.
Q. And how do you know that?
A. A review of the business records. They're looking at the signature card for one of the bank accounts for Esijemine Lucky. There was a phone number associated with the signature for Sulaiman Adedotun, and that phone number was associated with Samuel Aniukwu. We seized a phone from Samuel Aniukwu's residence during the search warrant, and that phone used that phone number. Additionally, on some of the other devices that we seized from Samuel Aniukwu's residence, there were references to Adedotun Sulaiman in chat messages and photographs on that device.
Q. And who, again, is Emeka Ibekie?
A. This is the defendant.
Q. And, again, 5206 Lincoln Avenue, Lisle, Illinois, who lived there?
A. Anthony Ibekie and Samuel Aniukwu.
Q. Okay. Okay. Next is 406.
A. 406 is Jenant, Incorporated. It was registered on December 4, 2018. The registered agent and incorporator are both Jennifer Gosha. And the address is 1419 North Harlem

Avenue, Apartment B, in Oak Park, Illinois.
Q. Who is Jennifer Gosha again?
A. Jennifer Gosha is another focus of this investigation.
Q. And what's the significance of the Harlem Avenue address in Oak Park?
A. That's Jennifer Gosha's residence.
Q. And you testified about that a little earlier?
A. Yes.
Q. Anything jump out at you regarding the name Jenant?
A. Yes. So this appears to be a shortening and merging of Jennifer's first name, Jennifer Gosha's first name, and Anthony Ibekie's first name. So Jennifer, Jen. Anthony, Ant. Jenant.
Q. Okay. Finally -- sorry, not finally. Next would be 408.
A. 408 is Setraco Services, Incorporated. It was registered on March 4, 2019. The registered agent and incorporator were both Sammy Maxwell. And the address was 5206 Lincoln Avenue, Unit 5 in Lisle, Illinois.
Q. Who is Sammy Maxwell?
A. This is another alias of Samuel Aniukwu.
Q. Okay. Next is 401.
A. 401 is Berger Services, Incorporated. It was registered on April 12, 2019. The registered agent and incorporator are both Tonyanika Fogle. And the address is 5206 Lincoln Avenue, Unit 4 in Lisle, Illinois.
Q. Who is Tonyanika Fogle?

A. That is the defendant's ex-wife.
Q. Did she live at that Lincoln Avenue address?
A. No.
Q. Okay. 402.
A. 402 is Emetech Solutions, Incorporated. It was registered on March 6, 2020, and the registered agent was Anthony Ibekie. And the incorporator was Ebuka Egbunam. And the address is 2726 Alyssa Drive in Naperville, Illinois.
Q. Can you remind the jury who Ebuka Egbunam is?
A. Yes. That is the defendant's son.
Q. What's the significance of 2726 Alyssa Drive in Naperville?
A. That is another address that Anthony Ibekie and Samuel Aniukwu resided at. And Ebuka Egbunam was there and Emetma Esposibit (phonetic) as well.
Q. Okay. So I notice in some of these addresses there's a unit listed with the Lincoln Avenue address; is that right?
A. That's correct.
Q. Does Lincoln Avenue have units?
A. No, it does not.
Q. Is it a single-family home, essentially?
A. Yes, that's correct.
Q. Based on your training and experience and familiarity with the investigation, why would somebody list unit numbers that don't exist?
A. To provide misleading information. And simply just an

attempt to obfuscate the true identity or the true address that's associated with the business.
Q. And why would somebody use aliases to register a business entity?
A. For the same reason. To create misleading information and obfuscate the person that might be associated -- truly associated with that business.
Q. Okay. And in summaries, every one of these business entities connected to the defendant in some way?
A. Yes.
Q. Okay. I want to talk to you now about bank records. During the course of your investigation, did agents subpoena bank records?
A. Yes, we did.
Q. What does it mean to subpoena bank records?
A. It just means that we get a court order, which is a subpoena. We serve that to the financial institution. And within that court order, we ask for certain records related to certain accounts at the bank.
Q. And were some of the bank records you subpoenaed accounts that were registered in the names of these business entities?
A. Yes, they were.
Q. And were some accounts where victims were told to send funds?
A. Yes, that's correct.

Q. In many cases, those were the same?
A. Yes.
Q. Okay. I'm now going to briefly publish the bank records, which were admitted into evidence a little earlier. Again, I'll just publish the first page.
And this is on publish? Okay. Great.
Okay. Special Agent, I'm just showing you the first page of Government Exhibit 301. What is this?
A. This is -- these are the bank records for Jenant, Incorporated from TCF Bank for the account number ending in 9392.
Q. And, again, we'll talk about these in more detail, so I'm just going to go through them sort of quickly.
This is Government Exhibit 302. What is this?
A. These are the bank records for Setraco Services, Incorporated from TCF Bank.
Q. Government Exhibit 303?
A. These are the bank records from TCF Bank for Samcord, Incorporated.
Q. 304?
A. These are the bank records from BMO Harris Bank for Berger Services, Incorporated.
Q. 305?
A. Bank records from JP Morgan Chase Bank for Emetech Solutions, Incorporated.

Q. 306?
A. JP Morgan Chase Bank records for Godmeks, Incorporated.
Q. 307?
A. JP Morgan Chase Bank records for Esijemine Lucky Nengite, Incorporated.
Q. 308?
A. U.S. Bank records for Setraco Services, Incorporated.
Q. 309?
A. Citibank bank records for Globayo LLC.
Q. And, finally, 311?
A. Bank of America bank records for Samcord, Incorporated.
Q. Okay. And 312 will be published at a later time.
Are bank accounts typically registered to a person or entity?
A. Yes.
Q. And does each bank account you subpoenaed have a signature card attached to it?
A. Yes.
Q. What is a signature card?
A. A signature card is a pretty standard document that anybody completes when they're opening a bank account. It usually contains either the name of the person or the entity that the bank account is going to be in. And then the individual that's opening the account signs that document. And then anybody else that's allowed to make transactions on or has signing authority

for that account will sign that signature card as well.
Q. Is there usually a registered address for the bank account as well?
A. Typically, yes.
Q. In preparation for trial, were you asked to review all those records that we just looked at and prepare a chart summarizing their contents?
A. Yes.
Q. How did you do that?
A. So I served the financial institutions with subpoenas and obtained the records. I reviewed the records for any relevant information, and then I summarized that information into a chart.
MS. DeMARCO: Okay. Can I publish just to the witness, please?
THE COURT: You may.
BY MS. DeMARCO:
Q. Okay. Special Agent, I'm showing you Government Exhibit 1102. Do you recognize this exhibit?
A. Yes, I do.
Q. What is it?
A. This is a summary chart of the bank accounts that I prepared.
Q. Does this chart fairly and accurately reflect the information contained in those bank records?

A. Yes.
MS. DeMARCO: The government moves to admit Exhibit 1102 into evidence.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: It's admitted. You can publish to the jury.
MS. DeMARCO: Thank you, your Honor.
(Government's Exhibit No. 1102 was received in evidence.)
BY MS. DeMARCO:
Q. Okay. First, what is the significance of each of these bank accounts?
A. Each of these bank accounts received money from victims in the inheritance fraud scheme.
Q. Okay. And, again, what are each of these columns?
A. So the first column on the left is just the government exhibit number. The second column is the name of the bank where the account was held. The third column is the account number for that bank account. The fourth column is the name of the entity that the account was held in. And then the last column are the signatories that were on the bank account.
Q. Okay. And, again, can you go through each column? You don't have to read the account number but just the entity and the signatories, starting with Government Exhibit 301.
A. Government Exhibit 301 is from TCF Bank, and that's Jenant,

Incorporated. And the signatories are Jennifer Gosha and Emenike Tonero.

THE COURT: Why don't you read the last four digits of the account number.

BY THE WITNESS:

A. Sure. The last four digits are 9392.

Q. And is Jenant one of the entities that you just testified about a few minutes ago?

A. Yes.

Q. Who is Emenike Tonero?

A. This is an alias of the defendant.

Q. Okay. And then Government Exhibit 302?

A. 302 is TCF Bank. The last four of the account are 7097. The account holder is Setraco Services, Incorporated. And the signatory on the account is Sammy Maxwell.

Q. And, again, Setraco is something you testified about a few moments ago?

A. That's correct.

Q. And, again, who is Sammy Maxwell?

A. An alias of Samuel Aniukwu.

Q. Government Exhibit 303?

A. TCF Bank, account ending in 5398, for Samcord, Incorporated. And the signatory is Emeka Toni Ibe.

Q. And who is Emeka Toni Ibe?

A. An alias of the defendant.

Q. And this is the name that you found the passport in?
A. That's correct.
Q. Okay. Next would be 304?
A. BMO Harris Bank, account ending in 5874. And the name is Berger Services, Incorporated. The signatory on the account is Tonyanika Fogle.
Q. And, again, Tonyanika Fogle is?
A. The defendant's ex-wife.
Q. Okay. 305?
A. Chase Bank, account ending in 6830. The entity is Emetech Solutions, Incorporated, and the signature on the account is Ebuka Elton John Egbunam.
Q. And who, again, is Ebuka Elton John Egbunam?
A. The defendant's son.
Q. Okay. And 306?
A. Chase Bank, account ending in 2012. The entity name is Godmeks, Incorporated. And the signatory on the account is Uchenna Ani Samuel.
Q. Who is Uchenna Ani Samuel?
A. An alias used by Samuel Aniukwu.
Q. Okay. And 307?
A. Chase Bank, account ending in 2296. The entity name is Esijemine Lucky Nengite, Incorporated. And the signatory is Adedotun Sulaiman.
Q. Who is Adedotun Sulaiman?

A. This is an alias used by Samuel Aniukwu.
Q. Okay. And then finally 308?
A. A Citibank account ending in 2818. The entity's name is Globayo LLC, and the signatory on the account is Vincent Emeka Izuegbu.
Q. And one more time, who is Vincent Emeka Izuegbu?
A. An associate of the defendant.
Q. Okay. I want to pause on Government Exhibit 304 and show you 304B, which is in evidence. And I'm blowing this up.
Okay. Special Agent, do you recognize what we're looking at here?
A. Yes, I do.
Q. What is this?
A. This is a canceled check from the bank records obtained for Berger Services, Incorporated from BMO Harris Bank.
Q. And what is the memo on this check?
A. "September rent."
Q. Who is the check made out to?
A. Milad A. Milad.
Q. Who is Milad A. Milad?
A. Milad A. Milad was the landlord for the address located at 2726 Alyssa Drive in Naperville, Illinois. And that is where the defendant resided, along with Samuel Aniukwu and Ebuka Egbunam.
Q. Okay. And the address for Berger Services, what was that

address?
A. 5206 Lincoln Avenue in Lisle, Illinois.
Q. Okay. So this is slightly confusing, but the Lisle address was the first address that you testified about, and then they moved to Naperville?
A. That's correct.
Q. Okay. And Milad Milad was the landlord at Naperville?
A. Yes.
Q. So this is a rent check made out for the Naperville address from the Berger Services account?
A. Yes.
Q. Special Agent, in the course of your investigation, have you had an opportunity to be familiar with the defendant's signature?
A. Yes.
Q. How did you become familiar with the signature?
A. Just through review of numerous bank records and other records throughout the investigation. But I also observed the defendant complete a handwriting exemplar in person.
Q. Do you recognize the signature that appears on this check?
A. Yes, I do.
Q. Whose signature is it?
A. It appears to be Anthony Ibekie's signature.
Q. Okay. So, in other words, Anthony Ibekie signed a check from the Berger Services account?

A. Yes.
Q. And that was an account that received victim funds?
A. Yes, it is.
Q. Were there multiple rent checks from Berger Services in the Berger Services account?
A. Yes.
Q. Okay. I'd now like to shift gears slightly. You mentioned earlier when you were talking about step 1 of the scheme that the perpetrators of the fraud would send a letter in the mail to the victims?
A. That's correct.
Q. Did you ever come into possession of any of these letters?
A. Yes, I did.
Q. How did that happen?
A. It was kind of a lucky break, really. So the -- some of the letters -- the return address on the letters was actually the address of DuPage County State's Attorney's office. And some of those letters were undeliverable to the intended recipient. So when they were returned undeliverable, they went back to the return address, which was DuPage County State's Attorney's office. And we were then notified and took possession of those.
Q. So just to clarify, the return address was to a law enforcement agency?
A. That's correct.

Q. And that was, like you said, just a completely lucky break in the investigation?
A. Yes.
Q. Okay. Did you take possession of some of those letters?
A. Yes, I did.
MS. DeMARCO: Judge, may I approach the witness?
THE COURT: You may.
BY MS. DeMARCO:
Q. Special Agent, I have handed you Government Exhibit 801. Do you recognize this exhibit?
A. Give me just one minute. Yes, I do.
Q. What is it?
A. These are the letters that I took possession of from DuPage County State's Attorney's office.
Q. How do you know that that's what they are?
A. I know that because this is my handwriting on the outside of this -- outside of this envelope. And then also my initials and date are on the evidence tape that contain the -- that are on the envelope that contain the letters.
Q. Are the letters in substantially the same condition as when you received them?
A. They appear to be, with the exception of slight discoloration from -- that's related to a lab analysis that we had done.
Q. Okay.

MS. DeMARCO: The government moves to admit 801 into evidence.

THE COURT: Any objection?

MR. CARLSON: Which one is 801?

MS. DeMARCO: It's the letters.

MR. CARLSON: Oh, they're both together in 801?

No objection, Judge.

THE COURT: Very good. 801 is admitted into evidence. You can publish to the jury.

MS. DeMARCO: Thank you.

(Government's Exhibit No. 801 was received in evidence.)

BY MS. DeMARCO:

Q. Special Agent, could you just hold them up for the jury? We'll display a photo that's a little more detailed, but.

THE COURT: Do you want to describe what the witness is doing here for the transcript?

MS. DeMARCO: I'm sorry. What was that, Judge?

THE COURT: Just describe for the transcript what the witness is doing.

MS. DeMARCO: Yes. So for the record, the witness is holding up the envelopes. She has removed the letters from the envelopes and is holding them up for the jury.

THE COURT: That's Exhibit 801?

MS. DeMARCO: Exhibit 801, yes. Government Exhibit 801.

BY MS. DeMARCO:
Q. Okay. You can put those back in the way they were packaged, Special Agent. Were the letters also photographed?
A. Yes.
MS. DeMARCO: Okay. Can I publish just to the witness, please?
THE COURT: You may.
BY MS. DeMARCO:
Q. Okay. I am showing you Government Exhibit 721. Do you recognize Government Exhibit 721?
A. Yes, I do.
Q. What is it?
A. This was one of the letters that I received from DuPage County State's Attorney's office.
Q. Okay. And there are two pages, two photos. Can you describe the two photos?
A. Yes. My mistake. The first one was the envelope, not the letter, of course. So the first one is the envelope, and then the second image that we are looking at right now is the letter that was inside the envelope.
Q. And is this a fair and accurate copy of the letter and envelope you received?
A. Yes, it is.
MS. DeMARCO: The government moves to admit 721 into evidence.

THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: All right. Exhibit 721 is admitted. You can publish to the jury.
MS. DeMARCO: Thank you, your Honor.
(Government's Exhibit No. 721 was received in evidence.)
BY MS. DeMARCO:
Q. Okay. I want to start with the envelope. Can you tell the jury what we're looking at here?
A. Yes. This is the envelope of the -- one of the letters that I obtained from DuPage County State's Attorney's office.
Q. Okay. And this address up here, is that the State's Attorney's office address?
A. Yes, it is. It's the municipal complex for the State's Attorney's office.
Q. And who is this letter addressed to?
A. Whitney Baker.
Q. Okay. And then I'm showing you this other page. What is this?
A. This is the letter that was inside the envelope, and it's also addressed to Whitney Baker. This appears to be substantially similar to many of the other inheritance fraud letters that we -- that we found during -- throughout the investigation.
Q. Is there a logo on this letter?

A. Yes. Up in the top, left corner.
Q. What is the logo for?
A. Standard Chartered Bank.
Q. And Special Agent, I'm going to have you read into the record this second paragraph.
A. "My name is Mr. Peter Pfizer, an account manager with Standard Chartered Bank, London United Kingdom. I retrieved your contact address and my search for the next of kin to a deceased customer of our bank, Mr. Vanbaker, a citizen of your country, who lived and died in London from cardiac arrest in the year 2010. Unfortunately, this customer died intestate, leaving his bank account with an open beneficiary status. All efforts made by our bank to locate his relatives have been unsuccessful, so I decided to write you as I have monitored this account in the bank for almost 10 years now, and no one has come forth with any claim. I would like to present you to our bank as his next of kin to claim this dormant account worth 11.6 million USD." And then it's 11.6 million spelled out.
Q. Okay. Could you just read the first paragraph -- or, sorry, the first sentence of this paragraph?
A. "It requires all confidentiality at this stage. And I believe that you are ready to keep this absolutely discreet until you are able to claim the funds from the bank."
Q. Can you read the last sentence of this paragraph as well?
A. "Once the funds are released to you, it will be shared

between the two of us."
Q. And then finally, I'm going to have you read the last paragraph and the signature?
A. "Please send your response to my personal e-mail, ppfizer456@aol.com, indicating readiness to proceed with this transaction. Then I will give you more details, and we shall have an in-depth discussion regarding a successful completion of this transaction. I await your response. Sincerely, Mr. Peter Pfizer."
Q. Okay. So once you had these letters in hand from the DuPage County State's Attorney's office, what did you decide to do with them to further the investigation?
A. We did a couple things with them. We sent both of the letters to lab -- to our lab for fingerprint analysis. And then we also decided to initiate an undercover operation using one of the letters.
Q. Can you tell the jury, what is an undercover operation?
A. An undercover operation is a special investigative technique that we use in which an agent that is specially trained to be an undercover agent assumes an alternate identity. And then that agent reaches out and tries to make contact with the individual that is the focus of the investigation.
Q. And why do agents use undercovers in investigations?
A. We use them to essentially just obtain additional

information or evidence in the investigation that might not otherwise be available through other means. A lot of times we're attempting to contact somebody that is maybe trying to conceal their identity. And through an undercover operation, sometimes we're trying to uncover actually who the true identity of the person is.
Q. So what was the plan for the undercover operation in this case?
A. So in this case, we were essentially going to have an undercover agent pose as -- so the letter is titled to Whitney Baker. So we were going to have an undercover pose as a Daniel Baker, which is a relative of Whitney Baker, that is handling her affairs and respond to this letter. And we wanted to see if we would get a response back and if the individual on the other side of the scheme would then walk us through the inheritance fraud, just like they would with any other victim.
Q. Was an agent assigned to be Daniel Baker?
A. Yes.
Q. Who is that?
A. Daniel Vela.
Q. Is he with IRS as well?
A. He is. He's a special agent with IRS Criminal Investigation.
Q. Did you give Agent Vela anything to get him started?
A. Yes. I gave him just a little bit of background on the

investigation. I also provided him a copy of this letter for Whitney Baker. And then I provided him some additional documents and things that we had seen as common patterns in the investigation that we had turned up, e-mail attachments, some of those kind of standard communications that we saw being used with other victims so he would maybe understand what he might receive through these communications.

Q. And did you keep in touch with Agent Vela throughout the undercover operation?

A. Yes, I did.

Q. Did you learn if he had, in fact, reached out to Peter Pfizer?

A. Yes, he did.

Q. Did the operation proceed to the point where Agent Vela was asked to make a payment?

A. Yes.

Q. Did you help coordinate that payment?

A. Yes, I did.

Q. Who was asking for the payment?

A. Pierre Delouis.

Q. Can you remind the jury who Pierre Delouis is?

A. Pierre Delouis is the individual posing as an attorney that the scammers instruct the victim to retain in order to claim the inheritance.

Q. So where does the money come from for an undercover

operation?
A. We have specially designated funds that are in undercover bank accounts that we use to fund those operations.
Q. And did you get approval to spend a certain amount in this case?
A. Yes, we did.
Q. How much were you approved to spend?
A. $1,100.
Q. Okay. And can you tell the jury what was the process for preparing that payment?
A. So I got in touch with an undercover agent that had access to one of the undercover bank accounts. And then I provided her the information that was provided to me from the undercover agent as far as who the checks should be made out to. She went to the bank and then obtained the cashier's check and sent that check to me so that we could use it in our operation.
Q. And where did you get the information about where to send the payment?
A. That was sent to the undercover agent by the individual posing as Pierre Delouis.
Q. And you may have touched on this already, but what format was the payment supposed to be made in? Wire transaction or --
A. Cashier's check.
Q. Okay.
MS. DeMARCO: Judge, could I ask you to read

Stipulation No. 5, please?

THE COURT: Okay. Members of the jury, we have another stipulation. Again, this is an agreement between the parties. We're going to pull it up on the screen so that you can see it. Page 10 of 22. All right. Everybody see that okay? All right. Here it goes, folks.

It says Stipulation No. 5.

If called to testify, a records custodian from the United States Postal Service (USPS) would testify that as a custodian of records, his or her responsibilities include maintaining and retrieving records of USPS. The records custodian would further testify that Government Exhibits 501-3, 501-4, and 501-6 are true and correct copies of original documents kept by USPS; and that

No. 1. The records were made by a person with knowledge of, or made with information transmitted by a person with knowledge of, the acts or events appearing on the records.

No. 2. That the records were made at or near the time of the acts or events appearing on the records.

No. 3. That it was the regular practice of USPS to make such records; and

No. 4. That the records were kept in the ordinary course of the regularly conducted activities of USPS.

Further, the parties agree that Government Exhibits 501-1 and 501-2 are fair and accurate photographs of a USPS

parcel and the cashier's check that went inside that parcel.

The parties agree that Government Exhibits 501-1, 501-2, 501-3, 501-4, and 501-6 are admissible in evidence.

Next page it says: "So stipulated." With signatures by a United States Attorney -- Assistant United States Attorney, signature for defense counsel, and signature by defendant Anthony Ibekie.

So stipulated?

MS. DeMARCO: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: Okay. Thank you, counsel. Go ahead, please.

MS. DeMARCO: Thank you, Judge. At this time the government moves to admit Exhibits 501-1 through 501-4 and 501-6 into evidence.

THE COURT: Any objection?

MR. CARLSON: No objection.

THE COURT: They're admitted. You can publish to the jury.

MS. DeMARCO: Thank you, your Honor.

(Government's Exhibits Nos. 501-1, 501-2, 501-3, 501-4, 501-6 received in evidence.)

BY MS. DeMARCO:

Q. Okay. Special Agent, I'm showing you Government Exhibit 501-2. Do you recognize this?

A. Yes, I do.
Q. What is it?
A. This is the cashier's check that we obtained for the undercover operation.
Q. Okay. I am going to blow this up a bit.
Okay. So first, what is the amount of the check?
A. $1,100.
Q. Okay. And who is it made out to?
A. Globayo, LLC.
Q. Is that one of the entities you testified about earlier?
A. Yes, it is.
Q. Where did Globayo LLC come from?
A. I'm sorry, could you phrase that again?
Q. Where did you get the information -- or who gave you the information to put Globayo LLC on this check?
A. The individual posing as Pierre Delouis provided the name, Globayo LLC, to our undercover agent and instructed him to get a cashier's check made out to that entity.
Q. Okay. And there appears to be a handwritten notation here?
A. Yes.
Q. What is that?
A. That is my handwriting. I included this written portion on here just to sort of indicate that the check was ours and so that there wouldn't be a mistake. It was a -- as to where this check came from. So I knew that this would be my handwriting.

Q. Okay. And once you had obtained and written the notation on the cashier's check, what was the next step? What did you do with it?
A. The next step was I then took this check to a United States Postal Inspector, who then helped me prepare a package that was going to be used for a controlled delivery of these funds.
Q. What is a controlled delivery?
A. A controlled delivery is, again, another special investigative technique that we use where we know the contents of the package and we prepare that package. We then have a United States Postal Inspector deliver that package. And that delivery is video-and-audio recorded. And, again, it just kind of helps us establish who might be on the other end of the transaction. We can see where the package goes and we can see who accepts receipt of it.
Q. Showing you Government Exhibit 501-1. What are we looking at here?
A. So this is the mailing label and the envelope, the express mail envelope that we used. And we put the cashier's check inside of this.
Q. Okay. And did you assist in filling out this information here?
A. Yes, I did. My handwriting is on the left-hand side of the address label.
Q. Okay. So up here in the top, left of what I've

highlighted, this is -- what is this?
A. This is our undercover agent's information. His name and address. His -- his undercover name and his undercover address.
Q. Okay. And is that the return address?
A. Yes.
Q. And this package is made out to who?
A. Globayo LLC. 1419 North Harlem Avenue. Suite B, Oak Park, Illinois.
Q. And where did the address come from? How did you know to send it there?
A. Again, that was provided by the individual posing as Pierre Delouis. It was given to our undercover agent, and he was instructed by Pierre Delouis to send the cashier's check to this address.
Q. What is the significance of this address?
A. This address is Jennifer Gosha's residence.
Q. Okay. And then I want to highlight this number up here. What is this number?
A. This is a tracking number for the package. It's the United States Postal Service tracking number.
Q. And what is a tracking number?
A. It's just a unique identification number that can be used to track the package and see where it's at in the postal stream, to see where -- what the status of it is. So that can

be tracked by employees inside the post office or, you know, by the general public. If you have that tracking number, you can go on the USPS website and be able to track that package and see what the status of it is.

Q. Do you know if this tracking number was conveyed to Pierre Delouis and Peter Pfizer?

A. Yes, it was.

Q. Did you learn if this package was delivered?

A. Yes.

Q. Was it?

A. Yes, it was.

Q. Who delivered it?

A. A U.S. Postal Inspector.

Q. Is that another member of law enforcement?

A. Yes, it is.

Q. Did you come to learn that the United States Postal Service keep records of who tracks packages?

A. Yes, I did.

Q. How do they do that?

A. They have an internal system that they can look up this tracking number, and they can determine what IP addresses have -- have tracked the package, essentially.

Q. You mentioned an IP address. What is an IP address at a high level?

A. An IP address is an internet protocol address. IP is short

for internet protocol. So it's a unique identifying number that is assigned to every device that's connected to a computer network, so such as like the internet. So it's basically just -- it tells you what network that device is connected to and where it's at on that network. So it allows for information to make sure it's getting to the proper device.
Q. Okay. I'm showing you Government Exhibit 501-4. What are we looking at here?
A. These are results from the U.S. Postal Service from their database that shows the IP addresses that track the controlled delivery package.
Q. Okay. And so I want to go through this in some detail. So this first column is what?
A. That's --
THE COURT: Excuse me, counsel. I'm sorry. Can you blow that up to make it a little easier for the jury to see it?
MS. DeMARCO: Yes.
THE COURT: There you go. Thank you.
BY MS. DeMARCO:
Q. So this is the first column that I've blown up.
A. So that is the tracking number that was listed on the controlled delivery package that we just looked at.
Q. Okay. And then source IP/phone/e-mail?
A. These are IP addresses that tracked that package at some point in time.

Q. Okay. Date and time?
A. That is the date and time that the package was tracked by those -- those specific IP addresses.
Q. That one is a bit self-explanatory, I guess.
Okay. And then transaction type?
A. Yeah, this just gives kind of an indication of what that IP address is. What -- what type of -- what type of device tracked that package. So, for instance, if it says XML single transaction, that means that it is someone that tracked the package using the USPS.com, the public-facing website. If it says intranet single transaction, that's referring to the intranet, not the internet. So the intranet is a private network that is -- that only U.S. Postal Inspection Service -- or U.S. Postal employees would have access to. So if it says intranet, that would have been an internal IP address from the post office.
Q. Okay. So the intranet are internal by postal service employees, and the XML are people who don't work for postal?
A. That's correct.
Q. People from the public?
A. Yes.
Q. Okay. So of the ones that appear to be public tracks, is there anything significant to you about how the IP addresses appear for the most part?
A. Yes. So any of the ones that are public tracked, all of

the IP addresses, the shorter ones, so all of them except for the really long one that you see, those are all VPNs.
Q. What's a VPN?
A. VPN is a virtual private network, which basically it hides an individual's IP address and their online activity by routing their internet traffic through an encrypted VPN server. So essentially what it does is helps make you more -- make a user more anonymous on the internet.
Q. Okay. And other than the internal tracks by postal and the VPNs, you mentioned a longer IP address, which I believe you're referring to the one that's fifth from the bottom?
A. Yes.
Q. Is there anything significant to you about this IP address?
A. Yes. The one fifth from the bottom that starts with 2600:1700. That IP address is the IP address for the residence located at 797 Oxbow Avenue, Unit 110 in Oswego, Illinois, which is the defendant's residence.
MS. DeMARCO: Okay. And, Judge, at this point, I'd ask you to read Stipulation No. 4.
THE COURT: All right, folks. We have another stipulation to read. We will pull it up for you on the screen. Everybody see that okay? All right. Here is Stipulation No. 4. Here it goes.
If called to testify, Linda Thomas, a trial analyst and records custodian from AT&T, Inc., would testify that as a

custodian of records, her responsibilities include maintaining and retrieving records of AT&T.

Paragraph No. 1. Ms. Thomas would testify that Government Exhibit 502 is a true and correct copy of original documents kept by AT&T, and that;

No. 1. The records were made by a person with knowledge of, or made with information transmitted by a person with knowledge of, the acts or events appearing on the records.

No. 2. That the records were made at or near the time of the acts or events appearing on the records.

No. 3. That it was the regular practice of AT&T to make such records.

No. 4. That the records were kept in the ordinary course of the regularly conducted activities of AT&T.

The parties agree that Government Exhibit 502 is admissible in evidence.

Paragraph No 2. Ms. Thomas would further testify about internet protocol (IP) addresses. And more specifically IPVS IP addresses. She would explain that AT&T U-Verse customers have a unique IPV --

You know, I think I said IPVS before, and I meant IPV6. So bear with me, folks, I sometimes invert things. So let me just take it from the top, paragraph 2. Okay? Bear with me. Strike all that in paragraph 2. Here it goes.

Ms. Thomas would further testify about internet

protocol (IP) addresses, and more specifically IPV6 IP addresses. She would explain that AT&T U-Verse customers have a unique IPV6 address directly provisioned to the account. The first four octettes within the IPV6 address remain static and uniquely identify the specific customer account. For the IPV6 address contained within Government Exhibit 502, those numbers are quotation mark, "2600:1700:1cb0:2d80." Closing quotation mark.

Paragraph 3. Any additional octettes following the first four octettes of an IPV6 address are considered dynamic and will vary with each internet session.

The next page says: "So stipulated." It has a signature from an Assistant United States Attorney, from defense counsel, and from a defendant Anthony Ibekie.

So stipulated?

MS. DeMARCO: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: Did I read all that correctly?

MS. DeMARCO: You did, your Honor.

THE COURT: Sorry I made a mistake there.

MS. DeMARCO: No, Sorry. It's a little tricky.

THE COURT: That was on me, so.

Okay. So that's Stipulation No 4, folks. Again, it's an agreement between the parties. You can take it for what it's worth when you do your deliberations.

Counsel, go ahead.

MS. DeMARCO: Thank you, Judge. And at this time the government moves to admit Government Exhibit 502 into evidence.

THE COURT: Any objection?

MR. CARLSON: No objection.

THE COURT: It's admitted. You can publish to the jury.

MS. DeMARCO: Thank you, Judge.

(Government's Exhibit No. 502 was received in evidence.)

BY MS. DeMARCO:

Q. Special Agent, I'm showing you Government Exhibit 502. Do you recognize this exhibit?

A. Yes, I do.

Q. What is this?

A. These are the subscriber records for the internet service at the Oxbow residence, the 797 Oxbow Avenue, Unit 110 in Oswego, Illinois.

Q. Okay. And I'm highlighting four octettes in the middle of this page here. What's the significance of those 16 digits?

A. These 16 digits match the first 16 digits of the IP address that we just saw on the U.S. Postal tracking records. And, again, so that is the same IP address.

Q. So this is the same IP address of the IP address that tracked the cashier's check?

A. Yes, it is.

Q. I'm showing you the second page. What are we looking at here?
A. This provides the customer account information for the internet service for that IP address.
Q. Okay. And is that the address you were referring to?
A. Yes, it is.
Q. Okay. And the contact name for this subscriber is who?
A. Samuel Aniukwu.
Q. Okay. Special Agent, did Samuel Aniukwu ever live at Oxbow Avenue?
A. No, he did not.
Q. Okay. There is a phone number connected to this account listed here; is that right?
A. Yes.
Q. Whose phone number is that?
A. Anthony Ibekie's.
Q. How do you know that?
A. This phone number was listed as a phone number on subscriber records for an e-mail address associated with the defendant. The e-mail address was aibekie@gmail.com. This phone number was also used on a phone that was seized from Anthony Ibekie's residence during a search warrant. And we also seized a phone from Jennifer Gosha. And we found communications on that phone in which she was communicating with the defendant at this phone number.

Q. Okay. And Special Agent, I know we've talked about a lot of addresses. So Oxbow is the third address that the defendant lived at with Ebuka Egbunam?
A. That's correct.
Q. So viewed together, do Government Exhibits 502 and 504 mean that the cashier's check package was tracked from the defendant's residence?
A. Yes.
MS. DeMARCO: Can I have one moment, your Honor?
THE COURT: You may.
MS. DeMARCO: Nothing further for this witness at this time.
THE COURT: Okay. Thank you, counsel.
Defense counsel, whenever you are ready.

CROSS-EXAMINATION

BY MR. CARLSON:
Q. Special Agent, you identified Government Exhibit 801 as letters that you received or recovered from the DuPage County State's Attorney's Office; correct?
A. That's correct.
Q. And there were two letters in envelopes that you received; correct?
A. Yes.
Q. And the government showed you Exhibit 721, which was the address and -- or the letter and envelope for Whitney Baker;

correct?
A. Yes.
Q. And the second one was a letter and envelope to a Saeid, S-a-e-i-d, Ghaemi, G-h-a-e-m-i; is that correct?
A. Yes, it is.
Q. And you had testified that you were present and watched Mr. Ibekie do a handwriting exemplar; is that correct?
A. That's correct.
Q. And the signature -- there are signatures on the two letters in 801; is that correct?
A. Yes.
Q. Are you aware whether there was ever a comparison of those signatures with the handwriting exemplars of Mr. Ibekie?
A. Not that I'm aware of.

MR. CARLSON: That's all I have at this time, Judge.

THE COURT: Okay. Thank you, Counsel.

Any redirect?

MS. DeMARCO: No, your Honor.

THE COURT: All right. Very good. You may step down. Thank you. Watch your step, please.

THE WITNESS: Yes, sir.

(Witness excused.)

THE COURT: Counsel, when you're ready, you may call your next witness.

MS. DeMARCO: Your Honor, the government calls Daniel

Vela.

THE COURT: Okay. Thank you.

Folks, by way of explanation, I've told you before that witnesses typically can't hear other people testify. The government is entitled to have a representative or two on behalf of the government sit at the table. So that's why Ms. Mansker is going to be able to be here for the trial. It's okay for a witness or two to do it on each side because they represent a party.

Come on up, please. Watch your step, please. Please raise your right hand.

(Witness sworn.)

THE COURT: Very good. Have a seat, please. Good afternoon to you.

THE WITNESS: Good afternoon.

THE COURT: I'd like you to speak into the microphone. I want to make sure all the men and women of the jury can hear you. And if you need something to drink, there's a pitcher of water to your right. Okay.

THE WITNESS: Good afternoon.

THE COURT: All right. Counsel, whenever your ready, you may proceed with your exam.

MS. DeMARCO: Thank you, your Honor.

DANIEL VELA, GOVERNMENT'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MS. DeMARCO:
Q. Can you please state and spell your name for the record.
A. Daniel Vela. D-a-n-i-e-l, V-e-l-a.
Q. Are you currently employed?
A. Yes, I am.
Q. Where do you work?
A. IRS Criminal Investigation.
Q. What's your position with IRS Criminal Investigations?
A. I'm a supervisory special agent.
Q. What does it mean to be a supervisory special agent?
A. I supervise agents in their investigations on potential violations of the Internal Revenue Code and other financial crimes.
Q. Can you summarize your job responsibilities beyond what you just said?
A. Sure. We conduct investigations which involve also conducting surveillance, doing undercover activities, interviewing witnesses, and attending court proceedings.
Q. How long have you worked for the IRS?
A. Seventeen years.
Q. And are you in Chicago?
A. No. I'm out of the Detroit field office.
Q. Okay. Okay, Special Agent. I want to draw your attention now to May of 2020. What was your position at that time?
A. I was a special agent.

Q. And what were your responsibilities as a special agent?
A. I'd investigate violations of Internal Revenue Code, and I also served as an undercover agent.
Q. Okay. Did you become involved in an undercover operation around that time?
A. Yes, I did.
Q. What does it mean to be an undercover special agent?
A. There's -- undercover agents go through a strict and long training process. And we assume a new identity, a different identity, and make contacts with different subjects.
Q. Why do agents go undercover?
A. It's an additional investigative technique or tool that the IRS uses to obtain information and gather evidence.
Q. And what was your role in this undercover operation?
A. I was to assume the identity with the last name Baker and make contact to Peter Pfizer that was listed in a letter.
Q. Where did you get this letter?
A. This letter was provided by the -- to me by the case agent.
Q. Who is the case agent?
A. Amy Mansker.
Q. Okay. Did you know anything about the case when you were assigned this role?
A. No.
Q. Throughout the undercover operation, did you keep in touch with Special Agent Mansker?

A. Yes, I did.
MS. DeMARCO: May I approach the witness?
THE COURT: You may.
BY MS. DeMARCO:
Q. I've handed you a disk that's marked Government Exhibit 202. Do you recognize this disk?
A. Yes, I do.
Q. What is it?
A. This disk contains e-mail correspondence that I had with Mr. Pfizer and other parties.
Q. How do you know that that's what it is?
A. I reviewed the contents of this disk.
Q. Okay. And is there anything on it that indicates that it's the same disk that you reviewed?
A. Yeah. I initialed the CD and the cover to the CD.
Q. Okay. And does Government Exhibit 202 contain fair and accurate copies of the e-mails you just referenced?
A. Yes, it does.
MS. DeMARCO: Government moves to admit 202 into evidence.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: It's admitted. You can publish the contents of the CD to the jury.
(Government's Exhibit No. 202 was received in evidence.)

MS. DeMARCO: Thank you, Judge. Can I approach the witness again?

THE COURT: You may.

MS. DeMARCO: Thank you.

BY MS. DeMARCO:

Q. In preparation for your testimony, did you also review two recordings?

A. Yes, I did.

Q. Are those Government Exhibits 601 and 602?

A. Yes, they are.

Q. Did you listen to them before trial?

A. Yes, I did.

Q. Are they fair and accurate copies of recordings that you -- recordings that you made as part of the undercover operation?

A. Yes, they are.

MS. DeMARCO: The government moves to admit Exhibit 601 and 602 into evidence.

THE COURT: Any objection?

MR. CARLSON: No objection.

THE COURT: They're admitted. You can publish them to the jury.

MS. DeMARCO: Thank you, Judge.

(Government's Exhibit Nos. 601 and 602 received in evidence.)

BY MS. DeMARCO:

Q. Okay. I've handed you a transcript binder. Can you please turn to 601T. Sorry, it's not a binder, it's more of a bound copy of documents.

Did you help prepare transcripts of Government Exhibits 601 and 602?

A. I reviewed the transcripts, and if there was any changes or edits, I made those.

Q. Are the two transcripts accurate transcriptions of Exhibit 601 and 602?

A. Yes, they are.

MS. DeMARCO: Judge, permission to hand out the transcript packets.

THE COURT: All right. Any objection?

MR. CARLSON: No, your Honor.

THE COURT: Okay. You have them for each member of the jury?

MS. DeMARCO: Correct, your Honor. I already tendered them to defense as well.

THE COURT: Okay. That's fine. So the Court Security Officer will be in charge of handing them to the jurors.

Okay. So you can hand them to the Court Security Officer, and he will do it.

MS. DeMARCO: Thank you, Judge.

THE COURT: And while he's -- when he's done with that, I want you to make a proffer on the record of what you're

doing, then I'll explain to the jury that they're just demonstratives. Okay?

MS. DeMARCO: Fair enough. Thank you, Judge.

THE COURT: Defense counsel, you've gone through them and checked them?

MR. CARLSON: Yes, Judge.

MS. DeMARCO: Okay. So for the -- oh, sorry. Go ahead.

THE COURT: You want to make a proffer of what's just been distributed to the jury?

MS. DeMARCO: Yes, your Honor. The government has just handed out for each member of the jury a bound packet of three documents. They contain three transcripts for 601 and 602. There is also a transcript in there for 603, which is not in evidence yet.

THE COURT: Okay. So the jury has currently in their hands a transcript of a document that's not been admitted -- or a recording that's not yet been admitted?

MS. DeMARCO: Correct, your Honor.

THE COURT: So we can either admit that now or we can just tell them not to look at that.

MS. DeMARCO: Um, it's coming in through a different witness, so.

THE COURT: Okay. So, folks, let me explain what this is. You've got a binder in front of you. They're transcripts.

Remember, you heard a minute ago the prosecutor said that they have some recordings. You're going to hear the recordings, I expect. Right, Ms. DeMarco?

MS. DeMARCO: Correct, your Honor.

THE COURT: You're going to hear the recordings. So these are transcripts prepared by the government of the recordings. The transcripts themselves are not evidence. The evidence is of the recording. Okay? It's not the transcript, it's the recording. If anything you hear on the recording is different than what you see, the recording is what matters. Okay? It's not the transcript. All right.

So the way the process goes is the government has prepared a demonstrative to help you. Defense counsel has looked through it and has basically checked it, and then we've given it to you. But, again, this is illustrative of what you may hear on the recording by way of helping you. Okay?

And the government also said a moment ago that the demonstratives in your packet include transcripts for Exhibits 601, meaning that recording, 602, and 603. I've admitted into evidence 601 and 602. And the government has just told me that the recording for 603 is going to come in later with a different witness. So please don't look at that one yet. Okay? We're gonna -- we're gonna stay as a team here. We're going to go one at a time. When she says go to 601, we'll do that. When we go to 602, we'll do that. Please don't look at

603 because it has not been admitted into evidence. Everybody got it? So this is an illustration of what you might hear.

With that explanation, you may go ahead, Ms. DeMarco.

MS. DeMARCO: Thank you, your Honor.

BY MS. DeMARCO:

Q. Special Agent Vela, how did you get involved in the undercover operation?

A. I was assigned the operation through an undercover program manager.

Q. And what was the first step?

A. The first step was to make contact with the person listed on the letter addressed to Whitney Baker.

Q. Okay. I'm showing you Government Exhibit 721, which is already in evidence. Do you recognize this photo?

A. Yes, I do.

Q. What is it?

A. This is a letter that was addressed to Whitney Baker regarding the inheritance opportunity.

Q. Okay. And who is the letter signed by?

A. Peter Pfizer.

Q. And was there an e-mail address for Peter Pfizer?

A. Yes, there was.

Q. What was it?

A. ppfizer456@aol.com.

Q. And what did you do in response to this letter?

A. I e-mailed Peter Pfizer, letting them know that my mother was Whitney Baker and I was handling her affairs because she had some medical conditions, and I was interested in pursuing the inheritance opportunity.
Q. Okay. I'm showing you Government Exhibit 202-1. Is this the e-mail you just described?
A. Yes, it is.
Q. Okay. Who is the e-mail from?
A. It's from baker.daniel810@aol.com to ppfizer456@aol.com on Friday, May 1st, 2020.
Q. Where did baker.daniel810@aol.com come from?
A. I created that e-mail specifically for this assignment.
Q. Okay. So this was not your real e-mail?
A. Correct.
Q. Did Peter Pfizer respond to you?
A. Yes, he did.
Q. I'm showing you Government Exhibit 202-2. Can you tell the jury what this is?
A. This is the e-mail from Peter Pfizer regarding my e-mail. It's from ppfizer456@aol.com to baker.daniel810@aol.com.
Q. Okay. And there appears to be an attachment?
A. Yes.
Q. Okay. Is this the attachment that was referenced?
A. Yes, it is.
Q. Okay. Is there an amount referenced in this letter?

A. Yes. The amount is for $11.6 million.
Q. Okay. And there appears to be a reference -- can you read No. 2 on this list?
A. "In view of the needed confidentiality and trust in this transaction, are you willing to sign a non-disclosure agreement?"
Q. Okay. Did you respond to this e-mail?
A. Yes. I responded that I was ready to proceed with the transaction and that I would sign an NDA, or non-disclosure agreement.
Q. And did you, in fact, enter into a non-disclosure agreement as Daniel Baker?
A. Yes, I did.
Q. Showing you Government Exhibit 202-3.
Okay. Who is this e-mail from?
A. This is from ppfizer456@aol.com to baker.daniel810@aol.com on Tuesday May 5, 2020.
Q. Okay. And what does Pfizer say in this e-mail?
A. He says that he has attached the NDA, he needs it signed and sent back, and that he would have some vital documents to provide to me, such as a death certificate.
Q. Okay. And there's reference to an attachment. Is this the attachment?
A. Yes, it is.
Q. Okay. And I want to highlight this paragraph here. Can

you summarize this paragraph, or read it?
A. "That upon the completion of this bank account claim and Whitney Baker subsequently receives the funds 11,600,000 United States Dollars, plus accumulated interest, Whitney Baker has agreed in writing to share the total amount received from this claim with Peter Pfizer in the following ratio: 60 percent for Whitney Baker and 40 percent for Peter Pfizer. Both parties agree that any expenses made during the course of this claim will be taken out of the total amount paid before sharing."
Q. Okay. So essentially Peter Pfizer and Whitney Baker are going to split the $11 million inheritance?
A. Yes.
Q. Okay. Was there continued e-mail correspondence after this?
A. Yes, there was.
Q. I'm showing you Government Exhibit 202-4. Who is this e-mail from?
A. This is from ppfizer456@aol.com to baker.daniel810@aol.com on Thursday, May 14, 2020.
Q. Okay. Were there a couple of attachments as well?
A. Yes, there was.
Q. Okay. And did Pfizer tell you to contact someone else?
A. Yes, he did.
Q. Okay. And I want to highlight that down here. Who did he tell you to contact?

A. The Manager of Operations, the Unclaimed Estate Department, UED, Standard Chartered Group, 1 Basinghall Avenue, London West EC2V 5DD United Kingdom. E-mail ued@standardgroupservices.com.
Q. Okay. And I'm showing you the attachments. Are these the attachments that Pfizer included in his e-mail to you?
A. Yes, they are.
Q. Okay. What is this one?
A. That's the death certificate of Mr. Pfizer's client, Sullivan Baker.
Q. Okay. So the name is down here?
A. Correct.
Q. Okay. What was the occupation of Sullivan Baker?
A. He was an oil and gas engineer.
Q. Okay. Did you follow the instructions that he gave you?
A. Yes, I did.
Q. And did you send those attachments to ued@standardgroupservices?
A. Yes, I did.
Q. Did they respond to you?
A. They did.
Q. I'm showing you 202-5. Is this the e-mail that you just testified about?
A. Yes, it is.
Q. Okay. So this is you sending those materials that Peter Pfizer sent you to ued@standardgroupservices.com?

A. That's correct.
Q. Okay. Showing you 202-6. Can you tell the jury what this e-mail is?
A. This is confirmation that UED Standard Group Services received my application and documents.
Q. Okay. And who signed this e-mail?
A. This was from Wyashika Sellar, the Manager of Operations at the Unclaimed Estate Department, UED, Standard Chartered Financial Group.
Q. Okay. And who is this e-mail from, the e-mail address?
A. From ued@standardgroupservices.com to baker.daniel810@aol.com.
Q. Okay. And there is reference in here to a questionnaire?
A. Yes, it is.
Q. Okay. Was there a questionnaire attached to the e-mail?
A. Yes.
Q. Did you forward the questionnaire to anyone?
A. I forwarded it to Peter Pfizer.
Q. What was his response to you forwarding this questionnaire?
A. He was going to provide me all the answers for the questionnaire to submit to the bank?
Q. Showing you Government Exhibit 202-7, highlighting the second e-mail here. What is this?
A. These are the answers that were provided by Mr. -- Mr. Pfizer.

Q. Okay. And he asked you to send the answers to the bank immediately?
A. Yes.
Q. Okay. And is this the questionnaire?
A. Yep, these were the answers to the questionnaire.
Q. Okay. Did you provide any of this information yourself?
A. No, I just used the information provided by Mr. Pfizer.
Q. Okay. I'm showing you Government Exhibit 202-8. Who is this e-mail from?
A. This is from ued@standardgroupservices.com to baker.daniel810@aol.com on Friday, May 22nd. And it was for the successful completion of the questionnaire.
Q. Who was it signed by?
A. Wyashika Sellar.
Q. Okay. And there is a reference to several attachments?
A. Yes.
Q. Are these the attachments that were attached to the e-mail?
A. Yes, they are.
Q. Okay. And they appear to be several documents?
A. Correct. They said I needed to contact their affiliate, Canada Trust Bank.
Q. Okay. And the logo on -- this attachment is a different bank; correct?
A. Correct.
Q. That's TD Canada?

A. That's correct.
Q. Did you forward this exchange to Peter Pfizer as well?
A. Yes, I did.
Q. Okay. What was his response?
A. He was going to provide some more documents for me to send to TD Canada.
Q. I'm showing you Government Exhibit 202-9. Who is this e-mail from?
A. This is from ppfizer456@aol.com to baker.daniel810@aol.com.
Q. What's the date of this one?
A. Sunday, May 24, 2020.
Q. So this has been going on over the course of several days at this point?
A. Yes.
Q. Okay. And what did he say in the e-mail?
A. He said that I had to attach -- I had to send this letter to TD Canada Trust Bank to complete the process of the transaction.
Q. Okay. I'm showing you Government Exhibit 202-10. Did you, in fact, follow his instructions and then reach out to another bank?
A. Yes, I did.
Q. Okay. So who is this e-mail to?
A. This is to ued@tdcanadagroup.com on Wednesday, May 27th.
Q. And this is from?

A. From baker.daniel810@aol.com.
Q. And these attachments, where did you get them?
A. Peter Pfizer.
Q. Okay. I'm showing you Government Exhibit 202-11.
Okay. Can you start with the bottom e-mail. What is that one?
A. This is from Peter Pfizer at peterp968@yahoo.com to baker.daniel810@aol.com.
Q. What did he say?
A. It was an e-mail from Peter saying that he was going to be using this new e-mail address.
Q. And previously he had been using an aol.com address?
A. Correct.
Q. Okay. And then you responded to him?
A. Yes, I did.
Q. What were you telling him in that e-mail?
A. Just that I e-mailed the documents to TD Canada and I'd let him know when I heard something back.
Q. Okay. I'm showing you Government Exhibit 202-12. Who is this one from?
A. This is from ued@tdcanadagroup.com to baker.daniel810@aol.com, on Wednesday, May 27, 2020.
Q. Okay. So this is the second bank you've contacted?
A. Correct.
Q. Okay. And I want to highlight this section here. Can you

read this part of the e-mail to the jury?
A. "Please take note that in recommending an accredited attorney for you, be informed that any costs/legal fees related to legal representation are solely your responsibility and are payable to the attorney as the attorney instructs you. That is not the responsibility of TD Canada Trust Bank. See the particulars of the attorney below. Barrister Pierre Delouis. Hall and Hall Chamber, 18 York Street, Toronto, Ontario Canada."
Q. Okay. And there's an e-mail address?
A. Yes.
Q. What is that e-mail address?
A. pdelouis@hallhallchamber.com.
Q. Okay. So is this the first time that you heard anything about an attorney?
A. This is the first time, yes.
Q. Okay. And who is this signed by?
A. This was signed by Nikka Avis, the Manager of Operations at the UED TD Canada Trust Bank Financial Group.
Q. Okay. And did you forward this response from Nikka Avis to Peter Pfizer?
A. I did, yes.
Q. Why were you keeping Peter Pfizer in the loop at all of these different stages?
A. There was a lot of steps to this process. And as I

received information from the banks, I would send it to Peter so he could instruct me on what to do next.
Q. Okay. So he was sort of guiding you through this process?
A. Yes.
Q. Did you ask Pfizer's thoughts on hiring an attorney?
A. I did ask him, yes.
Q. I'm showing you Government Exhibit 202-13.
Okay. Who is this e-mail from?
A. This is from peterp968@yahoo.com to baker.daniel810@aol.com on Thursday, May 28, 2020.
Q. And can you read the e-mail?
A. "Mr. Daniel, we will need a Canadian lawyer, and I believe that it is best to go with the recommended lawyer. If you can send me your number, I will call you so we can talk in detail; however, I have attached a letter that you will have to send to the lawyer asking him to represent us. Signed Mr. P."
Q. Okay. And when he references the recommended lawyer, who did you understand him to be referring to?
A. The TD Bank, Canada Bank, recommended a lawyer, the Peter Delouis -- or Pierre Delouis. Excuse me.
Q. And Pfizer mentions in here you sending him your number?
A. Yes.
Q. Did you, in fact, speak to him on the phone?
A. Yes, I did.
Q. Did you record that phone call?

A. Yes, I did.
Q. Is that standard in an undercover operation?
A. Yes.
Q. Okay. What was the purpose of the phone call?
A. The purpose of the call was to talk about all the steps that were being conducted and that the information I received, that I needed to have a Canadian lawyer and that there was going to be additional fees involved and how those fees would be handled.
Q. Okay. I'd like to now publish Government Exhibit 601. And the jury -- or the Court -- if the Court could instruct the jury to turn to 601T?
THE COURT: Are you going to play the recording now?
MS. DeMARCO: I am.
THE COURT: This might be a good time for a break. It's 3:00 o'clock. I think this is a nice, logical stopping point. We've been going about an hour and 45 minutes, and that's usually about as long as I'd like to go.
Folks, here is what I would like you to do. I would like you to leave the transcripts on your chair. Okay? Those are demonstratives. Leave them on your chair. I do want you, though, to take your jury notebook with you. Okay? So do a little bit differently. Leave the transcripts here, take the jury notebook with you. We're going to take about 15 minutes, or so. When you folks are ready, we're going to get rolling.

Okay?

So don't talk to anybody about the case. Do enjoy a little bit of break. Stretch your legs, get a drink, and we will see you in a couple minutes. Okay? Thank you, folks.

(Jury out at 3:00 p.m.)

THE COURT: You may step down, sir. Watch your step, please. Please don't talk to anyone about the substance of your testimony.

All right. Have a seat, everyone. I just have one quick thing, and then I'll let you take a break. I don't know if you all have talked about whether the transcripts should go back to the jury as part of deliberations. I will tell you that in my last couple trials, the parties jointly agreed that they should go back, even though they were demonstratives. The thinking between the parties then was that they had a mutual interest in having the jury understand what they were hearing. And so in my last couple trials, they agreed to it, and I allowed it, with a special instruction to the jury that they were -- they were demonstratives, it was not evidence, it was to help them. You know, ordinarily I think demonstratives don't go back, but sometimes they do. I think the District Court Judge has a lot of discretion on that.

You don't have to tell me now. I want you to think about it. I want you to talk it over and just put a pin in it, and we will talk about it at some later point. Okay? I don't

know how disputed the transcripts are, whether you think it's going to be helpful to them to have it in the jury room. But I do want you to just talk it over so we can have a decision on that well before we start deliberations. Okay?

Anything anybody wants to say before we convene?

MS. NUTINI: No, Judge. Thank you.

THE COURT: Mr. Carlson, anything from you?

MR. CARLSON: Nothing, Judge.

THE COURT: All right. So it usually takes about 15 minutes. As soon as I hear word from the jury that they're ready, we're going to get going. I know that we were thinking that maybe we'll finish trial next week, so as soon as the jury is ready, I want to get rolling. You know, I'm sensitive to the clock. So when they're ready, I'm going to be ready. Zipped up and ready. Okay? So we will see you in a few.

(Recess at 3:02 p.m., until 3:22 p.m.)

(Proceedings heard in open court; jury out.)

(Change of reporter.)

THE COURT: All right, folks. The jury is ready.

A couple of quick things. The woman on the jury who said she was having trouble hearing at least potentially has told -- well, let me back up. That didn't come out right.

Remember during jury selection Ms. Graver said that she has some hearing issues. She mentioned to Ms. Ramos that she's having no problem at all hearing everything. She's able to hear things fine. That's why she's not using the headset. So I think that's good news.

I think I'm going to tell the members of the jury that they can sit wherever they want for the rest of the trial. We've got a pretty wide disbursement of seats here, some close, some far, and you never know who is going to be uncomfortable. So I'm going to tell them they can move around after today. Okay? So if you want to lock in your mind who is who, you know, today is your last look for calling same seats.

Okay. Everybody ready to resume?

MS. NUTINI: Yes, Your Honor, just I think very brief.

THE COURT: Mm-hmm.

MS. NUTINI: The next witness after Mr. Vela is John Gorski.

THE COURT: Okay.

MS. NUTINI: He is the fingerprint witness.

THE COURT: Yep.

MS. NUTINI: During -- towards the end of his testimony, I'm going to be using a clicker to go through his demonstrative.

THE COURT: Mm-hmm. Fine.

MS. NUTINI: I would just ask that he be allowed to use the clicker --

THE COURT: That's fine.

MS. NUTINI: -- at the end --

THE COURT: Yep.

MS. NUTINI: -- and defense counsel doesn't have a problem with that.

THE COURT: Okay. That's fine. He can -- he can have control of the clicker. That's what all of us want.

MS. NUTINI: Thank you.

THE COURT: All right. So do you want to get the witness back up here?

MS. NUTINI: Yeah.

THE COURT: And you -- Ms. DeMarco, you've tested the recording? We're good to go?

MS. DeMARCO: Yeah.

THE COURT: It's going to work? Okay.

MS. DeMARCO: We tested it. Knock on wood, cross your fingers, it should be good.

THE COURT: I like things to go smoothly, so . . .

MR. CARLSON: Judge?
THE COURT: Yeah.
MR. CARLSON: Just one thing. The marshals had asked how long we were going to go today --
THE COURT: Yep.
MR. CARLSON: -- so they can make plans to get Mr. Ibekie back to the --
THE COURT: Yep.
MR. CARLSON: -- facility.
THE COURT: I would expect we would not go after 5:00. We'll end right at 5:00.
That still works for you folks? You can take him --
THE MARSHAL: Yes, Your Honor.
THE COURT: You can get him back?
All right. So we'll end at 5:00 today.
MR. CARLSON: Fine.
THE COURT: All right. Everybody ready to get the jury?
MS. DeMARCO: Yes, Your Honor.
THE COURT: All right. Let's get the jury.
(Jury in at 3:24 p.m.)
THE COURT SECURITY OFFICER: All rise.
THE COURT: All right. Have a seat, everyone.
Counsel, you may continue with your examination.
MS. DeMARCO: Thank you, Your Honor.

BY MS. DeMARCO:
Q. Special Agent Vela, before the break, we were talking about a phone call with Peter Pfizer?
A. Yes.
Q. Okay. And you recorded that phone call?
A. Yes, I did.
Q. Okay.
MS. DeMARCO: And, Your Honor, I would ask the jurors to turn to 601-T in their binders.
THE COURT: All right, folks. So you heard that. So they've asked if you would like to turn to 601 in your binders.
I'll tell you this. It's a demonstrative. You don't have to look at it. If you just want to listen, that's fine. This is there to help you. It's a demonstrative. So it's an optional demonstrative for you. If you just want to listen, that's fine. Okay?
Go ahead, Counsel.
MS. DeMARCO: Thank you, Judge. And I'm now going to publish Government Exhibit 601.
THE COURT: All right. So, folks, let me tell you what's going to happen. She's going to play --
(Audio clip played in open court.)
MS. DeMARCO: Sorry, Judge.
THE COURT: I jumped in without, like, telling you what I was doing.

So she's going to play the recording now. That's Exhibit 601. That matches the -- it's supposed to match what's in the transcript. Okay? Everybody understand?

All right. So do you want to again make a proffer what 601 is.

MS. DeMARCO: Yes, Your Honor.

Government Exhibit 601 is a recorded phone call between Special Agent Vela and Peter Pfizer from May 29th of 2020.

THE COURT: Okay. Go ahead.

MS. DeMARCO: Thank you.

(Audio clip played in open court.)

BY MS. DeMARCO:

Q. Special Agent, a few times throughout the call, you refer to the other caller as Peter.

A. Yes, I did.

Q. Why did you do that?

A. That's the only name I had known him to be from the beginning of the activity with the letter to Whitney Baker.

Q. Okay. And drawing your attention to page 1, line 42, when Pfizer says, "You cannot do it yourself. We need a Canadian lawyer, and we need to engage him. I think that's where we are right now," who did you understand him to mean by "engage him"?

A. That was the lawyer that was recommended by the Canadian bank, Pierre Delouis.

Q. Okay. Okay. So based on this call and your prior e-mails that we looked at, did you then reach out to Pierre Delouis?
A. Yes, I did.
Q. And did you attach the documents that Peter Pfizer had sent you?
A. Yes, I did.
Q. Did Delouis respond to you?
A. He did.
MS. DeMARCO: Okay. I'm now publishing Government Exhibit 202-14.
BY MS. DeMARCO:
Q. Okay. Who is this e-mail from?
A. This is from pdelouis@hallhallchamber.com to baker.daniel810@aol.com, on Saturday, May 30th, 2020.
Q. Okay. And can you summarize this e-mail.
A. This is an introductory e-mail just introducing his -- the firm Hall & Hall Chamber and that they specialize in these type of inheritance-type estate claims and that he would provide -- he would go through and look at our claim and see if we were entitled to the inheritance.
Q. Okay. And did you receive a second e-mail from Delouis?
A. Yes, I did.
Q. I'm showing you 202-15.
Okay. And who is this e-mail from?
A. This is from pdelouis@hallhallchamber.com to

baker.daniel810@aol.com.
Q. Can you read the first sentence of the e-mail.
A. "I have attached herewith the retainer agreement which is an understanding between you and this law firm appointing us as your legal solicitors/attorneys to work for you on all the legal purposes concerning your inheritance claim."
Q. Okay. And is there an attachment to the e-mail?
A. Yes.
Q. Okay. What does this attachment appear to be?
A. This is the retainer agreement.
Q. Okay.

MS. DeMARCO: Okay. And I'm blowing up this section, numbers one and two.

BY MS. DeMARCO:
Q. What is this part of the retainer agreement?
A. This is the fees that are going to be associated. One, it's a mandatory probate registry processing fee of 3900 United States Dollars, is required to be paid to the Canadian government through one of their accredited payment receiving brokers. And then, number two, change of ownership processing fee in the amount of 2,500 United States Dollars required by the Canadian government.
Q. Okay. So, in total, approximately 6,000-some dollars?
A. Yep. $6400, yep.
Q. Okay. Okay. And did you eventually sign this agreement as

Daniel Baker?
A. Yes, I did.
Q. Did you also forward this back to Peter Pfizer?
A. Yes, I did.
Q. Okay. I'm showing you 202-16.
Who is this top e-mail from?
A. This is from peterp968@yahoo.com to baker.daniel810@aol.com, on Tuesday, June 2nd, 2020.
Q. Okay. And what did Pfizer say?
A. Pfizer said that he reviewed the agreement and that he can attempt to see if they can take money out of the inheritance; but if not, he was going to provide 40 percent of the total cost and that I would provide 60 percent of the fees.
Q. Okay. So he offered to split that $6400 fee with you?
A. Yes.
Q. Okay. So at this point, is this the first time you've been asked for money as part of the undercover?
A. Yes, this is the first time.
Q. Okay. And did you move forward with paying part of this fee?
A. Yes, I did.
Q. So how does it work to get money for an undercover operation?
A. In the beginning of the undercover operation, there is amounts that we're allowed to spend for these type of

activities. And we were allowed to spend $1100 for -- for this undercover operation.
Q. Okay. And did this progress to the point of asking Delouis where to send the money?
A. Yes, it did.
Q. I'm showing you Government Exhibit 202-17.
Who is this e-mail from?
A. This is from pdelouis@hallhallchamber.com to baker.daniel810@aol.com, on Friday, June 5th, 2020.
Q. Okay. And there appears to be a reference to an attachment?
A. Yes.
Q. Okay. And then could you read this sentence of the e-mail.
A. "There is a 34 percent GST/HST tax charge payable if payment is received in Canada. Accordingly, we have waived this charge and have provided our offshore agent account for the payment to be made without the applicable taxes."
Q. Okay. And I'm showing you this attachment.
So this is the bank you're supposed to send the payment to?
A. Yes.
Q. Okay. What is the bank name?
A. Chase Bank.
Q. The address?
A. 1212 Hobson Road, Naperville, Illinois 60543.

Q. And what is the beneficiary name of this bank account?
A. Emetech Solutions, Incorporated.
Q. And the address?
A. 797 Oxbow Avenue, Oswego, Illinois 60540.
Q. And what are the last four digits of the account number?
A. 6830.
Q. Had Emetech Solutions come up at all in your conversations with Pfizer?
A. No, not one time.
Q. Okay. And what was your understanding, based on this e-mail, of why you were paying to a bank in Illinois when your attorney was in Canada?
A. Based on the e-mail, by sending money to this bank, I would save the 34 percent taxes if I would have sent it to Canada.
Q. What did you do with this banking information?
A. I forwarded it to Peter Pfizer.
Q. Okay. Did you also forward it on the law enforcement side?
A. Yes, I did.
Q. Who did you send it to?
A. I sent it to the case agent, and I also contacted another undercover agent to help me with the payment.
Q. Okay. Did you ever end up sending money to this account?
A. No. No.
Q. Okay. And why is that?
A. Later, they said that this account was under audit and that

they were going to need a cashier's check, so not to wire the funds to this account.

Q. Okay. Okay. At this point, did you have another phone conversation with Pfizer?

A. Yes, I did.

Q. And did you record that call?

A. Yes, I did.

Q. Okay. And what was the high-level kind of purpose of that call?

A. Mr. Pfizer wanted to instruct me that when I go to the bank actually to make this wire transfer, that to be careful what I say because as -- he said he was a banker. The bankers are responsible for the customer safety, and that I should say that I'm purchasing merchandise or goods and not to talk about the inheritance because the bank could refuse sending the wire at that point.

Q. Okay.

MS. DeMARCO: I'd like to publish Government Exhibit 602 and ask the Court to have the jury turn to 602-T.

THE COURT: All right. So, folks, you've heard that. The government is going to play a recording of a call. You have a transcript that is a demonstrative. It's not evidence. You can look at it or you can not look at it. It's up to you. It's just there to help you if you want to look at it. Okay?

Do you want to make a proffer of what 602 is, please.

MS. DeMARCO: Yes, Your Honor. Government Exhibit 602 is a recorded call between Special Agent Vela and Peter Pfizer on June 5th of 2020.

THE COURT: Okay. Thank you.

Everyone ready?

All right. Was the audio okay, everyone? Could you hear that okay? Was it too loud? Not loud enough? Everybody hear it okay?

All right. Counsel, you can go ahead and play it for the jury.

MS. DeMARCO: Thank you, Judge.

(Audio clip played in open court.)

BY MS. DeMARCO:

Q. Special Agent, I want to draw your attention to page 1, line 24.

When the caller says, "The bank does whatever they have to do to keep their customers safe, so when you go into the bank, and you're having a conversation with any of these representatives, be careful the kinds of words you are using. What I would advise is, um, when you -- when it comes to why you're sending the money, the purchase of sending is for the purchase of goods or purchase of merchandise. That way, it doesn't raise a whole lot of questions," what did you take that to mean?

A. I took that to mean to go on there and not say I was

sending the money for an inheritance, that I was entitled to say that. I needed to say I was purchasing goods or merchandise because if not, the banker might not allow me to send the money.
Q. Okay. And there's some conversation in here about Pfizer making a payment and you making a payment. At this point, you had this sharing agreement where half of you were going to -- you were going to pay half and he was going to pay half?
A. Right. So in order to pay the fees that the Canadian bank wanted, I told him I didn't have enough money to send right now the $6400. So he was going to send a portion, and I was going to send a portion, but I only was planning on sending $1,100.
Q. Okay. And did you and Pfizer exchange further e-mails about this payment?
A. Yes, we did.
Q. I'm showing you Government Exhibit 202-18.
Okay. I'm going to have you start from the bottom.
Who is this one from?
A. This would be me to Mr. Pfizer. I'm letting him know that I e-mailed the attorney retainer agreement, and I was going to forward any information that was sent.
Q. Okay. And --
A. And --
Q. Oh, sorry.
Okay. And then did he respond?

A. Yep. He responded on Friday, June 5th, 2020, that -- that -- he said, "I will send it directly and e-mail you my confirmation so that you can e-mail it to the lawyer." Signed "Mr. P."
Q. Okay. And then he e-mailed you again?
A. Yes, on Saturday, June 6th, 2020. He asked, "Can you send me the payment information, please?"
Q. Okay. And then, finally, up here.
A. This is from baker.daniel810@aol.com to peterp968@yahoo.com.
It's to Mr. -- Mr. Pfizer said, "Everything is good. I've been working on getting the 60 percent to send to the attorney, and I would have it by Friday. And I was going to borrow some money from my sister and that I would e-mail or call him by Friday."
Q. Okay. So he told you he was going to send the money directly rather than sending it to you to send?
A. Correct.
Q. Okay. I'm showing you Government Exhibit 202-19.
Who is this one from?
A. This is from pdelouis@hallhallchamber.com to baker.daniel810@aol.com.
Q. Okay. And you touched on this a little bit earlier, but can you please read this e-mail.
A. It says, "Dear Daniel, please disregard the account

information I gave you before because the account is currently being" -- "been auditing and will take time to process any transactions that get there. Pay by cashier's check only payable to Globayo LLC, address: 2726 Alyssa Drive, Naperville, Illinois 60565.

"You can make the cashier's check in separate checks. That is not a problem. Once you get the cashier's check, let me know so that I will give you the address to mail it. Kind regards, P. Delouis."

Q. Had Globayo LLC ever come up in your communications with Pfizer or anyone else?

A. No, not one time.

Q. Okay. And did you respond to him?

A. I did.

Q. What are you asking him in this e-mail?

A. I just apologize for the delay and that I'll let him know when I have the cashier's check. And I just wanted to confirm that I was going to mail -- where I was going to mail the cashier check to.

Q. Okay. And did he respond to your question about where you should mail the check?

A. Yes, he did.

Q. I'm showing you Government Exhibit 202-20.

Can you read this e-mail to the jury and tell us who it's from.

A. It's from pdelouis@hallhallchamber.com to baker.daniel810@aol.com, on Wednesday, June 10th, 2020.

It reads: "Hi, Daniel. Once you get the cashier's check, mail it to 1419 North Harlem Avenue, Suite B, Oak Park, Illinois 60302. Please let me know once you mail it. Thanks." Signed "P. Delouis."

Q. So what did you do with this updated information about the payment?

A. I provided it to the case agent, Amy Mansker, and the other undercover agent that was also going to send the payment.

Q. Were you involved at all in preparing and sending the payment?

A. No.

Q. Did you become aware that a check had been sent?

A. Yes.

Q. Did you receive a tracking number for the package?

A. Yes, I did.

Q. Did you provide that to Pierre Delouis?

A. Yes, I did.

Q. Did you also provide it to Peter Pfizer?

A. Yes.

Q. Okay. I'm showing you Government Exhibit 202-21.

What is this e-mail?

A. This is from baker.daniel810@aol.com to pdelouis@hallhallchamber.com, on Wednesday, June 17th, 2020.

It reads: "Mr. Delouis, I sent a cashier's check of $1,100 by express mail, and it should arrive by tomorrow. The tracking number is EJ199352533US. Thank you, Daniel Baker."
Q. Okay. And there's an earlier e-mail as well.
A. This is from pdelouis@hallhallchamber.com to baker.daniel810@aol.com, on Saturday, June 13th, 2020.
It reads: "Dear Daniel, this is to acknowledge receipts of the money order of $2,600, and it has been applied to your file. Once you send the cashier's check, let me know. Regards, P. Delouis."
Q. And who had allegedly sent this $2600?
A. Peter Pfizer.
Q. Did you ever see any proof of that payment?
A. No, other than a confirmation from -- from Mr. Delouis.
Q. Okay. Okay. I'm showing you Government Exhibit 202-22.
What is this e-mail?
A. This is from baker.daniel810@aol.com to peterp968@yahoo.com, Wednesday, June 17th, 2020.
It reads: "Mr. Pfizer, I received the money from my sister, and I was able to get to the post office to mail it out. I sent $1,100 to Globayo LLC in Oak Park, Illinois. It should arrive by tomorrow by express mail. The tracking number is EJ199352533US, Daniel."
Q. Other than Pfizer and Delouis, did you give this tracking number to anyone else?

A. No.

Q. Did Delouis confirm that he had received the undercover check?

A. Yes, he did.

Q. I'm showing you Government Exhibit 202-23.

What is this e-mail?

A. This is from pdelouis@hallhallchamber.com to baker.daniel810@aol.com, on Monday, June 22nd, 2020.

It reads: "Dear Daniel, this is to acknowledge receipt of the $1,100 cashier's check. Make the cashier's payable to Globayo LLC and mail it to 1419 North Harlem Avenue, Suite B, Oak Park, Illinois 60302.

"Thanks, P. Delouis."

Q. And is the reference to make the cashier's payable to Globayo LLC, is that in regards to further funds that you owed?

A. Correct, because I only paid the $1,100, and I still owed some more for the fees.

Q. Did you ever send any additional funds?

A. No, I didn't.

Q. Did Peter Pfizer try to call you other than the two times you spoke on the phone?

A. Yes, he did.

Q. Did you ever talk to him on the phone other than those two calls we listened to?

A. Just the two calls.

Q. How did the number come up when he tried to call you?
A. It didn't have a caller ID. It read "no caller ID." So I didn't answer it when I received it.
Q. Have I shown you every e-mail that you exchanged with Pfizer, Delouis, Wyashika Sellar, and Nikka Avis or just a sampling?
A. No, this is just a sampling. There was a lot more e-mails.
Q. Did you have any further involvement in the investigation?
A. No.
Q. And finally, Special Agent, do you know the defendant?
A. No, I do not.

MS. DeMARCO: Okay. One moment, Your Honor.

THE COURT: Mm-hmm.

MS. DeMARCO: No further questions.

THE COURT: Okay. Thank you, Ms. DeMarco.

Defense counsel, whenever you ready.

MR. CARLSON: No questions, Your Honor.

THE COURT: Okay. Sir, you can step down. Thank you for coming. Please watch your step.

THE WITNESS: Thank you, Your Honor.

THE COURT: Okay. Thank you.

(Witness excused.)

THE COURT: The government may call its next witness.

MS. NUTINI: Thank you, Your Honor.

The government calls John Gorski.

THE COURT: Okay.

Members of the jury, I'm going to stand up when the witness comes in. If anybody needs to stretch their legs, you can, too. All right. So . . .

(John Gorski enters the courtroom.)

THE COURT: Come on up, please. Good afternoon. Come on up. Please stand right here.

(Witness sworn.)

THE COURT: Very good. Have a seat, please.

Good afternoon to you.

THE WITNESS: Good afternoon.

THE COURT: A couple things. I'd like you to speak directly into the microphone. I want to make sure all the men and women of the jury can hear you.

And then if you need something to drink, help yourself to the pitcher of water on your right. Okay.

THE WITNESS: Thank you.

THE COURT: All right.

Counsel, you may proceed with your examination.

MS. NUTINI: Thank you, Judge.

JOHN GORSKI, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. NUTINI:

Q. Good afternoon.

A. Good afternoon.

Q. Can you please state and spell your name for the record.
A. My name is John Gorski, first name is spelled J-o-h-n, last name G-o-r-s-k-i.
Q. Where are you employed?
A. I'm employed by the Department of the Treasury, IRS Criminal Investigations Center for Science and Design in Chicago.
Q. And what is your position within the IRS?
A. I'm a fingerprint specialist.
Q. What's a fingerprint specialist?
A. So a fingerprint specialist, we receive evidence for the analysis and comparison of latent fingerprints. We compare fingerprints to known exemplars. We write reports, and then we testify in court as needed.
Q. And how long have you worked as a fingerprint specialist with IRS?
A. With the IRS, I've worked for approximately five and a half years as a fingerprint specialist.
Q. Did you work with any other agencies prior to working with IRS as a fingerprint specialist?
A. Yes, I did.
Q. Where did you work?
A. I previously worked for the Illinois State Police Division of Forensics Services.
Q. And how long did you work for the Illinois State Police?

A. I started with the Illinois State Police in November of 2011, and I left in December of 2018, so approximately seven years.
Q. Mr. Gorski, what is your general education background?
A. I received a Bachelor of Science in forensic science and a Bachelor of Science in chemistry with an emphasis in biochemistry from Loyola University of Chicago. I also earned a minor in criminal justice from Loyola University of Chicago.
Q. And what specialized training, if any, do you have in the field of fingerprints?
A. I completed a two-year training program in the area of fingerprints through the Illinois State Police.
Q. And do you have any certifications that are relevant to your field?
A. Yes, I do.
Q. What certifications do you have?
A. I'm a certified latent print examiner through the International Association for Identification.
Q. And is that a certification that is only good for a certain number of years?
A. That is correct. Yes.
Q. And can you describe that to the jury?
A. So the certification is good for a period of five years. After five years, I need to take a recertification exam. The initial certification exam for the field of latent prints

consisted of comparison exercises and a written examination. For the recertification exam, that will consist of comparison exercises.
Q. And when was the last time you were certified?
A. So I completed the initial certification in August of 2020- -- 21.
Q. Are you a member of any professional organizations?
A. Yes, I am.
Q. And what professional organizations?
A. I'm a member of the International Association for Identification, and also the Illinois division of the International Association for Identification.
Q. And are those fingerprint-related professional organizations?
A. Yes, they are.
Q. How do you stay up to date on any development in your field?
A. I stay up to date on developments in the field by attending professional meetings. Every year there is an annual conference through the International Association for Identification. I attend this meeting. I also attend the Illinois Division for International Association for Identification annual meetings. I also review periodical journals.
Q. Mr. Gorski, have you previously testified in the area of

fingerprints?
A. Yes, I have.
Q. And approximately how many times have you testified in that area?
A. I've testified approximately 12 times in the field of fingerprints.
Q. And given that you're employed by IRS and you were previously employed by the Illinois State Police, is it fair to say that your testimony has been on behalf of the government in those 12 occasions?
A. That is correct.
Q. I'd now like to turn to some background questions regarding the field of fingerprint examination.
Mr. Gorski, have you prepared a demonstrative today that would assist you in your testimony?
A. Yes, I have.
MS. NUTINI: Your Honor, permission to publish John Gorski as a demonstrative.
THE COURT: Any objection?
MR. CARLSON: No, Your Honor.
THE COURT: All right. Publishing -- you said you're going to publish John Gorski?
MS. NUTINI: It's the John Gorski demonstrative --
THE COURT: He's right there. Yeah. Okay. Fair enough.

MS. NUTINI: -- as a demonstrative.

THE COURT: That's totally fine.

MS. NUTINI: Thank you, Judge.

THE COURT: So, folks, again, this is a demonstrative. You've got to think of an exhibit differently than a demonstrative. An exhibit is evidence. You can consider that in the jury -- demonstrative just demonstrates something. It helps you understand. All right? So it's not evidence. It just helps you understand the other evidence you'll hear.

Go ahead, Counsel.

MS. NUTINI: Thank you, Your Honor.

BY MS. NUTINI:

Q. Mr. Gorski, what is friction ridge skin?

A. Friction ridge skin is a specialized type of skin that is found on your -- the palms and fingers of your hands as well as the soles and tolls of your feet. There are different areas of friction ridge skin that I look for when I'm conducting an analysis. Friction ridge skin has ridges and furrows that can be compared to a series of mountains and valleys, where the ridges correspond to the mountains and the furries -- furrows correspond to the valleys.

Q. So is the skin on my palm different than, say, the skin on my forearm?

A. Yes, it is.

Q. And, Mr. Gorski, what is a latent print?

A. A latent print is a chance recording of an individual's friction ridge skin that is left on an object after an individual comes into contact with an object. Latent prints often are not visible to the human eye without processing the object to help visualize any impressions that may be left behind.
Q. And you said it's a chance recording; is that correct?
A. That is correct.
Q. What do you mean by "chance recording"?
A. So a chance recording is something that is unintentional. It's something that just happens. If an individual picks up a glass, like to take a drink from the glass, there is a chance that they will leave behind a fingerprint. Just because somebody touches something does not mean that they will leave behind a fingerprint that is observable for identification purposes.
Q. So what are the factors that would come into play as to whether or not somebody left a fingerprint on, say, a glass?
A. So the different factors that play a role in an individual leaving behind a fingerprint on an object after they touch it include the amount of fingerprint residue that might be on their hands. Fingerprint residue can consist of moisture, sweat, paints, bloods, any other contaminant that might be on the fingers.
The surface that is touched also plays a role if a

fingerprint is left behind on the surface. There are different surfaces that are more receptive to having a fingerprint left behind. Good surfaces include paper, plastics, glasses, metals. Texture objects and fabrics are not good surfaces for the reception of fingerprints.
Q. So why would paper be a good surface to leave behind a fingerprint?
A. Paper is a good surface for fingerprints because when an individual touches a paper object, the fingerprint residue that might be transferred to the paper soaks down into the fibers of the paper.
Because the residue soaks into the fibers of the paper, it is protected. You cannot wipe it away. It stays there.
For different surfaces, like the paper -- or plastics, metals, and glasses, the fingerprint residue sits on the surface of that object, and it can easily be wiped away and destroyed.
Q. So we've talked about a latent print.
Mr. Gorski, what is a known print or a known print standard?
A. A known print standard is a deliberate recording of an individual's friction ridge skin that is taken under controlled situations in order to obtain high-quality fingerprints for comparison purposes.

Q. So what would be an example of a known print standard?
A. So a known print standard can be taken for a background check for job purposes. It can be taken with ink and paper. It can also be taken on a live scan device. A live scan device is similar to a scanner where the individual would place their hands on the surface of that device, and it would be digitally captured.
Q. So, is it fair to say a latent print is an unintentional recording, whereas a known print is an intentional recording?
A. That is correct.
Q. Mr. Gorski, can you walk the jury through the scientific methodology that you use when looking at latent prints and known print standards?
A. The scientific methodology that I use when I look at latent prints and known print standards is known by an acronym of ACE-V, A-C-E, dash, V.
The "A" stands for analysis, the "C" stands for comparison, the "E" stands for evaluation, and then the "V" stands for verification.
When I capture an image of a latent print, I would first analyze the latent print, looking for any observable details. If I determine that the latent print in question is suitable for identification, I would then compare that latent print to any known fingerprint exemplars. I'm looking at that point for similarities and differences, and that's the "E," the

evaluation for my comparison portion.

When I reach the determination of identification, every identification that is made in a case is verified by a second examiner who then independently goes through the same process of analyzing, comparing, and evaluating the latent print in the known exemplar.

Q. So let's talk about the analysis.

What things are you looking for when you analyze a latent impression?

A. So there are three separate levels of detail that I look for when I'm analyzing a latent impression. The first level of detail is the overall -- it's the simplest level of detail. I'm looking at the -- the ridge flow and pattern type.

The second-level detail consists of bifurcations, ending ridges, and dots. They are more discriminatory compared to level one detail.

The third level is the most extreme, smallest detail. They include pores, incipient ridges, creases, scars. Third level detail is often not repeated between separate touches because it is a smallest level of detail.

Q. So let's talk about the level one detail in a bit more detail.

Can you describe the level one detail.

A. Yes. The image on the left is an example of an arch. So the ridge flow for an arch starts with the ridges flowing in on

one side of the pattern, rising up in the middle, and then flowing out the opposite side of the pattern. An example is traced with the yellow line.

The image in the middle is an example of a loop, where you have ridges that flow in on one side of the pattern, rise up in the middle, and flow out the same side that they entered in from. Again, this is traced with a yellow line.

The image on the right is an example of a whirl where you have ridges that make a complete circuit between two deltas. The deltas are traced in orange, and the ridge flow for the whirl is traced in yellow. A delta is an area of friction ridge skin where you have ridges that flow in three separate directions.

Q. So that's the level one detail. How about the level two detail?

A. So for level two detail, there are three types that I look for.

The first type is an example of a ridge ending where you have a ridge that is traced in red that ends abruptly between two continuous ridges.

The second example is a bifurcation where you have a ridge that divides into two ridges.

And the third example is a dot where you have ridges that are no longer wide as they are tall. And, again, that's traced with the yellow dot -- or with the red dot. Sorry.

Q. And then you said that there was a third and final level?
A. Yes, I did.
Q. And that's the level three detail?
A. That's correct.
Q. And I believe you explained this was ridges, creases, scars, *et cetera*?
A. Yeah. So level three is the most -- it's the most minute detail, including creases, scars, pore size and location, ridge width and shape. It is often not repeated because it is the smallest observable detail.
Q. Are you familiar with the term "distortions"?
A. Yes, I am.
Q. Can you please describe for the jury what distortions are and how that plays into latent prints or known standards?
A. Distortions are caused by the amount of pressure that is left behind after an individual comes into contact with an object. Distortions exist in every single print. No two touches will look exactly alike because of the way that an individual happens to come into contact with the object. Pressure and movement apply and play a role in having distortions in fingerprints.
Q. So is it fair to say that distortions are sort of human factors that we may create?
A. That is correct.
Q. So after you observe the three levels of detail and

complete your analysis, what are the possible conclusions that you can reach at the end of a comparison?

A. At the end of the comparison, there are four different conclusions that I can reach.

The first is an identification. An identification is a determination that the latent print and the known exemplar are -- originate from the same source. Because the level and quality and quantity of corresponding information that is present between the latent print and the known exemplar, I would not expect to see that same amount of detail repeated in impressions made by different sources.

The second conclusion that can be reached at the end of a comparison is the determination of exclusion, which is where the latent print in question and the known exemplar do not originate from the same source.

The third conclusion that can be reached is a determination of inconclusive, which is where there's not enough information present in neither the latent print or the known exemplar to effect a conclusion of an identification or exclusion.

And the last conclusion that can be reached after a comparison is the determination that the latent print in question is just not suitable for identification because there's not enough quality and quantity of information present in the latent impression to effect a conclusion.

Q. And, Mr. Gorski, I'll just ask that we both kind of slow down so the court reporter can track what we're saying.

So if you reach the conclusion of identification, is there a final step that you go through?

A. Yes, there is.

Q. And what is that final step?

A. So if I reach the conclusion of identification, that latent print and exemplar are then verified by a second trained examiner.

Q. And what is a verification?

A. Verification is where the second examiner repeats the process of analyzing, comparing, and evaluating the latent print and the known exemplar.

Q. So just to take a step back, why is it that fingerprints are so useful as a means of identification?

A. Fingerprints are useful as a means of identification because they are both highly discriminatory and persistent to an individual throughout the individual's life.

Fingerprints form during fetal development. And the interactions between the developing baby and the lining of the uterus as well as what the environment is for the mother with the food and any other substances that the mother might ingest play a role in how fingerprints form during fetal development.

The fingerprints that a baby is born with will be the same fingerprints that that individual will die with, barring

any major injury to the dermal layer of the skin.

If there is an injury to the dermal layer of the skin, that will result in a scar, which, again, is persistent to that individual throughout that individual's life.

Q. So you talked about fetal development. Say there's two identical twins forming in a mother's body, will they have the same fingerprints?

A. No, identical twins will not have the same fingerprints. They will have the same DNA. But because of the interactions between the developing babies in the womb, all of those fingerprints, they might look similar; however, the arrangement of features with the bifurcations, ending ridges and dots, that arrangement of features will be different between identical twins in the womb.

Q. Mr. Gorski, we've talked about fingerprint identification and comparison.

But how does a fingerprint specialist actually process the recovery of fingerprints?

A. A fingerprint specialist processes different items depending on their makeup, if it's a porous item compared to a nonporous item with different processing techniques to help visualize a latent impression on the surface.

Q. So let's use a porous example to start.

Again, what is a porous type of document or example?

A. A porous item is a paper-based item, paper, cardboard,

anything that moisture can soak into the fibers of that item.
Q. So if you're processing paper for fingerprints, what do you do?
A. To process paper for fingerprints, I would first look at the item using natural light or a flashlight or a different light source to see if there are any observable fingerprints on the surface of that item.
After I visually examine the item, I would then use a technique called ninhydrin to process the paper-based item.
Ninhydrin is a chemical solution that reacts with amino acids and fingerprint residue. After I submerse the item to the ninhydrin technique, I would then place the item in a humidity chamber that is set at 60 degrees Fahrenheit and then 60 percent relative humidity -- sorry -- 60 degrees Celsius. This helps to facilitate the reaction between the ninhydrin and any amino acids that might be present in the fingerprint residue.
Q. Turning to the specifics of this case, did you personally process any evidence to actually recover fingerprints?
A. No, I did not.
Q. Who did that?
A. A retired fingerprint specialist by the name of John Onstwedder previously processed the items in question for fingerprint analysis.
MS. NUTINI: Your Honor, at this time, the government

would ask that we read Stipulation No. 14 into the record.

THE COURT: Okay.

We'll pull it up on the screen.

Everybody see that okay?

All right. Here it goes, folks. Here's Stipulation No. 14:

If called to testify, retired IRS-CI senior fingerprint specialist John Onstwedder would testify as follows. And there are three paragraphs.

Paragraph 1: In May and June 2020, Mr. Onstwedder was a senior fingerprint specialist with the IRS-CI laboratory in Chicago, Illinois.

Paragraph 2: Between May 28th, 2020, and June 4th, 2020, Mr. Onstwedder subjected two letters and two envelopes contained within Government's Exhibit 801, and marked in the laboratory as Item No. 1, to a developmental process and examined the item for ridge impressions.

More specifically, Mr. Onstwedder processed the documents with the chemical solution ninhydrin, which reacts with amino acids in fingerprint residue. The documents were then placed in a humidity chamber to help facilitate the reaction, resulting in a positive finding for the presence of ridge impressions/fingerprint residue, which appeared as a purplish-pink color, on the envelope addressed to SG.

Paragraph 3: Mr. Onstwedder photographed and scanned

these results into the IRS-CI's computer system, under laboratory No. 20-0117.

It says "So stipulated."

There is a signature for an Assistant United States Attorney.

There is a signature for defense counsel.

And there is a signature for defendant, Anthony Ibekie.

And it says "So stipulated."

So stipulated?

MS. NUTINI: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: Okay.

MS. NUTINI: Thank you, Your Honor.

BY MS. NUTINI:

Q. Mr. Gorski, did you take any role in Mr. Onstwedder's original examination?

A. Yes, I did.

Q. What did you do?

A. In Mr. Onstwedder's original examination, I served the role as a verifier for the identifications that were made. I also served the role as a technical reviewer for the report and the notes in the case.

Q. So we've talked about what a verifier is.

Can you explain what a technical reviewer is.

A. So a technical reviewer reviews both the report and the work notes to check for accuracy for grammatical errors, for any spelling errors, and to make sure that all the information was recorded accurately.
Q. And what were your conclusions, if any, as your role as a verifier and a technical reviewer?
A. As a verifier, I identified the latent prints made in the case by the original examiner. I also made a couple recommendations for corrections to be made on the report and the notes.
Q. And what type of recommendations did you make?
A. Minor grammatical corrections to make on the report and the notes.
Q. In other words, typographical types of errors?
A. That's correct. Yes.
Q. And at some point, were you asked to do your own analysis in this case?
A. Yes, I was.
MS. NUTINI: Your Honor, we have one other stipulation we'd like to read into the record, and that is Stipulation No. 15.
THE COURT: Okay. We'll pull it up on the screen.
All right. Everybody see that?
All right, folks. Here's Stipulation No. 15. Here it goes.

Government Exhibit 509 is a fingerprint card containing the fingerprints of the defendant, Anthony Ibekie, taken on July 16th, 2020. Government Exhibit 509 is in substantially the same condition as it was on July 16th, 2020. The parties agree that Government Exhibit 509 is admissible in evidence.

It says "So stipulated."

There is signatures for an Assistant United States Attorney, a signature for defense counsel, and a signature for Defendant Anthony Ibekie.

So stipulated?

MS. NUTINI: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: Okay.

MS. NUTINI: Your Honor, the government moves to admit Government's Exhibit 509 and to publish during this presentation.

THE COURT: Any objection?

MR. CARLSON: No objection.

THE COURT: It's admitted.

(Government's Exhibit No. 509 was received in evidence.)

THE COURT: You can publish to the jury.

MS. NUTINI: Thank you, Your Honor.

Your Honor, permission to approach the witness with Government's Exhibit 801, which has already been admitted into

evidence.

THE COURT: You may. You can publish to the jury.

BY MS. NUTINI:

Q. Mr. Gorski, I'll ask you to take a look at Government's Exhibit 801, and then just let me know when you're ready.

A. I'm ready.

Q. What is Government's Exhibit 801?

A. Government Exhibit 801 is two white envelopes.

Q. And have you seen Government's Exhibit 801 before?

A. Yes, I have.

Q. And when have you seen these materials?

A. I saw these materials previously with counsel as I was reviewing the case.

Q. And are these the items that were used in Mr. Onstwedder's original evaluation in which fingerprints were identified and photographed?

A. Yes, they are.

Q. And just to be clear, does Government's Exhibit 801 consist of two letters inside of two envelopes?

A. Yes, it does.

Q. And are these photographs that Mr. Onstwedder took of Government's Exhibit 801 the same prints and photographs that you used to conduct your own analysis?

A. Yes, they are.

Q. I'd like to walk through some of these photographs.

Mr. Gorski, can you describe for the jury what we're looking at in the left-hand image in this slide?
A. The image on the left is the latent print that has been designated 1-4-A, which was taken from the backside of the envelope addressed to Saeid Ghaemi.
THE COURT: You are showing the jury the demonstrative here, right, on the screen?
MS. NUTINI: Yes.
THE COURT: Okay.
MS. NUTINI: Yes, Your Honor. Thank you.
BY MS. NUTINI:
Q. And does it appear that this print has some coloration to it?
A. Yes, it does.
Q. Can you describe that for the jury.
A. The print "1-4-A" is a ninhydrin print, so the coloration is what fingerprint examiners call Ruhemann's purple. It is a purplish-pink color which results after a paper document has been processed with ninhydrin and placed in a humidity chamber to help facilitate the reaction between the latent print fingerprint residue and the ninhydrin chemical solution.
Q. Looking now at the right-hand image on Slide 9 of the demonstrative, what are we looking at here?
A. The image on the right has been processed to turn the ridges a dark black color and the furrows a grayish-white

color. The image is blown up a little bit to help make it easier to see.
Q. And so is that why it's been processed with two contrasting colors?
A. That is correct.
Q. In other words, to make your evaluation easier to do?
A. Yes. So we process the image to turn the colored image to a black and white image to help increase the contrast between the ridges and the furrows to help make it easier to visualize any second-level detail that may be on the image.
Q. And in Slide 9, are we focused on one print?
A. Yes, we are.
Q. And that's the print identified as 1-4-A?
A. That is correct.
Q. Mr. Gorski, do you see a pencil marking on the image to the left?
A. Yes, I do.
Q. And is that same pencil marking identified on the physical item of Government's Exhibit 801 that you have before you?
A. Yes, it is.
Q. And where is that pencil marking?
A. The pencil marking is on the backside of the envelope.
I will hold it up to point it out to the jury (indicating).
Q. And so it's on the envelope, not the letter; is that

correct?
A. That is correct.
Q. Moving on to Slide 10, what are we looking at here on the left-hand side?
A. The image on the left is, again, the black and white image of the latent print designated 1-4-A.
Q. And focusing again on the image on the left, were you able to observe or identify anything about the relevant fingerprint based on analyzing this image on the left?
A. Yes. The information I was able to determine from the image on the left is that the level one detail is either a left slant loop or a whirl. And this is based on a delta which, again, is an area of a fingerprint where you have ridges that flow in three separate directions. There is a delta in the lower right-hand corner of the image; and you have ridges that are flowing up and to the left, indicating that there is either -- there is a recurve there, which indicates it's either a left slant loop or a whirl.
Q. And moving to the image on the right, were you able to observe any second-level detail?
A. Yes, I was.
Q. And is that depicted in any way on the right?
A. The image on the right, I marked second-level detail, such as ending ridges and bifurcations, with a yellow dot.
Q. Mr. Gorski, did you then have the opportunity to compare

the fingerprint identified in Government's Exhibit 801 to any known fingerprint exemplar cards?
A. Yes, I did.
Q. Whose known fingerprint card?
A. I compared latent 1-4-A to the fingerprint exemplars bearing the name Anthony Ibekie.
Q. I'm showing you Government's Exhibit 509.
Is this the fingerprint exemplar card that you used to conduct your comparison?
A. Yes, it is.
Q. And this is Slide 11 of the demonstrative; is that correct?
A. It is correct.
Q. Can you walk the jury through what is the image on the right.
A. The image on the right is finger No. 6, the left thumb, that has been cropped out of the original image and rotated a little bit to make the fingerprint tip up and also blown up so that way it's easier to see.
Q. Is this the -- the left thumb the fingerprint that you used for your comparison?
A. Yes, it is.
Q. I'd like to walk through your comparison.
MS. NUTINI: Your Honor, at this time, may I provide the presenting clicker to the witness?
THE COURT: You may.

THE WITNESS: Thank you.

BY MS. NUTINI:

Q. And, Mr. Gorski, you can remove your gloves if it's easier for you to use the clicker.

So I'd like you to walk the jury through your analysis, and that's starting on the next slide. If you can describe what you did here.

A. I began my comparison by observing opposing ending ridges that are traced in blue near the tip of the latent impression. Directly above that, there is a short ridge, which is an ending ridge on both sides, that is traced in green. Directly above that, there is a continuous ridge that is traced in yellow dots. Above that is a short ending ridge that ends to the left with a continuous ridge directly above that.

Moving to the known exemplar, I observed the same features: the opposing ending ridges traced in blue, with a short ridge traced in green, a continuous ridge traced in a yellow dotted line, a short ridge traced in green, and a continuous ridge with a yellow dotted line directly above that.

Moving back to the latent impression, I then noticed an ending ridge that ends going to the top left directly below the two opposing ending ridges traced in blue. This ending ridge that I noticed is traced in a green line. Directly below that is a continuous ridge that is marked in a yellow dotted line.

Below that is a -- two opposing ending ridges that have been traced in blue with two continuous ridges traced in yellow dotted lines directly below that.

And then there is an additional ending ridge that ends at the top left traced in green with a continuous ridge traced in a yellow dotted line directly below it.

Moving back to the known exemplar, I observed the same features repeated in that impression as well: the ending ridge ending to the top left traced in green directly below the opposing ending ridges traced in blue, a continuous ridge traced in a yellow dotted line, opposing ending ridges traced in blue lines. Directly below that, you have two continuous ridges traced in a yellow dotted line. Below that, there is an upward to the left ending ridge traced in green with a continuous ridge traced in a yellow dotted line directly below it.

Q. Mr. Gorski, are these all of the details that you identified between the two prints, or is this just a sampling for the jury?

A. This is just a sampling of the information that I observed during my comparison for the jury.

Q. Did you observe any other second-level details that we haven't already discussed?

A. Yes, I did.

Q. And what were those?

A. So on this slide, I -- all the information and second-level detail that I observed between the latent print and the known exemplar I have marked up with green dots.
Q. And what were those second-level details that you marked with green dots on both?
A. So the second-level details that I had marked up on both the latent impression marked 1-4-A and on the known fingerprint exemplar bearing the name Anthony Emeka Ibekie, finger No. 6, included both ending ridges, bifurcations, opposing ending ridges, short ridges.
Q. And after you completed your comparison of the print from Government's Exhibit 801 to the fingerprint card for Anthony Ibekie, the defendant, did you reach any conclusions?
A. Yes, I did.
Q. And what were those conclusions?
A. I reached the conclusion of the latent fingerprint 1-4-A was identified to the fingerprint card bearing the name Anthony Emeka Ibekie.
Q. In other words, is it fair to say that the defendant's fingerprint was identified on Government's Exhibit 801?
A. Yes, it is.
MS. NUTINI: Your Honor, may I have a moment?
THE COURT: Yes.
(Counsel conferring.)
MS. NUTINI: I have no further questions. Thank you.

THE WITNESS: Thank you.

THE COURT: Thank you, Counsel.

Defense counsel, whenever you are ready.

MR. CARLSON: Thank you, Judge.

MS. NUTINI: And, Your Honor, I would just ask we go back into the "witness publish" mode. Thank you.

CROSS-EXAMINATION

BY MR. CARLSON:

Q. Mr. Gorski, it would be fair to say, would it not, that you have no firsthand knowledge about the recovery of this letter -- these two letters and envelopes in 2020? Is that correct?

A. Besides the information that I noticed in the report and the notes, that is correct.

Q. You weren't there when they were recovered, right?

A. I was not physically in the processing room when these were recovered, that is correct.

Q. And you weren't present when the agents recovered these from wherever they got them from, were you?

A. That is correct, I was not there.

Q. You weren't involved in this process at all until you were a reviewer or verifier for your colleague, correct?

A. That is correct.

Q. And when your colleague did his initial evaluation and testing, you were there when that happened, correct?

A. I was employed by the IRS at that time, yes.
Q. But were you watching him as he did this?
A. No, I was not.
Q. What you did is you reviewed the reports that he created, correct?
A. That is correct.
Q. And the -- when your predecessor examined the envelopes and letters -- and he looked at both of them, right, the envelopes and the letters?
A. That is correct. Yes.
Q. He didn't find any fingerprints at all on the letters; is that correct?
A. To my recollection, that is correct.
Q. He didn't find Mr. Ibekie's fingerprints on the letters, that's for sure, correct?
A. There were no prints recovered from the letters.
Q. And that's despite the fact that you said paper is a good substance to recover fingerprints from, correct?
A. Correct.
Q. You would agree with me, would you not, if a person never touched a surface, his fingerprint is not going to be found on there, right?
A. If an individual does not touch a surface, the fingerprint will not be from that individual on the surface.
However, just because a fingerprint was not recovered,

it does not mean that they did not touch the item as well.
Q. But it could mean that, correct?
A. It could, yes.
Q. I mean, if you never touched this piece of paper, your fingerprint is not going to be on it, is it?
A. That is correct. Yes.
Q. No matter how hard somebody tries, it's not going to be here, right?
A. That is correct. Yes.
Q. So what you and your colleague found was that there were fingerprints on the envelopes, correct?
A. That is correct. Yes.
Q. And there was one fingerprint found on the envelope addressed to Ms. Ghaemi, correct?
A. That is correct. Yes.
Q. And there were four fingerprints found on the envelope to Mr. -- or to Mr. Baker, correct?
A. That is correct. Yes.
Q. And the fingerprints found on the envelopes addressed to Mr. Baker were not Mr. Ibekie's fingerprints, were they?
A. That is correct.
Q. They belonged -- three of them belonged to a person by the name of Albert Williams, correct?
A. That is correct. Yes.
Q. And there was another print on there that couldn't be tied

to any person; is that correct?
A. That is correct. Yes.
Q. And so the only fingerprint that was recovered of Mr. Ibekie's was on the envelope addressed to Ms. Ghaemi, correct?
A. That is correct.
Q. And that is a single fingerprint that was found, correct?
A. That is correct.
Q. With no fingerprints on the corresponding letter inside, correct?
A. That is correct.
MR. CARLSON: I have nothing further, Judge.
THE COURT: Okay. Thank you, Mr. Carlson.
Ms. Nutini.
MS. NUTINI: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MS. NUTINI:
Q. Mr. Gorski, if someone is wearing a barrier such as gloves, would that impact whether a fingerprint is left behind on a surface such as paper?
A. Yes, it would.
Q. And why is that?
A. If an individual is wearing a barrier such as gloves, a fingerprint would not be transferred from the hands through the gloves to the paper.

MS. NUTINI: Thank you. I have nothing further.

THE COURT: Mr. Gorski, you may step down.

MR. CARLSON: Judge?

THE COURT: I'm sorry?

MR. CARLSON: Can I have one further question?

THE COURT: You may. Sure, come on up.

Sometimes, folks, we allow a recross. It's at the discretion of the Court.

RECROSS-EXAMINATION

BY MR. CARLSON:

Q. You have no idea whether anybody was wearing any gloves when they touched the envelope or the letters, do you?

A. That is correct.

Q. You're just saying that generally that could be the case?

A. Correct. Yes.

Q. But it's also possible if somebody is wearing their gloves and they took their gloves off, they could have touched an item, right?

A. It's possible, yes.

Q. Or they could've touched the item before they put the gloves on, correct?

A. It's possible, yes.

Q. Well, it's more than possible. I mean, if somebody touched an item before they put gloves on, the gloves would have had nothing to do with it, correct?

A. I was not at the location at the time or place when the object was touched, so I have no idea. All I can say is it's possible.
Q. So you have no information one way or another?
A. Correct.
MR. CARLSON: Thank you.
THE COURT: Okay. Mr. Carlson, thank you.
Ms. Nutini, any last questions?
MS. NUTINI: No, Your Honor. Thank you.
THE COURT: Okay. Mr. Gorski, thank you for coming. You may step down, sir. Please watch your step.
And we'll -- I'll ask you to hand the exhibits to the court security officer who will hand it to the government.
Thank you, Mr. Gorski.
(Witness excused.)
THE COURT: All right. The court security officer is going to hand the exhibit back to the government.
Could I talk with counsel for a brief sidebar?
MS. NUTINI: Yes, Your Honor.
THE COURT: Excuse us, folks.
(Proceedings heard at sidebar:)
THE COURT: All right. Everybody, can you hear me okay?
All right. It's 4:40. I don't know if the government has another witness in the can. We've got 20 minutes left here

today.

What does the government think?

MS. NUTINI: Your Honor, we do have another witness. It's Special Agent Sixto Luciano.

I anticipate his testimony will be about 20 to 30 minutes. So I defer to Your Honor if you want to go ahead and get started with him today, and we can resume his testimony on Thursday.

THE COURT: I think we're here. Let's just do it.

MS. NUTINI: Okay.

THE COURT: What do you think?

MS. NUTINI: That works for the government.

THE COURT: Mr. Carlson?

MR. CARLSON: Judge, I don't have a problem with that as long as it doesn't go longer than that. My concern is that Mr. Ibekie needs to get back to the jail to be able to change clothes, eat, and review what's gone on today, and I just don't want to go too long.

THE COURT: Yeah, we're going to stop at 5:00 either way. So if we don't finish today, they'll have to come back on Thursday. But let's use the time. Don't you think?

All right. Let's go ahead.

MR. CARLSON: That's fine.

MS. NUTINI: Thank you, Your Honor.

(Proceedings heard in open court:)

THE COURT: All right. Counsel for the government, you may call your next witness.

MS. NUTINI: Thank you, Your Honor.

The government calls Sixto Luciano.

THE COURT: Okay. You can have the witness come on up.

Come on up, please.

Good afternoon. Watch your step, please.

Stand right here (indicating).

Please raise your right hand.

(Witness sworn.)

THE COURT: Very good. Have a seat, please.

Good afternoon to you.

THE WITNESS: Good afternoon.

THE COURT: I'd ask you to please speak into the microphone. I want all the men and women of the jury to hear you.

And if you need something to drink, help yourself to a pitcher of water next to you.

THE WITNESS: Okay. Great.

THE COURT: Thank you.

Counsel, you may proceed with your exam.

MS. NUTINI: Thank you, Judge.

SIXTO LUCIANO, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. NUTINI:
Q. Good afternoon.
Can you please state and spell your name for the record.
A. Sure.
Sixto Luciano, and that's S-i-x-t-o, L-u-c-i-a-n-o.
Q. Where are you employed?
A. I'm employed with the Homeland Security Investigations.
Q. And is that sometimes referred to as HSI?
A. Yes.
Q. And what is your position within HSI?
A. I'm a special agent with HSI.
Q. And how long have you been a special agent?
A. I've been a special agent with HSI since 2008.
Q. And generally speaking, what are your duties and responsibilities as an HSI special agent?
A. HSI special agents conduct a wide range of investigations, including investigations into financial crimes, cyber-related crimes and other crimes, typically involving some connection to the border.
Q. And before your employment with HSI, did you work in any other law enforcement capacity?
A. I did.
Q. Where did you work?
A. I was employed as a postal inspector with the United States

Postal Inspection Service.
Q. And prior to that, were you employed with any other agencies?
A. I was a special -- sorry.
I was a special agent with Internal Revenue Service Criminal Investigations.
Q. Special Agent Luciano, I'd like to direct your attention to the spring of 2019.
Were you working as a case agent on an investigation involving an inheritance fraud scheme?
A. Yes.
Q. And the jury has heard some testimony on inheritance fraud already. But from your perspective, generally speaking, what was the nature of the investigation?
A. The investigation in an inheritance fraud scheme, typically what we observed were individuals that were receiving letters claiming to be from an employee of a bank to potential victims. And the letters informed them that they had a relative or someone with the same last name who had died, passed away, and had left a large sum of money that was unclaimed. And it offered to help the individual obtain those funds.
Q. And during your involvement in the investigation, did you become familiar with various individuals and locations relevant to the investigation?
A. I have.

MS. NUTINI: Your Honor, permission to publish Government's Exhibit 701, which has been admitted into evidence.

THE COURT: You may.

BY MS. NUTINI:

Q. Special Agent, do you recognize the individual depicted in Government's Exhibit 701?

A. I do.

Q. Who is this?

A. This is Mr. Anthony Ibekie.

Q. Do you see Mr. Ibekie in the courtroom here today?

A. I do.

Q. Could you please identify him by an article of clothing and his location in the courtroom.

A. Sure.

He is sitting at the table over to my left wearing a gray suit with a blue shirt and a golden-colored tie.

MS. NUTINI: Your Honor, may the record reflect that the witness has identified the defendant?

THE COURT: Yes.

BY MS. NUTINI:

Q. And how was the defendant related to your investigation?

A. Mr. Ibekie was one of the subjects of our investigation.

Q. And were there any other subjects or focuses of the investigation?

A. Yes.
Q. Who were they?
A. There was a Mr. Samuel Aniukwu and Ms. Jennifer Gosha.
Q. Showing you Government's Exhibit 702, which has been admitted into evidence.
Who is this?
A. That's Mr. Samuel Aniukwu.
Q. Showing you Government's Exhibit 703, which has been admitted into evidence.
Who is this?
A. That's Ms. Jennifer Gosha.
Q. Special Agent, I'm now showing you Government's Exhibit 713, which has been admitted into evidence.
Do you recognize what's depicted in Government's Exhibit 713?
A. I do.
Q. And what is this?
A. That's 5206 Lincoln Avenue in Lisle, Illinois.
Q. And what involvement, if any, did this address on Lincoln Avenue have to your investigation?
A. Sure. The investigation revealed that this was the residence of Anthony Ibekie and Samuel Aniukwu.
Q. Did anyone else live with the defendant and Mr. Aniukwu at the Lincoln premises?
A. Yes.

Q. And who is that?
A. Mr. Ebuka Elton John Egbunam.
Q. And what is your understanding of who Ebuka Elton John Egbunam is?
A. My understanding is that is Mr. Ibekie's son.

MS. NUTINI: Your Honor, at this time, the government would like to have Stipulation No. 6 read into the record.

THE COURT: Okay. Members of the jury, we're going to have another stipulation read. We're going to pull it up for you to see it.

All right. It's on the screen. Everybody see that okay? It looks -- now it's on the screen.

Everybody see that okay?

All right. Here we go.

Stipulation No. 6: If called to testify, a records custodian from the United States Citizenship and Immigration Services (USCIS) would testify that as a custodian of records, his or her responsibilities include maintaining and retrieving records of USCIS. The records custodian would further testify that Government Exhibit 504 contains true and correct copies of original documents kept by USCIS, and that, number one, the records were made by a person with knowledge of, or made with information transmitted by a person with knowledge of, the acts or events appearing on the records; number two, that the records were made at or near the time of the acts or events

appearing on the records; number three, that it was the regular practice of USCIS to make such records; and, number four, that the records were kept in the ordinary course of the regularly conducted activities of USCIS. The parties agree that Government Exhibit 504 is admissible in evidence.

It says "So stipulated."

There are signatures from counsel for the government, counsel for the defendant, and the defendant, Anthony Ibekie.

So stipulated?

MS. NUTINI: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: Okay. Thank you, Counsel.

MS. NUTINI: Thank you, Your Honor.

Permission to admit and publish Government's Exhibit 504.

THE COURT: Any objection?

MR. CARLSON: No objection.

THE COURT: It's admitted.

(Government's Exhibit No. 504 was received in evidence.)

THE COURT: You can publish to the jury.

MS. NUTINI: Thank you, Your Honor.

BY MS. NUTINI:

Q. Special Agent Luciano, I'm showing you Government's Exhibit 504, which is a compilation of several pages of documents.

Can you please describe for the jury what we're looking at here.
A. Sure. These are documents from an A file.
Q. And what is an A file?
A. An A file is a record or a file that contains interactions between a noncitizen and various immigration authorities, such as United States Citizenship and Immigration Services, Customs and Border Protection, and Immigration and Customs Enforcement.
Q. And does this specific document appear to be an application for naturalization?
A. Yes.
Q. I'd like to direct your attention to the bottom of page 1.
Who is this application for?
A. Mr. Anthony Ibekie.
Q. Scrolling to page 2 of the document, I'm going to blow up the middle portion.
Is there a date of birth listed for the defendant?
A. Yes.
Q. And what is that date of birth?
A. April 9th, 1965.
Q. Moving to page 3 of the document, is there a telephone number associated with the defendant?
A. Yes.
Q. And what is that telephone number?
A. (630) 854-0699.

Q. We're still on page 3 of the document and blowing up the middle portion.
Does there appear to be information the defendant has provided about his residence?
A. Yes.
Q. And what is the residence listed?
A. 5206 Lincoln Avenue in Lisle, Illinois.
Q. And what are the dates of residence listed there?
A. January 10th, 2010, to the present, which is the time that this form was completed.
Q. And this address at 5206 Lincoln Avenue, is this the same image we looked at in Government's Exhibit 713 a few minutes ago?
A. Yes.
Q. Moving to page 4 of the document, does the defendant list an occupation and an employer?
A. Yes.
Q. And what are those?
A. The employer is Numeks Healthcare, Inc., and the occupation is registered nurse.
Q. Does he list an address for his employer?
A. Yes.
Q. And what is that address?
A. 5206 Lincoln Avenue in Lisle, Illinois.
Q. And that's the same address as Government's Exhibit 713?

A. Yes.
Q. The same address where the defendant resided?
A. Yes.
Q. On page 5 of the document, is there a signature?
A. There is.
Q. And is there a date of signature?
A. Yes.
Q. And what's that date?
A. August 22nd, 2017.
Q. Scrolling to the bottom of page 6 of the document, does the defendant list a spouse?
A. Yes.
Q. And what's the name of that spouse?
A. Treonda Steadman.
Q. And scrolling to page 7 of the document, does the defendant list an ex-spouse?
A. Yes.
Q. And what is the name of the ex-spouse?
A. Tonyanika Fogle.
Q. And what are the dates of marriage?
A. From -- it appears to be 5/10 -- or May 10th of 2001 to June 13th of 2006.
Q. Is Tonyanika Fogle a name that you've become familiar with throughout the course of this investigation?
A. Yes.

Q. How?
A. Tonyanika Fogle was a name that was used to incorporate an entity that was used to then open a bank account that received funds from an inheritance fraud.
Q. And what was the name of the entity that Tonyanika Fogle incorporated?
A. Berger Services.
Q. And what was the relevance of Berger Services to this investigation?
A. Berger Services was an entity that was incorporated that was then used to create a bank -- to open a bank account. And, again, money from victims of an inheritance fraud went into that bank account.
Q. Finally, Special Agent, I'd like to direct your attention to page 8 of the document.
What are we looking at here?
A. It's a question and answer from the A file.
Q. And so is this a different date than the documents that we just reviewed?
A. Yes.
Q. And what's the date on this document?
A. It says April 2nd, 2012.
Q. I'd like to direct your attention to this question-and-answer portion of the document.
Can you please read for the jury the part that I've

blown up.
A. Sure.
It says, "Q. What is your true, full, and complete name?"
And the answer or response is: "Anthony Emeka Ibekie."
The next question: "What is the place/date of your birth?"
And the answer: "Lagos State, Nigeria, August 10th, 1976."
"Q. Have you ever used a different name?
"A. No.
"Q. Have you ever used a different date of birth?
"A. No. My date of birth is August 10th, 1976."
Q. Special Agent Luciano, is this August 10th, 1976, date of birth a different date of birth than what we reviewed in the application from 2017 that the defendant completed?
A. Yes.
Q. And what was that date of birth?
A. April 9th, 1965.
Q. I'd like to ask you some more questions about that Lincoln Avenue premises that we talked about. And I'd like to direct your attention to May of 2019.
Did agents, including yourself, conduct a trash pull at the Lincoln Avenue premises on May 1st of 2019?

A. Yes.
Q. And can you describe for the jury, what is a trash pull?
A. A trash pull is simply when we retrieve -- when investigators retrieve garbage that has been put out or has been abandoned and discarded and placed for collection by a waste management company.
Q. And why would you want to retrieve garbage in an investigation?
A. Sometimes that helps the investigation by identifying people who live at the residence and other -- other evidence like of -- patterns of life and other information about the people who reside at that location.
Q. And when law enforcement conducts a trash pull, do you sometimes work with any other entities to do so?
A. Yes, sometimes we have -- we have the waste management company assist us.
Q. And why would you work with a waste management company in conducting a trash pull?
A. Sure. Sometimes we use the waste management company in order to not expose ourselves so that it wouldn't raise suspicion and alert the person that they may be under investigation.
Q. So walk us through how that would happen.
A. Sure. So I would contact -- I would stop the garbage truck before it reaches the place that -- that we're looking to

retrieve the trash from. I would approach the driver, identify myself and ask him to collect the garbage from that specific location and then meet me at another location away -- where it's not visible from the residence.
Q. Did you work with a waste collection company to conduct the trash pull on May 1st of 2019?
A. Yes.
Q. And what specifically did you do that day?
A. So I approached the driver, and I asked him -- we informed him that we wanted to collect the trash from 5206 Lincoln Avenue, and we asked him to collect the garbage for us. And then I told the driver where I was going to meet them and had them meet me at that location.
Q. And did the waste collection company, in fact, collect the trash?
A. Yes.
Q. And did law enforcement maintain surveillance on the individual as this occurred?
A. Yes.
Q. And why is that?
A. To make sure that the garbage -- or the stuff that we're collecting is not commingled with other -- with the garbage from other individuals.
So, in this instance, another investigator observed that the hopper was -- was emptied and then collected the

garbage from that location placed in the hopper and then taken directly to where we were going to meet them.
Q. So we talked about why generally a trash pull might be conducted in an investigation.
Why was a trash pull conducted specifically in this investigation at the Lincoln Avenue premises?
A. To identify any information we could on the residence or activity at the residence.
Q. And, again, who resided there?
A. Mr. Anthony Ibekie and Samuel Aniukwu.
Q. And did you find anything of relevance to your investigation during the trash pull?
A. We did.
Q. Generally speaking, what types of items did you find?
A. We found numerous documents, including what appeared to be ripped up or shredded inheritance fraud scam letters addressed to multiple potential victims. And we also identified banking information, like what appeared to be bank statements.
Q. And were the documents you seized fully intact or were all -- were they all ripped?
A. Most of them were ripped.
Q. Did law enforcement photograph the items that were seized?
A. We did.
THE COURT: It seems like a perfect stopping point, I think.

MS. NUTINI: Great, Your Honor.

THE COURT: I think we'll save the photographs for later in the week. What do you think of that?

All right, folks. It is 4:59. So I said we're going to stop at 5:00 every day, and we're going to be a minute early. So we're going to let you go.

A couple of quick reminders. Tomorrow is a federal holiday. It's Wednesday, June 19th, a new federal holiday. The Court is closed tomorrow. If you come to the courthouse tomorrow, you will be disappointed when you tug on the door. No one will be here. It will be locked. So please just enjoy your day. Go about your daily lives tomorrow. Tomorrow is a day off, all right, so do not come tomorrow.

We are going to resume on Thursday morning. We're going to resume at the normal time. We're going to ask you to be here at 8:45 on Thursday morning. So not tomorrow, Thursday morning.

When you come here next week -- I'm sorry, next week -- when you come here in a couple of days, rather, and we reconvene in the jury room, you're going to be able to sit wherever you like. So for today, you folks had the same seats that you had when we impaneled the jury. You're welcome to keep the same seats if you want. If someone wants to call same seats, that's fine. If you want to swap it around, that's fine, too.

Some of you may have preferences in terms of being close or not close enough. So wherever you'd like to sit, you can sit on Thursday. Okay?

What I'd like you to do with your transcripts is leave them on your chair just like you did over the last break. So please do not take them with you into the jury room. Please leave them on your chair. I would like you to take your jury notebook, though. Take it with you. Leave it in the jury room. Don't take it home tonight. Take it and leave it in the -- in the jury deliberation room.

You've heard, what, I think six witnesses today so far. So you've heard a fair bit of testimony. You have not come close to hearing all of it. You cannot make up your mind until you've heard all of it. You've got to keep an open mind until all of it is in, all of it.

So please keep an open mind. Please don't talk to anybody about the case. Please don't talk to each other. Please do, though, have a good, safe ride home. Please have a good day off tomorrow. Please don't come tomorrow. Please come, what, Thursday morning. We'll see you at 8:45 Thursday morning.

Thank you, folks, for your service on your jury. We appreciate you.

Have a good trip home, folks. Take care.

COURT SECURITY OFFICER: All rise.

(Jury out at 5:01 p.m.)

THE COURT: All right. Sir, you may step down. Please watch your step.

Please don't talk to anyone about the substance of your testimony.

Have a good evening, sir. We'll see you Thursday morning. We'll start bright and early. Please be here a little early, as I'm sure you undoubtedly would. We're going to start promptly at 9:00 on Thursday. Okay?

THE WITNESS: Yes, sir.

THE COURT: Please don't talk to anyone about the substance of the testimony, even your lawyers for the government. Okay?

THE WITNESS: Yes, sir.

THE COURT: All right. Thank you.

Have a seat, everyone.

All right. So the demonstratives are on the chairs of the jurors. It looked to me like everyone followed instructions. I didn't see anybody walk off.

When Ms. Ramos gets back, I'll ask her to collect those and bring them back to the government.

So thank you for that.

I've just got a couple of housekeeping matters that I want to talk with you about, and then I want to get you on your way because I know we want to get Mr. Ibekie to the next spot.

We've had two witnesses identify Mr. Ibekie in the courtroom. I don't fault you for doing that. I think that's perfectly fine. I don't know if we need to do that going forward. I don't think anybody disputes who he is. I don't know that this is really a case where we need to identify the defendant again, as I see it.

I don't fault the government for doing it. I think it's been perfectly fine. I'm just not sure we need to do it again. I don't know if it makes anybody feel awkward to identify him again.

Does anybody see a need to do that anymore?

MR. CARLSON: No.

MS. NUTINI: That's fine, Your Honor.

THE COURT: You know, I don't have strong feelings about it. If there was a legitimate need, I would be fine. But I think we've -- I think everybody stipulates who he is, so I think that's fine going forward.

I do want to talk about the lineup for Thursday. As you know, I always ask for a proffer about the next day's witnesses, and I do that to -- as a benefit and a courtesy to the other side.

So if the government would be kind enough to make a proffer, I think I've got a good sense of what Mr. Luciano is going to do on Thursday morning.

Do you want to just let me know how much longer you've

got with Mr. Luciano. Probably not very much longer, I imagine.

MS. NUTINI: Yes, Your Honor.

THE COURT: And that's not suggestive. That's just a comment.

Go ahead.

MS. NUTINI: Yes, Your Honor.

I believe we have probably about 15 more minutes --

THE COURT: Yep.

MS. NUTINI: -- of direct testimony with Special Agent Luciano.

I'm not sure of the exact order at this point --

THE COURT: Mm-hmm.

MS. NUTINI: -- but I can let you know who else we'll be calling on Thursday.

THE COURT: Okay.

MS. NUTINI: Ebuka Egbunam, Christopher Wong, Larry Olson. And Special Agent Mansker will testify again on Thursday.

THE COURT: Okay. And why is that?

MS. NUTINI: She's being recalled -- we filed a motion *in limine* for permission to recall the case agent, and --

THE COURT: Okay.

MS. NUTINI: -- she's being -- it was unopposed. She's being recalled to testify about essentially her second

half the testimony.

THE COURT: Okay.

Any objection to that?

MR. CARLSON: No objection.

THE COURT: Okay. I had forgotten about that so thank you for that.

Go ahead.

MS. NUTINI: If that doesn't get us through the day, then Special Agent Christopher Kadonsky will take the stand towards the end of the day.

THE COURT: Okay.

MS. NUTINI: Our scheduling limitations are that two of our remaining victims are only able to testify on Friday.

THE COURT: Okay.

MS. NUTINI: And so they will be the two victims that testify Friday morning. If Special Agent Kadonsky has not completed his testimony on Thursday, which I don't anticipate he will, then he will also testify on Friday.

THE COURT: Okay.

MS. NUTINI: While we can't really predict timing, I do anticipate we will rest our case sometime Friday midday. I don't believe we're going to need the entire day. It will probably be sometime before lunch, but I just don't know. It may be after lunch.

THE COURT: Okay. So you've got two victims and only

two more victims. In other words, after Kadonsky, you've got two victims.

Did I get that right?

MS. NUTINI: Yes, Your Honor.

THE COURT: Okay.

Any questions about any of that, Mr. Carlson?

MR. CARLSON: No, Judge.

THE COURT: Okay. All this seems perfectly fine.

Here's what I'd like you to do: Tomorrow night, if you'd be kind enough to send an e-mail to Mr. Carlson and give him your best guesstimate of the order just as a courtesy to him. I'm not going to pour cement around it, but I'd like to give him a fair opportunity to know what's coming. You know, so if you'd be kind enough, just send an e-mail tomorrow night and let Mr. Carlson know your anticipated order of the witnesses. Okay?

MS. NUTINI: Yes, Your Honor.

THE COURT: All right. I think that sounds perfectly fine.

What do you want to talk about, anybody? Anything you want to cover?

MS. NUTINI: Your Honor, I think that we would just like to clarify sort of the schedule for the rest of the week.

THE COURT: Mm-hmm.

MS. NUTINI: And maybe this is a bit premature --

THE COURT: Mm-hmm.

MS. NUTINI: -- but we would like to discuss -- we don't anticipate doing closings on Friday --

THE COURT: Yeah.

MS. NUTINI: -- and just wanted to kind of flag that for Your Honor. We will need to do a charge conference.

THE COURT: Right.

MS. NUTINI: Obviously, the defendant has a right to present a case if he chooses to do so.

THE COURT: Yes.

MS. NUTINI: And so I think our thinking is that we will wait to close the following week, but I just wanted to sort of flag that for everyone.

THE COURT: You will not close this week, both as an act of mercy and because I need time to go through the jury instructions. So it will not disappoint you to learn you've got a little time to think about your closings.

All right. So you won't close this week, guaranteed. Okay?

MS. NUTINI: Thank you, Your Honor.

THE COURT: So let's imagine a world in which the government closes at noon on Friday. Okay? I don't know what Mr. Carlson intends. You don't have to tell me now.

I would really give you some latitude, Mr. Carlson, if they close on Friday about whether you want to think things

over and report back on Wednesday. I'd probably give you that courtesy, you know, to kind of sleep on it and think about it, depending on how much time you have.

But I don't expect you probably are going to have days of material. I don't know.

But what's your -- how should I think about what I should expect from what you're going to be doing --

MR. CARLSON: Judge, based upon --

THE COURT: -- if anything?

MR. CARLSON: -- Your Honor's rulings on the motions *in limine* and exhibits, we will not be calling everybody on our witness list.

THE COURT: Okay.

MR. CARLSON: And I am going to talk with Mr. Ibekie tomorrow being an off day to further figure out where we're going with that. I don't know that I'll have a complete answer, but I'll have a much better position.

I do want to bring to the Court's attention that I would like on Thursday morning, or when we finish the day on Thursday, to address Your Honor's ruling on one of the exhibits, which would be Exhibit 5, which is the Nigerian immigration documents.

I'm not prepared to do that now, Judge, and I don't have them with me. But I would like to address that issue with the Court.

THE COURT: Totally fine.

And I'm more than happy to hear that. As I always say, you know, motions *in limine* rulings are preliminary by definition. It's my sense of the lay of the land as I understand things. Things can shift. I learn more about trial as it rolls along.

I will tell you, before I took the bench, I did not fully appreciate the information disparity between the parties and the judge. You all know the case so much better than I do, so there could be something that I'm missing. So if there's something that I'm missing and you want to argue it, I'll listen to you.

So we can take it up Thursday. Just nudge me on that.

Why don't -- why don't we see how it is going on Thursday in terms of what we're going to be doing on Friday. You know, if we get into the afternoon -- if we're in the middle of the afternoon or early afternoon and you say, Mr. Carlson, that you might want to put on some testimony but you'd like to do it Wednesday morning, I might give you that latitude.

I think if we can finish the trial next week, that is advantageous for all sorts of reasons. I'm not going to sit on anybody. But if we think that there is any back-end pressure on that, I would require the defendant to present any case on Wednesday -- excuse me -- on Friday, if need be.

I may not have said that perfectly, but why don't -- the point I'm trying to say is why don't we see where we are on Thursday afternoon. We'll talk about -- Friday seems like Thursday's problem, not Tuesday's problem, is what I'm trying to say. Okay? So we'll reconvene on Thursday. Okay?

What else does the government want to raise? Anything else?

MS. NUTINI: Nothing further from the government.

THE COURT: Okay.

Mr. Carlson, what else from you?

MR. CARLSON: Nothing else, Judge.

THE COURT: All right. So it's 5:10. I'm anxious to let you folks get out of here.

Why don't we do this: Why don't we reconvene on Thursday morning at 8:45 as a second act of judicial mercy in a span of ten minutes. We'll have a little later start.

If you all think that there's any need to see me earlier than 8:45, I promise you I will be in the building. I get here pretty early. So if there's any need to come see me about any issue, large or small, and you want to start earlier than 8:45, just e-mail Ms. Ramos, and I'll come right out whenever you want to see me. Okay?

But it's a little easier on you folks if we have a little bit later a start; and as long as you're here by 8:45, that will be sufficient. It will also avoid the awkwardness of

me asking you to be here at 8:30 and me rolling out at 8:45, right, which I don't like doing, as I've been wanton to do from time to time.

Okay? Anything else, anybody?

MR. CARLSON: No, Your Honor.

THE COURT: So we'll see you at 8:45 on Thursday morning.

Have a good trip home, folks, and enjoy your day tomorrow, and we'll see you Thursday morning.

Take care, everyone.

MS. NUTINI: Thank you.

(Adjourned at 5:11 p.m., until 8:52 a.m., 6/20/24.)

* * * * *.

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Amy M. Kleynhans* — *5/27/2025*
Amy M. Kleynhans — Date
Official Court Reporter

*/s/ Sandra M. Tennis* — *5/27/2025*
Sandra M. Tennis — Date
Official Court Reporter

# I N D E X


| OPENING STATEMENTS | PAGE |
|---|---|
| By Ms. Nutini | 441 |
| By Mr. Carlson | 449 |

| WITNESSES | PAGE |
|---|---|
| DALE HELMS | |
| Direct Examination By Ms. Nutini | 461 |
| Cross-Examination By Mr. Carlson | 495 |
| Redirect Examination By Ms. Nutini | 496 |
| DAVID PETROSELLI | |
| Direct Examination By Ms. DeMARCO | 500 |
| Cross-Examination By Mr. Carlson | 507 |
| AMY MANSKER | |
| Direct Examination By Ms. DeMARCO | 511 |
| Direct Examination (Resumed) By Ms. DeMARCO | 533 |
| Cross-Examination By Mr. Carlson | 580 |
| DANIEL VELA | |
| Direct Examination By Ms. DeMARCO | 582 |
| JOHN GORSKI | |
| Direct Examination By Ms. Nutini | 623 |
| Cross-Examination By Mr. Carlson | 651 |
| Redirect Examination By Ms. Nutini | 654 |
| Recross-Examination By Mr. Carlson | 655 |
| SIXTO LUCIANO | |
| Direct Examination By Ms. Nutini | 658 |

| GOVERNMENT'S EXHIBIT | RECEIVED |
|---|---|
| No. 103-1 | 465 |
| No. 103-2 | 465 |
| No. 103-5 | 465 |
| No. 103-6 | 465 |
| No. 103-7 | 465 |
| No. 103-9 | 465 |
| No. 103-11 | 465 |
| No. 103-12 | 465 |
| No. 103-13 | 465 |
| No. 103-14 | 465 |
| No. 103-15 | 465 |
| No. 103-16 | 465 |
| No. 202 | 585 |
| Nos. 301 through 309 | 459 |
| No. 311 | 459 |
| No. 312 | 459 |
| Nos. 501-1, 501-2, 501-3, 501-4, 501-6 | 568 |
| No. 502 | 578 |
| No. 504 | 664 |
| No. 509 | 642 |
| Nos. 601 and 602 | 586 |
| Nos. 701 through 705 | 519 |
| Nos. 713 through 717 | 519 |
| Nos. 713 through 717 | 519 |
| No. 721 | 561 |
| No. 723 | 519 |
| No. 801 | 559 |
| No. 1101 | 541 |
| No. 1102 | 552 |