IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ) Case No. 20 CR 352
)
v. )
)
ANTHONY EMEKA IBEKIE, ) Chicago, Illinois
) June 20, 2024
Defendant. ) 8:52 a.m.

VOLUME 3
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. PAIGE NUTINI
MS. MEGAN DeMARCO
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For the Defendant: KENT R. CARLSON & ASSOCIATES, P.C.
BY: MR. KENT R. CARLSON
53 W. Jackson Boulevard, Suite 1523
Chicago, Illinois 60604

Also Present: MS. AMY MANSKER, Special Agent
IRS Criminal Investigations

MR. CHRISTOPHER KADONSKY, Special Agent
IRS Criminal Investigations

Court Reporter: AMY M. KLEYNHANS, CSR, RPR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 2318A
Chicago, Illinois 60604
Telephone: (312) 818-6531
amy_kleynhans@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE CLERK: 20 CR 352, USA versus Anthony Ibekie.

THE COURT: Good morning, folks.

Welcome back.

Let's get everyone's appearances on the record, if you would, please.

Start with counsel for the government.

MS. NUTINI: Good morning, Your Honor.

Paige Nutini and Megan DeMarco on behalf of the United States.

Also at counsel's table is Amy Mansker and Christopher Kadonsky with IRS Criminal Investigations.

THE COURT: All right. Very good.

Good morning, Ms. Nutini.

Good morning, Ms. DeMarco.

MS. DeMARCO: Good morning, Judge.

THE COURT: I stumbled on that for no reason. You've got the best alliteration in the courthouse. I've always said that. "Megan DeMarco," I just love how that sounds.

Good morning, Ms. Mansker.

And good morning, Mr. Kadonsky.

I struggle with you a little with your name.

MS. NUTINI: Kadonsky.

THE COURT: Kadonsky. I'm going to get that wrong. But it's well intentioned.

So good morning to you.

Nice to see all of you.

Defense team.

MR. CARLSON: Good morning, Your Honor. Kent Carlson on behalf of Anthony Ibekie, who is also here in court.

THE COURT: All right. Good morning, Mr. Carlson. Nice to see you.

Good morning, Mr. Ibekie. Good morning, sir.

THE DEFENDANT: Thank you, Your Honor. Thank you for having me.

THE COURT: Well, thank you for being here.

I want to say a special thanks to the marshals who were kind enough to be here again this morning. You folks are the best in the business. I really appreciate you. I hope that resonates because I mean it. So thank you for being here.

All right, folks. We are here for the resumption of trial. I think we made a lot of progress on the first couple days of the week. I appreciate how smoothly everything went in the last couple days. I thought the exams on both sides were very smooth.

Again, I'm saying that to everybody, for both sides. And I appreciated the cooperative spirit that I've seen so far.

I just wanted to check in with you. We can resume trial shortly. I think that most of the jurors are here. I think we might be waiting on one person, but I think most of

them are here. I know this because my buzzer keeps going off as people keep processing in.

But I just wanted to check in with you real quick and see if there's anything that you all had to talk about.

I got the list of admitted exhibits, Docket No. 312. It's exactly what I wanted. Thank you for doing that.

I don't, frankly, know if other judges do this. I think it's really helpful. It's helpful to me. I think it's going to be helpful to you. So thank you for doing it. It's exactly what I needed.

Anything you all want to talk about before we take a break?

MS. NUTINI: Your Honor, from the government's perspective, we would just like an opportunity to test our audio --

THE COURT: Yeah.

MS. NUTINI: -- and visual --

THE COURT: Of course.

MS. NUTINI: -- before the jury comes in. But otherwise, we have nothing to raise.

THE COURT: And we should make sure the volume is comfortable for everybody, too.

And it looks like on the chairs for the jurors, they've got the transcripts; is that right? Is that what you intended?

MS. NUTINI: Yes, Judge.

THE COURT: All right. So good. So they've got that on the chairs. They'll be there. It will be curious to see the big reveal when they come out to see who sits with who. I always think it's interesting to see if people have made friends over there. I'll be curious to know where they sit.

Anything else from the government before we get going?

MS. NUTINI: Not from the government.

THE COURT: Mr. Carlson, what do you want to talk about this morning?

MR. CARLSON: Judge, the only thing that I had is that I had mentioned when we broke the other day that I wanted to revisit the issue of our Exhibit No. 5.

THE COURT: Yeah.

MR. CARLSON: We can do that now or we can do that at another point in time. It doesn't need to be resolved today.

THE COURT: Yeah, I'm happy to talk about that.

I had assumed that you would be presenting it during your case-in-chief, right? So -- is that right? You're not going to present it today?

MR. CARLSON: I wasn't planning on presenting it today. I didn't know if you wanted to hear -- hear anything on it now or you --

THE COURT: Why don't we do it maybe after today because I want to get a copy --

MR. CARLSON: That's fine.

THE COURT: -- a copy and we'll talk it through. I mean, I am pretty aware of the case law in this area, but I never purport to have all the answers on anything, candidly. So if there's another case you want me to read or if there's some other language in the case that you think I should be looking at, I'm happy to do that. Okay.

MR. CARLSON: That's fine.

THE COURT: I don't have anything else.

Why don't we come back in about five minutes or so. We'll check on the last remaining juror, and we'll get going.

Did you send the e-mail to defense counsel, I assume, on the lineup today?

MS. NUTINI: We did, Your Honor. It hasn't changed from what we stated in court.

THE COURT: Okay.

MS. NUTINI: And Ms. DeMarco sent an e-mail --

THE COURT: Okay.

MS. NUTINI: -- this morning to defense counsel --

THE COURT: Okay.

MS. NUTINI: -- with the same lineup.

THE COURT: All right. So I appreciate that.

So go ahead and test the audio. Make sure it's comfortable for the jurors as well. Part of it is just being smooth with them, as you all are, and part of it is just making

sure it's a comfortable audio level. So you can have free rein in the courtroom.

We'll see with the jurors here, and if the jurors are here, we'll get going promptly in like five minutes or so. As soon as you're ready. Okay?

Thank you, folks.

(Recess at 8:57 a.m., until 9:11 a.m.)

THE CLERK: 20 CR 352, USA versus Defendant No. 2, Anthony Ibekie.

THE COURT: All right. Good morning, folks.

I've confirmed while we were out, the last remaining juror has arrived. That person was running a little late.

So we're now all here. Everyone is present and accounted for.

Was the government able to test the audio?

MS. NUTINI: Yes, Your Honor, and it works well.

THE COURT: Okay. And remind me, the last witness who was up, you were about to show photographs, I think, when we broke on Tuesday; is that right?

MS. NUTINI: That's correct, Your Honor.

THE COURT: Okay. All right.

Anything else anybody needs before we get going with the jury?

MR. CARLSON: No, Your Honor.

THE COURT: All right. Let's go ahead and get the

jury.

Do you want to bring the witness back up, Ms. Nutini?

MS. DeMARCO: Yes. We just sent an agent to go get him.

MS. NUTINI: Your Honor, the witness was in the restroom, but should be out.

THE COURT: No worries.

(Sixto Luciano enters the courtroom.)

THE COURT: Come on up, please.

Good morning.

THE WITNESS: Good morning.

THE COURT: Do you want to get the jury.

It's fine if you want to remind the jury to say this is where we left off. You can tell the jury again where you were. I mean, that's all fine. People like refreshers.

MS. NUTINI: Sure.

(Jury in at 9:14 a.m.)

THE COURT SECURITY OFFICER: All rise.

THE COURT: Have a seat, everyone.

Well, good morning. Good morning. Nice to see everyone today.

You folks, once again, are 15 for 15. Everyone is ready, present, and accounted for.

Thank you, everybody, for taking the time to be here today. We appreciate you. You're always welcome in my

courtroom. I appreciate you guys being here today.

You know, we have a couple days of trial under our belt. And you folks have spent more time in the Dirksen Federal Building than you reasonably expected. You were here last week Friday for jury selection and then Monday, and then you folks got the news that you were going to be sitting on the jury.

We made good progress on Tuesday. I think we had, what, I think six witnesses on Tuesday. So we made some pretty good progress.

As you may remember, we took a break right before some photographs were going to be shown. This is Mr. Luciano. So in a moment, I'll turn the floor over to the government.

What I often do with the attorneys in the courtroom, I'll let them, like, rewind the tape for 30 seconds or so and kind of remind you who the person was and bring you up to speed because you folks weren't here yesterday. So you may hear a first minute or two of things you've heard by way of refresher.

So it's a long way of saying we're happy that you're here, and we're going to resume where we left off.

And I'll turn the floor over to Ms. Nutini.

MS. NUTINI: Thank you, Your Honor.

SIXTO LUCIANO, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (CONT'D)

BY MS. NUTINI:

Q. Good morning, sir.
A. Good morning.
Q. Can you please remind the jury what your name is.
A. Sure.
My name is Sixto Luciano.
Q. And, Special Agent Luciano, can you please remind the jury where you work.
A. Sure. I work with Homeland Security Investigations.
Q. And at the end of last -- on Tuesday, we were talking about a trash pull that you conducted in May of 2019; is that correct?
A. Yes.
Q. And can you remind the jury where this trash pull was conducted.
A. The trash pull was conducted at 5206 Lincoln Avenue in Lisle, Illinois.
Q. And what is the relevance of that address?
A. That's a residence of Mr. Anthony Ibekie.
MS. NUTINI: NS I'd like to publish for the jury Government's Exhibit 713, which has been admitted into evidence.
THE COURT: You may.
MS. NUTINI: Thank you, Your Honor.
BY MS. NUTINI:
Q. Special Agent Luciano, is this the address at the Lincoln

Avenue premises that you were just referring to?
A. Yes.
Q. And this is the address where the trash pull was conducted?
A. Yes.
Q. So where we left off last time is you were explaining that the documents recovered -- the state of the documents that were recovered.
Can you refresh the jury on what the documents looked like.
A. Sure.
There were numerous letters that appeared to be either like ripped up or torn apart, and bank statements and other similar items.
MS. NUTINI: For the witness only, please.
BY MS. NUTINI:
Q. Special Agent Luciano, I am displaying on the screen Government Exhibit 718.
Do you see that on your screen?
A. I do.
Q. And this is a 21-page document; is that correct?
A. Yes.
Q. And I'm displaying the first page of the document?
A. Yes.
Q. Have you reviewed each page of the documents prior to your testimony today?

A. I have.
Q. And do you recognize this exhibit?
A. I do.
Q. What is it?
A. These are photographs of some of the items that we retrieved from the trash run -- or the trash pull at 5206 Lincoln Avenue.
Q. And do these photographs contained within Government Exhibit 718 fairly and accurately portray the items that were seized from the trash pull in May of 2019?
A. Yes.
MS. NUTINI: Your Honor, the government moves to admit and publish Government Exhibit 718.
THE COURT: Is it 718 in its totality, not just 718-1?
MS. NUTINI: Yes, Your Honor, 718-1 through 718-21.
THE COURT: Okay. Any objection?
MR. CARLSON: No objection.
THE COURT: All right. So Exhibit 718 in its entirety is admitted into evidence.
(Government's Exhibit No. 718 was received in evidence.)
THE COURT: You can publish to the jury.
MS. NUTINI: Thank you, Your Honor.
BY MS. NUTINI:
Q. So, Special Agent Luciano, I'd like to walk through each of these photos. Before I do so, can you describe to the jury,

once the items were seized from the trash pull, were they then photographed by law enforcement?
A. Yes.
Q. And so this first photograph we're looking at appears to sort of be put back together; is that correct?
A. Yes.
Q. And was that done by law enforcement?
A. Yes.
Q. So starting with 718-1, can you please describe for the jury what we're looking at.
A. So this is a bank statement. It looks like a fragment -- fragments put together of a bank statement from Chase, JPMorgan Chase, and it appears to document like a wire transfer.
Q. So I'd like to direct your attention to the outgoing wire transfer on January 8th of 2019.
Can you tell where this wire transfer is going based on this information.
A. Yes. It's going to an Access Bank in Lagos, Nigeria.
Q. And who does that Access Bank account belong to?
A. The beneficiary. It says Anthony Ibekie.
Q. And that's the defendant?
A. Yes.
Q. And do you see a reference to an entity?
A. I do.
Q. And what entity is that?

A. The entity is Jenant, Incorporated.
Q. And can you please remind the jury what the relevance of Jenant is to this investigation.
A. Sure. Jenant is an entity that was incorporated where bank accounts were opened in the name of that entity and that entity received funds from an inheritance fraud.
Q. And who incorporated or registered Jenant?
A. Jennifer Gosha.
Q. Now showing you Government's Exhibit 718-2.
Can you describe for the jury what we're looking at here.
A. Sure. These appear to be fragments of a utility bill in the name of Berger Services, Incorporated.
Q. And remind the jury, what is the relevance of Berger Services, Incorporated?
A. Berger Services was another entity that was incorporated, that bank accounts were opened in the name of that entity, and funds from inheritance fraud victims were sent to that account.
Q. And who is the registered agent of Berger Services, Incorporated?
A. Tonyanika Fogle.
Q. And, again, for the jury, who was Tonyanika Fogle?
A. Tonyanika Fogle was Mr. Ibekie's ex-wife.
Q. And what is the address that is listed for the company Berger Services, Incorporated?

A. 5206 Lincoln Avenue, Lisle, Illinois.
Q. And this is the address where the trash pull was conducted?
A. Yes.
Q. Now showing you Government's Exhibit 718-3.
Can you describe for the jury what we're looking at here.
A. Sure. This appears to be a handwritten note.
Q. So let's start from the top of the handwritten note.
What -- what I've highlighted, what does that say?
A. John Gene Delon, Gmail account.
Q. And remind the jury, who is John Gene Delon?
A. John Gene Delon was the name of a purported bank employee listed on some of the inheritance fraud letters that were sent to victims.
Q. And did John Delon correspond with victims as well?
A. Yes.
Q. And what else is listed in the portion I've highlighted?
A. Sure. It says "User," and then it says "Password: Gene5206" -- or it appears to say password, P-a-s-s.
Q. And any relevance to Gene5206?
A. Yes.
Q. What's the relevance?
A. Well, Gene is the middle name of John Gene Delon, and 5206 is the address of 5206 Lincoln Avenue in Lisle, Illinois.
Q. Again, the same address where the trash pull was conducted?

A. Yes.
Q. Does there also appear to be a phone number?
A. There does.
Q. Government's Exhibit 718-4. What are we looking at here?
A. This appears to be fragments of an inheritance fraud letter addressed to a potential victim.
Q. And who does the letter appear to be from?
A. It appears to be from Mr. John Delon.
Q. And can you tell the name of the purported relative who died?
A. It appears to say G-O Dorsey.
Q. And is there a rip in between the name?
A. Yes.
Q. And directing your attention to the bottom of this screen of the same exhibit, what are we looking at here?
A. This also appears to be a fragment of an inheritance fraud letter addressed to a potential victim.
Q. And, again, who is this from?
A. This is Mr. John Delon.
Q. And what is the name of the alleged individual who passed away?
A. Mr. Geo Justin.
Q. Government's Exhibit 718-5. It's a little small. Let me start with this one on the far right.
What are we looking at here?

A. This appears to be a fragment of an inheritance fraud letter addressed to a potential victim.
Q. 718-5 on the far left, what are we looking at here?
A. This appears to be a fragment of an inheritance fraud letter addressed to a potential victim.
Q. 718-6, what are we looking at here?
A. These appear to be fragments of an inheritance fraud letter addressed to potential victims.
Q. 718-7, the top portion.
A. This appears to be a letter addressed to a victim.
Q. 718-7, the bottom.
A. This appears to be an inheritance fraud letter addressed to a potential victim.
Q. 718-8, what are we looking at here?
A. This appears to be a fragment of an inheritance fraud letter addressed to a potential victim.
Q. 718-9.
A. This appears to be a fragment of an inheritance fraud letter addressed to a potential victim, and as well as a fragment of an envelope addressed to the same potential victim.
Q. 718-10, what are we looking at?
A. This, again, appears to be a portion of a -- or a fragment of an inheritance fraud letter addressed to a potential victim and a portion or a fragment of an envelope addressed to the same potential victim.

Q. And so far are all of these letters from TD Canada Trust?
A. Yes.
Q. Are all of the letters addressed from John Delon?
A. Yes.
Q. And are all of the letters addressed to a different victim's name?
A. Yes.
Q. 718-11, what are we looking at here?
A. This appears to be a fragment of an inheritance fraud letter addressed to a potential victim, as well as a fragment of an envelope addressed to the same potential victim.
Q. And just to be clear, for the record, this exhibit and the previous one we looked at, do there appear to be redactions to the document?
A. Yes.
Q. And are those redactions that were made for purposes of this trial?
A. Yes.
Q. 718-12, what are we looking at here?
A. This appears to be a fragment of an inheritance fraud letter addressed to a potential victim, as well as a fragment of an envelope addressed to the same potential victim.
Q. 718-13, what are we looking at here?
A. This appears to be a letter -- an inheritance fraud letter addressed to a potential victim, as well as a fragment of an

envelope addressed to the same potential victim.
Q. 718-14, what are we looking at?
A. This appears to be a fragment of an inheritance fraud letter addressed to a potential victim, as well as a portion or fragment of an envelope addressed to the same potential victim.
Q. 718-15, what are we looking at?
A. These appear to be fragments of a letter -- an inheritance fraud letter addressed to a potential victim, as well as a fragment of an envelope addressed to the same individual.
Q. And do all of these letters appear, from what you can see, to follow the same general template?
A. Yes.
Q. 718-16, what are we looking at here?
A. This appears to be a fragment of an inheritance fraud letter addressed to a potential victim, as well as a fragment of an envelope addressed to the same potential victim.
Q. 718-17, what are we looking at?
A. This appears to be a fragment of an inheritance letter addressed to a potential victim, as well as a fragment of an envelope addressed to the same potential victim.
Q. 718-18, what are we looking at here?
A. It appears to be a fragment of a letter addressed to a potential victim, an inheritance fraud letter, as well as a frag- -- fragments of an envelope addressed to the same potential victim.

Q. 718-19, what are we looking at?
A. These appear to be fragments of an inheritance fraud letter addressed to a potential victim, as well as a fragment of an envelope appearing to be addressed to the same potential victim.
Q. 718-20, what are we looking at?
A. This appears to be a fragment of an inheritance fraud letter addressed to a potential victim, and as well as a fragment of an envelope addressed to the same potential victim.
Q. 718-21, what are we looking at?
A. This appears to be a fragment of an inheritance fraud letter addressed to a potential victim, as well as a fragment of an envelope addressed to the same potential victim.
Q. So, Special Agent Luciano, were all of these fragments of letters contained inside of the trash outside of the defendant's residence?
A. Yes.
Q. And I know that I've made you repeat yourself a little bit throughout the course of looking through these documents, but can you describe for the jury, was this all of the documents recovered?
A. No.
Q. And what portion of the documents recovered was this?
A. This is just a sampling or a -- just a portion of the letters that were -- and other items that were recovered from

the trash that day.
Q. In each of the fragments of letters that we've looked at in Government's Exhibit 718, was there a different potential victim's name listed?
A. Yes.
Q. Why were these documents of significance to law enforcement if they were ripped up and inside of the trash?
A. Because they appear to match letters that were received by victims identified during the investigation.
Q. Okay. I'd like to shift gears a little bit and talk to you about some of the victims of this inheritance fraud investigation.
So earlier, you gave -- or on Tuesday, you gave a brief overview of how the inheritance fraud scheme worked.
What was the ultimate goal of the inheritance fraud scheme?
A. The ultimate goal of the scheme was to obtain as much funds or as much money --
MR. CARLSON: Objection, Judge.
THE COURT: Sustained.
BY MS. NUTINI:
Q. Based on your training and experience and your involvement in this investigation, what was your understanding of what the inheritance fraud scheme was trying to do?
MR. CARLSON: Objection, Judge.

THE COURT: I'm going to allow the answer as long as he doesn't talk about what was going on inside someone else's head. He can talk about the end result of the alleged scheme, but not what was -- someone was thinking.

All right. So with that instruction, you can answer.

BY THE WITNESS:

A. Can you rephrase the question?

BY MS. NUTINI:

Q. Special Agent Luciano, based on your training and experience and your involvement in this investigation, what was your understanding of what the goal of this inheritance fraud was with respect to victims?

MR. CARLSON: Judge, I object again.

THE COURT: All right. So I'm going to overrule it in part.

You can answer consistent with my instructions. You cannot testify about somebody's intent, but you can talk about -- you can give an answer to the question with that understanding.

Go ahead.

BY THE WITNESS:

A. I'm sorry. Do you mind asking that --

BY MS. NUTINI:

Q. Special Agent Luciano, were you involved in this inheritance fraud investigation?

A. I was.
Q. And in part of your involvement, did you interview victims?
A. I have.
Q. And what was your understanding of what victims provided when they got involved in this inheritance fraud investigation?
A. Sure. Victims of -- that we spoke with provided funds --
MR. CARLSON: Judge, I objected to hearsay.
THE COURT: As framed, overruled.
You can answer.
BY MS. NUTINI:
Q. You said victims provided funds?
A. Yes.
Q. And did those funds increase in value the longer the victims were involved in the inheritance fraud?
A. Yes.
Q. And based on your involvement in this investigation, was the defendant and his co-schemers successful in obtaining money from victims?
A. Yes.
Q. Were there numerous victims?
A. Yes.
Q. I'd like to talk to you about a few of those victims.
MS. NUTINI: For the witness, please.
BY MS. NUTINI:
Q. I'm showing you Government's Exhibit 711.

Do you recognize this individual?
A. I do.
Q. Who is this?
A. This is Mr. Dale Helms.
Q. And does Government's Exhibit 711 fairly and accurately portray a photograph of Dale Helms?
A. Yes.
MS. NUTINI: Permission to admit and publish Government's Exhibit 711.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: It's admitted.
(Government's Exhibit No. 711 was received in evidence.)
THE COURT: You can publish to the jury.
MS. NUTINI: Thank you, Your Honor.
BY MS. NUTINI:
Q. Special Agent Luciano, for the jury, can you remind the jury what the relevance of Dale Helms was to this investigation.
MR. CARLSON: Judge, I object. Dale Helms testified in this case. Having this agent regurgitate what Mr. Helms testified to is wrong, Judge.
THE COURT: So, overruled in part. I think he can address it -- it is true the jury has already heard from this person, but you can have a little bit of room on this.

So, overruled --
MS. NUTINI: Thank you.
THE COURT: -- in part.
Go ahead.
BY MS. NUTINI:
Q. What is the relevance of Dale Helms to this investigation?
A. Dale Helms was a victim of an inheritance fraud.
MS. NUTINI: For the witness only, please.
BY MS. NUTINI:
Q. I'm showing you Government's Exhibit 709.
Do you recognize this individual?
A. I do.
Q. And who is this?
A. This is Mr. Cong Le.
Q. And does this photograph fairly and accurately portray a photograph of Cong Le?
A. Yes.
MS. NUTINI: Permission to admit and publish Government's Exhibit 709.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: It's admitted.
(Government's Exhibit No. 709 was received in evidence.)
THE COURT: You can publish to the jury.
MS. NUTINI: Thank you, Your Honor.

BY MS. NUTINI:
Q. Special Agent Luciano, what is the relevance of Cong Le to this investigation?
A. Mr. Cong Le was a victim of an inheritance fraud.
MS. NUTINI: For the witness again, please.
BY MS. NUTINI:
Q. I'm showing you Government's Exhibit 707.
Do you recognize this individual?
A. I do.
Q. Who is this?
A. This is Mr. Robert Aguada.
Q. And does this photograph fairly and accurately portray Robert Aguada?
A. Yes.
MS. NUTINI: Permission to admit and publish Government's Exhibit 707.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: You can publish to the jury. It's admitted.
(Government's Exhibit No. 707 was received in evidence.)
MS. NUTINI: Thank you, Your Honor.
BY MS. NUTINI:
Q. Special Agent Luciano, for the jury, what is the relevance of Robert Aguada to this investigation?

A. Mr. Aguada was a victim of an inheritance fraud.

MS. NUTINI: For the witness, please.

BY MS. NUTINI:

Q. I'm showing you Government's Exhibit 710.

Do you recognize this individual?

A. I do.

Q. Who is this?

A. This is Dr. David Petroselli.

Q. And does this photograph fairly and accurately portray Dr. David Petroselli?

A. Yes.

MS. NUTINI: Permission to admit and publish Government's Exhibit 710.

THE COURT: Any objection?

MR. CARLSON: No objection.

THE COURT: It's admitted.

(Government's Exhibit No. 710 was received in evidence.)

THE COURT: You can publish to the jury.

MS. NUTINI: Thank you, Your Honor.

BY MS. NUTINI:

Q. Special Agent Luciano, what is the relevance of David Petroselli to this investigation?

A. Dr. David Petroselli was a victim of an inheritance fraud.

Q. Are these all of the victims that law enforcement identified as being connected to this inheritance fraud?

A. No.
Q. Are they only a subset?
A. Yes.
MS. NUTINI: May I have a moment, Your Honor?
THE COURT: You may.
(Counsel conferring.)
MS. NUTINI: I have nothing further. Thank you.
THE COURT: Okay. Very good. Thank you.
Mr. Carlson, whenever you're ready, sir.
MR. CARLSON: Just very briefly.

CROSS-EXAMINATION

BY MR. CARLSON:
Q. Special Agent, you saw the series of 718 photographs that the government put up, and I think you testified they were torn or ripped letters, *et cetera*, correct?
A. Yes.
Q. And they were -- they were literally torn, right?
A. They were torn, yes.
Q. They weren't put through a shredder, were they?
A. It doesn't appear to me that they were -- a shredder was used.
Q. They looked like they were manually torn, ripped, and then thrown away, right?
A. Yes.
MR. CARLSON: Nothing further.

THE COURT: Thank you, Mr. Carlson.

Ms. Nutini, any redirect?

MS. NUTINI: No, Your Honor. Thank you.

THE COURT: Mr. Luciano, thank you for coming.

You can step down, sir. Please watch your step.

Thank you.

(Witness excused.)

THE COURT: The government may call its next witness.

MS. NUTINI: Your Honor, the government calls Ebuka Egbunam.

THE COURT: Okay.

MS. NUTINI: Your Honor, while the witness is coming in, may we have a brief sidebar?

THE COURT: Sure.

Folks, we're going to have a brief sidebar. I have a -- I'll say what I said before. If we have a sidebar, you can view this as an opportunity to stretch your legs. So you can stand up and move around a little bit, if you'd like. You can say "hello" to your neighbor. You just can't talk to each other about the substance of the case or anything happening in the courtroom.

We'll reconvene momentarily.

(Proceedings heard at sidebar on the record:)

THE COURT: All right. Ms. Nutini, can everybody hear me okay?

MS. NUTINI: Yes, Judge.

THE COURT: Go ahead.

MS. NUTINI: Thank you, Your Honor.

So Special Agent Luciano was one of the case agents of this investigation. Now that he has testified, we were just going to ask permission if he would be able to sit in the courtroom for the remainder of the trial.

THE COURT: Mr. Carlson, do you have a reaction to that?

MR. CARLSON: As long as he's not going to testify again, no.

THE COURT: Yeah, so I was going to say the same thing. I will allow him to sit here as long as there's a zero percent chance that he's going to testify again, no matter what happens.

So if you bring him in here, I will not let you testify -- I will not let him go back to the stand no matter what. See what I'm saying? So you're waiving an opportunity to recall him on rebuttal, for example. If you're willing to do that, I'll let you do that.

MS. NUTINI: Yes, Judge, we do not plan to recall him.

THE COURT: All right. So -- but I'm telling you, like, if catastrophe strikes and you want to recall him, I won't let you do it.

Are you willing to make that deal here?

MS. NUTINI: Yes, Your Honor.

THE COURT: All right. So I'll go ahead and allow him to come on in. He won't be allowed to testify no matter what happens in the trial. Okay? Testify again.

MS. NUTINI: Thank you, Your Honor.

THE COURT: All right.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Counsel.

Whenever you're ready, you can call your next witness.

(Ebuka Egbunam enters the courtroom.)

THE COURT: Come on up, please.

Good morning.

Stand right here (indicating).

Raise your right hand.

(Witness sworn.)

THE COURT: Very good. Have a seat, please.

Good morning.

THE WITNESS: Good morning.

THE COURT: Thank you for being here.

I'd like you to speak directly into the microphone. I want to make sure all the men and women of the jury can hear you.

And if you need a drink at any point today, there is a pitcher of water to your right. Okay?

All right. Counsel, you may proceed with your exam.

MS. DeMARCO: Thank you, Your Honor.

EBUKA EGBUNAM, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. DeMARCO:

Q. Good morning.

A. Good morning.

Q. Can you please state and spell your name for the record.

A. My name is Ebuka Egbunam. That's E-b-u-k-a, space, E-g-b-u-n-a-m.

Q. How old are you, Mr. Egbunam?

A. I'm 24, but my passport has a mistake, so 23.

Q. How old are you actually?

A. 24.

Q. Okay.

A. Yeah.

Q. Where do you currently live?

A. I live in San Francisco.

Q. Okay. Are you currently employed?

A. Yes.

Q. Where do you work?

A. I work at Meta.

Q. And do some people know that as like Facebook?

A. Yeah, that's Facebook.

Q. How long have you worked at Meta?

A. Currently, for four months, I think, now.

Q. And what's your position there?
A. Software engineer.
Q. Software engineer?
A. Yeah.
Q. Before Meta, what did you do?
A. I was a student, and I started a company or two.
Q. And you started a company or two?
A. Yeah.
Q. Okay. Where were you most recently a student?
A. At the University of Illinois at Urbana-Champaign.
Q. Did you graduate?
A. No.
Q. Why not?
A. So I started a company mid class, and that -- that took a lot of my time. And then after -- right after that, Meta, like, came along, and so I went on to do that.
Q. Okay. What did you study at University of Illinois?
A. Computer science and math.
Q. And how long were you a student there?
A. In total, around probably 2.57 years.
Q. Okay. Did you attend any other schools?
A. I did.
Q. What schools did you attend, I guess going in reverse chronological order?
A. I started with Indiana University at Bloomington. I

started systems engineering there. And afterwards, I went to the Wilber Wright Community College and started computer -- associate's in computer engineering there.
Q. Okay. I want to talk to you a bit about your background.
Did you grow up in the United States?
A. No.
Q. Where did you grow up?
A. I grew up in Nigeria.
Q. Did you come to the United States at some point?
A. I did.
Q. When did you come?
A. I came in 2018.
Q. And how old were you at that time?
A. I was 18.
Q. Why did you come to the U.S.?
A. Mr. Ibekie spoke to my family and convinced them it would be the best place for me.
Q. Okay. When you first came to the United States in 2018, where did you live?
A. I lived with Mr. Ibekie.
Q. I'm showing you on the screen in front of you Government Exhibit 713, which is in evidence.
MS. DeMARCO: And this can be published to the jury. Thank you.
BY MS. DeMARCO:

Q. Do you recognize this photograph?
A. Yes.
Q. What is it?
A. This is the residence where I lived when I moved to the United States.
Q. And do you remember where this was?
A. Yes.
Q. Where was it?
A. In Lisle. Lisle, Illinois.
Q. Who lived with you at this address?
A. It was me, Mr. Ibekie, Mr. Sam -- I don't remember his last name -- and sometimes my stepsiblings would come over and stay for a little bit.
Q. Okay. I'm showing you now Government Exhibit 701, which is in evidence.
Do you recognize the person in this photo?
A. Yes.
Q. Who is it?
A. Mr. Ibekie.
Q. In 2018, when you came to the United States, what was your relationship with the defendant?
A. At the time, I knew him as a family friend that was trying to help me out with school.
Q. Did you later learn that you had a different connection to him than you thought?

A. That's correct.
Q. What was the connection?
A. I literally learned two years later that he was my biological father.
Q. Okay. Two years later you found that out?
A. Yeah.
Q. Did you know the defendant to use any name other than Anthony Ibekie?
A. He would sometimes be called Emeka.
Q. Do you know what e-mail address he used?
A. Yes.
Q. What was the e-mail address?
A. Aibekie@gmail.com.
Q. Aibekie@gmail.com?
A. Mm-hmm. Yes.
Q. Okay. I'm showing you Government Exhibit 702, which is already in evidence.
Do you recognize this photo?
A. Yes.
Q. Who is this?
A. Sam.
Q. And what was your relationship with Sam?
A. Nothing really. Just it was -- he was a friend of Mr. Ibekie and just someone in the house that I referred to him as uncle as well.

Q. You referred to him as uncle?
A. Yeah.
Q. Is that kind of like a title of respect?
A. Yes.
Q. Okay. How long did you live in Lisle?
A. Probably around two weeks before I headed out to school.
Q. Okay. So you moved to stay there for about two weeks and then headed to Bloomington?
A. Yes.
Q. Okay. Did you come back to the Lisle apartment at all?
A. Yes, once.
Q. On a break from school?
A. Yes, spring break.
Q. Okay. And did you finish that school year in Bloomington?
A. I did.
Q. At the end of the school year -- so now we're talking about it would be spring of 2019; is that right?
A. Mm-hmm, yes.
Q. Where did you go?
A. I went to -- I left school, and I moved back with Mr. Ibekie but at a different residence.
Q. Okay. I'm showing you Government Exhibit 714.
Do you recognize this photo?
A. Yes.
Q. What is this?

A. This is the residence that I moved into with Mr. Ibekie after the school year in Indiana.
Q. And do you know where this was, what town?
A. Yeah, this is in Naperville.
Q. How long did you live in Naperville?
A. I was in Naperville for probably just under a year.
Q. Okay. Did you go back to school in the fall?
A. No, I did not.
Q. Why not?
A. There was some complications, and Mr. Ibekie told me that he wasn't able to afford Indiana University anymore for me, so my only option was to stay at home.
Q. Okay. And who lived with you in Naperville?
A. It was me, it was Mr. Ibekie, it was Mr. Sam.
Q. Okay. So you said you stayed in Naperville for under a year?
A. Mm-hmm.
Q. Did you go somewhere else after that year was up?
A. Yes.
Q. Where did you go?
A. We moved to a residence in, I believe, Oswego, Illinois.
Q. Okay. I'm showing you Government Exhibit 715.
Do you recognize these photos?
A. Yes. This is the apartment complex.
Q. Okay. And you said this was in Oswego?

A. Yes.
Q. Who lived with you there?
A. It was me -- the primary residence was just me and Mr. Ibekie, and my stepsiblings would come in and live for a little bit.
Q. Your stepsiblings would come in for a little bit?
A. Yes.
Q. Did Sam move with you to Oswego?
A. No.
Q. Did Sam ever come to the Oswego residence?
A. Not that I've seen. Maybe once, but I don't fully remember him coming.
Q. Do you ever remember him staying the night?
A. No.
Q. Okay. I'm showing you Government Exhibit 703, which is in evidence.
Do you recognize this person?
A. Yes.
Q. Who is this?
A. Gosha. I believe Ms. Gosha. I don't remember her last name as well. She was -- she had a relationship with Mr. Ibekie.
Q. Personal or work relationship?
A. I think both.
Q. Okay. Okay. Shifting gears slightly, over the years that

you lived with the defendant, did you have an opportunity to hear him speak?
A. Yes.
Q. Multiple times?
A. Yes.
Q. Are you familiar with his voice?
A. Yes.
Q. Would you recognize his voice if you heard it?
A. I would.
Q. Okay. I'm going to play for you Government Exhibit 601. I'll play this for about a minute and then stop it.
THE COURT: This is in evidence?
MS. DeMARCO: Correct, this is already in evidence.
THE COURT: All right. Very good.
(An audio clip was played in open court.)
MS. DeMARCO: Okay. So, for the record, I've paused Government Exhibit 601 at 1 minute and 11 seconds.
BY MS. DeMARCO:
Q. Did you recognize the person speaking most recently on the clip?
A. Yes.
Q. Whose voice was it?
A. Mr. Ibekie.
Q. I'm playing you Government Exhibit 602, which is already in evidence. And, again, I'll play this for about a minute.

(An audio clip was played in open court.)

MS. DeMARCO: Okay. So I've paused this at 42 seconds.

BY MS. DeMARCO:

Q. Do you recognize the voice of the person who most recently said that they were going to send something to the bank?

A. Yes.

Q. Whose voice was that?

A. Mr. Ibekie.

Q. Okay. Shifting gears now, I want to draw your attention back to when you were living in Lisle.

While you were living in Lisle, did you ever come across a letter that seemed odd to you?

A. Yes.

Q. Can you describe the letter that you saw to the jury.

A. It was one of those letters where you're telling someone that they have some amount saved somewhere or, like, hidden somewhere, and they can get -- it's like a typical scam letter, in my opinion.

Q. Where did you find this letter?

A. It was over at the house. It was on Mr. Ibekie's desk. And, yeah, it was -- it was around the house.

Q. Around the house?

A. Yeah.

Q. Okay. I'm showing you Government Exhibit 721, which is in

evidence.

Did it look something like this?

A. Yes, it looks very, very similar to this.

Q. Okay. How many copies of this letter did you see in the Lisle house?

A. Probably thousands.

Q. Okay. And I think you mentioned that they were around the house and some were on a desk?

A. Yeah.

Q. Okay. Can you tell us more about the desk.

A. Yeah, it was like a stack of papers, just like you have a stack of A4 papers just -- just on the desk.

Q. And whose desk was it?

A. Mr. Ibekie's desk.

Q. How do you know that it was Mr. Ibekie's desk?

A. Well, while I was living with him for the two weeks, he would just -- he would be working there.

Q. Okay.

A. So I just categorized it as his desk.

Q. Did the letters disappear at some point?

A. Yeah, at some point, they -- they would always, like, disappear.

Q. Do you know what happened to them?

A. I don't know exactly what happened, but I believe they were, like, either mailed or shredded.

MR. CARLSON: Objection, Judge.

THE COURT: So, overruled. He's got to give a -- as long as it's nonspeculative. You can -- why don't you reask the question, and I'll instruct the witness that you can testify as to something within your personal knowledge. You can't speculate. Okay? So if you have a reasonable basis to testify to something, you can offer it within the scope of your personal knowledge, but you cannot speculate.

So, with that understanding, we'll ask you to restate the question.

MS. DeMARCO: Thank you, Your Honor.

BY MS. DeMARCO:

Q. Mr. Egbunam, did you ever see these letters leaving the house or going elsewhere?

A. No.

Q. Okay. Did you personally do anything with these letters?

A. Yes.

Q. What did you do with them?

A. I was asked to fold them.

Q. Who asked you to fold them?

A. Mr. Sam.

Q. When you say "fold them," what do you mean by that?

A. I meant that they would -- you know, they would be flat, and they would need -- they would need to be folded inside an envelope to be processed next and, I'm guessing, mailed.

Q. Okay. Did you see anyone else fold the letters?
A. Yes.
Q. Who?
A. Mr. Sam and Mr. Ibekie.
Q. Did you observe the defendant use any equipment when folding the letters?
A. Yes.
Q. What did you observe?
A. Well, Mr. Ibekie would wear, like, nursing gloves to fold the letters.
Q. Did you ever observe the defendant wearing those gloves other than when folding the letters?
A. No.
Q. Did you see these letters or letters like them anywhere other than Lisle?
A. At the Alyssa Drive.
Q. And Alyssa Drive was in which --
A. Naperville.
Q. Naperville.
Did you participate in folding them when you lived in Naperville?
A. Yes.
Q. Did you observe anyone else folding and stuffing letters in Naperville?
A. Yes.

Q. Who?
A. Mr. Ibekie.
Q. Where were the letters located in Naperville in terms of the house?
A. It was also located at his office.
Q. When you say "his office," whose office?
A. Mr. Ibekie's.
Q. Did anybody else work in that work space?
A. No. It was solely his.
Q. Okay. And, again, did you notice that the letters sometimes were gone?
A. Yes.
Q. Did you observe personally where they went?
A. No.
Q. Did you ever see the defendant or Sam do anything other than fold the letters?
A. No.
Q. Did you ever see them discard the letters?
A. Yes.
Q. What did you see?
A. I saw them -- well, actually, no. I didn't see them do anything else to the letters.
Q. Did you ever see them shred or rip the letters?
MR. CARLSON: Objection. Leading, Judge.
THE COURT: Overruled.

Go ahead.

BY THE WITNESS:

A. I saw them shred letters, yes.

BY MS. DeMARCO:

Q. Okay. How many letters were you given to fold at a time?

A. Probably in the hundreds, and I was folding -- you know, I was asked to just fold, fold a couple hundred, to give me a stack and asked me to fold.

Q. Okay. And, Mr. Egbunam, you testified a few minutes ago that they appeared to you to be a scam?

A. Yes.

Q. So if you knew they were scam letters, why did you participate in folding and stuffing envelopes?

A. It was a very confusing time in my life as well. I was scared in the sense that I really wanted to go back to school, and I really didn't want to let this be the thing that, like, stops my education. So I stayed away from, like, confronting the idea of it.

I did Google and see if these letters were being sent to people, and I didn't really find much online. I found some things, but not much. But I also tried to just stay my mind away from -- from the idea of this.

Q. Okay. Once you moved to Oswego, did you fold letters there?

A. No.

Q. Did anybody else fold letters in Oswego that you saw?
A. No.
Q. Did the defendant also have an office in Oswego?
A. Yes.
Q. Where was the office?
A. It was in the garage.

MS. DeMARCO: Judge, at this point, could we have Stipulation No. 12 read.

THE COURT: Yes.

Pull it up on the screen.

All right. Thank you, Ms. Ramos.

We've got Stipulation 12 on the screen.

Everybody see that okay?

All right. So here it goes. I'm going to read Stipulation No. 12 into the record.

"Government Exhibit 719 contains true and accurate copies of photographs taken by law enforcement during a search warrant conducted at 797 Oxbow Avenue, Unit 110, Oswego, Illinois, on or about July 16th, 2020.

"The parties agree that Government Exhibit 719, specifically 719-1 through 719-6, are admissible in evidence."

It says "So stipulated."

There is a signature by an assistant U.S. attorney, there is a signature by defense counsel, and there is a signature by the defendant Anthony Ibekie.

So stipulated?
MS. DeMARCO: So stipulated.
MR. CARLSON: So stipulated.
THE COURT: Okay. Thank you, Counsel. You may proceed.
MS. DeMARCO: Thank you, Your Honor.
The government moves to admit Exhibit 719-1 through 719-6 into evidence.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: All right. Exhibit 719 is admitted into its entirety in evidence.
(Government's Exhibit No. 719 was received in evidence.)
MS. DeMARCO: Thank you, Your Honor.
THE COURT: You can publish to the jury.
BY MS. DeMARCO:
Q. Mr. Egbunam, I'm showing you 719-1.
MS. DeMARCO: And this is published to the jury.
BY MS. DeMARCO:
Q. Do you recognize what's depicted in this photo?
A. Yes.
Q. What are we looking at here?
A. This is Mr. Ibekie's desk.
Q. And is this in Oswego?
A. Yes.

Q. Did you ever see anybody else work at this desk?
A. No.
Q. What was the relationship that you observed between the defendant and Sam?
A. They were friends but also business partners and -- yeah, that was it, friends and business partners.
Q. From what you observed, did one of them appear to be more of a leader and one more of a follower?
A. Yeah.
Q. Who was the leader?
A. Mr. Ibekie mostly coordinated things for Mr. Sam to do.
Q. And why do you think that?
A. I lived with them for -- for -- in totality, maybe eight, nine months. And I just saw it happen, like, multiple times where Mr. Ibekie would ask Mr. Sam to do, you know, different things, and that would be the case.
Q. Okay. So multiple times you saw the defendant --
A. Yeah.
Q. -- asking Sam to do things?
A. Yeah.
Q. Okay. I want to switch gears now.
At some point, did you come to learn that a company had been opened in your name?
A. Yes.
Q. What was the name of that company?

A. I believe Emetech Solutions.
Q. Emetech Solutions?
A. Yes.
Q. Who opened this company?
A. Well, technically -- well, Mr. Ibekie opened the company.
Q. Was your name on the incorporation paperwork?
A. Yes.
Q. Did you participate in incorporating that company?
A. Not explicitly.
Q. When you say "not explicitly," what do you mean?
A. Like I wasn't there when the company was incorporated. I was told about it, and I was fine at the time with it.
Q. Okay. What was the company supposed to be for?
A. At the time, I was just starting, like, trying to do, like, IT consulting work, and I was hoping to use the company to, like, be the entity where I, like, work with clients and kind of build, like, my portfolio.
Q. And did Emetech end up being that company?
A. No.
Q. So what was your understanding of why the defendant opened this company and put your name on it?
A. Well, Mr. Ibekie knew about my, like, engineering, I guess you call it, passion, and I was hoping -- well, I thought at the time that he was opening this company to help, like, follow that -- that dream of, like, doing software.

Q. Okay. Of doing software, you said?
A. Mm-hmm.
Q. Did you open a bank account in the name of this company?
A. Yes.
Q. Why did you do that?
A. I opened the bank account because Mr. Ibekie told me it would be the best thing to do, you know, with the company or register to.
Q. So Mr. Ibekie told you to open this bank account?
A. Yes.
Q. And was this at Chase Bank?
A. Yes.
Q. I'm showing you Government Exhibit 305-A, which is in evidence.
Do you recognize this document?
A. Yes.
Q. What is it?
A. This is the bank account -- the business bank account for Emetech Solutions.
Q. And did you fill this out?
A. Yes.
Q. Okay. So can you read the account title, if you can see that.
A. Yes. Emetech Solutions, Incorporated.
THE COURT: Let's see if you can blow that up for the

jury, if you can. Make it a little easier to see.
There you go. Thank you.
BY MS. DeMARCO:
Q. Okay. So that's the account title?
A. Yes.
Q. And the business address?
A. 797 Oxbow Avenue, Unit 110, Oswego, Illinois.
Q. This is where you were living at the time?
A. That's correct.
Q. Okay. And did you fill out this line here?
A. Yep. Yes.
Q. That's your signature?
A. That's my signature.
Q. Okay. And what are the last four digits of the account number?
A. 6830.
Q. Did the defendant go with you to open this bank account?
A. He drove me to the Chase Bank.
Q. Did he go inside the bank with you?
A. No.
Q. Did you have online access to this account?
A. Yes.
Q. Who else had online access to the account?
A. Mr. Ibekie.
Q. Anybody else?

A. No.
Q. Did you have a card associated with the account, like a debit card?
A. Yes.
Q. Did anybody else have a card?
A. Mr. Ibekie had the -- well, him and I shared the one and only card for the account.
Q. Did you monitor this account closely?
A. Yes. So I would open it -- not super closely, but I would open it and see the activity on it.
Q. I'm sorry. Can you repeat the last thing you said.
A. I would open the account on my phone using the mobile app and see the activity on it, but not super closely.
Q. Okay.
A. Yeah.
Q. How often did you use the account?
A. Very, very rarely.
Q. Very rarely?
A. Mm-hmm.
Q. Did you ever deposit money into the account?
A. No.
Q. Did you ever ask anybody else to deposit money into the account?
A. No.
Q. I'm showing you Government Exhibit 305-B, which is in

evidence.

Does this appear to be a bank statement?
A. Yes.
Q. What's the account for this bank statement?
A. The account number or the bank?
Q. So the name of the account here.
A. Em- -- Emetech Solutions.
Q. And the last four digits of the account number?
A. 6830.
Q. Okay. And this appears to be from when?
A. May 30th, 2020, to June 30th, 2020.
Q. Okay. I've blown up a deposit on this account for $6,400.

Mr. Egbunam, do you recognize this name, Dale Helms?
A. No.
Q. Did you ask Mr. Helms to deposit $6,400 into this account?
A. No.
Q. Do you know an individual named Dale Helms?
A. No, I don't.
Q. Did the defendant ask you to open additional bank accounts?
A. Yes.
Q. Why?
A. Just more business accounts for me or personal accounts for me because -- I don't think there was any, like, super strict reason. It was just like you should have more accounts, if you can, and we kind of just went to try and open accounts.

Q. Did you succeed in opening more accounts?
A. No.
Q. Why not?
A. So, when we drove around to the banks, they wouldn't open an account for an individual without a Social Security. I was an international student at the time.
Q. Okay. Changing topics a bit, obviously you have a background in software engineering.
Did you ever do any projects of that nature for the defendant?
A. Yes.
Q. What did you do?
A. I -- I built websites for him.
Q. What kind of websites?
A. Whatever websites he -- he wanted for his companies.
Q. How many websites did you build for him?
A. Over four.
Q. Over four.
A. (Nodding head up and down.)
Q. What was your understanding of what the websites were for?
A. My -- my understanding was that it was for, like, new partnership businesses he was starting up for different things.
Q. Do you remember any specific websites that you built?
A. I remember there was like a law bank-focused one.
Q. A law bank-focused one?

A. Mm-hmm.
Q. Who sent you the content for the websites?
A. Mr. Ibekie.
Q. And how did you know like what it should look like?
A. He would send me like a -- probably like -- like an original website, like an inspiration, you know, yeah, the original, yeah, something I should copy, basically.
Q. Okay.
A. Yeah.
Q. So he would send you, like, a sample --
A. Yes.
Q. -- and you would try to copy it?
A. A sample is the right word.
Q. Okay. And, Mr. Egbunam, are you familiar with the name John Delon?
A. No.
Q. What about the name Chandler Arnaud?
A. No.
Q. What about the name Peter Pfizer?
A. Very lightly for me. I think I've seen that name before, but not very familiar.
Q. Okay. What about Pierre Delouis?
A. No.
Q. Okay. I want to draw your attention now to July of 2020.
Did law enforcement come to your home in Oswego?

A. Yes.
Q. Did agents approach you on that day?
A. Yes.
Q. And did you speak to agents that day?
A. I did.
Q. Were you completely honest with law enforcement that day?
A. I was not.
Q. Why not?
A. That day was the first time in 20 years of living that I've ever had any encounters with law enforcement, so it was scary.
I was also, like, dealing with immigration, finding a school, trying to leave the house as soon as possible. And I guess I was trying to protect some of those things, and I kind led myself astray and didn't -- wasn't fully honest.
Q. And did you decide to cooperate with law enforcement at that point?
A. No.
Q. Have you been charged with a crime in a different fraud case?
A. Yes.
Q. Did you decide to cooperate with law enforcement after you were charged in that case?
A. Yes.
Q. Did you enter into what's called a deferred prosecution agreement with the government in your other case?

A. Yes.
Q. What is your understanding of what was required from you as part of that agreement?
A. One of the things was to be cooperative and be truthful always about all of my experience, and also to kind of have this one year go of not doing anything kind of bad, I guess. Yeah, and hopefully the case would be eventually deferred and then dropped.
Q. Okay. So what was your understanding of the benefit that you receive from cooperating truthfully and, as you said, staying out of trouble for a year?
A. Yeah, if -- I -- the benefit was that my -- my case would be dropped.
Q. Has that year now passed?
A. Yes.
Q. And did the government drop your other case?
A. Yes.
Q. Has the government ever paid you in cooperation -- sorry -- in connection with your cooperation?
A. No.
Q. Are you under oath today?
A. Yes.
Q. Do you understand that lying to a federal jury is a crime?
A. Yes.
Q. Okay. What's your understanding of what would happen to

you if you lied to the jury today?
A. I think there's like a five-year potential jail time.
Q. Have you ever been charged with any other crime other than that case that has been dropped?
A. No.
Q. Aside from the deferred prosecution agreement, have you received any other benefits from the government in exchange for your testimony today?
A. No.
MS. DeMARCO: May I have one moment, Your Honor?
THE COURT: You may.
(Counsel conferring.)
MS. DeMARCO: Nothing further.
THE COURT: Okay. Thank you, Counsel.
Mr. Carlson, whenever you're ready.

CROSS-EXAMINATION

BY MR. CARLSON:
Q. Sir, you testified a minute ago that you were raised in Nigeria; is that correct?
A. That's correct.
Q. And that it was Mr. Ibekie who convinced you and your family that you should move to the United States, correct?
A. That's correct.
Q. You weren't planning to come to the United States before that, were you?

A. No, I was not.
Q. You were content in Nigeria?
A. I was -- I wanted to go to Canada. I was thinking about that.
Q. But you had no plans to come to the United States?
A. Not the United States, no.
Q. And would it be fair to say that Mr. Ibekie convinced you that you should come to the United States?
A. Yes.
Q. And he convinced you because he told you he was willing to pay for your college education, right?
A. Yes.
Q. And that was important to you, right?
A. Very.
Q. And would it be fair to say that once you got here, that didn't happen?
A. It didn't.
Q. You were pretty upset, weren't you?
A. Not at the time. I wasn't very upset at the time.
Q. Well, didn't you believe he brought you here -- and I think those were the words you used with the agents -- under false pretenses?
A. Yes.
Q. And as a result of that, you ended up taking out student loans for your college, right?

A.  That's not correct.  I did not.
Q.  Did Mr. Ibekie pay for your college?
A.  Nope.
Q.  That upset you, didn't it?
A.  It was a difficult situation.  At the time, it didn't upset me.  I was more trying to understand, you know, financial difficulties.  It happens, but, you know, we're looking for ways around.  I could have gone to a community college.  That was something I kind of brought up that wasn't kind of, you know, like, adhered to.
I was just looking for an option to, like -- like, whatever other way.  Online school.  It didn't really matter.  I just wanted, you know, to get the degree.
Q.  Well, isn't it fair to say what you really wanted was for him to pay for your college education?
A.  Oh, that would have been wonderful, yes.
Q.  That's what you wanted, right?
A.  Yes.
Q.  And that's one of the reasons why you didn't confront him with what you observed, right?
A.  Yeah.
Q.  Because you didn't want to do anything that would jeopardize the chance that he'd pay for your college?
A.  Yes.
Q.  Because that was really the most important thing, right?

A. The most important thing was going to college. Whether he paid for it --

Q. But that's what you wanted, right?

A. That was -- that was -- that would be nice, yeah. I wanted it.

Q. That's why you came here, right?

A. I came here to go to college, not for him to pay for me to go to college.

Q. Well, I thought you told us a little while ago that he promised that he was going to pay -- that you weren't planning on coming, but -- until he promised to pay for your college, right?

A. Yes.

Q. And you testified that you saw these letters.

A. I did.

Q. Did you ever see letters or anything like that on a computer at any of those residences?

A. No.

Q. Did you ever hear Mr. Ibekie talking to any victims on the telephone?

A. No.

Q. Did you ever hear him pretending to be somebody else?

A. No.

Q. Did you ever see any lists of names and addresses?

A. No.

Q. Any spread- -- Excel spreadsheets with names and addresses on them?
A. No.
Q. And you never talked to Mr. Ibekie about any of this, correct?
A. No.
THE COURT: You said, "You never talked to Ibekie, correct," and he said, "No."
So let's make sure we've got a clean Q&A on that.
Go ahead.
BY MR. CARLSON:
Q. You never talked to Mr. Ibekie about anything that you observed, correct?
A. No.
Q. And you never questioned him about what was going on, correct?
A. No.
Q. And I think you testified that when the agents on July 20th came to the Oxbow residence, you lied to them, right?
A. I did.
Q. Now, when you lived with Mr. Ibekie at those three locations, you had Internet access there, didn't you?
A. I did.
Q. And while you were there, there were several computers in the premises, correct?

A. That's correct.
Q. And you used some of those computers, right?
A. No.
Q. You never used a computer that was in the premises?
A. I used my personal computer.
Q. So you used -- you had your own computer there, and you --
A. Yes.
Q. -- used that computer?
A. Yes.
Q. But there were other computers that were there?
A. Yes.
Q. And you never used those computers?
A. No.
Q. And you never saw what was on those computers, correct?
A. No.
Q. You were never charged along with Mr. Ibekie in this case, were you?
A. I don't believe so.
Q. Well, you would have known, wouldn't you?
A. I think so.
Q. You were charged in a separate case; is that correct?
A. Yes.
Q. A separate fraud case, correct?
A. Yes.
Q. And you knew when you were charged with that offense that

you were facing time in prison, correct?
A. Yes.
Q. You didn't want that, did you?
A. No, I did not.
Q. You didn't want to go to prison?
A. I did not want to go to prison.
Q. You also knew that if you were convicted, you were facing deportation, correct?
A. Yes.
Q. And you didn't want that either, right?
A. Yes.
Q. Did you want to be deported?
A. No, I did not.
Q. And as a result, you agreed to cooperate, correct?
A. No.
Q. You didn't agree to cooperate?
A. I did.
Q. Okay. So you agreed to cooperate because you didn't want to be convicted and sent to jail, and you didn't want to be deported, right?
A. No, I agreed to cooperate so that it would help my case. I didn't know exactly what would happen if -- I didn't know that the government would come back with potentially this deferred prosecution.
Q. Well, you were hoping to avoid going to prison, correct?

A. Yes.
Q. And you would have done whatever you needed to do to be able to do that, right?
A. Whatever is within my power, yes.
Q. And one of the things would be to cooperate with the government, correct?
A. Yes.
Q. And after you agreed to cooperate, you spoke with them on many occasions, correct?
A. Yes.
Q. I think you spoke to them on May 17th of 2022?
A. Potentially.
Q. Again on November 8th of 2022?
A. I don't remember the specific dates, but I did speak to them multiple times.
Q. And, again, then you didn't speak to them for a while but you talked to them again on April 29th of 2024, just a little while ago, correct?
A. Yes.
Q. And again on June 7th of 2024, correct?
A. Yes.
Q. Now, when you spoke to them on June 17th, the first time, you didn't tell them that Mr. Ibekie always wore gloves while he was folding these letters, did you?
A. The very first time?

Q. Yes.
A. I don't -- I don't believe so.
Q. And as a matter of fact, you didn't even tell them that on the second time; isn't that correct?
A. Probably, maybe. Maybe. I'm not sure.
Q. The first time you mentioned that was in trial preparation in this case on April 29th of 2024, correct?
A. That's -- that's correct.
Q. That's the first time you mentioned that?
A. Well, I don't remember if I didn't mention it in the -- the last times that I spoke to the government, but I remember that I did mention it on the first time for the trial preparation.
Q. So that's the first time you remember saying that --
A. Yes.
Q. -- correct?
MR. CARLSON: Can I have a minute, Your Honor?
THE COURT: You may.
(Counsel and defendant conferring.)
BY MR. CARLSON:
Q. Now, when you lived with Mr. Ibekie and Samuel at the Lisle premises --
A. Yes.
Q. -- Mr. Ibekie rented rooms to people in that building, didn't he?
A. I -- I have no idea of that. I had no idea of that.

Q. You have no idea whether he had tenants while he was there?
A. Yes.
Q. He -- did he have tenants?
A. I don't know.
Q. You don't know.
Because --
A. Yes.
Q. -- you were only there for a very short period of time, correct?
A. I was, yeah.
Q. When you lived with him in Naperville, were you aware whether he had tenants?
A. I don't believe he had tenants in Naperville.
Q. What about Oxbow?
A. He didn't have tenants in Oxbow.
Q. You never saw anybody else in the premises?
A. In Oxbow or in Naperville or --
Q. Well, let's start with Naperville.
A. Naperville, I mean, apart from Sam, every other person would come visit, maybe stay for a day and leave, or my stepsiblings that would come for, like, the weekend and leave.
(Counsel conferring.)
BY MR. CARLSON:
Q. This is the Lisle premises, correct?
A. Mm-hmm. That's correct.

Q. And you see several cars parked there, correct?
A. I see several cars, yes.
Q. Do you know whose cars those are?
A. No.
Q. Would you often see cars parked like that at the Lisle premises?
A. No.
Q. Never saw multiple cars parked there?
A. Two at most.
Q. As a result of your cooperation, the charges against you were completely dismissed, correct?
A. That's correct.
Q. And those charges could have led to your deportation, correct?
A. That's correct.
Q. And you haven't been deported, have you?
A. I have not.
Q. And you've got no pending charges?
A. I don't have any pending charges.
Q. And no conviction?
A. No conviction, correct.
MR. CARLSON: Nothing further, Judge.
THE COURT: Okay. Thank you, Mr. Carlson.
Any redirect, Ms. DeMarco?
MS. DeMARCO: Just briefly, Your Honor.

THE COURT: Okay. Come on up, please.

REDIRECT EXAMINATION

BY MS. DeMARCO:

Q. Mr. Egbunam, you were asked about the series of meetings that you had with the government over the last few years on cross-examination?

A. Yes.

Q. Were your earlier meetings focused more on your other case?

A. Yes.

Q. Did anybody ask you about gloves until the past few months?

A. No. No.

Q. You were also asked some questions about devices?

A. Mm-hmm.

Q. Did you have your own computer?

A. I did.

Q. Did you ever have any reason to go into the defendant's computer?

A. No.

Q. What about his phone?

A. No.

Q. Would it have been fairly odd for you to be rooting around in his devices?

A. I think that's disrespectful, yes.

Q. Okay. And I think you testified on direct, in total, you lived with the defendant for about eight or nine months?

A. Mm-hmm. Yes.
Q. Did you spend all of your time when you were living with him in his presence?
A. Probably around 40 to 50 percent of my time.
Q. Okay. But you had other things going on at the same time?
A. Yes. Yes, yes, yes.
Q. You were trying to get back to school?
A. I was trying to get back to school. I was skateboarding a lot. I was also teaching myself mobile development for the majority of my time and other forms of engineering as well.
Q. So you weren't with the defendant all day every day?
A. No, I wasn't. He was in the house while I was in the house, but we wouldn't see each other, yes.
Q. You would not see each other for --
A. Yeah.
Q. -- periods of time?
A. For -- yep.
Q. So is it possible that he had phone calls that you didn't hear?
A. Oh, yes. Yes.
MS. DeMARCO: One moment, Your Honor.
(Counsel conferring.)
MS. DeMARCO: Nothing further.
THE COURT: All right. You may step down.
Thank you for coming, sir. Have a safe trip home.

Please watch your step.

THE WITNESS: Thank you.

THE COURT: Thank you.

(Witness excused.)

THE COURT: Members of the jury, it is 10:30 right on the button. So I think now is a good time for a midmorning break. We are going to take a break that we normally do, 15 minutes or so. I want to make sure that you all have a chance to stretch your legs.

I see that you all have copies of the transcripts with you. Thank you for leaving them on your chair. So don't take them back with you into the jury room. Please do, though, take your jury notebooks. You've heard now from, what, seven witnesses or so, give or take. So you're starting to hear a fair bit of testimony. You have not heard all of it. You've got to keep an open mind until everything is done. Okay?

So don't talk about the case. Do enjoy a few minutes, and when you're ready, we'll get rolling again. Okay?

Thank you, folks.

THE COURT SECURITY OFFICER: All rise.

(Jury out at 10:31 a.m.)

THE COURT: All right. Have a seat, folks.

I'll just say a couple of brief things on a couple of objections, and then we'll let you folks have a break.

There were some objections about the objective of the

scheme. In the moment, I thought that it was potentially objectionable if this witness was to speculate about the intent of whoever was behind the scheme.

My reaction when I heard the question was the government just wanted to elicit testimony that the objective of the scheme was to get money from people. I didn't think that was a particularly -- a thunderbolt of revelation. I think that's probably what people think of an alleged fraud scheme is trying to do, is get money from people.

I didn't fault you for asking the question. I didn't think it moved the needle very much. That's not a knock. I'm just saying, I think that in a fraud scheme, to say that a fraud scheme is designed to get money from people is probably what people think a fraud scheme is.

So that's why I sustained the objection in part. I thought if the witness was going to talk about what Mr. Ibekie was thinking, I didn't think it was appropriate. But, you know, to say the goal of the fraud scheme was to defraud money out of people, I didn't think that really was particularly impactful one way or the other. So that's why I handled that particular question like I did.

There was another question about whether he believed that -- this is for the witness who just testified -- whether he believed the letters were mailed.

There was an objection. You know, it's hard to know

on the front end of a question like that whether there's a basis for him to answer it. If there is a certain scenario in which you're just inviting a witness to guess or speculate and there also could be a scenario where the witness has a good-faith basis grounded in facts for testifying that he believes that something was mailed.

You know, for example, to say that he saw letters repeatedly getting folded I think would give rise to an inference that they were mailed, because one of the things people do with folded letters is they put them in envelopes, and one of the reasons people put letters in envelopes is to put them in the mail. That's a perfectly reasonable inference.

I tend to do that around Christmastime, for example.

So that's why I handled that objection the way I did.

If the question was just inviting him to speculate. You know, he saw a stack of letters. And "What do you think happened?" "I don't know. Maybe it was thrown in the mail." That wouldn't have been proper, but I thought there was a sufficient evidentiary foundation for his expression or belief that they were -- they were mailed.

I interjected at one point, Mr. Carlson, on one of your questions because there were a number of questions in a row that were along the following lines: "You never X, correct?" And then he would say, "No." And I knew what you meant, everybody in the courtroom knew what you meant, but

sometimes it doesn't look as clean in a transcript.

So, for example, if I say, "You have never eaten ice cream in my courtroom, correct?" And he said, "No." It's like okay, no, you haven't eaten ice cream or no, what I just said is incorrect. See what I mean? So you can get a little tripped up in a double negative.

I didn't want to inject too much. I think everybody knows what it means. Like, you know -- I often say what happens in a courtroom is never fully captured by a transcript. You know, just when you're sitting through it in live testimony, I think everybody in the room -- I think nobody in the courtroom was confused. I think you made your point and did it effectively on that Q&A.

I just did want to flag, though, that sometimes it doesn't look quite as clean in the transcript, and I think people should be mindful of that.

So I probably interject myself a little more in a civil case than in a criminal case, but that's why I just did want to flag it there for you, Mr. Carlson.

MR. CARLSON: Thank you, Judge.

THE COURT: Again, everybody in the courtroom, Mr. Carlson, knew what you meant. You made your point. But I just wanted to have everybody be mindful of double negatives. Because it doesn't always play well on a transcript later.

And you may want a clean Q&A later, hypothetically

speaking, right? So.

I'd encourage everybody to think about that going forward. Okay?

I will say this, too, on objections: The jury is hit with a lot during a trial, a lot of questions, a lot of answers. It's a little bit like throwing a lot in a blender and spinning it up, you know. Each individual question is a drop, and it has to be a particularly potent drop for it to affect the whole thing. So I think everybody does the best they can to ask clean questions. I do the best I can to handle the objections. I am mindful of the fact, having taken the bench, that a district court judge doesn't have a whole lot of time to think about the answer and the question. You just do the best you can with the live fire that's directed your way.

So -- but I will say to you what I've said in a lot of cases is you just do the best you can with each individual question. I don't -- in any particular case, most questions get blended into the totality.

So I wouldn't, in any case, in any trial you ever have, get too focused on any particular question that you think was objectionable where it was sustained or not sustained. Because it all gets whirled together.

That's an imperfect metaphor, but I think you know what I'm getting at. You know, it is a rare question standing alone that is sufficiently impactful that it determines the

outcome of the case, in my view.

So you can take or leave what I just said. That was just my thinking up here.

Anything from the government before we take a few minutes?

MS. NUTINI: No, Your Honor.

THE COURT: All right. Mr. Carlson, anything from you?

MR. CARLSON: No, Your Honor.

THE COURT: Do you want to give me a sense of what you expect for the latter half of the morning, folks?

MS. NUTINI: Yes, Judge.

Next will be Christopher Wang, and he will be a fairly short witness, probably about 30 minutes --

THE COURT: Okay.

MS. NUTINI: -- in total, I would guess. And after that is Larry Olson, who is a -- the document reconstruction-related witness.

THE COURT: Okay.

MS. NUTINI: He will be a little bit longer.

THE COURT: Okay. So we'll do Wang, and then we'll go with the other witness, and it sounds like we may not finish with him before lunch. We'll just see how it goes.

Okay. And then this afternoon, how many do you expect to have this afternoon?

MS. NUTINI: Special Agent Amy Mansker will testify this afternoon.

THE COURT: Okay.

MS. NUTINI: And --

MS. DeMARCO: An hour, I think.

MS. NUTINI: -- her testimony will be about an hour.

THE COURT: Okay.

MS. NUTINI: We then have Special Agent Christopher Kadonsky, who -- so, just to complete the thought, he -- we had planned to call him last in the case, in part because the two victims that have to testify tomorrow because they're coming from out of town or have scheduling issues --

THE COURT: Right.

MS. NUTINI: -- his testimony in part is related to some of the documents they will admit.

THE COURT: Okay.

MS. NUTINI: So what we may ask, Your Honor, is for him to get through part of his testimony today and finish the rest when -- after those two victims have gone, but --

THE COURT: Okay. Any objection to that?

MR. CARLSON: No, Judge.

THE COURT: Okay. That's fine with me, yeah.

MS. NUTINI: Okay.

THE COURT: So I think we've got a plan here.

The jury typically needs, you know, 15, 20 minutes by

the time everyone uses the bathroom. So I'll ask my courtroom deputy to check in with you folks in about ten minutes or so. Okay?

Thank you, folks.

MS. NUTINI: Thank you.

THE CLERK: All rise.

(Recess at 10:40 a.m., until 10:57 a.m.)

THE COURT: All right. Welcome back, everyone.

Is the government ready?

MS. NUTINI: Yes, Your Honor.

THE COURT: Defense Counsel, are you ready?

MR. CARLSON: Yes, Judge.

THE COURT: All right. Let's go ahead and get the jury.

On a lighter note, the hallway smells like hash browns and bacon. I don't know what's happening back there, but the jury apparently is fed better than the rest of us.

(Jury in at 10:58 a.m.)

THE COURT SECURITY OFFICER: All rise.

THE COURT: All right. Have a seat, everyone.

Welcome back, everyone.

Counsel, you may call your next witness.

MS. NUTINI: Thank you, Your Honor.

The government calls Christopher Wang.

(Christopher Wang enters the courtroom.)

THE COURT: Okay. Come on up, please.

Stand right here (indicating).

Please raise your right hand.

(Witness sworn.)

THE COURT: Very good. Have a seat, please.

Good morning.

THE WITNESS: Good morning, Your Honor.

THE COURT: I'd like you to speak into the microphone, if you would, please. I want to make sure the men and women of the jury can hear you.

And if you need a drink, help yourself. There is a pitcher to your right. Okay?

THE WITNESS: Thank you, Your Honor.

THE COURT: Counsel, you may proceed.

MS. NUTINI: Thank you, Judge.

CHRISTOPHER WANG, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. NUTINI:

Q. Good morning, sir.

A. Good morning, ma'am.

Q. Can you please state and spell your name for the record.

A. Christopher Wang, W-a-n-g.

Q. And where are you employed?

A. Homeland Security Investigations.

Q. What's your position with Homeland Security Investigations?

A. I am a special agent computer forensics agent.
Q. And is the Homeland Security Investigations sometimes referred to shorthand as HSI?
A. Yes.
Q. And how long have you worked with HSI as a special agent?
A. Approximately, three and a half years.
Q. Prior to your work as an HSI special agent, where were you employed?
A. United States Postal Inspection Service.
Q. And what was your position with the United States Postal Inspection Service?
A. I was a postal inspector.
Q. What is a postal inspector?
A. A postal inspector are sworn law enforcement officers that protect and defend the U.S. Postal Service from illicit or dangerous use of the mail stream.
Q. And prior to your working with USPIS, United States Postal Inspection Service, where did you work?
A. The Department of Commerce.
Q. And prior to the Department of Commerce, did you work anywhere else in law enforcement?
A. I worked at the Department of State, Diplomatic Security Service.
Q. Special Agent Wang, I'd like to direct your attention to June of 2020.

Where were you working at this time?
A. At USPIS.
Q. As a postal inspector?
A. Yes.
Q. And in June of 2020, did you become involved in an undercover operation?
A. Yes.
Q. And what does it mean to go undercover?
A. An undercover operation involves a law enforcement officer acting -- or operating in a capacity that doesn't reveal their position as law enforcement.
Q. And what's the purpose of going undercover?
A. It is to collect evidence, direct evidence from ongoing criminal activity.
Q. And what type of undercover operation were you involved in in June of 2020?
A. I was to serve as a U.S. Postal Service mail carrier and deliver a mail item to an address.
Q. And is that known as a law enforcement term, what you were doing?
A. Yes, it's called a controlled delivery.
Q. And can you describe what a controlled delivery is to the jury.
A. A controlled delivery is a law enforcement operation whereby law enforcement officials intercept contraband or

illicit items, and then allow those items along their intended route while monitoring and surveilling the entire delivery.
Q. So you essentially -- you stop the items; is that correct?
A. Correct.
Q. And then you allow the items to proceed on while still sort of surveilling what's happening?
A. Yes.
Q. And what's the purpose of doing a controlled delivery?
A. It's to -- for evidence collection, as well as identifying suspects regarding the ongoing criminal activity.
Q. And how would you do that?
A. The evidence collection?
Q. How would you identify a suspect in the -- in the process of doing a controlled delivery?
A. So prior to the operation, we would be informed as undercover agents of any investigative subjects, shown their photographs, given a brief summary of the case.
Q. And is it fair to say that the delivery address of the controlled delivery is important to law enforcement?
A. Yes.
Q. In this case, what was the purpose of the controlled delivery operation you were assigned in June of 2020?
A. The purpose of this operation was to confirm the recipient as well as the address of the item.
Q. And what specifically was being delivered?

A. It was a cash -- it was a cashier's check.
Q. So I'd like to talk more specifically about June 18th of 2020.
What is the relevance of this day?
A. That is the date of the undercover operation.
MS. NUTINI: Your Honor, permission to publish Government's Exhibit 501, which has been admitted into evidence.
THE COURT: You may.
MS. NUTINI: 501-1. Excuse me.
BY MS. NUTINI:
Q. Special Agent Wang, do you recognize what's depicted on your screen?
A. Yes.
Q. What is this?
A. This is the item I delivered that day.
Q. And this is the item you delivered during the controlled delivery?
A. Yes.
Q. Were you involved in preparing this parcel to be delivered?
A. No.
Q. I'd like to direct your attention to the top right portion of the screen which I've identified -- I've blown up a barcode with a number below it.
Do you know what this is?

A. Yes. That's the tracking number.
Q. And what is a tracking number?
A. Tracking numbers identify specific mail pieces and allows customers to track the items as they flow through the mail stream.
Q. And then I'd like to direct your attention the "To" line that I've blown up.
Where -- what are we looking at here?
A. This is the recipient address.
Q. And what is the recipient address?
A. The recipient is Globayo, LLC, at 1419 North Harlem Avenue, Suite B, in Oak Park, Illinois.
Q. And was this the location of where you were going to deliver the parcel?
A. Yes.
Q. Is this a residential or a commercial building?
A. This is a residential building.
Q. But it's addressed to a business; is that correct?
A. Correct.
MS. NUTINI: Publishing Government's Exhibit 717, which has been admitted into evidence.
BY MS. NUTINI:
Q. Special Agent Wang, do you recognize this photograph?
A. Yes.
Q. What is this?

A. This is the address printed on the envelope.
Q. And specifically, is this the apartment complex?
A. Correct. Yes.
Q. And were you told of anyone who resided at this apartment complex and the Harlem Avenue premises?
A. Yes.
Q. Who?
A. Ms. Jennifer Gosha.
MS. NUTINI: Publishing Government's Exhibit 703, which has been admitted into evidence.
BY MS. NUTINI:
Q. Do you recognize this individual?
A. Yes.
Q. Who is this?
A. Ms. Gosha.
Q. And what was your understanding of Jennifer Gosha's involvement in this investigation?
A. I understood that she was the recipient of the monetary item and that she was involved in the ongoing criminal activity.
Q. So after you received this controlled delivery parcel, what did you do next?
A. We -- so I received this item at the staging location, which is approximately a mile away from the target address, and waited for instructions from the undercover operations

surveillance and cover team.
Q. And when you say "staging location," what do you mean by that?
A. A staging location is an area where we stage our vehicles en route to the final destination.
Q. And at some point, did you leave the staging location?
A. Yes.
Q. What were you driving when you left?
A. A United States Postal Service mail van.
Q. And were you driving alone or were you with anyone else?
A. I was by myself.
Q. And how were you dressed?
A. As a USPS mail carrier.
Q. And to be clear, are you a USPS mail carrier or were you in June of 2020?
A. No.
Q. Were you wearing any recording devices?
A. Yes.
Q. Where -- why were you wearing a recording device?
A. To document the undercover operation.
MS. NUTINI: For the witness only, please.
BY MS. NUTINI:
Q. Special Agent Wang, I'm showing on your screen Government's Exhibit 603.
Do you recognize this exhibit?

A. Yes.
Q. And what is it?
A. This is the surveillance video taken during the undercover operation.
Q. And to be clear, I'm showing you a still image of the beginning of the video; is that correct?
A. Yes.
Q. Have you reviewed this video in its entirety prior to your testimony today?
A. Yes.
Q. And does Government's Exhibit 603 contain a fair and accurate clip of the recording that you made on June 18th of 2020?
A. Yes.
MS. NUTINI: The government moves to admit and publish Government's Exhibit 603.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: Exhibit 603 is admitted.
(Government's Exhibit No. 603 was received in evidence.)
THE COURT: You can publish to the jury.
MS. NUTINI: Thank you, Your Honor.
Your Honor, permission to approach the witness?
THE COURT: You may.
BY MS. NUTINI:

Q. Special Agent Wang, I've also approached and handed you a transcript binder. I'd like you to turn to 603-T.

THE COURT: Would you like the jury to do that as well?

MS. NUTINI: Not yet.

THE COURT: Not yet.

MS. NUTINI: Just the witness, please.

THE COURT: Okay. So, folks, I may have this wrong, but I think this is the third recording. Remember there were three in the binder last time we were here, and I said look at the first two and not the third one. I think that's what we're going, with the third one here.

Is that right, Ms. Nutini?

MS. NUTINI: Yes. Yes, Your Honor.

THE COURT: Go ahead.

BY MS. NUTINI:

Q. Special Agent Wang, do you see 603-T?

A. Yes.

Q. And have you reviewed this transcript prior to your testimony today?

A. Yes.

Q. Did you help prepare or review the transcript for accuracy?

A. Yes.

Q. And were you given an opportunity to make any corrections to the transcript?

A. Yes, I was.
Q. Did you make any corrections?
A. No.
Q. And are the transcripts accurate -- true and accurate, to the best of your knowledge?
A. Yes.

MS. NUTINI: Your Honor, the government moves to admit and publish Government's Exhibit 603-T to the jury.

THE COURT: All right. So is 603-T the transcript?

MS. NUTINI: Yes, Your Honor.

THE COURT: All right. You're moving that into evidence?

MS. NUTINI: Your Honor -- excuse me -- we're just moving to publish it to the jury.

THE COURT: You want the jury to see it.

Any objection to the jury seeing 603-T as a demonstrative?

MR. CARLSON: No.

THE COURT: All right. So, folks, let me clarify that.

So -- so that request is granted.

So I'm going to allow you to take a look at the demonstrative. It's the third tab. I expect what's probably going to happen here is the government is going to play it, and you can follow along.

A couple reminders. The transcript is not evidence. It's a help. It's intended to be a help, I should say. It's up to you to decide if it's helpful.

The evidence is the recording itself. So if there's any difference between the transcript and the recording, then the recording is what matters.

Okay. So you're welcome to follow along on the transcript, if you'd like. If you just want to hear and watch and not look at the transcript, that's fine, too.

Go ahead, Counsel.

MS. NUTINI: Thank you, Your Honor.

BY MS. NUTINI:

Q. And, Special Agent Wang, before I play the recording, I'd like to direct your attention to the top-hand portion of 603-T.

Can you identify the date and time of this recording.

A. June 18th, 2020.

Q. And what is the time?

A. Oh. 4:31 p.m.

Q. And who are the speakers involved in the recording?

A. Undercover Postal Inspector Christopher Wang is "Wang" and Jennifer Gosha is "Gosha."

Q. And to be clear, "Wang" is you, correct?

A. Yes.

Q. Okay. Thank you.

And, Special Agent Wang, if you look at the bottom of

the recording, there is a date and time stamp on the recording as well.

Is that an inaccurate date and time stamp?

A. Yes.

Q. Okay. So the accurate date and time stamp is June 18th of 2020 at 4:31 p.m.; is that correct?

A. Yes.

MS. NUTINI: Okay. I'm now going to play the recording.

(A video clip was played in open court.)

BY MS. NUTINI:

Q. Special Agent Wang, I've paused at 17 seconds.

Do you see an individual in the reflection of the car?

A. Yes.

Q. Who is that?

A. That's me.

Q. And what did you do when you first arrived at 1419 North Harlem Avenue?

A. I exited the vehicle with the mail item as well as the pink slip.

Q. And what is a pink slip?

A. It is a -- it's PS3849. It's basically a redelivery notice where a customer would sign for a package.

Q. And you said "a redelivery notice"?

A. Correct.

Q. What do you mean by that?
A. Oftentimes, a customer is not home at the time of the delivery attempt, so the postal -- or the mail carrier will leave a notice because a signature is required for the proper receipt of that mail item.
Q. So have you attempted to deliver this package or conduct the controlled delivery before that day?
A. Yes -- or --
Q. When --
A. I'm sorry. It was earlier that day. Same day, but at an earlier time.
Q. Thank you.
So was this your second attempt to deliver the parcel?
A. Yes.
Q. Let me ask you this: Why was your first attempt not successful?
A. There was no response after knocking at the door.
MS. NUTINI: I'm going to replay the exhibit at 17 seconds.
(A video clip was played in open court.)
BY MS. NUTINI:
Q. Special Agent Wang, I've paused at 47 seconds.
What are you holding there?
A. The mail item as well as the pink slip.
Q. So the mail item, is that the same item as what was

depicted in Government's Exhibit 501-1?
A. Yes.
MS. NUTINI: I'm now replaying the exhibit.
(A video clip was played in open court.)
BY MS. NUTINI:
Q. Special Agent Wang, I've paused at a minute and 2 seconds.
Who is the individual depicted on your screen?
A. That's Jennifer Gosha.
MS. NUTINI: I'm now replaying the exhibit.
(A video clip was played in open court.)
MS. NUTINI: I'm pausing the exhibit at a minute and 51 seconds.
BY MS. NUTINI:
Q. Special Agent Wang, did you hear a male and a female voice in the recording?
A. Yes.
Q. And who was the male voice?
A. That's me.
Q. And who was the female voice?
A. Jennifer Gosha.
Q. And I'd like to direct your attention to the transcript at line 37 on page 1.
When you stated, "I was just confused by the addressee," what did Ms. Gosha say in response?
A. "Yeah, I'm working from home lately."

Q. And what did you understand that to mean?
A. That she was confirming that this was the correct address.
Q. You also could see Ms. Gosha signing something in the video.
What was she signing?
A. She was signing the pink slip.
Q. Special Agent Wang, after -- well --
MS. NUTINI: For the witness only, please.
BY MS. NUTINI:
Q. Special Agent Wang, I'm showing you Government's Exhibit 501-6.
Do you recognize this?
A. Yes.
Q. And what is this?
A. This is the PS Form 3849 that I had signed that day by Ms. Gosha.
Q. And does this photograph fairly and accurately depict that pink slip?
A. Yes.
MS. NUTINI: Your Honor, I believe this has already been admitted, but out of caution, the government moves to admit and publish Government's Exhibit 501-6.
THE COURT: All right. So I agree with you, it's already admitted. So out of an abundance of caution, it's admitted.

(Government's Exhibit No. 501-6 was received in evidence.)

MS. NUTINI: Thank you, Judge.

THE COURT: You can publish.

BY MS. NUTINI:

Q. Special Agent Wang, directing your attention to the pink slip -- I'm going to blow it up a little bit -- what's the date of the pink slip?

A. June 18th, 2020.

Q. And do you see a tracking number listed in the portion that I've highlighted for you?

A. Yes.

Q. And does that tracking number match the tracking number in Government's Exhibit 501-1?

A. Yes.

Q. And is this a slip you were referring to that is delivered if the first attempt is not successful?

A. Correct.

Q. Directing your attention to page 2 of this slip.

Do you see a signature here?

A. Yes.

Q. And what is the printed name appear to say?

A. J. Gosha.

Q. So after you successfully completed the controlled delivery of the parcel, what did you do next?

A. I returned to the USPS vehicle and drove back to the

staging location.
Q. And once you got back to the staging location, what did you do?
A. I deactivated the surveillance equipment and debriefed with the case agents.
Q. Did you provide the case agents with anything?
A. Yes, the PS Form 3849.
Q. And is that the pink slip we were just looking at?
A. Yes.
Q. Special Agent Wang, did you have any further involvement in this investigation besides the June 2020 events we've discussed today?
A. No.
Q. And did you have -- have you ever had any interaction with the defendant, Anthony Ibekie?
A. No.
(Counsel conferring.)
MS. NUTINI: Thank you. I have no further questions.
THE COURT: All right. Thank you, Counsel.
Defense Counsel, go ahead, please.
MR. CARLSON: No questions, Your Honor.
THE COURT: Okay. Sir, you may step down. Thank you for coming. Have a safe trip home.
THE WITNESS: Thank you, Your Honor.
(Witness excused.)

THE COURT: Please watch your step. You can leave that there. Thank you.

The government may call its next witness.

MS. DeMARCO: Your Honor, the government calls Larry Olson.

THE COURT: Okay.

MS. NUTINI: And, Your Honor, permission to retrieve the transcript?

THE COURT: Yes. Thank you.

(Larry Olson enters the courtroom.)

THE COURT: Come on up, please, sir.

Watch your step, please. Watch your step.

Stand right there (indicating).

Please raise your right hand.

(Witness sworn.)

THE COURT: Very good. Have a seat, please, sir.

Good morning.

THE WITNESS: Good morning.

THE COURT: I'd like you to speak into the microphone, if you would, please. I want to make sure everybody can hear you.

And there's a pitcher of water there. Help yourself anytime you'd like.

THE WITNESS: Thank you, Your Honor.

THE COURT: And, Counsel, whenever you're ready, you

may proceed.

MS. DeMARCO: Thank you, Judge.

LARRY A. OLSON, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. DeMARCO:

Q. Good morning.

A. Good morning.

Q. Can you please state and spell your name for the record.

A. My name is Larry A. Olson, spelled O-l-s-o-n.

Q. Are you currently employed?

A. I am not.

Q. Are you retired?

A. I am retired, yes.

Q. When did you retire?

A. I retired May of last year, 2023.

Q. What did you do before you retired?

A. My last job was with -- as a forensic document examiner.

Q. Where were you a forensic document examiner?

A. I worked for the Internal Revenue Service National Forensic Lab, which is located here in Chicago. And now it's called the IRS Center for Science and Design.

Q. And what were your job responsibilities as a forensic document examiner?

A. At the IRS laboratory, we look at documents that are submitted in investigations of tax and financial fraud to try

to determine whether, from the documents, we can determine some kind of crime has been committed.

We look to see if a document has been altered or if it's in its original state. We try to determine how a document was created, what -- by what business machine, what process. We try to determine where it was done; can we say that two documents came from the same source or different sources. We try to determine when the document was done.

We have ways of dating ink entries on a document to figure out what kind of ink it is and when it was made. Ancient things like typewriters, we can identify typewriters by the type style.

We also try to determine who created a document. We have a separate fingerprint section, but we can look at the handwriting and try to determine if Person A wrote something on a particular document.

We also get involved in document reconstruction, where something has happened to a document, and we're trying to put it back to its original state to see what it looked like.

Q. When did you start working for the IRS?

A. I started in July of 1985.

Q. And was your position in July of 1985 the same as when you retired?

A. Yes, it was.

Q. Did you work anywhere else before the IRS?

A. Yes, I did. I worked at the Immigration and Naturalization Service Forensic Document Laboratory, which was in McLean, Virginia, a suburb of D.C. Now, INS is called the Department of Homeland Security.
Q. What did you do at that laboratory?
A. At that laboratory, we were tasked with looking at travel and identity documents, things like passports, visas, resident alien green cards, Social Security cards, to see if they had been altered, if they were original or counterfeit, and I learned a lot of photography in that one also.
Q. Okay. I want to talk to you now about your education and training.
Can you tell the jury what your educational background is.
A. I have a Bachelor of Science in chemistry degree from the U.S. Naval Academy in Annapolis, and I have a Master of Forensic Science degree which I got from George Washington University in Washington, D.C.
Q. Okay. And at your first job with the Immigration and Naturalization Service Forensic Document Laboratory, did you receive any training there?
A. I did.
Q. What was the training you received?
A. I received training from three board-certified document examiners basically on commercial printing processes, the types

of processes that would print passports, ID cards, that sort of thing, and a lot of training on detecting alterations, how to see if something is counterfeit, if a page has been substituted, if a photograph has been substituted, something like that.

And as I said, we -- in those days, we took a lot of photographs to distribute to INS ports. So I learned a lot about photography.

Q. When you joined the IRS, did you receive any training there?

A. Yes, I did.

In -- from about January 1985 till the middle of 1987, I received specialized training in ink analysis. And this was from court-certified people who worked for the Bureau of Alcohol, Tobacco, and Firearms in D.C., the Secret Service in D.C., and the FBI, which is also in the D.C.-Virginia area. That was learning how to identify inks on a document and compare them with a reference standard collection that we had.

In addition to that, I also learned other aspects of document examination from one board-certified document examiner at the IRS. So this was learning about business machine printing, detecting what we call indentations in documents, which happen on the undersheets of a notebook when you're writing on the top sheet.

We looked at typewriting and, I think, as I said,

document reconstruction.
Q. Did you receive kind of periodic training throughout your time at the IRS?
A. Yes.
In addition to one-on-one, on-the-job training with the -- with my trainer, there were also workshops and seminars that I attended from time to time, like typewriting from the Secret Service, a paper manufacturer from the Institute of Paper Chemistry and so forth.
There are many -- there's a whole handful of professional organizations that we belong to which have annual meetings, people present papers, there are workshops and so forth.
So my whole career basically was continuing education in what was going on in documents.
Q. Okay. I think you mentioned a minute earlier document reconstruction.
A. Yes.
Q. Is that fair to say document reconstruction is kind of a subset of questioned document reanalysis?
A. It is a subset and, in some cases, a very specialized subset. So document reconstruction is where we have a document which has been damaged in some way, and we're trying to restore it. It could be a document with ink writing on it that has been left out in the sun and has faded. We try to read what

that is.

It could be something that's become soaked by water, and we're trying to get the pages apart and read those.

It could be something that was burned. And I have worked one case like that before.

More commonly things that can be done to documents: They could be cut up into pieces. They could be torn into pieces. Some documents are perforated. They're designed to be removed from something like a check from a check stub. And we might be asked to determine, you know, where it came from. And then also documents that are shredded. We are involved in that.

Q. And have you received training in document reconstruction?

A. I -- I have. I received training in most of the other areas. Reconstruction of shredded documents is a really specialized area. A lot of forensic laboratories don't even attempt to do this because of the complexity that's involved.

When I got my first case in 2010, we did not have a training plan for shredded documents. It was not part of our standard operating procedure as it's not the part of many different laboratories.

What I did when I received my first case in 2010 was there were a handful of papers by people at various labs that actually sort of documented what they did. I took those and, you know, continued working the case. And while I was doing

that, I discovered that there were things I was finding that had never been mentioned in print or in presentations before about how documents are shredded, how you can tell different shredders apart and so forth.

And so it was sort of on-the-job training as I went on. Because of what I found -- we had an intern. We did research and different types of shredders. We visited two shredder manufacturers. And because of that, I was able to write several papers and actually put it in our standard operating procedure and in our training manual.

Q. And have you received formal training on document reconstruction?

A. Yes. What I'm describing is the physical reconstruction of shredded documents. It is possible to reconstruct them virtually by computer, and the FBI has a program that they have used since 2007. I received training from them in 2015. So it's a little after I started my -- my case. We had them come to the laboratory and do training for the questioned document section.

So I did get some official training from the FBI. We were able to validate our use of their software and train other people in turn.

Q. Okay. Do you keep up to date on trends in document examination and reconstruction?

A. Yes, I do.

Q. How do you do that?
A. I still -- I am a member of a handful of different professional organizations. Several of them print or publish journals. And all of them have annual meetings. And I typically attend at least one meeting a year, keep up with the journals and so forth.
Q. And did you continue to do that even after retirement?
A. I have -- yes. I attended one meeting in April. I'm attending another in August and presenting.
Q. Did you train other chemists on questioned document analysis?
A. I have.
Q. Did you supervise other chemists?
A. I was supervising while I was training. They actually had an administrative supervisor. I was supervising their casework, yes.
Q. Okay. Have you trained chemists specifically on document reconstruction?
A. Yes, I have.
Q. Have you published articles about document reconstruction?
A. Yes, I have.
Q. How many?
A. Three. There was one on the manual methodology that I found. Another on shredders and how they differ from each other. And another one on reassembling plastic cards, like

credit and debit cards.

Because of my expertise, I was asked to write a book chapter for a book that was published in 2021 on *Document Examination in the 21st Century*.

Q. I think you mentioned this, but do you belong to professional organizations in the field of questioned document examination?

A. I do.

Q. Have you testified in court before?

A. I have.

Q. Approximately how many times?

A. 33 times in U.S. district courts, in criminal and civil cases, in U.S. tax court, and in the Commonwealth of Kentucky.

Q. Do you typically testify for the prosecution or the defense?

A. I have testified mostly for the side that called me, whether it was prosecution or civil.

I was asked to -- I was called to testify in one case for the defense.

Q. Okay. Okay. I want to talk to you a bit about your work.

Approximately how many investigations did you work on as an IRS chemist?

A. It has to be, you know, close to a thousand or so. I worked there for 38 years.

Q. How many cases did you work on that involved document

reconstruction?
A. Shredded documents specifically, the lab had 20 cases since 2012 when I started, and I worked ten of them.
Q. Okay. And I think you've already kind of explained what document reconstruction is, so now I'd like to kind of dive into that process.
What's the first step in the process when you're given a project to reconstruct a shredded document?
A. The very first step is to assess, you know, the material that you have to see what kind of shred it is and whether it is possible of being reconstructed.
There are shredders that shred what they call confetti shred, which are very, very tiny pieces that can't be dealt with.
We're also making sure there's no extra material, garbage or whatever, that's in the shred container.
Q. Okay. Once you've kind of assessed -- you know, kind of gotten the lay of the land, what's the next step?
A. The very next step is sorting, sorting what you have.
Now, a single 8-and-a-half-by-11 page can have as many as 200 to 300 fragments in it once it's shredded. And most cases involve multiple documents. So we're looking at fragments in the thousands. They're all combined in one container, so they have to be sorted, you know, to hopefully separate them into piles of individual documents.

We do this by looking at the paper, first of all. I mean, is it white photocopy paper? Is it white paper like you'd find on a receipt? Is it card stock of some sort? We're looking at the color of the paper. Sometimes you have Post-It notes that are mixed in that are very brightly colored.

We are looking for does the -- do the fragments have printing, do the fragments have writing, do the fragments have images, what colors are these.

We're looking for how the document was shredded. Did it appear to be shredded like bottom down or top down in the shredder, so vertically, or was it shredded sideways?

We're looking for shreds that have double sides because we have to be able to look at both sides from time to time.

Sorting is the process that takes the greatest amount of time because, you know, we are trying to separate everything into the lowest common denominator. It also takes a lot of space. We need a very large space to be sorting this and various containers to put the different types of shred in.

Q. So you mentioned it takes a long time; it's time-intensive.
How long typically does it take?

A. It could take days. It could take weeks. Sometimes we have been working on cases for a year or more.

Q. When you start the sorting, do you know how many documents are present?

A. What we can do is take the container, if it's not too big, and weigh it, and then empty the container and weigh it again. See how much the shred weighs. And then based on the weight of a single piece of paper, we can estimate how many like 8-and-a-half-by-11 documents might be in the container. That gives us just a rough estimate of what the enormity of the problem is.

Q. Okay. So once you've gotten past the sorting stage, you've got your piles of shreds that are similar to each other, what's the next step?

A. The next step is usually finding something to start with, starting with one of the piles. It could be the smallest pile, you know, the lowest hanging fruit, or it could be something that might be of most importance to the investigator in the case.

Sometimes we can see words or images or something, and we will, you know, start with a particular pile.

What we do next is we have to obviously, like, get everything so we can see it. So all the pieces are turned up, you know, the right way so we can see them. They're all oriented in the same direction. And we lay these out usually on, like, large sticky boards so we can see them all.

Q. And what's the goal of laying them out? What's the next step?

A. That's the next step to association, where we're trying to

make matches between the fragments.

Actually, as we're doing the layout step, we will probably see things that look like they belong together. We'll see part of a word on one, part of a word on another. We will put them together and set them aside. And the idea is to make as many associations as possible with the material that you have laid out.

Q. How -- what is the examiner looking for when they're trying to match fragments?

A. We could be looking for, you know, parts of words that -- that have been cut. We could be looking for parts of handwriting. We could be looking for, you know, images.

So we're trying to find something on one fragment that, you know, matches on another fragment.

Q. Okay. So once you've started associating parts of the document, what comes after that?

A. Typically, it's -- once you get several things associated, then you start actually reconstructing or building the document formally.

You may put -- put everything out on an opaque sheet, you know, something that's not double-sided; but once you get to reconstructing, you really need to do it on something that's clear plastic so that you can turn it over and see both sides, whether there's material on both sides or not.

As you are laying everything out, you're -- I'm likely

to find things that already start matching. I want to select something that has some sort of line to build from. It could be, you know, a vertical line, a horizontal line, a line of text.

So I will start placing that in the middle of the plastic sheet -- the plastic sheet has adhesive on it -- and then start building from there, taking pieces from the material that has already been laid out.

Since it's laid out and it's kind of organized, it's much less trial and error. And, you know, I'm looking for a particular piece that has a feature in it, and I can look among the -- the things that have already been spread out.

Q. Once the pieces are assembled into what resembles a full document or partial -- you know, almost full document, is there a verification process?

A. Yes, there is. I forgot to mention one thing. In order not to waste time, when we start associating, we will become aware possibly of what the thing is. We might see a form number. We might see a name.

The idea is to assemble small assemblies first and check with the submitter, check with the investigator, to see is this worth continuing on or not.

If it doesn't have anything to do with the case, we will set it aside and not waste our time and go on to something else.

So usually there's putting small things together, sort of a check-in with the investigator to see if it's -- it's worthwhile or not.

Once we have assembled something which, you know, everyone thinks is going to be useful to the case, and we've used up all of the material, there is a verification process.

You know, everybody can make mistakes, and we want to make sure that, you know, somebody else sees that this appears -- this all appears to be from the same document as well.

So every assembly is formally verified by another person in the laboratory.

Q. Okay. And so you jumped ahead of me.

But can you talk to the jury about -- how often are you staying in touch with the case agent to kind of get their feedback on the documents that you're looking at?

A. It happens fairly regularly. When we assemble a number of pieces to get an idea of what a document is, then we'll contact the agent, the investigator, and ask whether it's worth continuing with.

This goes on back and forth until, you know, we've used up everything that has some kind of printing on it or we've used up everything that the investigator thinks would be of use to the case.

Q. And when you say "investigator," that's typically a special

agent, a case agent?
A. An IRS agent, in our cases, yes.
Q. Okay. Do you sometimes take photos along the way to show progress and also to show the case agent?
A. We always do. We will take photos or make scans of assemblies as we go through them. We'll have Skype meetings with the investigator to show them the assemblies that are made, sometimes just to show them the things that have been laid out where only individual words are -- are visible.
But this is a continuous process as we go through the case.
Q. Okay. I want to draw your attention now to August of 2020.
Did you receive a bag of shredded documents at that time?
A. We did.
Q. Were you assigned a project at that time?
A. I was.
MS. DeMARCO: Okay. Permission to approach the witness, Your Honor?
THE COURT: You may.
MS. DeMARCO: Do you want gloves?
THE WITNESS: Not necessary.
BY MS. DeMARCO:
Q. Okay. Mr. Olson, I've handed you what's been marked as Government Exhibit 802.

Do you recognize this exhibit?
A. I do.
Q. What is it?
A. It's a bag that was submitted to us. It arrived in July, and I took custody on the 4th of August.
Q. How do you know that that's what it is?
A. Because I recognized the name of our evidence control person, and everything is double bagged.
So inside was another plastic bag about the size of a pillow. And my initials are on here from 8/4/2020, Case 20-0117. So that's when I actually took custody of the document -- or the bag.
Q. Okay. And does the bag appear to be in substantially the same condition as -- well, sorry, let me ask you this: After you were done with the project, did you send the bag somewhere?
A. Yes. After we were done, the -- all of the evidence was returned to the evidence control unit.
Q. Okay. And did you initial it when you returned it to evidence control?
A. Let's see.
Well, I see the -- the evidence control person did initial it that he took custody of it.
Q. Okay. And does the package appear to you to be in substantially the same condition as when you handed it over to the evidence custodian?

A. It does. There are evidence control tape, and the procedure is you don't cut through the tape so that you can see that it's originally sealing the bag in the original. You cut elsewhere. So that is, you know, not broken.

MS. DeMARCO: The government would move to admit Government Exhibit 802 into evidence.

THE COURT: Any objection?

MR. CARLSON: No objection.

THE COURT: Exhibit 802 is admitted.

(Government's Exhibit No. 802 was received in evidence.)

THE COURT: And you can publish to the jury as you already have.

MS. DeMARCO: Thank you, Judge.

BY MS. DeMARCO:

Q. Okay. So you mentioned you got this bag from evidence control in August of 2020?

A. Correct.

Q. Okay. And do you mind just -- there's another bag inside the bag. If you just want to show that to the jury.

What's inside that bag?

A. That is all of the material that was returned to evidence control.

So when we actually finish a case, it will contain the documents that have been constructed, and then everything else, everything that's been sorted, it all goes in the bag.

This does have my initials and name over it in many places. It's dated 3/16/2021.
Q. Okay. Okay. So inside that bag is the shreds that were not reconstructed as well as the reconstructed documents?
A. Correct.
Q. Okay. I'm going to show you photos of those. I think it will be a little clearer.
Okay. So what were you asked to do with this bag when you received it?
A. When we received it, we were asked by the agent, Agent Mansker, to look at the documents inside and see if they had anything that might have to do with inheritance fraud, money laundering, and the -- she did give some names of individuals and the fact that they were from Nigeria.
So this is kind of what we started out looking for when we first opened the case.
Q. Okay. And the goal was to reconstruct documents that matched what Agent Mansker told you?
A. Correct.
Q. Were you able to reconstruct any documents?
A. Yes, we were.
Q. Okay. High level, what kind of documents did you reconstruct?
A. There were 24 pieces of documents, basically. A lot of them were envelopes, security-type envelopes with addresses on

them. There were a couple of business forms, a passport page, and a business letter.

Q. Okay.

MS. DeMARCO: I'm going to publish just to the witness.

BY MS. DeMARCO:

Q. Mr. Olson, I'm going to show you a series of photos.

Do you see something on the screen in front of you?

A. I do.

Q. Okay. So this is Government Exhibit 720-1.

Do you recognize this photo?

A. I do.

Q. And I'm showing you 720-2.

Do you recognize this one?

A. I do.

Q. 720-6.

Do you recognize this photo?

A. I do, yes.

Q. 720-7?

A. Yes.

Q. 720-3 and 720-4.

Do you recognize all of these photos?

A. I do.

Q. Are they fair and accurate photos of documents that you reconstructed or partially reconstructed?

A. Yes, they are.
Q. Okay.
MS. DeMARCO: The government moves to admit Government Exhibit 720-1 through 720-7.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: So is that Exhibit 720 in its entirety or just part of 720?
MS. DeMARCO: This is 720 in its entirety.
THE COURT: Okay. Very good. So Exhibit 720 is admitted in its entirety.
(Government's Exhibit No. 720 was received in evidence.)
THE COURT: You can publish to the jury.
MS. DeMARCO: Thank you, Your Honor.
BY MS. DeMARCO:
Q. Okay. Mr. Olson, I'm showing you what's been marked as 720-1.
What are we looking at here?
A. This is the front of a security-type envelope that has printing on it.
Q. Okay. And what's the name that's on the front of the envelope?
A. The name reads "Anthony Ibekie." It has a partial address. "797" appears on other envelopes, "Oxbow Avenue, Unit 110," and what appears to be a ZIP code, "60543."

Q. So how could you tell this was an envelope and not some other type of document?
A. Because it has a security pattern printed on the back of it.
Q. Okay. I'm showing you 720-2.
Is this the back of what we just looked at?
A. It is.
Q. So what's the significance of the security pattern? How does that help you in your project?
A. Well, as you could see, it's a pretty involved pattern. It's sort of a plaid. And lots of lines, lots of dots. And, you know, not only does the printing that's on the front align, but also the pattern aligns on the backside.
Q. Did you find multiple types of security envelopes?
A. I did.
Q. How could you tell they were different types?
A. There were two different colors blue. There were black ones that did not have any specific pattern but just black lines. And there were two different thicknesses of the lines. So they had to have come from different types of security envelopes.
Q. How many different types of envelopes do you think?
A. Well, there were four, and then there was one address that was on just white paper.
Q. Okay. I'm now going to show you 720-6.

What are we looking at here?
A. This appears to be an address that's also printed on a security envelope.
Q. Okay. And was this a different type of envelope than the first one we looked at?
A. It was.
Q. How could you tell?
A. By the pattern on the back.
Q. Is that the pattern you're describing?
A. That's correct.
Q. Okay. And did you reconstruct documents other than envelopes?
A. We did.
Q. Okay. I'm going to show you Government Exhibit 720-3.
What are we looking at here?
A. This appears to be a business letter, which we described as a letter from Peter Pfizer from Standard Chartered Bank to Patrick Mulcare.
Q. Okay. I'm going to blow up a few sections of this letter.
Do we see the name Patrick Mulcare on the envelope a moment ago?
A. Yes.
Q. And are you able to read sections of this letter?
A. Yes.
"My name is Peter Pfizer, account manager with

Standard Chartered Bank, London."

It says something about the next of kin to a customer of our bank, Mr. Van Mulcare, who lived and died in London in 2010. This customer died intestate, unable to locate relatives.

Q. Okay. Are you able to make out an amount?

A. It -- this part says account worth what looks like 11.6. And capital "M" usually stands for "million." And a little further on the -- that same line, it says million 600,000.

Q. Here (indicating)?

A. Correct.

Q. Okay. Okay. And are you able to make out an e-mail address that is given in the letter?

A. Yes. It says, "Response to my personal e-mail petelondon54@aol.com."

Q. Okay. And are you able to make out who signed the letter as well?

A. It says, "Sincerely, Mr. Peter Pfizer." There is a printed signature, machine-printed signature, not a handwritten one, and the e-mail petelondon54@aol.com.

Q. Okay. So, obviously, the text is a little bit slanted?

A. Yes.

Q. Why is that?

A. This document -- in fact, all of the envelopes were shredded sideways. So an envelope is usually long, and they

were turned to the short direction to shred them. And when something is shredded sideways, you can read portions of the text.

This document as well was shredded sideways. It has kind of an unusual look to it because it was folded before it was shredded. So there are places where there are -- can you see the blue dot? Yes.

Q. Oh, yes, I see it. Yep.

A. Okay. So there are places where there are, you know, triangle -- triangular voids. There are pieces of shred that are V-shaped, such as this one here (indicating) and this one here (indicating). One points in one direction, one points in the other direction.

You may remember in grade school, if you tried to make snowflakes, you folded a piece of construction paper and made cuts, and when you open it, you have a mirror image of the cut. That's basically what we have here, is that the piece of shred is V-shaped. It was originally folded. And the cut is in the center of that V.

Q. So can you tell if the letter was shredded while it was folded?

A. It was shredded while it was folded, yes; otherwise, we wouldn't have the V shape and the direction. It seems to slant in one direction, then another direction, then another, then another. That's because it was actually shredded while it was

folded.

MS. DeMARCO: Okay. And just for purposes of the record, the witness has drawn two kind of sideways U shapes around the black triangles that appear on the exhibit.

BY MS. DeMARCO:

Q. Did the back of the letter tell you anything about how this letter was shredded?

A. There was noth- -- no printing on the back of the letter.

Q. Okay. I'm going to show you 720-4.

Is this the back?

A. This is the back, yes.

Q. And --

A. And --

Q. Go ahead.

A. The red lines are -- the dotted lines are things that I drew in to show where the folds occurred.

So there is one up here at the top (indicating). And there is another down here in the middle (indicating). And there is one down at the bottom (indicating).

So the sheet appears to have been folded three times before it was shredded.

MS. DeMARCO: Okay. And for the record, the witness has drawn brackets around red dotted lines on the back of the photo.

BY MS. DeMARCO:

Q. Okay. Finally, I want to show you Government Exhibit 720-5.

Were you able to partially reconstruct a logo?

A. Yes.

Q. Okay. Is this the logo here?

A. It is.

Q. Are you able to tell what the logo is?

A. The logo appears to read "Standard Chartered."

Q. Okay. So I think you testified that you received this in August and you returned it in about March?

A. Correct.

Q. Okay. So this project took several months?

A. Many months, yes.

Q. What did you do with the remaining fragments that you didn't assemble?

A. The remaining fragments were -- many of them were sorted, so they were bagged, you know, as they were sorted. There's a large bag of things that weren't, you know, sorted at all. Mostly white stuff. Some strike-ups like this were just covered in plastic. And the original documents that we -- I mean, the documents that reconstructed were also covered in plastic. And everything is returned to the submitter.

Q. And is it returned in that bag that's in front of you?

A. Yes, it should be in this bag here, which -- yeah, which I sealed in March of 2021.

Q. Okay. Finally, Mr. Olson, do you know the defendant?
A. No, I don't.
MS. DeMARCO: Okay. One moment, Your Honor.
(Counsel conferring.)
MS. DeMARCO: Nothing further, Judge.
THE COURT: Thank you.
Mr. Carlson, whenever you're ready.
MR. CARLSON: Thank you, Judge.

CROSS-EXAMINATION

BY MR. CARLSON:
Q. Mr. Olson, I think you told us that when you set out to do these things, you try to figure out a number of things, and one of the things that I think you mentioned is you try to see if you can find out what kind of computer or typewriter or whatever produced the document.
Were you able to do that in this case?
A. We didn't attempt to do that, no.
Q. And I think you also said you try to see if you could tell what type of shredder caused the shreds.
Did you do that in this case?
A. No, we were not -- yeah.
Q. Were you able from the shreds -- I think you said you were able to tell that they were shredded, I think you said, sideways. The letter, I'm talking about the letter specifically.

A. Yes.
Q. And when you say "sideways," that would mean this way (indicating), right?
A. Correct.
Q. It wouldn't be up and down like this (indicating)?
A. Correct.
Q. Is it usual to see it shredded that way?
A. It really depends on what the document is.
Q. And I think you said the envelopes were shredded that same way; is that correct?
A. Correct.
Q. Now, when you set out to do your reconstruction, you indicated that you confer periodically with the case agents, correct?
A. That's correct.
Q. And that they provide you with certain information; is that correct?
A. Yes.
Q. And when you were attempting to put this reconstruction together, were you shown an intact copy of that letter?
A. Yes, we were.
Q. So you knew what the letter was supposed to look like as you were doing your examination?
A. Yes.
Q. And you were told names to look for?

A. Correct.
Q. And words or catchphrases to look for?
A. Yes.
Q. And I think you just got done testifying that you had a whole bunch of stuff that you didn't even put together into anything, correct?
A. Correct.
Q. Because they weren't matching what you were looking for, correct?
A. Correct.
Q. Now, with respect to the envelopes that you examined -- and I think you were shown two envelopes. One had Mr. Ibekie's name and an address on it, and another one had Mr. Mulcare's name and address on it.
Were you able to tell where on the envelope that appeared, those names appeared?
A. No.
Q. So you don't know whether they were the addressee or the return address, correct?
A. That's correct.
Q. And you didn't have any connection with this investigation prior to this, correct?
A. No.
Q. And were you able to reconstruct just that one letter and those envelopes?

A. Yes.
Q. You weren't able to reconstruct anything else?
A. Well, as I said, there were other forms that -- that we did reconstruct that we were told were not germane to the investigation.
Q. So there were other documents not germane to the investigation that you were able to reconstruct?
A. Yes.
Q. But as far as being germane to this investigation, just the letter, which you had a copy of when you put it together -- correct?
A. Correct.
Q. -- and the envelope?
A. There were -- there was more than one envelope. There were several envelopes.
Q. I meant envelopes.
A. Yes.
MR. CARLSON: I have nothing further.
THE COURT: Okay. Thank you, Counsel.
MS. DeMARCO: Just briefly, Your Honor.
THE COURT: Great. Come on back up.

REDIRECT EXAMINATION

BY MS. DeMARCO:
Q. Mr. Olson, just to be clear, the two envelopes that I showed you were not the only envelopes you reconstructed?

A. No, they weren't.
Q. And then just quickly, you were asked on cross about did you have an example of the letter.
A. Yes.
Q. Is that fairly common practice that you kind of have an idea of what you're looking for when you go in?
A. Yes, it is. If I -- I mentioned before that, you know, if we develop a form number or some kind of identifier, we will try on our own or with the help of the investigator to try to find an example of that, so -- which aids the reconstruction so we're not, you know, reconstructing complete- -- something completely blind.
Q. And how long does it take typically to reconstruct one document?
A. It really depends on -- you know, if we have everything laid out properly, it -- I've done it before in an eight-hour workday in a different case. It could be, you know, a couple of days to a week or so.
We may have to go back to the material that's already been sorted to find additional pieces, you know, to place them somewhere.
Q. Is it fair to say that it's a fairly big waste of time to work on documents that end up not being relevant to the investigation?
A. Yes.

MS. DeMARCO: Nothing further, Your Honor.
THE COURT: Okay. Thank you, Ms. DeMarco.
Anything else, Mr. Carlson?
MR. CARLSON: No, Your Honor.
THE COURT: All right. Very good.
Sir, you may step down. Thank you for coming.
Please watch your step. Have a safe trip home.
If you can return the exhibit to counsel for the government, I'd appreciate it.
THE WITNESS: I will.
THE COURT: Thank you, sir.
THE WITNESS: Thank you, Your Honor.
(Witness excused.)
THE COURT: All right. Members of the jury, it's 12:07, which is another way of saying it's lunch time. It's lunchtime.
We're going to reconvene today at 1:15. So we'll give you an hour and a little bit of change. Why don't you just try to come back in the jury room a couple minutes before 1:15. All right? Come back a little bit before then, and we'll get rolling. We've got more testimony to hear this afternoon.
It looks like you've got the transcripts still with you. Please leave those on your chair. Please take your jury notebook with you. If you want to go to the second floor, you can. If you want to leave the building, still plenty hot

outside, if you want a nice, warm walk.

Come back in a little over an hour. Please don't talk about the case. Please do have an open mind. And enjoy your lunch. We'll see you in about an hour.

Thank you, folks.

THE COURT SECURITY OFFICER: All rise.

(Jury out at 12:09 p.m.)

THE COURT: All right. Have a seat, everyone.

Does anyone expect to use the demonstratives, meaning the transcripts, this afternoon? Anybody?

MS. NUTINI: No, Your Honor.

THE COURT: Mr. Carlson, I assume --

MR. CARLSON: No.

THE COURT: Okay. So during the lunch break, I'll ask Ms. Ramos to collect them and tender them back to the government. That way they aren't tempted to flip through it and be distracted by them.

Is Ms. Mansker next? Is that -- is that right?

MS. NUTINI: Yes, Judge.

THE COURT: You've got Mansker and then Kadonsky or something approximating that pronunciation, right?

MS. NUTINI: Yes, Your Honor. And we have the second half of Special Agent Mansker's --

THE COURT: Correct.

MS. NUTINI: -- testimony --

THE COURT: Yeah.

MS. NUTINI: -- and then the first half of Special Agent Kadonsky's.

THE COURT: Kadonsky. Excuse me. Yeah.

MS. NUTINI: I don't anticipate it will take us through the entire day.

THE COURT: Okay.

MS. NUTINI: So, as I said earlier, we do have two victims who will testify tomorrow morning that were not available to be here today.

THE COURT: Right.

MS. NUTINI: So if it's okay with Your Honor, we may break a little before 5:00 today.

THE COURT: Okay. So we've got Mansker and Kadonsky, and then you've got two victims tomorrow.

And is that all of the testimony you expect to present, those four witnesses?

MS. NUTINI: The two victims tomorrow and then the conclusion of Special Agent Kadonsky's testimony --

THE COURT: So --

MS. NUTINI: -- after those two victims.

THE COURT: So it's going to be the second twofer.

MS. NUTINI: Yes, Judge.

THE COURT: Right. So each government agent is going to testify twice.

MS. NUTINI: Yes.

THE COURT: Without objection?

MR. CARLSON: No objection.

THE COURT: Okay. That's fine. It seems like we're well ahead of schedule.

The jury will not be disappointed if we end a little early today. I do like us to use all of our court time because if the jury made the effort to get down here, I want to fill up the full trial day. But that is not the only consideration. We are ahead of schedule, and I understand with victims having availability issues, you know, I'll make a special accommodation. So I won't require you to fill up the whole trial day today because I think we're ahead of schedule. Okay?

How long do you expect the two victims to testify tomorrow, would you say?

MS. NUTINI: Probably total about an hour --

THE COURT: Yeah --

MS. NUTINI: -- between the two of them.

THE COURT: -- that's what I was thinking.

So we should talk this afternoon, Mr. Carlson, about what your plans are going to be for tomorrow. You don't have to tell me definitively today, but we should start having that conversation, I think.

MR. CARLSON: Certainly, Judge.

THE COURT: Do you want to talk to your client.

And, Mr. Ibekie, we'll talk about this at a greater length later. You've got a right to testify if you want -- it's up to you -- under the Fifth Amendment. You've also got an absolute right not to testify. And if you choose not to testify, I'll tell the jury that they can't hold it against us because the Constitution prohibits them from doing that.

All right. But you should talk to your lawyer about the pros and cons of it. It's not his decision, it's your decision, but you should I think talk to him and listen to each other and talk it through.

So that's a little bit of a preview.

Anything else, anybody?

MS. NUTINI: No, Your Honor. Perhaps we can discuss defense counsel's re-raising of the exhibits when we're done with today if we have a little bit of extra time.

THE COURT: Yeah, we'll see how that is.

So it's Exhibit No. 5?

MR. CARLSON: Yes, Judge.

THE COURT: All right. That's perfectly fine. We should also at some point talk about jury instructions.

How much work do you think it's going to be for us collectively to go through those?

I've seen them, but I have not gone through it in great detail, the jury instructions.

MS. NUTINI: I believe all of them are agreed that we

submitted. Defense counsel had previously proposed submitting two additional instructions that the government did not agree to.

THE COURT: Okay.

MS. NUTINI: I don't know how those will ultimately play out.

THE COURT: Okay.

MS. NUTINI: But I believe mostly we are agreed. And so it should be a fairly streamlined process.

THE COURT: Okay. Is that your reaction, too, Mr. Carlson?

MR. CARLSON: It is, Judge. And I think the only thing that we may need to do is there are certain jury instructions that we had question marks on depending upon what happened during the course of the trial.

THE COURT: Yeah. Sure.

MR. CARLSON: We need to clean that up. But I don't think there will be any disagreements as to that, either.

THE COURT: Okay. Well, why don't we talk about all of this at the end of the day today. You know, on Tuesday, we said that Friday's problem was Thursday's problem, I think, something like that. So that will be this afternoon. We'll just talk about the plan for the rest of the trial. Okay?

MR. CARLSON: Fine.

THE COURT: We'll see you in about an hour, folks.

Thank you.

THE CLERK: All rise.

(Recess at 12:13 p.m., until 1:24 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ) Case No. 20 CR 352
)
v. )
)
ANTHONY EMEKA IBEKIE, ) Chicago, Illinois
) June 20, 2024
Defendant. ) 1:24 p.m.

TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. PAIGE NUTINI
MS. MEGAN DeMARCO
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For the Defendant: KENT R. CARLSON & ASSOCIATES, P.C.
BY: MR. KENT R. CARLSON
53 W. Jackson Boulevard, Suite 1523
Chicago, Illinois 60604

Also Present: MS. AMY MANSKER, Special Agent
IRS Criminal Investigations

MR. CHRISTOPHER KADONSKY, Special Agent
IRS Criminal Investigations

Court Reporter: AMY M. KLEYNHANS, CSR, RPR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 2318A
Chicago, Illinois 60604
Telephone: (312) 818-6531
amy_kleynhans@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out; defendant present:)

THE COURT: All right. Are we ready to get the jury?

MS. NUTINI: Yes, Judge.

THE COURT: All right. We're going to have Ms. Mansker next; is that right?

MS. DeMARCO: Correct.

THE COURT: All right. Great. Let's go ahead and get the jury.

(Jury in at 1:26 p.m.)

THE COURT: All right. Have a seat, everyone. Welcome back.

Counsel, you may call your next witness.

MS. DeMARCO: All right. The government recalls Amy Mansker.

THE COURT: All right. Come on up, please.

(Witness sworn.)

THE COURT: All right. Members of the Jury, you'll remember that Ms. Mansker already testified during the trial. Every now and again, a witness will testify a second time. It's called recalling a witness. So in certain occasions, it's appropriate for someone to testify more than once. So that's why you're seeing Ms. Mansker for the second time. Okay?

Counsel, you may proceed.

MS. DeMARCO: Thank you, your Honor.

AMY MANSKER, GOVERNMENT'S WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MS. DeMARCO:

Q. Special Agent Mansker, I want to start by drawing your attention to July of 2020. Was there a law enforcement action related to this investigation around that time?

A. Yes, there was.

Q. What was it?

A. A search warrant. Multiple search warrants.

Q. Whose homes were searched?

A. The defendant, Anthony Ibekie, Jennifer Gosha, and Samuel Aniukwu.

Q. And which residence of defendant's are we talking about?

A. So for Anthony Ibekie, it was the residence located at 797 Oxbow Avenue, Unit 110, in Oswego, Illinois.

For Samuel Aniukwu, it was the residence located at 716 South Weber Road, Unit 512, in Romeoville, Illinois.

And for Jennifer Gosha, it was the residence located at 1419 North Harlem Avenue, Apartment B, in Oak Park, Illinois.

Q. I want to specifically focus you on the Oswego residence. Who lived there?

A. Anthony Ibekie and Ebuka Egbunam.

Q. And did you personally go to that address on that day?

A. Yes, I did.

Q. Who was present at the residence when you arrived?
A. Anthony Ibekie and Ebuka Egbunam.
Q. Anybody else?
A. No.
Q. What were you looking for, kind of a high-level overview, in the search warrant?
A. We were looking for evidence related to wire fraud, mail fraud, money laundering, and conspiracy. So any kind of financial records or corporation records that would relate to that. Identification documents or ownership documents, as well as, like, electronic devices, things of that nature.
Q. And can you tell the Members of the Jury, what does executing a search warrant generally entail? What's kind of the process for the day?
A. So first we get the search warrant approved, we get a valid court order to conduct the search warrant. Once we go to the location, we knock and announce and then make entry into the location. We secure the premises, meaning that we make sure that any occupants that are in the residence are controlled and that the premises is safe for us to be in at that point in time. And then the first thing that we do really before we start searching is we make an entry video to document what the premises looks like.
Q. Okay. And then while you're searching, do you take photos at various points?

A. Yes, we do.
Q. Okay. I'm showing you Government Exhibit 719-1, which is already in evidence, so this can go to the jury.
Do you recognize this photo?
A. Yes, I do.
Q. What are we looking at?
A. This is a desk that was located in the garage area of the defendant's residence.
Q. Okay. Were you able to ascertain whose desk this was?
A. Yes. It was Anthony Ibekie's.
Q. How did you know that?
A. Through a variety of things, primarily the type of documents that were seized from that desk, from that area. There was also a wallet in that area that contained Anthony Ibekie's identification and his Social Security card. And we also heard testimony from Ebuka previously identifying this desk as Anthony Ibekie's.
Q. Did you find anything to suggest that it was Ebuka's desk?
A. No, I did not.
Q. Or anybody else that worked there?
A. No.
Q. Okay. I want to just highlight a few pieces of this picture. What are we looking at here in kind of the top middle?
A. These are two large printers that are kind of -- large

printers that would be for, you know, printing a lot of documents.
Q. Okay. And under the desk, what appears to be here?
A. This is just a large pile of envelopes.
Q. Okay. I'm showing you Government Exhibit 719-2, which is in evidence. What are we looking at here?
A. That's the large pile of envelopes that's located under the desk.
Q. Are these the only envelopes you found during the search warrant?
A. No, it's not.
Q. Did you seize other envelopes?
A. Yes, we did.
Q. Can you describe what was different about those versus these?
A. Yeah. These -- so these are just blank envelopes. The ones that we opted to seize had -- they were actually printed with names and addresses of various individuals. They were white envelopes with the names and address printed on them. And then there was a Barn Swallow stamp that was directly printed on the envelope as well.
Q. So I'm showing you 719-6. Are these the envelopes you're talking about?
A. Yes, it is.
Q. Approximately how many of these did you find?

A. It was over 200 of them.
Q. And where did you find them?
A. We found them in that garage area.
Q. Okay. I'm showing you Government Exhibit 719-3. Do you recognize this exhibit?
A. Yes.
Q. What is it?
A. This is a photograph of the printers that were sitting on top of the desk in that garage area.
Q. Okay. When agents find items of evidentiary significance during a search warrant, what do you do with those items?
A. We will seize those items. We will bag them in evidence bags, evidence envelopes, or evidence boxes. We'll fill out an evidence tag and affix that to the container that the evidence is placed in, and then we will take that evidence to our on-scene evidence custodian, who then records that evidence in an inventory for the search warrant.
Q. Did you seize anything from this desk area and take it into evidence using the process you just described?
A. Yes, we did.
Q. Can you give a high-level overview of what you took?
A. Yeah. There was a lot of various items. Financial records, immigration records, identification documents, shredded documents. There was a printed list of e-mail addresses, phone numbers, passwords, corporation records,

things of that nature.

MS. DeMARCO: May I approach, Judge?

THE COURT: You may.

BY MS. DeMARCO:

Q. Special Agent, I've handed you Government Exhibits 803 to 815. Would you take a moment and just flip through them?

A. Okay.

Q. Do you recognize these exhibits?

A. Yes, I do.

Q. What do you recognize them to be?

A. These are all documents that were seized during the search warrant at the defendant's residence.

Q. How do you know that that's what they are?

A. Because I was on site at the search warrant, and I took custody of all of the evidence once the search warrant was complete. And then I subsequently reviewed and photographed all of the evidence.

Q. For purposes of trial, how did you prepare these exhibits?

A. So I just -- I pulled these out of the larger population of documents. There was a substantial amount of documents that we seized, so I pulled these out, and we just placed them in clear evidence bags for use at trial.

Q. Do these exhibits appear to be in substantially the same condition as when agents seized them from the Oxbow residence?

A. Yes, they do.

MS. DeMARCO: Your Honor, the government moves to admit Exhibits 803 through 815 into evidence.

THE COURT: Any objection?

MR. CARLSON: No objection.

THE COURT: It's admitted. You can publish to the jury.

(Government's Exhibit Nos. 803-815 received in evidence.)

MS. DeMARCO: Thank you, Judge. May I approach and take the exhibits back?

THE COURT: You may.

MS. DeMARCO: May I have the ELMO, please.

BY MS. DeMARCO:

Q. Okay. Special Agent, I'm going to show you Government Exhibit 803. What are we looking at here?

A. This appears to be a Nigerian passport.

Q. Okay. And who is this passport for?

A. It's for Toni Ibe Emeka.

Q. Where was this item found?

A. This was found in a dresser drawer in one of the bedrooms at the premises.

Q. Whose photo is on this passport?

A. Anthony Ibekie's.

Q. And the name again is?

A. Toni Ibe Emeka.

Q. Does Anthony Ibekie's name appear anywhere on this

passport?
A. It does not.
Q. What's the birthday on this passport?
A. November 11, 1975.
Q. Is this birthday consistent with other birthdays that the defendant has provided?
A. It's one of the birth dates. The defendant uses multiple birth dates.
Q. Okay. And we'll get into that a little bit later as well. Does the passport appear to be legitimate?
A. It does not.
Q. And what's that based on?
A. Based off of the name and the date of birth that's on the passport. Those do not match the photograph of the individual that's on the passport.
Q. Okay. I am showing you now Government Exhibit 804. What is this document?
A. This is a photocopy of a permanent resident card for Anthony Ibekie, as well as a Nigerian passport. If you could move it down. Yeah. A Nigerian passport in the name of Anthony Emeka Ibekie.
Q. And where was this one found?
A. This was found in the garage area of the defendant's residence.
Q. This appears to be a photocopy?

A. Yes, it does.
Q. Okay. And whose photo is on this passport?
A. Anthony Ibekie.
Q. What is the date of birth on this one?
A. April 9, 1965.
Q. And is that consistent with the birthday we just saw?
A. No, it is not.
Q. Okay. I am showing you now Government Exhibit 805. Do you recognize this exhibit?
A. Yes, I do.
Q. What is it?
A. This was the printed list of various phone numbers and e-mail addresses and passwords.
Q. Where was this document found?
A. This was also found in the garage area of the defendant's residence.
Q. Okay. I want to draw your attention to the third line that starts with Peter Pfizer. Can you remind the jury who Peter Pfizer is?
A. Peter Pfizer is an alias that's used by Anthony Ibekie in the inheritance fraud scheme.
Q. And drawing your attention to the phone number that follows Peter Pfizer, have you seen this phone number elsewhere in the investigation?
A. Yes, I have.

Q. Where?
A. This phone number was provided to our undercover agent during the undercover operation. It was also provided to a victim that previously testified, Dale Helms. And this phone number was also found on Anthony Ibekie's devices. There was -- there were records that were recovered for a service called TollFreeForwarding, and that those records indicate that a phone number and a voicemail box for Peter Pfizer was set up through TollFreeForwarding services associated with that phone number.
Q. Okay. I want to draw your attention to the next line down, the one that starts with Standard Group Services. What is the significance of Standard Group Services?
A. Standard Group Services is related to Standard Chartered Bank. So Standard Group Services is the e-mail domain that we saw used frequently, the ued@standardgroupservices.com. And it was typically seen in relation to Wyashika Sellar in communications with our undercover agent, as well as a victim of the inheritance fraud, Dale Helms.
Q. And there's a phone number that follows Standard Group Services. Have you seen that phone number elsewhere in the investigation?
A. Yes, I have.
Q. Where?
A. So this was a phone number that was provided for Wyashika

Sellar, both to our undercover agent, as well as to the victim, Dale Helms. And this phone number was also on those TollFreeForwarding records that were recovered from Anthony Ibekie's device. A phone number and voicemail box were set up using TollFreeForwarding services for this number for Wyashika Sellar.

Q. Okay. Drawing your attention to the next line down, it appears to be a hyperlink for peterpfizer@gmail.com. Did that e-mail address come up at all in the investigation?

A. Yes, pfizerpeter@gmail.com.

Q. Sorry, pfizerpeter@gmail.com. Thank you.

A. Yes, this e-mail address, again, was seen on Anthony Ibekie's device on those TollFreeForwarding records. This e-mail address was used to communicate with the TollFreeForwarding service about setting up those phone numbers that I previously spoke about.

Q. And can you explain to the jury what TollFreeForwarding is?

A. It's a service that provides phone numbers. It's a paid service that provides phone numbers and voicemail. And they also provide some services such as setting up, like, your voicemail inbox message, and things like that.

Q. Okay. So you found this e-mail address in connection with setting up TollFreeForwarding?

A. That's correct.

Q. Okay. What about the next line down, petelondon54@aol.com

A. Yes, this e-mail address was the e-mail address that was given on an inheritance fraud letter, specifically the inheritance fraud letter that was reconstructed by the lab from the shredded documents.
Q. Okay. The one we looked at earlier today?
A. Yes.
Q. What about peterp968@yahoo.com?
A. This e-mail address was used as an e-mail address for Peter Pfizer, and it was used to communicate with our undercover agent during the undercover operation, as well as with an inheritance fraud victim, Dale Helms, that we've already heard from.
Q. Okay. And the petelondon54 and peterp e-mail addresses appear to have the same password, shrine797. Does the number 797 mean anything to you?
A. Yes. That's part of the address of the defendant's residence, 797 Oxbow Avenue in Oswego.
Q. Okay. And then I want to draw your attention to the middle of the page. There's a line that starts with ued@standardgroupservices.com?
A. Yes.
Q. Does that e-mail address, did that come up in the investigation?
A. Yes, it did. This e-mail address was used by the individual posing as Wyashika Sellar to communicate with,

again, our undercover agent during the undercover operation, as well as with an inheritance fraud victim that we previously heard from, Dale Helms.

Q. And the password that follows, august@1976, does that have any significance to you?

A. Yes, it does. I had mentioned that Anthony Ibekie uses multiple dates of birth. This is consistent with one of those dates of birth, which is August 10, 1976, is one of the dates of birth that he uses.

Q. Okay. Finally the last line. The password that follows the track phone user, pfizerpeter@gmail.com, does Emeka1965 mean anything to you?

A. Yes. So Emeka is the defendant's middle name, Anthony Emeka Ibekie. And 1965, again, correlates to another one of the birth dates that we see him use frequently, which is April 9 of 1965.

Q. Okay. I'm now going to show you Government Exhibit 806.

Okay. Can you see that okay?

A. Yes.

Q. What are we looking at here?

A. This is Articles of Incorporation for Emetech Solutions, Incorporated, and is one of the documents that was seized from the defendant's residence during the search warrant.

Q. Where in the residence was it found?

A. It was found in the garage area.

Q. Is Emetech Solutions one of the entities associated with the fraud scheme?
A. Yes, it is.
Q. What's the connection?
A. Emetech Solutions -- a bank account was set up in the business name of Emetech Solutions that received victim funds specifically from Dale Helms who we have previously heard from.
Q. And is this the company that Ebuka Egbunam testified about?
A. Yes, it is.
Q. And just to clarify, we previous looked at this document when you testified on Tuesday; right?
A. Yes.
Q. That was from the Illinois Secretary of State?
A. That's correct.
Q. And this is the same document, but it was found on -- in the defendant's desk area?
A. Yes.
Q. Showing you Government Exhibit 807. What are we looking at here?
A. Articles of Incorporation for Berger Services, Incorporated. This is a document that was also seized from the garage area of the defendant's residence.
Q. Is Berger Services one of the entities that you've previously testified was associated with the fraud scheme?
A. Yes, it is.

Q. What's the connection?
A. A bank account was opened in the name of Berger Services, Incorporated that also received funds from an inheritance fraud victim.
Q. Okay. Showing you Government Exhibit 808. What are we looking at here?
A. This is a Certificate of Dissolution of Domestic Corporation for Esijemine Lucky Nengite, Incorporated, and is a document that was seized from the defendant's residence during the search warrant.
Q. Where?
A. In the garage area.
Q. Is Esijemine one of the entities that you earlier testified was involved in the fraud scheme?
A. Yes.
Q. What's the connection?
A. A bank account was opened in the name of this business that also received funds from a victim of the inheritance fraud.
Q. Showing you Government Exhibit 809. What are we looking at here?
A. These are checkbooks for a Chase bank account ending in 6830 for Emetech Solutions, Incorporated. And these were seized from the defendant's residence during the search warrant.
Q. Where in the residence?

A. In the garage area as well.
Q. And you previously testified that Emetech is one of the entities associated with the fraud scheme?
A. Yes, it is.
Q. Okay. And are you able to make out the account number?
A. Yes. It's 608066830.
Q. Is this a bank account that received victim funds?
A. Yes. Specifically from Dale Helms that we heard from previously.
Q. Okay. I'm showing you Government Exhibit 810. What is this?
A. This is a bank statement from Chase Bank for the Emetech Solutions, Incorporated account. And this is a document that was seized from the defendant's residence during the search warrant.
Q. Where in the residence?
A. In the garage area.
Q. Okay. And I want to see if we can zoom in a little bit here. Do you see what I've zoomed in on this particular transaction?
A. Yes.
Q. What is this transaction?
A. This shows a wire transfer originating from Dale Helms in the amount of $6,400, and it was deposited into the Emetech Solutions bank account.

Q. Okay. And this is the same document that we looked at earlier as well?
A. Yes.
Q. But that was from the bank; is that right?
A. That's correct.
Q. And this is the same document found on the defendant's -- in the defendant's desk area?
A. Yes.
Q. Showing you Government Exhibit 811. Zoom out. Do you recognize this one?
A. Yes, I do.
Q. What is it?
A. This is a funds transfer request authorization from Bank of America for Samcord, Incorporated. And this was a document that was seized from the defendant's residence during the search warrant.
Q. Where in the residence?
A. From the desk area as well, in the garage.
Q. Is Samcord one of the entities that you testified earlier is associated with the fraud scheme?
A. Yes.
Q. What's the connection?
A. A bank account was opened in the name of Samcord, Incorporated. And that bank account received funds from a victim as part of the inheritance fraud scheme.

Q. Okay. And I want to zoom in on this one a bit as well. Is there also a -- does there appear to be a transaction on this document?
A. Yes.
Q. Who is the recipient of the transaction?
A. Anthony Ibekie.
Q. Okay. And what is the bank account that it goes to?
A. It goes to an Access bank account ending in 8742 in Nigeria.
Q. Just for clarity, it's where I'm circling my pen; right?
A. Yes, that's correct.
Q. Showing you Government Exhibit 812. Do you recognize this document?
A. Yes.
Q. What is it?
A. It's a bank statement from Bank of America for an account in the name of Globayo LLC.
Q. Okay. And where was this one found?
A. This was seized from the defendant's residence during the search warrant operation, and it was located also in the garage area.
Q. Is Globayo LLC an entity that you've previously testified is associated with fraud scheme?
A. Yes.
Q. How is it connected?

A. Bank accounts were opened in the name of Globayo LLC that also received funds from the victims of the inheritance fraud, as well as the undercover agent.
Q. Okay. Bear with me because this one takes a moment.
Special Agent, do you recognize what I'm showing you?
A. Yes.
Q. Okay. What are we looking at here?
A. These are fragments from a -- what appears to be an AT&T bill for the Oxbow premises.
Q. And what, if anything, was significant to you about this document?
A. So the handwriting that's on the document, it indicates account name is Samuel Aniukwu, and it has "pass," which I understand to mean password, of 0465.
Q. Okay. And what's the significance of 0465?
A. Again, that's one of the dates of birth that Anthony Ibekie frequently uses, April 9th of 1965.
Q. Okay. And one of these shreds appears to be addressed to -- to who?
A. To Samuel Aniukwu.
Q. At what address?
A. 797 Oxbow Avenue, Unit 110 in Oswego, Illinois.
Q. And did Samuel Aniukwu ever live at 797 Oxbow Avenue?
A. No, he did not.
Q. And is this the same AT&T account that you testified

earlier was connected to the IP address that tracked the cashier's check?
A. It appears to be, yes.
Q. Okay. I'm showing you Government Exhibit 814. What is this document?
A. It's a Statutory Declaration of Age for Anthony Emeka Ibekie that was a document that was seized during the search warrant from the defendant's residence.
Q. Who is Godfrey Ibekie?
A. That's Anthony Ibekie's father.
Q. Okay. And does this give an age?
A. It provides a date of birth, yes.
Q. What's the date of birth on this?
A. August 10, 1976.
Q. Is this birthday consistent with other birthdays that we've seen from the defendant?
A. One of them, yes. Again, he uses multiple birth dates.
Q. Okay. And then finally I'm showing you Government Exhibit 815. What is this document?
A. This is a curriculum vitae which is a document that's similar to a resume. And it was -- it's for Anthony Ibekie, and it was seized during the search warrant of the defendant's premises.
Q. Okay. And scrolling in here, what is the e-mail address?
A. aibekie@gmail.com.

Q. And the phone number?
A. (630) 822-4947.
Q. Have you seen that phone number elsewhere in the investigation?
A. Yes, I have.
Q. Where?
A. This phone number was seen on the -- the AT&T account for the subscriber records for the AT&T internet service for the residence at Oxbow. It was also on subscriber records for the aibekie@gmail.com e-mail account. And we also seized a phone from the residence that used -- from Anthony Ibekie's residence that used this phone number. We also seized a phone from Jennifer Gosha's residence, in which she appeared to be communicating with Anthony Ibekie at this phone number.
Q. Okay. And is there a date of birth on this one?
A. Yes.
Q. What's the date of birth?
A. August 10, 1976.
Q. So this is consistent with the Statutory Declaration of Age?
A. Yes, it is.
Q. Okay. Have I shown you every document that you seized from the defendant's home?
A. No.
Q. I've shown you just a sample?

A. Yes, that's correct.
Q. Okay. Can I go back to the laptop, please? Thank you.
Okay. I'm showing you Government Exhibit 719-4, which is in evidence. What is this document?
A. This is a photograph of the passport in the name of Toni Ibe Emeka that was seized during the search warrant.
Q. So just a photo of the passport that we already looked at?
A. Yes, that's correct.
Q. And 719-5, what is this?
A. This is a photo of the printed list of passwords and user names and phone numbers that we previously talked about that was seized from the residence during the search warrant.
Q. So, again, just a photo of the same document we looked at?
A. Yes, that's correct.
MS. DeMARCO: Okay. May I approach, your Honor?
THE COURT: You may.
BY MS. DeMARCO:
Q. Special Agent, I have handed you Government Exhibit 802, which is already in evidence. Do you recognize the exhibit?
A. Yes, I do.
Q. What do you recognize it to be?
A. This -- these are shredded documents that were seized from the defendant's residence during the search warrant.
Q. How do you know that that's what it is?
A. I was present the day of the search warrant when these

documents were -- or when these shredded documents were received, or were seized. And looking at this bag, my name is on here as the individual that took custody of the evidence at the end of the search warrant. My initials are also on the evidence tape on the outside of the bag.

Q. Are those the same shreds that you sent to the IRS lab to be examined?

A. Yes, they are.

Q. Where were these shreds recovered from during the search warrant?

A. They were recovered from a paper shredder. There was a bin inside the paper shredder that was located in the garage area.

Q. Okay. And did you eventually receive the shreds back from the IRS lab?

A. Yes, I did.

Q. How do you know those are the same shreds that you received?

A. This -- this bag that was included in there with it, again, is the original bag that I sent to the lab.

Q. Okay. And is the way they're packaged now the way that the IRS lab packaged them, sent them back to you?

A. Yes.

Q. Okay. You can put that back together. Or we can do it later.

Switching gears slightly, still on the day of the

search warrant, in addition to searching the house, did you have a subpoena to obtain any other information from the defendant?

A. Yes, I did.

Q. What was that?

A. A handwriting exemplar.

Q. What is a handwriting exemplar?

A. A handwriting exemplar is just other special investigative tool that we use. It's a form that we have someone fill out that has various numbers, letters, common words, common phrases, things of that nature. It allows us to get a sampling of an individual's handwriting for later comparison and analysis.

MS. DeMARCO: Okay. May I publish just to the witness, please? Thank you.

BY MS. DeMARCO:

Q. Special Agent, I'm showing you Government Exhibit 508. Do you recognize this exhibit?

A. Yes, I do.

Q. What is it?

A. This is the handwriting exemplar that was completed by Anthony Ibekie.

Q. How do you know that that's what it is?

A. Because I was the one that observed him complete this handwriting exemplar, and my name is -- my signature is on this

form as the witness.
Q. Is this a fair and accurate copy of the exemplar that you obtained on July 16th of 2020?
A. Yes, it is.
MS. DeMARCO: The government would move to admit Government Exhibit 508 and publish to the jury.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: It's admitted. You can publish to the jury.
MS. DeMARCO: Thank you, your Honor.
(Government's Exhibit No. 508 was received in evidence.)
BY MS. DeMARCO:
Q. Okay. So can you tell the jury what we're looking at?
A. Yes. So this is the handwriting exemplar that was completed by Anthony Ibekie.
Q. Okay. And what is the address? Just to be clear, who filled out all of this information?
A. Anthony Ibekie filled out everything on here, with the exception of my signature and date and time right underneath my signature in the lower, right corner.
Q. Okay. So is your signature, date, and time down here --
A. That's correct.
Q. -- in the lower right?
A. Yes.

Q. Everything else here was provided by the defendant?
A. Yes.
Q. What's the address listed?
A. 797 Oxbow Avenue, Unit 110 in Oswego, Illinois.
Q. What is the date of birth listed?
A. April 9, 1965.
Q. Okay. And is this consistent with other birthdays that we've seen from the defendant?
A. Yes, it's one of them.
Q. Okay. But inconsistent with some of the other documents?
A. That's correct, yes. He uses multiple birth dates.
Q. Okay. Finally, whose signature is this?
A. Anthony Ibekie's.
Q. How do you know that?
A. I watched him sign the document, and that's evidenced by my signature on the witness line.
Q. Okay. On the day of the search warrant, did you have the opportunity to talk to the defendant?
A. Yes, I did.
Q. Did you record your conversation with him?
A. Yes.
Q. Have you reviewed that recording?
A. Yes, I have.
Q. Are you familiar with the defendant's voice based on that?
A. Yes, I am.

Q. Have you also reviewed Government Exhibit 601 and 602?
A. Yes.
Q. Are those the recorded calls that Special Agent Vela made?
A. Yes.
Q. Do you recognize the voices on that recording?
A. Yes, I do.
Q. Whose voices are they?
A. One of the voices is the undercover agent, Daniel Vela, and the other voice is Anthony Ibekie.
Q. Okay. I want to switch gears now and talk to you about some specific financial executions that occurred in this case.
Based upon the bank records that are in evidence, did you prepare additional summary charts?
A. Yes, I did.
Q. How did you do that?
A. I obtained the bank records from the financial institutions. I reviewed those bank records, identified relevant information, and then summarized that information into a chart.
Q. Okay. May I publish just to the witness, please?
Special Agent, I'm showing you Government Exhibits 1103, 1104, and 1105. Do you recognize those exhibits?
A. Yes, I do.
Q. Do they fairly and accurately summarize the information contained in Government Exhibits 301 through 312, which are the

bank records?
A. Yes.
MS. DeMARCO: The government moves to admit Exhibits 1103, 1104, and 1105.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: So Exhibits 1103, 1104, and 1105 are admitted. You can publish to the jury.
MS. DeMARCO: Thank you, your Honor.
(Government's Exhibit Nos. 1103-1105 received in evidence.)
BY MS. DeMARCO:
Q. Okay. Special Agent, I'm showing you Government Exhibit 1105. Does this appear similar to Government Exhibit 1102, which you previously testified about?
A. Yes.
Q. What's different about it?
A. There's an additional column on the far right side.
Q. What is that additional column?
A. It's titled "Victim Execution." So this column just lists out specific transactions for victims that sent money to the various accounts.
Q. Okay. And does this include all the victims in this scheme?
A. No, it does not.
Q. Okay. So is this chart essentially identical, except for

that last column?
A. Yes.
Q. And does it show victim funds going into each of the bank accounts that you previously testified were associated with the defendant?
A. Yes.
Q. Okay. So I want to go through some of these in more detail. I'm showing you Government Exhibit 312-1, which is already in evidence. What are we looking at here?
A. This is a Fedwire funds message. So a Fedwire record.
Q. What's a Fedwire record?
A. Well, Fedwire is the Federal Reserve wire network. So basically that is the network that's managed by the Federal Reserve for -- that banks use to send and receive funds through wire transfers. So basically it acts as a clearinghouse. So if somebody wants to send funds from an account at one bank to an account at another bank, the banks need a way to connect with each other and be able to move that money from one bank to the other bank. So the Federal Reserve makes that possible through the Fedwire network. So a Fedwire record is just a record from the Federal Reserve that shows details for each specific wire transfer transaction.
Q. So for every wire transaction, there's -- one of these records exists?
A. Yes.

Q. Okay. So let's kind of break down what information is included here. Is there a date of the transaction?
A. Yes.
Q. Is that up here under "Fedwire Appended Information"?
A. That's correct.
Q. So what is the date of what we're looking at?
A. March 8, 2019.
Q. Okay. And then under "Basic Information," there appears to be a sender?
A. Yes. So this is the bank information. It shows the sending bank and the receiving bank and the routing numbers for those banks.
Q. Okay. And there appears to be an amount?
A. Yes.
Q. Okay. And what is the amount of this transaction?
A. $6,405.
Q. Okay. And then we have originator information. So what is that?
A. That's the individual that is sending the wire transfer.
Q. Okay. So in this case it appears here?
A. Yes.
Q. So who sent this wire transaction?
A. Cong T. Le.
Q. And then we have beneficiary information under that?
A. Yes.

Q. So what is that describing?
A. That's the individual or entity that received the wire transfer.
Q. Okay. And who is the beneficiary in this case?
A. Jenant, Incorporated.
Q. So essentially this record shows that on March 8th of 2019, Cong Le wired $6,405 to the bank account connected to Jenant, Incorporated?
A. That's correct.
Q. And going back to our summary chart, is that reflected on here?
A. Yes, it is.
Q. Which line is it reflected in?
A. That's on the top line for Exhibit 301.
Q. Okay. So right here as I'm circling?
A. Yes.
Q. Okay. I'm going to show you Government Exhibit 312-2. Is this another Fedwire?
A. Yes, it is.
Q. What is the date of this one?
A. March 14, 2019.
Q. And the amount?
A. $22,962.75.
Q. The originator?
A. Cong Le.

Q. And the beneficiary?
A. Setraco Services, Incorporated.
Q. Okay. And does a Fedwire record indicate that the wire was actually received into the receiving bank account?
A. Yes, it does.
Q. Okay. And going back to the summary chart, is this reflected on the chart?
A. Yes, it is.
Q. Which line?
A. The line for Government Exhibit 302. The first transaction in the last box.
Q. So up here?
A. Yes.
Q. Okay. I'm now showing you Government Exhibit 302-B, which is in evidence. What are we looking at here?
A. This is a cashier's check that was obtained by a victim of the inheritance fraud and ultimately deposited into Setraco Services, Incorporated.
Q. So the date is here?
A. Yes.
Q. What's the date?
A. March 25, 2019.
Q. And the amount?
A. $80,000.
Q. There appears to be a remitter up here?

A. Yes. That would be Cong Le.
Q. And it's paid to the order of?
A. Setraco Services, Incorporated.
Q. And is this one reflected on the summary chart?
A. Yes, it is.
Q. Where?
A. Government Exhibit 302. So the second line down. And it's the second transaction in the last box.
Q. Okay. And did law enforcement receive a copy of this check through the bank records?
A. Yes, we did.
Q. Okay. So does that indicate that the check was actually deposited?
A. It does.
Q. Okay. I'd now like to show you Government Exhibit 301-C. What are we looking at here?
A. This is a cashier's check from a victim of the inheritance fraud. So, again, Cong Le. And it was sent to Jenant, Incorporated.
Q. Okay. So paid to the order of Jenant here. What's the date of the transaction?
A. March 26, 2019.
Q. And what is the amount?
A. $97,500.
Q. Is this reflected on the summary chart?

A. Yes, it is.
Q. Where?
A. The line -- the top line for Government Exhibit 301. It's the second transaction in the last box.
Q. Right here?
A. Yes.
Q. I'm showing you Government Exhibit 312-3. What are we looking at?
A. This is a Fedwire record.
Q. Okay. What's the date of this one?
A. September 4, 2019.
Q. Okay. And the originator appears to be here. Who is that?
A. Total Soil Solutions.
Q. Are you familiar with Total Soil Solutions?
A. Yes, I am.
Q. Who -- what significance does Total Soil Solutions have to the investigation?
A. Total Soil Solutions is a company associated with Gary Foster who's a victim of the inheritance fraud scheme.
Q. Okay. And how do you know that it's associated with him?
A. There's an address listed for Total Soil Solutions on the Fedwire record. I researched that address in law enforcement date bases and determined that that address is the residential address of Gary Foster. And then just through public information, searches on the internet, I was able to determine

that Total Soil Solutions is a Foster family business.
Q. What's the amount of this transaction?
A. $7,680.
Q. Who is the beneficiary?
A. Berger Services, Incorporated.
Q. Is this reflected on the summary chart?
A. Yes, it is.
Q. Where?
A. It is the fourth row down for Government Exhibit 304.
Q. So right here?
A. Yes.
Q. Okay. I'm showing you 312-4. What is this?
A. Another Fedwire record.
Q. What's the date?
A. June 2nd, 2020.
Q. And the amount?
A. $6,400.
Q. Okay. And the name of the originator?
A. Area Community Credit Union.
Q. Where is that located?
A. In Grand Forks, North Dakota.
Q. Okay. So there's a little extra line down here. What does this line say?
A. Dale Helms to Emetech Solutions, Incorporated.
Q. Okay. And then who is the beneficiary?

A. Emetech Solutions, Incorporated.
Q. Is this reflected on the summary chart?
A. Yes, it is.
Q. Where?
A. It would be the fifth line down, Government Exhibit 305.
Q. Right here?
A. Yes.
Q. Okay. I'm showing you Government Exhibit 309-A. What are we looking at here?
A. This is a cashier's check that is for a victim of the inheritance fraud.
Q. Which victim?
A. Dale Helms.
Q. Okay. Is this the check that he testified about a friend procured for him?
A. Yes, it is.
Q. What's the amount of this one?
A. $20,925.
Q. Is this reflected on the summary chart?
A. Yes, it is.
Q. Where?
A. The last row, Government Exhibit 309. It's the first transaction in the last box.
Q. And that check was made out to Globayo LLC?
A. Yes, it was.

Q. Okay. I'm showing you Government Exhibit 309-B. What are we looking at here?
A. This is the cashier's check that we obtained for use in the undercover operation that was ultimately delivered to Jennifer Gosha's residence as part of the controlled delivery and then subsequently deposited into a Globayo bank account.
Q. So it's made out to Globayo LLC?
A. Yes.
Q. And we looked at a photo of this earlier in your testimony. That photo was taken by a law enforcement?
A. Yes.
Q. And this photo was obtained how?
A. This is from the bank records for Globayo LLC.
Q. So this indicates that it was deposited with the bank?
A. That's correct.
Q. And is this one on the summary chart as well?
A. Yes, it is.
Q. Where?
A. It's the last row for Government Exhibit 309.
Q. Down here?
A. That's correct.

MS. DeMARCO: Okay. Judge, at this point could you please read Stipulation 7 and 8?

THE COURT: I will pull that up on the screen for everybody. Everybody see that okay? All right, folks, I will

read Stipulation 7, then I will read Stipulation No. 8. Here's Stipulation No. 7. Here it goes.

The $6,405 transfer of funds by victim Cong Le -- spelled C-o-n-g, and then Le, L-e -- to a TCF bank account for Jenant -- that's all caps, J-e-n-a-n-t -- on or about March 8, 2019, caused an interstate wire communication resulting in the transfer of those funds. The $22,962.75 transfer of funds by victim Cong Le to a TCF bank account for SETRACO -- spelled S-E-T-R-A-C-O in all caps -- on or about March 14, 2019, caused an interstate wire communication resulting in the transfer of those funds.

The $97,500 transfer of funds by victim Cong Le to a TCF bank account for Jenant on or about March 27, 2019, caused an interstate wire communication resulting in the transfer of those funds.

The $7,680 transfer of funds by victim Gary Foster to a BMO Harris bank account for BERGER -- spelled B-E-R-G-E-R in all caps -- on or about September 4, 2019, caused an interstate wire communication resulting in the transfer of those funds.

The $6,400 transfer of funds by victim Dale Helms to a Chase bank account for Emetech -- spelled E-M-E-T-E-C-H, in all caps -- on or about June 2nd, 2020, caused an interstate wire communication resulting in the transfer of those funds.

And when we turn the page we see, "So stipulated," signatures by counsel for the government, counsel for the

defendant, and defendant Anthony Ibekie.

So stipulated?

MS. DeMARCO: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: Let's go to Stipulation No. 8. It's on the screen. Here it goes.

The $80,000 cashier's check made payable to SETRACO -- spelled S-E-T-R-A-C-O in all caps -- from victim Cong Le, caused the use of the United States mails. More specifically, victim Cong Le mailed the $80,000 cashier's check from San Antonio, Texas via the United States Postal Service, and the parcel was delivered to 5206 Lincoln Avenue, Lisle, Illinois, on or about March 27, 2019.

The $20,925 cashier's check made payable to Globayo from victim Dale Helms caused the use of the United States mails. More specifically, victim Dale Helms mailed the $20,925 -- let me say that again. $20,925 cashier's check from Grand Forks, North Dakota via United Parcel Service, and the parcel was delivered to 1419 North Harlem Avenue, Apartment B, Oak Park, Illinois, on or about June 12, 2020.

The $1,100 cashier's check made payable to Globayo from an undercover agent working with law enforcement, attempted to cause the use of the United States mails.

It says, "So stipulated." There's a signature by the Assistant United States Attorney, there's a signature for

defense counsel, and a signature by defendant Anthony Ibekie. So stipulated?

MS. DeMARCO: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: Okay. Counsel, go ahead.

MS. DeMARCO: Thank you, your Honor.

BY MS. DeMARCO:

Q. Special Agent Mansker, the last topic I want to talk to you about today, in reviewing the bank accounts, did you review not only the victim funds coming in but some transactions going out?

A. Yes, I did.

Q. What jumped out at you of significance when you were doing that process?

A. There were several instances in which victim funds were wired out to a Nigerian bank account in the name of Anthony Ibekie within days of receiving those victim funds.

Q. And did you prepare additional summary charts showing those transactions you just described?

A. Yes, I did.

Q. Okay. I'd like to show you Government Exhibit 1103-1 which has been admitted. Can you tell the jury what we're looking at?

A. Yes. So this is a flow chart that depicts the receipt of $22,962.75 wire transfer from victim Cong Le that was received

into a TCF bank account ending in 7097 for Setraco Services, and that occurred on March 14, 2019.

Then subsequently, one day later, on March 15, 2019, a wire transfer was initiated wiring $8,500 to an Access bank account located in Nigeria in an account held in the name of Anthony Ibekie ending in 8742.

Q. And how do you know that that $8,500 transaction included the money that Cong Le had deposited in the account?

A. The account -- or the account balance for the Setraco Services bank account did not have enough money there prior to receiving the wire transfer from Cong Le to execute that $8,500 wire transfer out. So without the funds from victim Cong Le, there was not enough money in the bank to make that transaction.

Q. Showing you Government Exhibit 1103-2. What are we looking at here?

A. This is another flow chart. So this is depicting the receipt of the $80,000 cashier's check from victim Cong Le into a TCF bank account ending in 7097, held in the name of Setraco Services. And that was deposited on March 27, 2019.

Then subsequently, approximately two days later, on March 29, 2019, a wire transfer was made in the amount of $25,000 to an Access bank account in Nigeria held in the name of Anthony Ibekie, account ending in 8742.

Q. Okay. And, again, how do you know that that $25,000

transaction out included a portion of the $80,000 that Cong Le had sent?

A. Same situation as the last one. The bank account balance prior to receipt of those funds was -- there was not enough funds in there to send the $25,000 wire out until -- until those funds were received from Cong Le.

Q. Okay. And I'm showing you one final Fedwire. What are we looking at here?

A. This is a Fedwire record.

Q. What's the date of the transaction?

A. March 29, 2019.

Q. And the amount?

A. $25,000.

Q. Who is the originator?

A. Setraco Services, Incorporated.

Q. And who is the beneficiary?

A. Anthony Ibekie.

Q. Okay. And that bank account ends in what four digits?

A. 8742.

Q. Is this the same bank account that we saw that physical transaction for, the Samcord document that was found at the residence?

A. Yes, it is.

Q. And where is this bank located?

A. It's Access Bank, and it's located in Nigeria.

Q. Showing you Government Exhibit is 1103-3. What are we looking at here?
A. This is another flow chart. This depicts the $7,680 wire transfer from victim, Gary Foster, into a BMO Harris bank account ending in 5874 for Berger Services, Incorporated. That transfer, that wire transfer, went into that account on September 4th of 2019. And then subsequently, one day later, on September 5, 2019, a wire transfer out in the amount of $10,500 was sent to an Access bank account in Nigeria held in the name of Anthony Ibekie, account ending in 8742.
Q. Okay. And then finally showing you 104-1.
A. This is another flow chart. This is depicting a wire transfer in the amount of $12,000 -- $12,810 from victim Dave Petroselli. And the wire transfer was deposited into a TCF bank account ending in 5398, held in the name of Samcord, Incorporated. It was received into that bank account on June 14th of 2018.
Then approximately one day later, on June 15, 2018, a wire transfer out to an Access bank account in Nigeria, ending in 8742, in the name of Anthony Ibekie, was executed for $23,300.
Q. And obviously $23,300 is more than $12,000. So how do you know that Dr. Petroselli's check was included in that wire out?
A. Again, the prior balance on the account was not sufficient to cover that wire transfer. The victim, Dr. Petroselli, wired

this money in. There was also a large cash deposit and another wire transfer in that made up a sufficient dollar amount to fund the $23,000 wire transfer out.

It is notable that the other two deposits that went into the account, those two together were not sufficient to cover the 23,000 wire transfer out. So at least a portion of that had to have been from the victim funds from Dr. Petroselli.

Q. Okay. Final topic, special agent. In the course of the investigation, did agents reach out to TD Canada Bank to verify whether some of the names that came up in the investigation actually worked at that bank?

A. Yes.

Q. Specifically, did you inquire about whether John Delon ever worked at TD Canada?

A. Yes.

Q. Did he?

A. No, he did not.

Q. What about Chandler Arnaud?

A. He also did not work at TD Canada.

Q. Nikka Avis?

A. She also did not work at TD Canada.

Q. Did you also reach out to Standard Charter Bank?

A. Yes, we did.

Q. And did you inquire whether some of the names in the

investigation ever worked for Standard Charter?
A. Yes, we did.
Q. Is there any record of a Peter Pfizer ever working at Standard Charter Bank?
A. No, there is not.
Q. Why about Wyashika Sellar?
A. No, there is not.
Q. Did you also -- or did agents also research whether Pierre Delouis is a licensed attorney in Canada?
A. We did.
Q. Is he?
A. He is not.
Q. Did agents also go to the physical address listed for Hall & Hall Chamber?
A. Yes, they did.
Q. What did they find when they went there?
A. They spoke with a security guard at that location who had been working there for I believe approximately seven years. And in that amount of time, he was not familiar with the name Hall & Hall Chamber, and he was not familiar with the name Pierre Delouis having ever conducted business in that building.
MS. DeMARCO: May I have one moment, your Honor?
THE COURT: Yes.
MS. DeMARCO: Nothing further.
THE COURT: Okay. Thank you, counsel.

Mr. Carlson, whenever you're ready.

MR. CARLSON: Judge, brief sidebar.

THE COURT: Sure, let's do that. Excuse us, folks. If you'd like to stand up and stretch your legs, you're welcome to do so. Okay?

(Proceedings heard at sidebar:)

THE COURT: All right. The record will reflect that almost every juror is now standing up. It's never a bad time to stretch your legs.

Go ahead, Mr. Carlson.

MR. CARLSON: Judge, I don't have any questions of this witness based upon her testimony here today. I have a couple of questions on some unrelated matters. I know your Honor at the beginning of the trial said you would prefer in that instance to have me call a witness in my case. And I just wondered if that's what your Honor still preferred.

THE COURT: Okay. Well, I do have some flexibility on that, obviously. If it was up to you, would you like to do it now, or do you want to save it? If I gave you the opportunity, what would you do? I mean, I will say, she is going to be here throughout the trial.

MR. CARLSON: That was my --

THE COURT: You know, so what I typically do is do it in one shot, if there's a good reason to do it. I'm not sure there's a good reason to do it, given that she's going to be

here, you know. What do you think?

MR. CARLSON: Judge, I agree with that. I just wanted to double check with your Honor.

THE COURT: Yes. So you don't have any questions on cross, but you'd like to call her in your own case in chief when you're given the opportunity. Is that what you're saying?

MR. CARLSON: Yeah, for just two or three questions.

THE COURT: Yeah, that's fine. All right. So the lay of the land is, we'll go back on the record, I'll say: Any questions? And you'll say: No questions. Is that right?

MR. CARLSON: Correct.

THE COURT: And then when I turn the floor over to you, probably tomorrow morning, you may call her to the stand and ask her a couple of questions that are outside the scope of the direct we just heard, but they're questions in your case in chief. Is that basically the gist of it?

MR. CARLSON: Yes, Judge.

THE COURT: All right. Ms. Nutini clearly wants to say something. Anything?

MS. NUTINI: Your Honor, I'm sorry to jump in here. I just think for purposes -- because Special Agent Mansker is on the stand, and, you know, I think the government has no objection if Mr. Carlson would like to indicate he doesn't have any cross-examination for her and then he wants to direct her and not ask leading questions, we have no objection to him

doing so now so that she doesn't have to be called for a third time.

THE COURT: All right. So, Mr. Carlson, I'll give you the latitude. He's the criminal defendant. The government doesn't object. I will let you call the shots on those, Mr. Carlson. If you want to do it in your quote-unquote case-in-chief, you can. If you want to do it now, you can. I'll give you that latitude. What do you want to do?

MR. CARLSON: Judge, I think it would be better to do it in my case-in-chief, only because if I don't get the answer I anticipate from Agent Mansker, I would want to show her a document, which I do not have here today, it's back in my office.

THE COURT: Totally fine. Yeah, that's completely fair. Okay. So we'll go off the record, I'll say: Any questions? You'll say: No questions. And then I'll have her step down, and then we'll take a break. Okay?

MR. CARLSON: Thank you, Judge.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, counsel. Mr. Carlson?

MR. CARLSON: No questions, your Honor.

THE COURT: Okay. Ms. Mansker, you may step down. Thank you for coming.

THE WITNESS: Thank you, your Honor.

THE COURT: Watch your step, please. If you can return the evidence to the prosecutor, I appreciate that. Thank you.

(Witness excused.)

THE COURT: Okay. Members of the Jury, it's 2:30. We're going to take a break. We're going to take a break. We're going to have our midafternoon break a little bit early today. You know the drill. Take your notepad with you. As soon as you folks are ready, we'll get rolling with the next witness. Okay? Thank you, folks.

(Jury out at 2:31 p.m.)

THE COURT: All right. Have a seat, everyone. Just one more witness for the day; is that right?

MS. NUTINI: Yes, your Honor.

THE COURT: So I thought that'd be a nice, clean breaking point. That way, the witness can gather himself and get ready to go. You expect it'll be -- did you say less than an hour?

MS. NUTINI: Yes, your Honor.

THE COURT: Okay. So they'll go less than an hour. And then, Mr. Carlson, you'll have the baton. You can do whatever you want to do, and then we'll just close for the day. I'll reveal to the jury that they're getting an early departure, and no one will be disappointed, and there will be much rejoicing, I expect. Okay? So we'll see you in about 10

minutes, give or take, folks. Anything else?

MS. NUTINI: Yes, your Honor. Just something briefly to raise before the break, if that's okay with your Honor?

THE COURT: Yeah.

MS. NUTINI: One of our case -- excuse me, one of the IRS criminal investigation agents who has been helping out with this trial, he has been in the hallway the entire trial with witnesses, sitting in the witness room, just kind of coordinating --

THE COURT: Sure.

MS. NUTINI: -- the witnesses coming and going. He stepped into the courtroom to start watching Special Agent Mansker because there were no witnesses left today. He immediately thought he might recognize one of the jurors, so he left the courtroom.

THE COURT: Okay.

MS. NUTINI: He hasn't been associating with counsel table, so I don't think that any of the jurors would know he was affiliated with the government. But just out of an abundance of caution, we are raising that with your Honor.

THE COURT: Okay. Thank you for that. Do you have any reason to think the juror noticed him? Is it a man, the agent?

MS. NUTINI: It is a man.

THE COURT: Do you have any reason to think the juror

set eyes on the IRS agent, or recognized him, or anything like that?

MS. NUTINI: No, your Honor. The indication is no.

THE COURT: Okay.

MS. NUTINI: And I will note that it is an open courtroom, and so if -- if they were to recognize each other, he or she may have just thought that the agent was here watching the trial.

THE COURT: Yeah.

MS. NUTINI: But, again, just wanted to raise that.

THE COURT: Thank you for that. Which juror is it, and how do they potentially know each other? Is it just, like, where the face looks familiar, or is it a next-door-neighbor, kind of thing; or what is it?

MS. NUTINI: I don't have details at this time.

THE COURT: Okay. Maybe you'd be kind enough to just ask the agent which juror it is, and, you know, do they -- you know, it could be who knows what, you know. But why don't you just ask, that way Mr. Carlson can have the info.

Any issue with that, Mr. Carlson, or any follow-up?

MR. CARLSON: Judge, I would like to know -- get some more information before I --

THE COURT: Yes, that's fair.

MR. CARLSON: Obviously if he just walked in here and there's nothing more to it than that, they didn't meet eyes, or

anything like that, that's fine. But if it's a good friend, close friend, I might have an issue with that. But I'd like to know more.

THE COURT: Okay. Why don't you just let me know which juror it is and how they know each other and how well they know each other, if at all. Maybe it's a situation where the agent looks at a juror and says, boy, I think that's somebody from my kid's school, or something. Just why don't we get a little more info, and we'll take it from there.

MS. NUTINI: Will do.

THE COURT: All right. Thank you for raising that proactively. Appreciate that. Anything else anybody wants to cover?

MR. CARLSON: No, Judge.

THE COURT: Come back in about 10 minutes. Okay. Thanks.

(Recess at 2:35 p.m., until 2:51 p.m.)

(Proceedings heard in open court:)

(Change of reporter.)

THE COURT: All right. Everybody ready for the jury?

MR. CARLSON: Judge, Mr. Ibekie needs to get his tie on.

THE COURT: Oh, fine. Yeah, yeah. Of course.

No rush, Mr. Ibekie.

MS. NUTINI: And, Your Honor, during that, we did some follow-up on the juror issue that I can put on the record if --

THE COURT: Sure.

MS. NUTINI: So the juror that Mr. George -- the special agent -- that Mr. George indicated that he knew was sitting in the back row, the second-to-last chair. It's a female with blond hair. He went to middle and high school with her, he said.

He said that she, to his knowledge, did not see -- she did not see him before he left the courtroom. He said that in terms of -- he would describe her as an acquaintance, not a friend. They are on a group chat with some other people that went to high school because they had a mutual teacher that they all really liked. He said the last time he talked to her was probably a year ago. This was before he became a special agent with IRS-CI. So, to his knowledge, she does not even know he works for the government and that he works as a special agent.

Again, he indicated that she did not see him, and he

immediately left the courtroom and does not plan to return.

THE COURT: Okay. Thank you for that.

How long was the agent in the courtroom? Do you know?

MS. NUTINI: I think for just several minutes.

THE COURT: Okay.

MS. NUTINI: We're not confident, Your Honor.

THE COURT: Okay. Fair enough.

Mr. Carlson, any thoughts?

MR. CARLSON: Judge, it's also my understanding that she's an alternate juror.

THE COURT: Yeah.

MR. CARLSON: In light of everything, I don't see that there's anything that we need to do.

THE COURT: I leave it to you, Mr. Carlson.

I mean, you know, if you want, I could bring the person out here, the juror, and say, just a question for you, have you seen anybody in the courtroom that you've known.

The downside of that is she could feel put on the spot and she may wonder why she's getting asked. It may, you know, prompt her to do speculative things. So I don't know that I prefer that per se, but I wanted to throw it out there.

MR. CARLSON: Judge, I would not prefer that you do that. If you were going to do anything, what I would suggest that you do is you can just ask the entire jury panel whether they have seen anybody that they know in the course of these

proceedings.

THE COURT: That's a really good idea, Mr. Carlson. So when they come back, I'll say, "Folks, you know, members of the public come and go in the courtroom. I assume nobody here has seen anybody that they know come in and out; if that's not right, I need you to tell me."

Is that fair? It looks like we got --

UNKNOWN SPEAKER: Do we need to tell you? My daughter is a juror.

THE COURT: Oh, okay. Hi, there. Good afternoon.

UNKNOWN SPEAKER: He is my son.

THE COURT: Okay. Good afternoon.

Okay. So -- okay. I don't think I need to ask that juror about their family, but I'll say "other than your family," maybe I'll say.

What do you think?

MR. CARLSON: That's fine.

MS. NUTINI: That's fine.

THE COURT: Okay. Fair enough.

All right. Thank you for that.

Mr. Ibekie, are you -- are you ready, sir? Have you had enough time to --

THE DEFENDANT: Yes. Yes, Your Honor.

THE COURT: Okay. Everybody ready to get the jury?

MR. CARLSON: Yes, Judge.

THE COURT: Okay. Very good. Thank you.

(Jury in at 2:55 p.m.)

THE COURT SECURITY OFFICER: All rise.

THE COURT: All right. Have a seat, everyone.

Before we call the next witness, I wanted to cover one housekeeping matter. As you folks noticed, sometimes during trial, people come and go in the courtroom. It's a public courtroom. You never know who's going to pop in and out of the courtroom. It's perfectly fine. We're open for business every day all day.

If anyone comes into the courtroom that you know, I would like you to tell me, and that excludes any member of your family. So if a member of your family is here and watching the trial, enjoying the trial, that's perfectly fine, but especially if you see someone that you may think would be associated with the case going on. I just want you to let me know. So it's just kind of a standard thing. If you know anybody who walks in the courtroom, please let me know.

Anything that anybody has to disclose on that? Anybody know anything?

Okay. Seeing nothing.

Okay. Counsel for the government, you may proceed.

MS. NUTINI: Thank you, Your Honor.

The government calls Christopher Kadonsky.

THE COURT: Okay. Mr. Kadonsky, come on up, please.

Watch your step, please.

Please stand right here (indicating).

(Witness sworn.)

THE COURT: Very good. Please have a seat.

All right. Good afternoon to you.

THE WITNESS: Good afternoon.

THE COURT: You know the drill, obviously. Please speak into the microphone. I want to make sure all the men and women of the jury can hear you. And help yourself to any water you may need. It's just to your right. Okay?

THE WITNESS: Thank you.

THE COURT: All right. Counsel, you may proceed with your examination.

MS. NUTINI: Thank you, Judge.

CHRISTOPHER KADONSKY, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. NUTINI:

Q. Good afternoon.

Can you please state and spell your name for the record.

A. Christopher Kadonsky, K-a-d-o-n-s-k-y.

Q. Where are you employed?

A. The Internal Revenue Service Criminal Investigations.

Q. And what's your position with the Internal Revenue Service Criminal Investigations?

A. I am a special agent.
Q. How long have you been a special agent?
A. Approximately five and a half years.
Q. And, generally speaking, what are your day-to-day duties and responsibilities as an IRS-CI criminal -- IRS-CI special agent?
A. I investigate criminal violations of the Internal Revenue Code and related financial crimes.
Q. And before your employment with IRS-CI, did you work in law enforcement?
A. No, I did not.
Q. What did you do?
A. I was a revenue agent for the Internal Revenue Service.
Q. And the jury has heard a little bit of testimony between the difference, but can you remind the jury what the difference is in an IRS revenue agent and a criminal agent.
A. Yes, they're very different roles. A special agent investigates criminal violations of the Internal Revenue Code and related financial crimes. A revenue agent works in a different capacity, work on what we call the civil side of the IRS, which is doing audits and assessments.
Q. So you've done both?
A. I have.
Q. I'd like to direct your attention to November of 2019.
Were you assigned to an investigation involving the

defendant?
A. Yes, I was.
Q. And was the investigation ongoing when you joined?
A. Yes, it was.
Q. Did you eventually become one of the case agents on the investigation?
A. Yes, I did.
Q. Who were the other case agents?
A. Amy Mansker of IRS Criminal Investigation and Sixto Luciano of Homeland Security Investigations.
Q. Special Agent Kadonsky, I'd like to first ask you some follow-up questions relating to the bank accounts that we've discussed throughout this trial.
A. Okay.
Q. For starters, what is the general process for opening a bank account for a business?
A. For a business, you would go into the bank, request to open a business bank account. You would provide business records to that bank and fill out some paperwork, including an account application or account opening agreement. And then ultimately, you would provide them with your information as well and get the account opened up.
Q. And so perhaps this is an obvious point, but a person has to open a bank account for a business; is that correct?
A. That's correct.

Q. And does that person have to provide any sort of identification documents?
A. Yes. There's something called Know Your Customer, which is where banks are required to get documentation from the individual opening an account. That's the same with the business account. So the person opening the business account is going to have to provide documentation for the business as well as for themselves.
Q. And is the person who opens a bank account, say, for a business known as a primary account holder or something similar?
A. Generally, the person who opened the account is the primary account holder, the primary account signer. And then additional people can be added on after that.
Q. How do you add an additional person to a bank account?
A. Generally, it's just paperwork. You go into the bank, and you'll ask them to add an additional signer to the account. They'll have you either fill out an account ownership change form or a form to add that additional person to the account.
Q. And so if you're adding an additional person to the account, does the primary account holder have to go into the bank to do that?
A. Yeah, generally, the primary account holder would have to go in, authorize the bank to add the additional person to the account, and then the person being added would also have to go

in and sign the signature card or account ownership card.
Q. And does the person who's being added to the account have to provide identification documentation?
A. Yes. Just -- just like we discussed with Know Your Customer, the bank is required to get documentation and information for everybody who is an authorized signer on the account.
MS. NUTINI: Permission to publish to the jury Government's Exhibit 301-A, which has been admitted into evidence.
THE COURT: You may.
MS. NUTINI: Thank you, Your Honor.
BY MS. NUTINI:
Q. Special Agent Kadonsky, I'm showing you Government's Exhibit 301-A. I'm going to blow up the top portion of this.
Can you describe what we're looking at.
A. Yes, this is a business account application and agreement for TCF Bank for the business Jenant, Inc.
Q. And is that listed where I've highlighted?
A. Yes, it is.
Q. And remind the jury, what is a business account application and agreement?
A. So this would be the form that's filled out to open a business account, so that you're applying for a business bank account.

Q. And the jury has heard testimony about Jenant, but briefly, can you remind the jury the relevance of Jenant.
A. Yeah, Jenant is a business that had a bank account opened that received inheritance fraud proceeds from a victim. In addition, Jenant is a shortening and combination of the names Jennifer, "Jen," Anthony, "Ant," "Jenant."
Q. And who is the registered agent and incorporator for Jenant?
A. That's Jennifer Gosha.
Q. What is the date of this business account application and agreement?
A. It's January 29th, 2019.
Q. And what is the address?
A. 1419 North Harlem Avenue, Apartment B, in Oak Park, Illinois.
Q. Is that an address that has become relevant in this trial?
A. Yes, it is.
Q. And how so?
A. That is the residence of Jennifer Gosha.
Q. Is it also the residence where the controlled delivery was conducted?
A. It is, yes.
Q. I'd like to direct your attention to the second page of the document.
Does there appear to be a signature on the agreement?

A. Yes, there is.
Q. And who appears to have signed that?
A. That's Jennifer Gosha's signature.
MS. NUTINI: I'm now publishing Government's Exhibit 301-B, which has been admitted into evidence.
BY MS. NUTINI:
Q. Special Agent Kadonsky, what are we looking at here?
A. This is an account ownership change form for the TCF Bank account for Jenant. It's the same account that we had previously looked at the form for.
Q. And what is the date of this account ownership change form?
A. This is March 11th, 2019.
Q. And so is this the form you were referring to that allows a primary account holder to add someone to an account?
A. Yes.
Q. I'm directing your attention to the bottom portion of the screen where there are two signatures.
Under "Current Account Owner," do you see a signature there?
A. I do.
Q. And what does that signature appear to read?
A. That says "Gosha." It's Jennifer Gosha's signature.
Q. And is there a date?
A. It's March 11th, 2019.
Q. And then does there appear to be an additional account

owner and a signature?
A. There is.
Q. Have you seen that signature or something similar before?
A. Yeah, throughout the investigation, I've seen that signature.
Q. And how are you familiar with the signature?
A. I've seen it on various financial documents, bank documents, as well as on a handwriting exemplar filled out by Anthony Ibekie.
Q. So whose signature is this?
A. That's Anthony Ibekie's signature.
Q. And what is the name of the individual being added to this account?
A. Emenike Tonero.
Q. Who is Emenike Tonero?
A. Emenike Tonero is an alias used by Anthony Ibekie.
Q. Is the name Anthony Ibekie contained anywhere on this account ownership change form?
A. No, it is not.
MS. NUTINI: Now publishing Government's Exhibit 303-A, which is in evidence.
BY MS. NUTINI:
Q. Special Agent Kadonsky, what are we looking at here?
A. This is a business account application and agreement for TCF Bank. This one is for a business entity Samcord,

Incorporated.
Q. So this is different than the last one we looked at for Jenant; is that correct?
A. That's correct. This one is for Samcord, Inc.
Q. And what is the date of this application?
A. This is June 6th, 2018.
Q. And remind the jury, what is the significance of Samcord to this investigation?
A. Samcord is an entity that had bank accounts opened which received proceeds of inheritance fraud from victims.
Q. And who was the registered agent or incorporator of Samcord?
And, Special Agent Kadonsky, let me pull up -- I should have done this -- Government's Exhibit 1102, which has been admitted into evidence. I'd like to direct your attention to the highlighted portion.
Who is the registered agent or signatory for Samcord?
A. Emeka Toni Ibe.
Q. So we're back on 303-A.
I'm blowing this up again. So we're looking at the Samcord June 6th, 2018, business application agreement.
Is there a phone number associated with this business account?
A. There is.
Q. And what is that phone number?

A. It's (630) 854-0699.
Q. I'm now scrolling to page 3 of the document.
What is the name of the authorized signer listed on the account application?
A. Emeka Toni Ibe.
Q. Who is Emeka Toni Ibe?
A. That's an alias used by Anthony Ibekie.
Q. I'm now scrolling to page 4 of the document.
Who is the name listed on this portion of the document?
A. Toni Ibe Emeka.
Q. And who is Toni Ibe Emeka?
A. That's a variation of the "Emeka Toni Ibe" name. Ultimately, they were both used by Anthony Ibekie.
Q. So we've seen "Emeka Toni Ibe" and "Toni Ibe Emeka" both on the same document?
A. That is correct.
Q. And these are both alias names of the defendant?
A. That is correct.
Q. And, Special Agent Kadonsky, directing your attention to the signature on this document, have you seen this signature or something similar before?
A. I have, yes.
Q. And whose signature is this?
A. That's Anthony Ibekie's signature.

Q. So I'm pulling up what we just looked at, 303-A, and I'm putting it to the left-hand portion of the screen.

I'm also showing you 301-B, which we just reviewed as well. I'd like to have you take a look at these side by side.

So I'm scrolling to page 4 of the document on 303-A. And I'm also staying on the first page of the document for 301-B.

Do these signatures appear similar to you, Special Agent Kadonsky?

A. Yes, they do.

Q. And who is the signature on the left supposed to be for?

A. It is supposed to be for Toni Ibe Emeka.

Q. And who is the signature on the right supposed to be for?

A. Emenike Tonero.

Q. And who does it appear signed both of these documents?

A. Anthony Ibekie.

MS. NUTINI: Publishing Government's Exhibit 311-A, which is in evidence.

BY MS. NUTINI:

Q. Special Agent Kadonsky, what are we looking at here?

A. This is a business signature card for a Bank of America account in the name of Samcord, Incorporated.

Q. So did we just look at a business -- a bank application agreement for Samcord?

A. We did. This is a different bank, though.

Q. And so we just looked at TCF Bank?
A. That's correct.
Q. And this is Bank of America?
A. That is correct.
Q. I'd like to direct your attention to the bottom portion of the document.
What is the name of the person that's listed on this account?
A. Toni Ibe Emeka.
Q. And what is the date of this application?
A. June 15th, 2018.
Q. And where in time is that from the previous Samcord application we just looked at with TCF Bank?
A. It's fairly close in time.
Q. Is it less than two weeks?
A. Yes, it is less than two weeks.
Q. I'd like to scroll to the second page of the document.
Does it appear that there is some information provided to the bank to open this account?
A. Yes.
Q. And based on the document itself, what type of information was provided?
A. The document lists a foreign passport along with a passport number with an issuer of Nigeria.
Q. Is this information that you are familiar with from another

source?
A. It is.
Q. What source?
A. During a search warrant at Anthony Ibekie's residence, a passport bearing the name Toni Ibe Emeka was recovered. That passport contained Anthony Ibekie's photograph but not his name.
Q. I'm going to move this 311-A to the left. And I'm also going to pull up Government's Exhibit 719-4, which has been admitted into evidence.
Special Agent Kadonsky, can you compare the passport number listed in the application with the passport number identified on the passport itself in 719-4?
A. Yes, the passport number listed on the bank records is A01677289. The passport photo, the number listed on that is the same number, A01677289.
Q. And is the other information contained within the passport similar to the information provided to the bank?
A. Can you zoom in on the passport?
Q. I can.
A. It's a little hard to see.
Q. Of course.
A. Yes, it was.
Q. In both of these, do they both list the name Toni Ibe Emeka?

A. That is correct.
Q. And who is the individual identified in the photograph on this passport?
A. The person in the photograph on the passport is Anthony Ibekie.
Q. And does the name Anthony Ibekie appear anywhere on the passport?
A. No, it does not.
Q. Does the name Anthony Ibekie appear anywhere on Government's Exhibit 311-A to the left?
A. No, it does not.
Q. Okay. Let's shift gears a little bit and discuss another topic, which are e-mail accounts and some of the investigative tools relating to e-mail accounts.
A. Okay.
MS. NUTINI: Your Honor, can we please have read Stipulation No. 3 into the record?
THE COURT: Yes.
We will pull it up for the screen -- on the screen for the jurors to see.
All right. Everybody see that okay?
All right, folks. I'm going to read Stipulation No. 3 into the record.
Here it goes:
"If called to testify, a records custodian from

Google, LLC, ("Google") would testify that as a custodian of records, his or her responsibilities include maintaining and retrieving records of Google. The records custodian would further testify that government exhibits," colon, and then there are six subparagraphs (a) through (f). So let me just read them in order.

Subpart (a): "Government Exhibit 201 contains true and accurate copies of e-mails marked 201-2, 201-3, and 201-5 from the Google account saniukwu1@gmail.com kept by Google."

That's spelled s-a-n-i-u-k-w-u-1 at gmail.com.

Subparagraph (b): "Government Exhibit 503-1 contains true and correct copies of subscriber records from the Google account at aibekie@gmail.com kept by Google." That's spelled a-i-b-e-k-i-e at gmail.com.

Subparagraph (c): "Government Exhibit 503-2 contains true and correct copies of subscriber records from the Google account aristoblake@gmail.com kept by Google." That's spelled a-r-i-s-t-o-b-l-a-k-e at gmail.com.

Subparagraph (d): "Government Exhibit 503-3 contains true and correct copies of subscriber records from the Google account saniukwu1@gmail.com kept by Google." And, again, that's spelled s-a-n-i-u-k-w-u-1 at gmail.com.

Subparagraph (e): "Government Exhibit 503-4 contains true and correct copies of subscriber records from the Google account constantconsultant200@gmail.com kept by Google."

Subparagraph (f): "Government Exhibit 503-5 contains true and correct copies of subscriber records from the Google account ued@standardgroupservices.com kept by Google.

"The records custodian would further testify that each of these records, number one, were made at or near the time reflected on the e-mails; number two, that it was the regular practice of Google to generate such records; and, number three, that the records were kept in the ordinary course of the regularly conducted activities of Google.

"The parties agree that Government Exhibits 201-2, 201-3, 201-5, 503-1, 503-2, 503-3, 503-4, and 503-5 are admissible in evidence."

It says "So stipulated."

There's a signature by an Assistant United States Attorney. There's a signature for defense counsel. And there's a signature for defendant Anthony Ibekie.

So stipulated?

MS. NUTINI: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: Okay. Counsel, you may proceed.

MS. NUTINI: Thank you, Your Honor.

The government moves to admit and publish Government's Exhibit 201-2, 201 -3, 201-5, and 503-1 through 503-5.

THE COURT: Any objection?

MR. CARLSON: No objection.

THE COURT: They are admitted.

(Government's Exhibit Nos. 201-2, 201-3, 201-5, and 503-1 through 503-5 were received in evidence.)

THE COURT: You can publish to the jury.

MS. NUTINI: Thank you, Your Honor.

BY MS. NUTINI:

Q. Special Agent Kadonsky, as part of this investigation, did law enforcement obtain subscriber records for various e-mail accounts maintained by Google?

A. Yes, we did.

Q. What are subscriber records?

A. Subscriber records are the information that you provide to Google in order to get a Gmail or Google account. They would include things like your name, potentially a recovery e-mail address or recovery phone number or for two-factor authentication.

Q. And why are subscriber records useful for law enforcement in an investigation?

A. They help us identify who is opening the Gmail account.

Q. And when you say that an individual can provide their name in the subscriber records, can an individual also provide a name that is not their name?

A. Yes, it's whatever -- whatever name you provide to Google, that's what gets recorded.

MS. NUTINI: Publishing Government's Exhibit 503-1,

which has been admitted into evidence.
BY MS. NUTINI:
Q. Special Agent Kadonsky, what are we looking at here?
A. This is subscriber records for -- from Google for aibekie@gmail.com.
Q. And what is the name associated with this account?
A. Anthony Ibekie.
Q. And is there a phone number associated with this account?
A. There is, yes.
Q. What is the phone number?
A. (630) 822-4947.
Q. Is there a nickname associated with the account?
A. Emeka.
Q. I'm now showing you Government's Exhibit 503-2, which has been admitted into evidence.
Special Agent Kadonsky, what are we looking at here?
A. This is Google subscriber information for a Gmail account aristoblake@gmail.
Q. And what is the name associated with this account?
A. Aristo Blake.
Q. Is there a phone number provided as being associated with the account?
A. Yes.
Q. And what is that phone number?
A. (630) 822-4947.

Q. Have we seen this phone number before?
A. Yes, we have.
Q. Where did we see this phone number?
A. This is the phone number that's the same as the aibekie@gmail.com subscriber information. We've also seen it in various places throughout the investigation.
Q. And so this 4947 number was used to register the aristoblake@gmail.com and was also used to register the aibekie@gmail.com addresses?
A. To -- it was included for the subscriber information, yes.
Q. Thank you.
Who is Aristo Blake?
A. Aristo Blake is an alias used by Anthony Ibekie.
Q. And how do you know that?
A. The phone number is the same, as well as throughout the course of the investigation, we learned that this e-mail address, "Aristo Blake," is associated with Anthony Ibekie.
MS. NUTINI: I'm going to publish Government's Exhibit 502, which was previously admitted into evidence.
BY MS. NUTINI:
Q. Special Agent Kadonsky, the jury has seen this exhibit before, but can you remind us what this is.
A. Yes, this is customer account details for an AT&T U-verse account for Anthony Ibekie's residence of 797 Oxbow, Unit 110.
Q. So I'd like to scroll to page 2 of the document.

I'll blow this up for the jury.

Under "Primary Contact Information" for this account, is there a phone number listed?

A. There is.

Q. And what is that phone number?

A. (630) 822-4947.

Q. And is that the same phone number we just discussed as being associated with the subscriber records for both of those e-mail addresses?

A. It is, yes.

Q. Special Agent Kadonsky, while we have this up, I'm going to blow up this right-hand portion under "key/vals."

Do you recall when there was testimony about the IP address associated with this AT&T account at the defendant's apartment?

A. Yes, I do.

Q. I'm going to highlight the bolded portion.

And these are the first four octets; is that correct?

A. That is correct.

Q. And can you read for the jury what those first four octets are.

A. 2600:1700:1cb0:2d80.

Q. And what was the significance of the first four octets of an IP address?

A. The first four octets of this IPv6 -- IP address are the IP

address that's provisioned or static to the customer of the U-verse account.

So, for instance, this account -- this account at Oxbow Avenue where Anthony Ibekie resided, the IP address will have this consistently in the first four octets when it's captured.

Q. As opposed to remaining octets that could be dynamic and change; is that correct?

A. That's correct. The first four stay static, they stay the same. The remaining four are session based, and those can change or vary depending upon the time.

MS. NUTINI: Now I'm going to publish Government's Exhibit 503-5, which has been admitted into evidence.

BY MS. NUTINI:

Q. Special Agent Kadonsky, what are we looking at here?

A. This is Google subscriber information for ued@standardgroupservices.com.

Q. And what is the significance of the e-mail address ued@standardgroupservices.com?

A. This is an e-mail address that we saw throughout the investigation. Several victims, including victim Dale Helms, communicated with ued@standardgroupservices.com. In addition, the undercover operation, the agent, communicated at ued@standardgroupservices.com.

Q. I'd like to direct your attention to the bottom portion of

the screen relating to IP activity.

Do you see that?

A. I do, yes.

Q. And what are the dates for the IP activity that we see here?

A. It's March 30th, 2020, various dates through April 15th, 2020.

Q. I'm going to blow up just a portion of the IP information so that it's easier to see for the jury. I'd like to direct your attention to the first four octets that are in each of these logins or attempted logins.

Do you recognize these first four octets?

A. I do.

Q. How?

A. These are the first four octets from the AT&T U-verse directly provisioned IP address, 2600:1700:1cb0:2d80. That indicates that this IP address was from the Oxbow residence where Ibekie lived.

Q. So, in other words, this e-mail account has IP logins at the defendant's residence?

A. That is correct.

MS. NUTINI: Now publishing Government's Exhibit 503-3.

BY MS. NUTINI:

Q. What are we looking at here?

A. This is Google subscriber records for saniukwu1@gmail.com.
Q. And what is the name associated with this account?
A. Samuel Aniukwu.
MS. NUTINI: Publishing Government's Exhibit 503-4.
BY MS. NUTINI:
Q. What are we looking at here?
A. This is Google subscriber records for constantconsultant200@gmail.com.
Q. And what is the name of the individual associated with this account?
A. Opia Samuel.
Q. Who is Opia Samuel?
A. That's an alias used by Samuel Aniukwu.
Q. Special Agent Kadonsky, as part of this investigation, were search warrants conducted on two e-mail accounts?
A. Yes, they were.
Q. And, generally speaking, what does it mean to conduct a search warrant on an e-mail account?
A. Once the search warrant is sworn out and you have the order, you serve it on the e-mail service provider, in this case, Google. Google will then provide records related to the account, including the e-mails that fall under the responsive search warrant.
Q. And was one of the e-mail accounts searched saniukwu1@gmail.com?

A. Yes, it was.
Q. And is that the account that you testified was registered to the name Samuel Aniukwu?
A. Yes, it was.
Q. Did some of the e-mails contained within that account appear to be correspondence involving Aniukwu and the defendant?
A. Yes.
MS. NUTINI: Publishing Government's Exhibit 201-2, which has been admitted into evidence.
BY MS. NUTINI:
Q. There's a lot here, so let's break this into parts.
Special Agent Kadonsky, can you describe who this e-mail is from and who it is to.
A. This e-mail is from aristoblake@gmail.com to hallmark_security@hotmail.com and constantconsultant200@gmail.com.
Q. Who is aristoblake@gmail.com?
A. That is Anthony Ibekie.
Q. And who is constantconsultant200@gmail?
A. That is Samuel Aniukwu.
Q. Do you know who hallmark_security@hotmail.com is?
A. Hallmark Security is an additional co-conspirator believed to be named Emeka in Canada, but we were not able to identify that individual.

Q. And what is the subject of the e-mail?
A. The subject is "Emeka Canada."
Q. And what is the date and time of the e-mail?
A. June 11th, 2017.
Q. What's the time?
A. 8:12 a.m.
Q. So I'd like to move to the body of the e-mail.
And I'll blow this up for the jury.
Who is -- so the e-mail appears to be signed by a Tony.
Do you see that?
A. That is correct.
Q. Who is Tony?
A. Tony is Anthony Ibekie.
Q. Can you please read the e-mail for the jury.
A. "Emeka, this is the review of what I did with respect to this format. Kindly let me know your views. I believe you have sent to Sama the e-mail and password. You can still include it here in you response.
"I remember you mention that you already have the addresses. You will need to send them to me so I can complete the merging and setting of the mail as it will sent out to the recipient in a single window envelope.
"The second attachment is how the direct mail will appear to the recipient when they receive and open the mail."

Q. Special Agent Kadonsky, do you see a reference to "merging" and "setting of mail"?
A. Yes, I do.
Q. What is your understanding of what that means?
A. That's in reference to a mail merge process, which is where you take a template and a list of names and addresses, for instance, and you merge those together so it will put the names and addresses on the template for printing purposes.
Q. And what is the relevance of mail merging to this investigation?
A. We saw approximately 200 Excel spreadsheets containing names and addresses, as well as templates for the inheritance fraud.
Q. Special Agent Kadonsky, I'd like to scroll to the second page of the document.
Does it appear that there are some attachments attached to this e-mail?
A. Yes.
Q. Scrolling to page 3 of the document.
Does this appear to be one of the attachments?
A. Yes, this is one of the attachments.
Q. And, generally speaking, what are we looking at here?
A. This appears to be an early variation of a template inheritance fraud letter.
Q. And how about page 4 of the document?

A. This appears to be how the document would look after it undergoes the mail-merge process. Essentially, it's the template with the potential victim's information and then the signature being added.

MS. NUTINI: Now publishing Government's Exhibit 201-3.

BY MS. NUTINI:

Q. Special Agent Kadonsky, what are we looking at here?

A. This is another e-mail. This one is, again, from aristoblake@gmail.com to hallmark_security@hotmail.com and constantconsultant200@gmail.com.

Q. And, again, who is Aristo Blake?

A. That's Anthony Ibekie.

Q. And who is Constant Consultant 200?

A. Samuel Aniukwu.

Q. What is the subject of this e-mail?

A. "Idea."

Q. And what is the date and time?

A. June 11th, 2017, 8:34 a.m.

Q. So is this just a few minutes after the e-mail we just reviewed?

A. Yes.

Q. So I'm going to scroll down to page 2 of the document and expand the content of the message.

Before we read the message, who does it appear this

message is from?
A. This message is from Tony, Anthony Ibekie.
Q. And can you please read to the jury this message.
A. "Emeka, on another thought, since you have the direct mail addresses and I have sent you a sample of the merged e-mail, I suggest you do the merging yourself and send me the already merged letter in a bulk of 100 each, then I can print it, place the stamp in a single window envelope and put them in the mail. I know you said you have 1500 direct mail addresses. That fine. When we exhaust it, we can start using the 3,000 (selective prescreened direct mail) I just ordered.
"God will have mercy on us one day.
"Please forward our correspondences to Onowu."
Q. And next to the signature for Tony, is there a phone number?
A. There is. (630) 854-0699.
Q. And is this a phone number that we have seen on any other exhibits throughout the course of this trial?
A. Yes, it is.
Q. I'm going to publish for you Government's Exhibit 504.
Special Agent Kadonsky, do you remember when this exhibit was admitted during trial?
A. Yes, I do.
Q. And, generally speaking, what is this exhibit?
A. This is an exhibit. It's an application for naturalization

that was put on while Special Agent Sixto Luciano was testifying.

Q. And is this an application for naturalization for the defendant, Anthony Ibekie?

A. It is, yes.

Q. I'm scrolling to page 3 of the document.

What's the phone number that the defendant provided in this application?

A. (630) 854-0699, the same phone number as the e-mail.

Q. That we just reviewed?

A. That is correct.

Q. I'm also showing you Government's Exhibit 303-A, which is a business account application agreement that we reviewed earlier during your testimony.

Do you see a phone number associated with the Samcord, Inc., account when it was registered at TCF Bank?

A. Yes. The phone number associated with the Samcord, Inc., account at TCF is (630) 854-0699.

Q. And when have we seen this phone number?

A. That's the same phone number that was on the naturalization records as well as on that e-mail.

MS. NUTINI: Publishing Government's Exhibit 201-5, which has been admitted into evidence.

BY MS. NUTINI:

Q. Special Agent Kadonsky, who is this e-mail from and who is

it to?
A. This is from aristoblake@gmail.com, and it's to saniukwu1@gmail.com.
Q. And, again, who is aristoblake@gmail.com?
A. Anthony Ibekie.
Q. And who is saniukwu1@gmail.com?
A. Samuel Aniukwu.
Q. What is the date and time of this e-mail?
A. This is September 21st, 2019.
Q. And what is the subject of the e-mail?
A. "Standard."
Q. And does Standard have any relevance to this investigation?
A. It does. The inheritance fraud scheme often used Standard Chartered Bank as the purported bank that the inheritance was from.
Q. And in this e-mail from the defendant to Mr. Aniukwu, does he include a message and an attachment?
A. Yes. The message is just "Hello," and then there's an attachment, FMSCPfizer.docx.
Q. I'm going to scroll to the second page where the attachment is.
And this is an attachment sent from the defendant to Mr. Aniukwu; is that correct?
A. That is correct.
Q. And is this a document that we've seen before?

A. Yes.
Q. What is this?
A. This is an inheritance fraud letter that was mailed out to potential victims.
Q. And directing your attention to the top portion of the screen, is this a logo that we've seen before on these inheritance fraud letters?
A. Yes, it is.
Q. Directing your attention to the second full paragraph, it reads:
"My name is Mr. Peter Pfizer, an account manager with Standard Chartered Bank, London, United Kingdom." And it references a Mr. Van Maxwell who died intestate, leaving behind approximately $11.6 U.S. million.
Is this a template or theme that we've seen before in these inheritance fraud letters?
A. Yes, it's -- the language is very similar throughout the inheritance fraud. A couple of the names change and the dollar amount of the inheritance varies, but consistently this format is utilized.
THE COURT: Could we have a brief sidebar?
MS. NUTINI: Yes, Judge.
(Proceedings heard at sidebar on the record:)
THE COURT: I'm sorry to interrupt you, Ms. Nutini.
Bear with me, folks.

Have we told the jury what it means to die intestate? Do you think they know that?

MS. NUTINI: Your Honor, we can make that clear.

THE COURT: Mr. Carlson, any thought on that?

I think it's legal terminology. I've been wondering up here if we've told the jury what that means.

MS. NUTINI: It's a good idea.

MR. CARLSON: I agree.

THE COURT: I mean, it's obvious to you all. You passed the bar. But I wonder if any of them know what it means.

So just -- I don't make a lot of suggestions up here, but given that it's terminology that you all know like the back of your hand, this jury may not. My suggestion is we tell the jury what that means so they follow along. Okay?

MR. CARLSON: That's fine.

MS. NUTINI: Thank you, Judge.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Counsel. Excuse me there. Go ahead and proceed with your examination.

MS. NUTINI: Thank you, Judge.

BY MS. NUTINI:

Q. Special Agent Kadonsky, you were testifying that this template and this language appears similar throughout what we've seen previously throughout this trial and this

investigation; is that correct?
A. That is.
Q. And when it reads "Unfortunately, this customer died intestate," what does "intestate" mean?
A. So intestate, my understanding is that it's a customer that was in a different country that did not have a beneficiary or a next of kin.
Q. In other words, someone who dies without a will?
A. That is correct.
Q. So is this a term that's used to state that, you know, if you die without a will, then you have left behind something intestate?
A. Yeah, so no beneficiary, no will, things like that.
Q. And directing your attention to the bottom portion of the letter, do you see a signature from a Mr. Peter Pfizer?
A. I do, yes.
Q. And is this a signature that -- the template and the signature something we've seen or something similar we've seen before?
A. Yes.
Q. Is there an e-mail address associated with the signature?
A. Ppfizer@yandex.com.
Q. And let me ask you first, when we've seen these template letters, has the e-mail address changed for Peter Pfizer?
A. Yes, there's varying e-mail addresses used for Peter Pfizer

throughout the investigation.
Q. So in this one that's attached to the e-mail from the defendant, what is the e-mail address?
A. Ppfizer@yandex.com.
Q. Are you familiar with Yandex.com?
A. I am.
Q. And what is Yandex.com?
A. Yandex.com is an e-mail service provider. I believe it's based out of Russia.
Q. And is ppfizer@yandex.com an e-mail address that you've seen before?
A. It is, yes.
Q. And where have you seen it?
A. I've seen this e-mail address throughout the course of the investigation when dealing with correspondences or victim communications, in particular, for Gary Foster.
MS. NUTINI: May I have a moment, Your Honor?
THE COURT: You may.
(Counsel conferring.)
MS. NUTINI: That's all I have for today.
THE COURT: Okay. Thank you, Counsel.
Mr. Carlson?
MR. CARLSON: No questions, Your Honor.
THE COURT: Okay. Sir, you may step down. Thank you for coming. Please watch your step.

THE WITNESS: Thank you, sir.

(Witness excused.)

THE COURT: Counsel, could we have a very brief sidebar?

MS. NUTINI: Yes, Your Honor.

(Proceedings heard at sidebar on the record:)

THE COURT: All right. Just waiting for him to put his headset on.

There we go.

I'm making sure that the plan is to still the plan. The government does not have any more witnesses for today. You've got two more victims that you're going to testify to tomorrow, but you're -- you've shot your wad for the day, and you're done for the day, and you'd like to resume tomorrow morning with the jury; is that right?

MS. NUTINI: Yes. That's correct, Your Honor. So it will be the two victims tomorrow followed by the remainder of Special Agent Kadonsky's testimony.

THE COURT: Got it. Okay.

Anything to say other than just let the jury know that we're letting them go early and we're going to resume tomorrow at 9:00 o'clock?

MS. NUTINI: Yes, Your Honor, just briefly with respect to when you admonish the jury at the end of the day to not discuss the case with anyone, as you always do, given that

one of the jurors has indicated -- or at least a family member of the juror has indicated that they have family members watching the trial, we would ask that you specifically admonish the jurors to not discuss the case with anyone, including their family members.

THE COURT: That's a great idea. That's a great idea. Good suggestion. Thank you for that.

I wonder if we ought to start a little bit later for these folks tomorrow. If we've got two people -- should we start at 9:30 tomorrow? Should we let them sleep in a little?

MS. NUTINI: That's fine with the government.

MR. CARLSON: That's fine, Judge.

THE COURT: I think that's a little better for them, don't you think, on a Friday?

I mean, when we're done with the jury today, we're going to talk about our plan for tomorrow.

By way of a preview, Mr. Carlson, how much time do you think you're going to want to spend tomorrow on your case? Any idea?

We'll talk about it in a moment here, but --

MR. CARLSON: Judge, at this point, I don't really know. I am thinking that, if any, it would be very short.

THE COURT: Okay. The only reason I ask -- and I'm not putting you on the spot this second -- is I wouldn't want to have them come later, meaning come at 9:30, if it's going to

put you in a crunch tomorrow.

MR. CARLSON: It will not, Judge.

THE COURT: I'm going to tell them we're going to let them go early and come late tomorrow.

Is that good?

MR. CARLSON: That's fine.

THE COURT: Okay. All right. Thanks, folks.

(Proceedings heard in open court:)

THE COURT: All right. Folks, bear with us. Thank you.

You are done for the day. You are done for the day.

I will take note of the smiles on your faces.

So we're done a little bit early. This is a nice, clean, logical breaking point. So I just thought why don't we let you go a little early today. Okay?

And on a related note, we're going to let you not only leave a little early today, we're going to let you come a little bit later tomorrow. We're going to get going at 9:30 tomorrow. Okay?

Hopefully that will be a little more humane. You know, it's not easy coming to downtown Chicago. It's not easy coming to downtown Chicago and being here and ready to go at 9:00 o'clock. Right? That's not easy. So we're starting a little bit later in celebration of Friday.

And I think we -- I'll -- I don't want to make any

predictions about how long this will go. I will simply say this: We are certainly on track and maybe better than that. Okay? I'll just leave it at that.

So the fact that we're ending early today and starting a little later tomorrow is a sign that we're in good shape from a timing perspective, I think. Okay?

So everybody understands the plan?

So we're going to be done for the day. Come back tomorrow morning. Why don't you just be here, like, let's say, 9:15, 9:20, somewhere in there. Just be ready to go at 9:30, and we'll get rolling as soon as everybody is here.

Please take your jury notebooks with you.

The other thing I would say is, by way of a remainder, please don't talk to anyone about the case, anyone, anyone, anyone. For example, if any friend of yours is in the gallery, if any family member of yours is in the gallery, you know, anybody at all, you can't tell your Uber driver about it, you can't tell the person sitting next to you on the train. You can't talk to anybody about it, not even each other.

When you go back there today, you can wish each other well, you can talk about the Bears, talk about the Cubs, you cannot talk about the case until I tell you you can talk about the case at the very end. It's really, really important. All right?

So thank you for doing that. And bear with me that

I've repeated it. It's just important. Okay? So bear with me. I know you know the drill, but I still need to say it every day. Okay?

So please keep an open mind. We're going to see you tomorrow morning. We're going to get going right at 9:30. Come a little bit early. We'll have another good breakfast for you. Compliments to Ms. Ramos.

We'll see you tomorrow. Have a safe trip home, folks. We'll see you tomorrow. Take care.

THE COURT SECURITY OFFICER: All rise.

(Jury out at 3:48 p.m.)

THE COURT: All right. Have a seat, everyone.

That was a rather spontaneous exuberant expression of smiles when I said we're leaving early for the day. There was zero pushback at all, but I think that was a good suggestion.

You know, a lot of this exercise, I think, is keeping the jury in good spirits, feel like they understand things, feel like they're appreciated because then they're attentive. And I want to get things right, so I try really hard in the courtroom to keep them engaged and respected and feeling like they're taken care of, because then they want to be here. They're engaged. They feel part of the process.

So letting them go a little bit early every now and again and come a little later just shows that we care about them as people. And I think it means they're -- when they come

tomorrow, they'll be attentive. They're not like dragging in here in a bad mood. I want them -- I want a good vibe in the jury box, and I think we have that, as far as I can tell. I think they're getting -- that's my reaction of that for what it's worth.

I did want to follow up before I forget on the issue with the IRS agent who thinks he may know somebody on the -- one of the alternate jurors.

I took Mr. Carlson's suggestion. I asked everybody if they know anybody. Nobody reacted when I said does anybody have anything to disclose.

Mr. Carlson, were you satisfied with that? Was that enough for you?

MR. CARLSON: I am satisfied, Judge.

THE COURT: You --

MR. CARLSON: I am satisfied.

THE COURT: You are satisfied. Okay.

I tried to do it in a low-key way and make sure nobody felt on the spot. I didn't detect any reaction from anybody.

Anything else to add on that? Anything?

MR. CARLSON: Judge, I specifically was watching the woman who was involved, and she did not show any acknowledgment that we were talking about her at all.

THE COURT: Yeah, that was my read of it, too.

So, Ms. Nutini, good job flagging that. That was the

right thing to do. You know, when something like this comes up, it's always better to just front it, and then it's a nonissue. So good job doing that. So thank you for doing that.

Okay. So I have a couple of things I want to talk about. I know Mr. Carlson wants to talk about Exhibit 5.

Do you all want to take a five-minute break? Anybody need that? Or do you want to just roll forward? Everybody good?

MS. NUTINI: I think we're -- we're ready.

THE COURT: Okay. Before I forget, let's talk about the jury instructions conference. I think tomorrow after we are done for the day, we should plan on talking about the jury instructions.

MR. CARLSON: It makes sense.

THE COURT: Does that work for everybody?

MR. CARLSON: Yes.

THE COURT: And I may have misunderstood you. Did anyone say that they have a supplement that they expect to file or any -- any update or -- or did you just want to handle it at the conference tomorrow and talk things through with what's been previously --

MR. CARLSON: Judge, I think what I mentioned was we have some instructions that we did -- if the defendant testified, if the defendant didn't testify --

THE COURT: Right. Sure.

MR. CARLSON: -- if the defendant presented evidence, if they didn't present evidence, things like that that we just have to clean up.

THE COURT: Exactly. That makes -- makes sense to me.

Based on how trial has gone, does anybody have any new or different instructions to propose?

I assume not, but I don't know. Any changes? Or can I just go with whatever you filed before?

MS. NUTINI: Your Honor, we have no new instructions to propose. We do anticipate striking a portion of the instructions relating to aiding and abetting.

THE COURT: Okay.

MS. NUTINI: We don't anticipate moving forward with that theory or that charging theory.

THE COURT: Okay.

MS. NUTINI: And so we -- we anticipate a slight revision --

THE COURT: Okay.

MS. NUTINI: -- similar to sort of whether the defendant testifies or not. So we are happy to provide you a revised version --

THE COURT: Yeah.

MS. NUTINI: -- of the instructions before tomorrow.

THE COURT: That would be helpful.

If you don't mind doing this: It would help me if you would be kind enough to file a revised proposed set of jury instructions and attach a redline. That way Mr. Carlson can know exactly what's stricken. It will be clean in the record.

Mr. Carlson, if you have any objections, large or small, to any of the proposed changes, I want you to tell me.

MR. CARLSON: Will do.

THE COURT: And so please confer before you do that. That way I'll know what you're changing and that way I'll have the updated set.

Does that work for everybody?

MS. NUTINI: It does, Judge.

THE COURT: Okay. Does that sound good?

MR. CARLSON: Yes.

MS. NUTINI: Okay. So, Your Honor, just to be clear, so we'll --

THE COURT: Yeah.

MS. NUTINI: -- plan to do, you said, the charge conference tomorrow afternoon?

THE COURT: I think so. Is that okay?

MS. NUTINI: It does work, Your Honor.

And then also, just while we're on the topic of scheduling, can we set a time, whether that be this afternoon, for you to admonish the defendant about testifying?

THE COURT: Yeah, I gave him a little previous -- or

earlier I gave him a little admonishment -- that's the wrong phrase.

MS. NUTINI: Yeah, I don't mean to say admonish. I'm sorry. Colloquy.

THE COURT: A colloquy about this.

Let me do an informal one now, and I'll do a more formal one when the time comes.

But, Mr. Ibekie, I'm going to repeat what I said to you before. You have an absolute right to testify, and if you want to testify, then you can do that because you're a criminal defendant. And it's not up to your lawyer; it's up to you.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I'm sorry?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. And you also have an absolute right not to testify. If you don't want to testify, you don't have to testify. Nobody can make you testify.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And do you understand that if you choose not to testify, I'm going to tell the jury they cannot hold it against you that you didn't testify because you don't have to do anything except show up.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I want you to talk through this issue with your lawyer.

Have you done that already? Have you talked with your lawyer about whether you should to testify?

THE DEFENDANT: Yeah, we've talked a little bit about it.

THE COURT: Okay. I need you to talk a lot about it, not a little bit. I need you to talk a lot about it. So before tomorrow, I'm going to need to make sure that you and Mr. Carlson have really talked it through, and I want to make sure that you listen to Mr. Carlson. You don't have to follow Mr. Carlson's advice. You don't. It's up to you. But you should talk to him because he's here to help you. Okay? So I want you to take advantage of the fact that you've been afforded counsel here who is sticking up for you. I want you to talk to him about it and listen to the pros and cons and listen to his advice.

Is that okay?

THE DEFENDANT: Yes. Thank you for the kind words. I will do that.

THE COURT: Mr. Carlson, do you have enough time to do that before tomorrow? And have you gone over these issues with him so far?

MR. CARLSON: Judge, we have talked about it several

times --

THE COURT: Yeah.

MR. CARLSON: -- but I will be happy to sit down and discuss it with him again before we start tomorrow.

THE COURT: Okay. I appreciate that.

And, Mr. Ibekie, I'm going to go through a long list of questions on this tomorrow covering a lot of the same ground. Please bear with me when I do that. I'm not doing this to try to talk you into anything one way or the other, and I don't mean to repeat the same point.

The only reason I'm doing it is it's important. You know, one of my jobs as a judge here is to have a fair process for criminal defendants, and I want to make sure you understand the rules, understand your rights and know what your options are. Okay?

So we're going to talk about this again tomorrow. It's not because I'm trying to harangue you. I'm trying to make sure you understand the process and trying to make sure the process is fair to you.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. So we'll cover that again tomorrow.

What I usually do is do that after the government rests. You know, so we'll do that.

All right. So the -- thank you for that, Ms. Nutini.

A good suggestion.

So the government has a couple of witnesses tomorrow. It sounds like it will be an hour or so, give or take. We'll start at 9:30.

We might finish the two before the midmorning break?

MS. NUTINI: So --

THE COURT: Maybe I heard you wrong.

MS. NUTINI: The two victims --

THE COURT: Yeah.

MS. NUTINI: -- I believe, will be about an hour. I still think Special Agent Kadonsky has at least an hour left --

THE COURT: An hour left. Okay. So --

MS. NUTINI: -- of his testimony.

THE COURT: Got it.

MS. NUTINI: So probably about two hours in total.

THE COURT: Okay. So maybe we'll finish around lunch, give or take, somewhere in there, since I had them come a little bit later.

Without holding the defendant to it, do you have any predictions, Mr. Carlson, for what you expect for tomorrow?

I know we've got to talk about Exhibit 5 here. But bracketing that, and with a -- with the understanding that the defendant doesn't have to make up his mind yet whether he wants to testify, what would you reasonably expect we should expect for you tomorrow, if anything?

MR. CARLSON: Judge, as it stands right now, it will be very short.

THE COURT: Okay. Fair enough. Perfectly fine.

Whatever you'd like to do, you'll do. So I'm not going to press you now on whether he's going to testify, but we'll talk about that in the morning again. Okay?

MR. CARLSON: Fine.

THE COURT: Should we talk about Exhibit 5?

MS. NUTINI: Yes, Judge.

THE COURT: Defendant's Exhibit 5. So, Mr. Carlson, you were kind enough to flag for me that you wanted to talk about that issue again.

I issued an order before trial that gave my preliminary rulings on various exhibits, and part of that was Defendant's Exhibit No. 5.

Do you all have a copy in front of you?

MR. CARLSON: Yes, Judge.

THE COURT: All right. So, you all know which ruling I'm talking about, obviously?

I can pull the docket number if you want, but everybody knows.

MS. NUTINI: Yes, Judge.

THE COURT: All right. So Exhibit No. 5 is a document that spans, it looks like, four pages, Mr. Carlson.

MR. CARLSON: Yes, Judge.

THE COURT: And it's entitled "Nigeria Immigration e-Passport Application Form." So the first page is a form with some handwriting on it. The second page says "Nigeria Immigration Service Headquarters." The third page also says "Nigeria Immigration Service Headquarters." And the fourth page says the same at the top.

By the look of things, just looking at it, it looks to me like the first page is an application form for a Nigerian e-passport, and the next three pages purport to be documents from some government agency in Nigeria. That's what it purports to be, it looks to me.

So I would be curious to hear a proffer from you, Mr. Carlson, about the document. Please just explain to me what it is, who would lay the foundation for it, if anyone, what the relevance would be, why it's admissible. And I'm all ears.

So go ahead.

MR. CARLSON: Sure, Judge.

The heart of the set of the exhibits is that Emenike Tonero, Toni Emeka Ibe, Anthony Bekas (phonetic) Georgia, and Ibekie Emeka is the same person.

And we would be seeking to bring that in, Judge, under 18 U.S.C. 3505, which is foreign records of a regularly conducted activity. And I think it is relevant, especially in light of some of what we saw today about the aliases supposedly

used by Mr. Ibekie and also in the passport fraud issue.

And so I think that it is admissible pursuant to 3505, and that's what we would be seeking admission for.

When Your Honor issued the ruling, I think Your Honor was ruling on that under -- this as a business record, which it is a record of -- a business record of the Nigerian government as opposed to individual businesses, which were the other exhibits that Your Honor ruled on. And you ruled those were inadmissible because they were irrelevant.

This is a different type of document, and I think it is -- this document is relevant.

THE COURT: Okay. So let me ask an authentication question.

The statute that you referred to covers documents from a foreign government; is that right?

MR. CARLSON: Yes, Judge.

THE COURT: And so how do I know that this is what it purports to be? What's the authentication --

MR. CARLSON: Judge the --

THE COURT: -- for it?

MR. CARLSON: -- the -- the attestation to the -- that is included here and the certificate of authentication --

THE COURT: Okay.

MR. CARLSON: -- I think that is what makes it admissible. And I don't think that anything else needs to be

done.

THE COURT: So your view would be there's a certificate of authentication that lays the foundation. I don't have to peer behind whether the certificate of authentication is in fact authentic. That would be an argument for the government to poke holes at if they wanted to, I suppose, would be your position; is that right?

MR. CARLSON: That's correct, Judge.

THE COURT: Okay.

All right. What's the government's -- well, let's bracket relevance for a second, and let's just talk about authenticity.

Does the government have an authenticity objection at all?

MS. NUTINI: We do, Your Honor.

If you look at this statute, 18 U.S.C. 3505, that defense counsel is referring to, the -- there are -- under subsection (a)(1), it then lists sort of the requirements for a foreign record to be admissible. And my understanding is this would -- this would allow the document to be self-authenticated. It would also allow it to not be excluded by the rules of hearsay. So it sort of addresses both authentication and hearsay.

However, at the end of -- after listing out (A), (B), (C), and (D), it says, "Unless the source of information or the

method or circumstances of preparation indicate lack of trustworthiness."

That is the threshold issue here, Your Honor. These documents are not trustworthy.

There is a process that you can go through to obtain foreign documents from a foreign entity. There's a reason that this process is gone through, and it involves issuing letters rogatory. It involves --

THE COURT: I've done that before, yeah.

MS. NUTINI: It involves -- involving the Department of State. And that was not done in this case, Your Honor. And the reason that it's so important to do that is for this very reason. The government is left with a document that purports to have a signature from a foreign entity. And if Your Honor allows it, that's -- cross-examination is not going to address the issues that would result from allowing the jury to see this type of document. It's not a trustworthy document.

THE COURT: Where did this document come from? Was it from -- just produced by the defendant here? Or how did it emerge?

MS. NUTINI: Your Honor, your guess is as good as ours.

THE COURT: Like, where did you get it?

MS. NUTINI: It was provided in connection with trial.

THE COURT: Okay. Where did the defendant get it and

how --

MR. CARLSON: Judge --

THE COURT: -- did he get it and who provided it and all that stuff?

MR. CARLSON: It was sent to me by one of Mr. Ibekie's business associates in -- in Nigeria.

THE COURT: Okay. Not from the -- you didn't get it from the government itself?

MR. CARLSON: Judge, I did not. Mr. Ibekie has friends and family in Nigeria. They offered to go to the immigration service headquarters and obtain these documents, and this is what they sent me.

THE COURT: Okay. Do you know anything about that person or who it is or how they're related to Mr. Ibekie, if at all, and where they got it?

MR. CARLSON: Judge, all I know is that this was provided to me by -- and I don't recall the gentleman's name as I sit here, but he provided these to me and said -- and I know he purported to have to wait to get these documents.

THE COURT: Let me ask you a rhetorical question.

MR. CARLSON: Yes.

THE COURT: Imagine if I hopped online and typed in Sauka Airport Road in Abuja, Nigeria, what level of confidence do you have that I would get a hit for the Nigeria Immigration Service Headquarters? Have we kicked the tires on that?

MR. CARLSON: Judge, I cannot myself say that I have any -- there is no way I can vouch for the credibility of this other than what I was told.

THE COURT: Can I ask a question that I should know the answer to? What is the official language in Nigeria?

MS. NUTINI: Igbo, I believe.

THE COURT: How do you spell that?

MS. NUTINI: I-g-b-o, I believe.

THE COURT: Is it strange that the certificate of authentication is in English? Is that what you would expect if the language --

MS. NUTINI: Your Honor, there are a lot of strange things about this document.

THE COURT: Do you want to just spell out what you see as strange.

MS. NUTINI: Well, Your Honor, there are typographical errors in the document. For example, Emenike Tonero is spelled incorrectly. I don't know if that's on purpose or if that's a mistake.

There are quotation marks next to "Administrative Office" on the second page of the document where this purported Osuaga, Mary signed it. As Your Honor indicated, the document is in English. I don't believe that is the native language in Nigeria, as Your Honor --

THE COURT: I mean --

MS. NUTINI: -- noted.

I mean, there is a stamp -- however, it is not a raised seal or anything -- on this document. It's a stamp that I believe would be pretty easy to create.

THE COURT: I mean, "Anthony" is misspelled. There's some odd capitalization. I mean --

MS. NUTINI: It's also just a bizarre record, Your Honor, that sort of gets at the heart of some of the charges in this case. So it seems a bit convenient.

THE COURT: Is that the official name of the agency, Nigeria Immigration Service? Do we know? Is that it?

MS. NUTINI: We believe that is correct.

THE COURT: And do they use the phrase "Nigeria Immigration Service Headquarters"? Is that -- is that lingo a thing? If I Google that, am I going to be impressed?

This seems to me this is knowable. If there is a Nigeria Immigration Service Headquarters facility on Airport Road in Abuja.

Has the government looked into that?

Now, it could be the case that it is there and the document still could be inauthentic, but I can't envision any scenario in which this document would be real if there's no facility at the address. And I'm just wondering about that.

MS. NUTINI: Your Honor, based on a Google search that my colleague just did, the Nigerian Immigration Service

Headquarters, that is the name of the entity, according to this Google search, and the address is at Umar Musa Yar Adu'a -- that's, U-m-a-r, space, M-u-s-a, space, Y-a-r, space, A-d-u, apostrophe, A -- Express Way Airport Road.

THE COURT: Okay. So we've got Airport Road.

So is that the same or different, do you think?

MS. NUTINI: Your Honor, it's unknown. I think either way, it -- you know, if it's the same, then that's because somebody did their research as to how to make this look more authentic, from the government's perspective. If it's different, then I think that's a huge red flag as well.

THE COURT: The lingo just reads in an awkward way to me. Now, maybe that's a translation issue or maybe that's a red flag. It says it was sworn before the high court judge. It says "High Court Registry."

We have different stamps here. One stamp says "High Court Registry." The other one says "Nigeria Immigration Service." The dates are different.

I mean, if I really, really dig into this document, do you think I'm going to feel better or worse about reliability?

I mean, what do you -- I mean, like, "hereby" is misspelled. There's a space in there. It doesn't look like a professional-grade legitimate document to me. It doesn't mean it's not, but it just isn't the kind of thing that you would typically see from an agency of a sovereign nation. I don't

know.

What do you think, Mr. Carlson? What's your reaction to that?

MR. CARLSON: Judge, the only thing I can say -- and I -- while Igbo may be a language that is spoken in Nigeria, they do speak English in Nigeria.

The people that -- or the person that I was dealing with knew that we had to have records that we would be able to understand.

THE COURT: Yeah.

MR. CARLSON: So I assume, and maybe incorrectly, that what he did was have this -- whoever in the Nigerian Immigration Service do this in English so we'd be able to read it and understand it.

THE COURT: Mm-hmm. So by way of a proffer, Mr. Carlson, it -- bear with me -- it sounds like you personally didn't get this from the Nigerian government through official channels or through unofficial channels; you got it from someone in Nigeria that the defendant knows, and it sounds to me like you don't know that person. I'm not sure if you've ever spoken to that person, but you don't know who that person is or where they got the document from; is that right? Have I overstated that?

MR. CARLSON: Judge, I can say that I do not know the person. I have not talked with that person. I have e-mailed

several people.

THE COURT: Right.

MR. CARLSON: And I received these documents through e-mail being told that they went to the immigration office and obtained these documents.

THE COURT: Okay.

MR. CARLSON: And I have -- I have no way -- I do not and cannot vouch for the credibility of the documents themselves or the person that purportedly got me the documents.

THE COURT: Okay. Anything else that people want to say about authentication?

I'm going to go over this with a fine-toothed comb. And if anyone from either side wants to kick the tires on it and file anything, you can. I'm going to go over this pretty closely and see what I think about reliability.

But from an authentication issue, does anybody have any thoughts?

MS. NUTINI: Your Honor, only to point that it does not meet the requirements of 18 U.S.C. 3505 given the lack of trustworthiness. It also does not meet the self-authenticating requirements of 902(3) for a foreign record.

THE COURT: Yeah.

MS. NUTINI: And as defense counsel indicated -- well, first, it didn't follow the proper channels to receive a foreign document.

Secondly, as defense counsel indicated, he doesn't know who he corresponded with.

As Your Honor has seen, there are numerous e-mail addresses and alias names that have been used in this case alone during the trial presentation. And so who knows who was behind the e-mail address that Mr. Carlson was communicating with.

So I think the lack of trustworthiness is at all angles and at sort of every- -- everywhere you look with respect to this document.

THE COURT: And, Mr. Carlson, I have not seen the e-mail, right, where you got it?

MR. CARLSON: No, Your Honor.

THE COURT: Is that something I should see? I mean, that wouldn't be privileged, I wouldn't think, but . . .

I mean, I don't know what e-mail address you got it from. I wouldn't think it would be privileged, but I don't know. I mean . . .

MR. CARLSON: And, Judge --

THE COURT: This is a little bit of a -- I'm thinking out loud here, Mr. Carlson.

MR. CARLSON: I understand. And I'm trying to remember what else was said in the e-mail. That's all --

THE COURT: Okay.

MR. CARLSON: -- I'm trying to think about. And I

don't, off the top of my head, recall whether there was anything else or not. I believe there was.

THE COURT: Well, here's what I'd like you to do if nothing else, Mr. Carlson: I'd like you to -- well, let me back up.

Has the government seen the e-mail --

MR. CARLSON: No.

THE COURT: -- where you got it?

Okay. What I'd like you to do is bring the e-mail to court tomorrow morning. Just bring a couple copies. We'll talk tomorrow about if there's any issue with whether we can see it. I don't expect that there would be, I mean, it seems to me, if it has to do with origin of a document. I don't see any privilege issues, either.

Does anybody have any issue with that?

I don't know what e-mail address you got it from, you know.

MR. CARLSON: We got -- I --

THE COURT: And let me be just a hundred percent clear on this. I take everything you're saying at face value, Mr. Carlson. So please understand that. I don't mean this in a negative way at all. But, you know, if there's an issue about reliability, I don't know who's e-mailing you the documents, and I wonder if I should have a record on that.

Go ahead.

MR. CARLSON: Judge, I was going to say I have no problem bringing the e-mail. If I could just look at the e-mail to determine that there isn't anything else in there --

THE COURT: Yeah, fine.

MR. CARLSON: -- that's fine. And if there is any other materials that are related to the defense of the case, I would ask to be able to redact that.

THE COURT: Yeah, why don't we -- we'll take that up as it comes. But go ahead and -- just bring copies tomorrow and be prepared to at least talk about it.

MR. CARLSON: Certainly.

THE COURT: And we'll put a pin in that that we can talk about it.

Okay. Any other authentication issues on this document, anybody?

MS. NUTINI: Nothing further.

THE COURT: Okay. Can we talk about relevance one more time, Mr. Carlson. Can you take it from the top. Explain to me again why you think this is relevant.

MR. CARLSON: Judge, because the government -- as they brought out today on some of these bank accounts, some of these names were used. And this document goes to show that this is the same person.

THE COURT: All right. So what is the government's perspective on relevance?

Imagine -- imagine if we had the president of Nigeria himself testify tomorrow that this is an authentic document, hypothetically, would this be relevant, in your view?

MS. NUTINI: Well, Your Honor, the government agrees these are the same people. They're all the defendant. He used alias names. And so this doesn't advance the ball in the government's perspective.

I think what defense counsel and what defendant are trying to do is say that it couldn't have been passport fraud, for example, because this actually was one of his names. Well, maybe that's convenient for that count, but it doesn't help with the other counts of the case and --

THE COURT: Well, if it's -- if it's relevant to one count, then it's admissible from a relevance perspective, I would think, right?

MS. NUTINI: Well, sure. I mean, we do concede that this is relevant in the way in which the defendant wants to construe this. I mean --

THE COURT: Right.

MS. NUTINI: -- it is relevant that these aliases are all connected --

THE COURT: Right.

MS. NUTINI: -- to the defendant.

THE COURT: Let me put it this way: Apart from authentication, does the government have any other objection to

the admissibility of this document?

MS. NUTINI: Yes, Your Honor, we do.

THE COURT: Yeah, and help me with that.

Go ahead.

MS. NUTINI: We object on hearsay grounds. We also object on Rule 403 grounds. Just because a document is relevant doesn't mean that it's not going to be unfairly prejudicial or confuse the jury. I believe this document would do just that, confuse the jury.

It's not a -- again, from the government's perspective, it is not a trustworthy document.

THE COURT: Yeah.

MS. NUTINI: And so to allow a jury to see that document and have it admitted as evidence in this trial indicates that the Court has blessed it as a trustworthy document.

THE COURT: Help me with the hearsay objection.

MS. NUTINI: Well, Your Honor, I think it gets at whether this is self-authenticating, and if so, under 3505, then it won't be excluded against the rule against hearsay, according to this document -- according to 3505. If it's not, then it has to be a business record to be admissible, and the documents within that.

I mean, this is an out-of-court document that it has to pass the rules against hearsay to be admissible if we're not

looking at 3505.

THE COURT: Does the defendant intend to offer any witness to lay any foundation for this or is it just self- --

MR. CARLSON: No, Your Honor.

THE COURT: -- authenticating.

MR. CARLSON: It's --

THE COURT: It would just -- it would just be --

MR. CARLSON: -- self-authenticating.

THE COURT: -- self-authenticating, okay.

Well, I'll tell you what. I want to read the statute. I want to read the rule. And I want to just drill into this, look at the document.

But what else do you want to say on this document from anybody?

MS. NUTINI: Your Honor, finally, I think going back to the unfair prejudice to the government, if this is a self-authenticating document, who is the government able to cross-examine?

If Kent -- if defense counsel -- excuse me -- is just going to put this document into evidence, the government can't do anything with it with respect to a witness. It unfairly prejudices the government and, again, confuses the jury as to what is the purpose of this document and how are we supposed to understand this without any context.

THE COURT: Okay. Any final thoughts on behalf of the

defendant? Anything?

MR. CARLSON: Judge, that applies with any self-authenticating document.

THE COURT: Yeah.

MR. CARLSON: It's just -- it's the whole purpose behind the self-authenticating document. And I agree that if -- if -- under the rule, if it meets the requirements of 3505, it's not excludable based on the hearsay rule.

THE COURT: Yeah. I mean, the government has presented a lot of documents in this case without witnesses being here. I mean, you can't -- Mr. Carlson couldn't cross-examine anybody from Google today, for example, right?

MS. NUTINI: They weren't contested documents, Your Honor.

THE COURT: Right. No, I understand.

Well -- okay. Anything else, anybody?

MR. CARLSON: No, Your Honor.

THE COURT: Anything else?

MS. NUTINI: No, Judge.

THE COURT: You've got the lay of the land?

Okay. I'll ponder that, and we'll get you a ruling first thing tomorrow morning. I'll spend a little more time looking at this document.

I think we've got a plan for tomorrow, everybody, right?

Let me go over the plan with you.

We were going to convene with the jury at 9:30. I will give you a ruling off the bat on this document. You've got a couple of victims, and then your final witness will testify. You think you're probably going to be done before noon, it sounds like, give or take. I'm not holding you to it, but that's what it sounds like.

And then I will do the colloquy with the defendant. I'll let him know about his rights to testify or not testify.

I don't think I'm hearing any likelihood that we're going to go after tomorrow for a presentation of the evidence. It sounds like if the defendant has anything, you're going to be done pretty promptly tomorrow afternoon. And that's not a suggestion, but that's just what -- I'm reading the tea leaves in the courtroom here; is that fair, Mr. Carlson?

MR. CARLSON: It is, Judge. I don't believe that there's going to be anything tomorrow. However, one of the things that Mr. Ibekie had asked me is that -- and Your Honor had invited us to say that we would like to wait until Wednesday to make any final decisions.

I don't think our decisions are going to change one way or another. And even if they did, it would -- what we would have on Wednesday would be very, very brief.

THE COURT: All right. Well, I think given where we are, I would like you to put your testimony in tomorrow, I

think. I think you have enough time to prepare for it. I think we've only got a couple witnesses, and I would like you to be up to bat tomorrow afternoon. Okay?

MR. CARLSON: That's fine.

THE COURT: So you can sleep on it. I think you'll have enough time to consult with him, but I think we ought to get rolling tomorrow.

MR. CARLSON: That's fine, Judge.

THE COURT: Is there anything else anybody wants to cover? I think we've got a plan for tomorrow.

MS. NUTINI: Your Honor, just very briefly to close the loop on the jury-related issues that Your Honor addressed earlier. Thank you for instructing the jury at the end of today to not discuss anything with their family members.

The -- after you did so and after the jury left, I looked back in the gallery, and it appeared those family members had left. I would ask if they do appear tomorrow, again, not trying to single anyone out, but maybe you could make a statement to the whole gallery just a reminder not to talk to anyone about this case.

It's just, you know, a bit of a delicate situation because there are family members watching the trial and family members who are able to observe proceedings that happen outside of the juries.

And so we just would like to ensure -- and I know that

Your Honor already instructed the jurors, and there's no reason to believe any of the jurors are disregarding Your Honor's orders and are speaking with anyone, but out of an abundance of caution, if those family members are here again tomorrow, we would ask that there be some statement made to the whole gallery.

THE COURT: Okay. And you're saying in the presence of the jury and the gallery, you want me to just say something generally about no talking to the jury, jury don't talk to anybody, nobody talk to the jury, that sort of thing?

MS. NUTINI: I don't know that it even needs to be in the presence of the jury.

THE COURT: Okay.

MS. NUTINI: I think it's okay to do it before the jury comes out or on a break, but we would just ask that the instruction be given on both sides --

THE COURT: Okay.

MS. NUTINI: -- just, again, out of an abundance of caution.

THE COURT: Well, I'll tell you what, why don't you nudge me on that tomorrow. Maybe you can be in charge of leaving yourself a Post-It note, and I'll be happy to say something like that --

MS. NUTINI: Okay. Thank you, Your Honor.

THE COURT: -- so they know.

I don't know that I've ever seen that before, where a juror's family member is here. I did not expect that when the person raised -- have you ever seen that before, Mr. Carlson?

MR. CARLSON: I have never seen that before, Judge. But I must say that I was kind of surprised. I noticed them here yesterday -- or on Tuesday as well, and I just kind of wondered --

THE COURT: Yeah.

MR. CARLSON: -- who they might be.

THE COURT: If I had to guess -- and this is only a guess -- I wonder if that's the mom of one of the younger jurors who is here to pick them up or pick her up. That's just a guess. I have utterly no basis for that other than reading the age in the room and seeing -- this jury has a fair number of younger people in it.

Does anybody think that theory is wrong?

I don't know. That's the best I could come up with. I don't know why else a person would be here. It's unlikely to be for an entertainment value. It's probably -- my best efforts notwithstanding. It's probably a ride issue. Somebody is here, you know, picking somebody up.

But I'm happy to give a reminder tomorrow.

MS. NUTINI: Thank you, Judge.

THE COURT: Anything else, anybody?

MR. CARLSON: No, Judge.

THE COURT: On a lighter note, I was -- couldn't help but -- well, is it Mr. Olson, the reconstruction person? Is that right?

MS. NUTINI: Yes.

THE COURT: While he was testifying today, I think back to the movie Argo. I don't know if anybody saw the movie Argo with the Iranian children piecing together the shredding -- shredded pieces from the 1979 takeover of the American Embassy.

Do you remember that? That's -- do you know what scene I'm talking about? Has anybody seen that movie?

The government needs to watch that movie.

Mr. Carlson, have you seen that movie?

MR. CARLSON: I have, Judge.

THE COURT: All right. So do you know what scene I'm talking about?

MR. CARLSON: Yes.

THE COURT: It's a fabulous movie. But there's a scene where the children were helping the Islamic Republic by piecing together all the shreddings from the American Embassy, and they were making -- do any of the IRS agents know what scene I'm talking about?

You know, they were -- you should use this next time you testify. They were putting together the pieces of all of the -- and they're making the picture of the people who were

taken over. It seemed like a good analog to what was happening today.

But I'm apparently the only one, except for Mr. Carlson, who has seen the movie, so this comment didn't land like I expected.

All right. All right. Good job. I thought all three of you were very smooth. Good job.

We'll look forward to seeing you tomorrow morning. Okay?

Thank you, folks.

MS. DeMARCO: Thank you, Judge.

MS. NUTINI: Thank you.

THE CLERK: All rise.

(Adjourned at 4:28 p.m., until 6/21/2024, 9:43 a.m.)

* * * * *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Amy M. Kleynhans* — *5/27/2025*
Amy M. Kleynhans — Date
Official Court Reporter

*/s/ Sandra M. Tennis* — *5/27/2025*
Sandra M. Tennis — Date
Official Court Reporter

# I N D E X


| WITNESSES | PAGE |
|---|---|
| SIXTO LUCIANO | |
| Direct Examination (Cont'd) By Ms. Nutini | 695 |
| Cross-Examination By Mr. Carlson | 714 |
| EBUKA EGBUNAM | |
| Direct Examination By Ms. DeMARCO | 718 |
| Cross-Examination By Mr. Carlson | 745 |
| Redirect Examination By Ms. DeMARCO | 756 |
| CHRISTOPHER WANG | |
| Direct Examination By Ms. Nutini | 766 |
| LARRY A. OLSON | |
| Direct Examination By Ms. DeMARCO | 785 |
| Cross-Examination By Mr. Carlson | 812 |
| Redirect Examination By Ms. DeMARCO | 815 |
| AMY MANSKER | |
| Direct Examination By Ms. DeMARCO | 826 |
| CHRISTOPHER KADONSKY | |
| Direct Examination By Ms. Nutini | 882 |

| GOVERNMENT'S EXHIBIT | RECEIVED |
|---|---|
| No. 201-2 | 898 |
| No. 201-3 | 898 |
| No. 201-5 | 898 |
| No. 501-6 | 782 |
| No. 503-1 through 503-5 | 898 |
| No. 508 | 850 |
| No. 603 | 774 |
| No. 707 | 712 |
| No. 709 | 711 |
| No. 710 | 713 |
| No. 711 | 710 |
| No. 718 | 698 |
| No. 719 | 734 |
| No. 720 | 805 |
| No. 802 | 802 |
| Nos. 803 through 815 | 832 |
| Nos. 1103 through 1105 | 853 |