IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ) Case No. 20 CR 352
)
v. )
)
ANTHONY EMEKA IBEKIE, ) Chicago, Illinois
) June 21, 2024
Defendant. ) 9:43 a.m.

VOLUME 4
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. PAIGE NUTINI
MS. MEGAN DeMARCO
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For the Defendant: KENT R. CARLSON & ASSOCIATES, P.C.
BY: MR. KENT R. CARLSON
53 W. Jackson Boulevard, Suite 1523
Chicago, Illinois 60604

Also Present: MS. AMY MANSKER, Special Agent
IRS Criminal Investigations

MR. CHRISTOPHER KADONSKY, Special Agent
IRS Criminal Investigations

MR. TUAN DO, Vietnamese interpreter

Court Reporter: AMY M. KLEYNHANS, CSR, RPR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 2318A
Chicago, Illinois 60604
Telephone: (312) 818-6531
amy_kleynhans@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE CLERK: 20 CR 352, USA versus Defendant No. 2, Anthony Ibekie.

THE COURT: Good morning, everybody.

Let's get everyone's appearances on the record, if you would, please.

Start with counsel for the government.

MS. NUTINI: Good morning, Your Honor.

Paige Nutini and Megan DeMarco on behalf of the United States.

Also at counsel table is Amy Mansker and Christopher Kadonsky from IRS Criminal Investigations.

THE COURT: All right. Very good.

Good morning, Ms. Nutini.

Good morning, Ms. DeMarco.

MS. DeMARCO: Good morning, Your Honor.

THE COURT: Good morning, Ms. Mansker.

And good morning, Mr. Kadonsky. That's close enough. A little better, a little better today than yesterday.

Good morning to all four of you.

Defense team.

MR. CARLSON: Good morning, Your Honor.

Kent Carlson on behalf of Mr. Ibekie.

THE COURT: All right. Good morning, Mr. Carlson.

Good morning, Mr. Ibekie.

THE DEFENDANT: Good morning, Your Honor. Thank you for having me.

THE COURT: Good morning, sir. Nice to see you.

I want to say a special thank you to the marshals who are kind enough to be here today. As I often say, you guys are the best in the business. We're lucky to have you in the building. I wish the marshals service got more attention from the public and more appreciation. So you always get it in my courtroom. So thank you for being here today.

All right, folks. We are a little behind this morning through no one's fault. We needed to give some attention to some other places. We had to give the defendant time to talk with his lawyer.

And so it's about 9:45. We have a few preliminary matters to talk about. I'd like to do that during the break instead of making the jury wait back there.

I think there is a correlation between the mood in the jury and the amount of time that they feel like they're having wasted. So I don't want them to get grumpy, even though they probably have hash browns and bacon or something back there. Hash browns can only take you so far in life. I would like to bring them out here as soon as we can.

I do want to talk about the logistics of the day, and I want to talk about anything that you folks want to talk about before we get rolling.

I understand that one of the two witnesses is going to have an interpreter today; is that right?

MS. NUTINI: Yes, Judge. The first witness of the day will require a Vietnamese interpreter --

THE COURT: Okay.

MS. NUTINI: -- that we have brought.

THE COURT: Okay. Thank you for doing that.

You know, I was thinking before I came out here today, I don't know that I've actually ever had a translator during a trial. I've had lots of interpreters during sentencings and other matters. I don't know that I've had it during a trial before. So I want to talk a little bit about the logistics of the room and where that person should go.

I think it makes sense -- notice the phrasing, I think it makes sense for the interpreter to be in the line of sight of the jury. In other words, I think it makes sense for the interpreter to sit over by the witness box somewhere with a microphone, although maybe there's another way of doing it. Maybe a better way to do it is for the interpreter to be at the podium, frankly, as I think about it.

How do they often do it? I don't know.

MS. NUTINI: Your Honor, so we will not have simultaneous interpretation with this interpreter. I understand there's not headphones --

THE COURT: Okay.

MS. NUTINI: -- available. So it will need to be after -- you know, I'll pose a question, he'll interpret it.

So I think either I can stand at this table (indicating), and the interpreter can stand at this one (indicating), as Your Honor stated just now, or the interpreter can -- I just don't know if there's room for another seat, and he may have to be standing and whispering in the witness's ear. It might just make more sense for him to stand at the podium.

THE COURT: Okay.

MS. NUTINI: But I defer to Your Honor.

THE COURT: Okay. Mr. Carlson, I defer to your accrued wisdom here. What do you think?

I kind of like the podium idea as I think about it some more. That would -- is within the line of sight of the jury. They can see what's going on and there's no confusion about who is testifying and who isn't.

But what do you think?

MR. CARLSON: That's fine, Judge.

THE COURT: Okay. Why don't we try that. And if we have to change things on the fly, we'll do it.

I think we should try to do things slowly to make sure that everything is understood.

I understand that the interpreter might be a little bit hard to understand in English.

Is that your expectation? Or do you think that the

interpreter, meaning the person giving the English translation, is easy to understand or hard to hear?

MS. NUTINI: I think he's pretty understandable.

THE COURT: Okay.

MS. NUTINI: He has a bit of an accent from our ears, but he should be fine.

THE COURT: Okay. I will encourage everyone to go slowly. And I will be watchful as this goes along. If I personally have a hard time hearing something, I'll just say, "Can you say that again?"

If I detect a struggle, I may tell the jury, "If you can't understand what was just said, raise your hand." And I'll have the witness -- the interpreter repeat it.

I will only do that, though, if I think it's sufficiently unclear that I want some sort of feedback from the jury. All right? So I'll be the first line of defense in terms of being able to be understood.

So we'll just -- I think I would just encourage everyone to go sufficiently slowly so that everybody can get it today. Okay? And it takes whatever time it takes. Okay?

Anything else on the interpreter, anybody?

MS. NUTINI: Just that we would ask the interpreter be sworn in --

THE COURT: Absolutely.

MS. NUTINI: -- by the Court.

THE COURT: Yep, we'll swear the interpreter in right away. And I'm deputizing you as my reminder guardian person. If I screw this up, I want you to tell me, okay, if I forget.

Anything else on the interpreter, anybody?

MR. CARLSON: No, Your Honor.

MS. NUTINI: No, Judge.

THE COURT: And then what else do you want to talk about for the day?

We've got two victims, and then you're recalling one of the agents, obviously?

MS. NUTINI: Yes, Your Honor. One of the victims is having some delays getting here.

THE COURT: Okay.

MS. NUTINI: And so we --

(Counsel conferring.)

MS. NUTINI: So we might suggest after the first victim goes, we take a bit of an early morning break. If that's not amenable to the Court, then we will regroup.

THE COURT: Okay. How long do you expect the first witness to go?

MS. NUTINI: Probably about 30 minutes.

THE COURT: Okay. So we'll just see how this goes.

Okay. Anything else from the government before we get the jury?

MS. NUTINI: No, Judge.

THE COURT: Mr. Carlson, anything you want to raise?

MR. CARLSON: No, Judge.

THE COURT: Okay. Let's go ahead and get the jury, and we'll get rolling.

(Jury in at 9:49 a.m.)

THE COURT SECURITY OFFICER: All raise.

THE COURT: All right. Have a seat, everyone.

Well, good morning.

THE JURY: Good morning.

THE COURT: Good morning, everybody. Nice to see each and every one of you today. You once again are 15 for 15. Thank you, everybody, for making the special effort to come down here today. I appreciate you. Like I have said before, none of you live across the street. I know this for sure. All of you have made a special effort to get here.

Having done it every day, I know how hard it is to be in the Dirksen Federal Building in the morning. You're fighting a lot of traffic, you're hopping on a bus, you're getting on a train. That is not easy. You are guests in our system, and we appreciate you. So thank you for being here.

You know, I promised you a later start today. We said 9:30. Little did you know I maybe underpromised the lateness of the start. Instead of 9:30 -- you all were here -- it was actually a 9:50 start. So bear with me that we're a little bit later than expected. We're doing great on time.

So I will tell you this: If we start a little later, it doesn't mean that your jury service is going to get elongated. Sometimes I just have to talk to the lawyers. And we're well on track. I'll just say that. All right?

So thank you for your patience.

I served on a jury once, and I remember having to wait in the jury room thinking, "What on earth is going on out there?" So I know what it's like from your perspective. So thank you for being patient with us. Okay?

We have heard from a number of different witnesses, as you know. I've lost count at this point. Maybe eight or so, give or take. And we're going to resume today with another witness.

I'll ask the government to call your next witness.

MS. NUTINI: Thank you, Judge.

The government calls Cong Le.

THE COURT: Okay.

(Cong Le enters the courtroom.)

THE COURT: Come on up, please, sir.

Good morning.

All right, folks. Let me explain one thing first.

THE INTERPRETER: My name is Tuan Do. I'm a Vietnamese interpreter.

THE COURT: Okay. Could you please swear in the interpreter.

(Interpreter sworn.)

THE COURT: All right. Good morning.

THE INTERPRETER: Good morning.

THE COURT: Thank you for being here.

THE INTERPRETER: Thank you.

THE COURT: Members of the jury, we have an interpreter here.

THE INTERPRETER: Okay.

THE WITNESS: (In English) Yes.

THE COURT: Thank you for your service today, sir.

THE INTERPRETER: Okay. No problem.

THE COURT: We are going to use him today to make sure the witness understands the testimony.

I said that wrong.

I meant we're going to use an interpreter so he understands the questions and so that you understand the testimony.

THE WITNESS: (In English) Okay.

THE COURT: So bear with us. We're going to go one step at a time, one question at a time.

(Witness sworn.)

THE COURT: Thank you. You may be seated.

Sorry about that. I got distracted by the translator.

(Laughter.)

THE COURT: All right. Thank you, sir, for being

here.

THE INTERPRETER: Okay.

THE COURT: We're going to do this nice and slow, one question at a time.

If any member of the jury has a hard time understanding, I will try to make sure we repeat it so you can understand.

I will say this: No one should be in a hurry. It takes whatever time it takes.

Is the witness ready to proceed?

THE WITNESS: Yes.

THE COURT: Please tell him to speak into the microphone. And tell him he can have some water anytime.

THE WITNESS: Okay.

THE COURT: Okay. Counsel, you may proceed.

MS. NUTINI: Thank you.

CONG TANG LE, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. NUTINI:

Q. Good morning.

Can you please state and spell your name for the record.

A. My name is Cong Tang Le.

Q. Mr. Le, how old are you?

A. 63 years old.

Q. And what state do you live in?
A. Texas.
Q. How long have you lived in Texas?
A. 19 years.
Q. Are you currently employed?
A. Yes.
Q. What do you do?
A. I'm a nail technician.
THE COURT: A nail . . . ?
THE WITNESS: Fingernail.
THE COURT: Fingernail. Okay. Thank you.
BY MS. NUTINI:
Q. What is your native language that you speak?
A. Vietnamese.
MS. NUTINI: Your Honor, may I approach the witness?
THE COURT: You may.
BY MS. NUTINI:
Q. Mr. Le, I'm showing you a disk that is marked as Government's Exhibit 102.
A. Okay.
Q. Do you recognize this disk?
A. Yes.
Q. Have you reviewed the contents of the disk prior to your testimony?
A. Yes.

Q. And does this disk contain fair and accurate copies of e-mails and documents you exchanged in February and March of 2019?
A. That's correct.
MS. NUTINI: Your Honor, the government moves to admit Government's Exhibit 102 into evidence.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: Exhibit 102 is admitted.
(Government's Exhibit No. 102 was received in evidence.)
THE COURT: You can show it to the jury.
MS. NUTINI: Thank you.
BY MS. NUTINI:
Q. Mr. Le, I am showing you Government's Exhibit 102-1.
Do you see it on your screen before you?
A. Yes.
Q. I am scrolling to the second page of the exhibit.
A. Okay.
Q. What is Government's Exhibit 102-1?
A. The first page is the envelope that they sent to me.
Q. And how about the second page; what's the second page?
A. Yeah, and the second page mention I received some inheritance money.
THE COURT: Inheritance? Inheritance?
THE INTERPRETER: Inheritance, yes.

BY MS. NUTINI:
Q. Mr. Le, is this a letter that you received in the mail?
A. That's correct.
Q. Mr. Le, who did this letter state that it was from?
A. From John Delon.
Q. And did John Delon tell you who he worked for?
A. He said that he worked for the bank and the lawyer.
Q. And was that TD Canada Trust Bank?
A. That's correct.
Q. Mr. Le, do you know a person named Geo Le?
A. No.
Q. Did the letter provide you an e-mail address to respond to?
A. Yes.
Q. Did you respond to the letter?
A. Yes.
Q. Did you begin communicating back and forth with John Delon?
A. That's correct.
Q. And were these communications by e-mail?
A. That's correct.
Q. Did you ever talk to John Delon on the phone?
A. No.
Q. Did you ever meet John Delon in person?
A. No.
Q. Mr. Le, did someone help you translate e-mails back and forth with John Delon?

A. Yes.
Q. Was it a friend of yours?
A. That's correct.
Q. Mr. Le, at some point, did John Delon send you a copy of his driver's license?
A. That's correct.
MS. NUTINI: I'm publishing Government's Exhibit 102-3.
BY MS. NUTINI:
Q. Do you recognize this exhibit?
A. Yes.
Q. What is it?
A. This is a letter from John Delon.
Q. Is this a copy of the driver's license that John Delon e-mailed to you?
A. That's correct.
Q. I'm now showing you Government's Exhibit 102-4.
I'm directing your attention to page 4 of the document.
Is this an e-mail from you to a TD Canada Group's e-mail address?
A. That's correct.
Q. And are you attaching something to the e-mail?
A. That's correct.
Q. So after communicating with John Delon, did you complete a

bank application to begin the process of claiming an inheritance?
A. That's correct.
Q. Did you receive a response to your e-mail?
A. Yes.
Q. I'm going to go to the bottom of the e-mail.
Who was the response from?
A. Nikka.
Q. Is that Nikka Avis?
A. That's correct.
Q. And did Nikka Avis e-mail you from ued@tdcanadagroup.com?
A. That's correct.
Q. Did Ms. Avis recommend that you hire a lawyer?
A. That's correct.
Q. What was the name of the lawyer?
A. Hall & Hall Chamber.
Q. Hall & Hall Chamber?
A. That's correct.
Q. And was there a name of a lawyer within that firm that you were directed to contact?
A. Yeah, barrister.
Q. Barrister Pierre Delouis?
A. That's correct.
Q. Did Ms. Avis also provide you a reference number to your matter?

A. That's correct.
Q. And is that reference number in this e-mail that I've just highlighted?
A. That's correct.
Q. Did Ms. Avis provide you an e-mail address to contact Pierre Delouis?
A. That's correct.
Q. Did you then e-mail Pierre Delouis?
A. Yes.
Q. Did Pierre Delouis respond to your e-mail?
A. Yes.
Q. Did Pierre Delouis agree to help you claim the inheritance from the bank?
A. That's correct.
Q. Did Pierre Delouis tell you first that you owed him a retainer fee?
A. That's correct.
Q. Did you agree to pay the retainer fee?
A. That's correct.
MS. NUTINI: I'm publishing Government's Exhibit 312-1, which is in evidence.
BY MS. NUTINI:
Q. Mr. Le, I'm directing you to the originator information of this document.
Do you see your name?

A. Yes.
Q. And do you see an address below that name?
A. Yes.
Q. Do you recognize that address?
A. Yes.
Q. Is that the address of where you used to work?
A. That's correct.
Q. I'm also directing your attention to a date in this document.
Is the date March 8th of 2019?
A. That's correct.
Q. Is the amount listed $6,405?
A. That's correct.
Q. Do you recognize the sender bank?
A. Yes.
Q. What is it?
A. IBC Bank. International Bank.
Q. Is that the bank that you use?
A. That's correct.
Q. Mr. Le, did you send this wire of $6,405?
A. That's correct.
Q. I'm directing your attention to the beneficiary information.
Did you send this money to Jenant, Inc.?
A. That's correct.

Q. Are you familiar with a company called Jenant, Inc.?
A. No.
Q. And are you familiar with an address at North Harlem Avenue in Oak Park, Illinois?
A. No.
Q. Why did you send the money there?
A. Because they told me to send the money for me to receive the inheritance money.
Q. And when you say "they told you," who is "they"?
A. John Delon.
Q. Mr. Le, after sending this money, were you told at some point that you owed more money to claim your inheritance?
A. That's correct.
Q. Did you agree to pay more money?
A. Yes.
Q. I'm showing you Government's Exhibit 312-2, which is in evidence.
Mr. Le, directing your attention to the originator information, do you see your name listed?
A. Yes.
Q. Do you recognize the address?
A. Yes.
Q. Do you recognize the sender bank?
A. Yes.
Q. Is that the same bank as the last wire?

A. That's correct.
Q. And, for the record, is that International Bank?
A. That's correct.
Q. What was the amount of this wire?
A. $22,962.75.
Q. And who did you send this wire to?
A. Sent to Setraco Services.
Q. Were you familiar with a company called Setraco Services?
A. No.
Q. Were you familiar with an address at Lincoln Avenue in Lisle, Illinois?
A. No.
Q. Why did you send over $22,000 to this company?
A. Because John Delon told me to send the money for their service.
THE COURT: Say that one more time. Because . . . ?
THE INTERPRETER: John Delon told me --
THE COURT: Delon.
THE INTERPRETER: -- for the money for the service helping this transaction.
THE COURT: Okay. Thank you.
BY MS. NUTINI:
Q. So John Delon told you to send the money?
A. That's correct.
Q. After sending this second payment, did you receive your

inheritance?
A. No.
Q. Were you told there were even more fees that you owed?
A. That's correct.
Q. Were you told those fees were associated with some kind of lien?
A. Yes.
Q. I'm showing you Government's Exhibit 102-9. I'm going to start from the bottom.
Mr. Le, does this appear to be an e-mail chain between TD Canada Groups, Hall & Hall Chamber, which is Pierre Delouis's law firm, and yourself?
A. That's correct.
Q. After learning about the lien, did you send this e-mail?
A. That's correct.
Q. Did you write "I hope this is a final step to come up. Do you know, does he has any equity in the company? How many more days do I have?"
A. That's correct.
Q. Were you inquiring how many more days you had to make a payment?
A. That's correct.
Q. Mr. Le, later in the communication, do you write to Pierre Delouis, "I try to come up with the money. Please help me to apply for extension for now that give me more time to work on

it. Thanks"?
A. That's correct.
Q. Mr. Le, do you later ask for the account for the wire information?
A. That's correct.
Q. Does Pierre Delouis respond with the information?
A. Yes.
Q. Were you told that you were to send two cashier's checks?
A. Yeah, Mr. John Delon asked me to send it by cashier's check.
Q. Was one of the cashier's checks supposed to go to Setraco Services, Inc.?
A. That's correct.
Q. And that is at 5206 Lincoln Avenue in Lisle?
A. That's correct.
Q. Was the other cashier's check supposed to go to Jenant, Inc.?
A. That's correct.
Q. And is that at 1419 North Harlem Avenue in Oak Park?
A. That's correct.
Q. Mr. Le, are you familiar with either of these companies?
A. No.
Q. Are you familiar with either of these addresses?
A. No.
Q. I'm showing you Government's Exhibit 102-11.

Mr. Le, does this appear to be an e-mail from John Delon to you?
A. That's correct.
Q. Did John Delon offer to help you pay half of the amount that you owed?
A. That's correct.
Q. In this e-mail, is he telling you that he has paid his half?
A. That's correct.
Q. Does he then tell you to send $80,000 of your money to Setraco?
A. That's correct.
Q. And to send $97,500 of your money to Jenant?
A. That's correct.
Q. Mr. Le, did you also communicate with Pierre Delouis about these payments at the same time?
A. Yes.
Q. I'm showing you Government's Exhibit 102-12.
Who is this an e-mail from?
A. Pierre Delouis.
Q. Does this e-mail -- strike that.
Does Pierre Delouis appear to acknowledge receipt of payment from John Delon?
A. That's correct.
Q. Does Pierre Delouis then remind you you still owe your

half?
A. That's correct.
Q. Does Pierre Delouis direct you to send $97,500 to Jenant, Inc.?
A. That's correct.
Q. And $80,000 to Setraco Services, Inc.?
A. That's correct.
Q. I'd like to start by talking to you about the $80,000 payment to Setraco.
MS. NUTINI: I'm publishing Government's Exhibit 302-B, which has been admitted into evidence.
BY MS. NUTINI:
Q. Mr. Le, before we look at the document, did you obtain a cashier's check for $80,000?
A. That's correct.
Q. I'm scrolling to page 2 of the document. And I'm blowing up the cashier's check for you to take a look at.
Do you recognize this cashier's check?
A. Yes.
Q. Directing your attention to the top left-hand corner, do you see your name on the cashier's check?
A. Yes.
Q. Is this the cashier's check that you obtained for $80,000?
A. That's correct.
Q. What city and state were you in when you obtained this

cashier's check?
A. San Antonio, Texas.
Q. Did you then mail the cashier's check by USPS?
A. That's correct.
Q. Where did you mail it?
A. I sent to Setraco Services.
Q. You mailed it to Setraco Services?
A. That's correct.
MS. NUTINI: Publishing Government's Exhibit 102-11.
Your Honor, may I have a moment?
THE COURT: Yes.
(Counsel conferring.)
BY MS. NUTINI:
Q. Mr. Le, directing your attention to the address in this e-mail, when you said that the check was mailed to Setraco, did you send it to 5206 Lincoln Avenue in Lisle?
A. That's correct.
Q. Turning now to the $97,500 payment to Jenant.
MS. NUTINI: Publishing Government's Exhibit 301-C, which has been admitted into evidence.
BY MS. NUTINI:
Q. I'm scrolling to page 2 of the document, and I'm going to blow up this check and have you take a look at it, Mr. Le.
Do you recognize this check?
A. Yes.

Q. What is it?
A. It's a cashier's check.
Q. Do you see your name listed on the cashier's check?
A. Yes.
Q. And what is the amount of this cashier's check?
A. 97,500.
Q. And what is the date?
A. 26 of March 2019.
Q. Mr. Le, do you recognize this bank?
A. Yes.
Q. Is this your bank that you use?
A. That's correct.
Q. What city and state were you in when you obtained this cashier's check?
A. San Antonio, Texas.
Q. Did you then mail the cashier's check?
A. That's correct.
Q. Did you mail it to Jenant?
A. That's correct.
Q. I'm showing you Government's Exhibit 102-11 again.
Mr. Le, is this the address you mailed the check to?
A. That's correct.
Q. Mr. Le, after this third and fourth payment, at some point, did you begin to question whether this inheritance was real?
A. Yeah, toward the end, I was -- it was a scam.

Q. Toward the end, you learned it was a scam?
A. That's correct.
Q. What did you do when you learned it was a scam?
A. First, I went to the bank to cancel the check.
Q. Were you able to get any of your money back?
A. Yeah, I was able to stop one of the check.

THE COURT: Say that, sir, one more time for me.

THE INTERPRETER: "I was able to stop one of the check."

THE COURT: Stop one of the checks?

BY THE WITNESS:
A. So I be able to get the money back from the check I sent.

BY MS. NUTINI:
Q. You were able to stop one of the checks that you had sent?
A. The thing I went to two different bank. One bank was able to stop the check for me, and the other bank, I was not able to.
Q. And by "stop the check," Mr. Le, to clarify, you mailed the check, correct?
A. Yes. I sent the check overnight.
Q. And to clarify, are we talking about the $97,500 check?
A. That's correct.
Q. So you sent that check?
A. That's correct.
Q. But your bank reimbursed you?

A. That's correct.
Q. So you got that money back?
A. That's correct.
Q. But you didn't get back the $80,000?
A. That's correct.
Q. And you didn't get back the $22,000?
A. No.
Q. And you didn't get back the $6400?
A. No.
Q. Mr. Le, do you know the defendant?
A. No.
Q. Do you know anyone named Anthony Ibekie?
A. No.
Q. Mr. Le, you never met John Delon, did you?
A. No.
Q. And you never met Pierre Delouis, did you?
A. No.
Q. And you only corresponded with these people by e-mail; is that correct?
A. That's correct.
(Counsel conferring.)
MS. NUTINI: Thank you.
I have no further questions.
THE COURT: Thank you, Counsel.
Mr. Carlson, whenever you're ready.

MR. CARLSON: Thank you, Judge.

THE COURT: Tell him what I said.

THE INTERPRETER: I'm sorry?

THE COURT: Translate what I just said.

THE INTERPRETER: Okay.

THE COURT: Okay. Whenever you're ready, Mr. Carlson.

CROSS-EXAMINATION

BY MR. CARLSON:

Q. Mr. Le, you just testified that you do not know Mr. Ibekie, correct?

A. No.

Q. And you never dealt with Mr. Ibekie, correct?

A. No.

Q. And you never spoke with Mr. Ibekie, correct?

A. No.

Q. And you never received an identification card from Mr. Ibekie, correct?

A. For here, I don't know anybody named way back.

Q. Can you get a --

THE COURT: Say that. I want to hear it one more time.

THE INTERPRETER: "I don't see anybody on the document named way back."

THE COURT: Named . . . ?

THE INTERPRETER: Way back.

MR. CARLSON: Ibekie.
THE COURT: Ibekie? Is it Ibekie?
THE INTERPRETER: Ibekie? Ibekie, yes.
THE COURT: You're welcome to follow up as you see appropriate --
MR. CARLSON: Fine, Judge.
THE COURT: -- Mr. Carlson.
MR. CARLSON: Thank you.
THE COURT: Thank you.
BY MR. CARLSON:
Q. You did receive a copy of an identification card for Mr. Delouis, correct?
A. That's correct.
Q. And the person on that photograph is not the person sitting at that table; is that correct?
A. That's correct.
MR. CARLSON: I have nothing further.
THE COURT: Thank you, Mr. Carlson.
Any redirect from the government?
MS. NUTINI: Yes, Judge.
THE COURT: Whenever you're ready.
MS. NUTINI: Permission to publish Government's Exhibit 102-3 to the jury.
THE COURT: You may. Could we translate that for the witness.

Thank you. Go ahead, please.

REDIRECT EXAMINATION

BY MS. NUTINI:

Q. Mr. Le, just to clarify, you received a driver's license for John Delon; is that correct?

A. That's correct.

Q. You didn't receive a driver's license for Pierre Delouis; is that correct?

A. No.

Q. And you don't know -- you never met John Delon, did you?

A. No.

Q. And you never spoke with John Delon on the phone, did you?

A. No.

MS. NUTINI: I have nothing further.

THE COURT: Thank you.

Mr. Carlson, anything else?

MR. CARLSON: No, Your Honor.

THE COURT: All right. Thank you, sir, for coming.

You may step down.

Please watch your step.

Have a safe trip home. Thank you, sir.

Thank you, sir.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: I'd like to thank the interpreter.

Thank you, sir, for being here for your service.

THE INTERPRETER: Thank you for asking me.

THE COURT: You're excused, sir.

The witness handed me Government Exhibit 102, the CD. I'll hand it to my courtroom deputy to hand it back to the --

MS. NUTINI: Thank you, Judge.

THE COURT: I'd like to thank the lawyers for working together cooperatively with the interpreter to make sure everybody could understand the testimony. Thank you for doing that.

Could we have a 20-second sidebar, folks? Do you mind?

Excuse us, everybody.

(Proceedings heard at sidebar on the record:)

THE COURT: All right. Is the next witness here or are you going to call the agent?

MS. DeMARCO: He is here.

THE COURT: Okay. Very good. I think we should roll forward with the next witness if you're ready because we've only been going 45 minutes. Okay?

Here we go.

(Proceedings heard in open court:)

THE COURT: All right. The government may call its next witness.

MS. DeMARCO: The government calls Robert Aguada.

THE COURT: Okay. Thank you.

(Counsel conferring.)

(Robert Aguada enters the courtroom.)

THE COURT: Come on up, please.

Good morning.

Please stand right here (indicating).

Please raise your right hand.

(Witness sworn.)

THE COURT: Very good. Have a seat, please.

Good morning.

THE WITNESS: Good morning.

THE COURT: Good morning. If you'd be kind enough to speak into the microphone, I want to make sure all the men and women of the jury can hear you. And if you need something drink, help yourself just to your right.

THE WITNESS: Okay. Thank you.

THE COURT: Thank you.

Counsel, you may proceed.

MS. DeMARCO: Thank you, Your Honor.

ROBERT AGUADA, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MS. DeMARCO:

Q. Good morning.

A. Good morning.

Q. Can you please state and spell your name for the record.

A. Robert Aguada, R-o-b-e-r-t, A-g-u-a-d-a.
Q. How old are you, Mr. Aguada?
A. I am 50 years old.
Q. Where do you live?
A. I live in Niles, Illinois.
Q. Do you work?
A. Yes.
Q. What do you do for work?
A. I'm an accountant.
Q. Okay. I want to draw your attention to July of 2018.
A. Mm-hmm.
Q. Where were you living at that time?
A. I lived in Niles.
Q. Okay. Around that time, did you receive a letter in the mail regarding a relative?
A. Yes.
Q. What did the letter say, in summary?
A. It says that I have -- I had a relative in Canada, that he had a lot of money in the bank, and he had no -- he had no relative to inherit it, so he was looking for someone to -- to inherit the property -- money in the bank.
Q. Okay. Do you remember the name of the relative?
A. Yeah. George Aguada is what was stated on the letter.
Q. Did you know a George Aguada?
A. No.

Q. How much was the inheritance, approximately?
A. It was a lot. It was over a million, I think.
Q. What did the letter tell you you needed to do to collect this inheritance?
A. It said that, you know, he -- this guy worked in the bank, in that same bank in that department, that I need to -- to make -- agree with him regarding -- to help me get -- you know, file an application.
Q. So you needed to enter into an agreement with the person who sent the letter?
A. Yes. Correct, enter into an agreement.
Q. And did you reach out to that person?
A. Yes, I did.
Q. How did you reach out to them?
A. I think it was originally first e-mail.
Q. E-mail?
A. Right.
Q. And did they respond to you?
A. Yeah, he did.
Q. Okay.
MS. DeMARCO: May I publish just to the witness, please.
BY MS. DeMARCO:
Q. Mr. Aguada, on the screen in front of you, I'm going to show you a series of documents.

A. Mm-hmm.
Q. I'm showing you Government Exhibit 104-1, 104-1A, 104-2, 104-3, 104-3A, 104-4, 104-4A, 104-7, 104-7A, 104-8?
Do you recognize these documents?
A. Yes.
Q. Are they -- well, what are they?
A. I'm sorry?
Q. What are they?
A. So basically, these are e-mails communication with the guy named -- he call himself Chandler Arnaud.
Q. Okay.
A. And he's helping me with drafting some e-mails, some letters to send to the bank and to -- you know, to attorney.
Q. Did you -- have you received these e-mails in detail before your testimony today?
A. Yes.
Q. Are they fair and accurate copies of e-mails that you exchanged in August of 2018?
A. Yes, these are the exact copy -- printout copy of my e-mails.
MS. DeMARCO: The government moves to admit Government's Exhibit 104 into evidence.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: Exhibit No. 104 is committed.

(Government's Exhibit No. 104 was received in evidence.)

THE COURT: You can publish to the jury.

MS. DeMARCO: Thank you, Your Honor.

BY MS. DeMARCO:

Q. Okay. Mr. Aguada, I'm showing you Government Exhibit 104-1.

A. Mm-hmm.

Q. Do you see that in front of you?

A. Yes.

Q. Okay. I want to start with the bottom.

Okay. Starting down here --

A. Mm-hmm.

Q. -- is this an e-mail from you?

A. Yes.

Q. And who is the e-mail to?

A. This is an e-mail to Chandler Arnaud.

Q. Is that the person that's name was in the letter you received?

A. Yes.

Q. Okay. And is this the initial e-mail that you sent in out?

A. Yes. Correct.

Q. Or -- sorry -- the initial e-mail that you sent in response to the letter?

A. Yes. Correct.

Q. Okay. And is this the response that you received?

A. Yes.
Q. Okay. And who did you -- what was the e-mail address of the person who responded to you?
A. It was addressed to chandlerarnaud@yandex.com.
Q. Okay. And did Mr. Arnaud ask you to do anything to proceed?
A. Yes. Correct.
Q. What did he ask you to do?
A. He asked me to sign an agreement with him, a confidential agreement.
Q. Okay. And is this a reference to the confidentiality agreement?
A. Yes. Correct.
Q. Okay. And is there also a reference to sharing the inheritance?
A. Yes. Correct.
Q. What was your understanding of what the sharing agreement would be?
A. That he would -- whatever -- whatever the amount that I would get, he would get half of it.
Q. Okay. And did you agree to enter into the agreement with him?
A. Yes.
Q. And there appears to be an attachment to this e-mail; is that right?

A. Yes.
Q. I'm showing you 104-1A.
Is this the attachment to the e-mail?
A. Yes.
Q. What are we looking at here? What is this?
A. It looks like his picture, a driver's license, Ontario, Canada driver's license, and his name is on that.
Q. Okay. So the name of the driver's license is here?
A. Yes. And it says Chandler, comma, Arnaud.
Q. Okay. Okay. So what was the next step? Did you have to contact somebody else?
A. Yeah, he asked me to be reach out to the -- to the bank, TD.
Q. And did you then contact TD Canada Bank?
A. Yes, I did, mm-hmm.
Q. Where did you get the e-mail address to reach out to them from?
A. From -- from him.
Q. From Chandler Arnaud?
A. Yeah.
Q. Did TD Canada Bank reply to you?
A. Yes.
Q. I'm showing you Government's Exhibit 104-2.
Is this the reply from TD Canada?
A. Yes. Correct.

Q. And who did this e-mail come from?
A. It came from ued@tdcanadagroup.com.
Q. Okay. And was there a recommendation for the next step in this e-mail?
A. Yeah, in this e-mail, this person recommended that I contact an attorney, and she -- or he -- she recommended an attorney.
Q. Okay. And is this the attorney they recommended?
A. Yes. Correct.
Q. Okay. And what is this person's name?
A. It says "Barrister Pierre Delouis."
Q. And where does he appear to be located?
A. Located in Ontario, Canada, Toronto.
Q. And there's an e-mail address here for Mr. Delouis?
A. Yes. Correct.
Q. What's that e-mail address?
A. It's pdelouis@hallhallchamber.com.
Q. Okay. And who signed this e-mail?
A. Nikka Avis, the manager of operations, unclaimed estate department of TD Canada Trust Bank Financial Group.
Q. Okay. Did you reach back out to Mr. Arnaud at this point?
A. Yes.
Q. Why did you do that?
A. I let him know that the bank responded to me.
Q. And did you ask him advice about hiring a lawyer?

A. Yes.
Q. I'm showing you Government Exhibit 104-3.
Okay. And is this the e-mail where you ask him his thoughts on hiring Mr. Delouis?
A. Yes, I did. This was the e-mail.
Q. Okay. And he responded to you?
A. Correct.
Q. Okay. And specifically, can you read this part of the e-mail to the jury.
A. Mm-hmm.
Q. This sentence here.
A. "I am so confident in this lawyer because he helped a family from Ohio to successfully claim their inheritance in our bank last year."
Q. Okay. And he included the same contact information?
A. Correct.
Q. For Mr. Delouis?
A. Mm-hmm. Correct.
Q. Okay. Did he also include some attachments?
A. I believe so, yes.
Q. I'm showing you 104-3A.
Are these the attachments that he sent?
A. Yep, these were the attachments.
Q. And what were these for?
A. This were for answers to bank questionnaires.

Q. And who filled in this information? Was it you or --
A. He -- Chandler Arnaud.
Q. Chandler Arnaud filled this out?
A. Yeah. This is what he sent me.
Q. Did you know anything about this purported relative?
A. Nope.
Q. Okay. And this appears to be a letter to the lawyer?
A. Yes.
Q. Okay. And, again, who provided this information?
A. Chandler Arnaud provided this information.
Q. So based on your conversations with Chandler Arnaud and also the bank, did you then reach out to this lawyer?
A. Yes. Correct.
Q. How did you do that? E-mail? Call?
A. E-mail.
Q. E-mail.
Did Pierre Delouis respond to you?
A. Yes. Correct.
Q. Okay. I'm showing you Government Exhibit 104-4. Starting from the bottom.
Is this the e-mail that you reached out to him?
A. Yes.
Q. And he responded to you?
A. Yes.
Q. Okay. And what is the e-mail address he responded to you

from?
A. From pdelouis@hallhallchamber.com.
Q. Okay. And then can you read the first paragraph of this e-mail.
Well, first, let me ask you, who is this one from?
A. It's coming from pdelouis@hallhallchamber.com.
Q. Okay. And can you read the first paragraph of the e-mail.
A. He said, "Dear Robert, attached are what we need to carry on with your claim. Sign it and e-mail it back to us. I will give you the account information to make the payment of $12,810 so that we can go back to the bank and submit our bundle for fund release."
Q. Okay. And there appears to be attachments to this e-mail?
A. Yes.
Q. Okay. What is this?
A. This is a retainer agreement.
Q. And this -- who sent this to you?
A. P. Delouis, Mr. Delouis.
Q. Okay. And this included some fees that you were supposed to pay?
A. Yes.
Q. Okay. So the fees are here (indicating), here (indicating), here (indicating), and here (indicating)?
A. Mm-hmm. Correct.
Q. Okay. And the total amount was $12,000?

A. Correct.
Q. Okay. Okay. Did you at any point talk to Arnaud on the phone?
A. Yes, I did.
Q. Why did you do that?
A. To let him know that the attorney is asking for a certain amount.
Q. And did you come to any sort of agreement with him regarding these fees?
A. Yes.
Q. What was the agreement?
A. That I asked him to cover half of it.
Q. And did he agree to do that?
A. Yes.
Q. So he would cover about 6,000, and you would cover about 6,000?
A. Yes. Correct.
Q. Okay. So at this point, were you getting ready to make the payment to the lawyer?
A. Yes. Correct.
Q. And did you receive banking information to do that?
A. Yes.
Q. I'm showing you Government Exhibit 104-7.
Are these e-mails between you and Mr. Delouis?
A. Yes.

Q. Okay. And is this an e-mail from Pierre Delouis?
A. Correct.
Q. Okay. And does he say in the e-mail "Thanks for the signed retainer agreement. Please see attached our offshore/subsidiary agent account to make the payment of your half. There's a 19 percent GST/HST tax charge payable if payment is received in Canada. Accordingly, we have waived this charge and have provided our offshore agent account for the wire payment to be made without the applicable taxes"?
A. Yes.
Q. Okay. And then he also references the other half of the money being paid by cashier's check?
A. Yes.
Q. And that's the half that would be --
A. Yes.
Q. -- coming from Chandler Arnaud?
A. Correct.
Q. Okay. Okay. And there's an attachment to this e-mail?
A. Yes.
Q. Is this the banking information you received?
A. Yes. Correct.
Q. Okay. And where is the money going? What bank?
A. It's going to Chase Bank.
Q. Okay. And the last four digits of the account number?
A. 62296.

Q. And the beneficiary name?
A. Esijemine Lucky Nengite, Inc.
Q. Had you heard of this company at all in the course of your interactions with either the lawyer or Mr. Arnaud?
A. No, not until I received this.
Q. This is the first time you've heard of this company?
A. Yes. Correct.
Q. And what is the beneficiary address?
A. 4306 Nutmeg Lane, Lisle, Illinois 60532.
Q. So what was your understanding of why you were asked to send money to a bank in Lisle when this attorney was in Canada?
A. He's asking me to send it here so that -- in order to avoid some GST Canadian tax.
Q. Okay. And did you tell Chandler Arnaud where to send his half of the money?
A. Yes.
Q. Did you speak to Chandler Arnaud on the phone again?
A. Yes.
Q. What was the purpose of that call?
A. Regarding, you know, to send his half.
Q. Did you confirm with Chandler Arnaud that he had dropped off a check to the address that you were given?
A. Yes.
Q. Did you ever see any proof that he had actually mailed a check?

A. No.
Q. Okay. I'm showing you Government Exhibit 104-8.
Okay. And is this an e-mail from you to Pierre Delouis?
A. Yes. Correct.
Q. And you tell him "I had someone drop off a cashier's check earlier today. Please confirm you have the check"?
A. Yes.
Q. And did he respond?
A. Yes, he did.
Q. He said, "Cashier's check confirmed for 6,405 USD."
A. Yes, he confirmed.
Q. Did you then wire money to Pierre Delouis?
A. Correct.
Q. About how much money?
A. 6,400 something.
Q. Okay. I'm showing you Government Exhibit 307-A, which is in evidence.
A. Mm-hmm. Yep.
Q. Do you recognize this transaction?
A. Yes, I do.
Q. Okay. That's your name right there?
A. Correct.
Q. And this is the beneficiary name?
A. Yes. Correct.

Q. Okay. And this is the amount that you sent?
A. That's the exact amount.
Q. Okay. And this is a bank statement for Esijemine Lucky Nengite?
A. Correct.
Q. Okay. Finally, I'm showing you Government Exhibit 104-9.
Now, who is this e-mail from?
A. It's from P. Delouis.
Q. Okay. To you?
A. To me.
Q. And does he say, "This is to acknowledge the receipt of the payment receipt. It has been applied to your file. We will go to the bank and submit the bundle and we get back to you"?
A. Yes.
Q. And this is in regards to that wire we just looked at?
A. That's correct.
Q. Did you talk to Arnaud again on the phone?
A. Yes.
Q. What was the purpose of that call?
A. I told him I sent the -- I wired the money to -- to P. Delouis.
Q. At some point, did you begin to suspect that the inheritance was not real?
A. Yes.
Q. Did you send any money after this point?

A. No.
Q. Mr. Aguada, do you know the defendant?
A. I don't know. I've never met him before.
Q. Did you ever get that $6,000 back?
A. No.
Q. Did you ever receive an inheritance?
A. Nope.
MS. DeMARCO: May I have one moment, Your Honor?
THE COURT: You may.
(Counsel conferring.)
MS. DeMARCO: Nothing further.
THE COURT: Okay. Thank you.
Mr. Carlson.

CROSS-EXAMINATION

BY MR. CARLSON:
Q. Mr. Aguada, I think you just told the prosecutor that you don't know Mr. Ibekie; is that correct?
A. I've never met him in person.
Q. To your knowledge, you never dealt with anybody identified as Anthony Ibekie, correct?
A. I'm sorry. Can you rephrase the question again.
Q. To the best of your knowledge, you never dealt with anyone named Anthony -- who identified as Anthony Ibekie; is that correct?
A. I don't know that name, yes.

Q. And you were sent in one of the e-mails a photograph of Chandler Arnaud, correct?
A. Correct.
Q. The person depicted in that photograph is not Anthony Ibekie, is it?
A. It's not the same, no.
MR. CARLSON: Nothing further.
THE COURT: Okay. Thank you, Mr. Carlson.
Anything else from the government?
MS. NUTINI: No, Your Honor.
THE COURT: Very good.
Sir, you may step down. You may step down. Thank you for coming.
Please watch your step. Have a safe trip home.
THE WITNESS: Okay. Thank you.
THE COURT: Thank you, sir.
(Witness excused.)
THE COURT: All right. Members of the jury, it's a little before 11:00 o'clock, which means it's time for our midmorning break. We are going to take, you know, about 15 minutes or so.
We're going to take a lunch break today right at noon. So, you know, as soon as you folks are ready with your midmorning break, we're going to get rolling again. Okay.
So take your notebooks with you. Don't talk about the

case. You've heard a lot of testimony. You have not heard everything. So just talk about everything else except the case, and we'll see you in about 10 or 15 minutes.

THE COURT SECURITY OFFICER: All rise.

(Jury out at 10:59 a.m.)

THE COURT: All right. Have a seat, everyone.

Thank you, everyone, for how you handled the translator. I thought that went well.

I have a hard stop I've got to do at noon today. So I just wanted to let you know that. When we get rolling here with the jury, we're going to go as long as we can until we hit noon, and then I've got to go to a meeting.

So we'll just see where we are. And if the witness is done, fine. If not, we'll be over the lunch break. Okay?

You've got one witness left; is that right?

MS. NUTINI: Yes, Judge.

THE COURT: Do you want to make a proffer of what you expect to happen, how long will it to go and who it is?

MS. NUTINI: It's Special Agent Christopher Kadonsky. It's his second half of testimony. It will be primarily focused on the digital device review that he conducted.

THE COURT: Okay. What is your best guesstimate? I'm not going to hold you to it, but what's your best guesstimate for how long it will go?

MS. NUTINI: 45 minutes to an hour.

THE COURT: Okay. You didn't just say that because I talked about a hard stop at noon, did you? Okay.

MS. NUTINI: I don't know that we'll be able to get in by noon, but we may.

THE COURT: Well, here's the thing: You're under no pressure to get it done by noon. If you're not done, you're not done. It's not a big deal. We're going to bring the jury back after lunch anyway because I want to give the defense team a chance to talk over lunch and see what they want to do. So there's no pressure from me to be done by then. If you're not done, you're not done. It will be smooth either way.

Okay?

MS. NUTINI: Understood.

THE COURT: Does had a make sense, Mr. Carlson?

MR. CARLSON: That's fine, Judge.

THE COURT: And we'll cover Exhibit 5, *et cetera*, over the lunch hour. Okay?

Anything else you want to cover?

All right. We'll see you in about ten minutes.

Thanks, folks.

THE CLERK: All rise.

(Recess at 11:01 a.m., until 11:17 a.m.)

THE COURT: All right. Thank you, everybody.

The jury is ready.

Are you folks ready?

MS. NUTINI: Yes, Judge.

THE COURT: All right. Let's go ahead and get the jury.

THE DEFENDANT: Excuse me, Your Honor.

THE COURT: Yeah. Okay.

THE DEFENDANT: Would you have a minute for me? I can wait later on. I would like to address the Court, if you may.

THE COURT: Okay. Mr. Carlson, do you know what that's about?

MR. CARLSON: What's that?

THE COURT: Do you know what he's talking about?

MR. CARLSON: No.

THE COURT: Okay. I think you need to -- why don't you turn your microphone off, and why don't you talk to Mr. Carlson here for a minute here, Mr. Ibekie. If you make sure the microphone is off so you can talk privately to Mr. Carlson.

THE DEFENDANT: Just push the button?

THE COURT: Let's make sure both microphones are off.

(Counsel and defendant conferring.)

THE DEFENDANT: Your Honor --

THE COURT: So let me talk to Mr. Carlson first.

MR. CARLSON: He talked to me, Judge, and he has something he wants to address with the Court, and it's fine with me.

THE COURT: Okay. If you go into the microphone, Mr. Carlson, I would like you to say that again.

MR. CARLSON: I'm sorry, Judge.

He would like to address the Court, and it's fine by me.

THE COURT: Okay. And you've just consulted with him for a couple minutes. Do you need any more time to talk to him before he addresses the Court?

MR. CARLSON: No, Judge.

THE COURT: Okay. So, Mr. Ibekie, let me tell you this: You are a criminal defendant in an ongoing criminal trial. I have concerns about you talking.

Have you had a chance to talk with your lawyer right now?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you want more time to talk with your lawyer before talking to me?

THE DEFENDANT: No, Your Honor, we've had enough time. We've conferred enough.

THE COURT: I'm not going to prohibit you from talking to me, Mr. Ibekie, but I don't know what you're about to say, and I'm not a hundred percent sure this is a great idea. I'm not going to shut you down, but are you sure you want to talk to me?

THE DEFENDANT: Absolutely, Your Honor.

THE COURT: All right. Mr. Carlson, do you want to make a proffer to me what the topic is. What's the general topic?

MR. CARLSON: The general topic is regarding Mr. Ibekie's testimony.

THE COURT: The general topic is his testimony. Okay.

MR. CARLSON: I will front it with Your Honor.

THE COURT: Yeah.

THE DEFENDANT: He has told me this morning for the first time that, despite my representing him for a long period of time, for the first time ever, and despite his continual assertions he would not testify, he has decided this morning he would like to testify. He is not ready to testify. I am not ready to do any examination of him. And he wants the Court to know that and to allow us until next Wednesday to be able to be ready.

THE COURT: Okay. Is that the gist of it, Mr. Ibekie?

THE DEFENDANT: Absolutely, Your Honor. And most importantly is for -- for you, Your Honor, to acknowledge the fact that Mr. Kent Carlson in the past two and a half years I've worked with him, that I've been very adamant and clear that I will not be testifying. This was just a decision that I made this morning, and I brought it to his attention this morning.

I know that this could be overwhelming, and I also

acknowledge that he is not prepared for my questioning.

So that's why I'm asking the Honorable Court, to your office, to give us a little -- some more -- a little bit of time. I mean, we're familiar with the case. I believe by Wednesday next week when the Court reconvenes, I should be ready with my testimony.

It just breaks my heart what's going on in here, and I would like my voice to be heard by the jury.

THE COURT: Okay. So thank you for that, Mr. Ibekie.

Here's what I'd like to do: We've got the jury back there that is waiting to come back in and hear from the next witness.

I think we're going to have to have a longer conversation about all of this. So what I'd like to do is just bring the jury in, get about 40 minutes of testimony in, and then we'll break for lunch, and we can have more discussions about that. Okay? Is that all right?

THE DEFENDANT: Wonderful, Your Honor. Thank you.

THE COURT: That way we've got enough time and we don't keep people waiting. We'll have continuing discussions. And that way, you can continue to think things over and Mr. Carlson can kind of think things over. You guys can talk during lunch and just have a candid conversation, and then we'll reconvene, and we can talk about what the plan is going forward.

Does that sound okay to you? What do you think?

THE DEFENDANT: Thank you, Your Honor.

THE COURT: Okay. Is the government ready to call its next witness?

MS. NUTINI: Yes, Judge.

THE COURT: Okay. Let's get the jury, and we'll call the next witness.

MS. NUTINI: Judge, just as a heads-up, we plan on starting with a stipulation.

THE COURT: Okay.

(Jury in at 11:23 a.m.)

THE COURT SECURITY OFFICER: All rise.

THE COURT: All right. Have a seat, everyone.

Welcome back.

Counsel for the government, you may call your next witness.

MS. NUTINI: Thank you, Judge.

The government proceeds by way of stipulation at this point. We'd ask that Stipulation No. 9 be read into the record.

THE COURT: Okay. We can certainly do that.

I'll ask Ms. Ramos if she'd be kind enough to display it on the screen so everybody can see it.

All right. There it is.

Everybody see that okay?

So we are going to do No. 9, I think, Stipulation No. 9.

There we are.

Okay, folks. Here is Stipulation No. 9.

Here it goes.

If called to testify, a Federal Deposit Insurance Corporation representative would testify that the deposits of TCF Bank were insured by the Federal Deposit Insurance Corporation between 2017 and 2020.

If called to testify, a Federal Deposit Insurance Corporation representative would testify that the deposits of Bank of America were insured by the Federal Deposit Insurance Corporation between 2017 and 2020.

It says "So stipulated."

There's a signature by an Assistant United States Attorney, a signature by defense counsel, and a signature by defendant, Anthony Ibekie.

So stipulated?

MS. NUTINI: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: All right. Thank you, Counsel.

Ms. Nutini, you may call your next witness.

MS. NUTINI: Thank you, Judge.

The government calls -- recalls Christopher Kadonsky to the stand.

THE COURT: All right. Come on up, please, sir.

Please raise your right hand.

(Witness sworn.)

THE COURT: Very good.

Members of the jury, if you have the funny feeling that you've heard from this witness already, you're not wrong. This happens from time to time during a trial. Sometimes a witness will testify about part of a case, and then they'll come back later for a second part later. Okay? So that's why you're seeing him for the second time.

Counsel, you may proceed.

MS. NUTINI: Thank you, Judge.

CHRISTOPHER KADONSKY, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MS. NUTINI:

Q. Can you please reintroduce yourself and remind the jury where you work.

A. Christopher Kadonsky. I'm a special agent with IRS Criminal Investigation.

Q. Thank you, Special Agent.

Yesterday we talked about e-mail search warrants. That's where we left off your testimony.

I'd like to now talk to you about some residential search warrants that were conducted in July of 2020.

A. Okay.

Q. Do you recall Special Agent Mansker talking about search warrants that were conducted at three residences in July of 2020?
A. Yes, I do.
Q. Was one of those residence the residence at Oxbow Avenue in Oswego, Illinois?
A. Yes, Anthony Ibekie's residence.
Q. And was another the address at -- on Harlem Avenue in Oak Park, Illinois?
A. Yes, Jennifer Gosha's residence.

MS. NUTINI: Thank you.

And, Your Honor, at this time, we actually would ask for another stipulation to be read into the record, and that is No. 13.

THE COURT: All right. Happy to do that. We'll ask Ms. Ramos to kindly pull up Stipulation 13 so everybody can see it.

Everybody see that okay?

All right. Here it goes, folks.

Stipulation No. 13.

Government Exhibit 900 contains documents that were recovered from devices seized at 797 Oxbow Avenue, Unit 110, Oswego, Illinois, on or about July 16th, 2020. Internal Revenue Service Criminal Investigation Computer Investigative Specialist Brenda Euell, E-u-e-l-l, performed the extraction.

The parties agree that Government Exhibit 900 is admissible in evidence.

Government Exhibit 1001 contains text messages recovered from an Apple iPhone belonging to Jennifer Gosha and recovered from 1419 North Harlem Avenue, Apartment B, Oak Park, Illinois. Internal Revenue Service Criminal Investigation Computer Investigative Specialist John Ohlde, spelled O-h-l-d-e, performed the extraction. The parties agree that Government Exhibit 1001 is admissible in evidence.

It says "So stipulated."

There's a signature by an Assistant United States Attorney, by defense counsel, and by defendant, Anthony Ibekie.

So stipulated?

MS. NUTINI: So stipulated, Your Honor.

And just to confirm, it's Jason Ohlde, for the record, not John.

THE COURT: Okay. That's a good correction. Yes, I'm sorry. I was thinking about the pronunciation of the last name, I think, and I inserted the first name.

So let me correct that, folks.

It's -- it's the -- Specialist Jason Ohlde instead of whatever name I said before. So we'll strike that, and it will be Jason Ohlde.

So with that clarification, is that so stipulated?

MS. NUTINI: So stipulated.

MR. CARLSON: So stipulated.

THE COURT: All right. Sorry, folks, for making that mistake. But it seems like everyone else caught it except me.

So, Counsel, you may proceed.

MS. NUTINI: Thank you, Your Honor.

The government moves to publish -- admit and publish the following specific exhibits into evidence: 901, 903, 905, 906, 907, 908, 909, 910, 911, 912, 914, 915, and 1001.

THE COURT: All right. Any objection?

MR. CARLSON: Judge, could she read those one more time? I just want to make sure I got them all.

THE COURT: No problem at all.

Go ahead, please.

MS. NUTINI: 901, 903, 905, 906, 907, 908, 909, 910, 911, 912, 914, 915, and 1001.

THE COURT: All right. Any objection?

MR. CARLSON: No objection, Judge.

THE COURT: All right. They are admitted.

(Government's Exhibit Nos. 901, 903, 905, 906, 907, 908, 909, 910, 911, 912, 914, 915, and 1001 were received in evidence.)

THE COURT: You can publish to the jury.

MS. NUTINI: Thank you, Judge.

BY MS. NUTINI:

Q. Special Agent Kadonsky, the jury has heard testimony about

the physical evidence that was recovered at the defendant's residence, correct?
A. That is correct.
Q. Was there also digital evidence recovered?
A. Yes, there was.
Q. And, specifically, was that recovered from digital devices?
A. Yes.
Q. What is a digital device?
A. A digital device is any electronic device that has storage capacity. It could be something like a cell phone, a computer, a flash drive, an external hard drive, even things like your Apple Watch or a video game system like a PlayStation.
Q. And what is the process for law enforcement recovering evidence off of a digital device?
A. For IRS Criminal Investigation, we utilize computer investigative specialists. They are specially trained special agents that process the electronic devices and make or obtain an image or extraction of those devices.
Q. And is that what happened in this case?
A. Yes, it is.
Q. And, specifically, Brenda Euell and Jason Ohlde were the two computer investigative specialists that were referenced in the stipulation?
A. Yes.
Q. Did you then receive an extraction or a copy of each of

these devices?
A. For the majority of the devices, I received an extraction or an image. There were a few of the devices seized from the location that an image or an extraction was not possible.
Q. And for the ones that it was possible -- and we'll get into more detail about each of those -- did you review these devices?
A. Yes, I did.
Q. And what were you looking for when you reviewed these digital devices?
A. So I'm looking for a few things. One thing I'm looking for is attributions, so who's the owner or likely user of the device. So I'm looking for -- for things related to that. And then I'm looking for things related to the search warrant. So wire fraud, mail fraud, money laundering and, specifically, the inheritance fraud.
Q. And how do you determine attribution for a device?
A. There are several factors that go into making an attribution determination. We take a wholistic approach at looking at the device. So one of the things I look at is where was the device found. Was it in a bedroom? A common area? I look at the type of device. Is it a cell phone? A flash drive? A computer?
And, ultimately, the most important factor is what's on the device. So I'm going to use the term "artifacts," which

just means a file or configuration on the device. We look at the artifacts on the device. Is there anything in those artifacts that identifies a specific individual? Is there images? Is there a selfie of the same person over and over again?

I'll look at the configuration files for things like the Internet browser. Does it have autofills that tell me who -- who is using that particular device? Does it have user accounts or e-mail accounts logged into it that are attributable to a specific person?

Q. So I'd like to walk through just a small subset of what you recovered with the jury.

A. Okay.

Q. So let's start with the Harlem Avenue premises where Jennifer Gosha lived.

I'd like to first turn to a phone recovered from Jennifer Gosha's residence.

Did law enforcement, in fact, recover that phone from her residence?

A. Yes.

Q. And was law enforcement able to attribute that phone to Ms. Gosha?

A. Yes.

Q. Did you review that phone for evidence of communications with the defendant?

A. Yes, I did.
Q. Did you find anything of relevance?
A. I did.
MS. NUTINI: I'm going to publish what's been admitted as Government's Exhibit 1001.
BY MS. NUTINI:
Q. So before we get into the content of this message, can you please describe for the jury what we are looking at.
A. This is text messages between the parties. The phone number (630) 822-4947, which is Anthony Ibekie, and the phone number (630) 806-5088, which is Jennifer Gosha.
Q. And this was recovered from Ms. Gosha's phone?
A. That is correct.
Q. I'd like to direct your attention to the portion of the chat that I have blown up.
Can you identify for the jury -- what is the date of this communication between the defendant and Ms. Gosha?
A. This is June 17th, 2020.
Q. And what is the relevance of June 17th, 2020?
A. It's the day before the controlled delivery at Ms. Gosha's residence.
Q. Could you please read the text message exchange.
A. It starts with a message from Anthony Ibekie to Jennifer Gosha.
And it says, "Hey, baby."

Followed by "Good morning. I am expecting a letter to your home today at 3:00 p.m."

Ms. Gosha responds, "It's not here."

Mr. Ibekie responds, "Give it time."

Q. I'd now like to direct your attention to the bottom portion of the text message exchange.

What is the date of these messages?

A. June 18th, 2020.

Q. And what is the relevance of that day?

A. This is the date the controlled delivery of the cashier's check from the undercover operation was delivered to Jennifer Gosha's residence.

Q. Could you please read for the jury the text message exchange.

A. The first message is from Jennifer Gosha to Anthony Ibekie. And it says, "Your package was just delivered. It was supposed to be delivered by 10:30 a.m., so tell your sender to go back to the post office and get a refund."

Mr. Ibekie responds, "Okay," followed by "Can you bring it to work tomorrow?"

Q. And, Mr. Kadonsky, did we talk about this 4947 number during your testimony yesterday?

A. We did.

Q. And remind the jury what we talked about relating to this number.

A. Yeah, there were several times we've seen this phone number come up related to Anthony Ibekie. It's one of Anthony Ibekie's phone numbers.
Q. So I'd like to move on to the Oswego Avenue premises where the defendant lived.
Approximately how many devices did law enforcement seize during the search warrant at the defendant's house?
A. Approximately 17.
Q. And what types of devices were seized?
A. There were a few different types of devices. There were phones, computers, flash drives, external hard drives, an Apple Watch, as well as a PlayStation.
Q. And was law enforcement able to attribute at least some of these devices to a specific individual?
A. Yes, we were.
Q. And who were the individual or individuals you were able to attribute the devices to?
A. Several of the devices were attributable to Ebuka Egbunam, and several of the devices were attributable to Anthony Ibekie.
Q. So let's start with Ebuka Egbunam.
How many devices were attributed to Ebuka Egbunam?
A. Approximately five devices were attributable to Ebuka Egbunam.
Q. Can you describe those devices for the jury.
A. Yes, the -- there was a computer, a cell phone, an external

hard drive, which appeared to primarily be used to back up data from one of the other devices, as well as an Apple Watch and a PlayStation that were attributable to Ebuka Egbunam.
Q. What about the defendant; were you able to attribute any devices to the defendant?
A. Yes. Seven devices were attributable to Anthony Ibekie, of which one was an external hard drive that appeared to be a duplicate or a backup of another device. So six became the focus of the review.
Q. So seven devices; one was essentially a copy of another device?
A. That's correct.
Q. So you focused on reviewing six devices?
A. That is correct.
Q. And what types of devices were these six?
A. One was a USB drive, which is a thumb drive or a flash drive; an external hard drive; two Samsung phones; a MacBook computer; and a Dell computer.
Q. And, Special Agent Kadonsky, how did you attribute these six devices to the defendant?
A. It varies device by device, but ultimately, it's the location the devices were found, including the phones and the MacBook were found in Ibekie's bedroom, as well as the different artifacts or items that were on the phones and the computers and flash drives and the external hard drives. That

could be -- the files that were on there, they could be specific to a certain individual or more useful to a certain individual, something like a tax return or, you know, a work document that you wouldn't expect to be on somebody else's device.

It could be something more obvious, like on the Dell, where there's a Chrome, which is an Internet browser, and it autofills with the first and last name "Anthony Ibekie."

Q. And so just to be clear, for that Dell computer, the Chrome autofill was for the defendant's name?

A. Yes. There was a Chrome application, and it will store data and autofill that data while you're utilizing the browser. And for a first name, it autofilled in "Anthony." For a last name, it autofilled in "Ibekie," according to the configuration logs.

Q. How about for the two phones seized; were you able to attribute those to the defendant through things, as you discussed earlier, like photographs or text messages?

A. Yes. All of the six that I'm talking about were attributable to Anthony Ibekie. The phones were attributable either via images, documents stored on the phones, or through communications with individuals he had a personal relationship. And when I say "he," Anthony Ibekie had a personal relationship with, including spouses and others.

Q. So for these six devices that you attributed to the

defendant, give the jury an idea about the volume of material you reviewed.
A. It's a substantial amount of material. It's terabytes of data, thousands of artifacts. It is quite a bit of electronic evidence.
Q. And did you find material relevant to the investigation when you did your review?
A. Yes, I did.
Q. Can you give the jury a general overview of what you found.
A. I found communications with victims and potential victims. I found templates of inheritance fraud documents that I had become familiar with throughout the investigation, copies of drivers' licenses and things like that that I had seen before throughout the investigation.
Q. I want to walk through some of the specific documents that you recovered.
MS. NUTINI: I'm publishing Government's Exhibit 906, which has been admitted into evidence.
BY MS. NUTINI:
Q. Special Agent Kadonsky, I'm blowing this up for your review.
What is this?
A. This is what appears to be a driver's license, a Canadian Ontario driver's license for John Jean Delon.
Q. Where was this artifacted recovered?

A. This was actually recovered off of multiple devices, an external hard drive, as well as a Dell computer, Ibekie's Dell computer.
Q. Is that the same one you described Chrome autofilled with the defendant's name?
A. That is correct. Yes.
Q. And remind the jury, what's the significance of this document or artifact?
A. John Delon was a name used in the fraud scheme as a bank employee. His name was included on several of the letters that went out to the initial -- as far as initial contact for the victims, as well as communicating back and forth with victims as well.
Several of the victims -- or at least one who we heard from earlier had received a similar license.
Q. Who received a similar license that the jury heard from?
A. Mr. Cong Le.
MS. NUTINI: I'm going to move Government's Exhibit 906 to the left of the screen and pull up Government's Exhibit 102-3.
BY MS. NUTINI:
Q. Special Agent Kadonsky, can you describe for the jury what we're looking at here?
A. So on the left here, we have the -- the image that was found on Ibekie's external hard drive, as well as his Dell

computer.

On the right is the image that we saw when Cong Le was testifying, the license that he received from the person pretending to be John Delon.

Q. So I'd like to blow this up a little bit.

Can you identify the address listed in this portion.

A. It's 1411-10 Willowridge Road, and that's in Ontario, Canada.

Q. How about in 102-3?

A. It's the same address.

Q. Is the other information below the address also the same?

A. Yes. This appears to be a copy or a scan of the license that's displayed on the left.

Q. Did you find other evidence of John Delon on the defendant's devices?

A. Yes, I did.

Q. Like what?

A. There were templates referencing the name John Delon, letters -- or documents that looked like letters on the various devices, as well as communications.

Q. Have you seen this image of John Delon on the driver's license in any other documents throughout the course of this trial?

A. Yes, I have.

Q. Where?

A. When the victim, Mr. Aguada, was testifying, I saw a driver's license that had a similar or the same picture on it but a different name.

MS. NUTINI: I'm going to pull up for the jury Government's Exhibit 104-1A, which has been admitted into evidence.

BY MS. NUTINI:

Q. The image on the right, is this the image that Mr. Aguada testified about?

A. Yes, it is.

Q. So I'd like to blow up the art- --

THE COURT: Excuse me. That's Government Exhibit 104-1A.

MS. NUTINI: Thank you, Judge.

BY MS. NUTINI:

Q. Excuse me. 104-1A, is this the exhibit that Mr. Aguada testified about?

A. Yes, it is.

Q. I'd like to blow up the artifact recovered from the defendant's device.

Can you -- we'll start with -- well, I'll just keep them side by side so we can see them both.

Can you describe what photograph you see in both of these images.

A. This appears to be the same photograph.

Q. And, again, we've reviewed the address on the left. Can you tell the jury what the address is on the right image, which is the driver's license sent to Robert Aguada?

A. Yeah, the driver's license sent to Robert Aguada with the name Chandler Arnaud has an address of 1411-10 Willowridge Road in Ontario, Canada, the same as the driver's license for John Jean Delon that was recovered from the electronic devices, as well as sent to victim Cong Le.

THE COURT: And it looks like on the screen we had Exhibit 906 on the left, and on the right, we had Exhibit 104-1A on the right.

Is that right?

MS. NUTINI: That is correct, Judge.

THE COURT: Thank you.

MS. NUTINI: I'm now publishing Government's Exhibit 907, which has been admitted into evidence.

BY MS. NUTINI:

Q. Special Agent Kadonsky, what is this?

A. This is what appears to be a United Kingdom driver's license for Peter Pfizer.

Q. And where was this artifact recovered?

A. This was recovered from Ibekie's external hard drive.

In addition to this, there's another artifact that's very similar, which is a Peter Pfizer driver's license, except on -- appearing to be on either a piece of paper that's folded

or an envelope that's folded recovered from Ibekie's MacBook computer.

Q. So this image or something similar was recovered from two of the defendant's devices?

A. That's correct. This specific one was recovered from an external hard drive. The one that's very similar was on Ibekie's MacBook computer.

Q. What's the significance of this artifact?

A. Peter Pfizer is the name that we've seen throughout the trial. It was used in the inheritance fraud scheme to contact victims, communicate with victims.

Q. And was a copy of this driver's license or something similar sent to any of the victims who have testified during this trial?

A. Yes. Early in the trial, we heard from victim Dale Helms, and a copy of this driver's license was sent to him.

MS. NUTINI: I'm going to move Government Exhibit 907 to the left side of the screen.

I'm now going to display Government's Exhibit 103-2 on the right side of the screen.

BY MS. NUTINI:

Q. Special Agent Kadonsky, remind the jury what we're looking at here in Government's Exhibit 103-2.

A. On the right side of the screen in Exhibit 103-2, we have e-mails between ppfizer456@aol.com and Dale Helms.

Q. Is the subject of the e-mail "Here is the copy"?
A. Yes, it is.
Q. I'm going to scroll down to the attachments.
This is page 3 of 103-2.
Special Agent Kadonsky, I've published both images side by side.
What's your reaction?
A. The image on the left and the image on the right appear to be the same driver's license, different focuses. In particular, I'd point out that the one on the right appears to be the same image that was found on the MacBook computer.
Q. This is the one you said looked like it was sort of on top of a letter or something folded?
A. Correct. Yes.
Q. While we have Government's Exhibit 103-2 up, I'd like to direct your attention to page 2 of the document.
What's the phone number that Peter Pfizer provides to Dale Helms?
A. +44 20 3885 0817.
Q. Thank you.
Did you find other evidence of Peter Pfizer on the defendant's devices besides this driver's license image?
A. Yes, I did.
Q. What did you find?
A. I found templates utilizing the name Peter Pfizer, other

documents utilizing the name Peter Pfizer, e-mails utilizing the name Peter Pfizer, as well as TollFreeForwarding records related to Peter Pfizer.

Q. I'd like to talk about those TollFreeForwarding records.

MS. NUTINI: Publishing Government's Exhibit 909.

BY MS. NUTINI:

Q. What are we looking at here?

A. This is an invoice from TollFreeForwarding that was recovered from a Samsung phone from Ibekie's bedroom. The TollFreeForwarding record is addressed to Peter -- or to Pfizer, Peter.

Q. So this is an invoice addressed to Pfizer, Peter?

A. That is correct.

Q. And remind the jury, they've heard a little bit of testimony about TollFreeForwarding, but what is TollFreeForwarding?

A. TollFreeForwarding is a telecommunications company. You can pay them to have phone numbers set up, and they will do things like forward calls from that number to a different number, as well as they will do things like set up voicemails and things like that for you for a fee, and you can utilize different phone numbers that way.

Q. And when you explain set up voicemails, would that be a service providing a voicemail in another voice other than your own?

A. Yes. That would be -- somebody at TollFreeForwarding would record the voicemail and that would be what would be heard if somebody were to call that number and let it go to voicemail.
Q. I'd like to direct your attention to the usage portion of this invoice.
Do you recognize any names that have been relevant to this trial?
A. Yes. The first one under "London," it says Pfizer's phone, and it's +44 20 3885 0817. That's the same phone number we had previously discussed.
In addition, that's a number that was provided to both Dale Helms, who's a victim, and our undercover agent during the undercover operation.
Q. Is that the phone number we just viewed in the exhibit relating to Dale Helms as well?
A. Yes, it is.
Q. And what about under "Pfizer," what do we see here?
A. It says Wyashika's phone, and there's a phone number +44 20 3936 3077.
Q. Is this a phone number that we've seen during this trial?
A. It is, yes.
Q. And when have we seen it?
A. This is a phone number that's provided for Wyashika Sellar who is supposed to work at a -- as one of the banks, and we see that along with an e-mail address of ued@standardgroupservices.

That phone number and e-mail address are sent to victims and our undercover agent.

Q. So what is your understanding of the information that this invoice is providing?

A. So the information on this invoice, it includes the phone numbers that are registered or utilized with TollFreeForwarding for these individuals.

In addition to that, it lists the number of phone calls, the amount of minutes, and the fees attributable to utilizing that phone.

Q. So, in other words, were both of these phone numbers associated with Pfizer and Wyashika used for this monthly invoice?

A. Yes, they were.

Q. And what is the month we're looking at here?

A. This is June 2020.

Q. And this invoice was recovered on the defendant's devices?

A. Yes. This was on Ibekie's Samsung phone that was recovered from his bedroom.

Q. And did you find any other items of relevance on the defendant's phone relating to TollFreeForwarding?

A. Yes, I did.

I was able to identify and recover e-mails related to TollFreeForwarding.

MS. NUTINI: Publishing Government's Exhibit 910,

which has been admitted into evidence.

BY MS. NUTINI:

Q. Special Agent Kadonsky, before we get into the specifics of this, can you describe for the jury what we're looking at.

A. Yes. This is an extraction report from Cellebrite. It's a software used by our computer investigative specialists to image the phones. And then from there, I'm able to review the evidence through the Cellebrite report program.

Q. So when you were speaking earlier at the beginning of your testimony about how digital devices are copied for your review, is this one of the ways that they're copied?

A. Yes, this is one of the tools utilized by our computer investigative specialists.

Q. And what device are we looking at here?

A. This is a Samsung phone recovered from Ibekie's bedroom.

Q. I'm going to scroll to the second and third page of the document. And I'll start with the third page and blow up lines 5 and 6.

What type of -- before we get into the substance, what type of information are we looking at here?

A. These are e-mails between an e-mail address pfizerpeter@gmail.com to support@tollfreeforwarding.com.

Q. So they're e-mails on the defendant's phone in the name of pfizerpeter@gmail.com?

A. That is correct.

Q. What is the subject of the e-mail that Pfizer Peter sends to TollFreeForwarding?
A. "Upload this voicemail (male voice)."
Q. And what is the body of the message?
A. "Hello, you have reached Peter Pfizer. I am not available to take your call now, but please leave a detailed message. I will get back to you as soon as possible. NB. Can you also set the voicemail in such a way that the phone will ring at least five times before it goes to voicemail."
Q. Does TollFreeForwarding provide a response to Peter Pfizer's e-mail?
A. Yes, they do.
Q. What is that response?
A. It says, "Hello, Peter. Per your request, we have uploaded your voicemail greeting and set calls to ring five times before going to voicemail. Please let us know if you need any further assistance. Thank you."
Q. Special Agent Kadonsky, I'll now direct your attention to lines 3 and 4.
We will start with line 4.
What are we looking at here?
A. This is an e-mail from the e-mail address pfizerpeter@gmail.com to support@tollfreeforwarding.com.
Q. And, again, this is recovered from the defendant's phone?
A. That is correct.

Q. What is the subject of the e-mail?
A. "Female voicemail."
Q. Could you please read the bottom of the e-mail to the jury.
A. "Kindly record this voicemail for me (female voice) to +44 20 3936 3077. (Thank you for calling Standard Group Services. You have reached Wyashika Sellar. I am either on the phone or with another client. Please leave a message and your call will be returned shortly. Thanks a lot.)"
Q. Is the phone number ending in 3077 the same number we were just talking about a few minutes earlier?
A. Yes, it is.
Q. And remind the jury, what is the relevance of Standard Group Services?
A. Standard Group Services is one of the e-mail addresses, ued@standardgroupservices, that we've previously talked about. It was utilized as an e-mail address to respond to by the victims in the fraud.
Q. And was that e-mail address often signed by Wyashika Sellar?
A. It was.
Q. So speaking of Wyashika Sellar, did you find other items of relevancy relating to Sellar on the defendant's devices?
A. Yes, I did.
MS. NUTINI: Publishing Government's Exhibit 911, which has been admitted into evidence.

BY MS. NUTINI:

Q. Special Agent Kadonsky, what are we looking at here?

A. This appears to be a template or a communication related to Wyashika Sellar. At the bottom, you see the e-mail address ued@standardgroupservices.com, and the phone number +44 20 3936 3077 utilized by the individual pretending to be Wyashika Sellar.

This particular item was found on the -- I believe this one was found on the MacBook. There were very similar ones to this found on some of the other devices as well.

Q. And, generally speaking, is this a template or something similar that we've seen before?

A. Yeah, it just is a template communication. We see this communication utilized in the various victim communications.

Q. And directing your attention to specifically this ued@standardgroupservices.com e-mail address, is this an e-mail address we've talked about during your testimony yesterday?

A. Yes. Yesterday I talked about the subscriber records for ued@standardgroupservices.com.

Q. And remind the jury, what was the relevance of those records?

A. The IP address for those records returned to Mr. Ibekie's residence.

Q. The same residence where this search warrant was conducted?

A. That is correct.

Q. Do you see a phone number listed for Wyashika Sellar?
A. Yes, I do.
Q. Is that the same 3077 number we've been talking about?
A. It is, yes.

MS. NUTINI: Your Honor, may I keep going or did you --

THE COURT: It is noon, but -- why don't I stick to what I said before. It's noon, so we're going to break at noon, folks.

We're going to follow the same thing we did before. Take your jury notebooks with you. Don't talk to anyone about the substance of your testimony. Keep an open mind. I know I keep saying those things over and over. I do that for a reason. It's important. It's important. It's part of the procedure, fairness of the proceeding.

So please take everything with you. We're going to have a little longer lunch break today. We're going to go -- let's come back at 1:15. You've got an hour.

Are you folks getting enough time to eat? People getting enough time?

I don't want people being rushed. So have a little more time today. We'll go at 1:15. We'll resume then, and we'll see you when we see you.

Thank you, folks.

THE COURT SECURITY OFFICER: All rise.

(Jury out at 12:02 p.m.)

THE COURT: Sir, you may step down.

Don't talk to anyone about the substance of your testimony.

Have a seat, briefly, folks. Thank you, Ms. Nutini, for the nudge there. You know, if you were a minute or two away from wrapping up, I would have just been late. But thank you for the reminder. That was military-like precision by you. Right at noon, you stopped me.

So I've got a meeting with the chief judge and Tom Bruton on some assorted things, and I promised them that I would break at noon. So I'm going to break at noon.

One quick thing before I go. Thank you to you folks for filing the updated set of the proposed jury instructions. I would like you to file the redline on the docket.

Thank you, Counsel for the government, for e-mailing the redline. It's kind of you to do that. I'd like you to just put it on the docket. That way, it's easier for me to find.

And then if you folks would be kind enough to e-mail a Word version to the proposed order inbox. Make sure you obviously copy Mr. Carlson on it. That way, if I have to make changes to it, it's easier for me to do it. Okay? So if you'd be kind enough to do that at your convenience.

And then after I come back from my meeting, we do need

to reconvene. I want to continue my discussion with Mr. Ibekie and Mr. Carlson about whether he's going to testify.

And maybe, Mr. Carlson, you'd be kind enough to take some time here and talk to him and just talk it through. You know, it's serious business in a criminal proceeding. All right? So I want to make sure people have a chance to think things through and talk to counsel and make the best decisions they can.

I'll say to you again, Mr. Ibekie, what I've said to you before, it's ultimately your decision whether you testify. It's not your lawyer's decision; it's your decision. But I do really encourage all criminal defendants to talk to their lawyers and listen because they're there to help you and make the best decision.

So I'm not going to have you make a decision now about if you want to testify, but I do want you to talk with Mr. Carlson over the lunch hour and really talk with each other and listen to each other.

Does that sound okay?

THE DEFENDANT: Yes, Your Honor. We have a little challenge with that because in the court today, there's no place for me to talk to my attorney. When I came in this morning, the U.S. Marshal informed me that we are not -- I cannot -- I'm not allowed to -- we are not allowed to go back to talk together. And we do need quiet time. If you could

make that possible for us, even if just for 15 minutes, for me and my attorney to confer, and then, you know, get in more details and -- so I could have a better understanding about every decision I'm making.

THE COURT: Okay. I certainly want to give you a chance to talk with your lawyer.

Over the lunch hour, Mr. Carlson, do you know if he's able to meet with you privately upstairs?

MR. CARLSON: Yeah, Judge. The problem was -- and this is standard procedure in the courtroom. The marshals -- I asked whether we could go in the back knowing that the answer was no, but I asked anyway.

THE COURT: Yeah.

MR. CARLSON: They said we could talk upstairs. We were getting ready to start court.

THE COURT: Yeah.

MR. CARLSON: They kindly allowed us a corner to talk for a few minutes.

I will go upstairs to the lockup and see him over the lunch hour once I've had a chance to grab something to eat.

THE COURT: Yeah, totally fine.

I will give you a chance to talk, Mr. Ibekie. Don't worry about that. We'll give you a chance to talk.

THE DEFENDANT: Thank you, Your Honor.

THE COURT: You're entitled to that.

And thank you for adding that, Mr. Carlson. That makes perfect sense to me, everything you just said. I understand the logistics. You know, we've got a secure building. We move people in and out. And the marshals do such a terrific job of making sure people are where they need to be. But we'll make sure you have the time and the space and the opportunity to consult with your client about what he wants to do. Okay?

That's why I gave them a little extra lunch hour, 12:15 -- until 1:15.

So why don't we try to connect in here a little after 1:00, maybe 1:05.

And, Mr. Carlson, if you're not here and you're not ready, I'll assume that you're talking to Mr. Ibekie upstairs. All right. So if you're ready, we'll start maybe at 1:05. If you're not ready, we'll just assume that you're having productive conversations, and we'll convene when you're ready.

Does that sound fair to everybody?

MR. CARLSON: That's fine, Judge.

THE COURT: Does that sound good?

MS. NUTINI: Sounds good.

THE COURT: Okay. We'll see you in an hour. Get some food, and we'll see you in a bit.

(Recess at 12:06 a.m., until 1:16 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ) Case No. 20 CR 352
)
v. )
)
ANTHONY EMEKA IBEKIE, ) Chicago, Illinois
) June 21, 2024
Defendant. ) 1:16 p.m.

TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. PAIGE NUTINI
MS. MEGAN DeMARCO
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For the Defendant: KENT R. CARLSON & ASSOCIATES, P.C.
BY: MR. KENT R. CARLSON
53 W. Jackson Boulevard, Suite 1523
Chicago, Illinois 60604

Also Present: MS. AMY MANSKER, Special Agent
IRS Criminal Investigations

MR. CHRISTOPHER KADONSKY, Special Agent
IRS Criminal Investigations

Court Reporter: AMY M. KLEYNHANS, CSR, RPR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 2318A
Chicago, Illinois 60604
Telephone: (312) 818-6531
amy_kleynhans@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out; defendant present:)

THE COURT: All right, folks. Thank you for bearing with me. I wanted to talk about what's next up. Ms. Nutini dutifully broke right at noon. You've got a little bit to go, I know. What's your best guesstimate? I'm not sitting on you. It doesn't matter what the answer is, just by way of prediction.

MS. NUTINI: Probably about 20 more minutes, your Honor.

THE COURT: Okay. Perfectly fine, whatever you want to do. And then Mr. Carlson will have a cross. And then that is your last witness?

MS. NUTINI: It is, Judge.

THE COURT: Okay. And have all of the stipulations been read that are going to be read?

MS. NUTINI: They have.

THE COURT: Okay. And this is -- it sounds like the same question, but it's actually a different question. Did you read all the stipulations? In other words, 1 through 15, everything has been read. In other words, you not only read everything that you intend to read, but you also read everything; is that correct? Are both of those propositions correct?

MS. NUTINI: It is correct, your Honor. I'm only

hesitating because there is no Stipulation No 11. That was removed. That was never submitted to your Honor in the revised version.

THE COURT: Okay. Yep.

MS. NUTINI: So 14 stipulations have been read, yes.

THE COURT: Okay. So thank you for that. And you're done with presenting the exhibits, and everything. You're -- you're basically -- this witness is it, and you're done, you're resting?

MS. NUTINI: Yes, that's correct.

THE COURT: Okay. That's fine.

All right. So let me talk to the defense team. I don't know, Mr. Carlson, have you had a chance to talk with Mr. Ibekie over the lunch hour and how that went, but let's just talk for a minute about what your latest and best thinking is.

MR. CARLSON: Judge, I did speak with Mr. Ibekie for approximately a half hour upstairs over the lunch break. Mr. Ibekie, despite his previous assertions that he was not testifying, the latest being yesterday afternoon, now insists on testifying. There is no way, in light of his prior position, that he was not testifying. And I can be ready to put on Mr. Ibekie as a witness this afternoon.

THE COURT: Okay. What do you think, Mr. Ibekie? Is that -- is that correct about what you're currently intending

to do?

THE DEFENDANT: Absolutely. And Mr. Kent Carlson is absolutely right in what he said. And my -- I pray to Honorable Court to see if it could grant Mr. Carlson some additional time to prepare. I'm also doing my possible best to help in any way, shape, or form to, you know, have us ready by next week.

THE COURT: Okay. So it sounds like as late as yesterday afternoon the defendant was not intending to testify, and it was his longstanding position. But he showed up in court today and just announced a little bit ago, late this morning, that you -- that he wanted to testify.

Is that right, Mr. Ibekie?

THE DEFENDANT: Yes, your Honor.

THE COURT: When did you tell your lawyer for the first time that you wanted to testify?

THE DEFENDANT: Actually, it was about 9:15, thereabout, this morning, your Honor.

THE COURT: This morning? Okay.

All right. So, Mr. Carlson, you're not in a position to do the exam today, it sounds like?

MR. CARLSON: Judge, I am not. And just so your Honor is aware, I have spoken with Mr. Ibekie on this many, many times. And just quickly, June 12th at the MCC he told me he definitely wasn't going to testify. June 17th, here in court,

he told me he wasn't going to testify. June 18th, here in court, he told me he was not going to testify. June 19th at the MCC, he assured me he was not going to testify. Yesterday, June 20th, in court, he told me he wasn't going to testify. And then I spoke with him on the telephone last night, and he never mentioned anything about testifying. And the first time I heard about it was this morning.

THE COURT: Perfectly fine. I'll give you time. I'll give you time.

THE DEFENDANT: Thank you, your Honor.

THE COURT: That's fair. I think that's fair. You know, this is -- the bottom line, this is an important proceeding. We're going to do this in an orderly fashion. Maybe things are coming to a tee and crystalizing and -- crystalizing for Mr. Ibekie, and he realizes he wants to testify. I'll let him do it.

We've got Monday and Tuesday off. Here's what I will need you to do, though. Out of fairness to the government, I'm going to need you to let them know by Tuesday at noon one way or the other, up or down, if he's testifying. I assume the answer is going to be he's testifying, but I don't want the lawyers for the government to be preparing all weekend and then find out on Wednesday morning that he's actually not testifying at all. I think that's fair. That's more than enough time. Can you do that?

MR. CARLSON: Absolutely, Judge.

THE COURT: Let me say it, again. By Tuesday at noon, you've got to let the government know one way or the other if he's testifying. Is that fair?

MR. CARLSON: Absolutely.

THE COURT: Okay. So that's what we'll do. We'll finish our -- the exam right now. The government will rest. Right? And I'm just going to tell the jury they can enjoy the first full day of summer. I'll just make a little light comment to get them out of here in a good spirit.

I think even if the defendant testifies on Wednesday morning, we should still be well within our budget of finishing trial by the end of next week. It sounds like we're probably going to -- if I had to guess, I think we're still going to end with the evidence on Wednesday, I'm guessing. But who knows how long the defendant is going to testify. But that seems like a reasonable guess. Any reaction to that?

Hard to say, Mr. Carlson, because you haven't prepared yet, so you don't know how long it's going to go.

MR. CARLSON: That's correct, Judge. And I do believe we can probably get through Mr. Ibekie's testimony on Wednesday. I have been advised by the government that they would possibly have a rebuttal case at that point.

THE COURT: Okay.

MR. CARLSON: And I would just suggest that, you know,

we not schedule closings for any time on Wednesday.

THE COURT: All right. So why don't we talk about that after hours here.

MR. CARLSON: Sure.

THE COURT: Let's get the jury out here.

Ms. Nutini, go ahead.

MS. NUTINI: Yeah, your Honor, like you just said, we can talk about this after hours. I think we would object to not doing closings on Wednesday. We would ask that they be scheduled for Wednesday afternoon, or at least as planned on doing them Wednesday afternoon. I think we're getting a bit concerned about the timing now, and so we would like to move forward.

THE COURT: I understand. So let's put a pin in this, and we'll circle back after the jury is dismissed for the day.

But here's the punch line for the defense team. I understand that Mr. Ibekie has recently changed his mind and has decided to take the witness stand. I will give you time to prepare. All right. So I will not force him to take the stand today. I'll let you sleep on it and have until Wednesday. Okay? You do have to let the government know by Tuesday at noon if you've changed your mind.

All right. Everybody ready to get the jury?

MS. NUTINI: Yes, Judge.

THE COURT: Okay.

(Jury in at 1:26 p.m.)

THE COURT: All right. Have a seat, everyone. Welcome back, everybody.

Ms. Nutini, you're welcome to continue with your examination.

MS. NUTINI: Thank you, Judge.

CHRISTOPHER KADONSKY, GOVERNMENT'S WITNESS, DULY SWORN,

DIRECT EXAMINATION (Resumed.)

BY MS. NUTINI:

Q. Special Agent Kadonsky, before the break, we were talking about Wyashika Sellar; is that correct?

A. That's correct.

Q. I'm going to publish Government's Exhibit 914, which has been admitted in evidence. What is this?

A. This appears to be a letter addressed to Mr. Dale Helms signed, or with the signature block from Wyashika Sellar showing the e-mail at the bottom, ued@standardgroupservices.com.

Q. And where was Government's Exhibit 914 recovered on the defendant's devices?

A. This was found on Mr. Ibekie's MacBook computer.

Q. Directing your attention to the "to" column. Who is this letter to?

A. Dale Helms, a victim of inheritance fraud, who you heard testify earlier in this trial.

Q. And when -- excuse me. And who is this e-mail from?
A. Wyashika Sellar.
Q. And when Mr. Helms testified, did he discuss receiving a similar type of document?
A. Yes, he did.
Q. I'm going to publish Government's Exhibit 914 to the left of the screen. I'm also going to publish Government's Exhibit 103-6, which has been admitted into evidence on the right side of the screen.
Special Agent Kadonsky, looking at the first page of the document, what does this exchange appear to be?
A. The document on the right appears to be an e-mail from ued@standardgroupservices.com to Dale Helms.
Q. I have blown that up for the jury to be able to see. And what is the subject of this?
A. Successful completed questionnaire.
Q. Does Ms. Sellar indicate that there are documents attached to this e-mail?
A. Yes. It reads: "Dear Mr. Dale. Congratulations on the successful completion of the questionnaire. Please review the attached documents."
Q. And scrolling to page 2 of the document, I'm putting Government's Exhibit 103-6 on the right and 914 on the left. What is your reaction?
A. They appear to be the same document to me.

Q. And Special Agent Kadonsky, the artifact on the left, this was recovered from the defendant's MacBook computer?
A. That is correct.
Q. Publishing Government's Exhibit 915, which has been admitted into evidence.
Special Agent Kadonsky, what are we looking at here?
A. This is a redacted Minnesota driver's license for victim Dale Helms.
Q. And to be clear, has this been redacted for trial purposes?
A. That is correct.
Q. And where was this Minnesota driver's license for Dale Helms recovered?
A. An unredacted version of this driver's license was recovered from Mr. Ibekie's MacBook computer.
Q. This is the same MacBook computer that had the letter from Wyashika Sellar to Dale Helms?
A. That is correct.
Q. I'm publishing Government's Exhibit 901, which has been admitted in evidence.
Special Agent Kadonsky, what are we looking at here?
A. This is what appears to be a wire transaction from Peter Pfizer to Emetech Solutions, utilizing Barclays Bank.
Q. And what is the amount of the wire transaction?
A. $10,000.
Q. Is there a confirmation code number?

A. There is.
Q. What are the last four digits?
A. 1134.
Q. And does there appear to be any handwriting on this document?
A. Yes. The confirmation code appears to be circled, as well as the account number appears to be scratched out over to the left.
Q. And where was this artifact recovered?
A. This one was recovered from a flash drive, or thumb drive, from Ibekie's residence. In addition to this, there is a version of this document without the handwritten circle or the scratched out account number found on a MacBook computer.
Q. So this document, or a version of it, was found on two of the defendant's devices?
A. That is correct.
Q. Has the jury seen a document similar to this one during this trial?
A. Yes. While Dale Helms was testifying.
Q. I'm going to publish 901 to the left-hand side of the screen. I'm going to pull up Government's Exhibit 103-13, which has been admitted into evidence.
Special Agent Kadonsky, what are we looking at here?
A. This is an e-mail received by Dale Helms from peterp968@yahoo.com.

Q. And what does Peter Pfizer tell Dale Helms?
A. "Hey, Dale. I wired $10,000 to the lawyer. I have attached the confirmation receipt so you can send it to them."
Q. Scrolling to page 2 of the document, putting this side by side with Government's Exhibit 901, what is your reaction, Special Agent?
A. The document on the right appears to be a photocopy or scan of the document on the left.
Q. And directing your attention to the confirmation code on the right, what are the last four digits?
A. 1134. The same as the document found on Ibekie's devices.
Q. Do both confirmation codes appear to have circles around them that have been hand drawn?
A. They do, yes.
Q. And do both appear to have the account number scribbled out?
A. That is correct.
Q. And are both of these receipts addressed to the recipient, Emetech Solutions?
A. Yes, they are.
Q. And remind the jury, what's the significance of Emetech Solutions?
A. Emetech Solutions was a business that received inheritance fraud proceeds. We heard Ebuka Egbunam, the son of Mr. Ibekie, testify regarding Emetech Solutions.

Q. And is this a real wire transfer receipt either on -- excuse me. Just give me one moment.

I'm putting 901 back up on the left-hand screen, and I'm putting 103-13 back up on the right. Let me ask my question again.

Special Agent Kadonsky, are either of these real wire transfer receipts?

A. No. These are fictitious documents.

Q. How do you know that?

A. I reviewed the bank accounts for Emetech Solutions, and this transaction did not occur. It's not a real wire.

Q. In other words, do the bank records for Emetech Solutions show an incoming $10,000 wire on June 9th of 2020?

A. They do not.

Q. Do they show an incoming wire of $10,000 anytime on -- in June of 2020, from this address?

A. No.

Q. So we've discussed John Delon, Peter Pfizer, and Wyashika Sellar. Did you find any items of relevance related to Nikka Avis on the defendant's devices?

A. I did, yes.

Q. Publishing what's been admitted in evidence as Government's Exhibit 903.

Special Agent Kadonsky, what are we looking at here?

A. This is a message or an image of a message from Nikka Avis,

Unclaimed Estate Department, TD Canada Trust Bank Financial Group, to Cong. It says "Dear Cong" at the top, which is a reference to Cong Le, a victim of the inheritance fraud who testified earlier this morning.

Q. And where was this artifact recovered?

A. This one was found on an external hard drive.

Q. And an external hard drive belonging to the defendant?

A. That is correct.

Q. And you explained that Cong Le testified. What is the significance of this document itself?

A. Cong Le had communicated with Nikka Avis, we heard that earlier. And this -- this document appears similar to the document that he was discussing.

Q. Has the jury seen this document or something similar during trial?

A. Yes.

Q. I'm going to move Government's Exhibit 903 to the left-hand portion of the screen and pull up Government's Exhibit 102-12. Excuse me. I'm going to pull up 102-6.

Special Agent Kadonsky, comparing the artifact recovered from the defendant's device on the left-hand side of the screen to the e-mail correspondence between Cong Le and ued@tdcanadagroup.com on the right-hand side of the screen, what's your reaction?

A. They appear to be substantially the same.

Q. Does the first full paragraph appear to be the same for both of the e-mails?
A. Yes.
Q. How about the second full paragraph?
A. Yes, it does.
Q. Do both then say "kindly acknowledge receipt of this e-mail"?
A. They do.
Q. And a note?
A. The note appears to be the same.
Q. And how about "we look forward to hearing from you"?
A. The same.
Q. And the signature block?
A. Substantially the same. The spacing is slightly different.
Q. Are there other examples of documents relating to Nikka Avis on these -- the defendant's devices?
A. Yes, there are.
Q. Like what?
A. There are other templates and what appears to be communications related to Nikka Avis, as well as TD Canada Group and ued@tdcanadagroup.com.
Q. And that's the e-mail address you're referencing that Nikka Avis used in her signature block?
A. That is correct.
Q. Special Agent Kadonsky, the jury has heard some evidence

about the alleged attorney, Pierre Delouis, during this trial. Did you find any evidence relating to Pierre Delouis on the defendant's devices?
A. Yes, I did.
Q. Publishing Government's Exhibit 905, which has been admitted into evidence. Special Agent Kadonsky, what is this document?
A. This appears to be a communication between Pierre Delouis and Cong Le, a victim of the inheritance fraud.
Q. And where was this artifact recovered?
A. This one was on an external hard drive at Anthony Ibekie's residence.
Q. And what is the significance of this document?
A. This is a document that we saw a substantially similar document during the testimony of Mr. Cong Le.
Q. I'm going to move Government's Exhibit 905 to the left of the screen, and I will pull up Government's Exhibit 102-12.
Special Agent Kadonsky, what's your reaction?
A. These are the same.
Q. So the image on the left-hand side of the screen, this is an artifact recovered from the defendant's devices?
A. That is correct.
Q. And the image on the right-hand screen is an e-mail correspondence that Cong Le provided?
A. That is correct.

Q. We've heard testimony during this trial about letters being mailed to potential victims at their residences; is that correct?
A. That is correct.
Q. During your review of the digital devices, did you find evidence of the names and addresses of victims or potential victims?
A. Yes, I did.
Q. What did you find?
A. I found approximately 200 spreadsheets containing names, addresses, and information that could be used to mail letters to potential victims.
Q. So in each of the spreadsheets, approximately how many potential victim names were listed?
A. Approximately a thousand per spreadsheet.
Q. Publishing Government's Exhibit 908, which has been admitted into evidence. Special Agent Kadonsky, I'm going to scroll down several pages, and then I'll ask you some questions. This is page 2, page 3, page 4, page 5, page 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27. Does this keep going?
A. It does.
Q. What is this document, Special Agent Kadonsky?
A. This is an Excel spreadsheet that has a list of names and addresses that could be utilized for mail merge.

Q. And where was this document recovered?
A. This particular document was actually recovered on multiple devices, including Mr. Ibekie's external hard drive, Mr. Ibekie's MacBook computer, and Mr. Ibekie's Dell computer.
Q. And you said you came across approximately 200 of these types of spreadsheets?
A. That's correct. Approximately 200.
Q. And were those spreadsheets all on the same device, or were they on different devices?
A. No, across various devices.
Q. Is it fair to say that most -- most or many of these names are potential victims?
A. That's correct.
Q. Did you come across spreadsheets containing the names of actual inheritance fraud victims in this case?
A. Yes, I did.
Q. And who are some of the names that you came across in these spreadsheets?
A. Mr. Dale Helms, who you heard testify. Mr. Cong Le, who you heard testify. And Mr. Gary Foster, who was a victim of inheritance fraud.
MS. NUTINI: For the witness only, please.
BY MS. NUTINI:
Q. Special Agent Kadonsky, I'm showing you what's been marked as Government's Exhibit 708. Do you recognize this individual?

A. Yes, I do.
Q. Who is this?
A. This is Gary Foster.
Q. And does Government's Exhibit 708 fairly and accurately depict Mr. Gary Foster?
A. Yes, it does.
MS. NUTINI: The government moves to admit and publish Government's Exhibit 708 into evidence.
THE COURT: Any objection?
MR. CARLSON: No objection.
THE COURT: Government Exhibit 708 is admitted. You can publish to the jury.
MS. NUTINI: Thank you, Judge.
(Government's Exhibit No. 708 was received in evidence.)
BY MS. NUTINI:
Q. So for the jury, Special Agent Kadonsky, who is this?
A. This is Gary Foster, a victim of inheritance fraud.
Q. And was Gary Foster's name and/or address contained on more than one of these spreadsheets?
A. Yes, it was.
Q. Publishing Government's Exhibit 912, which has been admitted into evidence. What are we looking at here?
A. This appears to be wire instructions for an Access Bank account in Nigeria, with the beneficiary, Anthony Ibekie.
Q. And where were these wire instructions recovered?

A. This was recovered from multiple devices, including Ibekie's external hard drive, as well as one of the computer -- or, I'm sorry, one of the cellphones.
Q. And is this Access Bank account ending in 8742 one that is relevant to the case?
A. It is. This is something that throughout the trial we have seen inheritance fraud funds be sent to Nigeria.
Q. And sent specifically to this account?
A. That is correct.
Q. For the two phones that you recovered from the defendant's house, did you review the call logs contained on the phones?
A. I did.
Q. Did you find anything of relevance on the call logs?
A. I did.
Q. What did you find?
A. I found calls between one of Mr. Ibekie's phones and the undercover agent, as well as phone calls placed to victim, Dale Helms.
Q. I'm publishing Government's Exhibit 719-5, which has been admitted into evidence.
Special Agent Kadonsky, is this a document that the jury has seen before?
A. Yes.
Q. Can you remind the jury in what context they have seen this document?

A. This document was shown during Special Agent Mansker's testimony while you were reviewing physical evidence recovered from the search warrant at Anthony Ibekie's residence.
Q. So this sheet of paper was physically recovered from the defendant's house?
A. That is correct.
Q. And I'd like to just recap briefly a few of the items we've discussed today. Is there any relevance to this phone number, Peter Pfizer, based on your testimony today?
A. Yes. This phone number for Peter Pfizer was shown on the TollFreeForwarding records, as well as several of the letters that we have seen.
Q. How about this Standard Group Services phone number?
A. Yes, the Standard Group Services phone number was also on the TollFreeForwarding records and is the phone number used by Wyashika Sellar in communications with victims.
Q. Did you find an electronic version of this document on any of the devices?
A. I did.
Q. What did you find?
A. An electronic version of this document was found on the MacBook computer.
Q. And whose MacBook computer was that?
A. Anthony Ibekie's.
MS. NUTINI: Thank you. I have nothing further.

THE COURT: Thank you, counsel. Mr. Carlson?

CROSS-EXAMINATION

BY MR. CARLSON:

Q. Special Agent Kadonsky, just because a piece of a letter or an e-mail or something was located on a device, you can't tell who put that piece on there; can you?

A. I'm not able to tell who was behind the keyboard, but you can look at the artifacts on the device to determine the likely source based on attribution of who was using that device.

Q. But someone else could have used the device and put it on there; correct?

A. Yes, I can't say assuredly nobody else has ever used a particular device.

Q. So when you look at that, all you're seeing is the data that's on there. You don't have any information as to who actually, physically, put that there; correct?

A. You have to look at the attribution factor, so what all is contained on the device. And that gives you an idea of the likely user of the device.

Q. But it's only the likely user of the device. Many people could -- you would agree with me, many people can use a device; correct?

A. That's correct.

Q. And you're just saying that based upon your looking at the device and forming a belief of whose device it was, you just

kind of determined that that's who you believe placed that information there?
A. I'm sorry, could you -- can you rephrase that?
Q. Yeah. Based -- what you're doing is you're -- when you say attribution, you're looking at it and you're trying to make a determination of whose device it was; correct?
A. That is correct.
Q. And based upon that, you're suggesting you can determine who you believe the person who used that device and put whatever piece of evidence we're talking about on there; right?
A. That's correct. You look at the device, you look at the communications, whether or not they're talking to specific individuals. For instance, it would be unusual to have conversations that appear romantic and -- or directly related to a specific relationship on a device that doesn't belong to somebody in that relationship.
Q. But somebody -- somebody could lend somebody their phone to send it -- send a text message; correct?
A. Yes, but you look at the overall -- overarching level of artifacts on the device, and you can tell during certain time periods who likely has control of the device.
Q. And people share -- allow other people to use their computers; correct?
A. That is correct. We heard Mr. Ebuka testify that he did not utilize Mr. Ibekie's computers. And the likely users of a

computer would be the residents of that property.
Q. So whoever a resident -- you're suggesting whoever may be there could have done -- could have used that computer?
A. I think based on the artifacts that were identified on the devices, I believe Anthony Ibekie was utilizing those computers and electronic devices.
Q. But you can't say that if there were other people who were there they never used the computer; correct?
A. I'm not a -- I'm not following your question.
Q. All right. For example, if eight people lived at a house, you're not trying to say that eight people couldn't have used it -- one of the -- a computer that was there; right?
A. I -- I wouldn't be able to say whether or not they've ever touched that computer. I can tell you the likely primary user of it. Anytime somebody uses a computer, it will leave artifacts, and so you would see other user accounts, other information, other images and artifacts on those computers that would lend it to be a more complicated determination for attribution.
Q. But if several people were working on a project together, they might share some of that kind of information; correct?
A. It's possible.
Q. And you -- you wouldn't be able to say who it was specifically, whether it was one person, whether it was three people, whatever; correct?

A. That -- that's correct.

MR. CARLSON: I have nothing further.

THE COURT: Okay. Thank you, Mr. Carlson.

Ms. Nutini?

MS. NUTINI: Thank you, Judge.

REDIRECT EXAMINATION

BY MS. NUTINI:

Q. Mr. Kadonsky, do you remember the question you were just asked on cross about the hypothetical of if eight people lived at a house who might be using the device?

A. Yes.

Q. How many people lived at the Oxbow premises?

A. Two.

Q. And who were those people?

A. Ebuka Egbunam and Anthony Ibekie.

Q. Was there anyone else that lived at those premises? Was there anyone else that lived at that house?

A. Not that I'm aware of.

Q. And you already walked through how you attributed certain devices to Mr. Egbunam; correct?

A. That is correct.

Q. And how you attributed other devices to the defendant; correct?

A. That is correct.

Q. Did you find any evidence that someone else other than

Anthony Ibekie was using those six devices?

A. No, I did not.

MS. NUTINI: Thank you. I have nothing further.

THE COURT: All right. Sir, you may step down. Thank you for coming. Please watch your step.

(Witness excused.)

THE COURT: What next from the government?

MS. NUTINI: Your Honor, the government rests its case.

THE COURT: Okay. Members of the Jury, you just heard that. The government has rested its case. That means the government has completed its presentation of its side of the case. Putting aside any possible rebuttal, their presentation of the evidence has been completed.

In light of that, I'm going to let you go early today. I'm going to let you go early today. You're going to celebrate the first full day of summer out of the Dirksen Federal Building. All right? So I'm going to let you go.

It's about 2:00 o'clock. We're going to resume next week. Please remember the schedule for next week, folks. We're not going to be here on Monday. We're not going to be here on Monday. We're not going to be here on Tuesday. So Monday we're off, Tuesday we're off. Please don't come, unless you want to watch another trial. You won't watch this trial because this trial will not be here. Please don't come Monday

or Tuesday.

We are going to resume on Wednesday morning, and we're going to resume at the normal time of 9:00 o'clock. Okay? I hope that's not too early for people. I know some of you travel pretty far, actually. But we're going to be here at 9:00 o'clock on Wednesday morning.

You folks have now heard the government's case. You have not heard the whole entirety of everything you need to hear before you make up your mind. You have not heard jury instructions, et cetera. You have not heard closings. There's a whole lot of other parts of the trial you haven't heard yet. So you've got to keep an open mind until the very end of the trial.

You can't talk to anybody about the case. You know, if you have family or friends that either have been in the courtroom or you've talked to, like how is your day going, you can tell them you were at the jury service. You can't tell them anything about the case. You can't describe the case. You can't have any conversations with anybody, even each other. I know it may be tempting to talk to each other. You can't talk to each other about the case. That time will come. That time is not yet here. All right? So please keep an open mind. Please don't talk about the case with anyone.

Please take your jury notebooks. Please leave it in the jury room. They will be locked over the weekend. Nobody

will read it.

Please do have a good weekend. Please enjoy the first full day of summer. We will see you in, what, is that five days, I think; right? Give or take, if math checks out. We will see you on Wednesday morning at 9:00 o'clock. Have a great weekend, folks. We will see you. Thank you for your service to your country. Take care, folks.

(Jury out at 1:55 p.m.)

THE COURT: All right. Have a seat, everyone. All right. I've never seen a jury be disappointed when I tell them we're going to end early.

So I have a few things that I want to cover. I want to give you a ruling on the issue of Exhibit 5. Do you all want a break? Do you people want -- you've been going about a little over an hour, I guess maybe not quite an hour. Do you all want a break before we talk about that issue?

MR. CARLSON: I'm fine, Judge.

MS. NUTINI: We're fine.

THE COURT: Okay. Let me start with a couple questions for you on that. Again, we're talking about Defendant's Exhibit No 5. This is a follow-up to a colloquy that we had before. I issued a preliminary ruling at some point last week, and Mr. Carlson, in the last couple days, has said that he wanted to talk about that exhibit before -- excuse me, talk about that exhibit some more. In a moment I'll ask

you folks if you have anything else that you'd like to address on that.

I do want to follow-up with Mr. Carlson on one point. We talked about the e-mail that was attached to the document. Were you able to print that out?

MR. CARLSON: Judge, I -- what I did is I printed out -- I printed out one of -- one e-mail that is -- contains the same e-mail addresses, and stuff, as the others. I've received several e-mails with all of the exhibits that we have, but I printed out copies of that would show who the person who I communicated with is.

THE COURT: So bear with me. So is this the e-mail that you received that contained Exhibit No 5 as an attachment, or is this some other e-mail?

MR. CARLSON: Judge, this is -- I can't specifically find the e-mail that -- because I received probably 15 different e-mails with various sets of exhibits, I can't specify which one specifically had Exhibit No 5. But all of them came from the same source.

THE COURT: Okay. So let me back up. You got a bunch of documents from somebody by e-mail.

MR. CARLSON: Yes.

THE COURT: And you cannot locate the e-mail.

MR. CARLSON: It's not that I can't locate it, Judge, it's just that I don't know specifically which one No 5

pertains to. They all came from the same person.

THE COURT: Bear with me. Shouldn't there be an e-mail with an attachment of Exhibit No 5?

MR. CARLSON: There's other -- my point is, Judge, there are other exhibits along with --

THE COURT: Right.

MR. CARLSON: -- that.

THE COURT: That I understand. In other words, you got about 15 e-mails from somebody.

MR. CARLSON: Right.

THE COURT: And that somebody sent you exhibits.

MR. CARLSON: Right. And, Judge, what I'm trying to say, Judge, is some of them had parts of -- I would get these -- I'm trying to figure out the best way to explain it, Judge.

THE COURT: Yeah.

MR. CARLSON: I would get an e-mail that would have five separate files on it pertaining to five separate things. Then I'd get another e-mail with two separate things.

THE COURT: Okay.

MR. CARLSON: And I can't, with any specificity, without having to go back and look through every single one of those, find which ones specifically apply to No. 5.

I thought what your Honor wanted to know was the source of the e-mails.

THE COURT: Well, I do want that. But what I was hoping to get was a copy of the e-mail where this person e-mailed you the document that you've marked as Exhibit No 5.

MR. CARLSON: I would have to go back and look through all of those e-mails to be able to do that, Judge. And last night I just didn't have time to do that.

THE COURT: Okay. So what you have today is not the e-mail that transmitted the exhibit, but, rather, you have like an exemplar e-mail, another e-mail from this person that attached maybe some other document; is that it?

MR. CARLSON: This e-mail, what he says is, "I have successfully collected all the information from the source and submitted it to you."

THE COURT: Okay. Do you have an extra copy of that? Can I see it?

MR. CARLSON: I do, Judge. I have a copy for you and for the government.

THE COURT: I don't know if the government has seen it before, but why don't you be kind enough to pass it along. Maybe hand it to Ms. Ramos.

All right. Just to make a record by way of offer of proof, Mr. Carlson, if you'd be kind enough to just file this on the docket, just that way we've got a record.

MR. CARLSON: Sure, Judge.

THE COURT: All right. So I've got in my hand --

government's counsel, you got a copy, too?

MS. NUTINI: Yes, Judge.

THE COURT: All right. So it looks like it's dated yesterday at 5:21 p.m. It looks like that's when you printed it out, I assume. Upper, left corner it says "AT&T Yahoo e-mail." And it says "Re Documents." It looks to me to be an e-mail to you, Mr. Carlson, from somebody named Emeka, E-m-e-k-a, Ogbu. The e-mail address was emmynwa396@gmail.com. And let me just read it into the record. It's dated Saturday, May 11, 2024, at 4:01 a.m. I don't know if that's Africa time or America time, but that's the e-mail there.

Mr. Carlson had sent an e-mail saying: "Is this everything?" And there was a response that says: "Yes, Kent, for now. I have successfully collected all the information from the source and submitted to you. Please check if there is anyone missing. Let me know so I can contact the source. Thank you."

Again, that was in response to Mr. Carlson's e-mail saying "is this everything."

Down below, there's a different e-mail address, somebody named Declan Nnaji. Declan is D-e-c-l-a-n. Nnaji, N-n-a-j-i. With an e-mail address of declink79@gmail.com. Had e-mailed somebody else. That's the menwa396@gmail.com. It looks like to be Emeka Ogbu's e-mail address.

So let me see if I can tie a ribbon on that. It looks

like Declan Nnaji, N-n-a-j-i, sent documents to Emeka Ogbu, on May 7, 2024, presumably was forwarded to Mr. Carlson who responded, "Is this everything?" And then that was the response from Emeka Ogbu. That's a rough thumbnail sketch of what I'm seeing here.

Do you want to make a proffer, Mr. Carlson, about this? I understood you to say a minute ago that this particular e-mail is not the e-mail where you got the document that you later marked as Exhibit No 5. Rather, this is an exemplar of the kinds of e-mails that you got from this person providing you with information. Is that basically right?

MR. CARLSON: That is correct, Judge.

THE COURT: Do you want to just make a proffer about this e-mail? Anything else I should know?

MR. CARLSON: Judge, as I indicated previously, I had received several e-mails, probably total of 15 e-mails, from someone who I believed was Mr. Ogbu, O-g-b-u, with documents, most of which were included in the exhibits that I filed. And not just the Exhibit No. 5, but all sets of those exhibits. And I -- my e-mail to him here was I just wanted to make sure that I had received everything that he had gotten. And I was just verifying that.

THE COURT: Yep. Fair enough. Have you ever spoken to Emeka Ogbu?

MR. CARLSON: I have not, Judge.

THE COURT: And how about Declan Nnaji?

MR. CARLSON: I have -- other than seeing his name here, I have no -- no firsthand knowledge of who that is.

THE COURT: Do you know who these people are?

MR. CARLSON: I can tell you that I believe Mr. Nnaji is a lawyer. And I only know that, quite honestly, Judge, because my client told me that.

THE COURT: Okay. Do you know who Mr. Ogbu is? Maybe it's Ms. Ogbu, I don't know. I don't know if Emeka is a man or a woman.

MR. CARLSON: My understanding is it is a male.

THE COURT: Okay.

MR. CARLSON: I don't have any firsthand knowledge of who he is, other than he is someone who my client worked with and is friends with in Nigeria.

THE COURT: Okay. So defendant's friend in Nigeria sent you documents. And did that friend in Nigeria get it from -- the documents from Mr. Nnaji, or --

MR. CARLSON: That is what I took that to mean when he says "from the source." He did tell me in one e-mail that he was going to have somebody go to -- and I don't know whether it's a city hall, or whatever, immigration headquarters, whatever, to get records. And so what I understood this to mean was that Mr. Nnaji was the person who was going to get the records for Mr. Ogbu, who then sent them to me.

THE COURT: Okay. And the document in question, Exhibit No 5, did you get it on or about the same time? In other words, was it roughly like first half of May, give or take?

MR. CARLSON: Yes, Judge.

THE COURT: Okay.

MR. CARLSON: They -- there was -- it was all in a very short period of time.

THE COURT: Okay. Do you have any more information about the provenance of Exhibit No 5; in other words, who got it, where it came from, anything like that, other than what's on the face of the document?

MR. CARLSON: I do not.

THE COURT: Okay. It's a long way of saying, do you have any more info about the background of that document that we haven't already covered?

MR. CARLSON: I do not.

THE COURT: Okay. Does the government have any questions about this e-mail?

Thank you, Mr. Carlson, for pulling this. I know you're busy with trial prep. Thank you for taking the time to do that.

Does the government have any other questions on this?

MS. NUTINI: No questions. We have comments, your Honor.

THE COURT: Okay. All right. So why don't I do this. I have a couple questions for you. Let me cover my questions, and then I'll invite you folks to make any statements you want on the exhibit, and then I'll listen to you, and I expect I'll issue a ruling.

Let me ask you one question off the top. Does everyone agree that the correct framework is the following statute, 18 United States Code Section 3505. That's the statute about a foreign business record, basically. Plus 9023 of the Federal Rules of Evidence. Does everyone agree with that?

MS. NUTINI: Yes, Judge.

MR. CARLSON: Yes, Judge.

THE COURT: All right. What about 8038? In other words, Rule 8038. That's a general hearsay exception for public records. On the face it doesn't seem to cover domestic records versus foreign records. Maybe that's how it has been construed, I don't know. But 8038 says: A record or statement of a public office if, et cetera, et cetera, is not hearsay. Does anybody know if Rule 8038, meaning the hearsay rule about public records applies to public records of a foreign government, or does it only apply to domestic public records? I don't know, candidly.

MS. NUTINI: Your Honor, my understanding was that it only applied to domestic public records, but I don't know that

I have a citation to provide you right now.

THE COURT: Do you have an instinct on that, Mr. Carlson?

MR. CARLSON: Judge, I can only say to your Honor that I assumed because there is a separate statute that dealt with foreign records that the federal rule applied just to local -- or not local records, but records from the United States.

THE COURT: Yep, okay. That -- that very well may be right. I do think there's some similarity in certain respects between Rule 8038 and 18 United States Code Section 3505, specifically the carveout for trustworthiness. That's the guiding star in all of this. Do you agree with that?

MR. CARLSON: Yes.

THE COURT: Okay. All right. So I will let Mr. Carlson say anything he wants to say on this. You're the proponent of the evidence. You can go to bat for Exhibit No 5, if you like. I mean, we've talked about it a little bit, but why don't you make a quick proffer on why you think it's admissible. I said quick. It doesn't have to be quick. I didn't mean it like that. Make a proffer, go ahead.

MR. CARLSON: Thank you, Judge. I would suggest to the Court that the issue boils down to the question of trustfulness -- trustworthiness of the document. I think the remaining elements of 3505 are met. I believe -- and, again, I cannot vouch for the source of the document or the document

itself. All I can say is that these are the documents that were sent to me. I do not see anything and did not see anything on its face that indicates that it is not trustworthy. Having said that, I have no firsthand knowledge, and I'm not going to stand before this Court and say that I have firsthand knowledge, that these documents came from where they purport to be from or were kept in the manner they were. All I can say is, these are the documents that I received when I looked at them. I did not see anything in them that indicated a lack of trustworthiness. If I had, I would have not submitted them to the Court. I had no reason to doubt the legitimacy of them. And I just don't see anything that proves that they are not trustworthy.

THE COURT: All right. Thank you, Mr. Carlson.

Counsel for the government, anything you want to say?

MS. NUTINI: Yes, your Honor. Thank you. I think the primary issue here, yes, is trustworthiness of these documents. I also believe that the other elements of 3505 are not met because I don't think we can understand reasonably that this was a record kept in the ordinary course of business because we don't know that. And so I think there remain issues with the other elements of 3505.

But focusing specifically on trustworthiness here, what we have is essentially a game of telephone. We have one person sending documents to one person, who are then sending

documents to another person, who are then sending documents to defense counsel. There is a, quote, "source reference" in the e-mails. There is no indication any of these people work for a foreign government. These are Gmail addresses. There is no indication even that information was collected, say, from the Nigerian immigration services. It just says from the, quote, "source."

Your Honor, I would also point that Emeka Ogbu, while I can't say this with certainty, is believed to be a co-conspirator of the defendants. If your Honor remembers during trial, there were e-mails referencing Emeka Canada. It is believed that that is the same person. And so beyond not being trustworthy, this actually potentially is a co-conspirator of the defendant who -- a, quote, "business partner" I think is, or something to that effect that Mr. Carlson referenced is somebody who has helped the defendant potentially commit crimes and now is potentially helping him continue to commit crimes. And so the source of the documents are not trustworthy.

Then we look to the documents themselves. And, your Honor, I know we discussed some of that briefly yesterday, and so I won't repeat myself. What I will add is a little additional research that the government did. And the Nigerian immigration services website, if you go onto the official state website.

THE COURT: I have.

MS. NUTINI: And so your Honor probably knows there is a category that's called Document Authentication. There are several categories listed, including child adoption, birth certificate, marriage certificate, and end user certificates. There's no option that says whether this person has multiple names, or something to that effect. That is a made-up -- in the government's view, a made-up document.

I will direct your Honor to pages 2, 3, and 4 of the document. That while they appear to have a header, the information is not filled in. So, for example, the date, the reference number, all of that on pages 2 and 3, are blank. And so I don't know what we are to make of that, other than it's a header that's been taken from another document and is not actually an authentic document. You would think that that information on pages 2, 3, and 4 would actually be filled in if it were a legitimate document from a state entity.

And so, again, this rule applies to foreign records that have a foreign certificate and that are authentic. And, again, like common sense, there's a reason for that, and that is because they can be trusted. This is not that, your Honor. Just because it has the letterhead of a foreign entity does not make it admissible under 3505.

THE COURT: All right. Thank you. I had a question about Rule 9023. I don't know if people have it handy. Rule

9023 of the Federal Rules of Evidence is entitled Foreign Public Documents. It talks about whether the document itself authenticating.

My understanding, Mr. Carlson, is you do not have a proponent of the document that you plan to present in your case; is that right?

MR. CARLSON: That is correct.

THE COURT: Okay. So, in other words, nobody's going to stand up here and authenticate it. Your hook is that it has got to be self-authenticated. Do I have that right?

MR. CARLSON: Yes, Judge.

THE COURT: Okay. So the first sentence talks about the fact that there -- the rule covers a document that purports to be signed by someone authorized by foreign countries law. The second sentence says: "The document must be accompanied by a final certification that certifies the genuineness of the signature." The next sentence says: "The certification may be made by," and then gives a list of United States personnel. It looks to me like a foreign government document is self-authenticating only if it is accompanied by a certification from an official of the United States Government.

MS. NUTINI: That's our understanding as well, your Honor, which would be the letters rogatory process we discussed yesterday.

THE COURT: Right.

THE COURT: In other words, it says that there has to be a final certification, this certifies the genuineness, the signature, and then goes on to say how you can present that certification. And it has a number of possibilities. It says: "The certification may be made by a Secretary of the United States Embassy or by Consul General." Et cetera. It looks like I do need a certification from the United States Government official.

Am I reading that right? Mr. Carlson, do you agree with me on that?

MR. CARLSON: That's what it appears to say, Judge.

THE COURT: And I don't have that, do I?

MR. CARLSON: No.

THE COURT: Isn't that dispositive? It's -- you know, a document can't come into evidence unless it's authenticated or unless it's self-authenticating. To be self-authenticating, it needs a certification from a United States Government official. I do not have the certification from a United States Government official, and I also don't have a witness who's going to lay the foundation for authentication. So it seems to me by definition it's inadmissible. What am I missing?

MS. NUTINI: Your Honor, the government agrees with that. And also I think it fails for the trustworthiness reasons.

THE COURT: Separate and apart from the

trustworthiness part. It seems like we've got an authentication problem.

Mr. Carlson, do you disagree with that?

MR. CARLSON: No, Judge.

THE COURT: Okay. All right. Anybody else want to say anything under this topic?

MS. NUTINI: No, your Honor.

THE COURT: Mr. Carlson?

MR. CARLSON: No, Judge.

THE COURT: All right. So I'm going to make the same ruling I made before. Exhibit -- Defendant's Exhibit No 9 -- excuse me, Defendant's Exhibit No 5 is inadmissible. I'm not going to allow it to be admitted into evidence for a couple of reasons.

First and foremost, I think we've got an authentication problem. As we've just covered, I looked at Rule 9023 that talks about self-authenticating documents. Specifically it covers self-authenticating documents for foreign public records. A foreign public document is self-authenticating only if it is accompanied by a certification from the United States Government official. I don't have that. So, therefore, it can't be self-authenticated under Rule 9023. I would need a person, meaning a live witness, to lay the necessary foundation to authenticate it. I don't have that either. So there's no authentication, which

means it's not admissible. So that's -- case closed on that document. That's an independent grounds for saying it's inadmissible.

Separate and apart from that, there is the issue of trustworthiness. 18 United States Code, Section 3505, talks about the hearsay exception for foreign government records in a criminal proceeding. It basically says that a foreign record is not inadmissible hearsay if the proponent can lay the foundation, meaning Subparts A, B, C and D. It then goes on to have an important carveout. It says, quote, "Unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." End quote. So that's the key there, whether it has a lack of trustworthiness.

I candidly don't know off the top of my head if Rule 8038 applies as well. Rule 8038 is a hearsay exception for public records. Maybe it applies only to domestic records. Maybe it covers foreign records, too. I suspect it's the former. Like you all, I suspect that it probably only applies to domestic records because there is a more specific statute that covers it.

But in any event, it's neither here nor there because the important point is the same. Subpart B of Rule 8038 says that the document can't fall under this exception if the source of information or other circumstances indicated lack of trustworthiness. So it's a long way of saying, Rule 8038 and

18 United States Code Section 3505 cover the same ground. It's trustworthiness. It's inadmissible under the hearsay exception if the Court concludes that the document lacks trustworthiness.

I have looked at this document in great detail. I conclude that the document lacks trustworthiness for several reasons.

First, the source of the document is not trustworthy. It raises questions. There are ways to obtain a document from a foreign government through official channels. In particular, a person can do so by issuing letters rogatory. There are also ways to obtain a document from a foreign document through unofficial channels. For example, someone could write to the Nigerian government and obtain the document directly and informally. That's not what happened here. Defense counsel did not obtain the document through official channels. Defense counsel did not obtain the documents informally from the government itself. In other words, defense counsel didn't say that he personally reached out to the Nigerian government and made direct contact and received the documents directly from them. Instead, defense counsel obtained the document by e-mail.

The e-mail itself raises a number of questions in my mind. And I appreciated your proffer on this, Mr. Carlson. Thank you for providing the e-mail. The e-mail did not come from a representative of the Nigerian government. The e-mail

came from someone else, who I assume purported to be in Nigeria. This is Emeka Ogbu. Defense counsel was quite candid, saying that he didn't know this person, can't vouch for this person, never spoken to the person. I don't know who the person is. I don't know if that person is trustworthy. I did hear the reminder from government's counsel a moment ago that this person potentially is a co-conspirator.

Putting that issue aside, I don't know how exactly that person purportedly got the document from the Nigerian government. By the look of things, it looks like this person, Mr. Ogbu, may have gotten the document from Mr. Nnaji, N-n-a-j-i. But I don't know that for sure because the document refers to the "source." Maybe the source is Mr. Nnaji, maybe it's somebody else. Maybe Mr. Ogbu got the document from Mr. Nnaji, but that then raises a question: Where did Mr. Nnaji get the document? Did he get it from someone else? Did he create it? Did he get it from the government? Who knows. The provenance of the document is highly questionable and untrustworthy. There is no sponsoring witness. No one is going to take the stand and vouch for the document. So the origin of the document gives me a lot of pause.

Incidentally, nothing here is directed at Mr. Carlson in any way, shape, or form. He's doing what he should do, stick up for his client. So please understand, Mr. Carlson, that none of this is directed at you. You've been I think

quite candid in your advocacy. And I've appreciated you expressly noting the limitations of your proffer on this. You handled that exactly right. So thank you for doing that. You did not in any way get over your skis on this. You had an e-mail that you received, and you put it out there, but you didn't overplay your hand on this. So I appreciated how you handled it, and I'll just say that. So, no, none of this is directed at you, Mr. Carlson. So I hope you know that, so.

That being said, Mr. Carlson got an e-mail from somebody. He's never spoken to that person, hasn't met the person. No reason to think this is a trustworthy person. It didn't come from an Nigerian government source, at least directly. It's not a government e-mail, it's a Gmail account. So the source of the document raises a lot of questions.

Second, and even more importantly, the content of the document gives me a lot of pause. It just looks unreliable. It looks fishy. It looks like a forgery. And, frankly, it looks like a bad forgery. The more I looked at the document, the more questions I had. I just kept hitting pay dirt.

Let me just give you a summary of the document. It's a four-page exhibit. The first page is a handwritten completed Nigerian Immigration e-passport application form.

The second page has a header at the top that says, "Nigeria Immigration Service Headquarters." It begins, "To whom it may concern." It's signed by Mary Asogwa, A-s-o-g-w-a,

and it's dated April 5th, 2024. If you look on the stamp there, it says 5, backslash 04, backslash 24. Most areas of the country -- excuse me, most areas of the globe don't use the all American way of doing our dates and times. They go backwards, in my view. They give the date first, then the month, and the year. So I construe, 5/04/24, as being the fourth day -- excuse me, it should be the fourth month, the 5th day of 2024. Everybody read it the same way? It's April 5th, right, not May 4th?

MS. NUTINI: Yes, Judge.

THE COURT: All right. So that's my understanding, too. That's consistent with the rest of the document, too.

The third page has a header at the top that says, "Nigeria Immigration Service Headquarters." It says "Attestation." The signature is faint. It looks like it's signed by somebody named Adelaye, A-d-e-l-a-y-e. It might be A-d-e-b-a-y-e. I can't really tell. It's pretty faint. It's hard to read. But it's signed by somebody in the record's department. And, again, it's dated April 5, 2024.

The fourth and final page also a header at the top. It says, "Nigeria Immigration Service Headquarters." It's called, "Certificate of Authentication." By the look of things, it looks like it's dated April 25, 2024. If you look at the bottom, right corner, there's a stamp. It says 25, backslash 4, backslash 24. So I think that means the 25th day

of the 4th month of the 24th year of the Century. So I think that's April 25, 2024. Right? So when it says 25, backslash 4, backslash 24. That means April 25, 2024. All right? Everybody following me on that one when I talk about this? Do you agree with that, everybody?

MS. NUTINI: Yes.

MR. CARLSON: Yes, Judge.

THE COURT: All right. So that's what I've got, a four-page document.

After going over the document with a lot of granularity, a lot of questions jumped out. There were a lot of red flags that give me pause. Let me just give you a couple of them.

Look at page 1. There's a stamp in the upper, right corner, it says, "e-passpord application." Passport is misspelled. That surprises me. You would think that the good folks in the passport office of the Nigerian Immigration Department would spell passport correctly. And it's a stamp, too, it's not just a handwritten mistake. It's a stamp. The stamp is wrong. It's passport, not passpord.

Look at page 2. It's entitled, "To whom it may concern." Anthony is misspelled. It's A-n-o-t-h-o-n-y. That's supposed to be Anthony Ibekie because it says they're all the same person. It's a little bizarre that the name is misspelled.

The punctuation is weird. It says that Emeka Tonero, semicolon, Toni Imeka Ibe, colon, et cetera. And there's no more -- there should be a comma at the end, or a semicolon. The punctuation is weird. It starts with, "To whom it may concern." I think that's a little weird for a government document that's supposed to certify something to say "to whom it may concern." That's weird. It's not what I would typically expect. It doesn't have even a complete sentence. It says, "To whom it may concern that," and then a list of names, "is one in the same person." It's not even a complete sentence. "Is," by the way, should be "are." So and so and so and so "are" the same person.

Notice the font is different, too. If you look at the first phrase that begins "that," it says, "that Emeka Tonero." Everybody see that, the top third of the document? The font is different than the next sentence that follows. "This was conducted in our office." Why is the font different? That's weird.

There's a set of stray quotation marks by "Administrative Office."

Notice it also says the Nigerian Immigration Service, with an N. Nigerian Immigration Service. The top of the document says: "Nigeria Immigration Service," without an N. Not Nigerian, but Nigeria. And then the middle of the page, it says "Nigerian Immigration Office," with an n. You would think

that the good folks at the Nigeria Immigration Service would get their name right. It's weird.

There's also another punctuation problem after Mary. It says "Mary" period, "I" period.

I don't think I've shot my wad here in terms of why this page is weird-looking, but there's just a lot of things that jump out. The font is wrong. The name of the organization is wrong. The phrasing is awkward. It's not a complete sentence. It says: "To whom it may certain," et cetera.

Page 3 doesn't make me feel better. Again, it's entitled "Nigeria Immigration Service." "Hereby" is misspelled. It says "records I" department. That's wrong. And again here, look it, it says, at the bottom of the page, "Nigeria Immigration Office." It doesn't say Nigeria Immigration Service. It doesn't say Nigerian Immigration Service. It says, "Nigeria Immigration Service." So we've got one organization with three different names: Nigeria Immigration Service; Nigerian, with an N, Immigration Service; and Nigeria Immigration Office. I think that's bizarre.

And look at page 4. It says, "Nigeria Immigration Service Headquarters." The capitalization is awkward. And it also says below that it's sworn before the high court judge, but there's no signature.

And then when you go on each page, by the way, if you

look at page 2, page 3, page 4, there's a fill-in-the-blank thing that says, "directorate," "ref," and "date." Each page is left blank.

And then when you go page by page, the pages don't even match up. If you look closely, the fonts aren't the same size. If you look at page 2, it says, "Nigeria Immigration Service," with the header there. Everybody see that? I'm holding it up. It seems to match page 2 and 3, sort of, pretty close. But then page 4 is a different font size. It's not even the same size. It's in a different spot. It frankly looks like somebody forged it and got in too much of a hurry. They should have spent more time forging it before they sent it to me because it doesn't look right.

Even the symbol in the upper, left, the picture, doesn't look right. If you compare real closely the seal in the upper, left corner of pages 2 and 3 and compare it to the seal on page 4, it doesn't look right. It looks like somebody was manipulating the document and got it wrong.

You would think the letterhead would be standard, wouldn't you, in immigration service in Nigeria. Why does the header look different? Why does the letterhead look different? It's a different font size. The seal looks different. It's weird.

I also stumbled upon what I think is a date error. Look at page 3, the "Attestation" page. This is dated April 5,

2024. It says that the records are originals, and it lists three things. "Subpart A, the Certificate of Authentication. Subpart B, the Application Form. And Subpart C, To whom it may concern." Let me pause on that. It's weird to refer to a document as "to whom it may concern." It's just not what you would expect, to call a document "to whom it may concern."

But putting that aside, page 3 purports to certify that those three documents are correct. The certificate of authentication, the application form, and the to-whom-it-may-concern form. That is surprising to me because one of those documents apparently didn't exist at the time. If you look at the Certificate of Authentication on page 4, it has a date of April 25, 2024. So let me say that again. The Certificate of Authentication is dated April 25, 2024. But if you go back to the Attestation, that's dated April 5, 2024. How could you attest to the authenticity of the Certificate of Authentication on April 5, 2024, when it didn't exist until April 25, 2024?

I don't know what I'm missing here, but I think I'm missing a reliable document, is what I think I'm missing. In other words, the dates don't line up. The dates are backwards. You can't certify that something is correct if it didn't exist. The Attestation has a date of April 5, 2024, and it attests to the veracity of a Certificate of Authentication, which according to the face of this Certificate of Authentication

didn't exist until April 25, 2024. The dates don't match up.

I also have questions about the address. The address here for the Nigeria Immigration Service is listed as Sauka Airport Road in Abuja. It gives a phone number. I spent some time looking at the website of the Nigeria Immigration Service. The address is a little different. I do see that they have a facility in Abuja on something called Airport Road, but the address isn't exactly the same. The website lists it as Umar, U-m-a-r, Musa, M-u-s-a, Yar, Y-a-r, Abu'a -- I'm sorry, it's Adu'a, A-d-u'a, Expressway, Airport Road, Sauka, S-a-u-k-a, Abuja, A-b-u-j-a, FCT.

In other words, the letter that I got says, in Exhibit 5, Sauka Airport Road in Abuja. It's close, but that's not exactly what the website says. The website gives the actual name of the street, the expressway. Then it says, Airport Road, comma, Sauka, comma, Abuja. It's just different.

The phone number looks different, too. There's a phone number on the letter, Exhibit 5. The telephone number is 1341-875. That's not the number on the website. Anybody else notice that? The website number is 1556-359. Another number is 3401-399. Another number is 1819-988. Another number is 2785-603. I didn't see this number anywhere, 1341-875. Maybe it's on there and I'm missing it.

I'll simply note that when I saw that the address didn't exactly line up, then there's a phone number here that

doesn't match what's on the website, it gave me pause. It was yet another reason why I doubted the authenticity of the document.

I'll also say that I don't have the original of these documents, I have copies. They have a shoddy appearance. They're bad copies. They're hard to read. They're sketchy-looking, both literally and figuratively. It looks homemade. So the content, the appearance -- and the appearance of the document give me a lot of pause.

Third, I'll simply say this: I'm mindful of the fact that the case involves allegations of forged documents. I've heard lots of evidence in the case about forging documents and impersonating people, and whatnot. That's the province of the jury, it's not my decision. But I will simply say, this case involves allegations that documents were forged, so this questionable document appears in the context of a case involving allegations the documents were forged.

Again, the defendant is entitled to the presumption of innocence. I'm really not placing any weight on the fact that there's other evidence in the record that it was -- I'm not placing any weight on the fact that the case involves allegations that documents were forged, but I did want to call attention to the overall context of the case. Again, there's more-than-sufficient reason to think that it's not trustworthy, but I just wanted to provide the context.

I'm going to say again, because I don't want this point to get lost, I wanted to compliment Mr. Carlson for how he presented it. He was very up front with the fact that he wasn't personally vouching for the document. He didn't want to get over his skis. He put the ball in play but didn't over-argue it. So, Mr. Carlson, please take everything I'm saying here in that spirit. I acknowledge the way that you presented it, which I think was the right way to do it. So that's a long way of saying this: The document is not going to be admitted for a couple of reasons.

First and foremost, there's an authentication problem. The document itself is not self-authenticating because there's no certification from the government official from the United States. And we don't have a witness who can lay the foundation.

But separate and apart from that, No 2, the document just isn't trustworthy. There's a lot of reasons to doubt the trustworthiness of the document, both in content and appearance, and how it was sourced, where it came from, et cetera.

So it's a long way of saying Exhibit No 5 is inadmissible. It's not coming in. Okay?

Anything else on any of the defendant's exhibits, anybody?

MR. CARLSON: Judge, the only thing I would do is,

being that your Honor's ruling and the motions in limine is preliminary, I would at this point be offering the remainder of the documents as -- I'm sorry, Judge. I would be offering the remainder of the exhibits that we had at this point in trial. Just since we're at a breaking point, I'm doing it now.

THE COURT: Okay. That's perfectly fine. So I will say this: Some of my rulings were tentative in the following sense. I said, look, I don't see that a foundation has been laid. I said maybe the defendant will testify, maybe he'll be able to lay a foundation. So as things stand based on my -- the current evidentiary record, the documents that you put forward are not admissible. I don't know if you're going to be able to cure any of these authentication issues; right? I don't mean Exhibit 5, I mean the other documents.

MR. CARLSON: I understand, Judge.

THE COURT: So, you know, if -- you're going to have some conversations with Mr. Ibekie?

MR. CARLSON: Yes.

THE COURT: Maybe he'll testify, maybe he won't. If he does testify, maybe he can lay the foundation, maybe he can't, I don't know. But we'll each keep our powder dry on that, I suppose.

Based on what I've heard so far, I don't see that there has been a foundation laid. But if you want to try to lay it, it's really up to you.

MR. CARLSON: That's fine.
THE COURT: Do you see what I am saying?
MR. CARLSON: Yes.
THE COURT: Okay. Anything else from anybody on any of the defendant's exhibits?
MS. NUTINI: No, your Honor.
THE COURT: Okay. Anything, Mr. Carlson?
MR. CARLSON: No.
THE COURT: Okay. All right. So that takes care of that issue.
We had talked about having a jury instructions conference today. I still want to do that. I have a change of plea in 15 minutes. So I think we need to come back at, like, 4:00 o'clock, candidly. Is that something you folks are able to do?
MS. NUTINI: Yes, your Honor.
THE COURT: Okay. Is that a reluctant yes, or is that okay? You looked at each other a little longer than I expected.
MS. NUTINI: That's fine.
THE COURT: Is that -- is that crimping your plans?
MS. NUTINI: No.
THE COURT: I've got somebody in custody here that's going to plead, and they were supposed to do it over the noon hour or 1:00 o'clock, and we've been pushing them back. And I

don't want the person just sitting up there. So I think I do need to take the plea.

MS. NUTINI: That's perfectly fine.

THE COURT: Is that okay for you, Mr. Carlson?

MR. CARLSON: That's fine, Judge. And I would also -- would like to today, before it escapes my mind, to do Rule 29 motions.

THE COURT: Okay. Do you want to go ahead and just make an oral proffer on that?

MR. CARLSON: Yeah, Judge. I would just, as to all counts, make a Rule 29 motion that the government's evidence has not established guilt beyond a reasonable doubt. However, more specifically, I would address Count Five, which is the count that had to do with Gary Foster. We did not hear from Gary Foster in this case. We have heard nothing as to how -- how or why he sent whatever monies he sent. And without that, Judge, I don't think the government has met their burden on -- as to Count Five.

THE COURT: Okay. Do you want to make a proffer on anything else?

MR. CARLSON: No, Judge. I would -- your Honor heard the evidence, and I would just rest on my statement that the government hasn't made their case beyond a reasonable doubt.

THE COURT: All right. If you would like to make a written submission, you can. All right? Does the government

want to respond in general and respond in particular to the Foster argument?

MS. NUTINI: Yes, your Honor. The government opposes the Rule 29 motion. The government believes that it has provided sufficient evidence to go to the jury with respect to all counts. There were numerous victims who testified during this trial. There were two case -- three case agents who testified during this trial about the specifics of what occurred. There were other law enforcement agents who testified. The government introduced a plethora of documents, including bank records, Illinois Secretary of State records, numerous digital devices, and physical evidence recovered from the defendant's residence, all of which tie him to this inheritance fraud scheme. And that would cover the counts relating to the mail fraud, wire fraud, and money laundering.

With respect to the passport fraud and the bank fraud -- or, excuse me, false-statements-to-banks related charges, the government introduced, again, a plethora of evidence relating to that, including bank statements, including the fraudulent passport that was recovered in the defendant's residence.

Addressing -- so those are the counts in general.

Addressing specifically the count relating to the victim, Gary Foster, there was evidence that Mr. Foster wired money, and that was provided by the bank statements. It was

also provided by the federal wire transfers. So he -- he wired money into accounts controlled by the defendant. And with respect to him being a victim, there was testimony that his name specifically was recovered on victim spreadsheets. And it wasn't just one victim spreadsheet, it was multiple victim spreadsheets.

So for those reasons alone, the government believes that the Rule 29 motion should be denied.

THE COURT: Okay. Anything else you want to say, Mr. Carlson?

MR. CARLSON: Judge, I would just say, again, with respect to the Gary Foster, we heard no testimony whatsoever from Gary Foster about why he sent money or under what circumstances. And we received no documents. The government did not seek to introduce any records regarding anything that pertained to Gary Foster. And as we heard with all the other witnesses, we don't have any e-mails, we don't have any applications, we don't have anything like that with respect to Count Five.

THE COURT: Okay. Thank you. Folks, I may want to circle back with you on the Foster issue. Don't anybody read anything into that. I do recall his name coming up. We saw his picture today, for example, right? We saw -- with one of the witnesses we saw that today?

MS. NUTINI: Yes, your Honor.

THE COURT: I was wondering when Mr. Carlson was making his presentation whether Mr. Foster's name was on the spreadsheet. There were spreadsheets of people who were alleged victims. I was wondering if it was on there. I was not sitting up here keeping track of the names. But I may want to follow-up with you folks on the Foster issue and get more granularity. I think I've got a sense of the trial as a whole. I was not overtly listening for Foster's name as the trial went along. I do remember hearing it. But I may want to circle back with you on that at a later time. But I'll just take the motion under advisement. If anybody wants to submit anything in writing, you can. I might direct you to do so. But in the meantime, I'll just keep my powder dry on this, and we'll circle back later. Sound good, everybody?

MR. CARLSON: Fine.

MS. NUTINI: Yes, your Honor.

THE COURT: Okay. I want to talk about the stipulations before I forget. So we've got the stipulations. Have you all talked about whether the jury should have them in the jury room?

MS. NUTINI: We have not discussed that with defense counsel.

THE COURT: Okay.

MR. CARLSON: Judge, I have no problems with the stipulations themselves going back. I would oppose the signed

stipulations going back because of Mr. Ibekie's signature being on stipulations and then we have evidence of signatures that have been attributed to Mr. Ibekie. I don't think that's appropriate for the jury to be able to see.

THE COURT: All right. So you -- you want the jury to have the stipulations, meaning the substance, but not the signatures?

MR. CARLSON: Yes.

THE COURT: Okay. Okay. Did you have an issue during trial with the signature being shown as part of the stipulations? They've seen it I think 14 times without objection. It didn't occur to me that that might be an issue.

MR. CARLSON: Judge, I don't have -- I don't have that same concern. I think it's different when they're going back to the jury room. Theoretically, they could be comparing the signatures, and that's what my concern would be.

THE COURT: Okay. So you didn't have an objection with them seeing the signature in connection with the stipulations during the trial, but you don't want them to have the signature in the jury room connected to the stipulations?

MR. CARLSON: Correct.

THE COURT: Okay. Why don't you folks talk it over between now and 4:00 o'clock and see what you have to say. Is that okay, everybody?

MS. NUTINI: It is, Judge.

THE COURT: Okay. All right. So let's talk about Wednesday. I'm not going to ask Mr. Carlson for an estimate now for how long Mr. Ibekie is going to testify because it seems like this is a news bulletin to you that he's going to testify. Does the defendant plan to call any other witnesses or present any other evidence?

MR. CARLSON: At this time I do not, Judge.

THE COURT: Okay. In light of that, you all should be prepared to close on Wednesday. All right? So if Mr. Ibekie testifies and goes for four hours, we'll close when he's done. If he testifies for half an hour, we'll close when we're done. We'll have a short break, but you should plan to close. That way the jury can get rolling on their deliberations.

And, Ms. DeMarco, you're going to send me the Word version of the jury instructions, if you haven't already done so?

MS. DEMARCO: We did, your Honor. I think we sent them to Ms. Ramos.

THE COURT: Yeah, perfect. Thank you for doing that. I will -- I will save the colloquy about whether he's going to testify first thing Wednesday morning.

So right off the bat, Mr. Ibekie, we're going to cover that point. I'll say this to you, Mr. Ibekie. You're a defendant in a criminal trial. You've got the right to testify. You've got the right not to testify. I'm going to

direct you to talk about this issue one more time, at least, and maybe multiple times with Mr. Carlson. Spend some time with him to get ready one way or the other. Can you do that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. And then we'll just save that, Mr. Carlson, for -- for that time.

Let me ask you a general question that I've always wondered about. What do you think is the appropriate thing to say in the presence of the jury once the government is done when I turn the baton over to the defense? In other words, in my last trial, I didn't know, but I threw this out. I said to the jury, you know: The government has the burden of proof. The government has the burden of proof beyond a reasonable doubt. The defendant has an opportunity to present evidence. The defendant never has an obligation for that evidence. They can if they want to. And then I said: Does the defendant seek to present any evidence? I said something like that.

I don't know if that's typically what they do in this building, but that seemed to me to be the right thing to do, to remind the jury that the government has got the burden, let the jury know that you've had an opportunity to present evidence. I think that's important from a fairness standpoint for them to know that. But I don't know if, candidly, how other judges in the building have handled it.

Mr. Carlson, what's your experience? What do judges

normally say when you get the baton? Do they just say: Defense, anything? What do they say?

MR. CARLSON: Pretty similar to what you just suggested, Judge. That the government has rested their case. The defense has the opportunity but no obligation to present any evidence. Defense, where do you go from here?

THE COURT: Yeah, okay. Is that good with the government?

MS. NUTINI: It is, Judge.

THE COURT: Okay. So I will -- I'll do that when the jury is here off the bat. What all do you want to cover between now and when I do my change of plea in six minutes?

MS. NUTINI: Your Honor, I think we'd like to lastly just cover the topic of the defendant testifying. And obviously, as your Honor stated, you will do the colloquy on Wednesday first thing. That sounds fine to the government. We wanted to just flag two things in anticipation of him testifying.

The first is your Honor's rulings on the motions in limine relating to what the defendant intended to do with the money, et cetera. We would ask that he re-read your Honor's rulings and be reminded of that.

THE COURT: Can I stop you on that? It's a good suggestion.

MS. NUTINI: Yes.

THE COURT: Mr. Ibekie, have you read my rulings on the motions in limine?

THE DEFENDANT: Yes, your Honor.

THE COURT: Did you personally read them?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you understand them?

THE DEFENDANT: I'm still reading it.

THE COURT: Okay. I need you to read it again. And, Mr. Carlson, I'm going to have -- make sure that you go over with him, please, and make sure he understands it. Because there's some important things in there, Mr. Ibekie. For example, one of the things I said is you can't say: Oh, I did great, wonderful things with this money. I had this money, and I sent it to an orphanage. I gave it to Mother Teresa herself, anything like that. You can't -- you can't do that. Are you with me on that?

THE DEFENDANT: Yes, your Honor.

THE COURT: And that's going to be really important because here's what you don't want to have happen. You don't want to say something in front of the jury that I've told you you're not supposed to say because then I've got to strike it. I'm going to say: Jury, disregard what the defendant said. And that's not helpful. You know, that's not a good look. You don't want to do that. Are you with me?

THE DEFENDANT: Yeah, absolutely. I --

THE COURT: It's important -- you don't have to agree with any rulings a judge makes, but you do have to follow them.

THE DEFENDANT: Absolutely. I will follow all the -- in that particular respect, I've read that part, and I totally understand that, with the charity work that was done with the money was -- has been ruled irrelevant based on your ruling.

I do also know that my lawyer is probably going to pull information as far as my background and what I have done in my life.

THE COURT: Okay. Well, if you testify, I'm sure you and your lawyer will be well prepared to cover whatever material you think is appropriate and that I deem relevant. If he wants to cover your background, I think a certain amount of background is fine, you know. I just want to make sure you understand that you can't blurt out stuff that I said that you can't say because that's not helpful. That's not a good --

THE DEFENDANT: No. I have no plans to do that, your Honor.

THE COURT: That's good. All right. So it sounds like that's good.

Ms. Nutini, what else?

MS. NUTINI: Yes, your Honor. And just, again, because the idea of background was brought up, I would just remind the defendant that relevance will be an issue still from the government's perspective. I don't want to be in a position

where I'm objecting every question that is asked and answered. But we would object to relevance if there is going to be a long explanation as to the defendant's background and if that includes the altruistic things he has done in Nigeria, et cetera. That is a backdoor way of getting back at the same evidence that your Honor has already ruled to be --

THE COURT: So I think a certain amount of background is fine. I would not expect to hear testimony designed to create the impression to the jury that this is a good person who has good character who does good things and has lived a -- just a wonderful, productive, giving, loving life. Right? We don't want that.

So if he spent the last 20 years working in an orphanage in India, maybe some amount of that would be fine. But only some amount of that would be fine. Right? A little bit of background is okay, but it really shouldn't be planting seeds in the jury's mind that they don't want to convict somebody because he's a wonderful, good person who has just filled the world with love and happiness. Right? That's what we don't want. Okay? And we'll just take it one step at a time on Wednesday when it comes.

Does that sound good, Mr. Carlson? Are you good with that?

MR. CARLSON: That's fine, Judge.

MS. NUTINI: And finally, your Honor, I just want to

flag for the Court a conversation -- I did discuss this with defense counsel. We filed a motion about referencing the defendant's other conduct that he's been charged with. The marriage fraud related conduct. I understand that your Honor's ruling was essentially we can reference that conduct if he testifies, just not that he has been charged in a criminal case relating to that, which we certainly will stay away from.

In addition to his other conduct in the marriage-fraud scheme, depending on how the defendant testifies, the government may seek to impeach him with other related -- other related acts that are not just limited to the marriage fraud. There is some other conduct that the defendant has been involved in. We can flush that out more for your Honor. But at this point, I just wanted to flag for the Court that there may be some other conduct we seek to introduce --

THE COURT: Okay.

MS. NUTINI: -- if the defendant elects to testify.

THE COURT: Why don't you flush that out a little bit here because we're all here and Mr. Ibekie can hear it.

So, and Mr. Ibekie, here's the concept. They're saying that if you testify they're going to want to hit you with a bunch of other stuff. They've got other material that they think is useful. I don't know if I'd let them. I don't know if it's coming in or not. But what they're -- what they're trying to do is forewarn you that if you take the

witness stand, they have other topics that they want to cover. And I want to make sure you talk about this with your lawyer before you testify on Wednesday.

So, Ms. Nutini, why don't you give a little bit of a proffer here for the defense team so they have some sense of what might be coming down the pike if he takes the witness stand. Go ahead.

MS. NUTINI: Sure, your Honor. And, again, we haven't fully flushed this out, but some of the topics may include a romance-related scam, a lottery-related scam, and the -- this would be evidence that was recovered on digital devices. It would be evidence from other, again, mainly digital-related evidence that was recovered. A -- some other what the government believes are fraudulent-related documents that the defendant has submitted throughout the course of this case, including in his detention briefing. And, your Honor -- I just lost my train of thought. There was another category that will come to my mind. Oh, excuse me. Other physical documents that were recovered at the defendant's residence that didn't relate specifically to the inheritance fraud. So the government pulled those aside and did not introduce those. For example, a -- letters that appear on their face to be lies about various things.

THE COURT: Okay.

MS. NUTINI: And so those are some of the types of

documents that the government would seek to confront the defendant with.

THE COURT: And those would be relevant why?

MS. NUTINI: They would be relevant under 608, and they would go to the defendant's credibility as a witness who has decided to testify --

THE COURT: Right.

MS. NUTINI: -- and present his case to the jury.

THE COURT: Right. So did you hear all that, Mr. Ibekie?

THE DEFENDANT: Yes, your Honor.

THE COURT: So this is food for thought for you. I have not ruled on any of this for admissibility, but it's something to think about.

THE DEFENDANT: Yes, your Honor. I -- I want to just add something to that. I -- first of all, I do appreciate the fact that I'm -- I'm enjoying a fair hearing here. And one of the things that you are doing that is wonderful is that you have been the watch dog; meaning that, you -- you gauge, you watch everything that comes in.

One of your rulings that I also read indicates that -- that counsel is stuck with my response to what -- what -- what -- your questioning -- what my -- during the impeachment, my response to the impeachment. These are things I'm still starting -- I mean, I'm not a lawyer by profession, but I'm

fighting for my innocence. I'm being -- sorry. I'm fighting to be exonerated from a crime that I did not commit. I'm not standing here to say I'm a perfect man, but I wouldn't sit down and just watch my life destroyed over nothing. So I will -- I'm prepared for their -- for their impeachment, and I will do the best I can.

THE COURT: Okay. Well, thank you for that, Mr. Ibekie. Let me say one thing. You said you're fighting for your innocence. I'll tell you, in my courtroom, you're innocent until -- unless and until a jury says otherwise. Right? That's the rule. So I know what you meant, though. I know what you meant. You're inclined to stick up for yourself.

Here's the main thing that I just want you to understand, Mr. Ibekie. And we'll cover this again on Wednesday, is, you know, it's up to you if you testify. If you do testify, the government is trying to tell you today that they've got a lot of other stuff that they want to ask you about that they think will just make you look unbelievable. They're going to attack your credibility under a rule of evidence called 608. And I'm sure Mr. Carlson will cover that with you when he -- when he prepares you.

I just want to make sure you have a full understanding of what might be coming if you take the witness stand. Are you with me? Is that making sense?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay. Mr. Carlson, what do you -- what do you think? Anything else you want to adhere?

MR. CARLSON: Judge, I will discuss all of these things, as I have already with Mr. Ibekie. And I will meet with him and go over the pitfalls, which I've already discussed with him, and prepare for whatever testimony he -- he intends to give.

THE COURT: Okay. Well, I appreciate that. I'm going to need to break in a minute, folks, to do my change of plea. I think given where we are, why don't we try to shoot for 4:15. We'll do -- we'll do it at 4:15. Does that sound good, everybody?

MS. NUTINI: Yes, Judge.

THE COURT: We'll come back for -- and I don't expect to go for more than an hour this afternoon. Okay? So we will see you folks at 4:15. We are off the record.

(Recess at 3:05 p.m., until 4:42 p.m.)

(Proceedings heard in open court:)

(Change of reporter.)

THE COURT: All right. Have a seat, everyone.

Folks, I need probably just 60 seconds on one other case, and then we'll be ready to roll. Okay?

We're off the record.

(Off the record from 4:42 p.m. until 4:45 p.m.)

THE COURT: All right. Let's go back on the record.

All right, folks. It's 4:45. We're here for a jury instructions conference.

I have heard from the courtroom deputy that the marshals have a need to take Mr. Ibekie back to the MCC before too awful long so he can get a hot meal for dinner.

So we'll cover what we can cover, but I think we've got about 15 minutes or so.

Needless to say, jury instructions are vitally important, and it takes however long it takes. We'll cover whatever we can cover today, but I will go ahead and see fit to have us be done in 15 minutes so you folks can take him.

Thank you to the deputies who are here. I always appreciate everything you folks do for the court system. So thank you for facilitating everything today.

The good news, I think, is that you folks have worked together cooperatively. A lot of the instructions are not disputed, it seems to me.

Perhaps the best thing to do would be to just cover what you folks think we need to cover, maybe any hotly disputed issues, if any. Maybe you could point me to instructions that we need to focus on. So maybe we can cut to the chase and do that.

Does anybody want to go first?

I've got the most recent copy here.

Mr. Carlson, do you want to flag anything you want to flag?

MR. CARLSON: Judge, I believe that the revised jury instructions that were submitted I guess last night are all agreed to. The only thing we now may need -- in light of Mr. Ibekie's potential testimony, we may need to change some of those, but we won't know that until Wednesday.

Additionally, the two instructions that I proposed, being that Mr. Ibekie may testify on Tuesday, the giving of those instructions may very well depend upon what his testimony is if he testifies.

THE COURT: Okay.

MR. CARLSON: So I'm not really sure that we have much to really go over today.

THE COURT: Mm-hmm. So, in other words, the version that was filed last night with the redline, as you see it, all of that is agreed. The issue is simply we may have to tweak a couple of them and we may have to add a couple instructions

depending on whether Mr. Ibekie testifies.

Is that the gist of it?

MR. CARLSON: Yes, Judge.

THE COURT: Okay. What does the government think?

MS. DeMARCO: I think that's correct, Your Honor.

THE COURT: Okay. Well, let me just throw it out there.

Does anybody have any instructions that they actually want to talk with me about after having waited for two hours to talk with me about the jury instructions? Any thoughts from your end, anybody?

MS. NUTINI: Judge, I think, for the record, we would just state that the two instructions defense counsel is proposing -- that's the 5.07 instruction and a 6.10-related instruction. 5.07 is the mere presence instruction, 6.10 is the good faith instruction -- I think regardless of whether the defendant testifies, neither of these should apply.

And if Your Honor wants to defer ruling on that until the defendant testifies, that's fine, but I believe our arguments will generally remain the same.

THE COURT: Okay. Why don't we just talk about those briefly.

Mr. Carlson, do you want to just make a pitch for those briefly so I can start thinking about it. I have not at this point devoted any mental energy to it, but do you want to

let me know what you think, and we'll go from there.

MR. CARLSON: Certainly, Judge.

First of all, as the Court is aware, only minimal evidence is necessary to support a jury instruction. It does not need to be a hundred percent ironclad. And I believe that if Mr. Ibekie testifies, he will testify what his -- his actions were here, what he did, what he didn't do. And that may very well and I think could, depending upon the testimony -- which is why I'm not sure that we can -- you can rule on this today -- support both instructions.

Certainly just based upon what we've heard thus far in the case, that may not be true, but I think Mr. Ibekie's testimony could fill in the necessary gaps to be able to support those instructions.

THE COURT: Okay. Does the government want to say anything? We're not arguing it per se. I did hear what you said there, Ms. Nutini, but anything you want to add? It's fine if you want to keep your powder dry, too.

MS. NUTINI: Your Honor, simply that it's -- the committee comments to this instruction state that the presence instruction should be used in a very limited fashion. I don't believe there's been any evidence presented during this trial that would indicate that the defendant was simply present at the scene of a crime and something occurred.

Subsection (a) is the one that is used most typically

in conspiracy-types of cases. And it reads, "A defendant's presence at the scene of a crime, acknowledged that a crime is being committed, is not sufficient by itself to establish the defendant's guilt."

Again, there's been no evidence that the defendant was just present when something was occurring. I don't think that the facts of this trial as they have been presented fit this instruction at all and, frankly, would confuse the jury as to why this instruction was being provided given the testimony.

THE COURT: Do you want to talk to me about that, Mr. Carlson? How would that apply here?

MR. CARLSON: Judge, if Mr. Ibekie were to testify that he -- and I'll just pick one residence -- Naperville, for example, he lived there. He rented it out. He had tenants. He saw tenants doing things. He had nothing to do with anything that happened. He was merely a landlord. I think that would support that instruction.

THE COURT: Okay. Okay.

Let's talk about the other instruction, the good faith instruction.

Anybody want to offer more granularity on that?

Ms. Nutini, you've got the book open there, so do you want to say whatever you want on that?

MS. NUTINI: Sure, Judge.

Again, pointing to the committee comments, it reads,

"The Seventh Circuit has questioned whether a good faith instruction provides any useful information beyond that contained in the pattern instruction defining knowledge."

This is a case in which we are already defining knowledge. There is not an additional burden that the government must prove. And so it says, "For this reason, as a general rule, this instruction should not be used in cases in which the government is required only to prove that the defendant acted knowingly."

THE COURT: Okay. Any thoughts on that, Mr. Carlson?

MR. CARLSON: Judge, all I would suggest is that the case law is -- does not say that the instruction should not be given. I think it's within the Court's discretion as to whether a good faith instruction is proper; but many of the cases that have been cited going back and forth, and even Your Honor in your ruling, have not said that there is no good faith -- there is no reason to give a good faith instruction.

I think there is case law that says good faith is and can be a defense. And I -- I am unaware of any case that says the instruction should not be given.

THE COURT: Okay. I'm going to go out on a limb and guess the answer to this is going to be a resounding no, but does anybody want to submit anything in writing on this?

I assume not. I assume that's the last thing you want given how hard you've been working to get ready for trial.

But, you know, it's a little hard to do before the defendant testifies, too. You know, so it might feel a little premature.

It's a long way of saying if anybody wants to submit anything, I would read it. But I'm assuming that you folks just want to handle it orally. Probably the last thing you want to do at this point is do a written submission. I don't know.

MR. CARLSON: Judge, if Mr. Ibekie had testified today, I would take the opportunity to do it, but being that we don't know what that testimony is going to be yet, it's very hard to --

THE COURT: Yeah, I get that.

MR. CARLSON: Because I think a good faith instruction, it's very -- it would be very fact-specific.

THE COURT: Yeah.

MR. CARLSON: And I'm not sure in a vacuum that anything that we could supply to the Court other than if this, it should be given, if not, it shouldn't be given. And I'm not sure that helps anybody.

THE COURT: Okay. So anything from the government on that?

MS. NUTINI: No, Your Honor. I agree with Mr. Carlson on that.

THE COURT: Yeah. So here's what I'll say: I never prohibit people from submitting something in writing. I'm not

going to expect it from either side. You guys have been working really hard.

If somebody woke up tomorrow morning and decided they really wanted to submit something because they realized that there was some important case, I would read it. But I'm not going to order you to do a written submission. I'm not going to prohibit it, either.

I will look at the committee comments, Ms. Nutini. So thank you for flagging that.

Does that make sense, everyone?

MR. CARLSON: Yes, Judge.

THE COURT: Is that good? Is that fair?

MS. NUTINI: Yes, Your Honor.

THE COURT: I know that you folks would probably rather be thinking about Mr. Ibekie's exam or potential exam and thinking about closing instead of doing a written submission.

So why don't we do this: Is there anything else on the jury instructions that you folks want to cover? Anybody?

MS. NUTINI: Not from the government.

MR. CARLSON: No, Your Honor.

THE COURT: Okay. Well, this was a new record for me for a jury instructions conference. This was the fastest record-breaking jury instructions conference I've ever had.

Judge Chang probably does things like this all day

every day, but this is not how I normally roll.

So why don't we do this: I'm going to go over the instructions very carefully myself. I will be ready to go Wednesday morning with any questions or comments or concerns.

We are convening with the jury at 9:00 o'clock on Wednesday morning, right?

I think we ought to reconvene at 8:30. If I think that there is an issue where we need to convene earlier, I will let you know. Or if I think we need to get on the phone even after hours on Monday or Tuesday, I will let you know. Okay?

Again, I am going to be out of town. I am going to be at the Financial Disclosure Committee meeting. So I'm going to be largely out of pocket. But you all are the most important thing I've got going on because you're the criminal trial I've got going on. And that's always the most important thing I've got going on.

If you need to reach me between now and then, you can get in touch with me through Ms. Ramos. If I need to get in touch with you, I know how to do it. Okay. So if we need to have a telephonic hearing, we can do it at any time. Okay?

Anything about the jury instructions or anything else on that?

I did want to cover the exhibits before we get going here.

Let me just guess where I think this is going to go.

And this is not a directive. This is a soft prediction.

I think it is either likely that Mr. Ibekie won't testify or he will testify and it will go less than the full day, and we will give closing instructions, and we will do closings, and the jury will start deliberating on Wednesday.

If Mr. Ibekie is testifying all day on Wednesday and it rolls into Thursday, so be it. I won't cut him off. But that's my best guess for how this is going to go.

Does anybody disagree with that?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Judge.

THE COURT: All right. So you all should be prepared to do that. You should be prepared to close on Wednesday. You should be prepared to hear jury instructions on Wednesday.

And here's why I bring this up: The government needs to be ready to have their exhibits presented to the jury.

Okay. So what you need to do is have all of the exhibits in the PDF format that plays nicely with the Court's JERS system, J-E-R-S.

Do you all know about that?

Ms. DeMarco is a pro from the courtroom. You're one of two AUSAs that has now tried two cases in front of me, right? So you know the drill.

MS. DeMARCO: Yes, Your Honor.

THE COURT: Overall with the AUSAs, it's gone pretty

smoothly. I did have one trial where somebody rolled up at the last minute and said they weren't ready even though I gave the same speech. And I want to make sure it goes smoothly, right?

So do you know how to do it?

Obviously, you've got the PDFs. You've got to make sure the format is right. It's pretty simple, I think. I do think it's important with the recordings, in particular, that we get that in a format that is going to play nicely.

The good news is I'm not here Monday. I'm not here Tuesday. So you've got more than enough time to give it to Ms. Ramos, make sure she can upload it. Maybe you've done that already. I don't know. But if you haven't, I would really direct you by the end of the day on Monday -- the end of the day Monday, you've got to give all the materials to Ms. Ramos and make sure she can upload it on Tuesday.

See what I mean? Does that work?

MS. NUTINI: Yes, Judge. We are available and we will have all of the materials ready from our case-in-chief. I just caveat that with if defense counsel has any exhibits, we typically assist with defendants in loading those on JERS as well. And if we present a rebuttal case or if there's something we introduce when the defendant is testifying, then we would have those not ready until Wednesday.

THE COURT: Perfect. So you won't have it ready on Monday what you might present on Tuesday.

MS. NUTINI: Or Wednesday.

THE COURT: Or Wednesday. That's a good point, yeah. That's exactly right.

So just be ready to go just in case so that this can go smoothly. I want things going smoothly.

Does that make sense, everybody?

MR. CARLSON: Yes, Judge.

THE COURT: All right. We've got one minute on the clock, which you can each have 30 seconds of.

Anything from the government?

MS. NUTINI: So, Your Honor, are you asking us to go ahead and provide the JERS documents by Monday?

THE COURT: I kind of think you should, don't you think?

MS. NUTINI: Okay. Fine.

THE COURT: I mean, I don't know what you're likely to present. I don't see any downside, frankly. Let me put it this way: Think of the Wednesday version of you. The Wednesday version of you will be happy that the Monday version of you just took care of it, right, and just got it done. See what I mean?

And if you have to do a supplement or something like that on Wednesday, so be it. But just get it done in the meantime so that it's just done, you don't have to worry about it. I promise you that if it's done on Wednesday and you don't

have to do a supplement, you'll be glad.

Okay. Anything else from that on the government?

MS. NUTINI: No, Your Honor. Thank you.

THE COURT: Anything from you?

MR. CARLSON: Just one FYI. You're talking about a phone -- if there is a need for a phone conference. I just want the Court to be aware that because of Mr. Ibekie saying he's going to testify, I'm likely going to be locked up at the MCC most of Monday and Tuesday.

THE COURT: Okay.

MR. CARLSON: And I will be unable -- I can't take a phone in there. Nobody can get ahold of me. So if I am very tardy in responding to something, that's why, Judge.

THE COURT: No worries. I hereby promise to not have my nose out of joint. How's that? That will be fine. So I always keep my nose in joint up here. So whatever your availability is, we'll work around it.

Okay. Anything else from you, Mr. Carlson?

MR. CARLSON: No, Judge.

THE COURT: Anything else from the government?

MS. NUTINI: I do have one final point, Your Honor.

We did confer about the stipulations, and we have agreed that we will just redact -- we will remove every name so the stip -- where it says "So stipulated" and there are all the signature blocks, if it's okay with Your Honor, we will just

remove those from each of the stipulations so that when they go back to the jury, all they see is the text of the stipulations.

THE COURT: So it will be the text, and it will say "So stipulated," but it's not going to have the signatures?

MS. NUTINI: Correct.

THE COURT: Is that right? Is that acceptable to you?

MR. CARLSON: Yes, Judge.

THE COURT: All right. So what I'd like to you do, Ms. Nutini, is make that, give it to Mr. Carlson, and then I think we should file it, don't you think? Shouldn't we file it as -- I mean, I suppose you could just give it to me, but I think you should just go ahead and file it.

What do you think of that?

The only downside of filing it is the header numbers are going to be different. You may have to -- I don't know how to -- how that's going to look, but -- or maybe you have a clean copy.

MS. NUTINI: We can get something filed. And just, for the record, we'll, you know, name it something like without signatures just so -- I would prefer that the record be clear, if needed for appellate reasons, that this is not the actual signed version.

THE COURT: Yeah, I think we should have a record on the docket of what the jury is having.

MS. NUTINI: That's fine.

THE COURT: What do you think of that, Mr. Carlson?

MR. CARLSON: That's fine, Judge.

THE COURT: What else from the government?

MS. NUTINI: That's it. Thank you, Your Honor.

THE COURT: Okay. Mr. Carlson?

MR. CARLSON: Nothing else, Judge.

THE COURT: All right, folks. It's 5:02. I want to get the defendant out of here so he can get back to the MCC and get a hot meal.

Thank you, folks, for everything you did this week. I'll look forward to seeing you on Wednesday morning at 8:30.

Thank you to the marshals for being here, for transporting him, and I hope you folks get a little R and R. You get a couple days off, and we'll see you early next week. Okay? Or -- excuse me -- middle of next week. I beg your pardon.

See you, folks. Take care.

MS. NUTINI: Thank you, Judge.

(Adjourned at 5:03 p.m., until 6/26/2024, 8:39 a.m.)

* * * * *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Amy M. Kleynhans* — *5/27/2025*
Amy M. Kleynhans — Date
Official Court Reporter

*/s/ Sandra M. Tennis* — *5/27/2025*
Sandra M. Tennis — Date
Official Court Reporter

# I N D E X


| WITNESSES | PAGE |
|---|---|
| CONG TANG LE | |
| Direct Examination By Ms. Nutini | 965 |
| Cross-Examination By Mr. Carlson | 983 |
| Redirect Examination By Ms. Nutini | 985 |
| ROBERT AGUADA | |
| Direct Examination By Ms. DeMARCO | 987 |
| Cross-Examination By Mr. Carlson | 1003 |
| CHRISTOPHER KADONSKY | |
| Direct Examination By Ms. Nutini | 1013 |
| CHRISTOPHER KADONSKY | |
| Direct Examination (Resumed) By Ms. Nutini | 1051 |
| Cross-Examination By Mr. Carlson | 1065 |
| Redirect Examination By Ms. Nutini | 1068 |

| GOVERNMENT'S EXHIBIT | RECEIVED |
|---|---|
| No. 102 | 967 |
| No. 104 | 991 |
| No. 708 | 1062 |
| No. 901 | 1016 |
| No. 903 | 1016 |
| No. 905 | 1016 |
| No. 906 | 1016 |
| No. 907 | 1016 |
| No. 908 | 1016 |
| No. 909 | 1016 |
| No. 910 | 1016 |
| No. 911 | 1016 |
| No. 912 | 1016 |
| No. 914 | 1016 |
| No. 915 | 1016 |
| No. 1001 | 1016 |