IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ) Case No. 20 CR 352
)
v. )
)
ANTHONY EMEKA IBEKIE, ) Chicago, Illinois
) June 26, 2024
Defendant. ) 8:39 a.m.

VOLUME 5
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. PAIGE NUTINI
MS. MEGAN DeMARCO
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For the Defendant: KENT R. CARLSON & ASSOCIATES, P.C.
BY: MR. KENT R. CARLSON
53 W. Jackson Boulevard, Suite 1523
Chicago, Illinois 60604

Also Present: MS. AMY MANSKER, Special Agent
IRS Criminal Investigations

MR. CHRISTOPHER KADONSKY, Special Agent
IRS Criminal Investigations

Court Reporter: AMY M. KLEYNHANS, CSR, RPR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 2318A
Chicago, Illinois 60604
Telephone: (312) 818-6531
amy_kleynhans@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE CLERK: 20 CR 352, USA versus Defendant No. 2, Anthony Ibekie.

THE COURT: Good morning, everybody.

Nice to see everyone.

Let's get everyone's appearances on the record, if you would, please.

Start with counsel for the government.

MS. NUTINI: Good morning, Your Honor.

AUSA Paige Nutini and Megan DeMarco on behalf of the United States.

Also at counsel table is Amy Mansker and Christopher Kadonsky with IRS Criminal Investigations.

THE COURT: All right. Very good.

Good morning, Ms. Nutini.

Good morning, Ms. DeMarco.

MS. DeMARCO: Good morning, Your Honor.

THE COURT: Good morning, Ms. Mansker.

Good morning, Mr. Kadonsky.

I promised you by the end of the trial I'd start to get your names right. It took me a little while. But good morning. Nice to see each of you.

And defense counsel.

MR. CARLSON: Good morning, Your Honor.

Kent Carlson on behalf of Anthony Ibekie, who is not

yet here.

THE COURT: Yeah. Very good. Good morning, Mr. Carlson. Thank you for being here.

I have a couple of housekeeping things to cover with you, but I really would like the defendant here I think given that we're fast approaching the next stage of trial. I want to say -- I want to defer most of this.

I just wanted to cover two brief housekeeping matters until the defendant arrives, and then we'll cover the rest of the matters when he is here.

Is that okay with you, Mr. Carlson?

MR. CARLSON: That's fine, Judge.

THE COURT: I can repeat all of this. I just wanted to cover two quick things.

Thank you, folks, for e-mailing me the Word version of the revised jury instructions. Thank you for doing that. That was helpful.

Is that agreed?

MS. NUTINI: Yes, Your Honor.

THE COURT: In other words, does anyone have any objections? Is it agreed?

You agree with that?

MR. CARLSON: Yes, Judge. The only -- there's just my two instructions that the government doesn't agree to.

THE COURT: Right. Okay. So apart from that, I

should say.

MR. CARLSON: Apart from that, they're agreed, Judge.

THE COURT: Okay. So here's what I would like you to do: I think it would be helpful if the government would be kind enough to file it on the docket, including a redline. I always feel more comfortable if things are on the docket because it's, frankly, just easier for me to find, you know. And that way you all can get it, too. Nice and easy.

I have two small points to cover on that. And I'm happy again to repeat this in the defendant's presence.

I had put out a minute order yesterday asking you folks to double-check that the counts match between the instructions and the verdict form and the superseding indictment -- or the amended indictment. I did that because you renumbered the counts in the indictment. It looks like you folks fixed all of those things and double-checked that. So it looks like you did what I had asked you to do. Maybe you were going to do that independently. I assume you were. But it just occurred to me when I saw that you had a renumbered indictment, that we needed to just make sure that everything matches up. Because the jury instructions that were on the docket still referred, for example, to Count XVI, but there was no Count XVI, right. So I just wanted to make sure.

Have you all gone through that and confirmed that everything lines up and matches up and is correct?

It looks like you did. But I think that was sufficiently important that I wanted to flag it one more time.

MS. NUTINI: Yes, Judge.

THE COURT: Okay. That sounds good.

MR. CARLSON: Yes, Judge.

THE COURT: Okay. Very good.

I only had one suggested change. And, again, Mr. Carlson, I'm happy to raise this in the defendant's presence. It's not really a -- I don't know that this is going to be a hot-button change at all, but I wanted to just flag it.

You folks had combined in Counts I through VII the instruction for mail fraud and wire fraud. In other words, you list the elements of it. And I think the fourth element basically says it's got to be either in the mails or by wire, something like that.

I will be totally candid with you, I'm not a hundred percent sure how it goes in this building on that when you have a wire fraud and a mail fraud count in a case, whether you just give one instruction.

But let me give you a reaction to that, and I wanted to bounce it off you.

It seems to me that in a mail fraud case, you've got it prove that the fraud took place over the mail, and in a wire fraud case, you have to prove that it took place over a wire.

I assume -- I don't know. I assume that you can't

prove a mail fraud case by proving that the fraud took place over the wire. And, conversely, in a wire fraud case, you can't prove that the fraud took place over the mail.

Is that correct?

MS. NUTINI: That is correct.

MR. CARLSON: Yes, Your Honor.

THE COURT: I think that's right.

So let's imagine a world in which this jury thinks that there was a fraud that took place over the mail but not over a wire, not over a wire. It seems to me they've got to return a verdict of not guilty for the wire fraud, right? Are you following me?

MR. CARLSON: Yes.

THE COURT: So I don't want there to be any confusion.

Here's my suggestion, here's the punch line: I think we ought to give separate instructions, I think, for mail fraud and wire fraud. That's my instinct.

It is at least theoretically possible that the jury could conclude that the government proved the use of mails but not wire or *vice versa*. And if that's true, it would affect how they come out on those counts, and they shouldn't be clumped together.

I know this is a little maybe hypertechnical, but I tend to be in a hypertechnical mood when it comes to jury instructions.

Are you following me, everybody?

MS. NUTINI: Yes, Judge.

That's fine. I would just flag for the record, it is a stipulated element --

THE COURT: Yeah.

MS. NUTINI: -- with respect to both the mail -- the mail fraud and wire fraud counts for element 4.

THE COURT: Right.

MS. NUTINI: The defendant has stipulated to that element --

THE COURT: Yeah.

MS. NUTINI: -- to the extent that that matters.

THE COURT: Well, does the jury have to accept the stipulation, hypothetically?

I don't know. I don't think so. I mean, you folks tell me, but -- I mean, I think you're -- you make a good point.

Here's I think what I'd like you to do, unless somebody tells me there's a good reason not to: I think we should instruct the jury on the wire fraud count, and we should instruct the jury on the mail fraud count separately. I think it's really easy surgery to make. You've just got to cut it in half, basically. And for the wire fraud instruction, just refer to wire, and for the mail fraud instruction, just refer to mail. I think it's a little cleaner.

Here's what I always think when I go through jury instructions: How could this go completely sideways? What could go wrong? And I'm thinking, what if there was a world in which the jury found that there was a use of mail but not a wire? Then there's potential room for confusion.

Everybody following me?

MS. NUTINI: (Nodding head up and down.)

THE COURT: So bear with me, folks. This might be a little hypercautious, but I'd like you to do that.

If the government would be kind enough to do this, I would appreciate it: Please take the instruction and modify it. I think you ought to cut it in half. You should have one instruction for the elements of mail fraud, you should have one instruction for the elements of wire fraud. And you should modify that fourth element accordingly so that it refers to mails -- the use of the mails for the mail fraud and the use of the wires for the wire fraud count.

Show it to Mr. Carlson. Make sure he's on board with it. If he's on board -- if and when he's on board with it, I want you to file it with the redline.

The redline -- Ms. DeMarco, I assume you're the redline specialist over there, based on my read of the table.

If you'd be kind enough, Ms. DeMarco, for your redline, don't have it be a redline to the version that I got this morning or last night. Have it be a redline for the

version that you used as the point of comparison for your last redline.

Do you see what I'm saying?

MS. DeMARCO: Yes, Your Honor.

THE COURT: Okay.

MS. DeMARCO: Understood.

THE COURT: Anybody think this is hypertechnical?

It maybe is. I just would rather avoid any potential -- that was a reaction anyway.

What do you think, Mr. Carlson?

MR. CARLSON: It's fine by me, Judge.

THE COURT: Okay. Fair enough.

I want to save -- anything else on the jury instructions?

Ms. DeMarco, did I explain this well enough about what I'm looking for?

MS. DeMARCO: Yes, Your Honor.

THE COURT: It's pretty straightforward.

And let me just cover the other housekeeping matter.

Thank you for the delivery of the exhibits. Ms. Ramos is going to be uploading them. We've got them on a thumb drive.

Mr. Carlson, I don't know if you got the thumb drive or got a copy or had access to it or --

MR. CARLSON: Yeah --

THE COURT: -- I assume you did.

MR. CARLSON: -- I got a disk, Judge.

THE COURT: Very good. All right.

The only potential issue is that the recordings are not playing nicely with the court's system. It's not the fault of the government. It seems to be happening in the building more generally.

What we're going to do I think is have that uploaded on a laptop that has nothing else on it, and it's going to be played through that.

There's more to come on that, but it's a long way of saying thank you for the exhibits. Ms. Ramos is working with the IT staff to make sure all of it can be either uploaded onto the system or presented in a way through the laptop that it could be displayed to the jury.

Okay. So that's a long way of saying, thank you for the exhibits. We're getting it in the works.

Okay. Those are the two housekeeping matters that I wanted to cover because they seemed a little bit ministerial. Maybe there's one thing on the jury instructions that was a little more substantive, but I'll repeat that when the defendant is here. Okay? I'd like to save everything else.

Is there anything else that you folks want to cover from the government's perspective?

MS. DeMARCO: Just a clarifying question. Did you

want us to take out the citations for the jury instructions? The ones that say joint proposed instructions.

THE COURT: Thank you for that. Why don't you leave it for now.

MS. DeMARCO: Okay.

THE COURT: And then I'll delete it on my end. I think it's a nice, clean thing to have in the meantime on the docket. And I'll just -- I'll be in charge of deleting it, okay, deleting the footers.

Good question.

Anything else from the government?

MS. NUTINI: No, Judge.

THE COURT: Okay. Mr. Carlson?

MR. CARLSON: Yes, Judge.

I just wanted to remind the Court that I had made a Rule 29 motion specifically relating to Count -- generally, but with respect to Count V that Your Honor took under advisement.

THE COURT: Right.

MR. CARLSON: So that's something that is outstanding.

I also wasn't sure how the Court wanted me to seek admission of the exhibits that Your Honor ruled *in limine* were not admissible.

Your Honor said I needed to --

THE COURT: Excuse me one second.

Hi. Is he here?

THE MARSHAL: Yes.

THE COURT: Okay. Great. Come on in.

THE MARSHAL: We're waiting on one more person.

THE COURT: Okay. Very good.

So when he's ready, you can bring him on in.

THE MARSHAL: Okay.

THE COURT: Why don't we do this in the defendant's presence.

MR. CARLSON: That's fine, Judge.

THE COURT: And I've ruled on that, but why don't we do that. When the defendant isn't here, I only want to cover --

MR. CARLSON: I understand, Judge.

THE COURT: -- you know, real basic ministerial matters, which we'll repeat for him in his presence.

MR. CARLSON: And one last thing, Judge. I need about two minutes with Mr. Ibekie --

THE COURT: Totally fine.

MR. CARLSON: -- before the jury comes.

THE COURT: I'll give you whatever time you need.

MR. CARLSON: Thank you.

THE COURT: No worries.

All right. So, again, I wanted to save most of the matters for the defendant because he's not here, and I don't want him to feel like he's being excluded. So we're going to

save all of that.

But I did just want to thank the government for sending the exhibits, and I want to just encourage you to file the jury instructions on the docket. We'll save everything else.

When the defendant is here, I'll roll back out, and we'll get rolling.

THE CLERK: All rise.

(Recess at 8:51 a.m., until 9:10 a.m.)

THE COURT: All right. Good morning, everyone.

Let's go ahead and get everyone's appearances on the record, if you would, please.

Start with counsel for the government.

MS. NUTINI: Good morning, Your Honor.

Paige Nutini and Megan DeMarco on behalf of the United States.

Also at counsel table is Amy Mansker and Christopher Kadonsky, both with IRS Criminal Investigations.

THE COURT: All right. Very good.

Good morning to each of you. Good morning.

And defense counsel.

MR. CARLSON: Good morning, Your Honor.

Kent Carlson on behalf of Mr. Ibekie, who is also present.

THE COURT: All right. Very good. Good morning,

Mr. Carlson.

Mr. Ibekie, good morning.

THE DEFENDANT: Good morning, Your Honor.

Anthony Ibekie.

THE COURT: Good morning.

I'd like to say thank you to the deputies for being here today. You folks are the best in the business, as I always say. I appreciate you. Thank you for being here.

All right, folks. I want to follow up on where we left off.

Mr. Ibekie, I'll tell you, I didn't want to cover very much ground this morning when you weren't here. I covered two ministerial matters at 8:30 with the parties. But I'm going to repeat everything now for your benefit. And I saved everything else because I wanted you to be here because it's your criminal trial, and I thought you're entitled to be here.

But let me just tell you what I did when you weren't here. I thanked the parties for giving me the revised jury instructions. I asked them to file it on the docket so it's easy to find, including the redline. I asked them to double-check that the counts in the jury instructions match the counts in the verdict form and match the counts in -- the jury instructions have to match the verdict form, which has to match the superseding -- I'm sorry -- the revised indictment.

So the indictment has to match the numbering in the

jury instructions and has to match the numbering in the verdict form. It's all got to match.

And I also said to them that I thought the mail fraud and wire fraud instructions should be separated because the elements are just a little bit different. They're not a lot different, but they're a little bit different. So they're going to go ahead and file that. So that was the main topic that I covered.

The other thing I covered is I just thanked the government for sending me the exhibits, which we got on a flash drive. Your lawyer has it on a disk. And I said that we're having a bit of an issue with the recordings so we're going to -- through no fault of the government. So we're going to be providing that to the jury on a laptop. And the government and your lawyer are going to work with my courtroom deputy to make sure everything goes smoothly.

So that's all we covered, basically.

Do any of the parties want to add or clarify anything I just said?

I want to make sure Mr. Ibekie has --

MR. CARLSON: No, Your Honor.

THE COURT: -- a sense of what we just covered before.

MS. NUTINI: No, Your Honor.

THE COURT: Okay. Very good.

All right. I have a few things that I want to cover.

I did get a copy of the revised indictment, which you flagged in your filing yesterday.

Thank you for doing that.

Is this acceptable, everybody? Does it look good? Have you checked it? This is the copy that's going to go to the jury?

MS. NUTINI: Yes, Your Honor, that's the redacted indictment --

THE COURT: Correct.

MS. NUTINI: -- that will go to the jury.

THE COURT: Correct.

And you've renumbered the counts obviously, too?

MS. NUTINI: Yes.

THE COURT: All right. So this is Docket No. 324.

Is that good with you, Mr. Carlson?

MR. CARLSON: Yes.

THE COURT: Okay. Very good. So I've got that.

I want to cover the stipulations, Docket No. 320. Thank you for filing that. You filed it without the signatures. Thank you. I expected you to do that.

The question I have for you folks is, have you talked through whether this ought to go to the jury? Have you talked about that? And what do the parties think?

MS. NUTINI: Your Honor, we would like them to go to the jury. They were included on the flash drive that was

provided to Ms. Ramos.

THE COURT: Yep.

MS. NUTINI: And, again, that is a version of the stipulations with all the signature blocks removed.

THE COURT: Okay. Are you good with that, Mr. Carlson?

MR. CARLSON: Fine, Judge.

THE COURT: All right. Do you want it in hard copy or just on the -- PDF on the system?

MS. NUTINI: I think PDF is fine.

THE COURT: Fine. Okay. Very good. So we will do that.

Are you okay with that, Mr. Carlson?

MR. CARLSON: Yes, Judge.

THE COURT: Very good.

I now want to cover the plan for the day, and I want to cover in particular whether the defendant intends to testify.

You know, at the close of the evidence -- let me back up.

On Friday, early afternoon, the government closed. The government rested, I should say.

Mr. Ibekie then expressed an intention to testify. Mr. Carlson asked for the Court's indulgence to have more time to prepare, which I was happy to give. And we were going to

use that time to have defense counsel talk with the defendant about whether he intended to testify.

I had directed Mr. Carlson to file something yesterday saying that he -- whether he intended to testify, and you did that.

Thank you, Mr. Carlson, for that. I appreciate that.

Do you want to just give me your sense of the lay of the land, Mr. Carlson. Does the defendant still intend to testify?

MR. CARLSON: He does, Your Honor.

THE COURT: Okay. Let me have my colloquy with him.

I assume you've gone over all of this with him, obviously.

MR. CARLSON: I have, Judge.

THE COURT: So let me have a brief colloquy with you, Mr. Carlson.

And then, Mr. Ibekie, I'm going to ask you a series of questions, sir, because I just want to make sure you understand what you're doing. Okay?

So are you with me, Mr. Ibekie, so far?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So I'll start with Mr. Carlson.

Did you discuss with the defendant the possibility of testifying?

MR. CARLSON: I've discussed that with him on multiple

occasions, Judge.

THE COURT: All right. Did you explain all of his rights?

MR. CARLSON: I did.

THE COURT: Did you explain the Fifth Amendment?

MR. CARLSON: I did, Judge.

THE COURT: Did you explain that he's got a right to testify?

MR. CARLSON: I did.

THE COURT: Did you explain to him that he's got a right not to testify?

MR. CARLSON: I did, Judge.

THE COURT: Did you explain to him that no one will hold it against him if he doesn't testify?

MR. CARLSON: I did.

THE COURT: And did you tell him that no inference or suggestion of guilt could be derived from the fact that he chose not to testify and that I would instruct the jury to that effect?

MR. CARLSON: I did, Judge.

THE COURT: Did you explain to Mr. Ibekie the potential pros and cons, meaning the potential benefits and risks if he takes the witness stand and testifies and waives his right?

MR. CARLSON: Judge, I spent the vast majority of my

time trying to explain to him the dangers in his testimony, what the government could do as a result on cross-examination and rebuttal.

I explained to him in detail and on many occasions that I did not believe that it was wise for him to testify, but that the decision was his and his alone, but that I was advising him not to testify. And he advised me that despite my admonitions, he wished to exercise his constitutional right and testify.

THE COURT: Okay. Thank you.

Can you just make a brief high-level proffer of the number of times you spoke with him since Friday and when you spoke and how -- you know, how much time you spent with him?

MR. CARLSON: Since Friday, Judge, I spoke with him on Monday for about two hours and approximately two hours again yesterday in person at the MCC.

THE COURT: Have you had enough time to prepare him for testifying?

MR. CARLSON: I believe so, Judge.

THE COURT: All right. So, Mr. Ibekie, did you hear all of that, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. So let me ask you a series of questions. And please understand, Mr. Ibekie, that I'm not trying to talk you into anything, I'm not trying to talk you

out of anything. My job as a judge here is to make sure that this is a fair process, and I want to make sure you understand all of your rights.

Are you with me?

THE DEFENDANT: Yes, Your Honor.

THE COURT: The decision to testify is an important decision, so I need to ask you a number of questions. I need to make sure that you're making a knowing and voluntary decision.

Again, I'm not trying to send you a signal. I'm really not. I just want to make sure that you understand what you're doing. And I ask these same questions to every single criminal defendant.

Do you understand me?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So here it goes.

You have a right to testify if you want to testify.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And do you understand you've got a right to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You also have a constitutional right not to testify. In other words, you have a right against self-incrimination under the Fifth Amendment of the

Constitution.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: If you decide not to testify, I will instruct the jury that no inference or suggestion of guilt could be drawn from the fact that you did not testify.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Do you understand that you've got a constitutional right not to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: It is your decision and your decision alone whether to testify.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: No one can direct you to testify and no one can direct you not to testify. And that includes your lawyer. It's not up to your lawyer. It's up to you.

Again, it's not a decision that's within the discretion of counsel. It's your decision individually to make.

Do you understand that it's your decision and your decision alone about whether to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: That does not mean, of course, that you

cannot and should not confer with counsel about whether to testify. But I want to make sure that you understand that at the end of the day, it's your individual decision whether to testify. Whatever advice you may be given by your lawyer, it's your decision either to follow that advice or not follow the advice with respect to whether you should testify.

Do you understand that it's your decision and your decision alone whether to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: If you testify, it's going to go like this: If you testify, your lawyer will examine you on direct. He'll ask nonleading questions.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Then the government would cross-examine you, and they would ask you pointed questions, and I expect them to be leading questions, tough questions.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: And then your lawyer would have an opportunity to ask you questions on redirect.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So your lawyer would ask questions on direct, you get cross-examined, and then your lawyer would do

cleanup on redirect as need be.

Do you understand?

THE DEFENDANT: Yes, Your Honor.

THE COURT: If you testify, the government is going to cross-examine you.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: So it's going to be one of the attorneys on behalf of United States government. They're experienced federal prosecutors.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: The government is going to ask you a lot of tough questions, I bet. I mean, it could be a rough ride. It's going to be a lot of tough questions.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: If you testify, the normal rules of evidence would apply.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: If you testify, I'm not going to give you any special treatment, Mr. Ibekie, when it comes to evidentiary questions.

In other words, I'm going to treat you just like any

other witness because that's what I'm supposed to do. So I'm not going to give you any special latitude or any special breaks. I'm going to treat you just like any other witness in the courtroom who is testifying.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: In other words, I'm not going to come to your aid and help you. I'm just going to allow the government to ask questions as long as they're fair questions.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. If you testify, I will instruct the jury that all of the evidence in the case and all of the testimony of the witnesses, including yourself, would be evaluated in the same manner.

Do you understand that?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Have you discussed your rights with your lawyer?

THE DEFENDANT: I have.

THE COURT: All right. Have you discussed with your lawyer the possibility of testifying?

THE DEFENDANT: I have.

THE COURT: Has your lawyer explained all of your rights with you when it comes to the issue of whether you

should take the witness stand and testify?

THE DEFENDANT: Yes, he did.

THE COURT: Has your lawyer explained to you the pros and cons of testifying?

THE DEFENDANT: Yes, he did.

THE COURT: Did your lawyer explain the dangers of taking the witness stand and testifying?

THE DEFENDANT: Yes, he did.

THE COURT: Did you have an opportunity to ask questions to your lawyer about your rights and about the possibility of testifying?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Did you get answers to all your questions from your lawyer?

THE DEFENDANT: Yes, Your Honor.

THE COURT: How many times have you talked with your lawyer about your rights and about the possibility of testifying?

THE DEFENDANT: Three times in a total.

THE COURT: I'm sorry?

THE DEFENDANT: Three times.

THE COURT: 30?

THE DEFENDANT: No, three. Number three.

THE COURT: When was that?

THE DEFENDANT: We talked about it on Friday when I

made a decision. We talked about it on Saturday -- sorry, on Monday. And we also talked about it on Tuesday.

THE COURT: Okay. And how about before Friday? Didn't you talk with your lawyer before Friday about whether you should take the witness stand?

THE DEFENDANT: We've had that conversation.

THE COURT: How many times?

THE DEFENDANT: I will say about another three times.

THE COURT: Another three times. Your lawyer said something to the effect that he's been talking with you about this for the last two years; is that right?

THE DEFENDANT: Yes.

THE COURT: Okay. Have you had enough time to talk with your lawyer about whether to take the witness stand and testify?

THE DEFENDANT: Yes. I've had enough time, an ample time to talk to him about it.

THE COURT: Has your lawyer answered all of your questions about testifying?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Has your lawyer explained all of the risks to you about testifying?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Has your lawyer explained the Fifth Amendment?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Mr. Ibekie, do you need to talk to your lawyer again about whether you should take the witness stand?

THE DEFENDANT: No, Your Honor.

THE COURT: Do you have any more questions for your lawyer?

THE DEFENDANT: No, Your Honor.

THE COURT: Do you have any questions for me, Mr. Ibekie?

THE DEFENDANT: No, Your Honor.

THE COURT: Is anyone putting any pressure on you to testify?

THE DEFENDANT: No, Your Honor.

THE COURT: Is anybody putting any pressure on you not to testify?

THE DEFENDANT: No, Your Honor.

THE COURT: Let me just ask you again, Mr. Ibekie. Do you need to talk to your lawyer again about possibly testifying?

THE DEFENDANT: No, Your Honor.

THE COURT: Do you have any more questions for your lawyer about the possibility of taking the witness stand?

THE DEFENDANT: No, Your Honor.

THE COURT: How about me, Mr. Ibekie; do you have any questions for me?

THE DEFENDANT: No, Your Honor.

THE COURT: Do you think I'm asking you the same question over and over again?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Do you understand I'm trying to do that just to make sure you understand what you're doing?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. So let me just ask you, Mr. Ibekie: Do you want to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you waiving your right against self-incrimination under the Fifth Amendment?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you making that decision knowingly and voluntarily after consulting with counsel?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Folks, does anybody think I need to ask any additional follow-up questions of any kind to him?

MS. NUTINI: No, Your Honor.

THE COURT: Mr. Carlson?

MR. CARLSON: No, Your Honor.

THE COURT: Does anyone have any reason to doubt that the waiver is knowing and voluntary?

MS. NUTINI: No, Judge.

MR. CARLSON: No, Your Honor.

THE COURT: Okay. Mr. Ibekie, do you want to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. So I find based on your answers, that the defendant has knowingly and voluntarily exercised his right to testify on his behalf, and he's going to waive his rights under the Fifth Amendment.

Thank you, Mr. Ibekie, for answering my questions.

And let me say again, Mr. Ibekie, I was not trying to send any signals to you. My job is to make sure you understand what you're doing and --

THE DEFENDANT: Thank you, Your Honor.

THE COURT: -- make sure this is a fair process.

And I've had a number of other criminal defendants testify, and I ask them the exact same questions every time because I feel like protecting people, making sure they know what they're doing.

Are you with me?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. So, Mr. Carlson, let me just ask you a logistical point.

I assume he is your first witness.

MR. CARLSON: Yes, Judge.

THE COURT: Okay. So here's what I would like to do from a courtroom logistics perspective. When it comes time for him to testify, I would like him to walk up to the witness

stand. I would like the deputies to stay where they are. Don't move. It could be distracting to them, to the jury. They may get a signal. I don't know what the jury would think if you all moved.

I'm not worried at all about Mr. Ibekie sitting right here. We're getting along just fine, so it will be fine. I think it will be less noticeable for the jury if you folks just stay where you are.

So thank you for doing that. I'm not worried about it at all.

When the jury gets in, folks, in a minute, I'm going to warm them up, greet them, make sure they feel good about being here. I'm going to give them a reminder of where we left things off on Friday. I'll tell them the government has the burden of proof. The government has the burden of proof beyond a reasonable doubt. The defendant has an opportunity to present evidence. Has no obligation, but has an opportunity. And then I'll ask the defendant if he wants to present any evidence. That's how I'll do things.

Does that sound okay to you, Mr. Carlson?

MR. CARLSON: That's fine, Judge. The only question I had being that Mr. Ibekie has the walker, trying to get him over there is a problem. I was wondering if he could be seated in the jury box [*sic*] when the jury comes in.

THE COURT: I have no problem with that. I think

that's fine.

Any issue with that?

MS. NUTINI: That's fine from the government.

THE COURT: Okay. Yeah, that's fine.

All right. Does anybody have anything that they want to cover before we get the jury? Anybody need a break or anything?

MR. CARLSON: Judge, as I mentioned earlier, I had made a Rule 29 motion.

THE COURT: Yeah, so I'm going to take that advisement. I don't need to rule on that before the jury returns a verdict, do I? I don't think so.

MR. CARLSON: And then, Judge, I would seek admission again now that we're in our case of the exhibits that Your Honor ruled *in limine* were not admissible.

THE COURT: Okay. Do you want to make a proffer of which exhibits they are?

MR. CARLSON: Judge, yes, they are -- Exhibit No. 1 is TCF Bank letters; No. 2 is the Bank of America letter; No. 3 the Access Bank documents; 4, the Numeks, N-u-m-e-k-s, business records; 5, the Nigeria Immigration Service documents; and No. 6, the Dunukofia, D-u-n-u-k-o-f-i-a, government records.

THE COURT: All right. So very good.

So I previously ruled that those documents are not admissible. I'm going to stick with my prior ruling. Thank

you for the offer of proof.

Here's the one thing I'll say, though, Mr. Carlson: For some of those exhibits, I ruled that they were not admissible in part because of a potential lack of authentication. If you feel like you can lay the foundation for it, you know, I'll listen to you; but as things stand, I don't have a foundation for a number of those documents. So --

MR. CARLSON: Understood, Judge.

THE COURT: -- unless that changes, I'm going to stick with my prior ruling. Okay?

MR. CARLSON: Understood.

THE COURT: Is there anything anybody else needs before we bring the defendant on up and get the jury?

MS. NUTINI: No, Your Honor.

Would it be okay if I moved this podium over just an inch or 2 so we can see --

THE COURT: Sure.

MS. NUTINI: -- the witness easier.

THE COURT: No problem. No problem. So why don't you go ahead and do that.

And then maybe the deputies and/or Mr. Carlson could help Mr. Ibekie up as need be.

Do you want to come on up, Mr. Ibekie? Are you ready to testify, sir?

Let me ask you one more time, do you need any more

time to talk with your lawyer before you testify?

THE DEFENDANT: No, Your Honor.

THE COURT: Are you ready to testify?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Let's bring him on up.

All right. Thank you to the deputies for helping there.

All right. Everybody ready to get the jury?

MR. CARLSON: Yes, Your Honor.

MS. NUTINI: Yes, Judge.

THE COURT: All right. Let's get the jury.

(Jury in at 9:31 a.m.)

THE COURT: All right. Have a seat, everyone.

Well, good morning.

THE JURY: Good morning.

THE COURT: Good morning, everybody. Nice to see everyone. Once again you are 15 for 15. Everyone is present and accounted for. Thank you, everybody, for being here. Nice to see each and every one of you.

I hope you enjoyed the weekend. I hope you enjoyed the last couple of days. I hope nobody came down to the courthouse on Monday morning or Tuesday morning.

Thank you, everybody, for bearing with us that we had a couple of days where we took a break, but we are ready for you, and we know you're ready for us.

So let me just start again by saying thank you again, folks, for being here. You're now starting, what, the third week of being in the courthouse, right, technically speaking. And you had just a placeholder day on that Friday where you came in for the verdict form -- excuse me -- I'm sorry -- the jury instruction -- sorry -- I said it wrong -- the jury questionnaire, you came in that day, and you came back for jury selection, and here you are yet again on another week.

So I'll start the week off by saying thank you again, everybody, for being here. I appreciate that.

Let me just give you a brief refresher on where we left things on Friday.

Remember we broke I think early afternoon on Friday. The last thing you heard was the government say that they rested, which means they closed their presentation of their evidence, their case-in-chief.

The government has the burden of proof, not the defendant. The government has the burden of proof. The government has the burden of proving its case beyond a reasonable doubt.

A defendant does not have an obligation to present any evidence. A defendant does have an opportunity to present evidence if he wants to. But, again, the burden of proof always rests exclusively on the government.

Defense Counsel, does the defendant want to present

any evidence?

MR. CARLSON: We do, Your Honor.

THE COURT: Okay. Go ahead, please.

MR. CARLSON: Judge, I would call Mr. Anthony Ibekie.

THE COURT: Okay. Come on up, Mr. Carlson.

Good morning, Mr. Ibekie.

THE DEFENDANT: Good morning, Your Honor.

THE COURT: You know the drill, Mr. Ibekie. If you could speak into the microphone, I want to make sure all the men and women of the jury can hear you. So please do that.

And there's a pitcher of water. Just help yourself if you need something to drink anytime. Okay?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Very good.

Mr. Carlson, you may proceed when you're ready, sir.

MR. CARLSON: Thank you, Your Honor.

ANTHONY E. IBEKIE, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. CARLSON:

Q. Could you state the name you were given at birth.

A. Anthony Emeka --

MS. NUTINI: Your Honor, may --

THE COURT: Yeah, let me swear him in. Excuse me.

Let me swear you in, Mr. Ibekie. I'm sorry.

(Witness sworn.)

THE COURT: I'm sorry, folks. That was the second time I've made a mistake about the swearing in. I'm sorry.

With that, Mr. Carlson, take it from the top. Thank you.

BY MR. CARLSON:

Q. Can you state the name you were given at birth.
A. Anthony Emeka Ibekie.
Q. Where were you born?
A. Nigeria.
Q. Were you given any other names at birth?
A. Yes.
Q. By whom were you given those names?
A. Two names was by my mother, my parents. Two names was by my grandmother. And then my two last names was by my great grandparents.
Q. And what were those names?
A. Emenike Tonero was given to me by my great grandparents.
Q. And who gave you the two other names?
A. Ibe Emeka was given to me by my grandmother.
Q. Who gave you the other name?
A. Anthony Ibekie -- Anthony was my Christian name. Emeka Ibekie was given to me by my parents.
Q. What languages are spoken in Nigeria?
A. There are three languages: Igbo, Hausa, and Yoruba.
Q. Is English spoken in Nigeria?

A. No.
Q. Did there come a time where you came to the United States?
A. Yes.
Q. And when was that?
A. 2001.
Q. And what is your status in the United States?
A. I'm a legal permanent resident.
Q. Could you provide the jury with your educational background.
A. I obtained an associate degree in nursing from -- between -- in 2004, and that was from South Suburban College, South Holland, and Calumet, Illinois.
Then in 2006, I obtained a bachelor's degree in nursing from Indiana University in Gary, Indiana.
And in 2010, I obtained a medical degree from Central American Medical School in 2010.
Q. And where was that located?
A. In Belize.
Q. Can you tell the jury what your employment history is.
A. Yes.
I worked as a registered nurse while I was going to medical school from 2004 up to 2016. And the area of nursing that I worked was in -- I worked critical care and then the emergency room. And then in 2016, I started to work as a home health nurse, and I did that up until 2019.

Q. What was your employment after 2019?
A. I started several businesses, and I was buying Mack Trucks in the United States and shipping to Nigeria.
I also started -- I also pursued and obtained a license for other businesses that I did.
Q. What is your marital status?
A. I am divorced now.
Q. Do you have any children?
A. Yes.
Q. What are their names and how old are they?
A. I have five children. My oldest is Ebuka Egbunam. He's 24. My second is Uzoamaka; she's 20. My third is Nonye. Nonye is 16. And my fourth is Emeka; he's 12. And my baby -- my last son, Nnakeme, is 10.
Q. I'm going to direct your attention now to the year of 2016 and ask you, where did you live at that time?
A. I was living in Lincoln Avenue at Lisle.
Q. And who lived there with you?
A. I lived there with the tenants that were renting from me.
Q. How many tenants did you have?
A. Between 2016 and 2018, I had about 12 tenants.
Q. And do you recall any of their names?
A. Yes.
Q. And what were they?
A. Mr. Samuel Aniukwu, Mr. Aristo Blake Ebuga (phonetic),

Mr. Sunde Chuku (phonetic), Ms. Jennifer White, Ms. Erica Brown, and Mr. Udu a'Udu (phonetic), Mr. Oma Konal (phonetic).
Q. Were there others that you just don't recall the names of?
A. Yes.
Q. Did you have Internet access at that premises?
A. Yes.
Q. And was that available for tenants' use as well as your own use?
A. Yes.
Q. And did you -- included in their tenancy, did you provide services for them?
A. Yes.
Q. And what services did you provide?
A. I provided Internet services. I provided them with two computers. And I also provided them with a phone.
Q. What kind of computers did you provide for them?
A. It was a Dell laptop computer and an Apple Mac Pro book computer.
Q. Did you also use those computers?
A. Yes.
Q. Now, did you provide your tenants with a password to get on those computers?
A. Yes.
Q. And did tenants have their own passwords for their own Internet?

A. Yes.
Q. And they had Internet access, correct?
A. Yes.
Q. You heard testimony in this case, did you not, about an Aristo Blake Gmail account?
A. Yes.
Q. Was that Gmail account yours?
A. No.
Q. Did you ever use that Aristo Blake Gmail account?
A. No.
Q. Did you observe tenants using those computers from time to time?
A. Yes.
Q. Did you know what they were doing on those computers?
A. No, I wouldn't know. I would -- they -- I would come back home from work, and they would be on the computer maybe doing their own personal businesses, their work, whatever.
Q. Did you ever see any inheritance scam letters at the Lisle residence?
A. No.
Q. Did you ever fold any inheritance scam letters and stuff them into envelopes while wearing gloves at the Lisle residence?
A. No.
Q. Did you have a shredder at the Lisle residence?

A. I didn't have a shredder in Lisle residence.
Q. I'm going to direct your attention to Government Exhibit 718-3.
MR. CARLSON: And this is already in evidence.
THE COURT: You can publish to the jury.
BY MR. CARLSON:
Q. Do you see that document?
A. Yes, sir.
Q. What is that document?
A. This was a document that I wrote when I was helping one of my new tenants who had just started renting, and he was setting up a business account with his businesses. And this is information he give to me, and I wrote it down as I was helping him.
Q. Did there come a time when you moved from the Lisle residence?
A. Yes.
Q. And when was that?
A. That was in end of 2018.
Q. And where did you move to?
A. I moved to Naperville.
Q. And who lived with you at Naperville?
A. Mr. Samuel Aniukwu. My son live with us. And we had about four tenants move in with us. But in the course of my stay there, about eight tenants lived with us, too.

Q. And do you recall any of their names?
A. Yes.
Q. What are they?
A. Mr. Patrick Udaja (phonetic), Ms. Sandra Udechiko (phonetic), Ms. -- tenant Abiadu (phonetic), and Krista -- Crystal -- Crystal Achucu (phonetic). Crystal Achucu. And those are the four that moved in with us. Then when they had moved out from the time their tenancy expired, other people moved in.
The second batch was Angela Chakuma (phonetic). And we had Mr. Michael -- Mr. Michael Henderson. And then I also had Kenneth Tonyaza (phonetic). And then Mr. Ebuka Aristo Blake also stayed there.
Q. Did you have Internet access at that location?
A. Yes.
Q. And did you -- was that available for the tenants as well as yourself?
A. Yes.
Q. And what was included in their tenancies at this location?
A. It was the same thing from when I lived at Lincoln Avenue. I provided a phone for them, I provided two computers, and I also provided Internet services.
Q. And what kind of computers?
A. Dell computer, laptop computer.
Q. And where were those computers kept?

A. They were -- this particular house had a home office, so it was -- both of them were kept in the home office downstairs.
Q. Did you observe tenants using those computers?
A. Yes.
Q. Did you see what they were doing on the computers?
A. They were doing their businesses. I don't know precisely what they were doing, but they were doing their businesses, whatever they were doing on the Internet.
Q. How were you employed while you were living in Naperville?
A. I was running several businesses. I was buying Mack Trucks from Galva, Illinois, and shipping them to Nigeria. I refurbish it and supply it.
I was also working on my -- my license on a particular business I'm already -- I also obtained a license that I also operate, which is one of my businesses.
Q. Did you ever see any inheritance scam letters in Naperville?
A. No.
Q. Did you ever fold any scam letters and stuff them into envelopes while wearing gloves in Naperville?
A. No.
Q. Did you have a shredder in Naperville?
A. Yes, I had a shredder in Naperville.
Q. Did you ever shred any inheritance scam letters in Naperville?

A. No.
Q. Did there come a time where you moved from the Naperville residence?
A. Yes.
Q. When was that?
A. That was in January of 2020. I moved from -- I moved from there to Oxbow.
Q. And who lived at Oxbow with you?
A. It was myself, my son, and Mr. Sunde there. He was a tenant.
Q. Was he the only tenant?
A. Yes.
Q. And, again, did you have Internet services available there?
A. Yes.
Q. For your use as well as the tenants?
A. Yes.
Q. Did you ever see -- oh, did your agreement with him include providing Internet service, phone service, and a computer?
A. Yes.
Q. And where was the computer located?
A. It was located in my -- in the garage office that we all used.
Q. Other than yourself and your tenant, did anyone else have access to that computer?
A. Yes, my son did.

Q. And which son that?
A. Ebuka Egbunam.
Q. And he has testified here earlier?
A. Yes.
Q. And I think you testified that you had an office there, correct?
A. Yes.
Q. And did you ever see your son in the office?
A. Yes.
Q. And what was he doing when you saw him in the office?
A. He was on the computer.
Q. Did you ever see any inheritance scam letters at Oxbow?
A. No.
Q. Did you ever fold any scam letters and stuff them into envelopes while wearing gloves at Oxbow?
A. No.
Q. Did you have a shredder at Oxbow?
A. Yes.
Q. Did you ever shred any inheritance scam letters at Oxbow?
A. No.
Q. Now, I'd like to show you Government Exhibit 719-2.

THE COURT: Folks, as I said before, the lawyers share a computer for ease of presentation.

Thank you to the lawyers for working together cooperatively on that.

Go ahead, Mr. Carlson.

MR. CARLSON: Thank you.

BY MR. CARLSON:

Q. Do you see what's depicted in that photograph?

A. Yes.

Q. And what is this?

A. These are my envelopes. These are envelopes.

Q. And where did you get those envelopes?

A. From Walmart.

Q. And why did you get that many envelopes from Walmart?

A. With my licensed business, part of my -- after the process of obtaining the licenses, part of my -- the next strategy was during the marketing -- this was during the marketing strategy. These envelopes are supposed to be -- it's part of my marketing strategies. The flyers for my new license business go in this envelope, and they are -- I take them to the post office for mailing.

Q. Did you have flyers to be put in those envelopes at Oxbow?

A. No.

Q. Why not?

A. Because this was the time that we were having problems with COVID and delay in delivery. So the flyers that were supposed to go on these particular envelopes haven't arrived yet. I have an online company that produces my -- our flyers for this licensed business, and usually they will ship it and it's

delivered to me at my home.

At this point, there was a -- the delivery hasn't come for these ones.

Q. Now, you heard testimony about mailing lists and Excel spreadsheets with names and addresses on them.

Did you, in fact, have those?

A. Yes.

Q. And where did those come from?

A. I -- while I -- as I was -- while I was at the stage of marketing this business, I signed up with InfoUSA. InfoUSA is a company that sells mailing lists. And after I had gone through their screening process, they looked at the licenses and everything, they signed me up with Rebecca, who now -- would now send my mailing -- when she -- when I called them that I want my mailing list, she will charge my account, and then it will be sent to my e-mail address. And then from my e-mail address, I would download it to the computer and then begin to put the names on it and print it and then put the flyers in it and then put it back in the box that came from Walmart, then I take it to the post office.

Q. Let me ask you, are you Peter Pfizer?

A. No.

Q. Who is Peter Pfizer?

A. Peter Pfizer is a man I met in 2017.

Q. What's your relationship with Peter Pfizer?

A. It started off from -- it started off from a business conference in Nigeria. I met him first at a business conference, and then from there, I started to talk to him.
Q. Do you know where he works?
A. Yes.
Q. Where?
A. He works at Standard Chartered Trust Bank in London.
Q. And have you talked to Peter Pfizer on the telephone?
A. Yes.
Q. When?
A. I've been talking to him from 2017 maybe once a week. But over time, towards the -- over time, towards 2020, we started to talk a little more because I got -- started to know personal things about him, and he started to also know some personal things about me.
Q. Have you ever held yourself out or represented yourself as Peter Pfizer in letters?
A. No.
Q. What about e-mails?
A. No.
Q. What about on the telephone?
A. Yes.
Q. When?
A. That was -- Nia was in the hospital, and she was having problems with her pregnancy, and Peter was there with her. So

he asked me for a favor, and I offered to help.
Q. And were those phone conversations heard in this courtroom?
A. Yes.
Q. And that was your voice on those recorded calls?
A. Yes.
Q. Why was a copy of Peter Pfizer's driver's license on one of your devices?
A. I honestly don't know.
Q. Did you cause it to be put there?
A. No.
Q. Do you know why other materials related to Peter Pfizer were on your devices?
A. No.
Q. Did you cause it to be put there?
A. No.
Q. Have you ever heard any of your tenants talking to Peter Pfizer?
A. Yes. Back in 2017 when I come back home from work, Aristo Ebuga would be on a video call with him talking when I walk into the door. I've also observed Mr. Samuel talk to him on the telephone.
Q. Are you Pierre Delouis?
A. No.
Q. Who is Pierre Delouis?
A. I don't know.

Q. Did you ever have any relationship with him?
A. No.
Q. Did you ever hold yourself out in letters as Mr. Delouis?
A. No.
Q. Have you ever held yourself out in e-mails as Mr. Delouis?
A. No.
Q. Why was one of -- a photo of his driver's license on one of your devices?
A. I truly don't know.
Q. Did you cause it to be put there?
A. No.
Q. Are you Chandler Arnaud?
A. No.
Q. Do you have any relationship with Chandler Arnaud?
A. No.
Q. Have you ever held yourself out in letters as Chandler Arnaud?
A. No.
Q. What about e-mails?
A. No.
Q. What about telephone conversations?
A. No.
Q. Why was a driver's license -- a copy of a driver's license of Mr. Arnaud on your devices?
A. Again, I truly don't know why it's -- how it got -- I truly

don't know.
Q. Did you cause it to be put there?
A. No.
Q. Are you John Gene Delon?
A. No.
Q. Do you have any relationship with Mr. Delon?
A. No.
Q. Have you ever held yourself out either in e-mails or in letters as Mr. Delon?
A. No.
Q. What about in phone conversations?
A. No.
Q. Any idea why materials of Mr. Delon were on your devices?
A. I have no idea.
Q. Did you cause them to be put there?
A. No.
Q. What about Nikka Avis?
A. No.
Q. Did you ever represented yourself as Nikka Avis in either letters or e-mails or phone conversations?
A. I have never done that.
Q. Any idea why information related to Nikka Avis was on your devices?
A. No.
Q. Did you cause it to be placed there?

A. No.
Q. Now, you were present and heard your son testify that you persuaded him to come to the United States, correct?
A. Yes. Yes, I did.
Q. Did he want to come to the United States?
A. He didn't want to come to the United States, but -- no, he did not.
Q. And you persuaded him to come to the United States by offering to pay for his college, correct?
A. Yes.
Q. And you did pay for his college for a period of time?
A. Yes, I did.
Q. How long did you pay for his college?
A. It was for a couple of months.
Q. And what happened after that?
A. So I had asked him to come because I wanted to have a relationship with him. Then when -- I couldn't handle the children that I was taking care of. When I couldn't keep up with the payment plan that IU Indiana had given to me, I talked to him about it, that I couldn't continue with it, to pay.
Q. And what was his reaction when you told him that?
A. He was -- he was very upset. He was very upset. And I -- I tried to give him other options, you know, to help him because I used myself as an example. I told him that maybe he should go to a community college and perhaps get a nursing

degree. But he really didn't like it. He thought it was for little people. And -- but he was very upset about the fact that I couldn't continue to pay.
Q. I'm now going to show you --
MR. CARLSON: If you could switch over to the ELMO, please.
THE COURT: Is this in evidence?
MR. CARLSON: Yes, this is in evidence as Government Exhibit 801.
THE COURT: Okay. It's on the ELMO.
THE WITNESS: Please, can I get my reading glasses? It's in my walker.
MR. CARLSON: May I approach --
THE COURT: You may.
MR. CARLSON: -- the witness, Your Honor?
BY MR. CARLSON:
Q. Mr. Ibekie, do you recognize that?
A. Yes.
Q. And what do you recognize that as?
A. I recognize this as the letter that Peter had given to me on my second meeting with him in Nigeria. And I recognize this letter because the return address in Wheaton was -- is in the same county as Lisle where I used to live before, which is DuPage County. I recognize it by the return address on the -- on those letters.

Q. How many letters were you given?
A. It was between nine and 12.
Q. And what did you do with those letters?
A. I placed them in the mail when I got home.
Q. All right. Did there come a time in 2018 that you opened up a TCF Bank for Samcord?
A. Yes.
Q. After you opened that account, did you notice anything unusual?
A. Yes.
Q. What did you notice?
A. So it was about a week after opening the business account that I was going through the paperwork that was given to me at the bank, and I realized that there was an error in the information that was in the bank. So -- information in the paperwork.
Then I also realized that they had my name -- they had my name but not the official name that I use here on the paperwork. Then I went to the bank and notified the bank about the error. I was then further advised to write a letter to the office to notify them about that. And I also gave them a copy of the passport because I had used my passport to open the account. I gave them a copy of the passport.
Q. And what did you do with that letter?
A. I wrote a letter --

MS. NUTINI: Objection, Your Honor.

THE COURT: The question is, what did you do with the letter?

MR. CARLSON: Yes.

THE COURT: Overruled.

BY THE WITNESS:

A. I placed them in the mailbox in front of my home.

BY MR. CARLSON:

Q. And what was the error that you noticed?

A. So what happened is that I had -- I -- the error I noticed was there was -- they had my name, they had my other name, not my official name on the paperwork.

In other words, the passport that I had used was my passport that had my name -- my other name that I was not using here, and that's what I explained to them.

Q. Was the name one of the names you were given at birth?

A. Yes.

Q. Did there come a time when you opened up a Bank of America account for --

A. Yes.

Q. -- Samcord?

A. Yes.

Q. And when was that?

A. That was in 2018.

Q. And did you notice anything about that account?

A. Yes, because it happened simultaneously. I had opened the TCF Bank, and I think a few days later, I opened the Samcord because -- at BoA because this was all part of my -- for my businesses. I was getting payment from the supplies I made. So this is where the funds were going.

So I opened both of them within the same period like two or three days apart. It was over the weekend when I had come back from I think one of the -- from Galva, I was now going through the paperwork. I realized that the same error that happened in TCF also happened in Bank of America. And I sent both -- to both banks the letters informing them about the error.

Q. And what did you do with the letter?

A. I placed it in the mailbox in my home.

Q. Prior to the start of this case, had you ever heard of Dale Helms?

A. No.

Q. What about Cong Le?

A. No.

Q. What about Robert Petroselli?

A. No.

Q. What about Gary Foster?

A. No.

Q. What about Robert Aguada?

A. No.

Q. Did you have any idea that the $6400 from Dale Helms to Emetech Solutions was part of some kind of a fraud?
A. No.
Q. What did you believe it was?
A. I believe it was for legitimate business purposes.
Q. Did you have any idea that the $97,500 from Cong Le to Jenant was part of some kind of fraud?
A. No.
Q. Did you have any idea that the $12,800 from Robert Petroselli to Samcord was part of some kind of fraud?
A. No.
Q. Any idea that the $1,100 from the undercover posing as Daniel Baker to Globayo was part of some kind of fraud?
A. No.
Q. What did you believe it was for?
A. I believed it was for -- based on what I know and the relationship I've known -- I've had with Peter, it was for -- to pay for a legal fee for his client that he was helping, and he couldn't do that because he was with Nia at the hospital at the time.
Q. Why was that payment sent to a residence on Harlem Avenue in Oak Park?
A. In Oxbow -- Oxbow wasn't like the other houses I lived. This was built like in kind of apartment buildings, and they had incidents of packages been missing, being reported missing

in the complex. And I knew that this was money. So I asked Jennifer if it could be mailed to her house, and she said it was okay.
Q. Mr. Ibekie, have you ever created a false passport?
A. No.
Q. Have you ever asked anyone to create a false passport for you?
A. No.
Q. You're aware that passports were seized from the Oxbow premises, correct?
A. Yes.
Q. To the best of your knowledge, were those legitimately issued by the Nigerian government?
A. Yes.
Q. Do they contain mistakes?
A. Yes.
Q. What are the mistakes?
A. They had my name -- my unofficial name on the passports. And I've also used those names in Nigeria like in schools and some records in Nigeria. But the mistakes were they had my names on the passport when the official name that I use in the United States is Anthony Emeka Ibekie.
Q. Were the names reflected names you were given at birth?
A. Yes.
Q. Did you knowingly cause false information to be included in

your passports?
A. No.
Q. Did you ever intend to deceive anybody using those passports?
A. No.
Q. Now, you've heard testimony about several corporations in this case, correct?
A. Yes.
Q. Corporations that you had some interest in, correct?
A. Yes.
Q. Samcord, correct?
A. Yes.
Q. Jenant, correct?
A. Yes.
Q. Berger Services, correct?
A. Yes.
Q. And Emetech Solutions, correct?
A. Yes.
Q. Can you tell the ladies and gentlemen of the jury what the purpose of those corporations were.
A. So the purpose of those corporations was it was for purposes of supplying those Mack Trucks and heavy equipments that I purchased at Galva, Illinois, to the local governments in Nigeria.
So what I did was I registered these companies here in

the United States and then also registered it with the local governments.

What it did for me was that it allowed me to have more bids for work because what I supplied to them were Mack Trucks that were purchased in the United States. And I lived in the United States. It gave me a little upper hand over my local competitors.

So those companies were registered with the local government offices. So when my new trucks that I bought from here, when they get to Nigeria, it is refurbished at cheap level, and then it's supplied to the local governments.

So those -- and when they make their payments, they have to also pay me in my company's name. Some of the payments are also paid in the United States, and some are paid in Nigeria account.

Q. Was the purpose of any of these corporations to help facilitate some kind of fraud?

A. No. Absolutely, no.

Q. Did you knowingly use any of those corporations to facilitate any type of fraud?

A. No.

Q. Did you knowingly join any scheme to defraud anyone?

A. No.

Q. Did you ever intend to defraud anyone?

A. No.

Q. Did you ever knowingly launder money?
A. No.
Q. Did you knowingly provide false information to banks?
A. No.
Q. Did you knowingly use a false passport?
A. No.
MR. CARLSON: Nothing further.
THE COURT: Thank you, Counsel.
Counsel for the government, whenever you're ready.
MS. NUTINI: Thank you, Judge.

CROSS-EXAMINATION

BY MS. NUTINI:
Q. Mr. Ibekie, let me get this straight. When you lived at the Lincoln premises, you said that you had numerous tenants?
A. Yes, ma'am.
Q. How many tenants was that?
A. I think about 12 of them.
Q. You had 12 different people live with you?
A. Not -- not at the same time, but over the course of 2016 up until the time I left, I would say about 12 tenants.
Q. So for about two years, you had 12 tenants come in and out of your house?
A. Yes, ma'am.
Q. And you provided those tenants with computers, you said?
A. Yes, ma'am.

Q. A Dell and a MacBook?
A. Yes, ma'am.
Q. You also provided those tenants with a phone?
A. Yes, ma'am.
Q. Did all 12 share that -- those two computers and the phone?
A. Yes, it was part of the tenancy agreement. So we had a live-in area, actually it was the living room that was converted to a common living area. Some of these tenants were coming from overseas to purchase merchandise here. So the phone was -- there was no house phone. So the phone was what they used to -- it was part of the tenancy agreement that I had for them.
Q. And you never saw inheritance scam letters when you were living at the Lincoln premises?
A. No, ma'am.
Q. And when you moved to Alyssa, you said you had eight tenants total for that about year -- or less than a year you were there?
A. About a year plus. Yes, about eight total. Yes, ma'am.
Q. And you provided those tenants with a phone and two computers as well?
A. Yes, ma'am.
Q. The same phone and two computers?
A. Yes.
Q. And when you moved to Oxbow, you said you lived with your

son and you lived with one other tenant?
A. Yes, ma'am.
Q. And did you give that tenant the phone and the two computers?
A. Actually, at the time I was moving to Oxbow, I was wrapping up the rental business because my -- the other business that I was doing was already picking up. So this was a tenant that his tenancy was supposed to expire in March, but because the COVID has stopped flights from going out of the country -- he was from Ivory Coast, so he moved on with us to Oxbow and stayed up until I went into custody.
Q. So that's about 17 tenants that you had over the course of a few years?
A. Yes, ma'am.
Q. And you didn't have any tenant agreements with any of these people?
A. I had tenancy agreements with every one of them.
Q. There were no tenant agreements ever found on any of your devices, were there?
A. I believe that -- if I could say that, I believe that when I read the complaint, Larry Barry had told Kadonsky that he had a lease agreement with me.
Q. Mr. Ibekie, my question is, there were no tenant agreements on any of your devices, were there, for these 17 tenants?
A. I -- I'm not aware if -- I'm not aware of it, but I didn't

check.
Q. And when agents searched your house at Oxbow, they didn't find any printed tenant agreements for these 17 people, did they?
A. They did. I was informed by -- I believe it was also in the complaint that Amy Mansker had wrote that they had found a tenancy agreement that I had with Mr. Samuel Aniukwu. He had my phone number in the lease agreement that he signed with the -- when he -- when he moved to Romeoville. That was in the complaint. I'm sure they found it. I'm sure they did. Because they included it there.
Q. And you didn't see any inheritance scam letters at any of these houses, did you?
A. No, I did not. No, ma'am.
Q. Is it convenient that all 17 of these people engaged in the same fraud, huh?
MR. CARLSON: Objection, Judge.
THE COURT: Overruled.
BY THE WITNESS:
A. I wouldn't know. I wouldn't know. I wouldn't know.
BY MS. NUTINI:
Q. So when you're at Lincoln -- the fraud continues when you move to Alyssa, correct?
MR. CARLSON: Objection, Judge.
THE COURT: Overruled.

BY THE WITNESS:
A. I wouldn't know if there was fraud in the first place.
THE COURT: Stop. Stop. Overruled.
Take it again. Go ahead.
Overruled.
BY MS. NUTINI:
Q. Mr. Ibekie, there were -- you would agree with me there were numerous ripped-up inheritance fraud letters found in the trash at the Lincoln premises?
A. I -- I would -- I only saw a picture. I mean, I'm seeing what I saw in the -- in the -- in the discovery. What I saw was a picture of one inheritance scam letter that was ripped off. I only saw a picture. I never saw a bunch of it. And that is what is in my discovery.
Q. But throughout the course of this trial, you saw numerous ripped-up inheritance fraud letters presented?
A. Except for what was presented here, and this was the first time I saw it.
Q. And those were at the -- those were recovered from the Lincoln premises?
A. It was not from my house because I had talked to my lawyer about it. In the inventory list, they did not even include that bag in the inventory list.
Q. Mr. Ibekie, did you live at the Lincoln Avenue premises?
A. Yes, ma'am.

Q. And did you live there when the trash pull was conducted?
A. I was living there when the trash pull was conducted. I was -- yes, I was.
Q. And those letters were found in your trash?
A. And I'm telling you what I saw on the trash -- I never saw the -- nobody -- none of the marshals talked to me about -- I knew about this whole matter in 2020.

So at the time you're talking about, nobody ever talked to me about it. What I saw on the discovery was a picture that was marked Lincoln Avenue premises. It was just one letter in that picture. I never saw any bag.

All of these things that you were saying that happened, I began to see them here, while we were here.
Q. And when you moved to the Alyssa premises, victims kept getting letters, didn't they?
A. I wouldn't know, ma'am.
Q. And victims kept sending money, like Cong Le?
A. I wouldn't know.
Q. And then when you moved to the Oxbow premises, victims like Dale Helms kept getting letters and sending money.
A. I wouldn't know, ma'am. I wouldn't know, honestly.
Q. But it was your tenants who were doing this?
A. I wasn't even sure if they were the one doing it because I never saw it.
Q. Mr. Ibekie, you talked about Aristo Blake.

A. Yes, ma'am.
Q. That was -- that was one of your tenants, you said?
A. Yes.
Q. Would you agree with me that aibekie@gmail.com is your e-mail address?
A. Yes, ma'am.

MS. NUTINI: I'm publishing Government's Exhibit 503-1.

BY MS. NUTINI:
Q. Mr. Ibekie, this is the e-mail address we're talking about.

You'd agree with me --

MR. CARLSON: Judge --

BY MS. NUTINI:
Q. -- aibekie --

MR. CARLSON: -- it's not up on our computers here.

THE COURT: All right. So let's pull it up.

First of all, this is in evidence, right, Counsel? It's in evidence?

MS. NUTINI: It is, Your Honor.

THE COURT: Let's make sure we get it pulled up on defense counsel's screen so he can see it.

Thank you, Mr. Carlson, for telling me.

Members of the jury, it looks like the technology gods are frowning upon us right now. We've got to have somebody from the IT department come up and get his computer monitor

going. It's not the fault of Mr. Carlson or anybody. It's not the fault of the staff. My staff here does a terrific job. Every now and again, there is a quirk.

So Mr. Carlson is entitled to see anything that happens. If his client is getting questioned about a document, he is entitled to see it, and I'm going to make sure he gets to see it.

Okay. So in fairness, we're just going to take a quick break. I think it will take five to ten minutes at the most, but we need to get somebody up here.

So please take your jury notebooks with you. Why don't you go to the jury deliberation room.

You've heard a lot of evidence, but you haven't heard everything. Keep an open mind.

We'll see you as soon as the technology gods start smiling. Okay?

Thank you, folks.

THE COURT SECURITY OFFICER: All rise.

(Jury out at 10:20 a.m.)

THE COURT: All right. Have a seat, everyone.

I'd like to thank counsel for both parties for nudging me and reminding me gently when I forgot to swear in Mr. Ibekie. I'm sorry about that, folks. I think I've got the protocol down when someone walks up, I swear them in without an interpreter in English, things tend to go smoothly. When I had

an interpreter, it threw me off. And when I had somebody up here already, it threw me off. So I was 0 for 2 on those. But thank you, folks, for reminding me. That was the right thing to do. I appreciate you nudging me.

Why don't we take five minutes, folks. We've got to get an IT person up here.

Mr. Carlson, I wanted to make sure you had access to the exhibit.

MR. CARLSON: Judge, I -- and it dawned on me after Your Honor did that. I've got hard copies of that.

THE COURT: Okay.

MR. CARLSON: We can proceed that way. If we can't get this working --

THE COURT: Okay.

MR. CARLSON: -- we've got hard copies that we can use.

THE COURT: Well -- fair enough. So the jury is going to be back there using the restroom anyway, so I think we've got at least ten minutes. So why don't everybody just chillax for ten minutes. I'll come back at about 10:30 and see where we are. We'll get going.

Just in fairness, Mr. Carlson, I wanted to make sure you had access to the exhibit, you know. So I appreciate you flagging that.

Okay. We'll come back in ten minutes.

Thank you, folks.

THE CLERK: All rise.

(Recess at 10:21 a.m., until 10:34 a.m.)

THE COURT: All right. Thank you, everybody.

Mr. Carlson, is the screen working?

I understand the IT person came up and --

MR. CARLSON: It is, Judge. Thank you very much.

THE COURT: Of course. I'll tell the jury that these things happen. It's not your fault. You know, you did exactly the right thing by speaking up. I want you to do that. So thank you for doing that.

All right. Everybody ready to get the jury?

MS. NUTINI: Yes, Judge.

For efficiency purposes, we do plan on using the transcripts again.

Would you like us to go ahead and put those on the jurors' seats?

THE COURT: When do you intend to use it? Like right away?

MS. NUTINI: Pretty soon.

THE COURT: All right. Why don't you give them to Ms. Ramos, and she'll distribute it at the right time. Because otherwise, they'll come in, and, you know, they'll start thinking about it.

So --

MS. NUTINI: Sure.

THE COURT: -- if you'd be kind enough to give them to Ms. Ramos.

And what you'll want to do, Ms. Nutini, is say, "Your Honor, I'd now like" -- "I'd now ask the courtroom deputy to please pass out the transcripts," and she'll do it. Okay?

(Jury in at 10:35 a.m.)

THE COURT SECURITY OFFICER: All rise.

THE COURT: All right. Have a seat, everyone.

Thank you, everyone, for indulging us with the early midmorning break.

I want to say a special thanks to the IT folks who scrambled down here. They got it going right away. So we're good to go.

Mr. Carlson did exactly the right thing by flagging for me that his monitor wasn't working. I've told them separately outside your presence, if you have any technical issues, I need to know, because he's entitled to see everything.

All right. So thank you, Mr. Carlson, for flagging that.

So, Ms. Nutini, you can resume your examination.

MS. NUTINI: Thank you, Judge.

BY MS. NUTINI:

Q. So, Mr. Ibekie, before the break, we were talking about

this aibekie@gmail.com, which you confirmed is your e-mail address?
A. Yes, ma'am.
Q. And the recovery e-mail address is e-m-e-k-a-r-n @yahoo.com, correct?
A. Yes, ma'am.
Q. And the phone number is (630) 822-4947, correct?
A. Yes, ma'am.
Q. And that's your phone number?
A. Yes, ma'am.
Q. So the -- Aristo Blake, you said, was a tenant that resided with you, correct?
A. Yes, ma'am.
Q. And that Aristo Blake was not you.
Is that what you said?
A. Yes, ma'am.
Q. Showing you what's been admitted into evidence as Government Exhibit 503-2.
Mr. Ibekie, do you see this aristoblake@gmail.com?
A. Yes, ma'am.
Q. Is this your e-mail address?
A. No, it's not my e-mail address.
Q. What's -- is the recovery e-mail address e-m-e-k-a-r-n @yahoo.com?
A. Yes, ma'am.

Q. And that's the same recovery e-mail address as your e-mail address, correct?
A. That's correct.
Q. And the recovery phone number is the same phone number as well, ending in 4947, correct?
A. Yes.
Q. But you're saying that this is not your e-mail address?
A. When I started the rental business in --
Q. Mr. Ibekie, that's a yes or no.
Is this your e-mail address? Yes or no?
A. This was the phone number I transferred over -- it was my personal phone that I used as to meet all my requirement on the tenancy. The tenant -- this is the phone that I passed on for the tenants to use. And then I was using the new -- the older phone that I have. I have 854-0699 and 822-4947.
When I started this rental business, I took my older phone, which is this, and put it on the -- that was the phone I provided for the tenancy. And then the other one became my personal phone. Both of them were my phones.
Q. Mr. Ibekie, the 4947 phone number was recovered in your house at Oxbow. It wasn't recovered from one of your tenants, correct?
A. From 2000 and -- from the time I started this rental business, those two --
Q. Mr. Ibekie, that is a yes-or-no question.

Was the phone --

THE COURT: Stop. Stop. Stop. Hang on one second.

He was in the middle of his answer. So we're going to let him give a complete answer, and then you can follow up with any additional question.

So let's go ahead and complete your answer, Mr. Ibekie.

BY THE WITNESS:

A. Yeah, so the two phone numbers we're talking about, one was the original phone I was using. When I started the rental business, I got a new phone, and then the new phone I got, also my same account from T-Mobile, became the phone for the tenants. So I've always had these two phones all this time, even up until July 16th of 2020.

BY MS. NUTINI:

Q. So the 4947 phone number is your number?

A. Yes, ma'am.

Q. Because you're the aristoblake@gmail.com as well?

A. That is the phone number that the tenants used. The 805 -- the 854-0699 was the one that I ended up using for my own cell. And then the 822-4947, both of them still my phone from T-Mobile, but my agreement -- my -- the tenancy agreement provides that I should provide a phone for them. So that phone was the one I used for them.

Q. The tenancy agreement that we couldn't find on your devices

or anywhere in your residence?
A. Agent Kadonsky talked to Mr. Larry Barry, and he documented that Mr. Larry Barry told him he had a lease from 2017 to 2018. And that is in the complaint up until today.
Q. Mr. Ibekie, do you -- do you recall issuing an affidavit of support in November of 20 -- November 8th of 2017 that you signed?
A. Can you repeat the question one more time.
Q. Do you recall issuing an affidavit of support in November of 2017 in support of a student named Oquara Martins (phonetic)?
A. No.
Q. That's not a person you're familiar with, Mr. Ibekie?
A. No.
Q. And in this letter, you didn't sign it as Anthony Ibekie?
A. I don't even know the name you're talking about. Can you -- can you -- I have -- no.
MS. NUTINI: I'm marking this for identification as Government's Exhibit 1201.
Your Honor, may I approach?
THE COURT: You may.
BY MS. NUTINI:
Q. Mr. Ibekie, do you see the letter I've just handed you?
A. Yes, I'm looking at it, but this is not --
THE COURT: The question is: "Do you see the letter?"

THE WITNESS: Yes.

BY MS. NUTINI:

Q. And this letter was recovered on your MacBook, correct?

A. I don't know -- I -- I mean, you're telling me that it's recovered from there, but this is my first time seeing this letter, ma'am.

Q. Is that not your signature on the letter?

A. I did not sign this.

Q. And --

A. I don't even know -- this was -- I -- I don't even know who this man is. This is not my -- I'm seeing this for the first time, ma'am.

Q. So, Mr. Ibekie, my question is, is that not your signature on the letter?

A. It is not my signature. It doesn't -- it is not my -- it looks like -- it is not -- I'm not familiar with this document, ma'am.

Q. And when you list your e-mail address, your contact e-mail address as aristoblake@gmail.com on the letter, you're saying that's not you?

A. I did not do this. This is the first time -- if -- this is not even in my discovery. I didn't see this in my discovery, ma'am.

MS. NUTINI: Thank you, Judge.

May I approach?

THE COURT: You may.

MS. NUTINI: Your Honor, may we hand out the transcript binders.

THE COURT: Yes.

Folks, I'm going to ask my courtroom deputy to hand out to you the transcript binders. These are the transcripts of the recordings that you received before.

Thank you, Ms. Ramos, for doing that.

I'd ask everyone to not open them unless and until we get to the right spot.

I'll say again that this is not evidence. These are demonstratives that are there to help you. It's up to you to decide whether they're accurate or not. You don't even have to look at them. If you don't want to look at them, you don't have to look at them. If you want to just listen, that's fine, too.

Okay. It looks like we have 14 -- oh, we have 15.

All right. Very good. Thank you, folks, for working together.

Does everyone have a copy?

It looks like everybody has got a copy.

Very good. Thank you, everybody.

Ms. Nutini, you can proceed.

MS. NUTINI: Thank you, Your Honor.

I am now going to publish Government's Exhibit 601.

And if the members of the jury would like to follow along at 601-T, they can.

THE COURT: All right. Everybody heard that? 601-T. You don't have to look, but if you want to look, you can look.

You can proceed, Ms. Nutini.

MS. NUTINI: Thank you, Judge.

(An audio clip was played in open court.)

MS. NUTINI: I'm pausing at 2 minutes and 20 seconds.

BY MS. NUTINI:

Q. Mr. Ibekie, did you hear that last voice?

A. Yes, ma'am.

Q. And --

A. Ma'am, this call was called at --

Q. Mr. Ibekie --

THE COURT: Hang on a second.

So the question was just "Did you hear that last voice?" That's the question.

BY THE WITNESS:

A. Yes, ma'am.

BY MS. NUTINI:

Q. And that's your voice, correct?

A. Yes, ma'am.

Q. You are pretending to be Peter Pfizer during this call, correct?

A. Yes, I was -- I was reading a script at that time. I was

called at 7:00 o'clock that morning, and we had that conversation. And I wrote the script with him on the phone, and I placed the call about -- sometime about 9:00 or 10:00 o'clock.
Q. So this call is May 27th of 2020, correct?
A. Yes, ma'am.
Q. And you say from -- I'm looking at line 14.
You say, "Yes, usually, uhm, uhm, from my experience in the bank. The bank usually requires, uhm, the customer in a situation like this to have a lawyer to administer to the estate."
A. That's exactly what Peter had recited to me, and I wrote it down before I placed that call. And if you could see those pauses I had was because I was trying to catch myself as I was making those calls.
Q. So Peter, you're saying, knew what to anticipate that the caller might ask him?
A. This was his -- this was his client. Nia was in the hospital. This was his client. And for whatever they are talking about, he couldn't leave Nia. And I -- when he asked me for this favor, I offered to help.
I've been knowing this man since 2017. We knew some personal things about each other.
Q. And when you were telling Special Agent Vela, who you didn't know was an undercover agent, that he needed to hire a

Canadian lawyer, we -- and I quote line 42, "You cannot do it yourself. We need a Canadian lawyer, and we need to engage him. I think that's where we are right now."
A. Again, this was information that Peter had passed to me. If I grasped -- if I knew everything about the whole situation, it will -- I was just given information, a little piece of information that Peter had shared with me on the phone to help him out at the time.
Q. Mr. Ibekie, when you were speaking with Mr. Vela, these were lies that you told him.
A. Yes.
Q. They were lies when you said, "We need to engage a Canadian attorney."
A. Yes.
Q. You knew there wasn't a Canadian attorney.
A. I didn't know if there was -- excuse me. I didn't know if there was any Canadian -- I knew that Peter was a banker. I knew that Peter worked in the bank. I was helping him. I have no clue what was going on. I have no idea. I was -- I wrote those things in the script as I was saying it. I had no idea.
Q. And these were lies, you would agree with me?
A. Absolutely.
Q. You're not Peter Pfizer?
A. I am not Peter Pfizer.
Q. And you were pretending to be Peter Pfizer in this call?

A. Because I was helping my friend.
Q. Is that a "yes"?
A. Yes.
MS. NUTINI: Moving on to Government's Exhibit 602, which has been admitted into evidence.
Your Honor, may I play the recording?
THE COURT: You may.
And is that matching the transcript, obviously?
MS. NUTINI: It does, Your Honor, at 602-T.
THE COURT: All right. So, folks, again, if you'd like to use the transcript, you can. If you don't want to, that's fine, too.
You can play the clip when you're ready.
MS. NUTINI: Thank you, Judge.
(An audio clip was played in open court.)
MS. NUTINI: I'm pausing at a minute and 37 seconds.
BY MS. NUTINI:
Q. Mr. Ibekie, that's your voice in this recording as well?
A. Yes, ma'am.
Q. And you're pretending to be Peter Pfizer again in this recording?
A. Yeah, this was a recording that was back to back. It was -- the first one was the day before. I think the other one was the next day. And this was all part of what Peter had told me on the -- what we talked about on the phone, that I was going

to help him. He was helping a client of his. I didn't know the details of what they were doing, but this was just what he shared with me to help him tell the client.

Q. Mr. Ibekie, would you agree with me that the previous call we listened to was from May 29th of 2020?

A. I'm not sure of the dates, to be honest with you.

Q. And this call is from June 5th of 2020. So it's not the next day, correct?

A. What I will say is that I'm not sure of the dates. And I admit -- I will agree with you, perhaps, but what I'm saying is that was I talking -- or did I talk on the phone as Peter Pfizer? I did, but I had no intention or -- or no intention or any plan to defraud anybody or did I know that any kind of fraud was going on.

Q. Mr. Ibekie, the question was: This recording was on June 5th of 2020, yes or no?

A. Yes, ma'am.

Q. And you are pretending to be Peter Pfizer in this recording as well?

A. Yes, ma'am.

Q. And you are, in fact, coaching the person you're talking to as to what to say to the bank?

A. He was -- he sounded like an elderly man who was having trouble paying his lawyer at the bank. The bank was giving him a hard time, and that's what I found out from Peter. And I was

really trying to walk him through the process. I did not know there was any kind of fraud or scheme going on.

Q. And on lines 23, you say, "The bank does whatever they have to do to keep their customers safe. So when you go into the bank and you're having a conversation with any of these representatives, be careful the kind of words you are using."

A. Yes, I did.

Q. You said that?

A. Yes, ma'am.

Q. And when you said it, you were pretending to be Peter Pfizer?

A. Yes.

Q. And that was a lie?

A. Yes.

Q. You said you were Peter, not that you were helping your friend Peter?

A. How can I tell him I'm helping my friend Peter. I was trying to -- I was taking it -- I was taking it from -- I mean, it doesn't even make sense. I wasn't -- I wouldn't tell him I was helping Peter. I was talking -- I said I was Peter because Nia was in the hospital. I have known about -- I was going to be one of the godparents when the baby was born. I have no -- I have known Peter for a long time, and I know that -- I know what he was going through at the hospital at that time. That's when I stepped in to do that.

Q. So is that a "yes" to my question, you said that you were Peter, not that you were helping Peter?
A. Yes, you are correct, ma'am.
Q. And you gave Peter Pfizer a phone number -- excuse me. Acting as Peter Pfizer, you gave Special Agent Vela a phone number to call?
A. The phone number I obtained from -- these are all -- the phone number that Peter had given to me, that's what I give to him. I believed that was his work phone number.
MS. NUTINI: Publishing Government's Exhibit 17 -- 719-5, which has been admitted into evidence.
THE COURT: You may.
Mr. Carlson, is that working okay for you?
MR. CARLSON: Yes, Judge.
THE COURT: Very good.
BY MS. NUTINI:
Q. Mr. Ibekie, this was the document recovered in your residence at Oxbow.
And I'd like to direct your attention to this phone number.
This is the same phone number that you used to communicate as Peter Pfizer, is it not?
A. The phone that I used to communicate was a phone in the house that Mr. Sunde -- I had one tenant like I said that had moved into Oxbow with us. It was a phone in the house that

Peter had said that Sunde could give me a phone to use, and that was the phone I used to share that call. That -- I don't even know if this was a number on that phone, if that's what it is.

Q. This is the same phone number that you provided Special Agent Vela to call you on that recording that we listened to at 601; is it not?

A. Yes, ma'am, that because -- I got that information from Peter. Not from the tenant, I got it from Peter, from the conversation I had with him.

Q. Mr. Ibekie, this document was found at your house, correct?

A. I don't know -- I don't know where this was found, to be honest.

Q. This --

A. I have not seen this in the discovery. This was the first time I'm seeing this here, too.

Q. Mr. Ibekie, this document was found on your desk.

A. I didn't see it in my inventory list when I looked at inventory list.

Q. You had that home office garage?

A. There was an inventory list that was documented the day I was arrested, and that -- I went through that list. This paper was not there. If it was found in my house, I don't know how it got there. But it was not listed on that inventory list.

Q. And, Mr. Ibekie, this document was found -- we looked at a

picture of that earlier when your lawyer pulled it up. It's your desk.

You have those two big printers, correct?

A. Yes, I had two big printers in my office.

Q. And you had a lot of envelopes all around your desk?

A. Yes, ma'am.

Q. And your wallet was found on that desk?

A. I -- yes, I would think so because I used the desk.

Q. And there were documents and bank statements from the companies we've talked about through this trial. Berger Services, Emetech, Globayo, those were all on your desk?

A. These are -- actually, it was from the inventory list, it was on the shelf, and these are the corporation I registered for my trucking business. And then there was also some from the license business that I had.

Q. And --

A. It was on the shelf on the inventory list. I saw the inventory list.

Q. So yes or no, these were -- these were on your desk or around your desk?

A. It was on the shelf.

Q. These were on your desk or around your desk, including the shelf?

A. I wasn't there, but from the inventory list that I looked at, it was documented that it was found on the shelf in my

office.
Q. Mr. Ibekie, you keep saying you weren't there. You lived there?
A. When they were doing all of this, they already put me in the car. I was already arrested and put in the car.
Q. Mr. Ibekie, you lived at the Oxbow residence?
A. Yes, ma'am.
Q. And these were all the fake companies that you helped register?
A. They are not fake companies, ma'am. They are not fake companies. I did legitimate work with these businesses. I got paid for these businesses, and the payments were made in the U.S. banks from these businesses. I was buying these Mack Trucks from Galvo, Illinois. I would drive four hours sometimes. I would go into the woods and even wash them, then I ship them to Nigeria. When it gets there, I refurbish it with cheap labor. It come -- it looks like new again, and I supply it to these local governments with these companies.
Q. And that shredder bin, that was right next to your desk as well?
A. I had a shredder bin in Oxbow, yes, ma'am.
Q. And those shredded documents that Larry Olson reconstructed --
A. He did --
Q. -- those were inside that shredder bin --

A. He did not --
Q. -- were they not?
A. First of all, ma'am, in the inventory list, he did not document that list. And I told my lawyer that. He did not document any -- any bin. What he -- actually, it was in control 6. He said a shred -- a shred paper document in the shred bin. It was later on that that shed paper document turned to become shredded scam letter.
Let's look at inventory list right now. You will see it was in control 6, No. 4. What he documented that he found on the shredder, shredder bin, was a shred paper document. I never -- she documented it on July 16th of 2020. It was never a scam letter. All this scam letter came in later on. But I know exactly what you have on the inventory list now.
Q. And, Mr. Ibekie, these were -- Mr. Ibekie, these were your letters inside the shredder bin?
A. I didn't have any letters in the shredder bin. I had my envelopes underneath my desk. And those envelopes I hadn't been able to put the flyers in it because it never came in the mail. The COVID was delaying it from coming.
What goes in those envelopes -- I purchased it from Walmart. What goes in those envelopes were the flyers I get from the company that sends them to me. I stuff it in and put it in the back in the same -- the envelopes I got from Walmart has 1100 -- comes in a hundred in each box. After I do the

whole work, I'm stuffing -- I put it back in the same box. I carry it into my car, and then I drive to the post office and drop it at the post office.
Q. Mr. Ibekie, would you agree with me there were no flyers found anywhere in your garage?
A. Yes, I've -- that is true because that was right -- if I had flyers, those envelopes would not be here. I have to order them, and there was a delay in the delivery.
Q. And there were no flyers found in the shredder bin? Yes or no?
A. I don't -- I didn't see that documented in the -- in the shred bin, it said -- what it said in the inventory list was a shred paper document. Then he said in control 11, No. 12, in the garbage can, he said "torn papers."
Q. Mr. Ibekie, you lived there, I'm asking what you know. I'm not asking what's on an inventory list.
A. I --
Q. Were there flyers in the shredder bin, to your knowledge?
A. No, I don't know what was in the shredder bin, to be honest with you, but I know that I didn't have any flyers at home.
Q. There were letters signed by Peter Pfizer in your shredder bin?
A. Ma'am, there was none because in -- what you documented on 16th of July, and it was signed by Amy Mansker, was that it was a shred paper document.

Let us look at the inventory list now and see what you documented on that day. It was on control 6, No. 24, I believe. You said in the shred bin, it was a shred paper document. It was -- look -- let's -- it doesn't even make sense. If you have investigated me for two years, and I didn't know anything that you are investigating me, if you --

Q. Mr. Ibekie, I would ask you just to answer the question that I ask.

A. Ma'am, there was no shred -- from the inventory list I looked at, there was not -- there was no documentation about a shred paper in the shred bin. All it says is a shred paper document.

Q. And, again, this was your desk inside of the garage?

A. It was a desk that all of us used. I -- we converted -- I converted the garage because I had my own business going on. Sunde was there. My son was there. Everybody uses it at their own time.

Q. Your son who was in college most of the time?

A. He wasn't in college. It was COVID at the time. How could he be in college? He was there.

Q. And, Mr. Ibekie, this typed up list was also found on your computer, was it not?

A. All I can tell you is that this is the first time I'm seeing this document. It was not even in my discovery. This is the first time in this court that I'm seeing this document,

and I have not -- I can't even explain anything about it.

Q. And before you printed this list, you typed up every line --

A. Now, I'm seeing --

Q. -- and you wrote -- I'm still asking my question, Mr. Ibekie.

THE COURT: Hang on one second.

Let's make sure we get the full question --

THE WITNESS: Okay.

THE COURT: -- and then you can answer. We'll make sure we get the full answer, and then you can ask the next question. And let's go a little bit slower so we get a good, clean record for my court reporter. Okay?

THE WITNESS: Okay.

THE COURT: If you can, go a little bit more slowly and we'll get a clean record and make sure everybody from the jury can understand everything, too. Okay? If we just slow down a little, I think people will --

THE WITNESS: I just --

THE COURT: Hang on a second.

And then we'll make sure everybody can understand everybody. Okay?

So let's go ahead and get a nice, clean question, and then you can answer it to your heart's content, and then we'll get a new question. Okay?

THE WITNESS: I have something --

THE COURT: So -- excuse me, Mr. Ibekie. Let's get a new question -- it doesn't have to be a new question. Let's get a -- let's restart the question, and then you can answer the question, and we'll go from there.

So go ahead, Ms. Nutini.

MS. NUTINI: Thank you, Judge.

BY MS. NUTINI:

Q. Mr. Ibekie, before you printed this list that was found on your desk, you wrote each of these names and each of these passwords and you typed them up on your computer.

A. I did not. I just found out that the first number on top here is my son's phone number. Right. I just noticed it right now, (331) 321-3791. He doesn't have 630 number with me.

This is my son's phone number, if I can -- I have not talked to him in two years, but this is his phone number, right, the one on top. My phone number is (630) 854-0699. This is my son's phone number.

Q. And, Mr. Ibekie, this list was recovered on your MacBook, not your son's MacBook, your MacBook?

A. That's -- that's what you told me. I mean, I have -- I can't say yes or no to that, but that's what you told me.

And this is the MacBook that we use from -- we've been using that from seven -- 2017 up until when we all moved into Oxbow.

Q. And this was the same number that you gave victim Dale Helms when you were posing as Peter Pfizer?

A. I didn't -- I've never talked to Mr. Dale Helms. I never gave him anything. I don't -- I met that man for the first time in this courtroom.

MS. NUTINI: Publishing Government's Exhibit 103-2, which has been admitted into evidence.

THE COURT: You may.

BY MS. NUTINI:

Q. Mr. Ibekie, on May 5th of 2020, you write to Dale Helms that your phone number is 44 20 3885 0817.

A. Ma'am, I did not write this.

Q. And after Dale Helms told you that he was scared and that it was a lot of money, you responded to him, and you said, "Hey, Dale. I got it. I know you scared. I'm just as scared, but I believe this because I know this customer in person while he is alive."

That's what you said to him, acting as Peter Pfizer, isn't it?

A. Ma'am, I did not say this, and I did not write it.

Q. And this was a lie when you acted as Peter Pfizer to Dale Helms?

A. I did -- I did tell a lie on the phone as I was talking about -- about -- if I knew that this was the kind of thing that was going on, I would never be part of that. I was

helping a friend who was just in a bind. And, you know, what can I say? I was already -- I've -- I built some kind of relationship with this man.

I met Peter twice from 2017 to 2000 -- he knew about my divorce. We talked about so many things. We worked through a lot of -- he knew a lot of personal things about me, too.

So I would -- if I knew, if I had a clue that this was what was going on, I would not do that.

Q. And, Mr. Ibekie, victims like Dale Helms, his materials, including his driver's license, was found all over your devices at your house in Oxbow, were they not?

A. I didn't know how it got there. And I'll be totally honest with you. And I'm not disputing that. I didn't know how it got in those computers. So many people had used that computer.

Q. So you would agree with me that Dale Helms' materials were found on your devices?

A. It wasn't just my devices. It was the devices I provided for the tenants. And they had been using that from 2017 up on -- I even used it, too, to do my nursing documentation work.

Q. So let's talk about the MacBook.

A. Okay.

Q. The MacBook that was recovered at your residence, this was your MacBook that had your information on it?

A. Ma'am, again, these are the two computers that I provided for the tenants. And I also --

Q. The agents didn't --
A. And I also used it like I've testified earlier.
Q. The agents didn't find reference to 17, 16, 15 --
A. How can --
Q. -- even two other tenants.
A. How can --
Q. They found reference to your name, Mr. Ibekie.
A. How can I believe what the agents are saying if they would not include that they talked to Larry Barry, who told them they had a lease with me.
Q. Mr. Ibekie, you're not answering my question.
A. Go ahead, ma'am.
Q. My question was, the MacBook computer had your information all over it, correct?
A. I used the computer.
Q. There wasn't information for these other alleged tenants?
A. I don't know about that because I haven't -- they were -- I saw them use the computers. If you are telling me, that's news to me now. But I saw them use those -- it was part of the tenancy lease. It was part of the tenancy lease. I had to provide those computers. It sat in the living area. We converted the living room to be the common area.
Now, let me tell you a little bit about these patient -- the tenants. Some of these tenants were coming from overseas to buy merchandise here. And what they buy sometimes

are purses, handbags, and colognes, and they ship them overseas. So why they are here only three months' tenancy? They will usually stay in a hotel.

In order for me to make myself competitive as these hotels where they stay, I have to provide everything that a hotel provides for them.

So when they come here, they will use the computers to do whatever they need to do. I don't know exactly what they're doing, but I know I've seen them use the computers.

Q. And, Mr. Ibekie, that Dell computer, the other computer that was found at your house, that had your information all over it as well?

A. It was -- it should have my information because even when I started -- I never -- this was computers that -- I had the Dell already, then I bought the MacBook, and I placed it there.

When I get home, my -- only my e-mails, I check it on my phone. To document my -- because I work like -- I see patients throughout the day. When I come home, I have to document, chart on those patients. I sit in one of those desks. I use any computer that is available to do my nursing documentation.

Even the tenants themselves know that about 6:00 o'clock when I take a shower and come out of the living room, that I would do my -- they would usually let me have one -- you wouldn't see two people using the computer at the

same time. The desk was sitting right there in the living room, and everybody uses those computers.
Q. Mr. Ibekie, the autofill, the Chrome autofill for the Dell computer was your first name and last name, Anthony Ibekie, was it not?
A. I had bought those -- I bought that Apple Pro from the Apple Store in downtown Naperville. I --
Q. It's a yes or no.
A. Yes, ma'am.
Q. And the autofill for the phone number was your phone number --
A. It was --
Q. -- ending in 4947?
A. It was my phone number from T-Mobile.
Q. And the autofill for the e-mail address was aristoblake@gmail.com?
A. That, I don't know about.
Q. And, Mr. Ibekie, Peter Pfizer's license was found on your computer?
A. I honestly don't know how it got there.
Q. And you sent that license to victims like Dale Helms?
A. I never did.
Q. And you wanted them to think that you were Peter Pfizer and that Peter Pfizer was a real person?
A. Ma'am, I never did that, and I never tried to mislead -- I

never even talked to any of them.
Q. So, Mr. Ibekie, your testimony today is that you were helping out Peter Pfizer?
A. I never helped Peter. I wasn't helping him to do fraud. I helped Peter because he was in a bind. Like -- I admit that what I said was a lie, but I didn't know it has anything to do with fraud. I thought that I'm helping him because Nia was in the hospital. I've kind of -- he wasn't telling me -- it wasn't like new. It was something I've already known. I knew when she started having this -- she was going to have a miscarriage when she was two months into her pregnancy. I kind of knew what was going on. It wasn't something that just happened suddenly.
Q. So your testimony is that you were helping Peter Pfizer because he had a sick family member in the hospital?
A. Yes, for -- to help get one of his clients to -- one of the client that he's helping to complete their transaction with the lawyer.
And, you know, just thinking about it, he is -- he needs to just support his family. I wasn't doing that knowing there was any fraud going behind the scene.
Q. And, Mr. Ibekie, do you remember writing a letter to this court in January of 2020?
A. Which court?
Q. This court, in January of 2020.

A. Yes, ma'am.
Q. And it was to Judge Norgle, the previous judge.
A. Yes. Yes.
Q. And in that letter, do you remember explaining to the judge that Mr. Peter Pfizer duped you and manipulated you?
A. Absolutely. And that's what I'm trying to say. I don't want to use the word "duped" because you guys have told me what I shouldn't say. He duped me and manipulated me.
I know now that Peter already know that the U.S. Marshal were after him, and he used me as a bait. That is what I know for sure now. Because at the time that I was -- that's exactly what I wrote. I told Judge Norgle that Peter duped me and used me, manipulated me to do -- to say those things on the phone.
Q. Mr. Ibekie, during your direct testimony, you said that you were helping out Peter, that he was a friend you had known for years, and you were helping him out because his wife was in the hospital?
A. Yes.
Q. And now you're agreeing with me that he duped and manipulated you?
A. I was helping him not because -- not -- not to defraud anybody. I was helping him because he was in a bind. Nia was in the hospital, and I knew about the story. I knew so much about what was going on. I knew it was a difficult time for

them. He asked me for a favor, and I offered to help. Not because I know anything about the fraud that he was doing.

And back to the letter you just talked about, I said this -- what I'm saying now to Judge Norgle then. Peter manipulated me and duped me into doing this. Now I know -- after I got arrested, I now know that Peter -- even on that day that he had me writing all of those things I said to the -- I said on the phone, Peter probably have sensed that you guys were watching him or whatever and had me to do that. Because that was the only time in three years that he had asked me to do something like that.

Q. Mr. Ibekie, there is no Peter Pfizer?

A. That's your opinion. That was Peter Pfizer, ma'am. And a lot of people know Peter Pfizer.

Q. You are Peter Pfizer, Mr. Ibekie.

A. I am not Peter Pfizer.

Q. And it was a lie when you said that Peter Pfizer was in the hospital -- or his wife was in the hospital.

A. Peter Pfizer -- for me to even -- for me to even make that statement, it was a situation where I know that it was critical for me to do that.

Q. And --

A. But not to this point where I knew there was any kind of fraud going on. That was Peter Pfizer.

Q. And, Mr. Ibekie, it was a lie when you told the Court that

Peter Pfizer duped and manipulated you, because you are Peter Pfizer?

A. No, it was not a lie. What you just read, I said that in 2020, right after -- if I'm not mistaken, I could be wrong, to Judge Norgle. I was explaining to him that I am not Peter Pfizer.

And also, even Agent Kadonsky had told me that --

Q. Mr. Ibekie --

A. -- Gary Foster --

Q. -- I ask you --

A. -- had received --

Q. -- to answer --

A. -- a letter --

Q. -- my question.

A. -- while I was already incarcerated.

THE COURT: Hang on one second. Let's -- we'll let him finish, and then you can ask him a new question.

BY THE WITNESS:

A. So --

THE COURT: Go ahead.

BY THE WITNESS:

A. -- Agent Kadonsky had informed me that he received the same scam letter from Gary Foster, one of the victims, when I was already in Winnebago custody -- in custody. And then he spoke with Agent Kadonsky, Gary Foster say that --

MS. NUTINI: Your Honor --

BY THE WITNESS:

A. -- he told him that it came to his wife this time. And I saw the report that Agent Kadonsky wrote, and I saw it. Nobody is bringing it up here.

But this was already when I was already incarcerated. And I shared that also with Judge Norgle, letting Judge Norgle know that, look, I'm not this person that agent -- one of the victims that was listed in my indictment had written a letter to Agent Kadonsky. Both of them talked to him on the phone. That the same scam letter came to his wife, Marcia Foster. And I saw the letter, the same letter that she got from this Agent Kadonsky.

MS. NUTINI: Your Honor, I would ask that the witness be instructed to answer the question posed and also that he not be referencing hearsay that is outside of this court.

THE COURT: Yeah. So here's what I'll say, Mr. Ibekie: When you get a question, please focus on the question and answer the question that's posed.

Your lawyer is going to have another chance to ask you questions. So --

THE WITNESS: Okay.

THE COURT: -- if she asks you a question, there's more that you want to fill in, Mr. Carlson is well equipped to ask you any follow-up questions. Okay?

THE WITNESS: All right.

THE COURT: So let's focus on the prosecutor's questions. Do the best you can with each individual question, and then she'll ask you a new question.

I think it would help if we maybe just slow down just a little. I know we want to get a lot of content out, but I want to make sure all of the members of the jury can understand everybody, and I want to make sure the court reporter gets a nice, clean record. Okay?

I think if we slow down a little and focus on the question, we'll have a clean record for everybody. Okay? What do you think?

MS. NUTINI: Thank you, Judge.

THE COURT: Go from there, Ms. Nutini.

BY MS. NUTINI:

Q. And, Mr. Ibekie, this phone number that we've been discussing tied to Peter Pfizer --

MS. NUTINI: I'd like to publish Government's Exhibit 910, which has been admitted into evidence.

THE COURT: You may.

MS. NUTINI: Oh. Excuse me. 910.

May I go into witness publish mode only? Thank you.

Okay. If we could go back into jury presentation mode.

This is Government's Exhibit 910.

THE COURT: All right. You can publish to the jury.

MS. NUTINI: Thank you.

THE COURT: It's in evidence, right? It's in evidence?

MS. NUTINI: It is, Your Honor.

THE COURT: You can publish to the jury.

BY MS. NUTINI:

Q. Mr. Ibekie, this is the same phone number, this 0817 number, that you used for Peter Pfizer when you contacted TollFreeForwarding and asked for a male voice to upload this voicemail, was it not?

A. Ma'am, no, that is not. I knew about TollFree. I knew about the word "TollFree.com," as I'm looking at it, for the first time in this courtroom. This wasn't even in the discovery. I have never had any contact with these people. I never used them for my business. I had nothing to do with this company. I knew about the name of this company for the first time in this courtroom.

Q. And, Mr. Ibekie, these -- these text messages were recovered from your device, were they not?

A. Well, from what it says here, it was recovered from this device. However, we also have known that a lot of other people was using this device.

Q. This was recovered from your Samsung cell phone.

A. It cannot be. I'm certain because I -- it cannot be. Show

me -- can you scroll down?

It cannot be.

Let me look at it.

It was not.

Q. Mr. Ibekie, this is an exhibit that's been admitted into evidence, and it was recovered from device No. 13, which was your Samsung phone.

A. Ma'am, please, can you show me -- just scroll down. Let me look at the -- the foot -- what is on there. Because what I saw earlier was an e-mail address.

THE COURT: All right. So let's do this.

The witness has a question pending to him. He's asked to see the exhibit. So let's go ahead and let him see the exhibit, and then you can repose the question after he's seen it. Okay?

MS. NUTINI: That's fine, Your Honor.

I would just note for the record this is an exhibit the witness has in his possession.

THE COURT: Fair enough. Let's just go ahead --

MS. NUTINI: Which way are we scrolling?

THE COURT: Let's --

THE WITNESS: Where it has the --

THE COURT: Hang on. We're going to go from the top, and then we're going to scroll down. We're going to let the witness see it, the members of the jury can see it. And then

you can -- once he's had a chance to refresh himself, we can --

THE WITNESS: Sorry, Judge.

THE COURT: So we're going to start at the top.

Just go ahead and scroll down, Ms. Nutini.

THE WITNESS: Can you stay on this page for a minute so I can see it.

THE COURT: You want to look at that page?

THE WITNESS: Yes, please.

THE COURT: All right. That's --

THE WITNESS: I just --

THE COURT: -- fine.

THE WITNESS: -- need to look at it.

THE COURT: You tell me when you're ready, Mr. Ibekie.

MS. NUTINI: Your Honor, I also have a printed copy that may be a bit easier for the witness to review.

THE COURT: All right. Mr. Ibekie, would you like to see a hard copy, sir?

THE WITNESS: Yes, that would be helpful because my eyes --

THE COURT: You can approach. Go ahead and hand him a hard copy.

Have you got it in your hand, Mr. Ibekie?

Why don't you take a look at it, and when you're ready, she'll ask you a follow-up question. Okay?

THE WITNESS: Yes, Your Honor.

Ma'am, I'm ready.

BY MS. NUTINI:

Q. Mr. Ibekie, my question was, this -- these text messages were recovered from your Samsung cell phone?

A. I can't say that because it doesn't even say my phone number on it at all. I can't say this is my phone number -- from my device.

Q. Would you agree with me that your phone number ends in 4947?

A. Yes, ma'am.

Q. And in these e-mails, you, posing as Peter Pfizer, are asking for a male voice to be uploaded to a voicemail, correct?

A. I never asked anybody for that. I never had that conversation with anybody. And I still don't find my phone number here.

Q. And, Mr. Ibekie, scrolling to the second page of the document on this same phone, you also request that a female voice be uploaded from TollFreeForwarding for Wyashika Sellar, correct?

A. Ma'am, I never had that conversation with anybody.

Q. And you provide the phone number for Wyashika Sellar ending in 3077?

A. I never did. I never provided any phone number. That name is even new to me. I never provided any phone number for anybody by Wyashika Sellar.

Q. You're saying the name Wyashika Sellar is new to you?
A. I have never had any -- anything to do with that name. I knew some of these names as I was looking through the discoveries and things that were being said in court. I never even paid any particular attention to this Wyashika Sellar. I never paid any attention to that.
But this, I did not have anybody record any female voice. This is not my phone number. It doesn't have my phone number on it.
Q. And Wyashika Sellar worked for Standard Group Services, correct, allegedly?
A. How would I know? I don't know.
Q. Mr. Ibekie, you are Wyashika Sellar, are you not?
A. Ma'am, I'm not Wyashika Sellar.
Q. And you pretended to also work for Standard Group Services under the name Wyashika Sellar?
A. I never worked for Standard Trust. Even Peter, who worked for Standard Trust, I couldn't even find it. It was his aunt that is on the website. I saw his aunt's picture on the website. I never worked for Standard Trust. I never worked in a bank before.
Q. Mr. Ibekie, you registered the domain standardgroupservices.com, did you not?
A. I -- I have never registered any domain by that name.
Q. You paid for the domain on May 7th of 2020.

A. I did not -- I can't -- I did not pay for any domain for doing that.
Q. And the receipt for that domain was sent to your e-mail address aibekie@gmail.com?
A. I do not recall any doing of those things. Because at this point, my son was living in my house. Sunde was living there. I have not -- I did not set up any e-mail or recall paying for any Gmail account, any of that.
Q. And the Google domain registry is addressed to you. It says, "Hello, Anthony Ibekie."
A. Can you show me what you're looking at because I --
Q. Certainly.
A. Because I can't . . .
MS. NUTINI: Your Honor, may I approach?
THE COURT: You may.
MS. NUTINI: This is marked for identification as Government's 1202.
BY MS. NUTINI:
Q. Let me know when you're ready, Mr. Ibekie.
A. Ma'am, I've looked at this document. I --
Q. Mr. Ibekie, I said let me know when you're ready.
A. Yes, ma'am, I'm ready.
Q. Would you agree with me that this e-mail from Google domain -- is from a Google Domains, domain-noreply@google.com?
A. Yes.

Q. I'm looking at the first page.
A. Yes.
Q. And would you agree with me that the sent date is May 7th of 2020?
A. Yes, ma'am.
Q. And would you agree with me that it is sent to aibekie@gmail.com?
A. Yes, ma'am.
Q. And that the subject is your Google Domains purchase receipt?
A. Yes, ma'am.
Q. And that it says, "Hello, Anthony Ibekie. Thank you for making a purchase from Google Domains."
A. Please, let's go back to the question you asked me prior to this.
Q. Mr. Ibekie, the question I posed is, would you agree with me that it says, "Hello, Anthony Ibekie. Thank you for making a purchase from Google Domains"?
A. I meant the question you asked before this one.

THE COURT: Do you want to clarify a prior answer?

THE WITNESS: Yes. He said that she --

THE COURT: Hang on.

The question before was ". . . the subject is your Google Domains purchase receipt?"

Is that the question you want to clarify?

THE WITNESS: Yes.

THE COURT: All right. Go ahead and clarify your answer.

BY THE WITNESS:

A. So that's what -- I did not purchase this domain.

THE COURT: Go ahead, Counsel.

MS. NUTINI: Thank you, Your Honor.

BY MS. NUTINI:

Q. And on page 2, would you agree with me that the domain is standardgroupservices.com?

A. Yes, that's what it says.

Q. And that that is -- Standard Group Services is the same alleged company that Wyashika Sellar worked for?

A. Ma'am, I wouldn't know, honestly.

Q. And that it was -- the domain was paid for with a Mastercard ending in 5847?

A. Yes.

MS. NUTINI: Your Honor, may I approach to retrieve the document back?

THE COURT: You may. You may.

THE WITNESS: Does -- does --

THE COURT: There's no question pending.

MS. NUTINI: I've also retrieved 910 back from the witness.

BY MS. NUTINI:

Q. Mr. Ibekie, you remember being asked questions on direct about John Delon and Chandler Arnaud and Pierre Delouis?
A. Yes, ma'am.
Q. These are also names you pretended to be, are they not?
A. I never pretended to be any of those.
Q. You talked to victim Cong Le posing as John Delon?
A. I never talked to -- no. No.
Q. And those communications with Cong Le were recovered on your devices?
A. Ma'am, I have no -- I don't know if you recovered that from my devices, from the devices that was used by me or the tenants.
Q. And you sent Cong Le a fake copy of a driver's license for John Delon?
A. I have never sent any driver's license to Cong Le or received any from him.
Q. And the reason you communicated with victims like Cong Le is you were trying to get money from them?
A. Ma'am, from -- what you said in 2017 -- I was working as a home health nurse. I was out of the house from morning to night. Cong Le's incident, from what I'm reading here, happened in 2018. I was still on the field every day until 5:00 p.m.
Q. And there was a TollFreeForwarding invoice found for John Delon as well on one of your devices, wasn't there?

A. I had nothing -- I have nothing to do with TollFree. I knew about TollFree from right in this courtroom.
Q. And you used TollFreeForwarding because you wanted to mask your own voice?
A. No, I didn't use it even for my own business. I used -- I wouldn't -- I have -- I never had anything to do with it, TollFreeForwarding. I have no need for it.
Q. You talked to victim Robert Aguada posing as Chandler Arnaud?
A. No, I did not.
Q. And you sent Robert Aguada that same fake driver's license that you sent for John Delon, but you changed a few things and you sent it to him pretending to be Chandler Arnaud.
A. Ma'am, I did not do that.
Q. And you pretended to be Pierre Delouis.
A. No, ma'am.
MS. NUTINI: Publishing Government's Exhibit 102-9, which has been admitted into evidence, Your Honor.
THE COURT: You may.
BY MS. NUTINI:
Q. Mr. Ibekie, I'm showing you a communication between Cong Le and Pierre Delouis.
Do you see that on your screen?
A. Yes, ma'am.
THE WITNESS: Your Honor, if -- just right there --

MS. NUTINI: Your Honor, there's --

THE COURT: Hang on. There's no question pending.

THE WITNESS: Okay.

THE COURT: If you need it blown up or something like that, you can ask me.

Can you see the document okay?

THE WITNESS: There's key evidence I want to --

THE COURT: So the question is just can you see it okay?

THE WITNESS: Yes, Your Honor.

THE COURT: Okay. So I understand there may be some things that you want to say, but what you've got to do now is do the best you can answering the prosecutor's questions, and then your lawyer will have a chance to ask you follow-up questions. Okay?

THE WITNESS: Yes, Your Honor.

THE COURT: So we'll just stick with that plan.

THE WITNESS: Okay.

THE COURT: All right. Ms. Nutini, go ahead.

BY MS. NUTINI:

Q. And, Mr. Ibekie, you were Pierre Delouis when you were communicating with Cong Le in this e-mail chain?

A. No, ma'am.

Q. And when Cong Le told you that he was trying to come up with the money and he was having trouble so he wanted to apply

for an extension, you knew Cong Le was having trouble coming up with the money?
A. Ma'am, the phone was sent from an iPhone. You did not even seize an iPhone in my home. I never used an iPhone.
Q. Mr. Ibekie, the question is --
A. I never --
THE COURT: Hang on a second. Let's let her finish the question --
THE WITNESS: Okay.
THE COURT: -- and then you can do the best you can.
So go ahead, Counsel.
BY MS. NUTINI:
Q. The question is, you knew Cong Le was having trouble coming up with the money based on this e-mail?
A. I have no clue anything about this matter. I have -- I did not talk to Cong Le. He never told me -- I never talked to him about anything. I don't even know this man. I have no idea.
This is the first time I'm seeing this informations for the first time. I have nothing to do with this communication. And I don't have an iPhone.
Q. Mr. Ibekie, would you agree with me that an individual can type "sent from my iPhone" to anything that they would like to?
A. I -- I have no idea. I don't know. But usually, if you sent something from iPhone, like I've received e-mails, it used to say "sent from iPhone." I don't have an iPhone.

Q. And when Cong Le told you that he was having trouble coming up with the money, you told him you would apply for an extension right away.
A. Ma'am, I did not share any -- I did not have any conversation with this man.
Q. This was another lie because there was no extension.
A. I did not speak with Cong Le at all.
Q. You knew there was no money, and you knew there was no inheritance.
A. I didn't know about anything about this matter.
Q. Mr. Ibekie, what's your birthday?
A. 04/09/65.
THE COURT: Can we put that -- make sure -- is that April 9th or September 4th?
MS. NUTINI: Thank you, Judge.
BY MS. NUTINI:
Q. Mr. Ibekie, is that April 9th of 1965?
A. Yes, ma'am.
Q. That's not the birthday that you provided in your immigration A-File documents, is it?
A. Can you repeat that question one more time --
Q. Sure.
A. -- please.
MS. NUTINI: And, Your Honor, permission to publish Government's Exhibit 504, which has been admitted into

evidence.

THE COURT: Okay. You may publish that.

BY MS. NUTINI:

Q. Mr. Ibekie, that's not the document that you -- excuse me -- that's not the birthday that you provided to U.S. authorities when completing your immigration paperwork, is it?

A. I completed my immigration paperwork in November of 2019.

Now, can you scroll down so I could see what you are talking about, please?

Q. Mr. Ibekie, what I'm asking you is on this page, on page 8, when it asks, "What is the place and date of your birth," and you say, "August 10th, 1976," that's not April -- would you agree with me that's not April 9th, 1965?

A. Ma'am, I did not provide this information. That's why I want to see the whole thing. I did not provide this information.

Q. Would you agree with me that it says, "Have you ever used a different date of birth," and you say, "No, my date of birth is August 10th, 1976"?

A. I did not fill this form. I did not provide this information.

Can you see what date -- what date it says that this was done? I did my application in November of 2019.

THE COURT: All right. So let's let him see the document.

BY MS. NUTINI:
Q. Mr. Ibekie, this is a document dated April 2nd of 2012.
A. In 2012, I have not even applied for U.S. citizenship. I applied for U.S. citizenship in November of 2019. I had my fingerprinting done -- I had my fingerprinting done sometime -- sometime that December of 20- -- of 2019. In 2012, I have not applied for U.S. citizenship.
Q. Mr. Ibekie, would you agree with me that this is your name?
A. Yes, ma'am.
Q. And this has been redacted, but that this is your file number ending in 524?
A. I don't know my -- my file number, to be honest with you. I know my Social Security number.
Q. Okay.
A. But I did not apply for my citizenship in 2012. And another reason is because I was in school. How could I have done that? I was in Belize.
Q. Mr. Ibekie, you testified on direct exam that you have several children; is that correct?
A. Yes, ma'am.
Q. And when those children were born, did you receive a birth certificate for them?
A. My -- my ex did.
Q. And would you agree with me that your birth date listed on the birth certificate is August 10th, 1976, not April 9th,

1965?
A. Say that one more time, please, that my --
Q. The birth date listed on at least two of your children's birth certificates for you, the father, is August 10th of 1976?
A. My ex was the one who was doing all those things. She's the one who did all the registration for the kids' births. I --
Q. Mr. Ibekie --
A. I'm not sure -- can I -- I'm not sure because she wrote down there. If you show me, I will look at it. But my date of birth is not August 10, 1976, like you say.
MS. NUTINI: I'm marking this for identification as Government's Exhibit 1203.
Your Honor, may I approach?
THE COURT: You may.
BY MS. NUTINI:
Q. Mr. Ibekie, please take a look at those and let me know when you're ready for a question.
A. Yes, ma'am.
Yes, ma'am. I'm ready.
Q. Would you agree with me that both of your children's birth certificates list your birthday as August 10th of 1976?
A. Yes, it did, but I did not apply for it.
Q. And that both of these birth certificates were recovered from your devices?

A. I'm not sure where you recovered it, but at the time these children -- my children were born, me and my ex-wife were going back and forth. I did not apply for this birth certificate for my children.

Now, what it says it's written here is August 10, 1976, that is not the information that I gave or provided to anybody.

MS. NUTINI: Your Honor, may I approach the witness and retrieve the document?

THE COURT: You may.

MS. NUTINI: And, Your Honor, if I may have one moment to grab a document.

THE COURT: You may.

MS. NUTINI: I'd like to publish two physical exhibits that have been admitted into evidence using the ELMO.

THE COURT: Okay. You may.

MS. NUTINI: Thank you.

BY MS. NUTINI:

Q. Mr. Ibekie, I'm showing you Government's Exhibit 814, which is a statutory declaration of age recovered at your house in Oxbow.

Do you see that?

A. Yes.

Q. And the birth date listed in paragraph 3, would you agree with me, is August 10th of 1976?

A. Yes.
Q. I'm now showing you a résumé that was recovered, again, at your residence. This is Government's Exhibit 815.
Mr. Ibekie, would you agree with me that that's your photograph?
A. Yes, ma'am.
Q. Would you agree with me that the address listed, 2726 Alyssa Drive, was the second residence discussed during this trial where you lived?
A. Yes, ma'am.
Q. Would you agree with me that aibekie@gmail.com is your e-mail address?
A. Yes, ma'am.
Q. And that this 4947 number is your phone number?
A. Yes, ma'am.
Q. And that the birth date listed is August 10th of 1976?
A. Yes, that's what it says.
Can you allow me to explain that to you?
THE COURT: So the question is simply if --
BY THE WITNESS:
A. That is what is listed, yes.
THE COURT: Yeah, the question was simply what was listed. So --
THE WITNESS: Yes, that's --
THE COURT: -- any explanation would need to be the

subject of a question from the prosecutor or your defense counsel.

THE WITNESS: Okay --

THE COURT: So, otherwise --

THE WITNESS: -- Your Honor.

THE COURT: You've answered the question.

You can proceed, Counsel.

MS. NUTINI: Thank you, Judge.

I'm done with the ELMO. Thank you.

Permission to publish Government's Exhibit 719-4, which has been admitted into evidence.

THE COURT: You may.

MS. NUTINI: Thank you, Judge.

BY MS. NUTINI:

Q. Mr. Ibekie, I'm showing you Government's Exhibit 719-4.

It's a photograph of a physical exhibit that we have.

I'm holding up Government's Exhibit 803.

This was a passport recovered from your residence, correct?

A. Yes, ma'am.

Q. I'd like to direct your attention to the date of birth listed.

Would you agree with me, Mr. Ibekie, this is your photograph?

A. Yes, ma'am.

Q. And the date of birth listed is November 11th, 1975?
A. Yes, ma'am.
Q. So that's three different birthdays that you've talked about today, correct?
A. Yes. This was the passport that has an error that -- that was given to me that -- that was issued to me by Nigerian immigrations. Until -- it happened twice until they got it corrected.
Q. So there was an error both in the name and the birth date?
A. Errors in passports is a normal -- is a usual thing with Nigerian passports. Even my son testified while he was here. It is not something that is -- it is a practice. And what happens, that when you find out these errors, you go back to them, and they correct it.
So when this passport came, it had an error in it, and I did -- I followed the necessary steps, and they sent me the passport with my right date of birth.
Q. Mr. Ibekie, while we have this up, you would agree with me that Toni Ibe Emeka is not your legal name?
A. That is a name given to me by my grandparents.
Q. You would agree with me it's not your legal name?
A. It's not my legal name in the United States. But I've used it in official records in Nigeria, like school and things like that in Nigeria before I came here.
Q. And you would agree with me that Ibe Emeka Toni, or some

variation of those three names, is not your legal name?
A. It is not my legal name in the United States, but it is amongst my names that I had in Nigeria.
Q. You would agree with me that Emenike Tonero is not your legal name?
A. That's a name given to me by my great grandmother, and that is not my legal name in the United States but is an official name I have used in Nigeria.
MS. NUTINI: I'd like to republish Government's Exhibit 504, which has been admitted into evidence.
THE COURT: You may.
BY MS. NUTINI:
Q. Mr. Ibekie, this is your application for naturalization.
I'd like to just orient you to the document here.
Do you see your name listed here, Anthony Emeka Ibekie?
A. Yes, ma'am. Yes, ma'am.
Q. I'd like to scroll to page 2 of the document titled "Information About You."
Question 3 reads, "Other names you have used since birth. Include nicknames, aliases, and maiden name if applicable."
Do you see that?
A. Yes, ma'am.
Q. And do you see that you did not list any of these other

names that you have used since birth, did you?
A. First of all, ma'am, I'm looking at this right now. As you scroll down, I did not fill this application. I did not apply for citizenship in 2017. And I say this because these things are not -- I'm not surprised that -- these things -- I don't know where it came from, but if I had filled this form, I would include these names here.
And the date on this document says 2017. I did not apply for U.S. citizenship in 2017.
Q. Mr. Ibekie, my question is, for Part 2, Question 3, did you list any nicknames, aliases, or maiden names?
A. I did not complete --
MR. CARLSON: I object. He said he didn't fill out --
BY THE WITNESS:
A. I did not complete this form.
THE COURT: So hang on.
So it's overruled. You can ask the question.
And I understood your answer. You can answer the question.
And then you can follow up.
Go ahead.
BY MS. NUTINI:
Q. Mr. Ibekie, are there any other names listed in this document under "other names you have used since birth"?
A. I'm only seeing the little -- the little -- can I look at

the whole -- I'm only seeing the little --

THE COURT: All right. So let's do this: Let's let him look at the whole document.

THE WITNESS: Please.

THE COURT: And when he's had a chance to review the whole document, you can ask him any follow-up question.

MS. NUTINI: Your Honor, if I may approach with a printed copy.

THE COURT: Very good.

Mr. Ibekie, the prosecutor is handing you a printed copy of Exhibit 504. I want you to take a look at it. And when you're done with your review, the government's attorney is going to ask you some questions.

THE WITNESS: Yes, Your Honor.

THE COURT: Just tell us when you're read.

BY THE WITNESS:

A. Yes, ma'am, I'm ready.

BY MS. NUTINI:

Q. Thank you, Mr. Ibekie.

And on -- in Part 2, Question 3, would you agree with me there are no other names listed under "other names you have used since birth"?

A. Yes, ma'am.

MS. NUTINI: Okay. Your Honor, may I approach with -- to retrieve the document?

THE COURT: You may.

THE WITNESS: On page --

THE COURT: She's just getting the document back from you, Mr. Ibekie.

THE WITNESS: Okay.

THE COURT: There's no question pending.

THE WITNESS: Okay. I'd like my lawyer to look at it because --

THE COURT: Yeah, so we'll just wait for the next question, and we'll go from there.

THE WITNESS: Okay.

BY MS. NUTINI:

Q. So let's pull back up what's been admitted as 719-4.

Mr. Ibekie, you used this passport to register a bank account for the Samcord account, did you not?

A. Yes, ma'am.

Q. And when you noticed an error, you didn't send this passport back; you used it to open a bank account?

A. When I noticed the error, I quickly went back to the bank. I gave them a copy of this passport, and I told them what I have noticed. And it was about a week after the registration of the -- opening of the bank account.

Q. And when you used that passport and you presented it to the bank pretending to be Toni Ibe Emeka, that was a lie?

A. I did not lie. I gave them a passport. I had a couple of

passports at home. But that passport was what I included with me and all the documents required to go to the bank. I handed it off to the lady, and I sat at the -- in the back. When she was done, she had me come up and sign my name and then gave me the packets.

When I got home, it was -- I believe it was a week. And this was for Samcord. Samcord was the business that I was using for the trucking business. It was a week when I was now going through the documents, I realized that the passport that I had used was the one that had the error, and that's when I went back to them.

MS. NUTINI: I'm going to publish what's been admitted as Government's Exhibit 303-A.

THE COURT: You may.

MS. NUTINI: Thank you, Judge.

BY MS. NUTINI:

Q. This is the Samcord Business Account Application Agreement you were just referring to, is it not?

A. Is it possible that I have the hard copy of these documents, please? I have very bad sight.

Q. I will blow it up for you.

A. Okay.

Q. This is the Samcord TCF --

A. Yes, I --

Q. -- Business Account Application Agreement, is it not?

A. I believe so. It looks like it.
Q. Scrolling.
Mr. Ibekie, this is your signature, is it not, under "Emeka Toni Ibe"?
A. That was my initial. I didn't type the name. It was probably the bank that typed it. That was my initial.
Q. This is your initial, correct, under "Signature"?
A. Yes.
Q. You signed this?
A. Yes.
Q. Now, on page 4 of the document, this is your handwriting, is it not?
A. Yes, ma'am.
Q. So you wrote in "Toni Ibe Emeka"?
A. Yes. And I believe I did this because -- you see, these names are not strange to me. This is a name that even at home my family call me sometimes, you know.
THE COURT: All right. So, Mr. Ibekie, the question was simply if you -- whether you wrote it.
BY THE WITNESS:
A. Yes, I did.
THE COURT: The question wasn't why --
THE WITNESS: Okay.
THE COURT: -- or anything like that.
THE WITNESS: I --

THE COURT: The question is just whether you wrote it. Okay?

So we'll let the prosecutor ask the next question.

BY THE WITNESS:

A. I wrote it, ma'am.

BY MS. NUTINI:

Q. And you didn't notice the error or the mistake on the passport then. You wrote the name on the passport, "Toni Ibe Emeka."

A. Yes, ma'am.

Q. And this is your signature right here, is it not?

A. Yes, ma'am.

Q. And this is your handwriting dating it 6/6 of '18?

A. Yes, ma'am.

Q. And when you signed this document pretending to be Toni Ibe Emeka, that was a lie.

A. No, that's my name.

Q. And you opened this account so you could receive fraudulent money from victims.

A. No, that was my -- I opened this account because I already have a functional business, which is a trucking business, and I was originally registering it because I was also receiving payments from the local governments in Nigeria after they approve my supplies and my beats.

Q. Victims like David Petroselli sent money to this Samcord

account.
A. I have -- I have never met Petroselli, and I've never asked him to send money into this account.
Q. And you then took that money, and you wired some of it into an Access Bank account in Nigeria in your name?
A. Ma'am, I have a functional business I'm doing. I wasn't -- if I -- if -- even with these funds from Petroselli that I found out now, what I seen that I was credited in my bank account was $12,000. At the time I made a wire, it was for $23,000. I had businesses I was doing. I did not know that this was a fraudulent fund. I have no idea it was a fraudulent fund. And I never spoke with that man.
Q. But you would agree with me that you wired over $23,000 on June 15th of 2018 to an Access Bank account in Nigeria in your name.
A. That's legitimate funds from my legitimate business that I wired into my business account in Nigeria, yes, ma'am.
Q. And you said you are also Emenike Tonero?
A. That's my name.
MS. NUTINI: Publishing what's been admitted in evidence as Government's Exhibit 301-B.
THE COURT: You may.
BY MS. NUTINI:
Q. Mr. Ibekie, I am zooming in on the additional account owner signature.

That's your signature, is it not?
A. Yes. Yes, ma'am.
Q. And when you signed this document, purporting to be Emenike Tonero, that was a lie?
A. Yes, this was -- it was not a lie. This was in 2019, and it was -- Jennifer was already on the account. I was being added to the account. Jennifer came to the house. I gave her my passport, and she took it to the bank.
When I got off from work -- I think I was on a business trip at the time. When I got back, she told me that I had to go to the bank. When I go to the bank, I was shown a paper, and I signed it. And they gave me a debit card, and I left.
So this was an account that was already existing in Jennifer's name. I was an add-on to this account.
Q. And when you asked Jennifer to add you on, you gave her a passport in the name of Emenike Tonero?
A. Yes, absolutely. And I did because, at the point, Jenant was one of the businesses that I was using to do business in Nigeria, the contracts that we do. So sometimes -- the reason why Jennifer was helping out in that business, too, because if we have --
THE COURT: Mr. Ibekie, I'm sorry.
THE WITNESS: I'm sorry.
THE COURT: The question was simply whether you gave

her a passport in the name of Emenike Tonero.

BY THE WITNESS:

A. Yes, ma'am, I did.

THE COURT: All right. Thank you.

Go ahead, Counsel.

MS. NUTINI: Thank you, Judge.

BY MS. NUTINI:

Q. And you were added to that Jenant account so you could access fraudulent money from victims.

A. No, ma'am, that's not true.

Q. So you could take that money, and you could wire it overseas to that same Access Bank account in Nigeria in your name?

A. No, ma'am.

MS. NUTINI: I'd like to publish what's been admitted as Government's Exhibit 912.

THE COURT: You may.

MS. NUTINI: Thank you, Judge.

BY MS. NUTINI:

Q. Mr. Ibekie, you had this Access Bank account, or accounts, in Nigeria, did you not?

A. Yes, ma'am.

Q. And you used this account and other accounts to send -- have -- to receive money from victims and send that money to Nigeria?

A. This is my legitimate business -- account in Nigeria. I have never sent any fraudulent money -- funds to this account. Every funds that had left from me, funds that I've -- I've -- I obtained from my legitimate businesses that went into this account.
Q. Was Cong Le one of your legitimate business customers?
A. I don't know who Cong Le is except for when I met him in court here.
Q. Did he sound like one of your legitimate business customers?
A. I've never had any business to do with Cong Le.
Q. Because Cong Le sent an $80,000 cashier's check to Setraco Services on March 25th, 2019, did he not?
A. Setraco is not even my business. It belongs to Mr. Samuel.
Q. The question is, did Cong Le send a cashier's check on March 25th, 2019, for $80,000?
A. It says it's on indictment.
Q. And four days later, did you wire 25,000 of those dollars into an Access Bank account in your name?
A. It was not -- no, I did not.
Q. Are you saying you didn't receive $25,000 four days later?
A. $25,000 was wired to my Access Bank account, but I did not wire any $25,000 from the United States to my Access Bank account.
Q. But you're admitting that you did receive that money?

A. I did not receive any money because that $25,000 went back to Peter Pfizer. It came from Mr. Samuel Aniukwu.
Q. Mr. Ibekie, you used this Access Bank account to launder money overseas?
A. No, ma'am. This is my personal business account. My personal business as I've seen using for a long time in Nigeria.
Q. And you provided wire instructions, like this document in 912 found on one of your devices, to victims?
A. I never provided that to any victim. This is my personal wire instruction. If I go to the bank, I take this myself, and give it to the banker. If I have funds that I need to go into my bank account, it goes there.
(Counsel conferring.)
BY MS. NUTINI:
Q. You mentioned Jennifer when we were talking about Jenant; is that correct?
A. Yes, ma'am.
Q. And you're talking about Jennifer Gosha?
A. Yes, ma'am.
Q. From 2018 to 2020, you and Ms. Gosha were close?
A. Yes, ma'am.
Q. You were in a romantic relationship?
A. Yes, ma'am.
Q. And you helped her when she needed help, and she helped you

when you needed help?
A. Yes, ma'am.
Q. For example, in June of 2020, you asked her to accept that $1,100 cashier's check from Daniel Baker.
A. Yes. Like I testified, I was in a complex now where we had incidents of packages coming up missing, and I knew that she has -- it could be safer at her place, and I did ask her to receive it for Peter.
Q. And you thought Daniel Baker was a victim?
A. Who is Daniel Baker?
Q. You didn't know Daniel Baker was an undercover agent?
A. I don't know who -- oh, okay. You mean the undercover agent?
Can you repeat the question, ma'am, please.
Q. Mr. Ibekie, we listened to recordings earlier, did we --
A. Yes.
Q. -- not?
A. Yes.
Q. And the person you were talking to in those recordings, you thought his name was Daniel Baker?
A. Honestly, I don't even know the name. And I don't -- I mean, sincerely speaking, I don't recall his name.
Q. Mr. Ibekie, would you agree with me that the individual you talked to on those recordings, at some point, you told that individual to send a cashier's check for $1,100.

A. I don't recall that part, honestly. I knew that the conversations that I pretty much had with Peter was to help with an elderly man that was just having -- that the bank was giving a hard time to make some fees -- make some legal fees.

I am not sure if I told the man to send money now. I do know that at some point, Peter had asked me if I could receive that payment in the -- in my house. And I told him I couldn't because I'm afraid that it will get lost. And that was how Jennifer got into the picture.

I don't recall -- and I'm being totally honest with you. I don't recall ever telling the man -- or I don't even know his name -- to send anything to my address. I don't recall that.

MS. NUTINI: I'd like to publish what's been admitted as Government's Exhibit 1001.

THE COURT: You may.

BY MS. NUTINI:

Q. Mr. Ibekie, I'm showing you a conversation between yourself and Jennifer Gosha, you with the 4947 number, and Ms. Gosha with the 5088 number.

Do you see that?

A. Yes, ma'am.

Q. And do you see what you say to her? "Hey, baby. Good morning. I'm expecting a letter to your home today at 3:00 p.m."?

A. Yes, ma'am.
Q. And that's you writing these messages?
A. That's correct. And this was -- let me clarify what I said earlier. So the information I gave to her was information I got from Peter. I never spoke to that man. If I told that man --
Q. Mr. Ibekie, I'm just asking you --
A. Okay.
Q. -- to answer my questions.
A. Yes, ma'am, that was me sending Jennifer this text message.
Q. Thank you.
Does Ms. Gosha respond, "It's not here," and you tell her to give it time?
A. Yes, ma'am.
Q. The next day, does Ms. Gosha let you know that the package was delivered?
A. Yes, ma'am.
Q. And that was the package that you directed her to accept, correct?
A. That's correct.
Q. And she did?
A. Yes. And she didn't know it was also coming from Peter because I didn't have that conversation with her. I just asked her if she could receive the letter because -- at her home.
Q. She accepted the package for you because you told her to?

A. Yes, ma'am.
Q. And she was doing a favor for you; you guys were in a relationship?
A. Yes. I was in a relationship with Jennifer, yes, ma'am.
Q. And you also did favors for Jennifer?
A. I don't understand your question, ma'am.
Q. You also did favors for Ms. Gosha?
A. She was my girlfriend.
Q. Mr. Ibekie, one of those favors is you helped Ms. Gosha get out of work, didn't you?
A. What?
Q. You helped Ms. Gosha get out of work when she needed to?
A. I have -- me and -- Jennifer works as a supervisor at the post office. I have nothing to do with her job. What do you mean by get her -- I have not -- she has a job at the post office, I think post manager or something, and it was closer to my house.
Q. Mr. Ibekie, I would ask you to answer my question.
A. Okay. I have nothing to do with Jennifer's job.
Q. In January of 2018, you wrote Ms. Gosha a doctor's note excusing her from work for two weeks.
A. I did? No, I wouldn't do something like that. I'm not licensed to practice in the United States. I did not.
Q. So you would agree with me you're not a doctor?
A. Ma'am, I went to -- I completed medical school in Belize,

Central America. I have an M.D. degree from Belize, yes, ma'am.
Q. You would agree with me that you are not a licensed physician in the United States?
A. I never claimed I was a licensed physician in the United States. I said that I completed medical school, and I have an M.D. degree from Belize.
Q. Mr. Ibekie, in -- Mr. Ibekie, a letter recovered from your house is dated January of 2018 in which you pretend to be a doctor, do you not?
A. Ma'am, I have never pretended to be a doctor.
Can I take a look at this document, please?
Q. Of course.
MS. NUTINI: I'm just looking for my exhibit stickers.
Your Honor, may I approach?
THE COURT: You may.
BY MS. NUTINI:
Q. Mr. Ibekie, I'm showing you what's been marked for identification as Government's Exhibit 1205. It's a copy of the original document that I'm holding here.
Take a look. Let me know when you're ready.
A. Ma'am, I can't -- I'm ready.
THE COURT: Thank you.
BY MS. NUTINI:
Q. Mr. Ibekie, this letter that I've shown you, would you

agree with me it says it's electronically signed by Dr. Ibekie, Anthony?
A. Yes, that's what it says.
Q. And that it's dated January 6th of 2018 to patient Jennifer Gosha?
A. That's what it says.
Q. And that it reads, "For medical reasons, the above-named patient should be excused from work from February 5th of 2018 to February 19th of 2018."
A. That's what it says.
Q. Mr. Ibekie, this letter is a lie.
A. Ma'am, I have no -- I have nothing to do with this letter, and I'm not even -- this is the first time I'm seeing this letter. It's not -- it wasn't in my discovery.
Q. This letter that was recovered at your house.
A. You did not include this letter in my discovery on the inventory list.
Q. Mr. Ibekie, you would agree with me that you were not Ms. Gosha's treating physician, are you?
A. I did not write this letter.
Q. And that during -- from February 5th of 2018 to February 19th of 2018, Ms. Gosha wasn't sick?
A. Ma'am, I have no information about it, but I did not write this letter. You guys already know that Jennifer was my girlfriend. This letter was not included in the inventory list

that was then seized at my house. You -- there were many things that you seized at my house. This letter was not there. And this is the first time I'm seeing this letter.

Q. And, Mr. Ibekie, you would agree with me that during those dates when Ms. Gosha was not sick, she was on vacation with you in Nigeria.

A. I never even had any informations about Gosha being sick or not being sick. We never had that conversation.

MS. NUTINI: Your Honor, may I approach to retrieve --

THE COURT: You may.

MS. NUTINI: -- the document?

THE COURT: Let us know when we're at a good logical stopping point for lunch. Okay?

MS. NUTINI: Judge, may we just go on a brief sidebar?

THE COURT: Yep.

Folks, bear with us. We're going to take a short sidebar.

(Proceedings heard at sidebar on the record:)

THE COURT: All right. Ms. Nutini.

MS. NUTINI: Thank you, Judge. I anticipate we only have about ten more minutes. So if it's okay with you Your Honor, I'd like to finish before we take our break.

THE COURT: Okay. That's fine with me.

And, Mr. Carlson, how much do you think you're going to have for redirect?

MR. CARLSON: Judge, honestly, I have no clue.

THE COURT: No clue. Do you think that means nothing or do you think that's more than ten minutes?

MR. CARLSON: It's probably nothing, but not more than -- if there is any, not more than ten minutes.

THE COURT: All right. So it sounds like we're on track to finish with this witness by 12:30 and be done at lunch.

Is that the idea?

MS. NUTINI: Yes, Judge.

THE COURT: I hope I did not make people hungry with lunch over there by promising the jury we'll break soon. But if we've got just 20 minutes, I think we should just go ahead and finish this witness and break at lunch.

What do you folks think?

MS. NUTINI: Agreed.

MR. CARLSON: That's fine.

THE COURT: All right. Let's do that.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Counsel.

MS. NUTINI: Thank you, Judge.

THE COURT: Ms. Nutini, go ahead, please.

BY MS. NUTINI:

Q. Mr. Ibekie, let's talk about your son, Ebuka Egbunam.

A. Yes, ma'am.

Q. You talked a little bit about him on your direct exam, did you not?
A. Yes, ma'am.
Q. That he was angry with you?
A. He was pretty upset because of -- I love my son, and I wanted to have a relationship with him. For 18 years, he lived in Nigeria, and I had an opportunity to spend some time with him, and I did what I could to -- I prom- -- yes, I wanted my son to be with me.
Q. And you brought Mr. Egbunam to the United States when he was 18 years old?
A. No, I did not. Ebuka had almost a perfect scored SAT. And IU, Indiana University, offered him admission to study computer science in IU. And then they offered him a student visa. And when all of these things were all coming together, I -- it was an opportunity I saw that I could go in and -- he was going to go to Canada. And I said, "Look, if you could come to the United States, maybe we can begin to bond and know each other and then help you with school." And he agreed with me.
Q. So you encouraged him to come to the United States.
A. Yes, ma'am, I did.
Q. And when he did, you asked him to help you do things?
A. I never asked him to do anything for me other than me helping him to -- in school.
Now, he had helped me to --

Q. Mr. Ibekie, I would --
A. Okay.
Q. -- ask that you just answer my question.
A. Yes, ma'am.
I never asked him to do anything for me. I helped him with paying his tuition for a few months.
Q. You asked him to help you build websites.
A. I never did.
Q. Specifically for Pierre Delouis's fake law firm Hall & Hall Chamber.
A. Ma'am, that is not true.
Q. Mr. Ibekie, you'd agree with me your number ends in 4947, correct?
A. Yes, ma'am.
Q. That's the same number we've been talking about all day?
A. That's the number the tenants used most of the time.
Q. And in June of 2019, you texted with Mr. Egbunam asking him to help you build a fake website?
A. I don't remember doing that, but if I could look at the -- what you have, it will help me refresh my memory.
MS. NUTINI: Your Honor, may I approach?
THE COURT: You may.
MS. NUTINI: This has been marked for identification as Government's 1206.
THE WITNESS: Thank you.

BY MS. NUTINI:
Q. Mr. Ibekie, take a look. Let me know when you're ready for a question.
A. Yes, ma'am.
I'm ready, ma'am.
Q. I'm showing you an extraction of text messages between yourself and Mr. Egbunam. I'd like you to start on the first page of the document.
A. Okay.
Q. Do you see the blue and green bubbles?
A. Blue and green bubbles? I'm trying to -- on the first page?
Q. The first page of the text messages.
A. Oh. Yes. Yes, ma'am, I do.
Q. And, Mr. Ibekie, in -- on June 7th of 2019, do you write to Mr. Egbunam, "Www.hallhallchambers.com, look up this site and replicate it immediately"?
A. First of all, I never sent this e-mail. And this phone number was the phone number designated to the tenants that lived in my home. This was a phone number the tenants were using. So I never sent this e-mail, and I've never asked my son to build a website for me.
Now, my son has taught me -- to help me do merging -- showed me how to do merging for my own business. That was the only thing computerwise that he taught me how to do.

When my --
Q. Mr. Ibekie, I'll ask that you --
THE COURT: Let me give the instruction here. The question was whether you wrote that passage.
THE WITNESS: No, I --
THE COURT: Let's just stick to that question.
THE WITNESS: Okay.
THE COURT: And whenever we get an answer, we will follow up with the next question.
So --
THE WITNESS: No, I --
THE COURT: -- the question was whether you -- why don't you restate the question so you get the exact quote.
MS. NUTINI: Thank you, Judge.
BY MS. NUTINI:
Q. Mr. Ibekie, on June 7th of 2019, when you write "www.hallhallchambers.com, look up the site and replicate it immediately," you said that to your son, Mr. Egbunam?
A. I did not.
Q. Would you agree with me that the number associated with 4947 for these messages is a WhatsApp account for Toni?
A. Yes, because this -- this --
THE COURT: So the answer is --
BY THE WITNESS:
A. Yes.

THE COURT: Okay. Thank you.
BY MS. NUTINI:
Q. And, Mr. Ibekie, one of your nicknames is Toni?
A. Yes. Both phone numbers are my phone number.
Q. Mr. Ibekie, does Mr. Egbunam respond, "No, there's no site like that. Just clicked it"?
A. I'm seeing it here now. That's what he responded. I'm seeing it right now.
Q. So that's a "yes"?
A. Well, that's the response. And, first of all --
Q. Mr. Ibekie, is that the response that Mr. Egbunam provides?
A. This is not Egbunam's phone number.
Q. Mr. Ibekie, is that the response that Mr. Egbunam's provides?
A. I don't believe it is my son that even send this text message because this is not his phone number. His phone number is 331.
Q. And then on the second page of the document, do you clarify www.hallhallchamber.com without an S?
A. I did not. And this is not even my son's phone number because I know his phone number. It is a 331 number.
MS. NUTINI: Your Honor, may I approach and retrieve the document?
THE COURT: You may.
BY MS. NUTINI:

Q. Mr. Ibekie, this inheritance fraud is not the only fraud you committed, is it?
A. I did not commit any inheritance fraud, ma'am.
Q. You also committed marriage fraud?
A. I did not commit marriage fraud.
Q. You had your son, Ebuka Egbunam, get married to Jennifer Gosha's son to commit marriage fraud?
A. My son is a grown man. He does what he wants. I cannot control that man.
Q. This was your idea.
A. It was not my idea.
Q. You offered to pay Ms. Gosha's son.
A. I did not offer to pay anybody for anything for marriage.
Q. And that was after you tried to get two of Ms. Gosha's daughters to marry Mr. Egbunam.
A. Ma'am, that is a lie. That's what you guys made up. That is a lie.
Q. You helped Mr. Egbunam and Gosha's son get that marriage paperwork.
A. I did not. Even in that case, the girl -- the girl that you brought in to say that I helped her, I have never been in a car with her, and she testified that she's never been in a car with me.

THE COURT: Hang on.

BY MS. NUTINI:

Q. Mr. Ibekie --

THE COURT: Hang on. Hang on.

The question was whether you helped them get the paperwork. So let's --

THE WITNESS: No.

THE COURT: -- let's answer the question again.

BY THE WITNESS:

A. No, I did not. Jennifer --

THE COURT: Stop there.

He said, no, he did not.

So next question, please.

BY MS. NUTINI:

Q. Mr. Ibekie, you attended that fake marriage ceremony with Ebuka Egbunam and Ms. Gosha's son?

A. That is not true. I have no idea what -- my son is a grown man.

THE COURT: The question was whether you attended the ceremony.

BY THE WITNESS:

A. I did -- I -- I -- I -- I -- the boy -- the man -- the boy and my son spent a night in my house. And in the morning, I drove them to the courthouse. He spent the nights in the house.

During the night, they were playing video games in the

room. And I came out from my bedroom, and I saw both of them. We had breakfast in the morning, and I drove them to the courthouse. And then Jennifer met us at the courthouse.

But I have no -- my son goes downtown to where this kid lives -- where this man lives and spends the weekend there. I have nothing to do with what they were doing.

Q. Mr. --

THE COURT: Hang on. The question was whether you attended the ceremony.

BY THE WITNESS:

A. I was in courthouse.

BY MS. NUTINI:

Q. Is that a "yes," you attended the ceremony?

A. I would say yes, but I was -- I was at a courthouse, yes.

Q. You drove Mr. Egbunam and Gosha's son to the courthouse, and you attended this marriage ceremony.

A. Yes. He was -- he spent the night at my house, and then in the morning, they -- he came -- he came with a train. And in the morning, Ebuka couldn't drive because he doesn't have a driver's license.

Q. Thank you, Mr. Ibekie.

A. In the morning, I drove them to -- I drove them to the courthouse, and then Jennifer met us there.

Q. And then you paid Ms. Gosha's son to marry Mr. Egbunam --

A. I did not give -- pay that man. I did not spend my -- in

fact, we had a problem when I thought he was taking advantage of my son. I did not give that man a dime.

THE COURT: Hang on. Hang on.

I will strike that answer.

So let's just stick to the question. The question was whether you paid Mr. Gosha's son to marry Mr. Egbunam.

So why don't you restate the question.

Listen to the question in its entirety, and then answer the question as best you can. Just stick to the question. Just stick to the question. And then she'll follow up. And your lawyer can ask some follow-up questions. All right?

So, Ms. Nutini, go ahead, please.

MS. NUTINI: Thank you, Judge.

BY MS. NUTINI:

Q. You paid Ms. Gosha's son to marry Ebuka Egbunam because this was your idea?

A. I did not pay him or give him a dime to marry my son.

Q. And you knew this was a fake marriage?

A. How would I know it's a fake marriage? He spends the weekends over -- downtown. I've picked him up from downtown from the guy's house before.

Q. You wanted Mr. Egbunam to enter into a fake marriage for immigration purposes?

A. That is not true.

Q. This was another lie that you came up?
A. That is not true.
Q. And that you roped Mr. Egbunam into helping you with?
A. That is not true.
Q. And this wasn't the only fraudulent marriage you arranged, was it?
A. First of all, my son was 18 years old when he got here. I didn't know his sexual orientation --
Q. Mr. Ibekie --
A. -- and I'm not going to pry into that.
Q. -- I would ask that you answer my question.
This wasn't --
A. Yes, ma'am.
Q. -- the only fraudulent marriage that you arranged, was it?
A. I have not -- I have not been in any fraudulent marriage at all.
MS. NUTINI: Thank you. I have no further questions.
THE COURT: Okay. Thank you, Ms. Nutini.
Mr. Carlson.

REDIRECT EXAMINATION

BY MR. CARLSON:
Q. Mr. Ibekie --
A. Yes, sir.
Q. -- did you ever hold yourself out to be Peter Pfizer?
A. No.

Q. John Delon?
A. No.
Q. Nikka Avis?
A. No.
Q. Wyashika Sellar?
A. No.
Q. Chandler Arnaud?
A. No.
Q. Pierre Delouis?
A. No.
Q. Did you ever do that in any e-mails or letters?
A. No.
Q. Did you have any communication whatsoever with Dale Helms?
A. No.
Q. Mr. Foster?
A. No.
Q. Cong Le?
A. No.
Q. Robert Petroselli?
A. No.
Q. Robert Aguada?
A. No.
Q. Did you ever intend to defraud anyone?
A. Never.
MR. CARLSON: Nothing further.

THE COURT: All right. Thank you, Mr. Carlson.

Counsel, if we could have a brief sidebar.

(Proceedings heard at sidebar on the record:)

THE COURT: Ms. Nutini, you didn't expect to ask any additional questions there, did you? Maybe you did.

MS. NUTINI: That's correct, Your Honor.

THE COURT: Correct that you did not intend to ask additional questions?

MS. NUTINI: I have no additional questions.

THE COURT: All right. Very good.

All right. So, Mr. Carlson, do you have any additional testimony from any witness or any other exhibits or anything -- any other evidence you want to present?

MR. CARLSON: No, Judge.

THE COURT: All right.

MR. CARLSON: We would rest.

THE COURT: All right. So what I'd like to do is -- we're going to break I think until 1:45 so we can get the jury instructions finalized. I'm going to tell the jury we're going to have a little bit longer lunch break. 1:45. Because I think if we tell them 1:30, we're not going to be ready. Okay?

And does the government have any rebuttal?

MS. NUTINI: Your Honor, we would like a brief opportunity to confer about that over the lunch break --

THE COURT: Yeah, that's fine.

MS. NUTINI: -- if that's okay.

THE COURT: All right. So I'm going to not have him step down just because of his physical issue. I'm going to -- I'm going to ask you if you have any additional evidence to present. He's not going to step down yet. Okay?

MR. CARLSON: That's fine, Judge.

I -- one other thing, in light of the government saying that they're -- they want time over the lunch hour to determine whether they're going to put on a rebuttal case, I would ask the Court maybe to tell the jury 2:00 o'clock instead of 1:45 so we can deal with any rebuttal that the government might have to put on.

THE COURT: What does the government think? I mean, do you think you're more likely than not to do a rebuttal?

MS. NUTINI: I think we're more likely to not do a rebuttal, Your Honor, but we would just like an opportunity to --

THE COURT: How long -- yeah, that's fine.

How long are the closings going to go, folks?

MS. DeMARCO: Mine is an hour, Your Honor.

MR. CARLSON: 20 minutes.

THE COURT: Okay. So I'm going to have them come back at 2:00.

Is that okay, everybody?

MS. NUTINI: That's fine.

MR. CARLSON: That's fine.

THE COURT: So I'm going to -- right now, we're going to go on the record, and I'll say, "Mr. Carlson, anything else from the defense?" And you'll rest, and the jury will hear that, and we'll have them come back at 2:00 o'clock. All right?

MR. CARLSON: Fine.

THE COURT: Very good.

MS. NUTINI: Your Honor?

THE COURT: Yes.

MS. NUTINI: Are you going to give them a preview that they are going to be coming back for the closing arguments?

THE COURT: I'm not going to tell them -- well, are we going to do jury -- well, back up.

How long is your rebuttal going to go?

MS. NUTINI: If we do a rebuttal case, it will be maybe ten minutes.

THE COURT: Okay. Very good.

I'm going to just -- I'm going to ask Mr. Carlson, "Anything else from the defense?" He is going to rest. I'm going to tell them we're going to do closings and jury instructions this afternoon. Okay?

MS. NUTINI: Great.

MR. CARLSON: Fine.

(Proceedings heard in open court:)

THE COURT: All right. Thank you, Counsel.

Mr. Carlson, does the defendant want to present any additional evidence or call any other witness?

MR. CARLSON: Judge, at this time, the defense would rest.

THE COURT: All right. Members of the jury, the defendant had an opportunity to present evidence, and he has rested his presentation of the evidence.

We're now going to take a lunch break. Thank you for bearing with me for the last ten minutes. I know you were thinking we were going to take a break about 12:15. It's 12:28. You're going to come back at 2:00. So we're going to reward you on the back end. We're going to give you an hour and a half for lunch.

Here's what I reasonably expect to happen this afternoon: Remember, for each examination, the person calls a witness, and then the other side cross-examina- -- does a cross-examination, and then you have a redirect.

The same thing goes with the evidence. The government presents the evidence, defendant has an opportunity to present evidence, and then the government has an opportunity to do rebuttal if they want. Sometimes people do a rebuttal, sometimes they don't.

All right. So I'm going to -- we're going to come back at 2:00 o'clock. Maybe there will be a rebuttal, maybe

there won't, but I do expect today we're going to closing arguments, and you're going to get jury instructions from me. Okay? That's the general sketch of the afternoon which you can expect. Okay?

So please come back from lunch, be ready to go at 2:00 o'clock. Please take your jury notebooks with you.

We've heard a lot of testimony so far. You can't talk about anything yet. And you can't make up your mind yet. It's really important to keep an open mind until it's all said and done, and it's not all said and done yet. Okay?

So we'll see you at 2:00 o'clock, folks. Thank you, everybody.

THE COURT SECURITY OFFICER: All rise.

THE COURT: And leave the transcripts, please, on your chair.

Thank you, folks.

(Jury out at 12:30 p.m.)

THE COURT: You can step down, Mr. Ibekie. You can step down.

Maybe the marshals can help him with his scooter there.

(Witness excused.)

THE COURT: Watch your step, Mr. Ibekie. There is a couple stairs there, sir. Please be careful.

Thank you to the marshals.

All right. I want to give the government a chance to talk about any rebuttal. I do want to talk to you folks about the jury instructions.

And I need some time on my end once the jury instructions are finalized to make copies for the jurors. So I do need a little lead time.

Do you all want to talk about the two instructions that you had proposed, Mr. Carlson, about whether those are in play or not? In other words, do you want to -- are you proposing those still? Not proposing them?

MR. CARLSON: I am, Judge.

THE COURT: Okay. Has the government thought through those, talked those through?

MS. DeMARCO: Yes, your Honor, we're opposing them.

THE COURT: Okay. So why don't we do this. I'd like to get a copy of them, and I want give you folks a break. We've been going about two hours. I need to let my court reporter and staff touch base.

Why don't we come back in 45 minutes. We're going to come back at 1:15. Okay? We're going to give you folks 45 minutes to confer, think things over. We're going to finalize the jury instructions at 1:15, and we'll go from there.

Mr. Carlson, just to make sure that I spot them, do you want to just make a proffer about which two instructions you're talking about that are disputed.

MR. CARLSON: Yes, Judge. They're both pattern Seventh Circuit's instructions. The first one is the good faith instruction. And I'll get Your Honor the cite in a second here.

THE COURT: Does this give enough time for Mr. Ibekie to get some lunch, folks? Can he get some lunch?

THE MARSHAL: (Nodding head up and down.)

THE COURT: Good. Okay. Thank you.

MR. CARLSON: Judge, the good faith instruction is 5.07 -- or, no, excuse me. The first one is the mere presence instruction, and that's 5.07. It's the mere presence at the scene, performing an act that advanced the crime and association.

And the second one is the good faith instruction, which is Seventh Circuit Pattern 6.10.

THE COURT: Okay. I will take a look at those. Thank you for the reminder. I know that was the concept, but I didn't have it in front of me.

So why don't we come back in 45 minutes. We'll talk it over. Once I finalize the jury instructions, we'll get rolling.

Ms. Nutini?

MS. NUTINI: Judge, also just wanted to flag our joint proposed instructions. We flagged two and wrote them sort of as if needed --

THE COURT: Yep.

MS. NUTINI: -- based on the defendant's testimony. That's joint proposed Instruction No. 10, and that's about the defendant making inconsistent statements. And then there is joint proposed Instruction 12. And that is about the defendant committing acts other than the ones charged in the indictment.

THE COURT: Okay. And you're proposing giving those instructions?

MS. NUTINI: Yes, Judge.

THE COURT: And does the defendant have a position on that?

MR. CARLSON: Judge, I don't necessarily have a problem with it. The only question I have is I'm trying to think of what inconsistent statements that were made.

THE COURT: All right. So I'll tell you what, let's save this for our 1:15 final conference.

I do need the Word version of the updated copy.

Ms. DeMarco, have you sent that to me?

MS. DeMARCO: I sent you this copy, Judge, but not the copy that breaks out the mail and wire fraud.

THE COURT: That's what I need. It's not on the docket yet, either. I know we've been in court the whole time, so that's why you haven't done it.

So -- I didn't mean it that way when I said I don't have it yet. I was simply saying I think it would help me if

you would be kind enough to do that. I know that I just sprung that on you at 9:30 this morning, and you haven't had a chance to do the surgery. But if you could sprinkle a little magic on the jury instructions, separate that, and then send it to me. That way, I'll have the latest and greatest version.

Make sure Mr. Carlson is okay with it. And if he is not okay with it, I want to know. But I'd like you to send that to me. And then that will be the springboard for our conversation at 1:15.

MS. NUTINI: And, Judge, just so we're clear, the potential revisions, including defendant's two instructions and the two we just discussed, will your office -- or will your chambers be making those, or would you like us to take another break and make those before 2:00 o'clock if we're meeting at 1:15?

THE COURT: Yeah, so if you could e-mail me and file on the docket the latest and greatest jury instructions, I can do the last stitch of the surgery on my end. I'll either include those instructions or not include them.

Why don't you go ahead and include it in the draft, and I can delete it if I'm not going to give it.

MS. NUTINI: Okay.

THE COURT: Does that make sense?

MS. NUTINI: It does.

THE COURT: Does that make sense, everybody? Does

everybody understand the plan?

So if you'd be kind enough to send that to me, we'll take it from there. We'll see you in about 45 minutes. I think that should be enough time for us to talk it through and make any final changes and get it going for the jury. Okay?

We'll see you in about 45 minutes, give or take.

Is that good for everybody? Do you have enough time to eat, 1:15?

MS. NUTINI: Yes, Judge.

THE CLERK: All rise.

(Recess at 12:36 p.m., until 1:26 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 20 CR 352 |
| | ) | |
| v. | ) | |
| | ) | |
| ANTHONY EMEKA IBEKIE, | ) | Chicago, Illinois |
| | ) | June 26, 2024 |
| Defendant. | ) | 1:26 p.m. |

TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. PAIGE NUTINI
MS. MEGAN DeMARCO
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For the Defendant: KENT R. CARLSON & ASSOCIATES, P.C.
BY: MR. KENT R. CARLSON
53 W. Jackson Boulevard, Suite 1523
Chicago, Illinois 60604

Also Present: MS. AMY MANSKER, Special Agent
IRS Criminal Investigations

MR. CHRISTOPHER KADONSKY, Special Agent
IRS Criminal Investigations

Court Reporter: AMY M. KLEYNHANS, CSR, RPR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 2318A
Chicago, Illinois 60604
Telephone: (312) 818-6531
amy_kleynhans@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out; defendant present:)

THE COURT: All right, folks. Let's talk about the jury instructions. Has everyone had a chance to go over the jury instructions?

MR. CARLSON: Yes.

THE COURT: All right. It looks to me like there are two instructions for the government that you want to talk about, there are two instructions for the defendant you want to talk about. Then we've got to talk about the splitting of the mail fraud and the wire fraud instructions. That's what I've got on my agenda.

Let's talk about the government's two proposed instructions first. The government proposed instruction No 10 on page 11. That's the instruction about the prior inconsistent statements. Do you want to just give me your best pitch for that?

MS. DeMARCO: Yes, Judge. I think these are actually agreed. So it's really up to the defendant. They really go to the defendant's benefit. But 3.04 is about inconsistent statements. This would apply to the Peter Pfizer statement. The defendant talked in court about Peter Pfizer being a friend, having a relationship with him. And Ms. Nutini impeached him on the prior letter that he had written that told a different story about his relationship with Peter Pfizer. So

that's why the government thinks that one's appropriate, but --

THE COURT: Which letter?

MS. DeMARCO: The letter that he wrote to Judge Norgle, saying he was a victim of fraud, and Peter Pfizer duped him. It's not a substantive inconsistent statement, so maybe the jury instruction is not necessarily appropriate.

THE COURT: I mean, let me ask you this: Is the jury, in your view, going to know what we're talking about here if they get this instruction? Because I didn't know.

MR. CARLSON: And I -- Judge, I had asked them myself.

MS. DeMARCO: That's fine. That's fine, Judge. It's -- it's really for the defendant's benefit.

THE COURT: Yeah. I mean, what do you think, Mr. Carlson?

MR. CARLSON: I just think it's more confusing than anything.

THE COURT: I will tell you my reaction. I read this and I thought, what prior inconsistent statements are we talking about? I mean, usually it comes up when you've got some prior sworn statement or -- or a clean statement in a letter, or something like that. I don't know that we have that here. There was the letter to Judge Norgle, which the jury didn't even see.

MS. DeMARCO: Right.

THE COURT: Which is fine. That's not in evidence.

So I don't think we need it. Does anybody want to go to bat for joint proposed instruction No. 10 on page 11, which comes from Seventh Circuit Pattern Instruction 3.04, anyone?

MS. DeMARCO: No, we're fine with cutting it, your Honor.

THE COURT: Is the defendant okay with cutting it?

MR. CARLSON: Yes, Judge.

THE COURT: All right. So it's cut. We're not going to take that.

All right. Next one is joint proposed instruction No. 12. Seventh Circuit Pattern Instruction 3.11. It's about other acts, meaning, other alleged fraudulent acts. I assume this has to do with the alleged marital fraud?

MS. DeMARCO: Correct, Judge.

THE COURT: You want to go to bat for that, anybody? Mr. Carlson, do you want this?

MR. CARLSON: Yes, Judge.

THE COURT: The government support it?

MS. DeMARCO: That's fine, Judge. Yes, we think it's appropriate.

THE COURT: So I think we ought to do it, too. I mean, the bottom line is we don't want anybody to think Mr. Ibekie committed marital fraud, therefore he must have committed wire fraud or mail fraud. Because that's not a permissible inference. It was there to impeach him but not

to -- essentially to speak to his credibility, I should say, his character for truthfulness under Rule 608; right? That was the point of it; right?

MS. NUTINI: Yes, Judge.

THE COURT: So I'll include Seventh Circuit Pattern Instruction 3.11 without objection. This is joint proposed instruction No 12. Do I have that right, Mr. Carlson?

MR. CARLSON: Yes, Judge.

THE COURT: All right. Done. So that's okay. I agree with you.

And I want to look closely, folks, page 25 and 26. You have joint proposed instruction 23 and joint proposed instruction No 24. You carved in half the wire fraud instruction and the mail fraud instruction. I appreciate you doing that. My only reaction looking at it is, on page 26, the numbering is wrong. It says 5, 6, 7, 8. We've got to change that to 1, 2, 3, 4. Which is an easy fix on our end.

Have you all read these two instructions carefully, and did they look consistent with the law to you folks? Do they look good?

MS. DeMARCO: Judge, just one error that Ms. Nutini just caught. The -- sorry, I did these kind of quickly. In the wire fraud instruction, we still have Count Eight of the indictment charges the defendant with attempted mail fraud. So that should be cut from that instruction.

THE COURT: Let me back up. Page 25 covers Counts One, Two, Four, Five, and Six. And that's the wire fraud instruction; right? And then page 26 covers Count Three and Count Seven. That's the mail fraud. And it says here Count Eight is attempted mail fraud. Is that wrong? Why is it wrong?

MS. DeMARCO: Count Eight is attempted mail fraud, but it only needs to be in the mail fraud. It should be in the instructions with Counts 3 and 7, and the paragraph is still in the wire fraud section.

THE COURT: Oh, I see.

MS. DeMARCO: It's just repeated. It only needs to be --

THE COURT: I see. You're saying on page 25. I misunderstood you.

MS. DeMARCO: Correct.

THE COURT: Okay. So you're saying on page 25 there's a reference to Count Eight, and we just need to delete that whole paragraph because it's duplicative of what's on the other page; is that right?

MS. DeMARCO: Correct.

THE COURT: All right. So that makes sense. Good catch. Thank you for that. So, in other words, it'll go Counts One, Two, Four, Five and Six, it'll have the four elements, and then it'll jump right to the "if you find"

paragraph.

MS. DeMARCO: Correct.

THE COURT: Okay. You agree with that, Mr. Carlson?

MR. CARLSON: Judge, the numbering I have on these is off, so I'm having a hard time following you here.

THE COURT: Okay. I guess I'm looking at the redline. Here's the concept. Does everybody see the instruction for the elements of Counts One, Two, Four, Five and Six --

MR. CARLSON: Yes.

THE COURT: -- for wire fraud? I think what the government is saying that there's a paragraph here that should be deleted because it's duplicative of what's in the next page. Do you see it says Count Eight of the indictment charges --

MR. CARLSON: Yes.

THE COURT: That's in the wrong spot.

MR. CARLSON: Ah, I see.

THE COURT: This is the wire fraud instruction, and it only belongs in the mail fraud instruction because it's in a mail fraud --

MR. CARLSON: Got it.

THE COURT: -- attempted -- an attempted mail fraud instruction. Is that right?

MS. DeMARCO: Correct.

THE COURT: All right. So --

MR. CARLSON: My pages were stuck together, Judge,

that's why --

THE COURT: No worries. No worries. Is everybody on board with the substance of the wire fraud instruction? Everybody agree it looks good?

MS. DeMARCO: Yes, your Honor.

MR. CARLSON: Yes, Judge.

THE COURT: All right. Looks good to me, too. So thank you for doing that.

And then how about the next page. This is joint proposed instruction 24. This is the mail fraud instruction, as well as the attempted mail fraud instruction for Counts Three, Seven, and Eight. Notice it does have the paragraph here for Count Eight for the attempted mail fraud instruction. I will change the numbering, folks. Do you see it says 5, 6, 7, 8? I'm going to correct that. Not a big deal. It's easy. It looks right to me. Does it look right to you all?

MS. DeMARCO: Yes, your Honor.

MR. CARLSON: Yes.

THE COURT: Okay. Let's do this. Let's go to page 44. This is the next instruction. This is the instruction for defense proposed instruction No 1, Seventh Circuit Pattern 5.07. This is the presence-at-the-scene-of-a-crime instruction. Mr. Carlson, you go to bat for that?

MR. CARLSON: Yes, Judge. Mr. Ibekie testified that

he had tenants that were in his residences who had access to his devices, that he did not cause material to be put on those devices, he does not know how it got on there, and he didn't intend to defraud anybody. He merely had tenants. And as a result of that, Judge, I think it establishes he was present at the scene without knowledge that a crime was being committed. He performed acts in the sense that he provided computers and internet access and cellphones but had no knowledge that a crime was being committed, and he merely associated with people who may have been involved in this.

THE COURT: Okay. What does the government think?

MS. NUTINI: Your Honor, that is -- what Mr. Carlson stated with respect to how Mr. Ibekie testified is correct. However, that's not the complete record on the matter. There was testimony from numerous individuals, most notably Special Agent Christopher Kadonsky, who talked about the devices recovered at the defendant's residence and talked in detail about how each of those were attributable to the defendant himself.

THE COURT: Right. But viewing the evidence in the light favorable to the defendant, why isn't this instruction appropriate?

MS. NUTINI: Well, your Honor, I would, again, point to the committee comments. First, that the mere presence instruction should be used in a limited fashion.

THE COURT: Right.

MS. NUTINI: And with respect to this case specifically, it's my understanding this is typically used in a situation such as like an assault, where somebody is just standing there and not involved in the activity. That is not the case we have here, your Honor.

THE COURT: Yeah.

MS. NUTINI: It just doesn't seem appropriate. And I think it will confuse the jury as to the issues that are actually before them.

THE COURT: So the gist of the potential defense is the tenant stated it wasn't the defendant himself. And that's -- it's a little bit -- kind of an oversimplification --

MR. CARLSON: Yes.

THE COURT: -- kind of overly raw, but that's the gist of it. It didn't -- there's reasonable doubt, in your view, about whether it was the defendant because other people had access to --

MR. CARLSON: Right, Judge.

THE COURT: One of the tenants, right, so. So that, to me, is a reason to have the third paragraph, essentially. And maybe the second paragraph. I wasn't sure how the second paragraph fit, but if -- if the performance of the acts is providing the computer, I can see that. I was less sure about the first paragraph, defendant's presence at the scene of the

crime. Usually -- yeah, I guess I think of this in terms of like a street crime situation. You know, just because you were there doesn't mean you did it. I'm especially unsure about the middle phrase. "Knowledge that a crime is being committed." I mean, defendant doesn't have -- I mean, no one is --

MR. CARLSON: Judge, I'll --

THE COURT: Does that -- does that fit?

MR. CARLSON: I'll make it easy for the Court. I have no problem with not giving the first paragraph and just giving the second two.

THE COURT: I think the -- I think the first paragraph is a little confusing to this jury. I mean, especially it says, "and knowledge that a crime is being committed." That's just like just if somebody's getting, you know, knifed in the street and you walk by and you see somebody getting knifed in the street, it doesn't mean you did it. I think -- I think -- I can understand why the latter two paragraphs fit this case. The first paragraph I think is -- is confusing, potentially. And I'm not sure it really fits the facts. What do you think of that?

MR. CARLSON: Judge, I will strike the request for the first paragraph.

THE COURT: Okay. Does the government want to say anything else in the latter two paragraphs? Because it does seem to me to fit. The defendant's theory is he provided a

computer. He provided a phone. Just because it was on his computer doesn't mean he did it. And just because people in his house -- just because the computer was in his house doesn't mean that he did it, I guess is the concept. That seems correct to me. I know you have contrary evidence, but, you know, why shouldn't I instruct the jury on that?

MS. NUTINI: Your Honor, we have nothing further to argue with respect to that.

THE COURT: Okay. All right. So -- so just to tie a ribbon on it, the defendant is no longer proposing the first paragraph that begins "the defendant's presence at the scene of a crime." You are, though, proposing the latter two paragraphs? Do I have that right?

MR. CARLSON: That's correct, Judge.

THE COURT: All right. So I'm going to adopt that. I'm going to give the latter two paragraphs. I think it fits the evidence that I have heard. There's evidence in the record that all sorts of potentially incriminating material was found in his home, on his computer, et cetera. Defendant's theory is that other people had access to the home, other people had access to the desk, and the study, and the garage, and the computer, et cetera. So I think the defendant's theory is just because it was in his home doesn't mean he did it. And so I think it fits the case.

If the government thinks I'm missing something, I'll

hear you out, but I think that makes sense to me. Anything else from the government? I want you to tell me if I'm missing something.

MS. NUTINI: No, your Honor.

THE COURT: Okay. So I'm going to give the latter two paragraphs. I'm not going to give the first paragraph.

The final instruction is good faith. It's defendant's proposed instruction No 2, Seventh Circuit Pattern Instruction 6.10. It's entitled: Good Faith, Fraud/False Statement/Misrepresentations. I've read the committee comment as well, page 143.

Does the defendant want to go to bat for this?

MR. CARLSON: Judge, in light of how the evidence went in, I'm not sure that this fits exactly as I had at the time. I would say that Mr. Ibekie did testify that he relied on information provided to him by Peter Pfizer, and specifically in those phone conversations, and that he acted based upon his belief that Mr. Pfizer was asking him to do something that was not fraudulent.

THE COURT: Okay. Does the government want to say anything?

MS. NUTINI: Yes, your Honor. The good faith instruction for 610 simply, in the government's view, doesn't fit the circumstances of this case. Mr. Ibekie didn't testify that he did things in good faith. What he testified to was

that he didn't do things, period. And so he is claiming to lack having taken any action. And so I think this instruction is not appropriate for the way in which he testified.

THE COURT: Yeah, all right. So I'm not going to give this instruction. I agree with the government on this. And I think Mr. Carlson is right to acknowledge that this doesn't perfectly fit, at the very least, the evidence that came in. I just think in general it doesn't fit the evidence that I've heard in the courtroom.

I will say, as a general matter, I have a lot of reservations about good faith instructions. It's intended to illuminate the meaning of intent to defraud. And personally I think it adds more confusion than clarity. Back when I practiced at the SEC, I tended to oppose good faith instructions because I thought it was at best duplicative and at worse confusing. And I think here it adds more confusion than it resolves.

By the way, there's a committee comment here on page 143 that says, quote, "It should be used in cases in which the government must prove some form of specific intent, such as intent to defraud or willfulness." Unquote. I think we're missing an "only" in that. I think it's supposed to read, rather, it should "only" be use in cases in which the government must prove some sort of specific intent. I don't know if I'm right on that, but that's how I'd read it. I think

it's a better reading of that sentence. In other words, you shouldn't give it in a case involving a situation where the defendant has to have acted knowingly. Rather, it should only be given in cases in which the government must prove specific intent.

I don't know if you're following me here, folks, but I think that's maybe not quite perfectly phrased in the committee comment. The concept is, I think the good faith instruction shouldn't be given when the situation is whether the defendant acted knowingly. It should only be given when there is a question about whether the defendant acted with intent to defraud. I just don't think it adds very much. It's going to be clear from the instructions that the government has the burden of proof beyond a reasonable doubt the defendant acted with intent to defraud. I don't think telling someone that good faith is not intent to defraud really adds much. It's just like throwing more terminology at the jury. It feels like jargon to me. It's legalese. It doesn't illuminate anything. It just gives them another concept to think about. It's at best repetitive or duplicative. At worst, it's confusing. So I don't think it adds any more clarity. It adds confusion, not clarity. Also, again, for the reasons stated by the government, it doesn't fit the case particularly well.

Anything else to say on this, anybody?

MR. CARLSON: No, Judge.

MS. NUTINI: No, Judge.

THE COURT: Mr. Carlson, if you want to say anything else to go to bat for that instruction, I'll listen to you. It just doesn't seem to fit. Anything else you want to say? How strongly do you feel about me giving this instruction?

MR. CARLSON: Judge, in light of how the evidence came in, I don't feel as strongly as I did at the time I proposed the instruction.

THE COURT: Yeah, I hear you. Okay.

All right. So I will make those changes. I'm going to make the changes to all the footers. We're going to get rid of them. And we're going to do that right now. I'm going to e-mail it to you and give you folks a chance to look at it one last time in case I messed anything up. Okay? So give us 10 minutes, and we'll e-mail it to you.

Is there any other part of the instructions that you folks want to talk about? Are all the other instructions agreed?

MR. CARLSON: Yes, Judge.

MS. NUTINI: Yes, your Honor. The government has a proposed limiting instruction, but we can hold off and do that when your Honor is done with these, if you would prefer. But nothing further on the jury instructions.

THE COURT: When you say a "limiting instruction," for what?

MS. NUTINI: Your Honor, the defendant testified numerous times today about not being provided the discovery materials. When I confronted him with a document, he said something to the effect of these were not ever given to me, or something like that.

THE COURT: Yeah.

MS. NUTINI: The government is proposing the following limiting instruction, and I will quote it. "Each side was given access to the discovery materials, including the physical items seized during the search warrants and the full digital extractions from the electronic devices."

I ran this by Mr. Carlson. He said it seemed appropriate, given the way in which the defendant testified. What we would propose is that your Honor give that instruction before we -- like, when the jury returns, essentially.

THE COURT: Right. Okay. Have you taken a look at that language, and are you on board?

MR. CARLSON: I have, Judge. And in light of Mr. Ibekie's testimony, I think the jury is entitled to know that we had equal -- both sides had equal access to that.

THE COURT: Okay. Fine.

MR. CARLSON: Whether Mr. Ibekie saw specific things or not is another story. But I have no reason to believe we didn't have every piece of evidence that the government had in this case.

THE COURT: Got it. So the language from the government is agreed?

MR. CARLSON: That's fine.

THE COURT: All right. So what I'd like you to do is e-mail it to my courtroom deputy to the proposed order inbox, and I will read whatever you have, assuming it's on board. So I'll do that right off the bat. Okay.

MS. NUTINI: Thank you, Judge.

THE COURT: What I'm going to do is make the changes. I'm going to come back out here in 10 minutes. I'm going to e-mail the version to you, and I'm going to say, does anybody have any other final changes, objections, or whatnot to the jury instructions, and then we'll get going.

Does the government expect to do a rebuttal? And if so, what do you expect?

MS. NUTINI: No, your Honor.

THE COURT: Okay. So we'll go right into jury instructions, and then we'll do closings. Does that sound good, everybody?

MS. NUTINI: Yes, your Honor.

MR. CARLSON: Just one thing before I forget, Judge.

THE COURT: Yep.

MR. CARLSON: I would renew my Rule 29 motion at the end of all the evidence.

THE COURT: Yep, okay. Very good. So do you -- I

guess now or at the end of all the evidence; right? So you're -- right?

MR. CARLSON: Yes.

THE COURT: So based on the representation from the government, I'll state that the Rule 29 motion is fully preserved. How's that? It will be fully preserved. But when we come back, I will give the limiting instruction, and then I'll say: Any rebuttal from the government? You'll say no. And then I'll tell the jury it's going to be time for jury instructions. I'll read the jury instructions. We'll take a break. We'll take a break for 5 or 10 minutes after the jury instructions, and we'll go from there. Okay? Does that make sense, everybody?

MR. CARLSON: Yes, Judge.

THE COURT: Give me, like, 10 minutes to make the final changes. Ms. Ramos and I have made a few changes to the jury verdicts form. For whatever reason, every time we get a jury verdict form from the government with the little boxes to check, on our end it shows up as a Capital G. I don't know why it's happening in every case. It's just kind of a quirk.

MR. CARLSON: I've said the same thing to the government. I get them the same way, Judge.

THE COURT: We have one printer. It's only the courtroom printer that can print it as a box. So this little guy under here is going to be printing it for you. So we'll

get it to you shortly. Okay? So we'll come back in 10 minutes, everybody? Does that sound good?

MR. CARLSON: Fine, Judge.

THE COURT: Thank you.

THE CLERK: All rise.

(Recess taken from 1:48 p.m. until 2:04 p.m.)

THE COURT: We are back. I have asked my clerk to send you the updated version of the jury instructions reflecting the final changes that we made in our conference a minute ago. She's going to be sending you a redline momentarily. Has everyone gotten a Word version?

MS. NUTINI: Yes, Judge.

MR. CARLSON: Judge, I for some reason can't get Word on my phone.

THE COURT: We'll print you a copy.

MR. CARLSON: Or it can be sent in PDF. I can get PDFs, but for some reason, Word disappeared from my phone.

THE COURT: No worries. Why don't we -- why don't we do this, Mr. -- just in the interest of time, let me just hand you my -- give you my own copy of the -- it occurred to me I've handed you my copy that says "stop" on one of the pages. So it's the top secret judicial lingo on page, like, 39 in the purple pen, it says "stop." I don't think I'm divulging any judicial work product there, but that was a note to myself.

Has everyone gone over -- on the government's side,

have you looked at the changes that I've made?

MS. NUTINI: We are doing so currently, your Honor.

THE COURT: All right. So why don't we do this, folks, actually. Let's do this. I'm not going to rush people. This is too important.

Ms. Chochrek is going to send you the redline. All right? We're going to print you a hardcopy of the redline. Okay? So let's come back in five minutes, and we'll print you our redline. It's important to get this right, it's not important to get this fast. Do you see what I mean? So if I can get that back from you, Mr. Carlson. Does that make sense, everybody?

MS. NUTINI: Yes, Judge.

MR. CARLSON: Yes, Judge.

THE COURT: All right. Let's come back in five minutes, and we'll get it to you. In the meantime, though, I do want to talk to you about the verdict form. Did everybody see the revised verdict form? I say it's revised. The revisions were slight. I did add the case number in the caption. I need that because I need to know what case number it is once I have it. I need to make sure it gets filed in the right spot, so I've added that. The jury is not going to infer anything from the case number. I'm confident of that. Has everybody looked at the revised verdict form? Did you get it in hardcopy?

MS. NUTINI: I don't believe we have one.

THE COURT: Okay. So Ms. Ramos is going to hand it to you. And Ms. Chochrek will print out the redline.

By the way, let me say this on the caption, everybody. The captions were a little different for the verdict form and the jury instructions. One of them had "also known as" with the other names, and the other one didn't. Do you see what I mean? So the version that I got from you all had two different case captions. I made it the same. I included the, "also known as." I could also take it out. I don't know if it matters either way. But it seemed to -- we have to pick a horse, include the nicknames, or not, and I included them. I can go the other way, too. It doesn't matter to me.

MS. NUTINI: Given that it's the way it's charged in the indictment, we would ask that the nicknames be included.

THE COURT: Okay. Any objection to that?

MR. CARLSON: No, Judge.

THE COURT: All right. So I'll go ahead and include that.

MS. NUTINI: Your Honor, we also noticed an error on Count Eight. And this I believe is the government's mistake. I apologize.

THE COURT: It should be attempt; right?

MS. NUTINI: Count 8 should be attempted mail fraud.

THE COURT: Yeah, attempted. Good catch. Okay. I

will make that change.

All right. Here's what we're going to do. I'm going to go type in "attempted." We're going to get five new copies. Everybody is going to get a copy. Ms. Chochrek will walk out with the redline of the jury instructions. I'd like you to look at it. I want to make sure it's right. We've been -- everybody has been working on it really hard on this trial for a long, long time. I know we're anxious to get going this afternoon, but we want this to be a smooth landing for trial; right? So I want to make sure that you look at the instructions and make sure that it's right.

Let me also say this, folks, as I read the jury instructions. A lot of things feel differently on this side of the bench than on that side of the bench. One of the things that I have learned being on the bench is it's actually harder to read the jury instructions than I had reasonably expected. It's kind of an out-of-body experience reading them. It's like 40 single-spaced pages. Because I try to present it in a way that can actually be digested for the jury. And I think about my tone, I think about my volume, I think about my cadence, I think about what page I'm on. I make sure people are doing okay. In a couple of other cases, I have inadvertently made mistakes in reading the jury instructions. Sometimes it has been important where I'll forget a word, or I'll just get a sentence wrong. If I make any mistake that is important, I

need you to tell me and interrupt me. Just say, Judge, just like you did when I messed up the oath earlier. Okay? Not only will I not mind if you do that, I am actively encouraging you to correct me if I mess something up. Are you with me? I really -- I owe it to the defendant, I owe it to the government, too, to get this right. I'm really going to try to get this right. I don't know why, but sometimes when I'm reading it, I just say the wrong word. I just do. So I need you to tell me if I get this wrong. Can you do that? You got to stick up for me a little bit as I am reading the jury instructions. All right? I'm going to do my level best to read it, have it be accurate, have it understood. But every now and again I just say the wrong word. And if I do that, I need you to correct me. Okay? So feel -- feel encouraged to interrupt me if I get this wrong. Okay? Because I owe it to you folks. Does that sound good?

MR. CARLSON: Sounds good, Judge.

THE COURT: All right. So we will be back in a couple of minutes and we'll get going. All right? Thank you.

(Recess taken from 2:11 p.m. until 2:17 p.m.)

THE COURT: Welcome back, everyone. Have you had a chance to go through the redline of the jury instructions?

MS. NUTINI: Yes, Judge.

MR. CARLSON: Yes, Judge.

THE COURT: Does the government have any issues with

any of the changes in the redline?

MS. NUTINI: No changes, your Honor, except for the final "mere presence" instruction that we added is currently on page 44. It just seems a bit out of place. I think it should be earlier in the instructions before the elements are listed out.

THE COURT: So you think page 44 ought to go where?

MS. NUTINI: We think it should be read before the elements. And I can give you a page number for where the elements start.

THE COURT: So a new page 25-and-a-half?

MS. NUTINI: Yes.

THE COURT: All right. So, Mr. Carlson, any problem with moving that so the "presence" instruction that's currently on page 44 would go before the elements on page 26 and after the one about "not speculating." It should be page 25-and-a-half. Any objection to moving it there?

MR. CARLSON: Judge, I don't. I would wonder, though, whether it would make more sense to have it go either right after the knowledge instruction.

THE COURT: Which is what page?

MR. CARLSON: 28. I don't have any strong feelings one way or another, Judge, but.

THE COURT: I think that's a fine proposal, too.

MS. NUTINI: That's fine.

THE COURT: So the "mere presence" instruction would become page 28-and-a-half. So after the instruction about "acting knowingly" and before the instruction on "interstate communications." Is that right, everybody?

MS. NUTINI: That's fine with us, Judge.

THE COURT: All right. Does the government have any other objections, changes, suggestions of any kind, large or small, to anything relating to jury instructions?

MS. NUTINI: No.

THE COURT: All right. Does the defendant have any objections, changes, corrections, additions, or otherwise, to anything in the jury instructions, large or small?

MR. CARLSON: No, your Honor.

THE COURT: All right. So in other words, if I move that instruction, the instructions are agreed?

MR. CARLSON: Yes.

THE COURT: Is that right?

MS. NUTINI: Yes.

THE COURT: All right. Here's what I'm going to do. Like a bolt of lightening, I'm going to go move that instruction. I'm going to print 16 copies for the jury. I will e-mail you the final version. We will get rolling in 10 minutes. Is that good, everybody?

MR. CARLSON: That's fine, Judge.

THE COURT: Ms. Ramos has prepared the jury verdict

form that has the change that we talked about to Count Eight. So I'd like you to look at that and make sure it's correct. Let's look at that right now. Is it correct on Count Eight, everybody?

MS. NUTINI: It is, Judge.

MR. CARLSON: Yes, Judge.

THE COURT: Okay. So why don't you study the jury verdict form, be ready to go on that. I will be out here in just a couple of minutes. We will e-mail you the final jury verdict form, we will e-mail you the final jury instructions, and we will get rolling. Okay?

All right. Come back in -- we'll come back in 10 minutes. Thank you, folks.

(Recess taken from 2:21 p.m. until 2:38 p.m.)

THE COURT: All right, everyone. Has everyone looked over the final jury verdict form? Yes?

MR. CARLSON: Yes, Judge.

MS. NUTINI: Yes, Judge.

THE COURT: Does it look good, everybody?

MS. NUTINI: It does.

THE COURT: Okay. My staff e-mailed you the final version of the jury instructions. We also have now printed for you two copies per side of the final jury instructions.

Does everybody have those, both electronically and in hard copy?

MS. NUTINI: We do.

MR. CARLSON: Judge, I have them in hard copy.

THE COURT: Got it. We I think e-mailed it to you. Maybe it's still in the pipeline, but at least you've got it in hardcopy in front of you.

MR. CARLSON: Yes, Judge. Part of the problem is it appears Word has vanished from my phone, and so I can't get e-mails in Word on my phone. I can get them in PDF, but I've --

THE COURT: Yeah, I'm sorry about that. You've got it in hardcopy in front of you?

MR. CARLSON: Yes, Judge.

THE COURT: Has everyone had a chance to go over the jury instructions?

MS. NUTINI: Yes, your Honor.

MR. CARLSON: Yes, your Honor.

THE COURT: Do they look good, everybody? Does anybody have any -- let me put it this way: Does anybody have any final objections, changes, corrections, additions, or otherwise, large or small, of any kind to the jury instructions?

MS. NUTINI: No.

MR. CARLSON: No.

THE COURT: Okay. Here's what we're going to do. I'm going to bring the jury back. I will fall on the sword. I

will apologize to them for being bad at making predictions about start times.

I'm going to read the limiting instruction. It's going to read as follows: "Each side was given access to the discovery materials, including the physical items seized during the search warrants and the full digital extractions from the electronic devices."

Does that sound good, everybody?

MS. NUTINI: It does.

MR. CARLSON: Fine, Judge.

THE COURT: Okay. I'll do that. And the defendant already rested; right?

MR. CARLSON: Yes.

THE COURT: And I'll say, does the government have any rebuttal case. And you will say no. I will then tell the jury that the record is closed, and I'm going to do the jury instructions. I'm going to read the first, you know, 37 pages or so, give or take. I'm going to have a stop. And then we're going to take a quick break, just so you can get set up and gather your thoughts. And then we're going to go right into closings. When the government is done, presumptively we'll take another break, Mr. Carlson, so you can consult with your client one last time and get set up and get oriented, and then we'll go. Does that sound good, everybody? Everybody comfortable with that?

MS. NUTINI: It does. And, your Honor, I know the jury is waiting, but we just have two very brief --

THE COURT: Okay.

MS. NUTINI: -- additional matters to raise for the Court.

THE COURT: Yes.

MS. NUTINI: We have a Government Exhibit 300 which are the bank records. Those were not provided on the flash drive because they are voluminous. I believe we have the signoff from defense counsel for this, but it's on a disk. We are providing a CD ROM player as well because I know the court's computer doesn't have one. So we have these to provide to Ms. Ramos, if that's okay with your Honor.

THE COURT: Okay. Does that work for you, Mr. Carlson?

MR. CARLSON: That's fine, Judge.

THE COURT: Okay. Fine.

MS. NUTINI: We also have the physical exhibits, which are 801 through 815. Those have been segregated. And we just wanted to see what your Honor would like us to do with those.

THE COURT: Yeah, you know, they're exhibits, so they I think presumptively should go in the jury room, unless there's a good reason not to. If it's cocaine or a firearm, that would be a good reason not to. I don't know that there's a good reason not to send the physical exhibits back. The

other option is to say, look, the physical exhibits are available to you upon request. But that might create questions for them about what they are.

I guess my -- my slight preference would be to send them back. But I'm not strongly in that camp, if anybody has a different preference. Go ahead.

MS. NUTINI: We would like them to go back, your Honor. We just weren't sure if you wanted us to pass those up now, basically.

THE COURT: I see. Yeah, we can do it during a break. But, yeah, we'll --

MS. NUTINI: Okay.

THE COURT: Any issue of the physical exhibits going back?

MR. CARLSON: No, Judge.

THE COURT: Okay. All right. So does everybody understand the plan? Everybody got the plan for the afternoon here?

MR. CARLSON: Yes, Judge.

MS. NUTINI: Yes.

THE COURT: I appreciate everybody working through things cooperatively here. Do you all feel like you've had enough time to go through the final changes to the jury instructions? Does anybody need more time on the jury instructions?

MR. CARLSON: No, Judge.

MS. NUTINI: No.

THE COURT: I would give it to you if you needed it. I really would, you know that, so.

Okay. So let's go ahead and get the jury.

MR. CARLSON: Judge, how long were you planning on going today with -- assuming that we finish up with jury instructions and all closing arguments, are -- how long do you keep the jury deliberating?

THE COURT: Yeah, I tell the jury that they have to continue deliberating until at least 4:45 every day.

MR. CARLSON: Okay.

THE COURT: After that, they're free to stay or free to go. They have to start no later than 9:30. They've got to keep normal hours, in other words. My best guess, and this is nothing to do with this group of people, but we're going to probably land -- we're going to probably be done in about two hours. I expect they're probably going to leave for the day, is my best guess. But I'm going to tell them they can stay until 6:00, if they would like. Does that sound good?

MR. CARLSON: That's fine, Judge.

THE COURT: Okay. Let's get the jury.

(Jury in at 2:43 p.m.)

THE COURT: All right. Have a seat, everyone. Members of the jury, I'm sometimes off on my time predictions.

That was a little later than I expected. I expected that we would be ready by 2:00 o'clock, and it's now 2:44. I will tell you, just as a general matter, I don't like making people wait. I especially don't like making juries wait. So I'm sorry that you folks had to wait back there.

I will tell you this, on the good news side of the ledger, we're ahead of schedule. We're not behind schedule, we're ahead of schedule. So if that's any small consolation, we're ahead of schedule. Okay, folks? So thank you for your patience. I served -- as I told you, I served on a jury once, me personally. I remember being back in the jury room wondering what was happening out there. So that was a good experience for me because, ever since then, I felt so sympathetic for jurors whenever I make them wait. So I'm sorry. It's not the parties' fault that you had to wait. You can blame me if you need to blame anybody. Don't blame them, blame me all you want. Okay? But it's a long way of saying welcome back. Okay?

Let me just re-orient you and remind you what happened. The government closed its case last week, obviously. The defense presented evidence today, obviously with defendant testifying. And then right before our lunch break, the defendant rested. Meaning, the defendant has completed his presentation of the evidence. I have one short instruction to give you now before taking the next step. So sometimes they

call it a limiting instruction in the law. It just means along the way during the trial sometimes a judge will give an extra bonus instruction to the jury as you roll along. All right? So let me give you one instruction. It's only a sentence or two. Okay? Here it goes:

Each side was given access to the discovery materials, including the physical items seized during the search warrants, and the full digital extractions from the electronic devices.

So just because I've read it to you orally, I have not shown it to you, let me read it just a second time. Okay? Here it goes:

Each side was given access to the discovery materials, including the physical items seized during the search warrants, and the full digital extractions from the electronic devices.

Does anybody want me to read that again? Okay. So that's an additional instruction.

The next thing to do is to see if the government has any rebuttal case.

Would the government like to present any rebuttal evidence of any kind?

MS. NUTINI: No, your Honor.

THE COURT: All right. So the government is not going to be presenting any rebuttal evidence. That means, folks, the record is closed. The record is closed. You've heard all the evidence that you're going to hear in the case. The record is

closed.

The next thing to do, everybody, is to do jury instructions. I'm going to instruct you on the law. These are the final jury instructions that are going to control your deliberations. In a moment I'll pass it out to you in hard copy. We then will take a short break. Then we're going to do closing arguments. The government goes first, the defense team goes next, and the government gets a rebuttal. Okay? That's the overall outline what we're going to do this afternoon. Okay?

So without further adeu, I'm going to give you the jury instructions. I am going to ask my courtroom deputy to hand it out to you in hard copy. All right. So she's going to give everybody a hard copy. Thank you, Ms. Ramos, for doing that.

This is your copy. You are welcome to mark it up or not mark it up. If you want to mark it up, that's fine. If you don't want to mark it up, that's fine, too. I personally am a visual person. I think I soak things up better if I can see it and hear it instead of just hearing it. Not everybody is that way. If you want to just listen, that's fine. If you want to listen and read along, that's fine, too.

Here's the one thing that I ask. We're going to stay as a team. We're going to stay on the same page. So if we're on page 12, please don't skip ahead to page 15 or flip back to

something. We're going to go page by page, one page at a time, everybody on the same page, literally and figuratively. All right? Everybody is going to be on the same page.

So as you can see, it has got a little weight to it, but the good news is a lot of the pages have only a couple of sentences in it. All right? It is roughly -- I'll let you look at the last page. It's 41 pages long. I don't know how long it will take me to read this to you. Let me give you my best guess. I think it will probably take about 45 minutes, or so, give or take. We will see how good that prediction is. But that's my best guess, it will take about 45 minutes, or so. I will try to read it slowly enough and carefully enough so I don't have to repeat myself. All right?

So does everybody have a copy? Everybody understand that plan? I'm going to give you the jury instructions, and we're going to do closings, and then we're going to give you the last final instructions. I must save the last two or three instructions for after the closings, and then we're going to dive right in. Is everybody ready to do the final closing instructions? All right. So if you'd like to follow along, you can. If you go to the jury instructions, we're going to go to page 2. It begins "Members of the jury." Everybody there? All right, folks, here it goes:

Members of the jury, I will now instruct you on the law that you must follow in deciding the case. I will also

give you a copy of these instructions to use in the jury room. You must follow all of my instructions about the law, even if you disagree with them. This includes the instructions I gave you before the trial, any instructions I gave you during the trial, and the instructions I am giving you now.

As jurors, you have two duties. Your first duty is to decide the facts from the evidence that you saw and heard here in court. This is your job, not my job or anyone else's job.

Your second duty is to take the law as I give it to you, apply it to the facts, and decide if the government has proved the defendant guilty beyond a reasonable doubt.

You must perform these duties fairly and impartially. Do not let sympathy, prejudice, fear, or public opinion influence you. In addition, do not let any person's race, color, religion, national ancestry, or gender influence you.

You must not take anything I said or did during the trial as indicating that I have an opinion about the evidence or about what I think your verdict should be.

Can everybody see that on the screen, too? Hopefully it's on the screen, if you like that, if that helps you. It helps you. All right. Here it goes. Page 3.

The charges against the defendant are in a document called an indictment. You will have a copy of the indictment during your deliberations.

The indictment in this case charges the defendant

Anthony Emeka Ibekie committed the crimes of wire fraud, mail fraud, money laundering, making a false statement to a financial institution, and false use of a passport. The defendant has pled not guilty to the charges.

The indictment is simply the formal way of telling the defendant what crimes he is accused of committing. It is not evidence that the defendant is guilty. It does not even raise a suspicion of guilt.

The defendant is presumed innocent of each and every one of the charges. This presumption continues throughout the case, including during your deliberations. It is not overcome unless, from all the evidence in the case, you are convinced beyond a reasonable doubt that the defendant is guilty as charged.

The government has the burden of proving the defendant's guilt beyond a reasonable doubt. This burden of proof stays with the government throughout the case.

The defendant is never required to prove his innocence. He is not required to produce any evidence at all.

You must make your decision based only on the evidence that you saw and heard here in court. Do not consider anything you may have seen or heard outside of court, including anything from the newspaper, television, radio, the Internet, social media, text messages, e-mails, or any other source.

The evidence includes only what the witnesses said

when they were testifying under oath, the exhibits that I allowed into evidence, and the stipulations that the lawyers agreed to. A stipulation is an agreement that certain facts are true or that a witness would have given certain testimony.

Nothing else is evidence. The lawyers' statements and arguments are not evidence. If what a lawyer said is different from the evidence as you remember it, the evidence is what counts. The lawyers' questions and objections likewise are not evidence.

A lawyer has a duty to object if she thinks a question is improper. If I sustained objections to questions the lawyers asked, you must not speculate on what the answers might have been.

Give the evidence whatever weight you decide it deserves. Use your common sense in weighing the evidence, and consider the evidence in light of your own everyday experience.

People sometimes look at one fact and conclude from it that another fact exists. This is called an inference. You are allowed to make reasonable inferences, so long as they are based on the evidence.

You may have heard the terms "direct evidence" and "circumstantial evidence." Direct evidence is evidence that directly proves a fact. Circumstantial evidence is evidence that indirectly proves a fact.

You are to consider both direct and circumstantial

evidence. The law does not say that one is better than the other. It's up to you to decide how much weight to give any evidence, whether direct or circumstantial.

Do not make any decisions simply by counting the number of witnesses who testified about a certain point.

You may find the testimony of one witness or a few witnesses more persuasive than the testimony of a larger number. You need not accept the testimony of the larger number of witnesses.

What is important is how truthful and accurate the witnesses were and how much weight you think their testimony deserves.

Part of your job as jurors is to decide how believable each witness was, and how much weight to give each witness' testimony, including that of the defendant. You may accept all of what a witness says, or part of it, or none of it.

Some factors you may consider include:

The age of the witness;

The intelligence of the witness;

The witness' ability and opportunity to see, hear, or know the things the witness testified about;

The witness' memory;

The witness' demeanor;

Whether the witness had any bias, prejudice, or other reason to lie or slant the testimony;

The truthfulness and accuracy of the witness' testimony in light of the other evidence presented; and

Inconsistent statements or conduct by the witness.

It is proper for an attorney to interview any witness in preparation for trial.

You have heard testimony from Ebuka Egbunam, who received a benefit in return for his cooperation with the government.

You may give this witness's testimony whatever weight you believe is appropriate, keeping in mind that you must consider the testimony with caution and great care.

You have heard testimony that the defendant committed acts other than the ones charged in the indictment. Before using this evidence, you must decide whether it is more likely than not that the defendant took the actions that are not charged in the indictment. If you decide that he did, then you may consider that evidence only in helping you decide the believability of the defendant's testimony. You may not consider this evidence for any other purpose. To be more specific, you may not use the evidence to conclude that, because the defendant committed an act in the past, he is more likely to have committed the crimes charged in the indictment. The reason is that the defendant is not on trial for these other acts. Rather, he is only on trial for wire fraud, mail fraud, money laundering, making a false statement to a bank,

and passport fraud. The government has the burden to prove beyond a reasonable doubt the elements of the crimes charged in the indictment. This burden cannot be met with an inference that the defendant is a person whose past acts suggest bad character or a willingness or tendency to commit crimes.

You have heard testimony of an identification of a person. Identification testimony is an expression of the witness' belief or impression. In evaluating this testimony, you should consider the opportunity the witness had to observe the person at the time and to make a reliable identification later. You should also consider the circumstances under which the witness later made the identification.

The government must prove beyond a reasonable doubt that the defendant is the person who committed the crime that is charged.

You have heard testimony from witnesses, namely John Gorski, who gave testimony about fingerprint analysis; and Larry Olson, who gave testimony about document reconstruction. You do not have to accept these witnesses' opinions and testimony. You should judge each witness's opinions and testimony the same way you judge the testimony of any other witness. In deciding how much weight to give to these opinions and testimony, you should consider the witness' qualifications, how the witness reached his or her opinions, and the facts I have described -- excuse me, and the factors I have described

for determining the believability of testimony.

You have heard recorded conversations. This is proper evidence that you should consider together with and in the same way you consider the other evidence.

You were also given transcripts of the conversations on the recordings to help you follow the recordings as you listened to them. The recordings are the evidence of what was said and who said it. The transcripts are not evidence. If you noticed any differences between what you heard in a conversation and what you read in the transcripts, your understanding of the recordings is what matters. In other words, you must rely on what you heard, not what you read. And if you could not hear or understand certain parts of a recording, you must ignore the transcripts as far as those parts are concerned.

I am providing you with the recordings and a device with instructions on its use. It's up to you to decide whether to listen to the recordings during your deliberations. You may, if you wish, rely on your recollections of what you heard during the trial.

If, during your deliberations, you wish to have another opportunity to view a transcript as you listen to a recording, send a written message to the court security officer, and I will provide you with the transcript.

Certain summaries were admitted in evidence. You may

use those summaries as evidence. It's up to you to decide how much weight to give to the summaries.

If you have taken notes during the trial, you may use them during your deliberations to help you remember what happened during the trial. You should use your notes only as aids to your memory. The notes are not evidence. All of you should rely on your own independent recollection of the evidence, and you should not be unduly influenced by the notes of other jurors. Notes are not entitled to any more weight than the memory or impressions of each juror.

You have heard evidence obtained from the government's use of undercover agents. The government is -- is permitted to use these techniques. You should consider evidence obtained this way together with and in the same way you consider the other evidence.

The indictment charges that the crimes happened "on or about" certain dates. The government must prove that the crimes happened reasonably close to those dates. The government is not required to prove that the crimes happened on those exact dates.

The defendant has been accused of more than one crime. The number of charges is not evidence of guilt and should not influence your decision.

You must consider each charge and the evidence concerning each charge separately. Your decision on one

charge, whether it is guilty or not guilty, should not influence your decision on any other charge.

In deciding your verdict, you should not consider the possible punishment for the defendant. If you decide that the government has proved the defendant guilty beyond a reasonable doubt, then it will be my job to decide on the appropriate punishment.

You should not speculate why any other person whose name you may have heard during the trial is not currently on trial before you.

Counts One, Two, Four, Five, and Six of the indictment charge the defendant with wire fraud. In order for you to find the defendant guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

1. That the defendant knowingly devised or participated in a scheme to defraud, as described in Count One; and

2. That the defendant did so with the intent to defraud; and

3. The scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and

4. That the purpose of carrying out the scheme or attempting to do so, the -- I'm sorry, let me say that again.

4. That for the purpose of carrying out the scheme or attempting to do so, the defendant caused interstate wire

communications to take place in the manner charged in the particular count.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant guilty of that charge.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove anyone of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant not guilty of that charge.

Counts Three and Seven of the indictment charge the defendant with mail fraud. In order for you to find the defendant guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

1. That the defendant knowingly devised or participated in a scheme to defraud, as described in Count One; and

2. That the defendant did so with the intent to defraud; and

3. The scheme to defraud involved a materially false or fraudulent pretense, representation, or promise; and

4. That for the purpose of carrying out the scheme or attempting to do so, the defendant caused the use of the United States Mails or a private or commercial interstate carrier in

the manner charged in the particular count.

Count Eight of the indictment charges the defendant with attempted mail fraud. A person attempts to commit mail fraud if he (1) knowingly takes a substantial step toward committing mail fraud, (2) with the intent to commit mail fraud. The substantial step must be an act that strongly corroborates that the defendant intended to carry out the crime of mail fraud.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant guilty of that charge.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant not guilty of that charge.

Let me stop right there for a moment, folks. In plain English, notice on page 23 it covered Counts One, Two, Four, Five, and Six. Those were -- that was the instruction for wire fraud. Wire fraud. The last instruction I just gave you for Counts Three and Seven were for mail fraud. And Count Eight was attempted mail fraud. So some of the counts are wire fraud, some of the counts are mail fraud. Okay. They're different.

Let's go to page 25. Here it goes.

A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said.

If a defendant performed acts that advanced the crime but had no knowledge that the crime was being committed or was about to be committed, those acts are not sufficient by themselves to establish the defendant's guilt.

A defendant's association with persons involved in a crime or criminal scheme is not sufficient by itself to prove his participation in the crime or membership in the criminal scheme.

The government must prove that interstate communication facilities, parenthesis, as to Counts One, Two, Four, Five, and 6, parenthesis, or the United States mails or a private or commercial interstate carrier, parenthesis, as to Counts Three, Seven and Eight, parenthesis, were used to carry out the scheme, or were incidental to an essential part of the scheme.

In order to cause interstate wire communications to take place, or use or cause the use of the United States mails or a private or commercial interstate carrier, the defendant need not actually intend that use to take place. If you --

excuse me. You must find that the defendant knew this use would actually occur, or that the defendant knew that it would occur in the ordinary course of business, or that the defendant knew facts from which that use could reasonably have been foreseen. However, the government does not have to prove that the defendant knew that the wire communication was of an interstate nature, or that the carrier was an interstate carrier.

The defendant need not actually or personally use interstate communication facilities, the mail, or an interstate carrier.

Although an item communicated interstate, mailed, or sent by interstate carrier need not itself contain a fraudulent representation or promise or a request for money, it must carry out or attempt to carry out the scheme.

Each separate use of interstate communication facilities, the mail, or an interstate carrier in furtherance of the scheme to defraud constitutes a separate offense.

The mail-fraud and wire-fraud statutes can be violated whether or not there is any loss or damage to the victim of the crime or gain to the defendant.

The government need not prove that the scheme to defraud actually succeeded.

A scheme is a plan or a course of action formed with the intent to accomplish some purpose.

A "scheme to defraud" is a scheme that is intended to deceive or cheat another and to obtain money or property or cause the potential loss of money or property to another by means of materially false or fraudulent pretenses, representations, or promises.

A materially false or a fraudulent -- or fraudulent pretense, representation, or promise, may be accomplished by an omission or the concealment of material information.

In considering whether the government has proven a scheme to defraud, the government must prove beyond a reasonable doubt one or more of the false or fraudulent pretenses, representations, or promises charged in the portion of the indictment describing the scheme. The government, however, is not required to prove all of them.

A scheme to defraud may be committed by more than one person. A defendant's guilt may be established without proof that the defendant personally performed every act constituting the scheme to defraud.

A false or fraudulent pretense, representation, promise, omission, or concealment is "material" if it is capable of influencing the decision of the person to whom it was addressed.

A person acts with "intent to defraud" if he or she acts knowingly with the intent to deceive or cheat the victim in order to cause a gain of money or property to the defendant

or another or the potential loss of money or property to another.

Wire transfers of funds, or deposits of checks that are cleared using wire transfers of funds, constitute transmission by means of wire communication.

Count Nine of the indictment charges the defendant with money laundering. In order for you to find the defendant guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt:

1. The defendant engaged or attempted to engage in a monetary transaction; and

2. The defendant knew the transaction involved criminally derived property; and

3. The property had a value greater than $10,000; and

4. The property was derived from mail fraud, as charged in Count Three of the indictment; and

5. The transaction occurred in the United States.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt, then you should find the defendant guilty of that charge.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt, then you should find the defendant not guilty of that

charge.

The term "monetary transaction" means the deposit, withdrawal, transfer, or exchange, in or affecting interstate commerce, of funds or a monetary instrument, by, through, or to a financial institution.

The alleged monetary transaction need not involve "all" criminally derived property, only over $10,000 in criminally derived property.

"Interstate commerce" means trade, transactions, transportation, or communication between any point in a state and any place outside that state or between two points within a state through a place outside the state.

The term "financial institution" means -- excuse me. Say that again.

The term "financial institution" includes commercial banks.

The term "criminally derived property" means any property constituting, or derived from, proceeds obtained from a criminal offense.

Counts Ten, Twelve, and Fourteen of the indictment charge the defendant with making a false statement to a financial institution. In order for you to find the defendant guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

The defendant made a -- excuse me.

1. The defendant made a false statement to a financial institution in writing; and

2. At the time the defendant made the statement, he knew it was false; and

3. The defendant made the statement with the intent to influence the action of the financial institution concerning a bank account application; and

4. The accounts of the financial institution were insured by the Federal Deposit Insurance Corporation.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant guilty of that charge.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one or -- of -- excuse me. Let me say that again.

If, on the other hand, you find from your consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant not guilty of that charge.

And, folks, this is going to be the last instruction before we take our break. The last three instructions we're going to save until later. So page 38 is going to be the last

instruction. We will give the other ones after closings. Okay? Here it goes.

Counts Eleven and Thirteen of the indictment charge the defendant with false use of a passport. In order for you to find the defendant guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

1. The defendant knowingly used a passport; and

2. The government acted -- excuse me. I said that again. I'm going to -- I'm sorry, I made a mistake. I'm going to start over. Here it goes. Strike that. Here it goes.

Counts Eleven and Thirteen of the indictment charge the defendant with false use of a passport. In order for you to find the defendant guilty of these charges, the government must prove each of the following elements beyond a reasonable doubt:

1. The defendant knowingly used a passport; and

2. The defendant acted willfully, that is, he deliberately and voluntarily used a passport; and

3. The passport was false, forged, or counterfeited.

If you find from your consideration of all the evidence that the government has proved each of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant guilty of that charge.

If, on the other hand, you find from your

consideration of all the evidence that the government has failed to prove any one of these elements beyond a reasonable doubt as to the charge you are considering, then you should find the defendant not guilty of that charge.

I'm stopping there on page 38. Counsel, did I read the instructions accurately?

MS. NUTINI: Yes, your Honor.

MR. CARLSON: Yes.

THE COURT: Okay. Members of the jury, we're going to take a short break. Part -- if you're wondering why we're taking a break already, sometimes parties need to hook up some technology, so we want it to be smooth for you. It also gives them a chance to talk to their teams one last time. All right? So we're going to take a break. We're going to keep it short. It's going to be, like, five, 10 minutes. If you all need to use the restroom, we will give you time. As soon as you folks are ready, we're going to come back, we're going to get rolling with the closing arguments. Okay? We'll see you in a couple minutes. Thank you, folks. You can take the instructions with you.

(Jury out at 3:19 p.m.)

THE COURT: All right, folks. Have a seat. Thank you, everybody, for listening carefully. I caught myself at one point where I said government and I meant the defendant, but I fixed it. I appreciate you being attentive to that.

We'll get rolling in a couple minutes. Does anybody need anything?

MR. CARLSON: No, your Honor.

THE COURT: Government?

MS. NUTINI: No, Judge.

THE COURT: Okay. So, again, the government is going to go about an hour, give or take, and then we'll take a break, and defendant's team will go. Do you expect to have a rebuttal, perhaps?

MS. NUTINI: Yes, your Honor. We can plan to just move right into rebuttal after the defendant's closing, if that works for the Court.

THE COURT: Okay. That will be fine with me. We will get going in five minutes. Thank you, folks.

(Recess at 3:20 p.m., until 3:27 p.m.)

(Proceedings heard in open court; jury out:)

THE COURT: All right. Have a seat, everyone.

A couple of quick reminders before we get the jury. During closings, you may show the jury the transcripts, if you'd like, the demonstratives. That's fine.

You can show the jury the final jury instructions, if you'd like.

Does everyone have a copy of that?

I don't know if you want to -- I know you have it in hard copy, obviously. You've got it electronically, too. I know Mr. Carlson had an issue with getting it electronically.

You're welcome to put it on the ELMO. You're welcome to pull it up on the screen, if you'd like. I think that's perfectly fine. You can remind the jury what the instructions are, no problem there. You just simply can't opine on the law. You can't construe the jury instructions. You can't tell the jury what they mean. Please don't. I will stop you. You don't want that to happen. So please do not instruct the jury on what the law is and do not interpret my jury instructions.

For example, "beyond a reasonable doubt," no one should be telling the jury what that means. That has an aura of mysteriousness, it seems to me, under the Seventh Circuit case law. The Seventh Circuit doesn't want us explaining to the jury what that means.

You can tell the jury that that's the burden, you can

tell them what the standard is, but let's not get into an explanation of what that means.

I think that's all I've got.

I will say this: In every jury trial, I've said do not object just to knock the other side off. I never liked that, when people did that to me. Don't do that to the either side.

When you're up there in front of the jury, you don't want the other side objecting for improper reasons. I don't need to say that to the three of you because none of the three of you would do that, but I'm going to keep my streak alive of saying it in each jury trial. All right? So I'm not worried about that at all in this particular case.

Is everyone ready for closings?

MS. DeMARCO: Judge, I just wanted to flag one thing.

THE COURT: Yeah.

MS. DeMARCO: On my PowerPoint, I have the mail and wire fraud elements collapsed, like basically the old version that we had.

THE COURT: That's fine.

MS. DeMARCO: Okay. And I'll tell the jury, you know, these are the same elements, one, two, and three. They're different for wire --

THE COURT: Yeah, that's fine. So, I mean, I've instructed them on the law. Your demonstrative is just going

to be a synthesis of that. I think that's -- that's fine.

MS. DeMARCO: Okay. Just I wanted to --

THE COURT: Totally fine.

Anything else from the government --

MS. DeMARCO: No --

THE COURT: -- from your perspective?

MS. DeMARCO: -- Your Honor. We're ready to go.

THE COURT: Okay. Very good.

Mr. Carlson?

MR. CARLSON: No, Judge.

THE COURT: And with your PowerPoint, are you ready to go with the clicker? It's going to be, like, smooth and Major League Baseball here?

MS. DeMARCO: We've tested it.

THE COURT: You've tested and the clicker works. All right.

I was always afraid of the clicker when the jury was there.

MS. DeMARCO: I even have extra batteries.

THE COURT: I used to bring extra batteries, too. I used to go to Walgreens the night before and buy extra batteries just in case.

All right. Let's get the jury.

(Jury in at 3:30 p.m.)

THE COURT: All right. Welcome back, everyone.

Have a seat, please.

Members of the jury, you have now heard most of the jury instructions. Not all, but most of them. The vast majority you've heard.

The time has now come for you to hear closing arguments.

I'm going to repeat what I said to you a moment ago. Any statements by the lawyers are not evidence. All right? You have already heard the evidence. What you're about to hear is an argumentation from the lawyers about the case. They're going to make arguments to you about the evidence that you've heard, and they're going to tell you the verdict that they think you ought to decide in rendering your verdict. Okay?

So the way it works is the government speaks first because the government has the burden of proof. The defendant doesn't have a burden to do anything. The government has the burden of proof to prove its case beyond a reasonable doubt, so the government is going to go first. The government is going to speak last.

So usually the government speaks first, the defense speaks, and then sometimes there is a short rebuttal at the end. It's usually substantially shorter. Okay? So most of it's on the front end.

Without further ado, I'll turn the floor over to the government to give your closing arguments.

MS. DeMARCO: Thank you, Your Honor.

CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

MS. DeMARCO: Deception, manipulation, and greed. Those are the themes that you heard about last week during the government's case-in-chief.

The defendant, Anthony Ibekie, deceived victims into thinking there was an inheritance. He manipulated them once they started corresponding with him. And out of greed, he took their money.

And the government has the burden to prove this to you beyond a reasonable doubt.

And these are some of the people that I want you to keep in mind during my presentation: Dr. Petroselli, Cong Le, Dale Helms, Gary Foster, Robert Aguada.

These are some of the people that the defendant deceived, manipulated, and stole from.

For this conduct, as the judge instructed you, he is charged with 14 different counts.

Counts I through VIII are wire and mail fraud charges, with Count VIII an attempted mail fraud charge.

Counts I through VII correspond to payments that the victims made, either wire transactions or checks that they mailed.

Count VIII corresponds to the undercover check. It's charged as an attempt because the mails were never actually

used. The agents orchestrated the check.

Count IX is the money laundering count.

Counts X, XI, XII, XIII, and XIV, they relate to using a fake passport to open bank accounts.

I'm going to spend most of my time this afternoon on Counts I through VIII, and then at the end, I'll talk about the money laundering count and then the false statements and opening the bank accounts.

So I want to give you just a brief overview of the scheme, which I know you're all pretty familiar with at this point. But we've had a few days off, so just as a reminder.

There is no dispute that there was a scheme here. And you heard multiple victims testify about that and Agent Vela testify about that. So you know that step one, the victim receives a letter in the mail. The letter says, "You have a relative who died without a will, there is somewhere between 9 and $11 million sitting in a bank account, and you're entitled to it."

The victim responds.

You saw some of those e-mails last week.

Step three, this is where the manipulation part comes in. There is a back-and-forth with the defendant, co-schemers, and the victims, giving them different steps: "You have to fill out a questionnaire. You need to send us a death certificate."

Then you get to step four. The victim is told, "You need a lawyer. You need a lawyer to help you through this process." And this is where the victim is told, "You need to give us money. The lawyer is going to charge you some legal fees."

Some of the victims, it continues after that. There is more legal fees.

Mr. Le is told there is a lien on the account, there is even more money that needs to be paid.

And then, finally, you get to step five, when the money is actually transmitted, a wire transfer or a check in the mail.

I also want to give you an overview of some of the people and places that you heard about last week before we sort of dive into the elements.

You heard some testimony about Sam Aniukwu. He participated in the fraud. You heard that from Mr. Egbunam. And he lived with the defendant in Lisle and Naperville.

You heard a little testimony about Ms. Gosha. She is the one who accepted the cashier's check, the undercover check.

You heard about these two folks: Tonyanika Fogle, Vincent Izuegbu. Tonyanika Fogle is the defendant's ex-wife. Vincent Izuegbu is an associate of his.

And all four of these people, there were entities that we'll talk about a little bit later that were registered in

their names, and bank accounts as well.

Mr. Egbunam you heard from last week. He's the cooperator. And he also told you about how he participated in the fraud scheme. And we'll talk about him a bit more.

These are the residences that had significance in this investigation. So we start with 5206 Lincoln Avenue in Lisle.

You have a stipulation. And remember the judge told you stipulations are agreed facts. So you can take what's in the stipulations as true. The government signed them, defense signed them.

So Stipulation No. 10, the defendant, Mr. Aniukwu, and Mr. Egbunam lived in Lisle until about the spring of 2019.

This is where the trash pull occurs, in March of 2019. And there are several -- the majority of the business entities that we talked about that received victim funds are registered in Lisle.

And then we have the Naperville premises. That comes a little bit later. Stipulation No. 10, the defendant, Mr. Aniukwu, and Mr. Egbunam, they move there in the spring of 2019. This is where Emetech Solutions -- that's the company that the defendant registered, and Ebuka Egbunam 's name is registered.

And you'll remember that Special Agent Mansker testified that the defendant was paying rent checks out of the Berger Services bank account. And Berger Services is one of

the entities that received victim funds.

And then we go to Oxbow in Oswego. The defendant and Mr. Egbunam lived there from December 2019 to July of 2020.

At this point, remember, Mr. Aniukwu, he moves to Romeoville. He doesn't move with them.

And this is where the search warrant occurs, in July of 2020. This is where all those documents are recovered, and this is where the devices are recovered.

Finally, you have the Oak Park apartment where Jennifer Gosha lived. And this is where the undercover cashier's check is delivered.

And we'll talk about all of this in more detail.

And this is where Jenant, Incorporated, is registered.

So, as I mentioned, I want to talk about the first eight counts. And when we looked at the overview, there is no dispute that a scheme occurred. So the question for you all is, how do you know that that man participated knowingly in this scheme?

And here are the four elements that the government needs to show:

One, that the defendant knowingly devised or participated in a scheme to defraud.

Two, that he did so with the intent to defraud.

Three, the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise.

And, four, that he either used the United States mails -- those relate to the mail fraud counts -- or caused the use of an interstate wire communication.

So the first three elements of mail and wire fraud are the same. The fourth is different for the mail fraud and the wire fraud counts.

There are a few instructions I want to highlight. I know the judge just read them to you, but these are the ones I want to kind of emphasize.

A scheme to defraud is a scheme that's intended to deceive or cheat another and to obtain money or property or cause the potential loss of money or property to another by means of materially false or fraudulent pretenses, representations, or promises.

The definition of "knowingly": A person acts knowingly if he realizes what he is doing and is aware of the nature of his conduct, does not act through ignorance, mistake, or accident. In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did or said.

And I'm going to repeat this definition a couple times because it's important.

You may consider all of the evidence, including what the defendant did or said. And we're going to look at some of the things the defendant did and some of the things he said

that show you that he knowingly participated in this fraud.

So here are some of the ways that you know he knowingly participated in the fraud.

And we're going to talk about these in more detail.

He e-mails drafts of an early inheritance letter to co-schemers in June of 2017.

Multiple victim inheritance letters found in his trash, March of 2019.

His fingerprint is found on an envelope containing an inheritance fraud letter.

Mr. Egbunam observed the defendant stuffing thousands of scam letters into envelopes at multiple locations.

A victim inheritance letter found in his shred bin in Oswego, along with printers and envelopes, July of 2020.

200 Excel spreadsheets on his devices containing victim -- potential victim names and addresses.

The password for the John Jean Delon Gmail account found in his trash.

The typed list of accounts and passwords found on his desk in Oswego.

The IP address at Oswego used to log on to ued@standardgroupservices.com.

His own voice when he calls Agent Vela and pretends to be Peter Pfizer.

The victim communications found on multiple devices,

multiple victims.

He set up phone numbers using TollFreeForwarding for Peter Pfizer and Wyashika Sellar.

The victims send money to entities that are associated with him.

He takes some of the victim funds and funnels it to his personal bank account in Nigeria.

Every fraudulent entity that received victim funds is associated with him in some way.

Every bank account that received victim funds is associated with him in some way.

The bank statements and the Secretary of State records found on his desk in Oxbow in July of 2020.

He tracked the undercover cashier's check using his IP address, and he told Jennifer Gosha to expect that delivery.

Every step of this scheme the defendant knowingly participated in. And we're going to go step by step.

So step one, unsolicited letter to the victims.

This is the early version of the letter that he sends in June of 2017. It's from Aristo Blake. And you saw earlier today that the Aristo Blake Gmail account has the defendant's phone number connected to it and the same recovery e-mail as aibekie@gmail.com.

He says in this e-mail, "This is the review of what I did with respect to this format. Let me know your views. You

have sent to Sama the e-mail and password. You can include in your response."

He says, "The second attachment" -- the third paragraph -- "is how the direct mail will appear to the recipient when they receive and open the mail."

This is clearly a reference to people receiving and opening mail.

He also talks about merging and setting of mail. And Special Agent Kadonsky talked about that.

What does that mean? It's mail merging. It means batch printing of envelopes and addresses. And it's signed by Toni, aristoblake@gmail.com, signed Toni, a nickname of Anthony.

And this is the attachment. This is an early version of the inheritance fraud letter. It's not the exact same one we see later. It evolves. But there are certain details I want to point out because they show you that this is one scheme that occurred over time.

The first line of every letter we see: "I am aware this letter has come to you as a surprise."

He always talks about "a citizen of your country who lived and died in London from cardiac arrest in the year 2007."

The amount is always either 9.2 million or $11.6 million. And we'll see this in future versions of the letter.

Then you have the trash pull. And that's almost two years later. Multiple ripped-up letters found in the defendant's trash. Letter after letter after letter. And they include the same details: "I am aware this letter has come to you as a surprise."

This one is from John Delon, another alias that we see used with the victims.

"Died in London from cardiac arrest." This one is 2009. "My name is John Delon."

They all use the same first name of the purported relative: Geo, short for George. And the amount is also the same. In the body of the second paragraph, it's $9.2 million. It's the same scheme.

Then you have his fingerprint that's found on an envelope. And remember Special Agent Mansker told you that the agents, they got a lucky break in the investigation. Purely coincidental, the defendant put the return address of the DuPage County municipal complex on the letters.

So the agents took possession, sent them for fingerprinting, and used one for the undercover operation.

On the left is the latent print that John Gorski talked to you about. That's the one that was on the envelope.

On the right is the defendant's fingerprint. That's Government Exhibit 509. And you have a stipulation that says that Government Exhibit 509 contains the defendant's

fingerprint.

This is all evidence that he knowingly participated in this scheme.

Mr. Egbunam observed the defendant stuffing thousands of letters into envelopes for years.

And I want to pause here and talk about Mr. Egbunam a little bit.

The judge instructed you that he got a benefit from the government, so you must consider his testimony with caution and great care. But I would encourage you to consider how what he said was corroborated by other evidence.

So, for example, he talked to you about thousands of letters being stuffed into envelopes. And you know that letters -- letters upon letters upon letters were found in the defendant's trash. You know that stacks of information were found in his Oswego place in July of 2020.

He talked to you about Emetech Solutions. He told you, "The defendant registered that company without talking to me first. He told me to open a bank account in my name, only me, and the defendant had access to that account."

And that's corroborated, because when you get to the search warrant in July of 2020, there is a bank statement for Emetech Solutions on the defendant's desk. And there's articles of incorporation for Emetech on the defendant's desk.

So consider how -- when you're assessing Mr. Egbunam's

credibility, consider how what he told you is corroborated by other evidence.

Then you have the shred bin. Remember Mr. Olson who told you about putting little pieces of paper together? This was reconstructed from the defendant's shred bin in July of 2020. It's yet another victim inheritance letter.

"Died in London." "Cardiac arrest." This one is in 2010.

11.5 -- $11.6 million. And this one is signed by Peter Pfizer.

You'll notice also that the e-mail address petelondon54@aol.com is one of the e-mails that's on the printed list of the e-mails and phone numbers on the defendant's desk.

You also have his home office setup: two printers, tons of envelopes, and stamped envelopes with addresses on them.

These were not for marketing; these were for inheritance fraud. Mr. Egbunam told you that. And you've seen the other evidence that that's what this is for.

200 Excel spreadsheets containing victim names on the defendant's devices. And let's talk about the devices for a moment.

Special Agent Kadonsky told you that at the Oswego search warrant, the agents recovered six devices that were

attributable to the defendant. And he told you what that means. It means the autofills put the defendant's name in.

The conversations, you can tell it's the defendant's because -- based on the context, what he's saying, who he's talking to.

Six devices attributable to defendant. And I think my colleague asked Special Agent Kadonsky on redirect, "Was there any evidence that these devices were attributable to anyone else?" And Special Agent Kadonsky said, "No."

These were the defendant's devices. 200 Excel spreadsheets across those six devices containing potential victim names and addresses.

Remember that knowledge instruction, what the defendant did and said. The defendant had these Excel spreadsheets on his computer. This is what he did.

The e-mail that we saw. That's what the defendant said. They show his knowledge of this scheme.

Moving on to the next phase of the scheme, the victim response. And this is where the manipulation comes in. It starts with an initial deception, and then the victims are kind of lured in.

The password found in defendant's trash for John Jean Delon, one of the aliases for Peter Pfizer used to communicate with victims, and the password.

And you'll notice the defendant has a tick, we'll call

it. The password is Jean5206. 5206 Lincoln Avenue. He puts the address names in the passwords.

And then you have this list found on the defendant's desk. On this list alone you have a number given to Dale Helms, e-mail addresses used to communicate with victims and the undercover agent, a phone number used for Wyashika Sellar. And, again, you have passwords: Shrine797, 797 Oxbow Avenue. Password: August1976, one of the birthdays the defendant uses.

So let's break this down a little bit.

The phone number for Peter Pfizer ending in 0817, this is the phone number that he gives Agent Vela when he doesn't know that Agent Vela is an undercover agent.

Again, what the defendant did and said, these are his words that he said, this phone number.

The phone number for Standard Group Services, one of the entities that the victim has to go to, one of the hoops they have to jump through to get to the point of collecting the inheritance.

This is an e-mail between ued@standardgroupservices and Agent Vela posing as Daniel Baker, the same phone number for Wyashika Sellar.

This is one to Dale Helms, the same phone number. This one from Peter Pfizer to Dale Helms.

You have the e-mail address ued@standardgroupservices.com, the unclaimed estates

department. It's the same e-mail address that communicates with Agent Vela when he's posing as a victim. It's the same e-mail address that Peter Pfizer gives Dale Helms.

And, again, on the defendant's desk, the account and the password, his birthday -- one of his birthdays.

You have peterp968@yahoo.com. This is an e-mail from Agent Vela to Peter Pfizer -- sorry. The bottom e-mail, Peter Pfizer to Daniel Baker. That's Agent Vela, of course.

"Moving forward, please contact me with this e-mail." What's the e-mail? Peterp968@yahoo.com.

On the topic of ued@standardgroupservices, this is the Google subscriber information. Government Exhibit 503-5. It's the e-mail address for ued@standardgroupservices.com, an e-mail given to multiple victims in this case.

The IP address is these 16 digits.

And then you have Government Exhibit 502, which is the subscriber records for the Internet at the Oxbow premises where only the defendant and Mr. Egbunam lived.

What's the IP address? It's the same.

What this tells you is that the defendant was logging in to the account, ued@standardgroupservices.com, creating that IP activity at the bottom, from the Oxbow premises in Oswego.

And you have a stipulation that the parties agree the digits after the first 16 digits change based on the time, the date, but the first 16 digits are what's called directly

provisioned, a technical -- overly technical way of saying they stay the same. It's the same IP address.

Then you have the defendant's own words on recording.

(An audio clip was played in open court.)

MS. DeMARCO: What the defendant did and said -- and this is maybe the clearest example, the defendant's own words, which he doesn't dispute is his voice, as Ebuka Egbunam and Special Agent Mansker also identified his voice on this recording.

Listen to these recordings in the jury room. The defendant is pressuring Agent Vela to hire a lawyer. Which lawyer? Pierre Delouis. Ask yourself, are these the words of somebody who is filling in for a friend or just jumping in last minute? No, he is deeply familiar with the intricacies of the scheme because it's his scheme and he is knowingly participating in it.

He talks about the lawyer. He tells him to lie to the bank in the second call. He's not reading a script. He's responding to Agent Vela's questions in real time. Nowhere does he say in here, "Excuse my ignorance. I'm a little new to this. I'm just helping out a friend who is having a family situation, but I'll help you the best I can."

No, he knows exactly what he is talking about. He is furthering this scheme by telling Agent Vela, "We need to get this Canadian lawyer." Lie to the bank, so they don't flag

this transaction for fraud.

This shows his knowing participation.

Then you have the victim communications found on the defendant's devices.

A letter to Cong Le. On the left, was found on the defendant's device. On the right, provided by Cong Le. He received this letter. They are exactly the same.

This, again, shows the defendant's knowing participation.

You have driver's licenses sent to Cong Le, Robert Aguada, and on the defendant's device. The name is slightly different. Mr. Aguada was communicating with Chandler Arnaud, but the picture is the same, the information is the same.

He set up phone numbers and voicemails for the people who were communicating with the victims.

The TollFreeForwarding records. He sends e-mails to TollFreeForwarding saying, "Record this voicemail for me: Thank you for calling Standard Group Services. You have reached Wyashika Sellar. I'm not available. Please leave a message."

Then we get to the last part of the scheme, and that's the greed. You have money sent to entities that are associated with the defendant in different ways. All the defendants -- sorry. All the victims are told Setraco, Jenant, Emetech, Esijemine. The last one is from Robert Aguada. The first one

is Cong Le. Dale Helms. Agent Vela is told send it to Globayo.

And I know you recognize all of these names at this point.

All of these entities are associated with the defendant in some way. He is the common denominator. His ex-wife, his son, his roommate, himself using alias names: Emeka Toni Ibe; Anthony Ibekie at Emetech Solutions; Tonyanika Fogle, his ex-wife; Jennifer Gosha, his girlfriend. He's the hub. He is the common denominator between all of these people.

And then you have some of the names themselves. Samtoni: Samuel Aniukwu/Toni. Anthony Ibekie. Godmeks: Godfrey, his father; Emeka, his middle name. Jenant: Jennifer and Anthony.

The addresses, many of these are registered to Lincoln Avenue in Lisle. It's another way these are associated with the defendant.

The same with the bank accounts. The people who sign and open these bank accounts are all people surrounding the defendant, alias names of him, his son, aliases of Samuel Aniukwu.

You don't have to rely on those summary charts alone to show you that the defendant is connected to these entities because the agents found physical documents for all of these.

Articles of incorporation for Emetech, Esijemine.

These are the entities that were found on his desk.

The same with the bank statements. Emetech Solutions. That one is a Samcord one. Globayo.

And let me just pause. And I should say, too, these -- you'll have these back in the jury room with you. These are the physical exhibits. They're just photos of them.

I want to pause on Government Exhibit 810 because this is a bank statement found in the defendant's desk area that includes on the first page the transaction from Dale Helms.

Let me just emphasize that.

On the defendant's desk was a bank statement that included victim funds paid to his bank account. This is proof of his knowing participation.

Back to the IP addresses. This is the USPS record. Remember they -- Special Agent Mansker testified about how they keep records of who tracks packages. On the left is that tracking number, the unique tracking number connected to the cashier's check.

In Government Exhibit 502, the subscriber records. It's the same 16 digits.

He also tells Jennifer Gosha, "I'm expecting a letter to your home." The next day, the day the package was actually delivered, he says -- she says, "Your package was delivered. It was supposed to be delivered by 10:30. Tell your sender to go back to the post office and get a refund." He says, "Can

you bring it to work tomorrow?"

Remember what the defendant did and said, and these are his own words found in text messages on Jennifer Gosha's phone: "I'm expecting a letter to your home." It's not a letter; it's a cashier's check.

Then you have the funds that are funneled to his personal bank account in Nigeria. Cong Le wires $22,000. The next day, a deposit goes out to Access Bank in Nigeria.

Special Agent Mansker told you when she prepared these charts, these wires out to Access Bank had to include the victim funds based on the preexisting amount of money that was in those accounts. So you know these wires out included victim funds to the defendant's personal bank account.

Several examples of this: A $12,000 wire transfer from Dr. Petroselli goes into a Samcord account. The very next day, the defendant wires money to his personal bank account in his name in Nigeria.

These are all the ways you know that he knowingly participated in the scheme.

And remember that first part of the definition of "knowingly." Somebody who knows what he's doing, doesn't act by mistake or accident. That's what knowingly means.

The defendant didn't trip into a mailbox and send out all of these letters. These documents didn't magically appear on his devices. He put them there because he knowingly

participated in the scheme. Nobody could do all of these things and not know what they were doing or accidentally do all of these things.

So that's element one of the mail and wire fraud counts. He knowingly participated in a scheme to defraud.

He also did so with the intent to defraud. And, again, I'm just going to pull out a few of the jury instructions.

"A person acts with 'intent to defraud' if he or she acts knowingly with the intent to deceive or cheat the victim in order to cause a gain of money or property to the defendant or another or the potential loss of money or property to another."

Here's some ways you know his intent to defraud.

Start out with the original letter. It's full of lies. It's lie after lie. Special Agent Mansker told you Peter Pfizer never worked for Standard Charter Bank. There is -- they have no record of any employee ever working there. He's not a real person.

Every victim who testified told you, "I didn't know George Aguada. I didn't know the relative that was named in this letter."

Every victim who testified told you they never received the inheritance, because it's a lie. This shows you the intent to defraud, the intent to cheat people out of money.

And then you have the manipulation. And this kind of correlates to sort of the middle phase of this scheme. This scheme is intentionally slow. There are intentionally steps that the victims have to go through to get this inheritance, because it makes it seem more legit.

They have to fill out questionnaires. They have to send a copy of the death certificate. The bank makes it seem like they need actual information from them. Because the more steps they have to go through, the more it seems like, well, it must not be a scam; there are protections in place.

Then you have the fact that the defendant tricks the victim into thinking that Peter Pfizer or John Delon is their advocate, is out to help them, to guide them through the process. He tells them in the original letter that "the funds will be shared between the two of us." So this makes the victim think that Peter Pfizer, he has skin in the game, "he is out to help me because he has something to gain."

Remember this? Dale Helms. Peter Pfizer tells Dale Helms, "I'm going to help you with the fees. Don't worry. We're in this together." He sends him this Barclays Bank wire.

On the left is the wire from Dale Helms. On the right is the exact same document found on the defendant's device. It's phony.

And Special Agent Kadonsky told you that the agents checked, this wire never happened.

The defendant goes to extreme lengths to make the victims feel secure and reassured, and this is one example.

Here's another one to Cong Le. John Delon says, "I have reached my limit with this transaction. I decided to pull money from my mortgage. I'm asking my family for money."

Again, he is making the victim think that he's helping them along because he also has something to gain.

He tells Dale Helms, "I am just as scared."

And this, again, is the defendant's intent to defraud. It's lie after lie. He is leading them down this path.

"I know this customer in person while he is alive." It's another lie. It's just lie after lie after lie.

Then you have other examples. The defendant asked the victims to sign a nondisclosure agreement. Why? So they don't tell their friends and family what they're doing. So nobody says, "You might want to think twice about this." So they don't tell the police what's going on.

He uses alias names, friends of his as shields to register the bank accounts and the Secretary of State entities. Why? To hide his own involvement.

And this goes, again, to his intent to defraud, his intent to conceal, to deceive.

He registered to subscriber records using Sam Aniukwu's name, even though Sam Aniukwu didn't live at Oxbow.

He frequently changes Peter Pfizer's e-mail address.

It's AOL, then it's Yahoo!, then it's Gmail. It's all an attempt to conceal his involvement. And that shows you his intent to defraud.

So that's element two of mail and wire fraud.

Element three is the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise.

"A false or fraudulent pretense, representation, promise, omission, or concealment is 'material' if it is capable of influencing the decision of the person to whom it was addressed."

Here are some of the material misrepresentations -- and we've talked about these already -- that an inheritance existed; that Peter Pfizer/John Delon/Chandler Arnaud/Nikka Avis/Wyashika Sellar were real people -- they weren't -- the victim needed to fill out paperwork to obtain the inheritance; the victim needed to hire Pierre Delouis to gain that inheritance; that Pfizer/Delon/Arnaud would pay or had paid some of the fees; that Pierre Delouis required a retainer fee; that Pierre Delouis had done additional legal work and required additional fees.

These are all material misrepresentations. And if you ask yourself: Were these capable of influencing people? Yes, they were because they did. Because you heard from the victims that they believed these lies, and they were influenced.

Dr. Petroselli lost $58,000.

Cong Le over $200,000.

Dale Helms, $27,000.

Mr. Aguada, about $6,000.

You heard each of these people testify that they were influenced by these lies. They sent money to the defendant because of what he said to them.

That's element three.

Element four is using the mails or the wires.

So now we'll talk about each of these counts with a little bit more specificity.

Count I is the March 8th, 2019, wire from Cong Le to the TCF Bank for Jenant.

So you've seen these Fedwire records before. There is the date, the amount. The originator is Mr. Le. The beneficiary is Jenant, Incorporated.

You also have Stipulations 7 and 8. Stipulation 7 tells you that this transfer of funds caused an interstate wire communication. And, again, that's agreed on by the parties.

Basically, element four is met by this stipulation.

So for Count I, you have elements one, two, three, and four. Guilty of Count I.

Count II relates to a March 2019 wire from Mr. Le to the TCF bank account for Setraco. Again, you have the Fedwire: March 14th, 2019, about $22,000, almost $23,000, from Mr. Le to

Setraco Services.

Stipulation No. 7, this wire transfer caused interstate wire communications.

That's element four for Count II.

Count III is the cashier's check, the $80,000 cashier's check that Mr. Le sent to the Lincoln Avenue residence.

There is that cashier's check. It's Government Exhibit 302-B.

The remitter is Mr. Le. It's paid to the order of Setraco, March 25th, 2019, $80,000.

This one is in Stipulation No. 8. Stip 7 is the wire fraud. Stip 8 is the mail fraud counts.

So this says the $80,000 cashier's check caused the use of the United States mails as element four of Count III.

Count IV relates to another cashier's check from Mr. Le to TCF bank account for Jenant. It's from Cong Le. March 26th, 2019, is when he wrote the check. The amount is $97,500. Made out to Jenant, Incorporated.

Stipulation No. 7, this transfer of funds caused an interstate wire communication. That's Count IV.

Count V is a wire transfer from Gary Foster to BMO Harris bank account for Berger Services. You have the date. The amount: $7,680. The name is Total Soil Solutions made out to Berger Services.

You didn't hear Gary Foster testify in this trial, but you heard Special Agent Mansker tell you that Total Soil Solutions is a Foster Family Company, it's related to Gary Foster. And you also heard from Special Agent Kadonsky that Gary Foster's name was on a spreadsheet on the defendant's device listing other victims, along with Dale Helms and Cong Le. So you know that he was a victim in this case.

And you have a stipulation that the transfer of funds on that date caused an interstate wire communication.

So that's Count V.

Count VI relates to the $6,400 wire transfer from Mr. Helms to the Chase bank account for Emetech Solutions. This is the one that was sitting on the defendant's desk. You have the date, the amount. It's paid to Emetech Solutions. And there is a line down here that says Dale Helms to Emetech Solutions.

Stipulation No. 7, this caused an interstate wire communication.

So that's element four for Count VI.

Count VII relates to the delivery of a cashier's check from Mr. Helms to Globayo in Oak Park. It's $20,000, almost 23, made out to Globayo. And Mr. Helms told you that this is a check his friend helped him get because his bank wouldn't issue the check. And he identified this exhibit.

Stipulation No. 8, this caused the use of the

interstate mails -- sorry, the United States mails.

So that's Count VII, element four. Guilty of Count VII.

Count VIII is a little bit different. As I mentioned, it's the cashier's check from the agents. It didn't actually go through the mail, so it's charged as an attempt. So the government has to prove that the defendant knowingly took a substantial step toward committing mail fraud with the intent to commit mail fraud.

So here are some of the steps that he took to get that cashier's check over the finish line.

This is the e-mail where Agent Vela tells Pierre Delouis, "I sent a cashier's check." There is the tracking number that you've seen several times at this point. This e-mail is Wednesday, June 17th at 7:34 a.m. of 2020.

20 minutes later is when the defendant tracks that check from Oxbow. That's the IP address that we already looked at.

Then he texted Jennifer Gosha, "I'm expecting a letter to your home today at 3:00 p.m."

And this is Government Exhibit 603, that video that we all watched. And you see Jennifer Gosha accepting the package. She gives Agent Wang a little bit of grief about how it's late, and she signs it.

She texts the defendant, "Your package was just

delivered." He says, "Can you bring it to work tomorrow?"

And this is that cashier's check, which you saw both during Agent Mansker's testimony and also -- this is the exhibit from the bank records. Eleven hundred thousand dollars -- $1100 for Pierre Delouis' legal fees made out to Globayo LLC.

You have a stipulation that this was an attempted use of the United States mails.

So the substantial steps that he took: procuring the check, telling Agent Vela to send it in the first place, tracking it, telling Jennifer Gosha to expect it and to bring it to work the next day. Several substantial steps toward committing the mail fraud. And you know he had the intent to commit mail fraud because we already talked about that.

I want to pause on the defendant's testimony for a moment.

Even before this morning, you knew that he is a serial professional habitual liar. You heard that he lied to victims in this case. He lied to the banks about his identity. He lied to the Secretary of State about his identity, registering entities in Ebuka Egbunam's name, never telling him. He lied to U.S. Immigration authorities about his birthday. He lied to his own son. He didn't tell his son he was his father. He told him he would pay for college. Didn't. He told him that Emetech Solutions was a legitimate company, and it wasn't.

And then you had his testimony this morning. And I submit to you that the idea that 17 tenants at three different locations were engaging coincidentally in the same fraud that his friend Peter Pfizer in London was participating in makes no sense, and it's ridiculous on its face. And the defendant, the whole time, had no idea what was going on? It doesn't make sense.

I would encourage you not to credit his testimony or his explanation. The idea that documents just appeared on his devices when Special Agent Kadonsky told you there was no indication that anybody else used these devices. They were communal devices? A communal computer passed along between 17 tenants just doesn't make any sense. And you know that he has a history of lying because you saw that even before he testified.

So that's the first eight counts.

Moving on to the money laundering count.

The government has to prove that the defendant engaged or attempted to engage in a monetary transaction; the defendant knew the transaction involved criminally derived property; that property was greater than $10,000; the property was derived from mail fraud as charged in Count III of the indictment; and the transaction occurred in the United States.

So this is the mail fraud. This is Count III. It's the check from Cong Le, the $80,000 check to Setraco. And the

money laundering occurs when the defendant takes $25,000 of that money and wires it to his bank account in Nigeria.

There is the date. The amount is $25,000. The originator is Setraco Services. And it goes to Anthony Ibekie, Access Bank in Nigeria, his personal bank account.

We also saw this in the summary charts that Agent Mansker prepared. The $80,000 check is deposited on March 27th. Two days later, $25,000 is wired out. And, again, it had to include Cong Le's money based on the deposits that were in the account before.

So element one: The defendant engaged in a monetary transaction. He wired $25,000 to his bank account in Nigeria.

He knew the transaction involved criminally derived property. That's everything that we talked about with element one. He knew that this money was derived from mail fraud.

The property was $25,000. That's greater than $10,000.

The property was derived from mail fraud. We've talked about Count III.

And it occurred in the United States. The Setraco bank account was based in Illinois.

Bless you.

THE COURT: Thank you.

MS. DeMARCO: Okay. Getting closer to the end here.

Counts X, XI, XII, XIII, and XIV -- well, Counts X and

XI go together. It's a passport fraud count and opening a bank account with that false passport.

Counts XII and XIII, the same thing.

And then Count XIV is a different false statement to a bank account.

So to prove making a false statement to a bank, the government must prove the defendant made a false statement to a financial institution in writing; at the time he made this statement, he knew it was false; he made the statement with the intent to influence the action of the bank concerning a bank account application; the accounts of the financial institution were insured by the FDIC.

For passport fraud, the government must prove the defendant knowingly used a passport; he acted willfully; he deliberately and voluntarily used a passport; and it was false, forged, or counterfeited.

So Counts X and XI relate to him using the Toni Ibe Emeka passport with the date of birth November 11th, 1975, on a bank account application for Samcord. And this is a TCF bank account application for Samcord.

The next set of counts are also for Samcord, but it's Bank of America.

So this is the account application. It's for Samcord. And here is the part that the defendant filled out. He writes out the name "Toni Ibe Emeka." And the date of birth

"November 11th, 1975." He also types in the name, or someone types in the name, "Emeka Toni Ibe."

Again, the fake birthday.

There is a passport number on this account. And this is how you know he used the fraudulent passport to try to open this account, in addition to the fact that he told you this morning.

This is the fake passport that was found in the defendant's home during the search warrant. The name is Toni Ibe Emeka. The pass- -- the birthday is November 11th. It also includes a signature in the bottom left that looks like it says "Emeka."

This is a false passport.

And, again, this is how you know that he used that false passport to try to open up this bank account. It's the same passport number.

You also have his signature on the account. And you can compare that to Government Exhibit 508. That's the exemplar that Special Agent Mansker took on the day of the search warrant. And they appear to be the exact same signature.

And there's really no disputing, based on this morning's testimony, that this is what occurred.

So how do we know that birthday is false? Well, this morning he told you his birthday is in April. On the passport,

it says November. And then you have the USCIS records. His full name, Anthony Emeka Ibekie, his legal name. August 10th, 1976. August 10th, 1976, a different birthday than was on the passport. His résumé also says August 10th, 1976.

So element one, he made a false statement to a financial institution. He put the wrong name -- a fake name and a fake birthday. He knew that it was false.

He admitted this morning that that's not his legal name. And we all, I'm sure, have nicknames from their families. That doesn't mean you get to put them on a passport and try to open up a bank account.

He made the statement with the intent to influence the action of the financial institution. This was an account to open a bank account. He was trying to influence the bank by letting them open this account in a fake name.

Stipulation No. 9, TCF Bank, the deposits to TCF Bank were insured by the FDIC. So that's element four of Count X.

Count XI, he knowingly used a passport. He deliberately and voluntarily used a passport, and the passport was false, forged, or counterfeited. It had a false name and a false birthday.

Counts XII and XIII used the same passport, but this is on a Bank of America application, also for Samcord.

So this is the application form, Government Exhibit 311-A.

Again, Toni Ibe Emeka, foreign passport with photo, and that same passport number. On the left is the fake passport. On the right is this same bank application with just the passport number blown up. And it's the same.

Again, you can match the signatures from the bank account application and the handwriting exemplar.

Stipulation No. 9 tells you that, just like TCF Bank, the deposits at Bank of America were insured by the FDIC.

So, again, he made a false statement to a financial institution, put a fake name on a bank account application. He knew it was a fake name. Anthony Ibekie is his legal name. He made this statement to influence the bank to get this bank account opened. And by stipulation, you know that the accounts of Bank of America were insured by the FDIC.

Similar to Count XIII, he knowingly used a passport, deliberately and voluntarily used a passport, and the passport was false.

Finally, you have Count XIV. This is another false statement on a bank account. This time he uses Emenike Tonero. He is trying to be added to an account that Jennifer Gosha had already opened. So he uses the name Emenike Tonero. Again, not his legal name. And the signature is clearly his from the handwriting exemplar.

So he makes another false statement to a bank in writing. He knew it was false. He knows that's not his legal

name. He intended to open up -- or to be added to an account, and the account was insured by the FDIC.

I want to end today kind of the same way we started this trial. Our first witness was Dale Helms. And when Ms. Nutini asked him, "How did this impact your life," he said, "It was my life savings" that he gave to this scam.

And when you go back to the jury room and you listen to the evidence and you look at the evidence and you review it, we ask that you find that it was the defendant, Anthony Ibekie, who caused Dale Helms to lose his life savings, and for all of these other people to lose money.

And when you look at all the evidence, we ask you to come back with the only verdict that's consistent with that evidence: Guilty on all counts.

THE COURT: Thank you, Counsel.

Members of the jury, we're going to have a short break. We're going to take five minutes, give or take. That way, you can get a drink, use the restroom.

As soon as you folks are ready, we're going to hear from the other side.

You've heard closing arguments on behalf of one side. You haven't heard both sides yet, right? So you've got to hear from both sides.

Defense counsel is going to get a closing. So we're going to do that after a break. We're going to keep it, I

think, as short as we reasonably can. I do want to give you folks a chance to use the restroom and stretch your legs. So we can't start without you. As soon as you're ready, we'll get rolling.

Okay. Come back in five or ten minutes.

As soon as you're ready, we'll come back.

Keep an open mind.

(Jury out at 4:28 p.m.)

THE COURT: All right. Have a seat, folks.

We're going to keep it short, obviously.

A reminder to the parties: If you -- I know the government had demonstratives. I don't know if the defendant does. It's fine if he does, and it's fine if he doesn't. But please file them on the docket by the end of the day today. I like having a record on the docket of what the jury saw.

So thank you in advance for doing that.

We're going to stick to the plan. We'll have Mr. Carlson do his closing, and then we're going to go right into a short rebuttal.

You know, it's 4:30. I've got a couple of instructions to give them, and then we'll let them start deliberating.

Based on experience, I expect they're probably going to adjourn, frankly, but it's up to them.

All right. So that's the plan. We'll come back in

five minutes, and we'll get going.

Sound good, everybody?

And, Mr. Carlson, you're welcome to wear a lapel mic, if you want. If you don't want to, that's fine. Just be mindful of the microphone.

I could hear you just fine, Ms. DeMarco. So just keep doing -- doing that.

I want to make sure everybody can hear you. Okay?

MR. CARLSON: Fine.

THE COURT: Come back in five minutes.

THE CLERK: All rise.

(Recess at 4:29 p.m., until 4:38 p.m.)

THE COURT: All right, everyone. It looks like everyone is present and accounted for.

Mr. Carlson, are you ready for closing?

MR. CARLSON: Yes, I am.

THE COURT: All right. Very good.

Let's get the jury.

(Jury in at 4:39 p.m.)

THE COURT: All right. Have a seat, everyone.

All right. You've heard the closing argument from one side but not the other side. That's about to change.

Mr. Carlson, I'd invite you to give the closing argument on behalf of the defendant.

CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

MR. CARLSON: Thank you, Judge.

Ladies and gentlemen, on behalf of Anthony Ibekie, I want to sincerely thank you for your time and attention you have given to this case.

We've taken you away from your everyday routines for a brief period of time to fulfill one of the highest duties of American citizenship. Without you, without your performing your faithful duties, this unique system of justice, as Judge Seeger described it earlier, a system available only in the United States, would crumble. So thank you.

I remind you once again that it is the government that must prove Anthony Ibekie's guilt beyond a reasonable doubt. The burden never shifts to Anthony.

He is presumed innocent, even at this stage of the trial. His plea of not guilty stands, and the presumption of innocence remains with him.

I submit to you that I don't believe the evidence in this case has overcome that presumption of innocence.

Anthony Ibekie took that witness stand. And on direct examination and on cross-examination, he tried his best to honestly tell you his story. He told you that he did not knowingly become a member of any scheme to defraud. He told you that he did not intend to defraud anyone.

He told you that he didn't knowingly provide any false information to banks, but, rather, he made a mistake. And more

than that, he told you when he realized the mistake, he tried to rectify it.

He told you he did not knowingly launder any money, but he believed that the funds that came into the bank accounts were legitimate funds.

He told you he did not knowingly use a false passport, but, rather, that the Nigerian passport that he had contained mistakes.

He explained everything he did, why he did it, and he denied the things that he didn't do. He didn't deny everything. He denied only the things that weren't true.

You folks listened to all the evidence, and you heard Judge Seeger give you the jury instructions. And I'm not going to rehash everything that was said during the course of this trial, but there are a few things that deserve repeating and highlighting.

And I, like Ms. DeMarco, am not going to -- I shouldn't say -- I'm going to spend most of my time talking about the mail and wire fraud scheme.

In order to sustain its burden of proof, the government must prove beyond a reasonable doubt that Anthony Ibekie knowingly joined and became a member of the scheme to defraud, and they must prove beyond a reasonable doubt that he acted with the intent to defraud.

And I submit to you that the evidence has failed to

show that he knowingly joined any scheme to defraud and failed to show he acted with the intent to defraud.

In order to prove those things, the government must prove that Anthony Ibekie acted knowingly.

Ms. DeMarco told you that as well in her opening.

The government must prove beyond a reasonable doubt that Anthony Ibekie realized what he was doing and was aware of the nature of his conduct and did not act through ignorance, mistake, or accident.

I submit to you that the evidence that Anthony acted knowingly -- and, again, "knowingly" is important because "knowingly" is an element in each and every one of the counts with which he is charged. So "knowingly" is a very important aspect. But I submit to you that the knowing aspect of this, the knowing aspect of the intent to defraud is woefully inadequate.

Now, neither Dale Helms nor Robert Aguada, Mr. Petroselli, Cong Le -- they told you they never dealt with Anthony Ibekie. They dealt with people who were identified as Peter Pfizer, Pierre Delouis, Chandler Arnaud, John Jean Delon, Nikka Avis, not Anthony Ibekie.

And Anthony told you that he never posed or held himself out to be any of those people in e-mails or letters. Well, what did he tell you? There was one occasion he held himself out as Peter Pfizer because his good friend, whose wife

was in the hospital losing her pregnancy, asked him to do a favor, and he did it.

You didn't hear any other testimony about Anthony Ibekie holding himself out as anyone else. And his son, Ebuka, told you he never knew his father to have done that.

Anthony Ibekie could have come up here and given you all kinds of reasons why Pfizer, Delouis, Arnaud, Delon all appeared on his computer. He didn't do that. He came up here and told you the truth: He didn't know how it got there.

What do we know? We know that Anthony Ibekie had tenants. He named them, told you when they were. And that is part of their tenancies. In order to be -- to be able to compete with hotels, he had to provide services for them, the same services that a hotel would require: Internet access, telephone, and, in his case, also computers. And Anthony told you that he saw the tenants using those computers and cell phones.

And, again, he could have got up there and told you, "Yeah, I saw them on there. I saw these fake letters that they were typing out. I saw the scam letters on there that they were sending to people." He didn't tell you that. He told you the truth. He told you, "I don't know what they were doing on those computers." And I think that's important for you to remember.

Ebuka, I want to just talk to him -- talk to you about

him for a minute. He told you he never wanted to come to the United States. He wanted to go to Canada, but that his father lured him to the United States by promising to pay for his college education. And that was the only reason he came here.

He then tells you that his father reneges on that and refuses to pay for his college anymore. But despite that being the whole reason he was here, he is not upset. He told you he wasn't even disappointed that his father wasn't going to pay for his college.

I submit, ladies and gentlemen, that doesn't make any sense.

It's also contrary to what Anthony told you, and what Anthony told you makes much more sense. Not only was he mad, he was really mad. He was furious because now he couldn't go to college.

What else did he tell you? He told you he would have done anything to keep from getting a felony conviction, would have done anything to avoid going to jail, and he would have done anything to keep from being deported.

And Judge Seeger advised you in his -- in the jury instructions that you must consider his testimony with caution and great care because he had a stake in this. He wanted something. And this table (indicating) could provide it for him.

He told you that he has two interviews with the

agents, and that he never mentions in those interviews anything about his father stuffing envelopes with gloves on.

Two years later, a month or two months ago, for the first time while we're preparing for this trial -- the first time he comes up with this story about stuffing -- his father stuffing envelopes with gloves on.

Why? He wanted to cement his deal. He wanted to cement his freedom, because he knew that the argument could be made in this courtroom that Anthony Ibekie never touched those inheritance scam letters because his fingerprints were never on those scam letters. And the fingerprint expert told you paper is a very good surface to recover fingerprints from. He knew that that was a problem. And he knew that the argument could be made that there was no evidence that Anthony ever touched these unless he could explain away the lack of fingerprints.

At the same time, he tells you, "My dad never had a single tenant, not one." Why did he tell you that? Help cement his freedom, his deal. Because he knew the argument could be made, an argument that Anthony told you about today, there were tenants in those residences, the tenants had access to the computers, and they could be responsible for what was on those computers.

That's what Anthony told you.

He says, no, never a single tenant.

Again, you have to judge his testimony with caution

and great care. And the reason for that is, in exchange for his testimony, he got what he wanted: freedom.

The charges against him were dismissed. No conviction of any kind. No jail time and no deportation. Is that guilt proven beyond a reasonable doubt? I suggest when it's considered alone or in conjunction with other evidence, it's far from it.

Judge Seeger advised you -- or instructed you, I should say, that if Anthony Ibekie performed acts that advanced a crime but had no knowledge that a crime was being committed or was about to be committed, those acts alone are not sufficient to establish guilt.

So the knowledge I talked to you about before is required, but it's not enough. There's got to be more.

Judge Seeger also instructed you that Anthony Ibekie's association with persons involved in a criminal scheme is not sufficient by itself to prove his partition -- participation or membership in a criminal scheme.

I submit to you that the evidence you heard is not the kind of evidence, when considered with the instructions I just mentioned to you that Judge Seeger gave you, to support a -- to support the government's case against Mr. Ibekie beyond a reasonable doubt.

Remember again, he's presumed innocent. He told you on the witness stand that he was innocent. He denied

committing those crimes. More importantly, he denied acting knowingly and with the intent to defraud.

Before winding up, I want to talk to you a little bit about one specific count, and that's Count V. And that's the count that charges Anthony Ibekie with knowingly defrauding Gary Foster.

You didn't see or hear from Gary Foster, unlike Dale Helms, Robert Aguada, David Petroselli, Cong Le. Gary Foster didn't get up on that witness stand and swear to tell the truth.

You didn't hear from him that he was scammed. You didn't hear from him that he was defrauded. You didn't see any letters or e-mails between Gary Foster and anyone. All we know is Gary Foster sent $7,680 to Berger Services. We know nothing more than that.

And I submit to you that the fact that his name appears on a purchased spreadsheet isn't enough to sustain that conviction.

I noticed you listened very, very intently when Ms. DeMarco told you what she thought the evidence in this case has shown. And when I sit down, I'm not going to have a chance to talk to you again. Ms. Nutini is going to have the last unrebutted chance to speak with you on behalf of the government.

And as Judge Seeger has told you, what she says is not

evidence, just as what I say to you is not evidence. When all is said and done, the only thing that matters, the only thing that really counts is what you believe the evidence in this case has shown, you, the jurors.

And I suggest when taken as a whole, the evidence has failed to establish beyond a reasonable doubt that Anthony Ibekie knowingly became a member of the charged scheme to defraud, knowingly laundered money, knowingly made false statements to banks, and knowingly used a false passport.

When you retire to the jury room, ladies and gentlemen, Anthony Ibekie's future is in your hands. You have the last word. If you have any doubts as to whether the government has met its burden of proving Anthony Ibekie's guilt beyond a reasonable doubt, have them now. Because when you return to this courtroom with your verdict, your words will be immortal.

I believe and I'm confident that when you consider and weigh all of the evidence and apply the law as given to you by Judge Seeger -- but most importantly, use your common sense, your everyday experiences in life. And I believe if you do that, you will conclude that the government has failed to overcome the presumption of innocence and failed to prove Anthony's guilt beyond a reasonable doubt. And you will return to this courtroom with a verdict of not guilty.

Thank you very much.

THE COURT: Thank you, Mr. Carlson.

I'll now invite the government to give a rebuttal.

MS. NUTINI: Thank you, Judge.

REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT

MS. NUTINI: What a coincidence. Almost all of the fraudulent entities we've discussed during this trial were registered to an address where the defendant lived. These fraudulent entities in these bank accounts were all connected to the defendant, his son, his ex-wife, his associates, his alias names, that he admitted to using today.

Evidence of every single alias identity was found on the defendant's devices: Peter Pfizer, John Delon, Chandler Arnaud, Wyashika Sellar, Nikka Avis, Pierre Delouis.

Evidence of the victims you heard testify during this trial were also found on the defendant's devices. The trash pull at the defendant's residence. At the Lincoln Avenue residence, you saw that there were those numerous ripped-up letters from these alias names addressed to potential victims.

The fingerprint on the envelope of the letter that law enforcement intercepted before it made its way to a potential victim.

The home office at the Oswego premises with those two huge printers and the envelope. The defendant's home address which had an answer key with all the passwords, typed up phone numbers, also found on the defendant's device.

And that passport in the fake name of Toni Ibe Emeka, again, found at the defendant's residence.

What a coincidence. The defendant would have you believe he must be the most unlucky person in the world. He had 17 roommates, he said, I think, that lived at each of these houses, and apparently, these 17 roommates were all engaged in the same fraudulent scheme.

Members of the jury, the defendant is not an unlucky person. This is not a coincidence. The defendant is a guilty man.

The common denominator in all of this, all of the evidence that you've heard over the past several days, is the defendant. The bank accounts, the fraudulent entities, the trash pull evidence, the fingerprint, the physical documents from the search warrant, the digital documents from the devices, all of this points to the defendant.

The defendant knowingly committed these crimes.

The defendant has no burden, as you've been instructed throughout this case, to present any evidence. The burden rests solely on the government. But the defendant chose to take the witness stand. He was sworn under oath to tell members -- you, members of the jury, the truth. And so, like any other witness, you can assess what he said on that witness stand.

Ask yourself, did what he say make sense? Why did he

struggle to give straight answers? Why was he rambling so much?

For example, what was the defendant's explanation for Peter Pfizer? First, he said he was a friend. He said he was doing him a one-time favor because his wife was in the hospital.

That doesn't make sense, first of all. He wasn't doing him a one-time favor. You saw at least two undercover recordings. You saw numerous communications between Peter Pfizer and victims. This wasn't a one-time occurrence.

At the same time, the defendant also wanted you to believe that he was manipulated by Pfizer, he was duped by Pfizer. Which one is it? Is he a friend or is he manipulating the defendant? It's neither of those.

The defendant is Peter Pfizer. It's neither of those because he is the man who is operating as Peter Pfizer always. When he is talking to the undercover, when he is talking to the victims who testified during this trial, when he is e-mailing those victims, it is the defendant.

What about the physical evidence recovered at the defendant's house in his home office? Did this physical evidence just walk itself onto his desk and magically appear? No, it didn't. And the defendant didn't have an explanation for why those materials were found in his office.

The same with the digital evidence.

You heard from Special Agent Kadonsky that these devices, these six devices, were attributed to the defendant, things like selfies and text message communications, *et cetera*. They weren't attributed to another person. But did the defendant have an explanation for why there was so many communications with victims? There were driver's licenses, *et cetera*. No, he said, "I don't know how they got there."

Does that make sense?

When asked a question on cross-examination that the defendant was not prepared for about a document, he hesitated. He asked to see the document, which, of course, he has a right to see a document. But then he stumbled. He tried to come up with an answer. He looked through the document. He was hesitating.

These are all things that you can consider when you are assessing the credibility of the defendant, just like any other witness.

Ask yourself why the defendant struggled to answer basic questions. Ask yourself why he tried to distract you.

The answer is simple, members of the jury. The defendant was trying to make this case about something that it's not because the evidence overwhelming points to the defendant as a guilty man.

And your job, members of the jury, is to consider all of that evidence. Your job is to listen to the judge's

instructions and ignore those distractions.

As Mr. Carlson said, you have common sense, and your job is to use that common sense. You arrived at your -- at this trial with it, and you're going to go back into the jury room and deliberate, and you're going to still have that common sense.

Compare what the defendant told you with the other witness testimony and evidence that you have seen and heard during this trial.

Again, the trash pull, the recorded conversations, the victim testimony and communications.

And let me pause there and, when we're talking about victims, touch on Gary Foster.

You heard testimony from Agent Mansker that Gary Foster wired those funds to the Berger Services account. This is an account that was registered in the defendant's ex-wife's name. He sent those funds to that account.

You also heard testimony that Gary Foster's name showed up on not just one but several of those potential victim spreadsheets that we talked about during trial that Special Agent Kadonsky recovered.

So I would submit to you Gary Foster is a victim in this case, and Gary Foster was duped just like Dale Helms, just like Cong Le, just like the other victims that you heard testify during this trial.

Again, compare the defendant's testimony to all of the evidence that you have heard during this trial.

The defendant's explanation for things don't make sense. And let me just give you a few examples.

The idea that the defendant had 17 roommates over the course of three different residences in just a few years doesn't make sense.

You heard Ebuka Egbunam testify, and he told you that there weren't any roommates at the Lincoln premises.

Again, compare what the defendant is telling you with the things you've heard during this trial and with your own common sense.

The idea that these alleged roommates had access to phones and computers is ridiculous.

Mr. Carlson made a comparison to a hotel and how a hotel provides amenities. A hotel doesn't provide you with a cell phone to text people and to send incriminating materials. A hotel doesn't provide you with a computer to log on and do things.

Use your common sense.

The idea that the money going into these bank accounts was legitimate for some sort of business purpose is ridiculous. These funds didn't just magically appear in these bank accounts belonging to the defendant. He didn't see these huge wire transfers from victims and think, "Oh, this is somebody from a

business interaction I did for my company." No, these were victims that he knew were sending money based on the inheritance fraud.

The idea that the defendant accidentally got two passports with his photo but that they had the wrong names and dates of birth and this was some sort of accident he tried to rectify makes no sense.

You saw the bank records that were obtained over a series of time. If it was a mistake the defendant rectified immediately, why do the bank records still show those false names? Because the defendant didn't rectify that. He meant to use these false names, and he meant to use these false dates of birth because he wanted to distance himself from the crimes he was committing.

The idea that Ebuka Egbunam, the defendant's son, had some sort of vendetta against him because his dad wouldn't pay for his college doesn't make sense.

Assess Mr. Egbunam's credibility by corroborating what he told you with the other evidence you've heard during this trial.

As my colleague told you, the letters Mr. Egbunam testified about, these weren't made-up letters. These were letters that you saw, ripped-up letters found in the trash at the Lincoln premises. You've seen so many of these letters in various forms, whether it be on e-mails, in physical copy, on

the digital devices. These were the letters he was talking about.

The Emetech Solutions company he talked about, you saw documents for Emetech Solutions, including documents at the defendant's residence, on his desk. This was a company that the defendant registered to accept fraudulent funds.

"There's something happening here, but what it is ain't exactly clear." If you remember, those were the words defense counsel started this trial with. Those are powerful, beautiful lyrics, but they don't apply to this case. Not even a little bit.

It's crystal clear what is happening here. The defendant is a fraudster. He is a con artist who duped innocent people into giving him hundreds of thousands of dollars.

The government asks you to hold the defendant accountable for what he did. Find the defendant guilty on all counts for the simplest and most commonsense reason of all: because he did it.

Find the defendant guilty because he is guilty.

Thank you.

THE COURT: Thank you, Counsel.

Members of the jury, we have now completed the closing arguments. We're now going to complete the jury instructions. We've got most of the way there. We've got a couple left, so

we're going to go ahead and do that.

Remember, everybody, we ended at page 38. Let's go to page 39. There is just three pages left, I think.

It's the page that begins "Once you're all in the jury room." Everybody there?

You're welcome to follow along, if you want, folks. It's on the screen as it was before. If you want to just listen, that's fine, too.

All right. Everybody ready?

All right. Here it goes.

Once you're all in the jury room, the first thing you should do is choose a foreperson. The foreperson should see to it that your discussions are carried out in an organized way, and then everyone has a fair chance to be heard.

You may discuss the case only when all jurors are present.

Once you start deliberating, do not communicate about the case or your deliberations with anyone except other members of your jury. You may not communicate with others about the case or your deliberations by any means. This includes oral or written communication, as well as any electronic method of communication, such as telephone, cell phone, smartphone, iPhone, computer, text messaging, instant messaging, the Internet, chat rooms, blogs, websites or services like Facebook, LinkedIn, YouTube, Instagram, Snapchat, Twitter,

TikTok, or any other method of communication.

It's another way of saying, folks, you may not communicate with anyone, you may not use your phones, period, for anything, period. Anything.

If you need to communicate with me while you're deliberating, send a note through the court security officer. The note should be signed by the foreperson or by one or more members of the jury. To have a complete record of this trial, it's important that you do not communicate with me except by a written note.

I may have to talk to the lawyers about your message, so it may take me some time to get back to you. You may continue your deliberations while you wait for my answer.

Please be advised that transcripts of trial testimony are not available to you. You must rely on your collective memory of the testimony.

If you send me a message, do not include the breakdown of any votes you may have conducted. In other words, don't tell me that you're split 6-6 or 8-4, or whatever your vote may happen to be.

A verdict form has been prepared for you. You will take this form with you to the jury room.

I have the jury verdict form in my hands, folks. It's right here. It's just three pages long.

Let me just give you the highlights.

The top has the caption. It says, "Verdict Form."

It says, "We, the jury, as to the following charges in the indictment, find as follows regarding Defendant Anthony Emeka Ibekie."

That's page 1.

Page 2 has basically three columns. The left side has all the counts, Counts I through XIV. And then it says what the count is.

So, for example, it says, Count I, wire fraud; Count II, wire fraud; Count III, mail fraud, *et cetera*.

I know it's hard to see. I'm holding it up. You'll see it soon enough. But that's the concept. It just lists all 14 counts right here on the left.

And then there is just a choice. The first option is "Not Guilty." The next option is "Guilty."

For each count, you have to answer -- you have to give your answer. You have to mark one or the other. Not both. You have to mark one or the other. And you have to make sure you give an answer to each and every one of the 14 counts.

So please make sure that for every count, you either mark "Not Guilty" or "Guilty." It can't be both. It has to be one or the other for all 14 counts. Okay? So simple enough. Basically, 14 questions. 14 counts, 14 questions -- 14 answers.

The last page is simple. It says, "So say we all."

And it says "Foreperson." And there are 12 lines for 12 jurors. Everyone has got to sign it. Every member of the jury has got to sign it, and it's got to be dated. Everybody has got to sign it because every jury verdict has to be unanimous.

All right. So that's it. So it's basically a cover page, a list of 14 questions, and then a signature page with a date.

So I've got the original jury verdict form. I'm going to hand it to my courtroom deputy.

In a moment, she'll give it to the court security officer.

Let me go back to the jury instructions.

Go back to page 40.

When you have reached unanimous agreement, your foreperson will fill in, date, and sign the verdict form. Each of you will sign it as well.

Advise the court security officer once you have reached a verdict.

When you come back the courtroom, the clerk will read the verdict aloud.

Notice where it says, "Advise the court security officer." You have to do that by writing a note. You write a note to the court security officer.

The last page, folks, page 41.

The verdict must be the considered judgment of each

juror. Your verdict, whether it is guilty or not guilty, must be unanimous.

You should make every reasonable effort to reach a verdict. In doing so, you should consult with each other, express your own views, and listen to your fellow jurors' opinions. Discuss your differences with an open mind. Do not hesitate to reexamine your view and change your opinion if you come to believe it is wrong. But you should not surrender your honest beliefs about the weight or the effect of the evidence just because -- I'm sorry. Let me say that again.

But you should not surrender your honest beliefs about the weight or effect of evidence just because of the opinions of your fellow jurors or just so there can be a unanimous verdict.

The 12 of you should give fair and equal consideration to all of the evidence. You should deliberate with the goal of reaching an agreement that is consistent with the individual judgment of each juror.

You are the impartial judges of the facts. Your sole interest is to determine whether the government has proved its case beyond a reasonable doubt.

Did I read that accurately, everybody?"

MS. NUTINI: Yes, Judge.

MR. CARLSON: Yes, Judge.

THE COURT: All right. So the last thing I would say,

folks, is, when you are in the jury room, you will have access to all of the exhibits.

So remember, during the trial, there were all sorts of exhibits that were presented? Some of them were presented electronically. Some of them were played to you, the audio clips. You saw some video. You also got some physical exhibits shown to you. You're going to have access to all of that in the jury room. That Jumbotron back there will allow you to present it.

If you have any trouble with any of the IT, I want you to let the court security officer know, and we'll make sure that you have ready access to everything. Okay? It should work smoothly, but if you have any trouble, please let us know, and we'll make sure you have access to everything.

The next thing we need to do, the final thing, is to dismiss the three alternates.

We have 15 of you here. Under the Constitution, a jury in a criminal case consists of 12 people. So three of you are not going to be participating in the jury deliberations.

Let me say this to you before I say who it is: We very much appreciate your jury service. We really do. And that includes the three alternates.

We have alternates in every criminal jury trial, and we need it for good reason. Imagine if we got to the last day of trial and all of a sudden somebody got COVID or they had a

funeral or some other reason, we'd have to start over. If we didn't have alternates, we would have to start over. So that's why in every single case you have extra people here.

In a moment, I'm going to dismiss three of you. Three people who have been sitting through this trial for a week and a half are not going to be deliberating, but that doesn't mean you were wasted. You are not wasted at all. Your time was absolutely essential. We could not have done this trial without the alternates.

So let me say thank you to the three alternates before you know who it is.

Thank you, folks. We couldn't have done it without you, and I hope you appreciate -- feel appreciated for your jury service.

In a moment, the courtroom deputy is going to announce who they are.

Let me say this: The three alternates are going to be excused, but there's some chance in any jury trial that they could be recalled. For example, if somebody got COVID tomorrow, we might need one of the alternates to come back. Okay?

So for the three of you who are alternates, you are not yet technically excused from jury duty. The same rules are going to apply. You will be excused from jury duty only when the jury renders a verdict. And Ms. Ramos will call the three

alternates and say, "The jury trial is over. You're excused from jury service." Okay?

So you'll get a phone call, the three alternates.

But until then, normal rules apply for the three alternates. You can't talk to anyone about the case. You can't look up anything about the case. You can't look at the phone about the case. You can't talk to anyone about it at all for anything. Okay?

So without further ado, Ms. Ramos is now going to announce the names of the three alternates.

THE CLERK: The first alternate is Harris Livingston.

The second alternate is Helena Mackoff.

The third alternate is Ervina Ajkic.

THE COURT: So the three of you are the three alternates.

Thank you to the three of you who have been here during the trial. We very much appreciate you.

The next step in the procedure is the court security officer needs to take the three of you into the jury room.

Please give your jury notebooks to the court security officer and the jury instructions to the court security officer.

Please go back to the jury room, get your belongings. He'll show you the door.

The rest of you need to stay put. Okay?

So thank you again, folks, for your service to your country.

You can go ahead with the court security officer.

(Juror Livingston, Juror Mackoff, and Juror Ajkic exit the courtroom.)

THE COURT: Members of the jury, when the court security officer comes back, I will swear him in, and I will allow you to go back into the jury room.

Let me talk to you about the plan, the overall plan.

You can deliberate for as long as you like. I say this to every jury in every case. You can deliberate as long as you like. Don't feel rushed to deliberate for any reason.

People are always curious to know what the hours are. A jury has to keep normal hours. And by that, I mean they have to be here at least until 4:45 every day. So it will be not a revelation to you to see that it's 5:20 in the afternoon. That's after 4:45. That means, when you go back to the jury room in a moment, if you would like to begin deliberating, you absolutely can. If you, as a group, decide you want to adjourn for the day and begin deliberations tomorrow, that is fine, too. That is up to you.

So you can start deliberating today, if you would like. If you decide as a group that you're going to deliberate tomorrow, that's fine, too. Okay?

I always tell the jury normal hours apply. We've been

starting at 9:00 o'clock. I'm going to let you folks start at 9:30 tomorrow, if you'd like. You cannot start later than 9:30. Okay? So I always tell juries you can't decide to be here from 11:00 to 1:00 every day. All right? That doesn't work. You've got to be here at the latest by 9:30. And you have to stay at least until 4:45 every day.

All right. So that's the plan.

Everybody understand the hours?

So in a moment, I'll invite you to go back to the jury room. It will be up to you how long you want to stay today.

Without further ado, I'm going to ask the courtroom deputy to swear in the court security officer.

(Court security officer sworn.)

THE COURT: All right. Very good.

The court security officer has been sworn in.

I've given the original jury verdict form to Ms. Ramos to give to the court security officer. I'm also going to give Ms. Ramos a copy of the indictment.

So, folks, we went through the jury instructions. They refer to the counts. We went through the jury verdict form. That refers to the counts. The indictment has the counts in there as well, so you can see exactly what the charges are.

So I'm handing the courtroom deputy the indictment as well as the jury verdict form.

Members of the jury, it is now time for you to deliberate. You can deliberate for as long as you want. Do not feel rushed for any reason.

We will see you when we see you.

Thank you, folks, for your public service. Thank you for your service to your country.

You may begin your deliberations and go to the jury room.

Thank you, folks.

THE COURT SECURITY OFFICER: All rise.

(Jury out at 5:25 p.m.)

THE COURT: All right. Have a seat, everyone.

All right. Well, the jury has the case. It is now 5:25.

In my experience, I'd be very surprised if they don't call it a day, but we'll see. It's up to them.

And when they do adjourn, whenever it is -- whether it's now or at 6:00 o'clock, we'll put something on the docket and let you know. All right?

I will keep you posted if I get a note, as sometimes I do. I'll let you know. And I will call you in and bring you right over.

I do not require the lawyers to stay in the building.

I;know, Mr. Carlson, you're -- are you in the Monadnock Building?

MR. CARLSON: Yes, Judge.

THE COURT: All right. So that's perfectly fine. You can go back to your office.

My best guess is the jury is going to adjourn for the day and come back tomorrow.

If we get a note, we'll e-mail you and/or call you, and we'll put something on the docket as well.

Does Ms. Ramos have your cell phone numbers if need be? Your personal cell phone numbers?

MS. NUTINI: Your Honor, we will make sure those are written down and provided before we leave court.

THE COURT: That's perfect. Just in case. I assume e-mail is going to suffice, but just in case I think we ought to have those. So thank you in advance for doing that.

Thank you in advance for filing the demonstratives. I will -- I will say this as well: I just wanted to compliment the lawyers on both sides for everything they did during the trial. You were smooth. You were well prepared. You were courteous. You were cooperative. You were respectful both to the Court and to each other. And I'm referring to all of the lawyers on both sides. Your exams were tight and focused and polished and pointed. You made your points effectively.

You know, I was thinking to myself up here I don't know that I saw even a dropped paper clip from you all during the trial. There were not any dropped balls or "oops" moments.

The jury was treated to Major League Baseball-level advocacy.

So I wanted to compliment all three of you on your high-level advocacy. That's the kind of advocacy I want to see.

You know, here in the Dirksen Federal Building, especially on the 23rd floor, which is the best floor to be on, I think, I appreciate everything that you folks did to bring that level of excellence to my courtroom. I was impressed with you all.

I thought at one point during the trial I'm going to order each and every one of you to try a case in front of me at least once a year because it's such a pleasure having all three of you in my courtroom.

So well done to you, Ms. Nutini.

Well done, Ms. DeMarco.

Well done, Mr. Carlson.

All three of you were terrific to have in my courtroom. So thank you for your high-level advocacy. I appreciate that.

MS. NUTINI: Thank you, Judge.

THE COURT: I will let you know when I hear something.

I'll say this to you all: You never know what a jury will do. You know, this is our, you know, system of justice. You all hit the ball as hard as you could, and that's all you can do as lawyers.

I always tell lawyers in every case after every trial don't personalize the win too much, don't personalize the loss too much, whatever it is. You know, sometimes the best advocacy results in a losing hand and *vice versa*. You know, so don't take it to heart either way too much. You know, be gracious in victory and gracious in defeat, as I know you will be.

You know, I'll say this to you, Mr. Ibekie: You know, we did the best we could to give you a fair trial here. You know, it's out of our hands. It's up to the jury.

Ms. Ramos has said that the jury wants to come back tomorrow at 9:00, and that's fine by me.

You can tell the court security officer that they can come back at 9:00.

That shows they were listening. They asked a clarifying question about how early they could start. I told them how late they -- the latest point they could start, but they want to keep to the normal schedule of 9:00 a.m., so they'll be starting at 9:00 and leaving for the day.

I was saying, Mr. Ibekie, you know, this is our system -- okay. I've got handed a note here. Here is a note.

The note says, "We have selected a foreperson. We will start deliberations tomorrow at 9:15 a.m."

I'm struggling with the name. It looks like Matt L. something. Maybe Ms. Ramos could use the index there and

construe the name.

THE CLERK: I'm not sure.

THE COURT: I think it's written in some sort of cuneiform, ancient Cyrillic typography there.

Well, we'll try to decipher the signature there.

But does anybody want to see the note?

You're welcome to see it.

It looks like the first name starts with "M." She'll double-check and see who the signature is, if it matters to you who the foreperson is.

But they're coming back at 9:15 today [*sic*].

So, I was saying, Mr. Ibekie, you know, it's up to the jury now. It's up to we, the people, to decide what to do.

We will keep you posted. As soon as I hear something, we'll let you folks now.

Thank you to the deputies, too. I know we're a little bit later in the day. I know that puts you folks out. I think it was unavoidable this day. Thank you for bearing with us. You know, we had to wrap up the jury trial, and we ended when we ended. So thank you for bearing with us. Because I know that there are sensitivities in the marshals service.

You folks have been great to deal with. I always love having you folks in my courtroom, honestly. So I appreciate you folks. Thank you for bearing with us, and please thank any supervisors who may be noticing the fact that we've got a

criminal defendant in an ongoing trial. Just give them my thanks, if you would. Okay?

Anything else anybody wants to cover?

MS. NUTINI: Your Honor, the physical exhibits, may we tender those to Ms. Ramos to provide to the jurors?

THE COURT: Yes. So -- thank you for doing that.

So you should give them to Ms. Ramos. Ms. Ramos will give them to the court security officer. And the court security officer will put them in the courtroom. All right?

So you've got them there. Thank you in advance for handing them to Ms. Ramos. I appreciate that.

Anything else from the government?

MS. NUTINI: No, Judge.

THE COURT: Okay. Anything else from the defense?

MR. CARLSON: Judge, the only thing I have is I wanted to maybe -- maybe I should just talk to Ms. Ramos, but I will be in front of Judge Kennelly at 9:30 tomorrow. So if --

THE COURT: I never get crossways with Judge Kennelly.

MR. CARLSON: I just wanted to let the Court know --

THE COURT: Yeah.

MR. CARLSON: -- if I --

THE COURT: Totally fine.

MR. CARLSON: -- if a message comes out or a call, I won't be able to --

THE COURT: Totally fine. I --

MR. CARLSON: -- call until I'm done.

THE COURT: I will always defer to Judge Kennelly.

But if you've got -- and the same with the government. If you've got a conflict, you know, I'm easy to deal with. You know, we'll figure it out. Okay?

It was a pleasure having you folks in the courtroom. I'll let you know. You know, if I hear anything tomorrow morning, I'll let you know.

We'll see you when we see you. Okay?

Thank you, folks. Take care. Have a good night.

MS. DeMARCO: Thank you, Judge.

MR. CARLSON: Thank you.

THE CLERK: All rise.

(Adjourned at 5:33 p.m.)

* * * * *

We certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Amy M. Kleynhans* — *5/27/2025*
Amy M. Kleynhans — Date
Official Court Reporter

*/s/ Sandra M. Tennis* — *5/27/2025*
Sandra M. Tennis — Date
Official Court Reporter

# I N D E X


| WITNESSES | PAGE |
|---|---|
| ANTHONY E. IBEKIE | |
| Direct Examination By Mr. Carlson | 1169 |
| Cross-Examination By Ms. Nutini | 1195 |
| Redirect Examination By Mr. Carlson | 1287 |

| CLOSING ARGUMENTS | PAGE |
|---|---|
| By Ms. DeMarco | 1359 |
| By Mr. Carlson | 1396 |
| By Ms. Nutini | 1406 |