IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No. 20 CR 352 |
| | ) | |
| v. | ) | |
| | ) | |
| ANTHONY EMEKA IBEKIE, | ) | Chicago, Illinois |
| | ) | June 27, 2024 |
| Defendant. | ) | 1:18 p.m. |

VOLUME 6
TRANSCRIPT OF PROCEEDINGS - JURY TRIAL
BEFORE THE HONORABLE STEVEN C. SEEGER

APPEARANCES:

For the Government: MR. MORRIS O. PASQUAL
ACTING UNITED STATES ATTORNEY
BY: MS. PAIGE NUTINI
MS. MEGAN DeMARCO
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604

For the Defendant: KENT R. CARLSON & ASSOCIATES, P.C.
BY: MR. KENT R. CARLSON
53 W. Jackson Boulevard, Suite 1523
Chicago, Illinois 60604

Also Present: MS. AMY MANSKER, Special Agent IRS Criminal Investigations

MR. CHRISTOPHER KADONSKY, Special Agent IRS Criminal Investigations

Court Reporter: AMY M. KLEYNHANS, CSR, RPR, CRR
Official Court Reporter
219 S. Dearborn Street, Room 2318A
Chicago, Illinois 60604
Telephone: (312) 818-6531
amy_kleynhans@ilnd.uscourts.gov

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court; jury out:)

THE CLERK: 20 CR 352, USA versus Defendant No. 2, Anthony Ibekie.

THE COURT: All right. Good afternoon, everyone.

Let's get everyone's appearances on the record, if you would, please.

Start with counsel for the government.

MS. NUTINI: Good afternoon, Your Honor.

Paige Nutini and Megan DeMarco on behalf of the United States.

Also at counsel table is Amy Mansker and Christopher Kadonsky, both special agents with IRS Criminal Investigations.

THE COURT: All right. Good afternoon, Ms. Nutini.

Good afternoon, Ms. DeMarco.

MS. DeMARCO: Good afternoon, Judge.

THE COURT: Good afternoon, Ms. Mansker and Mr. Kadonsky. Good afternoon to you.

Defense team, go ahead, Counsel.

MR. CARLSON: Good afternoon, Your Honor.

Kent Carlson on behalf of Mr. Ibekie, who is also present.

THE COURT: All right. Very good.

Good afternoon, Mr. Carlson.

And, Mr. Ibekie, good morning -- I beg your pardon. Good afternoon, sir.

THE DEFENDANT: Good afternoon, Your Honor. Thank you for having me.

THE COURT: Well, thank you for coming.

A special thank-you to the deputies for being here. You folks are the best in the business. As I always say, I appreciate you folks. I appreciate all of your support. I hope you feel that in my courtroom every time you walk in. So I appreciate you folks.

Speaking of which, I need to talk about the events of the day before we get to the fact that we've got a jury verdict.

We have a jury verdict, and I'll get to that in a second.

I want to talk about the events from earlier in the day before we do anything else.

Mr. Ibekie was supposed to be transported over this morning for court. My courtroom deputy got a call from the marshals saying Mr. Ibekie was refusing transport, and the marshals service requested an order from me authorizing the use of force to bring him over here. It's called a drag order. So I issued that order. It's on the docket.

Has everybody seen that?

MR. CARLSON: Yes, Your Honor.

MS. NUTINI: Yes, Judge.

THE COURT: I don't know the full backstory. I have

not heard from counsel for the defendant yet.

I do know I don't like it when people are not here. I don't like it when there's an issue with people getting over here safely and cooperatively. I don't know what happened. I don't know what the backstory was.

I do want to hear from you, Mr. Carlson, about what your understanding of the story was.

But I'll just tell you this: From what I was hearing, the marshals service says he was refusing to come over today, and that's why they needed an order from me authorizing the use of force, which I do. I never enjoy doing it. I'll do it if I have to do it.

But what is your perspective, Mr. Carlson, on how this went so completely sideways this morning? How could there have been that level of misunderstanding about where he was supposed to go?

MR. CARLSON: Judge, I do believe it was a tremendous misunderstanding. Yesterday -- and this is what Mr. Ibekie related to me, and I have no reason to not believe that.

But yesterday you had indicated that there was no need for me to remain in the building, that I was free to go to my office. Mr. Ibekie took that as meaning he didn't need to come over here until he knew there was a jury verdict, and at that point, he would be brought over.

Mr. Ibekie this morning called me and said, "They

didn't bring me over. Were they supposed to?" And I said, "They should be bringing you over shortly."

So he was not -- was not voluntarily saying, "I refuse to come over." He was confused.

The minute I heard from Mr. Ibekie this morning, I contacted Ms. Ramos to advise her what I had learned.

I do not believe Mr. Ibekie was trying to deliberately avoid coming to court. I believe it was a true misunderstanding.

THE COURT: Okay. Well, thank you for that explanation. I don't want to spend too much time on that. I'll just simply say I like things going smoothly. I like everybody participating in the process cooperatively. And I'm confident that I'm not going to have any more issues.

You never know what the jury is going to do. Maybe he'll be acquitted. Maybe he won't. We'll know momentarily.

But I did want to just raise it because it's an unusual thing for me to have to issue an order like that. So I just wanted to acknowledge it.

Anything else that anyone wants to say on this topic before we move to the events of the day?

MS. NUTINI: Not from the government.

THE COURT: Okay.

All right. So we're done with that topic.

Let's talk about the note I got. I actually got two

notes, both of which were handed to me shortly ago. I got a note at 10 -- that has today's date with a 10:08 time on it. It says, "We're having issues with Adobe. Can you help?"

And this was signed by the same foreperson. I'm struggling a little to read the name. I don't know if it's Matt.

You folks are welcome to see it.

But my courtroom deputy did say someone from IT went in and made sure the system was going, you know. And so I just got handed the note.

Would anyone like to see this note?

You're welcome to see it.

We'll post it on the docket, if you'd like to see it.

The other and, I think, more important note is dated today at 12:36 p.m. It says, "The jury has come to a unanimous decision on the charges."

Again, the same signature is there. It's got the court security officer's signature on it with the date and time as well.

Does anyone want to see the note?

MS. NUTINI: Your Honor, we would like to see the note --

THE COURT: Okay.

MS. NUTINI: -- if that's okay.

THE COURT: Sure. Go ahead.

So I'll hand both notes to my courtroom deputy. You can take a look at the notes and hand them back when you're done.

Let's make sure both sides see it.

They'll be filing it on the -- we'll be filing it on the docket, so you'll have a record of it.

All right. Everybody has had a chance to look at it?

MR. CARLSON: Yes, Judge.

MS. NUTINI: Yes, Judge.

THE COURT: All right. Very good.

So I don't know whose signature this is. It starts with an "M." We have a Matthew Berkowicz. I mean, it's neither here nor there. We'll find out early -- we'll find out soon enough.

I'm, candidly, a bit stumped as to whose signature this is. Maybe you folks know. But we'll know in a minute.

All right. So let me go over the procedure with you folks.

In a moment, we'll have the jury come in. I'm going to ask them who the foreperson is. That person will stand up. I'm just going to ask a couple yes/no questions: Did you get a verdict? Is it unanimous? Is the form signed and dated by everybody?

They're going to hand it up to me. I'm going to read it. I'm going to make sure it's complete. I will then read it

to you folks. I'll publish it to you folks. I'll poll the jury. We'll see what they do. If everybody says "yes," I'll note that there's a unanimous verdict. And if they don't, I'll let you know.

You know, it's a pretty simple jury verdict form. I've had a lot of complex forms in this courtroom, but this is a relatively straightforward one.

They've got 14 answers -- excuse me. They've got 14 answers to give, right? So hopefully, it will be straightforward, knock on wood.

Anything else anybody wants to say? Any questions?

MR. CARLSON: No, Your Honor.

THE COURT: Mr. Ibekie, does that make sense, sir? You understand the procedure?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. So basically, we're going to bring them in and make sure it's unanimous, and I'll publish to you folks.

Everybody ready to get the jury?

MR. CARLSON: Yes, Judge.

MS. NUTINI: Yes, Judge.

THE COURT: All right. Let's go ahead and get the jury.

(Jury in at 1:30 p.m.)

THE COURT: Have a seat, everyone.

Good afternoon, everyone.

THE JURY: Good afternoon.

THE COURT: Welcome back. Nice to see each and every one of you.

I received a note a short while ago from the court security officer. It's dated June 27th, which is today's date. It's got a time of 12:36 p.m. It says, "The jury has come to a unanimous decision on the charges." There is a signature. It's signed by the court security officer with a time of 12:33 p.m. from today's date.

Who is the foreperson?

Would you please stand up and give me your name.

FOREPERSON LEHET: Michael Lehet Jones.

THE COURT: Is that your signature?

FOREPERSON LEHET: Yes, sir.

THE COURT: All right. I'm going to ask you a couple questions. I just need you to answer "yes" or "no" to my questions, please, sir.

Has the jury reached a unanimous verdict on all of the charges?

FOREPERSON LEHET: Yes.

THE COURT: Is the verdict form signed by each and every one of the jurors?

FOREPERSON LEHET: Yes.

THE COURT: Is the verdict form dated? In other

words, does it have today's date on it?

FOREPERSON LEHET: Yes.

THE COURT: While you're double-checking, do you want to double-check and make sure it's signed by all 12 jurors?

FOREPERSON LEHET: Yes.

THE COURT: It is? Okay. Very good.

Here's what I'd like you to do: I'd like you to hand the original jury verdict form to the court security officer. The court security officer will hand it to me.

(Tendered.)

THE COURT: All right, sir. You may sit.

Thank you.

All right. I have the original jury verdict form in my hands. I'm going to look over the jury verdict form and make sure it's complete. I will read it to myself first, in other words.

When I am done with that, I'm going to read it out loud. I'm going to read it to the entire gallery and to the parties.

When I read the jury verdict form, it's very important for each and every one of the jurors to listen carefully to what I'm saying. Please listen carefully as I announce it.

When I'm done, I'm going to go one by one and I'm going to ask each and every one of you: "Was this and is this your verdict?"

In other words, it's called polling the jury. It's making sure that it's accurate.

Okay? Everybody got it?

So I'm going to read it to myself. I will then read it out loud. I'll then poll each and every one of you to see if it's right. Okay?

I'll now read the verdict form to myself.

(Pause.)

THE COURT: I have now read the verdict. I'll now announce the verdict to the public.

"We, the jury, as to the following charges of the indictment, find as follows regarding Defendant Anthony Emeka Ibekie:

"Count I, wire fraud: Guilty.

"Count II, wire fraud: Guilty.

"Count III, mail fraud: Guilty.

"Count IV, wire fraud: Guilty.

"Count V, wire fraud: Guilty.

"Count VI, wire fraud: Guilty.

"Count VII, mail fraud: Guilty.

"Count VIII, attempted mail fraud: Guilty.

"Count IX, money laundering: Guilty.

"Count X, making false statements to a bank: Guilty.

"Count XI, passport fraud: Guilty.

"Count XII, making false statements to a bank:

Guilty.

"Count XIII, passport fraud: Guilty.

"Count XIV, making false statements to a bank: Guilty."

In other words, the jury has answered "Guilty" to all 14 counts.

I can hold it up.

We will obviously publish it to you folks on the docket. It's guilty for all 14 counts, Count I through Count XIV.

I have confirmed -- the last page, it says, "So say we all." I count 12 signatures for representing the -- all members of the jury. It's dated today's date, June 27th, 2024.

I'm now going -- so I confirmed that there are answers to each and every one of the 14 counts. There is a signature by each member of the jury, and it's dated today's date.

I'm going to hand the original jury verdict form to my courtroom deputy.

Members of the jury, I'm now going to poll the members of the jury.

Here's what we need to do: I'd like you to hand the microphone to the first juror, if you would, please.

And I'm just going to call out your name. When you hear your name, I would like you to stand up, and then I'd like you to just tell me "yes" or "no" to the question.

All right. So stand up. I'll call your name.

Ms. Roth, was this and is this your verdict?

JUROR ROTH: Yes.

THE COURT: Ms. Perkins, was this and is this your verdict?

JUROR PERKINS: Yes.

THE COURT: Mr. Montana -- I'm sorry, folks -- was this and is this your verdict?

JUROR MONTANA: Yes.

THE COURT: Ms. Gramer, was this and is this your verdict?

JUROR GRAMER: Yes.

THE COURT: Ms. Landry, was this and is this your verdict?

JUROR LANDRY: Yes.

THE COURT: Mr. Provan, was this and is this your verdict?

JUROR PROVAN: Yes, Your Honor.

THE COURT: Ms. McCaster, was this and is this your verdict?

JUROR McCASTER: Yes, Your Honor.

THE COURT: All right. So all seven people in the front row, you've all answered "yes"; is that right?

JURORS: Yes.

THE COURT: Okay.

All right. So let's go to the back row.

Mr. Lehet, was this and is this your verdict?

FOREPERSON LEHET: Yes.

THE COURT: Ms. Bell, was this and is this your verdict?

JUROR BELL: Yes.

THE COURT: Mr. Zambrano, was this and is this your verdict?

JUROR ZAMBRANO: Yes, Your Honor.

THE COURT: Ms. Cardiff, was this and is this your verdict?

JUROR CARDIFF: Yes.

THE COURT: And finally, Mr. Kramer, was this and is this your verdict?

JUROR KRAMER: Yes.

THE COURT: All right. So I've answered -- gotten answers from all 12 of you.

All right. I've polled all members of the jury. All 12 people of the jury have said "yes."

The Court finds that the verdict is unanimous.

Again, I've handed the original verdict form to my courtroom deputy for filing.

Counsel, is there anything else that we need to do before we dismiss the jury?

MS. NUTINI: No, Your Honor.

MR. CARLSON: No, Your Honor.

THE COURT: All right. Members of the jury, you have now completed your jury service.

Thank you for serving on the jury.

Let me say that again.

Thank you for serving on the jury.

You know, as I said the other day -- this is your third week of being in this building, right? You came here, what, a week and a half ago on that Friday to fill out the jury verdict form -- excuse me -- I said the wrong thing again. I keep doing that for some reason -- the jury questionnaire. You didn't fill out the verdict form when you came in; you filled out the jury questionnaire on that Friday. You came in for jury selection. You heard several days of testimony. You spent a lot of time getting to know each other and getting to know the courtroom and the procedure.

We really appreciate you doing that. You know, as I said before during jury selection, none of you live across the street. A lot of you live pretty far, and it was not easy being here at 9:00 o'clock in the morning. I know what it's like to be in downtown Chicago this early in the morning. It's not easy for all of you. You've got to take public transit or fight the crowds or whatnot. And it's not easy getting home, either.

But you all did it. Each and every day, you were on

time, you were attentive, you brought good spirit into the courtroom.

Thank you genuinely, everybody, for doing that. And I hope you know we mean that.

You know, it's because of people like you that we can offer the system of justice for everybody.

So thank you for your service.

I'll simply say this: Some of you have served your country before, some of you will serve your country again, all of you have served your country now. All of you have served your country now. I hope you feel pride that you've served your country by serving on the jury, folks.

So here's what we're going to do: I'm going to ask the court security officer to take you into the jury deliberation room. I just need you to wait there for a couple minutes. I'm going to come back. I have certificates to give each one of you. I know it's not a lot, but it's a way for us to say thank you on behalf of the court that you served as a juror.

It's a little memento from government-issued paper, but it's a way of just expressing our sincere thanks for the time that you've devoted to this process.

Okay, folks?

So if you'd be kind enough to go with the court security officer, I'll be back there in a few minutes to

distribute the certificates.

Thank you, folks, for serving on the jury.

THE COURT SECURITY OFFICER: All --

THE COURT: You're dismissed.

THE COURT SECURITY OFFICER: -- rise.

(Jury out at 1:40 p.m.)

THE COURT: All right, folks. Ms. Ramos will put the verdict form on the docket.

We've got a couple things to do now. There is a Rule 29 motion pending. I have not ruled on it. I took it under advisement.

I do think I want more information from the government on the Foster issue. So at the very least, I'd like you to summarize your view of the evidence on that issue.

I think it's Count V, Mr. Carlson. Is that right, sir?

MR. CARLSON: That's correct.

THE COURT: So I'd like just to get a summary from the government about why you think the evidence is sufficient on that. And that's not suggestive, so don't anybody read anything into what I'm saying, but I think it would be helpful to me if you would be kind enough to do that.

And I'll give you whatever time you need. And we'll give Mr. Carlson whatever time he wants to respond.

So --

MS. NUTINI: Yes, Your Honor.

Now? Are you ready now?

THE COURT: So you can do it now, or do you want to do it in writing?

MS. NUTINI: Your Honor, we're fine to provide some information now for --

THE COURT: Okay. Go ahead.

MS. NUTINI: Your Honor, Gary Foster is the victim we charged in Count V, the wire fraud charge with respect to Mr. Foster. The evidence presented at trial was presented through primarily Special Agent Mansker and Special Agent Kadonsky. And the evidence presented included the bank records showing that a wire transfer was made from Total Soil Solutions to an account belonging -- account we attributed to the defendant.

And I -- I believe it was $7600, the amount of the wire transfer that went into that bank account. And there are records that the bank account received the wire transfer. There is also the Fedwire records showing that transfer.

Special Agent Mansker testified that Total Soil Solutions is a Foster Family business out of California, meaning it belongs to Gary Foster's family. Also, the address listed for Total Soil Solutions on the Fedwire is Gary Foster's personal home residence.

Addion- -- so that shows the wire transfer occurred.

With respect to why Mr. Foster wired the money to that account, Special Agent Kadonsky testified that Mr. Foster's name was recovered on several spreadsheets, that were those potential victim names and addresses of spreadsheets that the defendant used during the mail merge to merge those spreadsheets into the inheritance fraud letters.

And it's the government's view necessarily that that means Gary Foster was a victim of this case, and Gary Foster was an inheritance fraud victim who wired money to an account he otherwise knew nothing about this company and sent the money because he fell victim to an inheritance fraud scheme, like the other victims who testified during this trial.

THE COURT: Okay. Thank you.

So it's one wire of $7600?

MS. NUTINI: 7680 is the exact amount.

THE COURT: 7680.

MS. NUTINI: Yes.

THE COURT: And is there -- well, let me back up.

Mr. Foster obviously did not testify, right?

MS. NUTINI: That's correct.

THE COURT: All right. Is there any testimony in the record about any communications between Mr. Foster and the defendant?

MS. NUTINI: Not in the record, Your Honor.

THE COURT: Right. So we know that Foster or Foster's

company sent money to the defendant, and we know that Foster's name was listed in a spreadsheet that you view as a list of victims, basically.

Is that the gist of it?

MS. NUTINI: More than one spreadsheet, Your Honor.

THE COURT: More than one spreadsheet.

I think what would help me, if you would be kind enough to file on the docket just the list of exhibits that I should look at, because I would like to look at the exhibits.

I get what you're saying about bank records, but it would be helpful to me if you'd be kind enough to pin down which exhibits. And if the exhibits are bulky, if you could say, "Look at Exhibit, you know, 42, page, you know, 986," or whatever.

Do you see what I mean?

MS. NUTINI: Yes, Judge.

THE COURT: You know, I'll take a look at it.

I mean, in your view, is that enough to support a finding beyond a reasonable doubt that there was fraud, the fact that he was included in a spreadsheet with other names of alleged victims? That's basically the gist of it. Money was sent, and he is on a list of alleged victims. That's --

MS. NUTINI: Yes, Your Honor. Money was sent to a bank account that has no other legitimate purpose --

THE COURT: Okay.

MS. NUTINI: -- but to receive fraudulent funds from victims.

THE COURT: Okay. Well, I'd like to take a look at the exhibits, if you don't mind.

It's Kadonsky and Mansker's testimony.

Is there any other testimony that I need to look at from the trial or just those two?

MS. NUTINI: Just those two, Your Honor.

THE COURT: I'm not suggesting it's not sufficient. I just wanted to make sure I know the universe. I will definitely look at that.

And say again the name of the company. It's Soil . . .

MS. NUTINI: Total Soil Solutions.

THE COURT: Okay. Very good.

MS. NUTINI: That's the name of the company listed on the Fedwire.

THE COURT: Right. And the money went to which account?

MS. NUTINI: Berger Services Incorporated, which was registered by the defendant's ex-wife, Tonyanika Fogle.

THE COURT: Okay. Mr. Carlson, do you want to respond to that?

MR. CARLSON: Yes, Judge.

There is not only not any testimony from Gary Foster

as to why he sent the money, there is not an e-mail between any of the people involved in Gary Foster. There is not a letter. There is not an inheritance scam letter that is in evidence. There is not any of the e-mail threads that we saw with all the other victims. There isn't anything with respect to Gary Foster. All we can do is speculate about Gary Foster.

We don't even know from the record in this case whether Mr. Foster even knew who Mr. Ibekie was or why he believed he was sending the money. We don't have that. He didn't take the witness stand and say, "I was a victim. I received these letters. I relied on what was in these letters."

We don't have that. All the other people who testified, we had that, but not Gary Foster.

And with respect to the spreadsheets, yes, his name may have been on a spreadsheet, and so have -- were thousands of other people. Not every person on that spreadsheet is a victim. And the mere fact that his name is on the spreadsheet without more doesn't establish that it was used for any improper purpose.

And I think that what we had -- what we need in this case, if a conviction is going to stand, is some evidence that Mr. Foster was defrauded, and we just don't have that.

THE COURT: How many names are on the spreadsheet?

MS. NUTINI: Your Honor, I believe that Special Agent

Kadonsky testified there were thousands -- at least a thousand names on the spreadsheet.

THE COURT: And how many of those are victims?

MS. NUTINI: I can't speak to that right now.

THE COURT: Is it all of them or some of them?

MS. NUTINI: Only -- no, all of them are not victims. Some of them are potential victims.

THE COURT: Okay. So these are people who received a letter?

It's a spreadsheet of what? People who got letters?

MS. NUTINI: It's a spreadsheet of what was recovered on the defendant's devices. These are spreadsheets found on the defendant's devices.

THE COURT: Okay.

MS. NUTINI: And so they are spreadsheets of, presumably, potential victims. Some of them were actual victims, some of them who testified during this trial.

THE COURT: Is it a spreadsheet of people who received letters from the defendant? And is that supported by the record?

MS. NUTINI: Your Honor --

THE COURT: Do we know that everybody on the spreadsheet got a letter from the defendant?

MS. NUTINI: There -- I -- respectfully, there's no way to know that.

THE COURT: Okay.

MS. NUTINI: So I can't say that every single person on the spreadsheet received a letter.

THE COURT: Right. So there is a spreadsheet of a bunch of names.

It's over a thousand; is that --

MR. CARLSON: Yeah, Judge.

THE COURT: -- right?

So over a thou- -- you agree with that?

(Counsel conferring.)

MS. NUTINI: Yes, Your Honor, approximately a thousand.

THE COURT: Okay. And how many of those people are victims, meaning people who contributed money?

MS. NUTINI: Your Honor, we only -- it is somewhat time-consuming to search these spreadsheets. So the agents only searched the spreadsheets for the victims who were going to be testifying or mentioned during this trial.

As Your Honor may or may not be aware, there were numerous other victims of this case. We cabined the evidence presented at trial to the victims who were either charged in executions in Counts I through VIII or who were local victims who could appear.

THE COURT: Let me put it this way, too: Of the thousand or so names -- or more than a thousand names, how many

of them contributed to the defendant or the defendant's companies?

MS. NUTINI: Well -- and -- perhaps I'm not being clear.

The -- Dale Helms and Cong Le were two names that were found on the spreadsheets.

THE COURT: Right.

MS. NUTINI: Those were victims who testified that -- I instructed the agents to look for those names.

THE COURT: Right.

MS. NUTINI: With respect to other victims of the inheritance fraud scheme, we did not direct the agents to search for those names since they were not victims being addressed during the trial phase. It's very likely something we would provide to Your Honor for the sentencing phase, but because we were only talking, we didn't want to introduce evidence that the jury wasn't going to have knowledge of --

THE COURT: Right.

MS. NUTINI: -- because these weren't victims who were going to be referenced.

THE COURT: I mean, do we know -- let me back up.

And bear with me if I'm repeating myself.

But do we know for sure that everybody on the spreadsheet got a letter from the defendant?

MS. NUTINI: Your Honor, there is not a way to know

that --

THE COURT: Yeah. And --

MS. NUTINI: -- whether everyone actually received a letter. There's not a way for the government to know that.

THE COURT: Okay. How many people on the spreadsheet sent money to the defendant? Do we know?

I know Cong Le did, according to the jury, and Mr. Helms did. But how many others?

MS. NUTINI: Again, Your Honor, that's not something we have searched for because we cabined the search of these spreadsheets to victims who were testifying.

THE COURT: Right.

MS. NUTINI: So I can speak to the victims who testified during this trial. It was Cong Le, Dale Helms --

THE COURT: Right.

MS. NUTINI: -- and Gary Foster, who, obviously, didn't testify, but he was referenced.

THE COURT: Here's the issue I'm having -- and don't anybody read anything into that word.

Here's the question I'm going after: The government wants to support an inference of fraud based on the fact that this person's name appears on the spreadsheet. And it leads me to wonder, how strong is that inference? Is it strong enough to support a verdict beyond a reasonable doubt? Is there anybody's name on there, meaning on that spreadsheet, who

didn't get a letter? Is there anybody on that -- anybody's name on that spreadsheet who didn't contribute money? Is the spreadsheet overinclusive? Does it include people who didn't get a letter or didn't contribute money, you know, *et cetera*?

MS. NUTINI: Your Honor, it certainly does include people who didn't contribute money.

The point of this scheme was to send letters --

THE COURT: Right.

MS. NUTINI: -- in bulk and only -- you know, it's a funnel effect. Only --

THE COURT: Right.

MS. NUTINI: -- certain people responded.

However, I would point Your Honor to the fact that -- this -- I believe defense counsel used the word "speculation." It's not speculation. This is an inference we're talking about. It's a reasonable inference.

And the standard that Your Honor must view is the -- viewing the light -- viewing the evidence in the light most favorable to the prosecution for Rule 29.

And the defendant must convince the Court that even in that light, no rational trier of fact could have found him guilty beyond a reasonable doubt. It's a significant burden for defense counsel or for the defendant to overcome.

THE COURT: All right. So why don't we do this: I'm going to take a close look at the spreadsheets and any other

exhibits that you think supports the finding.

What would help me is if the government, by the end of the day tomorrow, could just file a page or two that just identifies the exhibits. You can probably do it in a couple sentences.

Is that okay? Do you mind doing that?

MS. NUTINI: It is, Your Honor.

I just want to be --

THE COURT: Yeah.

MS. NUTINI: I just want to clarify something --

THE COURT: Yeah.

MS. NUTINI: -- on the spreadsheets.

THE COURT: Sure.

MS. NUTINI: There was only one spreadsheet introduced as an exhibit at trial.

THE COURT: Okay.

MS. NUTINI: And that was for, again, sort of like the cumulative effect of showing the jury a bunch of spreadsheets.

I can confirm this: I don't believe it's the spreadsheet that has Gary Foster's name on it.

THE COURT: Okay.

MS. NUTINI: So I can point Your Honor to that spreadsheet and say there's something similar for Gary Foster in my filing, but it's not going to be the exhibit that was introduced during trial.

THE COURT: Well, here's what I'm getting at: I need to see if the record that the jury heard supports the jury's finding.

So I need -- I need citations to any exhibits in the record that make reference to Foster. Whatever it is, it is. If it's a spreadsheet that's not in the record, it's not going to carry me very far unless there's some independent, you know, testimony or something else that supports the verdict, right?

So if there is just some spreadsheet out there the jury never saw, I don't know that that's going to get you very far.

MS. NUTINI: Well, Your Honor, the way the testimony came in -- Special Agent Kadonsky testified about the exhibit, 900-something. I can't remember the exact number. I asked him a question to the effect of "Were there other spreadsheets recovered on these devices?

"Yes.

"And did you search those spreadsheets for victim names that have come up during this trial?

"Yes."

THE COURT: Right.

MS. NUTINI: "And what were those names?"

He said, "Gary Foster, Dale Helms, and Cong Le."

THE COURT: Right.

MS. NUTINI: So that's the record, Your Honor, would

be the testimony from Special Agent --

THE COURT: Okay.

MS. NUTINI: -- Kadonsky.

THE COURT: So here's -- here's what I would like to do: I will read the testimony very carefully. I would like the government, by the end of the day tomorrow, to file something -- a paragraph is fine -- that just says, "Judge, please look at these exhibits. As you think about the Foster issue, look at these exhibits. These are the exhibits that contain any evidence" -- or "that contain the evidence that supports the Foster's" -- "the Foster-related crime," meaning Count V.

And maybe it's just a couple of exhibits, and maybe it's more than that. But I want to make sure I have everything. I don't want to issue a ruling on it until I'm sure that I have all of the exhibits. All right?

And don't anybody read anything into my questions one way or the other. I just want to make sure that I know the evidentiary lay of the land. I know which transcripts to read. I want to make sure that I know all of the exhibits to read. And I'll just give you my best ruling on that. Okay?

MS. NUTINI: Okay.

THE COURT: Does that make sense?

Does anybody want to submit anything else in writing on the Rule 29 motion?

You can. I'd give you the opportunity to do it, if you'd like to do it. You don't have to do it. If you want to just rest on oral argument, that's fine.

Does anybody want an opportunity to submit any additional --

MR. CARLSON: No, Your Honor.

MS. NUTINI: Your Honor, we will submit the filing you just referenced, but otherwise, no.

THE COURT: Okay. Here's what I would say: If you -- if you change your mind on that, I'll give you until January -- excuse me -- January? -- July 10th.

Is that Wednesday, July 10th?

So I'm not going to put you on the spot right now. I don't expect that I'd issue a ruling on that issue before then anyway.

So if anybody wants to submit anything, you've got until Wednesday, July 10th.

That's not suggestive, folks. You don't have to submit anything. But if between now and then you think, "Boy, I think the judge ought to know this or ought to think about this," you can do it.

Is that fair, everybody?

MR. CARLSON: Fine, Judge.

THE COURT: So I won't be disappointed if you don't file anything. If you have anything you want to say, I'll read

it and I'll listen to you. All right? So it's an opportunity, not an obligation.

All right? Is that fair?

MS. NUTINI: Yes, Your Honor.

THE COURT: I mean, you don't have to file anything, but I'll give you a chance if you want. Okay?

MR. CARLSON: Thank you, Judge.

THE COURT: All right. So is there anything else that you all want to say before we end?

MS. NUTINI: We'd like to get a sentencing date scheduled, Your Honor.

THE COURT: Yep. And Ms. Ramos has got that in the works. We'll put it on our minute order.

And here it goes.

THE CLERK: The sentencing will be set September 19, 2024, at 1:30. The PSR will be due August 15, 2024. Any objections to the PSR will be due September 5th, 2024, and any responses will be due September 12, 2024.

THE COURT: Do those dates work for everybody?

MS. NUTINI: Yes, Your Honor.

MR. CARLSON: Judge, they should work. And the reason I say that is -- and I say this in conjunction with the next request I was going to make, which is an extension of time to file post-trial motions.

I'm scheduled to have back-to-back cataract surgery.

And so assuming everything goes well and there aren't any problems, those dates will work fine.

THE COURT: That's perfectly reasonable, Mr. Carlson.

Good luck with your surgery.

MR. CARLSON: Thank you.

THE COURT: I didn't know about that. You'll get whatever time you need. All right?

So just -- here's what I'd like you to do: If you need an issue -- I'm sorry. If you need more time, you don't have to even file a motion. Just let the government know, and just e-mail Ms. Ramos and copy the government's counsel and just say, "Because of my surgery, I need more time," and you'll get it. Okay.

MR. CARLSON: That's fine, Judge.

THE COURT: You don't have to file a motion.

Go ahead.

MR. CARLSON: I need to make a request for an extension of time for post-trial motions within the time.

THE COURT: Yes.

MR. CARLSON: I would ask for 45 days to be able to do that, Judge.

THE COURT: Okay. 45 days from today?

MR. CARLSON: Yes.

THE COURT: So post-trial motions would be due 45 days from today?

MR. CARLSON: Yes.

THE COURT: All right. Any issue with that from the government?

MS. NUTINI: No, Your Honor.

THE COURT: So I'll go ahead and give you that. So let's look on the docket.

THE CLERK: August 12th.

THE COURT: Does August 12th work for you?

MR. CARLSON: Fine.

THE COURT: All right. So post-trial motions will be due August 12th.

Does that work for you, Mr. Carlson?

MR. CARLSON: Great. Thank you, Judge.

THE COURT: What else from the government?

MS. NUTINI: Nothing further.

THE COURT: Okay. Mr. Carlson, anything else?

MR. CARLSON: Nothing further, Judge.

THE COURT: All right. Let me say just a couple quick things before we close.

I want to say thank you again to the lawyers for how you conducted yourselves throughout the trial. I very much appreciated your professionalism, your high-caliber performance. I think all three of you did just a really terrific job for your clients. And I don't throw that around in every case, I'll tell you that. But I was impressed with

all of your examinations.

Thank you for being courteous and well prepared and cooperative.

I joked yesterday that I think I'm going to order all three of you to try a case in front of me once a year.

I just wanted to say again how much I appreciated each and every one of you being in the courtroom because it was a pleasure to have you here. It was just a very smooth, well-run trial on both sides, you know, the government and defense counsel. So thank you for your professionalism throughout the trial. It was enjoyable for me to try the case with you.

And to Mr. Ibekie: Sir, we're going to have sentencing in a couple of months.

THE DEFENDANT: Yes, Your Honor.

THE COURT: If you're wondering why it takes a couple of months, it's a good thing, not a bad thing. You don't want me sentencing you tomorrow. You want to make sure that I have the chance to get information from probation, learn more about you.

I know a fair bit about you, but I'm about to learn a lot more. And I need to learn more, Mr. Ibekie, before I sentence you.

And I've got to give your lawyer an opportunity to gather information, make the best arguments he can for you. And I've got to give the government the same courtesy. And

then we'll come back in a couple of months, and I'll make the best decision I can based on the facts and the law. Okay?

THE DEFENDANT: Okay, Your Honor.

THE COURT: Here's what I would say, Mr. Ibekie: You are now awaiting sentencing. You should be a model citizen between now and then. Don't give anybody any hard time in the MCC, I'm telling you. That's not a résumé builder with me. Things should be going smoothly between now and then, smoothly. You should be as polite and gentile and agreeable as you can possibly be between now and then. I don't want to hear any hiccups. All right? So go nice and smooth. That's how you should be conducting yourself. Be a model citizen over there.

And we'll look forward to seeing you at sentencing. Okay, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Very good.

Anything else from anybody?

MR. CARLSON: No, Your Honor.

MS. NUTINI: No, Your Honor. Thank you.

THE COURT: All right. So the jury is back there awaiting the receipt of the certificates, so I want to do that.

Thank you, everyone, for trial. We'll see you down the road.

Thank you, folks.

THE CLERK: All rise.

(Adjourned at 2:01 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Amy M. Kleynhans* ____________ *5/27/2025* _
Amy M. Kleynhans, CSR, RPR, CRR Date
Official Court Reporter